```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA

***************************************************************
UNITED STATES OF AMERICA

                         Criminal Action No. 22-2
VS.                      Section "G"
                         New Orleans, Louisiana
                         November 14, 2022

ERNESTINE ANDERSON-TRAHAN
***************************************************************
```

                      TRANSCRIPT OF JURY TRIAL
           HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
                 UNITED STATES CHIEF DISTRICT JUDGE
                            VOLUME I




<u>APPEARANCES:</u>

FOR THE GOVERNMENT:          Brian Eugene Flanagan
                             DOJ-Tax
                             150 M Street NE
                             Suite 1.405
                             Washington, DC 20004

                             Marissa R. Brodney
                             Michael C. Boteler
                             DOJ-Tax
                             Tax Division, SCES
                             150 M Street NE
                             Washington, DC 20002




FOR THE DEFENDANT:           Michael William Magner
                             Thomas C. Wicker, IV
                             Jones Walker
                             Place St. Charles
                             201 St. Charles Ave.
                             Suite 5100
                             New Orleans, LA 70170

# OFFICIAL TRANSCRIPT

```
ALSO PRESENT:                      Judge Ernestine Anderson-Trahan
                                   Kim Better
                                   Aaron Washington
                                   Timothy Moore
                                   Dewaiyne Horner
```

```
Official Court Reporter:          Nichelle N. Wheeler, RMR, CRR
                                  500 Poydras Street, B-275
                                  New Orleans, Louisiana 70130
                                  (504) 589-7775
```

```
      Proceedings recorded by mechanical stenography,
transcript produced via computer.
```

**OFFICIAL TRANSCRIPT**

I N D E X

|                              | Page |
|------------------------------|------|
| VOIR DIRE                    | 14   |
| OPENING STATEMENTS           | 133  |

E X A M I N A T I O N S

| **Witness**                                      | **Page** |
|--------------------------------------------------|----------|
| DEVIN GEORGE                                     |          |
|    DIRECT EXAMINATION BY MR. FLANAGAN   | 160 |
|    CROSS-EXAMINATION BY MR. MAGNER     | 179 |
|    REDIRECT EXAMINATION BY MR. FLANAGAN | 184 |
| CHRISTINA DUGAS                                  |          |
|    DIRECT EXAMINATION BY MR. FLANAGAN   | 187 |
|    CROSS-EXAMINATION BY MR. WICK       | 191 |
|    REDIRECT EXAMINATION BY MR. FLANAGAN | 193 |
| LISA HIBBS                                        |          |
|    DIRECT EXAMINATION BY MR. WICK      | 194 |
|    CROSS-EXAMINATION BY MR. WICK       | 215 |
|    REDIRECT EXAMINATION BY MR. BOTELER  | 225 |
| TAMARA GRIFFIN-MAJOR                             |          |
|    DIRECT EXAMINATION BY MR. FLANAGAN   | 233 |

1                     **P R O C E E D I N G S**

2                  (Call to order of the court.)

3          THE COURT:  Good morning.

4          ALL:  Good morning.

5          THE CASE MANAGER:  Counsel, make your appearances.

6          THE COURT:  Did you say the case?

7          THE CASE MANAGER:  I'm sorry, Judge.

8          THE COURT:  That's okay.

9          THE CASE MANAGER:  Criminal Action No. 22-2, *USA v.*

10   *Ernestine Anderson-Trahan.*

11          THE COURT:  Make your appearances.

12          MR. FLANAGAN:  Good morning, Your Honor, Brian

13   Flanagan for the Government --

14          THE COURT:  Good morning.

15          MR. FLANAGAN:  -- Department of Justice Tax Division.

16          Would you like me to introduce my co-counsel or would

17   you like them to introduce themselves?

18          THE COURT:  Yes, for the record.

19          Well, they can introduce themselves, whichever is

20   easier.

21          MS. BRODNEY:  Good morning, Your Honor, Marissa

22   Brodney on behalf of the United States.

23          THE COURT:  Good morning.

24          MS. BETTER:  Good morning, Kim Better.

25          THE COURT:  Good morning.

1          MR. BOTELER:  And, good morning, Your Honor, Michael

2     Boteler on behalf of the United States.

3          THE COURT:  Good morning.

4          MR. MAGNER:  Good morning, Your Honor, Mike Magner on

5     behalf of the defendant, Ernestine Anderson-Trahan, who is

6     present in court.

7          THE COURT:  Good morning.

8          MR. WICKER:  Good morning, Your Honor, T.C. Wicker on

9     behalf of the Defendant.

10          MR. MAGNER:  And with us is Aaron Washington.  He

11     will be assisting us with the IT presentation.

12          THE COURT:  Okay.  Thank you.

13          So I understand you have some preliminary matters to

14     discuss with the court before I bring the jury up.

15          MR. FLANAGAN:  Yes, Your Honor.  Just to bring to the

16     Court's attention we do have sitting right now Special Agent

17     Timothy Moore and Special Agent Dewaiyne Horner.  They're

18     case agents.  We don't expect them to testify, but they're

19     present in the well.

20          We do expect a revenue agent to observe the hearing.

21     Special Agent David Carrone is on our witness list.  He's a

22     summary witness.

23          THE COURT:  Okay.  So you got to give me the

24     authority for this.  I have never heard of a summary witness.

25     That's for the jury to do.

1          MR. FLANAGAN:  Yes, Your Honor.  So a summary witness

2     is authorized under the Federal Rules of Evidence to

3     testify --

4          THE COURT:  Wait.  Which rule?  Which rule of

5     evidence?

6          I've heard of summary evidence.  I think the

7     defendant has some summary evidence, but I've never heard of

8     a summary witness.  So give me the rule.

9          MR. FLANAGAN:  The witness -- it's the same rule as

10    summary evidence, Your Honor.  The witness is permitted --

11         THE COURT:  And the rule is what, 1006?  What is it?

12         MR. FLANAGAN:  Yes, 1006.

13         THE COURT:  Okay.  Keep talking.

14         MR. FLANAGAN:  And in accordance with the rules,

15    we've notified the Court.  We've notified the defense about

16    this witness.

17         THE COURT:  You notified the Court this morning.  And

18    summary evidence you're supposed to disclose at the pretrial

19    conference.  I even asked you about that so we knew summary

20    evidence.  I didn't know anything about a summary witness.

21         MR. MAGNER:  And so, Judge, I do have a problem.  I

22    was not aware that the two case agents would be here, but I

23    would object to another government witness, you know, sitting

24    through the trial.

25         THE COURT:  Yeah.  What is the purpose?  Is this

1    person going to testify?  They're not an expert.

2         1006.

3         And this is the first time you mentioned this for

4    some reason.

5         MR. FLANAGAN:  No, Your Honor.  So the Government has

6    provided notice to counsel about this witness.  The

7    Government has provided the summary exhibits the witness

8    would testify to and lay foundation for and introduce into

9    the court.

10         THE COURT:  Where is it?  Was this in your updated

11    list or the list you provided to me --

12         MR. FLANAGAN:  Originally provided to you.

13         THE COURT:  Which exhibit is it?

14         MR. FLANAGAN:  They are currently Exhibits 87

15    through 92.  I'll double check that for the Court.

16         But understanding one counsel, one cause, I was not

17    prepared to brief this issue, so I would ask that the Court

18    indulge me and let my co-counsel, Mike Boteler, address this

19    issue.

20         THE COURT:  Okay.

21         MR. BOTELER:  One moment.

22         THE COURT:  You're going to pull 1006, the rule,

23    because it's not in my binder for whatever reason.  Not the

24    binder you prepared, but my bench book.

25         Yes.

1          MR. BOTELER:  Thank you, Your Honor.

2          I just -- I think there may have been a little

3    miscommunication in the sense of we do have a revenue agent

4    who we did provide summary evidence and charts to and some of

5    the summary charts are based on assumptions of what will come

6    into evidence.  The jury could hear those assumptions, and

7    based upon their knowledge of what the witnesses hear can

8    make those calls.  So, for instance, the main thing is -- the

9    tax comps and on the tax comps he just said the cost of the

10   wedding was $80 and that was the assumption he made.

11         THE COURT:  Then --

12         MR. BOTELER:  He doesn't necessarily have to be in

13   the courtroom, Your Honor, if that's --

14         THE COURT:  Is that your objection, Counsel?

15         MR. MAGNER:  That is my objection, Judge.

16         THE COURT:  So I'm not going to allow him in the

17   courtroom.

18         MR. BOTELER:  Thank you, Your Honor.

19         THE COURT:  He provided a summary exhibit.

20         MR. BOTELER:  Yes, he did.

21         THE COURT:  And, Counsel, Mr. Magner, you've seen

22   that and you've been provided with the information that

23   supports this summary?

24         MR. MAGNER:  I have been provided the summary charts.

25   I assume that Mr. Carrone will lay a foundation for them and

1   testify about them.  My objection is having three government

2   folks here.

3          THE COURT:  I agree with you.  So his objection is

4   sustained.

5          MR. BOTELER:  Thank you, Your Honor.

6          THE COURT:  So he can come in and testify when he

7   presents the summary evidence.  That's correct.

8          MR. BOTELER:  Thank you, Your Honor.

9          THE COURT:  All right.  Is there anything else?

10          MR. FLANAGAN:  There was a stipulation of fact that

11   was signed this morning, Your Honor, I wanted to bring to the

12   court's attention.

13          THE COURT:  And you would like me to read that to the

14   jury?

15          MR. FLANAGAN:  Yes, Your Honor.

16          THE COURT:  If you would offer it into evidence and

17   give it to the court.

18          When would you like me to read it?  Right after

19   opening or before opening?

20          MR. FLANAGAN:  No, Your Honor.  We would ask that you

21   read this -- we would call certain witnesses and then read

22   this stip and then present additional evidence.

23          THE COURT:  I've never done it that way.  Stipulated

24   facts, I tell the jury -- you know, either you can make your

25   opening statements and tell them what you're going to show

1    and then I read stipulated facts because, you know, I give

2    you some indulgence in a criminal trial, but in a civil

3    trial, we just don't go over stipulated facts anymore and I

4    don't want witnesses talking about stipulated facts.  I'll

5    give you some leeway, but, you know --

6            MR. FLANAGAN:  Then after opening, Your Honor.

7            THE COURT:  Okay.  And I need a copy of it.

8            MR. FLANAGAN:  Providing a copy to the court.

9            THE COURT:  Uh-huh.

10           MR. FLANAGAN:  I'm providing the original.  Excuse

11   me, Your Honor.

12           THE COURT:  If that's the original, we need to put it

13   into evidence.

14           And then you want to try to make me a copy?

15           THE CASE MANAGER:  Yes.

16           THE COURT:  All right.  Anything else?  Anything

17   else, Counsel?

18           MR. FLANAGAN:  Just to clarify, that won't be a

19   government exhibit for numbering purposes.  That's just a --

20           THE COURT:  Okay.  Sure.

21           MR. FLANAGAN:  -- stipulation of fact.

22           THE COURT:  This is by both parties.  You're okay

23   with that?

24           MR. MAGNER:  Yes.

25           THE COURT:  Just a few housekeeping things, something

**OFFICIAL TRANSCRIPT**

1    that's come up, so today we're going to stop at 3:15.  I

2    apologize.  I have to sit in on a meeting with the Fifth

3    Circuit judicial council that starts and it's important for

4    some administrative matters and the court.  So I didn't

5    leave.  I wasn't there.  But they did ask that -- the chief

6    did ask that I participate.  So we will leave at -- I mean,

7    so we will end at 3:15 and then resume tomorrow morning.

8              MR. MAGNER:  Judge, in terms of scheduling, I heard

9    from some of my partners who may have a case next week or the

10   week after or something like that, I think we're reasonably

11   certain that we're going to finish the case this week.  So in

12   terms of telling the venire, you know, how long the trial's

13   going to be, I would be shocked if it would go past --

14             THE COURT:  I plan to tell them three or four days

15   because they have to deliberate.

16             MR. MAGNER:  Yes.

17             THE COURT:  And I will tell them that in case there's

18   something extraordinary going on, you know, in their lives

19   they won't be able to be there.

20             MR. MAGNER:  Thank you.

21             THE COURT:  Is there anything else?

22             MR. FLANAGAN:  Nothing from the Government.

23             MR. MAGNER:  Nothing from the Defense.

24             THE COURT:  I just want to, you know, tell you, if --

25   you know, I want the trial to move on as expeditiously and

1    efficiently as possible.  But as judges, sometimes we get

2    caught up in that.  So don't hesitate to just ask, you know,

3    if you need a break, if I'm -- I will tell the jury the same

4    thing.  I know this is -- you know, these are very important

5    and critical and maybe at times emotional testimony and

6    evidence so, you know, either try to get my attention or get,

7    you know, my case manager's attention and I'm happy to do

8    that.

9          You know, I'm pretty structured in the morning.  On a

10   regular trial day, we'll have at least two small breaks and

11   they will tend to be around the same time.  But, you know,

12   I'll ask the jury too, sometimes you have people who have

13   issues and I need to take more breaks than that, but I wanted

14   to be sure that I told counsel the same thing.

15         MR. MAGNER:  Judge, I'm sorry.  There is one thing

16   that I just realized.  I don't think we discussed at the

17   pretrial conference how many alternates the court is inclined

18   to seat.

19         THE COURT:  I thought we said two.

20         MR. MAGNER:  Did we say two?

21         MR. BOTELER:  That would be the government's request

22   to be two.

23         THE COURT:  We have one?  Is that what I said in the

24   pretrial?

25         MR. MAGNER:  (Nods head.)

```
 1            THE COURT:  We said one, but what is it?  Two?
 2            MR. BOTELER:  I usually request two, Your Honor, but
 3    if one is --
 4            MR. MAGNER:  I would ask for two.  I'm a pessimist
 5    and with all the COVID and flu going around --
 6            THE COURT:  Are we good with that?  Do we need three?
 7            MR. BOTELER:  I think two would be sufficient, Your
 8    Honor.
 9            THE COURT:  You agree as well?
10            MR. MAGNER:  Yeah.
11            THE COURT:  And sometimes traffic, I try to wait, but
12    a lot of things happen in a week.
13            Okay.  So we'll pick 12, Ms. White, and two
14    alternates.  We will just amend that.
15            And you remember you have 30 minutes each for
16    opening.  That's still sufficient?
17            MS. BRODNEY:  Yes, Your Honor.
18            MR. BOTELER:  Yes, Your Honor.
19            THE COURT:  That's still sufficient, Counsel?
20            MR. MAGNER:  Yes.
21            THE COURT:  All right.  If there's nothing further,
22    I'll go step out while they bring up the jury, the venire.
23            THE CASE MANAGER:  All rise.
24                        (Recess taken.)
25                        (In open court.)
```

**OFFICIAL TRANSCRIPT**

<u>VOIR DIRE</u>

1
2   (Prospective jurors seated.)

3       THE COURT:  Criminal Action 22-2, *United States of*

4   *America v. Ernestine Anderson-Trahan.*

5       Counsel, please make your appearances.

6       THE COURT:  You all can have a seat while counsel

7   make their appearances.

8       MR. FLANAGAN:  Good morning, Brian Flanagan for the

9   United States.

10      MS. BRODNEY:  Good morning, Marissa Brodney on behalf

11  of the United States.

12      MR. BOTELER:  And good morning, Michael Boteler on

13  behalf of the United States.

14      MS. BETTER:  Kim Better, paralegal.

15      MR. MAGNER:  Good morning, ladies and gentlemen.  I'm

16  Mike Magner and I'm honored to represent Ernestine "Teena"

17  Trahan.  With me is my colleague T.C. Wicker and Aaron

18  Washington will be helping us with the IT presentation.

19      Good morning.

20      THE COURT:  First, I want to thank you all for being

21  here.  While jury service takes you away from your daily

22  obligations, it is fundamental to our justice system for

23  citizens to participate as jurors.  Other than voting, being

24  a juror is the most important duty of a citizen in our

25  democracy.

1        As jurors, you act as citizen judges in a matter of

2   grave concern to your fellow citizens.  So, again, I want to

3   thank you for being here and for fulfilling this very

4   important obligation.

5        Ladies and gentlemen, we'll now have what is known as

6   the *voir dire* examination.  This is a criminal case in which

7   the United States Government has brought certain charges

8   against the Defendant, Ms. Ernestine Anderson-Trahan.  Both

9   the Government and the Defendant have a right to have this

10  case tried by qualified fair and impartial jurors.

11       A qualified and impartial jury is one that is

12  responsible and capable.  It is one that will without fear,

13  favor, bias, prejudice, sympathy, or passion herein decide

14  the issues to be tried objectively.  It is a jury that will

15  render its verdict based solely on the evidence presented at

16  this trial and the law applicable to the case as given to you

17  by the court.  And when I say "the Court" I'm talking about

18  myself, the judge.

19       It is the law that the Court cannot just assume that

20  a juror is qualified and impartial.  Instead, we make an

21  inquiry known as the *voir dire* examination to determine the

22  qualifications and impartiality of prospective jurors.  The

23  purpose of the questions that I will ask you is to develop

24  the whole truth concerning the competency of each prospective

25  juror, his or her frame of mind, and ability to do his or her

1  sworn duty to follow the jury's oath.  Your answers will

2  enable me to determine whether any of you should be excused

3  for cause and will also allow counsel for the parties to make

4  intelligent use of peremptory challenges.  Those are

5  challenges the law gives the parties that may be exercised

6  without assigning any reason.

7       Your answers to the questions I ask must be complete

8  and truthful.  You're required to disclose in answering a

9  general question any matters that might tend to disqualify

10 you for any reason from sitting on this case.  If you give

11 false or misleading answers, this can result in the seating

12 of a juror who might have been discharged by the court for

13 cause or stricken through the exercise of peremptory

14 challenge and could result in a miscarriage of justice.  So

15 I'm ordering you to listen carefully to the questions being

16 asked and answer them accurately and completely to the best

17 of your ability.

18      Although I'm going to ask these questions to all of

19 you collectively, you should consider them as though directed

20 to each of you individually, to be answered by each of you

21 individually.  If any of your answers to any of the following

22 questions is "yes," please raise your hand, state your juror

23 number and name, and I'll call you up to the bench.  And one

24 member from the government and -- one lawyer from the

25 government and one lawyer from the defense team will approach

**OFFICIAL TRANSCRIPT**

1    the bench with you and we can follow-up and get the details.

2    Because I want you to be truthful and I don't want you to

3    feel -- some of the questions can be very personal, so I

4    don't want you to be embarrassed about, you know, telling us

5    everything about a particular situation or it's not even

6    embarrassment.  I think it's a lot easier to just come up

7    here when you have a specific situation to explain.

8         If you feel that the response to any of the questions

9    that I'm going to ask you is of a personal nature, as I said,

10   feel free to approach the bench and discuss the matter

11   directly.  But that's what I was just telling you.

12        I give that to everyone so that there's no sign of

13   whether or not it's particularly personal to you.  If you

14   raise your hand I'll bring you up to the bench and we'll talk

15   about it, because we'll take as much time as we need to get

16   through these questions.  It's a very, very important part of

17   the process.

18        We are here for a criminal trial in the matter of

19   *United States of America v. Ernestine Anderson-Trahan*.  This

20   case is before the court by reason of a superseding

21   indictment found by the grand jury.  The superseding

22   indictment is only a charge.  It is the means or vehicle by

23   which the government accuses the defendant of having

24   committed a crime.  In other words, it is used to tell the

25   defendant what the government claims that she did.  It's not

1    evidence of guilt.  No inferences of guilt may be drawn by

2    the jury from the mere fact that the government has charged

3    the defendant.

4         In this case, by means of the superseding indictment,

5    the government has charged Ms. Anderson-Trahan with willfully

6    filing false tax returns in violation of Title 26, United

7    States Code, Sections 7206(1).  As I have told you

8    previously, the superseding indictment is not evidence of

9    guilt.  The defendant has pleaded not guilty to the charges

10   set out in the superseding indictment.  The not guilty plea

11   raises fact issues to be tried by a jury.

12        The law requires you to presume that the defendant is

13   innocent.  That presumption of innocence shall continue

14   throughout the trial unless and until after deliberations the

15   jury is convinced from the evidence adduced at this trial

16   that the guilt of the defendant is established beyond a

17   reasonable doubt.

18        The government has the burden to prove the guilt of

19   the defendant beyond a reasonable doubt.  This means that the

20   government must prove beyond a reasonable doubt every

21   essential element of an offense charged before there can be

22   any conviction on that offense.  The defendant is not

23   required to prove her innocence or offer any evidence.

24        The defendant is also not required to testify at

25   trial.  While you may think that a defendant who is not

1  guilty would want to tell her side of the story, it is not

2  necessary that she do so.  The defendant does not need to

3  tell her side of the story and does not even need to have a

4  story.  If the defendant does not testify, you are not to

5  consider her failure to testify in any way in determining

6  whether she is guilty.  For instance, you may say, "I wasn't

7  sure whether she was guilty, but I think the fact that she

8  did not testify means that she is guilty."  That's

9  inappropriate.  It's not allowable.

10      Conversely, you may not infer that a defendant is

11  guilty because she elected to take the stand and testify.

12  You're not to take that into consideration one way or

13  another.

14      Although, you, as the jury, are the judges of the

15  facts in the case, you must accept and apply the law

16  applicable to the case as it is given to you by me.  If you

17  are selected as a juror, it will be your sworn duty under the

18  law to decide this case solely on the evidence adduced during

19  this trial and the law applicable to the case as it is given

20  to you by the court.

21      Now, if the answer is "no" to any of the following

22  questions, please raise your hand:  Can you read, write,

23  speak, and understand the English language?

24      THE CASE MANAGER:  Swear them in?

25      THE COURT:  She's going to swear y'all in.  I get

1    carried away sometimes.

2              (Prospective jury administered oath.)

3         (Affirmative responses from the prospective jury.)

4         THE COURT:  Again, if the answer is "no" to any of

5    the following questions, please raise your hand.  Just pass

6    it around.

7         Wait.  Dena, who holds the mic?  The person in the

8    middle?

9         THE CASE MANAGER:  Yeah, they'll just pass it.

10        THE COURT:  Okay.  Let ask you again.  If the answer

11   is "no" to any of the following questions, please raise your

12   hand:  Can you read, write, speak, and understand the English

13   language?  Can anybody not?

14        You cannot?  Please approach the bench, please.

15        Counsel, come up here.

16             (Prospective Juror No. 16 approaches.)

17        WHEREUPON, the following proceedings were held at the

18   bench:

19        THE COURT:  State your name and your juror number.

20        PROSPECTIVE JUROR NO. 16:  Juror No. 16.  My name is

21   Rieko Bush.

22        THE COURT:  Hold on a second.  Juror No. 16.  I'm

23   just trying to keep track of it.  Juror No. 16.

24        PROSPECTIVE JUROR NO. 16:  Rieko Bush.

25        THE COURT:  Uh-huh.

1          PROSPECTIVE JUROR NO. 16:  I do understand single
2     conversation English, but I would probably have miss --
3     difficult understanding term of legal term I guess.
4          THE COURT:  Well, a lot of people have difficulty
5     with legal terms, so we explain it.  Okay?  The legal terms
6     will be explained in the jury instructions.
7          PROSPECTIVE JUROR NO. 16:  Okay.
8          THE COURT:  What language do you speak?
9          PROSPECTIVE JUROR NO. 16:  I speak Japanese.  Yes.
10         THE COURT:  It would be possible.  It might be
11    difficult to get a Japanese interpreter, but we do provide
12    interpretation.  But with regard to legal terms, those are
13    explained to you and to the jury in the jury instructions.
14         Do you have any follow-up questions?
15         MR. BOTELER:  Yes, Your Honor.
16         Are you able to read English?
17         PROSPECTIVE JUROR NO. 16:  Yes.  Yes.
18         MR. BOTELER:  Thank you.
19         THE COURT:  Thank you.
20                   (In open court.)
21         THE COURT:  Thank you very much.
22         While she's getting back to her seat, the next
23    question, let me know if the answer is "no" or "yes" to this
24    one actually.  They're usually no, but this is going to be
25    yes.

1          Do you have any physical or mental limitations

2     affecting your hearing, sight, alertness, attention, or

3     similar function that would prevent you from giving your full

4     attention to the evidence during this trial?

5          All right.  Next question, do you understand that the

6     superseding indictment -- that is, the government's charge

7     against the defendant -- is not evidence of guilt of the

8     defendant?

9          Everyone understand that and can accept that?

10          Will you so regard the superseding indictment in that

11     regard?  Yes?

12          Do you -- did anybody have a question?  No?  Okay.

13          Do you understand that you cannot draw any inference

14     of guilt just from the fact that the government accuses the

15     defendant?  Do you understand that?

16          Will you refrain from drawing any such inference?

17          Your function as a juror is to decide questions of

18     fact.  The Court will instruct you however as to the law to

19     be applied in this case.  You are bound by those instructions

20     and cannot substitute your own notions of what you think the

21     law is or should be.

22          Now, raise your hand if you do not understand these

23     principles.

24          Okay.  Will you accept and apply the law as given to

25     you by the Court and disregard any ideas, beliefs, or notions

1   you may have or which you may encounter in reaching your

2   verdict as to what the law should or should not be?

3        Okay.  Could and will you follow the law as

4   instructed by the Court even if you disagree with it?

5        All right.  In federal court, the jury determines the

6   guilt or innocence of the defendant based on evidence heard

7   at trial.  Should the jury return a verdict of guilty, the

8   Court will decide the punishment.  In federal court,

9   punishment is a matter strictly for the Court and it is not

10  to be considered by the jury in any way in arriving at a

11  verdict.

12       Will you be unable to reach a verdict because you are

13  not allowed to also consider punishment?

14       All right.  Do you hold any religious or

15  philosophical beliefs that would make it difficult or

16  impossible to return a verdict of guilty against a person

17  charged with a crime regardless of the circumstances?

18       Will you decide the case solely on the evidence

19  presented at this trial and the law as given to you by the

20  court?

21       Will you take all facts and arguments from both sides

22  into consideration before returning a verdict?

23       Anyone?  Yes?

24       As I previously explained to you, the law requires

25  you to presume the defendant innocent and requires the

1  government to prove the guilt of the defendant beyond a

2  reasonable doubt.  Will you give the defendant the benefit of

3  the presumption of innocence?

4       Everyone yes?

5       Okay.  Will you require the government to prove the

6  guilt of the defendant beyond a reasonable doubt before

7  reaching a verdict of guilty?

8       All right.  In this case, you will learn that the

9  defendant is a judge.  Will you be able to not hold the

10  defendant to any higher standard on these charges just

11  because she's a judge?  Will you be able to treat the

12  defendant as a reasonable person and not apply any higher

13  standard because she's a judge?  Everybody can do that?

14       All right.  Will you firmly put aside any feelings of

15  prejudice, sympathy, or passion and decide the case solely on

16  the evidence and the law and render a true verdict without

17  regard to the consequences to the prosecution or to the

18  defendant?  You can all do that?

19       All right.  Do you understand that there is no legal

20  requirement that the government use specific investigative

21  techniques to prove its case?

22       There's no requirement.  This may not apply here,

23  but, anyway, there's no requirement to lift latent

24  fingerprints or use any other particular processes, have tape

25  recordings or interviews or make photographs of some crime

1  scene.  Your concern is to determine whether or not on the

2  evidence or lack of evidence the defendant's guilt has been

3  proved beyond a reasonable doubt.

4       Do any of you feel that because of television shows,

5  like CSI and Law & Order, that you would need to see some

6  forensic evidence or hear some sort of recording or

7  fingerprints, DNA, or any kind of particular investigative

8  evidence before you could vote to convict a defendant of a

9  crime?

10      All right.  Now, if any of you would answer "yes" to

11  the following questions, raise your hand or if you have any

12  particular information.  And I know sometimes these questions

13  seem confusing.  That's why I'm looking at you and trying to

14  ask you in a way that if your answer is "yes" or "no" it

15  would be appropriate to the question.

16      The defendant in this matter is Ernestine

17  Anderson-Trahan.  Do any of you know or have you ever heard

18  of the defendant in this case?

19      Approach is bench.  Thank you.

20          (Prospective Juror No. 16 approaches.)

21      WHEREUPON, the following proceedings were held at the

22  bench:

23      THE COURT:  Good morning.  Say your name, your juror

24  number.

25      PROSPECTIVE JUROR NO. 27:  Emily Capdeville and 27.

1        THE COURT:  You're number what?

2        PROSPECTIVE JUROR NO. 27:  27.

3        THE COURT:  Emily Elizabeth Capdeville?

4        PROSPECTIVE JUROR NO. 27:  Yeah, that's it.

5        THE COURT:  All right.  So the question was, do you

6   know or have you ever heard of the defendant?

7        PROSPECTIVE JUROR NO. 27:  Yeah.  I mean, I live in

8   Orleans Parish.  So I just follow it on the news.  I mean,

9   I've heard of it on the news.  That's it.

10       THE COURT:  All right.  So you're related to her in

11  any way?

12       PROSPECTIVE JUROR NO. 27:  Huh-uh.

13       THE COURT:  Have you ever worked or any member of

14  your family ever worked with her directly?

15       PROSPECTIVE JUROR NO. 27:  (Shakes head.)

16       THE COURT REPORTER:  Can you answer verbally?

17       PROSPECTIVE JUROR NO. 27:  No.  Sorry.

18       THE COURT:  It's going to be a follow-up question,

19  but I might as well ask it now.  Do you think -- you said you

20  follow it on the news.  Do you think that you could put that

21  information -- and juror number what?

22       PROSPECTIVE JUROR NO. 27:  27.

23       THE COURT:  Do you think you could separate yourself

24  from that information?  Do you think you could --

25       PROSPECTIVE JUROR NO. 27:  Possibly not, to be honest

1     with you.

2          THE COURT:  What do you remember hearing?

3          PROSPECTIVE JUROR NO. 27:  Just that there's tax

4     evasion I think.

5          THE COURT:  I'm sorry?

6          PROSPECTIVE JUROR NO. 27:  Tax evasion I think or

7     misrepresentation of tax burden.  I don't remember details

8     honestly.

9          THE COURT:  Okay.  So you don't remember any details?

10         PROSPECTIVE JUROR NO. 27:  Yeah.

11         THE COURT:  Have you formed any opinion as to her

12    guilt or innocence?

13         PROSPECTIVE JUROR NO. 27:  Probably not, no.

14         THE COURT:  Do you have any follow-up questions?

15         MR. MAGNER:  If the judge instructed you, if you had

16    to make your decision based upon the evidence --

17         PROSPECTIVE JUROR NO. 27:  I could do that.

18         MR. MAGNER:  -- that's deduced in court and follow

19    the court's instructions --

20         PROSPECTIVE JUROR NO. 27:  Uh-huh.

21         MR. MAGNER:  -- and put aside anything you may have

22    heard or read --

23         PROSPECTIVE JUROR NO. 27:  Yeah.

24         MR. BOTELER:  I have nothing further, Your Honor.

25                    (In open court.)

1    THE COURT:  All right.  Have you read or heard

2    anything -- unless you've already disclosed it.  Have you --

3    MR. FLANAGAN:  Ma'am -- Your Honor, excuse me.  I

4    just want to make sure, I thought I saw another hand.

5    THE COURT:  Oh, was there another hand?  Oh, more.

6    Okay.

7    Thank you for pointing that out.

8    MR. FLANAGAN:  Yes, Your Honor.

9    THE COURT:  Y'all come up to the bench.  I'm sorry.

10   I didn't see y'all.

11   Any more?  Because you can just stand in line right

12   behind.  You can stay at the table.  You can stay at the

13   table.

14   (Prospective Juror No. 7 approaches.)

15   WHEREUPON, the following proceedings were held at the

16   bench:

17   THE COURT:  Your name and juror number what?

18   PROSPECTIVE JUROR NO. 7:  Sorry, Your Honor.  My name

19   is Shannon --

20   THE COURT:  Wait.  I've got to find you.  Juror

21   number what?  Juror No. 7.  You are Shannon Ray Barbin?

22   PROSPECTIVE JUROR NO. 7:  Yes, Your Honor.

23   THE COURT:  Can you tell us how you know --

24   PROSPECTIVE JUROR NO. 7:  No, ma'am.  I apologize.  I

25   should have spoke earlier.  I wasn't sure.  I have a

1    situation, ma'am.  I have a -- it's an Intoxalock in my

2    truck.

3            THE COURT:  You have a what?

4            PROSPECTIVE JUROR NO. 7:  Can I show you my phone?

5            THE COURT:  Uh-huh.

6            PROSPECTIVE JUROR NO. 7:  And I -- I got convicted of

7    a DWI and today is the calibration date.  When I left my

8    house at 4:45 this morning -- I have 4 hours and 33 minutes

9    before it clocks me out.  And I'm not trying to get out of

10   this.  I spoke to Ms. Mary Beth.  I rescheduled everything

11   because I was offshore.  And my vehicle is in the parking

12   garage and it's gonna lock me out.  I'm going to have to get

13   a tow truck and it's going to be about $600 to get the tow

14   truck to get it out.  So today is the 14th.

15           Let me show you this.  I apologize.

16           THE COURT:  I'm not following you.  So you have to go

17   check in with someone?

18           PROSPECTIVE JUROR NO. 7:  No, it's a calibration,

19   ma'am.  They're going to -- it's going to make it to where I

20   can't crank my truck.

21           THE COURT:  Okay.  Now, why is this happening?

22           PROSPECTIVE JUROR NO. 7:  Say it again.

23           THE COURT:  Why is this happening?  Because of what?

24           PROSPECTIVE JUROR NO. 7:  It was -- it was a DUI.

25           THE COURT:  No.  I'm just saying, why didn't you do

1    whatever you were supposed to do so you don't get locked out

2    of your truck?  What were you supposed to do?

3              PROSPECTIVE JUROR NO. 7:  Ma'am?  Oh, no.  No.  It's

4    the calibration date.  I have to be across the river,

5    Terrytown, at Precision Auto for them to be recalibrate.

6    It's for them to recalibrate the machine.  It's Precision

7    Auto.

8              THE COURT:  When?  When?

9              PROSPECTIVE JUROR NO. 7:  Today.  At 4 -- I have --

10   at 4:45 this morning I left my home and I have 4 hours and

11   33 minutes before it locks me.  It's going to make it to

12   where I can't crank my truck.

13             THE COURT:  Okay.  And when is that going to happen?

14   4:30 today?

15             PROSPECTIVE JUROR NO. 7:  No, no, no.  It's going to

16   happen 4 hours and 33 minutes from when I left my house at

17   4:45 --

18             THE COURT:  So you're locked out?

19             PROSPECTIVE JUROR NO. 7:  -- so I'm getting close.

20             No, I'm not locked out yet.  I'm not locked out.  I'm

21   getting close.  That's what I was trying to --

22             THE COURT:  I'm going to let him -- do you have any

23   issue?

24             MR. BOTELER:  No objection.

25             MR. MAGNER:  No.

```
 1              THE COURT:  Go and handle this.

 2              Dena, can you tell them to send --

 3              THE CASE MANAGER:  Yes.

 4              PROSPECTIVE JUROR NO. 7:  I'm sorry.

 5              THE COURT:  You're going to have to just come back

 6   and report another day.

 7              All right.  The next person.

 8                  (Prospective Juror No. 18 approaches.)

 9              THE COURT:  Good morning.  And your juror number?

10              PROSPECTIVE JUROR NO. 8:  8.

11              THE COURT:  Juror No. 8?

12              PROSPECTIVE JUROR NO. 8:  Yes.

13              THE COURT:  And you're Debbie Montell --

14              PROSPECTIVE JUROR NO. 8:  Giordano.

15              THE COURT:  -- Giordano?

16              All right.  How do you know the defendant?

17              PROSPECTIVE JUROR NO. 8:  I'm pretty sure I've heard

18   about this on the news.

19              THE COURT:  What do you remember hearing?

20              PROSPECTIVE JUROR NO. 8:  Well, I just remember my

21   first reaction and my reaction is anybody in a position like

22   that should be paying their taxes.

23              THE COURT REPORTER:  Speak up a little more into the

24   microphone.

25                  PROSPECTIVE JUROR NO. 8:  Where is the microphone?
```

**OFFICIAL TRANSCRIPT**

1          MR. BOTELER:  Right here.

2          PROSPECTIVE JUROR NO. 8:  Oh, okay.  Thank you.

3          So my first reaction, when I hear anything like that

4     is debt.  Someone in a position -- they should be taking care

5     of their business.

6          THE COURT:  So you're unable to -- you're assuming

7     she's guilty without hearing the --

8          PROSPECTIVE JUROR NO. 8:  I am.  That was my first

9     reaction.  I don't know how any evidence is going to -- I

10    don't know.  I just can't answer that.  I just know my first

11    gut reaction as a person.

12         THE COURT:  All right.  Any follow-up?

13         MR. MAGNER:  So I have some questions.  So you know

14    we all have gut reactions.

15         PROSPECTIVE JUROR NO. 8:  Yes.

16         MR. MAGNER:  We need your responses.

17         PROSPECTIVE JUROR NO. 8:  Sure.

18         MR. MAGNER:  If the judge instructs you though that

19    you have to consider the evidence at trial and be fair to

20    both sides and directs you to do that, can you do that?

21         PROSPECTIVE JUROR NO. 8:  I would do my best, but I'm

22    just saying, I know what my initial feelings were.  I mean, I

23    can -- I can do my best, if that's what you want.

24         THE COURT:  Well, that's your initial feelings.

25         PROSPECTIVE JUROR NO. 8:  I know.  I'm just being --

1       THE COURT:  What?

2       PROSPECTIVE JUROR NO. 8:  I'm just being --

3       THE COURT:  So all jurors are required to be here.

4       PROSPECTIVE JUROR NO. 8:  I'm just trying to be

5   honest.

6       THE COURT:  So if you were -- you know, this is the

7   thing.  I mean --

8       PROSPECTIVE JUROR NO. 8:  Yeah.

9       THE COURT:  -- people sometimes feel that because

10  what happens is, even in a case, the government would put on

11  its evidence, but you would have to stay open to hear the

12  defendant's evidence.  I just instructed you that and asked

13  you if you could be fair and impartial and not make a

14  decision until after you deliberate.  And so --

15      PROSPECTIVE JUROR NO. 8:  All I can honestly say is

16  I'll do the best I can.  I mean, I believe people should be

17  innocent until proven guilty.

18      THE COURT:  You do believe that?

19      PROSPECTIVE JUROR NO. 8:  I do believe that.

20  However, I still know my first reaction.

21      THE COURT:  Do you have any follow-up?

22      MR. MAGNER:  Yes.  Are you saying you might have a

23  hard time being fair to Ms. Trahan?

24      PROSPECTIVE JUROR NO. 8:  I think so in this case.

25      THE COURT:  Okay.  You can have a seat.

```
 1              (Prospective Juror No. 8 returns to galley.)
 2         MR. MAGNER:  We would challenge for cause and I think
 3    Mr. Barbin, the previous juror --
 4         MR. BOTELER:  No objection to striking for cause.
 5         THE COURT:  For both of them?
 6         MR. BOTELER:  Right.  No objection, Your Honor.
 7         THE COURT:  So Juror No. 7 and 8 for cause, strike
 8    them for cause.
 9         MR. MAGNER:  Are we going to need more?
10         THE COURT:  What?
11         MR. MAGNER:  Are we going to need more jurors?
12         THE COURT:  Dena, do we have more downstairs?
13         THE CASE MANAGER:  I can find out.
14              (Prospective Juror No. 24 approaches.)
15         THE COURT:  Okay.  The next one.  You're juror number
16    what?
17         MR. MAGNER:  24.
18         THE COURT:  24.
19         You're Juror No. 24?
20         PROSPECTIVE JUROR NO. 24:  Good morning, Your Honor.
21    I'm Juror 36 (sic).
22         THE COURT:  Okay.  You're Wanda Simmons?
23         PROSPECTIVE JUROR NO. 24:  I am.
24         THE COURT:  And how do you know the defendant?
25         PROSPECTIVE JUROR NO. 24:  I don't know her
```

**OFFICIAL TRANSCRIPT**

1   personally, but I just -- I don't know if this is relevant,

2   but the news and the newspapers, you know, have been saying

3   things --

4           THE COURT:  Would you be able to sit here and listen

5   to the evidence?

6           Those are just newspaper reports.  Would you be

7   able -- the defendant has a right to be presumed innocent.

8           PROSPECTIVE JUROR NO. 24:  I'm sorry?

9           THE COURT:  The defendant has a right to be presumed

10  innocent.

11          PROSPECTIVE JUROR NO. 24:  Yes.

12          THE COURT:  And everybody does.  If you were charged

13  with a crime, wouldn't you want a jury that would not just

14  because they heard some news, but listen to the evidence --

15          PROSPECTIVE JUROR NO. 24:  Yes.  Yes.

16          THE COURT:  -- that's put on in trial?  Could you do

17  that?

18          PROSPECTIVE JUROR NO. 24:  I think so.

19          THE COURT:  Do you have any follow-up question?

20          MR. MAGNER:  I take it, Ms. Simmons, you're thinking

21  you would have a hard time being fair to Ms. Trahan?

22          PROSPECTIVE JUROR NO. 24:  I'm not sure.  I just read

23  a lot --

24          MR. MAGNER:  You did.

25          PROSPECTIVE JUROR NO. 24:  -- and seen a lot.

1        MR. MAGNER:  Okay.

2        PROSPECTIVE JUROR NO. 24:  And I don't know if I can

3   listen to this case, but, I mean, I'm just not sure.

4        MR. MAGNER:  Thank you.

5        You think you'd have a hard time getting that out of

6   your mind, what you read?

7        PROSPECTIVE JUROR NO. 24:  I would.

8        MR. MAGNER:  Thank you, ma'am.  We appreciate you.

9        THE COURT:  Do you have any follow-up questions?

10        MR. BOTELER:  Yes, Your Honor.

11        Would you be able to listen to the evidence presented

12   in court today?  Well, not just court, but in court and be

13   able to make a decision based on what was presented to you in

14   court?

15        PROSPECTIVE JUROR NO. 24:  I mean, I could listen,

16   yes.

17        THE COURT:  I can't hear your answer.

18        PROSPECTIVE JUROR NO. 24:  I'm sorry.  I could

19   listen.

20        THE COURT:  You could what?

21        PROSPECTIVE JUROR NO. 24:  I could listen, but, you

22   know --

23        THE COURT:  You could listen.

24        MR. BOTELER:  And would you be able to base any

25   judgment on what evidence you listened to?

**OFFICIAL TRANSCRIPT**

1          PROSPECTIVE JUROR NO. 24:  Yes.

2          THE COURT:  Let me ask, you said you heard

3   information.  What did you hear?

4          PROSPECTIVE JUROR NO. 24:  I'm sorry.  What?

5          THE COURT:  What did you hear?

6          PROSPECTIVE JUROR NO. 24:  I mean, I just know she

7   took money and --

8          THE COURT:  She what?

9          PROSPECTIVE JUROR NO. 24:  Took money.

10         THE COURT:  That's not the facts in this case.

11         PROSPECTIVE JUROR NO. 24:  That's not?  Okay.

12         THE COURT:  So that's why it's important for you to

13   listen to the evidence.

14         PROSPECTIVE JUROR NO. 24:  Okay.  Okay.

15         THE COURT:  Okay.  That's not what she's accused of.

16   She's accused of tax evasion, which is not -- which is --

17   that's not the same thing.

18         Any follow-up?

19         PROSPECTIVE JUROR NO. 24:  Okay.

20         THE COURT:  So knowing that, again, I go back to,

21   could you listen to the evidence?

22         I mean, you can't bring in here anything you thought

23   you heard someone else -- you got to listen to what the

24   evidence is here.

25         PROSPECTIVE JUROR NO. 24:  Yes, ma'am.  Yes, ma'am.

1        THE COURT:  Now, could you do that?

2        PROSPECTIVE JUROR NO. 24:  Yes, ma'am.

3        THE COURT:  Thank you.  You can have a seat.

4        (Prospective Juror No. 24 returns to galley.)

5        We can pursue that further.

6        MR. MAGNER:  I'm sorry?

7        THE COURT:  You can pursue that further if you need

8   to.

9        MR. MAGNER:  We would challenge her for cause.  She

10  was equivocal.  She teared up at some point when she said, "I

11  think I can."

12        MR. BOTELER:  We would object for cause.  If Your

13  Honor heard, it sounded like she heard facts about something

14  different than this case and she did say she would be able to

15  listen to the evidence and make a decision.

16        THE COURT:  This one's a tough one.  I may call her

17  back.  Let me wait before -- let's wait.

18        MR. MAGNER:  Okay.

19        THE COURT:  Okay.  The next?

20        (Prospective Juror No. 22 approaches.)

21        PROSPECTIVE JUROR NO. 22:  Good morning, Your Honor.

22        THE COURT:  Juror number?

23        PROSPECTIVE JUROR NO. 22:  Juror No. 22.  Yes, ma'am.

24        THE COURT:  Juror No. 22.  Okay.  Albert.

25        PROSPECTIVE JUROR NO. 22:  Tritico.  Yes.  Yes, Your

1    Honor.

2         THE COURT:  How do you know the defendant?  How do

3    you know the defendant?

4         PROSPECTIVE JUROR NO. 22:  I have a master's in

5    journalism.  I may be --

6         THE COURT:  I'm sorry?

7         THE COURT REPORTER:  Speak up.

8         PROSPECTIVE JUROR NO. 22:  I have a masters degree in

9    journalism and I read four newspapers a day, so I'm aware of

10   the charges and I'm also aware -- and this is my concern.

11   The repeated, you know, ask for delay in the course --

12        THE COURT:  I'm sorry?

13        PROSPECTIVE JUROR NO. 22:  The delays in the case

14   based on prejudicial language in the original indictment,

15   those sorts of things.

16        THE COURT:  Okay.  That didn't happen.

17        PROSPECTIVE JUROR NO. 22:  Then I misunderstood.

18        THE COURT:  You misunderstood or you're confusing it

19   with another case.

20        PROSPECTIVE JUROR NO. 22:  Perhaps.

21        THE COURT:  So could you sit and listen to the

22   evidence in this case, the evidence --

23        PROSPECTIVE JUROR NO. 22:  Yes, I could.

24        THE COURT:  -- that's going to be presented in this

25   case --

1          PROSPECTIVE JUROR NO. 22:  Yes.

2          THE COURT:  -- and put out of your mind what you

3     might have heard outside of --

4          PROSPECTIVE JUROR NO. 22:  Yes.  But I figured that

5     the next question was going to be media related so --

6          THE COURT:  It is.  It is.  So you won't have to come

7     back.

8          PROSPECTIVE JUROR NO. 22:  Well, I will, of course,

9     do my jury duty as expected, but I wanted to put that on the

10    record --

11         THE COURT:  Thank you.

12         PROSPECTIVE JUROR NO. 22:  -- that I'm aware of the

13    facts in the case.

14         MR. MAGNER:  Are you willing to put whatever you --

15         PROSPECTIVE JUROR NO. 22:  Yes.

16         MR. MAGNER:  -- seen, heard, or read aside --

17         PROSPECTIVE JUROR NO. 22:  Yes, sir.

18         MR. MAGNER:  -- and make your decision based on

19    what's in court?

20         PROSPECTIVE JUROR NO. 22:  Yes, sir.

21         MR. MAGNER:  Are you a working journalist --

22         PROSPECTIVE JUROR NO. 22:  I was a journalist for

23    18 years.  I'm now a school teacher.

24         THE COURT:  Thank you for your service.

25         MR. MAGNER:  Where did you work?

1          PROSPECTIVE JUROR NO. 22:  Mainly in Texas and

2     Florida.

3          MR. MAGNER:  But you're a news junky is what you're

4     saying?

5          PROSPECTIVE JUROR NO. 22:  I'm a news junky.

6          MR. MAGNER:  Okay.  I gotcha.

7          THE COURT:  You're not going to be able to watch the

8     news and or listen to it while we're in trial.

9          PROSPECTIVE JUROR NO. 22:  I'm sorry, Judge?

10          THE COURT:  You want me to repeat that?

11          PROSPECTIVE JUROR NO. 22:  Uh-huh.

12          THE COURT:  You're not going to be able to listen to

13     the news or follow the news while we're in trial.  Do you

14     think you can do that?

15          PROSPECTIVE JUROR NO. 22:  I can't understand the

16     question, Judge.

17          THE COURT:  I said do you think you will not be able

18     to listen to the news while we're in trial?

19          PROSPECTIVE JUROR NO. 22:  Oh, during the trial --

20          THE COURT:  Yeah.

21          PROSPECTIVE JUROR NO. 22:  -- should I be called?

22     That would be a sacrifice on my part, yes, ma'am.

23          THE COURT:  We all make sacrifices, but you will --

24          PROSPECTIVE JUROR NO. 22:  Of course.

25          THE COURT:  -- do it.

1    PROSPECTIVE JUROR NO. 22:  Of course.  If ordered to
2    do so, I will do so.  Yes, ma'am.
3    THE COURT:  Thank you.  Thank you.
4    MR. BOTELER:  No questions, Your Honor.
5    PROSPECTIVE JUROR NO. 22:  Thank you, Your Honor.
6    (In open court.)
7    THE COURT:  All right.  So these are just follow-up
8    to that.  I asked if anyone -- if you knew or had you ever
9    heard of the defendant in this case.  And if you've
10   already -- and the next one, if you've already disclosed it,
11   you don't have to come and disclose it again.
12   Have you read or heard anything relating to this case
13   from any source, including any news reports or media
14   coverage, relating to Judge Trahan or anything -- I want to
15   say Trahan, sorry, but it's Trahan, right?
16   THE DEFENDANT:  It depends on where you're from.
17   THE COURT:  I know because I'm from Lafayette.  It's
18   Trahan in Lafayette.
19   All right.  Have you read or heard anything relating
20   to the case from any source, including any news reports or
21   media coverage, relating to Judge Trahan or any of the -- or
22   any of the city judges in Orleans Parish?
23   All right.
24   Have you or any of your family members or any close
25   friends ever been employed by Second City Court in the Parish

**OFFICIAL TRANSCRIPT**

1    of Orleans or had any business in Second City Court?

2          All right.  Since 2013, have you or any of your

3    family members or any of your close friends ever had a case

4    or marriage before the Second City Court in the parish of

5    Orleans since 2013?

6          Okay.  You want to come up?

7              (Prospective Juror No. 12 approaches.)

8          WHEREUPON, the following proceedings were held at the

9    bench:

10         THE COURT:  State your juror number.  You're No. 12.

11         PROSPECTIVE JUROR NO. 12:  12.

12         THE COURT:  You're Reginald Williams.  Okay.

13         PROSPECTIVE JUROR NO. 12:  Okay.  My daughter is an

14   attorney --

15         THE COURT REPORTER:  Can you speak into the

16   microphone, please?  I can't hear you.

17         THE COURT:  Speak into the microphone.

18         PROSPECTIVE JUROR NO. 12:  My daughter is an

19   attorney.  Latanya Thompson.  I think she was employed by

20   criminal court.  I don't know if that's Second District Court

21   or what.

22         THE COURT:  It's a different court.

23         PROSPECTIVE JUROR NO. 12:  It's a different court?

24         THE COURT:  Uh-huh.

25         PROSPECTIVE JUROR NO. 12:  So I just wanted to make

1   sure it's not a conflict.

2          THE COURT:  No, it's not the same.

3          So would that fact weigh on you in any way?  Would

4   you hold Ms. Trahan to a higher standard?  Would you not be

5   able to follow --

6          PROSPECTIVE JUROR NO. 12:  Hold who to a higher

7   standard?

8          THE COURT:  -- the law as I instruct you?

9          PROSPECTIVE JUROR NO. 12:  The defendant?

10         THE COURT:  The defendant.

11         PROSPECTIVE JUROR NO. 12:  No.

12         THE COURT:  All right.  Anything further?

13         MR. BOTELER:  No, Your Honor.

14         MR. MAGNER:  Do you know what type of law your

15   daughter practices?

16         PROSPECTIVE JUROR NO. 12:  Well, she's a -- she's a

17   defendant for the insurance companies.  She was in personal,

18   but she done her internship, she was in criminal, juvenile

19   criminal court, I believe.

20         MR. MAGNER:  She's done a little bit of everything.

21         PROSPECTIVE JUROR NO. 12:  Pardon?

22         MR. MAGNER:  She's done a little bit of everything it

23   sounds like.

24         PROSPECTIVE JUROR NO. 12:  What?

25         MR. MAGNER:  She's done a little bit of everything.

1          PROSPECTIVE JUROR NO. 12:  Oh, yes, she's done a lot

2     over the years.

3          THE COURT:  Anything further?

4          PROSPECTIVE JUROR NO. 12:  I don't think I have a

5     conflict of interest now though.

6          THE COURT:  Thank you.

7          MR. BOTELER:  Just quick follow-up --

8          PROSPECTIVE JUROR NO. 12:  Yeah, she's done a little

9     bit of everything.  I wouldn't be --

10         THE COURT:  His daughter --

11         PROSPECTIVE JUROR NO. 12:  -- in no conflict of

12    interest, you know, because she's an attorney because I don't

13    know what court she works in.

14         MR. BOTELER:  When you mentioned she worked in the

15    juvenile system, do you know which side?  Did she represent

16    the defendants?

17         PROSPECTIVE JUROR NO. 12:  She worked for the

18    defendant for the insurance company.

19         MR. BOTELER:  Defendant for the insurance company?

20         PROSPECTIVE JUROR NO. 12:  Yeah.  She used to work in

21    personal injury.  Now she's on the other side.

22         MR. BOTELER:  Okay.  Thank you, sir.

23         THE COURT:  Thank you, Mr. Williams.  You can have a

24    seat.

25         PROSPECTIVE JUROR NO. 12:  I didn't know what court

1    she worked in.

2          THE COURT:  No.  No.  That's true.  But that's good.

3                    (In open court.)

4          THE COURT:  All right.  As stated, this case involves

5    events related to Orleans Parish Second City Court.  Do you

6    hold any strong feelings, philosophical beliefs, or have you

7    had any experience with any Orleans Parish government

8    official that would prevent you from being fair and impartial

9    in this case?

10         All right.  Let's see.  Some of these will sound

11   duplicative, but I have to ask you because sometimes it

12   triggers something.  So are any of you related by blood or

13   marriage or any of you personally other than what you

14   disclosed already acquainted with the defendant?

15         Do you or any member of your family have any

16   connection of any kind to the defendant that you can think

17   of?

18         All right.  During the trial, you're going to hear

19   evidence regarding government officials being paid in cash

20   for work related to their position.  Do you feel that you can

21   hear this evidence, evidence of that kind, and still be able

22   to be fair and impartial?

23         Because it doesn't -- it's not related to the crime

24   the defendant is being charged with.

25         Would you be able to hear that kind of evidence and

1   separate that in your mind from the evidence being presented

2   in this case and the evidence you are to consider in weighing

3   her guilt or innocence?

4         Everybody will be able to do that?  Not

5   particularly -- okay.

6         Any follow-up -- it might have been inartful -- that

7   triggered that question.  Are y'all okay?

8         MR. MAGNER:  No follow-up, Judge.

9         THE COURT:  All right.  Now, would counsel for all

10  parties in this case please rise and identify themselves one

11  at a time for the prospective jurors.

12        MR. BOTELER:  Good morning again.  My name is Michael

13  Boteler on behalf of the United States.

14        MS. BRODNEY:  Good morning again, Marissa Brodney on

15  behalf of the United States.

16        MR. FLANAGAN:  Brian Flanagan on behalf of the United

17  States.

18        MR. MAGNER:  Michael Magner here on behalf of Ms.

19  Trahan.

20        MR. WICKER:  T.C. Wicker also here on behalf of

21  Mr. Trahan.

22        THE COURT:  Do any of you or any member of your

23  family know any of the attorneys for either the government or

24  the defendant in this matter?

25        More specifically, did you or any members of your

1   family know -- the attorneys work for the government, but we

2   have a United States Attorney here in the Eastern District of

3   Louisiana, Duane Evans.

4          Do any of you know Duane Evans or any of the

5   assistants who work in the United States Attorney's Office?

6          All right.  Do any of you or members of your family

7   know the defense attorneys or members of their law firm?  Did

8   you tell them -- did you say your law firm?

9          MR. MAGNER:  No, I didn't, Judge.

10         We're both with the Jones Walker law firm.

11         THE COURT:  Are any of you familiar with anyone who

12   works at the Jones Walker law firm?  No?  Okay.

13         All right.  Any of you have any family member or

14   acquainted with anyone who works in the Federal Public

15   Defender's Office?

16         Do any of you or any members of your family know

17   Andrew Caleb Rayford or William M. Montague?  They were

18   attorneys who were previously involved in this matter.

19         Okay.  To the best of your knowledge, have you or has

20   any member of your immediate family or close personal friend

21   ever been counsel or represented by or prosecuted by the

22   Department of Justice, the U.S. Attorney, or any of his

23   assistants or been represented in one way or another with the

24   defense attorneys or any members of their firm?

25         All right.  Now, there are going to be some witnesses

1    in this case, and so I'm going to ask you these names.  And

2    you can ask more questions if it sounds like somebody you

3    might know, but it's important for us to find out now whether

4    or not you might know someone who is going to come to testify

5    as a witness.  So I'm going to ask you these names.

6            Krystal Ancar.

7            You put it the opposite, right?  That's how it is,

8    right?  That's the name?

9            MR. FLANAGAN:  Yes, Your Honor.

10           THE COURT:  All right.  Does anyone know Krystal

11   Ancar?

12           Wanda Anderson Davis, Rashida Barringer-Payton, David

13   Carrone, Sharon D'Angelo, Clifton Davis, Shandell Dorsey,

14   Kristina Dugas, D-u-g-a-s; Lillian Dunn-Buffington, Devin

15   George, Tamara Griffin-Major, Deatrice Henderson, Michael

16   Hall, Lisa Hibbs, Tamara Klung Jacobson, Allison Kotsay,

17   K-o-t-s-a-y; Benjamin Marshall, Lauren McHugh Rocha,

18   R-o-c-h-a; Corrine Shelton, Monique Sennette,

19   S-e-n-n-e-t-t-e; Yolanda Martin; Zeta, Z-e-t-a, Hayes;

20   Stanley Anderson, Harold Anderson?  And I asked you before

21   about Ernestine Anderson-Trahan.

22           Okay.  You want to come up to the front?

23           (Prospective Juror No. 30 approaches.)

24           WHEREUPON, the following proceedings were held at the

25   bench:

1          THE COURT:  You are juror number --

2          PROSPECTIVE JUROR NO. 30:  I'm Juror 30, Kevin

3   Schulz.

4          THE COURT:  Okay.  Which name did you --

5          PROSPECTIVE JUROR NO. 30:  Harold Anderson.

6          THE COURT:  Harold Anderson?

7          PROSPECTIVE JUROR NO. 30:  Uh-huh.

8          THE COURT:  Okay.  So you want to tell him a little

9   bit --

10          MR. MAGNER:  Sure.  He is Ms. Trahan's brother, I

11   think.

12          THE COURT:  Do you know where he works?

13          MR. MAGNER:  Yeah.  He's a black gentleman, I think

14   in his 60s.

15          PROSPECTIVE JUROR NO. 30:  (Shakes head.)

16          THE COURT:  You don't know him?

17          PROSPECTIVE JUROR NO. 30:  No.

18          THE COURT:  All right.  Thank you.

19                    (In open court.)

20          THE COURT:  Let me just finish that again, Harold

21   Anderson or Ernestine Anderson-Trahan.  Anybody know any of

22   these witnesses?

23          All right.  Thank you.

24          So I asked you if you knew him.  Do you have any

25   business relationships with any of these witnesses?

1          All right.  Other than what I've told you today, do

2   you have any information about the facts of this case?

3          All right.  I'm going to ask this again.  Have you

4   read, seen, or heard anything about this trial or this case,

5   except what you heard here today?  And if you disclosed it

6   already, that's fine.

7          Has anyone talked to you about this case?

8          All right.  Have you ever expressed any opinion

9   whatsoever about the guilt or innocence of the defendant?

10          Have you any opinion whatsoever as to the guilt or

11   innocence of the defendant at this time?

12          Anyone?

13          All right.  Now we're off to another set of questions

14   here.  Have you ever served as a juror in a criminal or civil

15   case or as a member of a grand jury either in federal or

16   state court?

17          All right.  Y'all want to come up?

18              (Prospective Juror No. 6 approaches.)

19          WHEREUPON, the following proceedings were held at the

20   bench:

21          THE COURT:  Okay.  Juror No -- put the -- Juror No. 6

22   and you are Melissa Baudot Ziegler?

23          PROSPECTIVE JUROR NO. 6:  Uh-huh.

24          THE COURT:  Okay.  I got it right?

25          PROSPECTIVE JUROR NO. 6:  Close enough.

1          THE COURT:  Close enough.  Okay.

2          PROSPECTIVE JUROR NO. 6:  It's fine.

3          THE COURT:  Okay.  What kind of case was it?  Civil

4    or criminal?

5          PROSPECTIVE JUROR NO. 6:  Civil.  Now, I don't know

6    if this is considered state.  It was for St. Tammany Parish.

7          THE COURT:  Yes.

8          PROSPECTIVE JUROR NO. 6:  So I have served on a drug

9    case and then I served on a civil case involving wrongful

10   death in a nursing home.

11         THE COURT:  All right.  Did you reach a verdict in

12   those cases?

13         PROSPECTIVE JUROR NO. 6:  Both of those cases were

14   one plea, the drug case plea.  It was like his third

15   degree -- third time charged.  He plead out before we

16   finished the trial.  And then for the civil one, the defense

17   did some kind of motion, because they felt like the -- the

18   expert witness was not an expert and so the judge ruled with

19   the defense and they -- you know, he stopped the case.  So

20   that was it.

21         THE COURT:  All right.  In these cases, was anyone

22   elected the foreperson of the jury?

23         PROSPECTIVE JUROR NO. 6:  No.

24         THE COURT:  They had a foreperson.  It just wasn't

25   you.

1          PROSPECTIVE JUROR NO. 6:  No, we never had a

2    foreperson --

3          MR. BOTELER:  Never got that far.

4          MR. MAGNER:  Never got that far.

5          THE COURT:  Oh, that's right.  Okay.  All right.

6          Is there anything about your prior jury service that

7    would make you unable to be fair and impartial to both sides

8    in this case?

9          PROSPECTIVE JUROR NO. 6:  No.

10          THE COURT:  All right.  Is there anything that

11    happened in your experience in those trials that would affect

12    your -- or impact how you view the court system, the judge in

13    this case?

14          PROSPECTIVE JUROR NO. 6:  No.

15          MR. BOTELER:  Nothing further, Your Honor.

16          THE COURT:  Thank you.

17          (Prospective Juror No. 6 returns to galley.)

18             (Prospective Juror No. 15 approaches.)

19          THE COURT:  Juror No. 15?

20          PROSPECTIVE JUROR NO. 15:  Yeah.  Uh-huh.  I was in

21    the criminal court.  I went to Plaquemines Parish and I was a

22    juror member.

23          THE COURT:  Oh, wait.  You're Byron Williams.

24          PROSPECTIVE JUROR NO. 15:  Byron Williams.

25          THE COURT:  Okay.

1        PROSPECTIVE JUROR NO. 15:  Yeah.

2        THE COURT:  Okay.  So it was a civil or a criminal

3    case?

4        PROSPECTIVE JUROR NO. 15:  It was a criminal case.

5        THE COURT:  All right.  Do you remember what it was

6    about?

7        PROSPECTIVE JUROR NO. 15:  It was drugs.  It was

8    about drugs.

9        THE COURT:  How long ago was that?

10       PROSPECTIVE JUROR NO. 15:  About 25 years ago.

11       THE COURT:  Did you reach a verdict in that case?

12       PROSPECTIVE JUROR NO. 15:  Yeah, we did.  We --

13       THE COURT:  What was it?

14       PROSPECTIVE JUROR NO. 15:  -- found him guilty.

15       THE COURT:  Found him guilty?

16       PROSPECTIVE JUROR NO. 15:  Uh-huh.

17       THE COURT:  Was anyone elected foreperson by the

18   jury?

19       PROSPECTIVE JUROR NO. 15:  Let me see.  Yeah, I think

20   one person was.

21       THE COURT:  Was it you?

22       PROSPECTIVE JUROR NO. 15:  No, it wasn't me.  But we

23   come back with the verdict and we found him guilty.

24       THE COURT:  Okay.  Is there anything about your prior

25   jury service that would make you -- make you unable to be

1    fair and impartial?

2          PROSPECTIVE JUROR NO. 15:  No.  No.  No.  Listen to

3    the facts, whatever it is it's going to be, you know what I

4    mean?

5          THE COURT:  All right.  Is there anything that

6    happened in your experience in that trial that would affect

7    or impact how you would view the judge in this case?

8          PROSPECTIVE JUROR NO. 15:  No.  No.

9          THE COURT:  Parties in this case --

10         PROSPECTIVE JUROR NO. 15:  No.  No.

11         THE COURT:  -- do you have any follow-up?

12         MR. MAGNER:  No.

13         MR. BOTELER:  No.

14         THE COURT:  Next?

15                   (In open court.)

16         THE COURT:  While we're questioning these few people,

17   if you've been on a jury, you know, if you would stay, but

18   otherwise, if you want to take a quick bathroom break, 10

19   minutes.  There are bathrooms in the hallway and there are

20   two bathrooms right through this door on the side.

21         Okay.  So if you need a bathroom, this is a good time

22   to take it and we'll wait for you to get back.

23         You want to see who goes and make sure we have

24   everyone.

25         WHEREUPON, the following proceedings were held at the

1  bench:

2          THE COURT:  All right.  What kind of case was it?

3          PROSPECTIVE JUROR:  Criminal case.

4          THE COURT:  How long ago was it?

5          PROSPECTIVE JUROR:  It's been a while.  Yeah.  It's

6  been a while.

7          THE COURT:  I keep getting called for jury duty and

8  everybody's saying 20 years ago.  I got jury duty two weeks

9  from now.

10         Okay.  So did you reach a verdict in the case?

11         PROSPECTIVE JUROR:  We did.

12         THE COURT:  And what was it?

13         PROSPECTIVE JUROR:  It was guilty.

14         THE COURT:  Was anyone elected foreperson of the

15  jury?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  And who was it?

18         PROSPECTIVE JUROR:  It was another gentleman.  It

19  wasn't me.

20         THE COURT:  It wasn't you.  Okay.  Is there anything

21  about your prior jury service that would make you unable to

22  be fair and impartial in this case?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  All right.  Is there anything that

25  happened in your experience in that trial that would affect

1    or impact your perception of parties, the jury, the court

2    system?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Thank you.

5           MR. MAGNER:  What type of case was it?

6           PROSPECTIVE JUROR:  It was a drug trial.

7           MR. BOTELER:  I'm sorry?

8           THE COURT REPORTER:  I'm sorry?

9           PROSPECTIVE JUROR:  It was a drug case.

10          THE COURT:  Thank you.

11              (Prospective Juror No. 19 approaches.)

12          THE COURT:  And you are Juror No. 19, Jeffrey Willis.

13          PROSPECTIVE JUROR NO. 19:  Correct.

14          THE COURT:  All right.  So what kind of case was it?

15   Civil or criminal.

16          PROSPECTIVE JUROR NO. 19:  It was a criminal.

17          THE COURT:  All right.  Did you reach a verdict in

18   the case?

19          PROSPECTIVE JUROR NO. 19:  I'm sorry?

20          THE COURT:  Did you reach a verdict?

21          PROSPECTIVE JUROR NO. 19:  Yes.

22          THE COURT:  Okay.  What was it?

23          PROSPECTIVE JUROR NO. 19:  Not guilty.

24          THE COURT:  Do you remember what kind of case it was?

25          PROSPECTIVE JUROR NO. 19:  Sorry?

**OFFICIAL TRANSCRIPT**

1          THE COURT:  What kind of case?

2          PROSPECTIVE JUROR NO. 19:  Cocaine possession.

3          THE COURT:  Was anyone elected foreperson of the

4    jury?  You had a foreperson?

5          They're in charge of writing stuff down and giving it

6    to the --

7          PROSPECTIVE JUROR NO. 19:  No, it was a one-day

8    trial.

9          THE COURT:  Okay.  So you were not the foreperson?

10          PROSPECTIVE JUROR NO. 19:  No, I was not.

11          THE COURT:  Is there anything about your prior jury

12    service that would make it unable for you to be fair and

13    impartial for both sides in this case?

14          PROSPECTIVE JUROR NO. 19:  No, Your Honor.

15          THE COURT:  Is there anything that happened in your

16    experience in that trial that would affect or impact how you

17    would view --

18          PROSPECTIVE JUROR NO. 19:  No, Your Honor.

19          THE COURT:  -- the parties or the judge in this case?

20          MR. MAGNER:  Was the case in Jefferson?

21          PROSPECTIVE JUROR NO. 19:  No, it was in Florida

22    actually.

23          MR. BOTELER:  Where in Florida?

24          PROSPECTIVE JUROR NO. 19:  Ft. Lauderdale.

25          MR. BOTELER:  Ft. Lauderdale, in state court, Boward

1    County?

2         PROSPECTIVE JUROR NO. 19:  Boward County.

3         MR. BOTELER:  And how long ago was that?

4         PROSPECTIVE JUROR NO. 19:  In the '90s.

5         MR. BOTELER:  In the '90s, okay.

6         THE COURT:  All right.  Anything further?

7         MR. MAGNER:  Nothing further.  Thank you, Judge.

8         MR. BOTELER:  Nothing further, Your Honor.

9         THE COURT:  You can have a seat.

10                    (In open court.)

11        THE COURT:  Okay.  We'll wait.  We'll just take a

12   break and wait.  If anyone else needs to use the restroom,

13   you all can go ahead and do it.  When it looks like everybody

14   is back, you can call me.

15        THE CASE MANAGER:  All rise.

16                    (Recess taken.)

17                    (In open court.)

18        THE COURT:  You can have a seat.  Let's get back to

19   it.

20        Okay.  Have you, any member of your family, spouse,

21   brother, sisters, parents, or children or a close friend ever

22   been a victim of a crime or been convicted, arrested,

23   accused, or charged with a crime?

24        All right.  Starting here.  Just line up.

25        WHEREUPON, the following proceedings were held at the

1    bench:

2              (Prospective Juror No. 3 approaches.)

3         THE COURT:  Juror number?

4         PROSPECTIVE JUROR NO. 3:  3.

5         THE COURT:  What's your number?

6         PROSPECTIVE JUROR NO. 3:  3.

7         THE COURT:  Oh, there you go.  Okay.

8         And you are Josh Tillman Haynes?

9         PROSPECTIVE JUROR NO. 3:  Yes, ma'am.

10        THE COURT:  Okay.  Tell us about the situation.  Who

11   is it?

12        PROSPECTIVE JUROR NO. 3:  I was charged with a charge

13   probably back in a --

14        THE COURT:  I can't hear you.

15        PROSPECTIVE JUROR NO. 3:  I was charged with a charge

16   back in 2012, but I was pardoned by the governor and I got it

17   recently expunged.

18        THE COURT:  All right.  So you said you were

19   pardoned.  So you went to trial?

20        PROSPECTIVE JUROR NO. 3:  I went to trial but --

21        THE COURT:  All right.  And you were convicted.  What

22   was the crime?

23        PROSPECTIVE JUROR NO. 3:  Possession with intent to

24   distribute.

25        THE COURT:  So it was expunged?

```
 1            PROSPECTIVE JUROR NO. 3:  Yes, ma'am.

 2            THE COURT:  All right.  Would that fact make it

 3   difficult for you to vote guilty or not guilty in this case?

 4            PROSPECTIVE JUROR NO. 3:  Huh-uh.

 5            THE COURT:  Would it make it more difficult for you

 6   to find the presumption of innocence?

 7            PROSPECTIVE JUROR NO. 3:  (Shakes head.)

 8            THE COURT REPORTER:  You have to say yes or no.

 9            PROSPECTIVE JUROR NO. 3:  No.

10            MR. MAGNER:  Could you be fair to both sides in the

11   case?

12            PROSPECTIVE JUROR NO. 3:  Yes.

13            MR. BOTELER:  Would you be able to be fair and

14   impartial to the United States based on the evidence that you

15   hear?

16            PROSPECTIVE JUROR NO. 3:  Yeah.

17            MR. BOTELER:  If you heard evidence that convinced

18   you beyond a reasonable doubt, would you be able to follow

19   the judge's instructions?

20            PROSPECTIVE JUROR NO. 3:  Yes.

21            THE COURT:  Thank you.

22            Next?

23            (Prospective Juror No. 3 returns to galley.)

24              (Prospective Juror No. 9 approaches.)

25            PROSPECTIVE JUROR NO. 9:  No. 9, Sandra Nocito.
```

**OFFICIAL TRANSCRIPT**

1           THE COURT:  You're No. 9.

2           PROSPECTIVE JUROR NO. 9:  I was a victim to rape

3     while being car-jacked.  And that's about 25 years ago.  It's

4     still with me, but I'm also -- wanted to let you know I am a

5     police officer and I am secretary to chief of police.

6           THE COURT:  Okay.  Where?

7           PROSPECTIVE JUROR NO. 9:  Westwego.

8           THE COURT:  We'll just go ahead and ask her questions

9     about all of that.

10          MR. MAGNER:  Sure.  You want to cover that now?

11          THE COURT:  You want to go ahead?

12          MR. MAGNER:  Sure.  So being a police officer, you

13    know, working for the police department in Westwego -- and

14    you're the assistant to the chief of police?

15          PROSPECTIVE JUROR NO. 9:  Yes.

16          MR. MAGNER:  Would you have a hard time being fair to

17    the defendant in a case like this?

18          PROSPECTIVE JUROR NO. 9:  Well, I was listening to

19    the questions she asked, if you felt that she should be held

20    to a higher standard, but I never thought about it, but I

21    mean sitting here thinking about it -- and I do feel that

22    way.  Because I look at you and I look at her and y'all both

23    the judge.  Okay?  When you get into politics or being a

24    judge, you should hold yourself higher because you are going

25    against other people that's coming in front of you, whether

1    it's for that, for anything else.  How can you judge someone

2    if you're doing something that's not right?  Okay?

3         And I believe in doing -- I'm an honest person.  I

4    believe in doing the right thing.  I've been with the chief

5    for 27 years.

6         THE COURT:  I mean, I understand that they should,

7    but would you be able to put that aside and say --

8         PROSPECTIVE JUROR NO. 9:  I'm sitting here, and when

9    you asked that question, that's what's going through my head.

10         THE COURT:  As a matter of fact, I was going to ask

11    you about it because I saw the expression on your face.

12         PROSPECTIVE JUROR NO. 9:  Yeah, I just can't get past

13    that.

14         MR. BOTELER:  What juror number are you again?

15    Sorry.  I missed --

16         PROSPECTIVE JUROR NO. 9:  G-9.

17         MR. BOTELER:  9.  Thank you.

18         PROSPECTIVE JUROR NO. 9:  And I think it's because my

19    values are so high.  Somebody does something at work, it

20    really disappoints me and I just have strong feelings about

21    that.

22         THE COURT:  Okay.  Thank you.

23         MR. MAGNER:  So we appreciate your candor, both

24    sides.

25         PROSPECTIVE JUROR NO. 9:  Yeah.

1          MR. MAGNER:  You'd have a hard time taking --

2          PROSPECTIVE JUROR NO. 9:  I would have a hard time.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR NO. 9:  Thank you.

5           (Prospective Juror No. 9 returns to galley.)

6          MR. MAGNER:  We would challenge Juror No. 9 for

7    cause.

8          MR. BOTELER:  No objection, Your Honor.

9          THE COURT:  I did see her reaction to be honest with

10   you.

11         Okay.  So we got that?

12         THE CASE MANAGER:  Yes.

13         THE COURT:  Next person?

14            (Prospective Juror No. 21 approaches.)

15         THE COURT:  Juror No. 21.

16         PROSPECTIVE JUROR NO. 21:  21, Neupert.

17         THE COURT:  All right.  You want to tell us about the

18   situation?

19         PROSPECTIVE JUROR NO. 21:  I mean, I've just been

20   convicted of simple assault.

21         THE COURT:  Okay.

22         PROSPECTIVE JUROR NO. 21:  I'm going to be honest

23   with you, with all y'all, I don't believe in your justice

24   system for various reasons.  So it's a waste of my time being

25   here.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  So y'all know better than me.  Assault is

2    a felony?

3          PROSPECTIVE JUROR NO. 21:  I'm sorry.  I'm hard of

4    hearing too.

5          MR. MAGNER:  Join the club.

6          THE COURT:  Because I don't understand how he got

7    this far, someone convicted of a felony.  Have you been

8    pardoned?

9          PROSPECTIVE JUROR NO. 21:  I'm sorry.

10          THE COURT:  Have you been pardoned?

11          PROSPECTIVE JUROR NO. 21:  I've never did time.  It

12    was a simple assault.  It was a misdemeanor.

13          THE COURT:  Oh, okay.  It was a misdemeanor.

14          PROSPECTIVE JUROR NO. 21:  But, I mean, my son's got

15    felonies.  My brother's got felonies.  I'm just not a big

16    believer in the justice system.

17          THE COURT:  You have questions for him?

18          MR. BOTELER:  If you were able to hear evidence from

19    people associated --

20          PROSPECTIVE JUROR NO. 21:  It's going to be innocent.

21    I don't believe in the justice system.  I'm being honest.

22          MR. MAGNER:  Just for the record, you say your son

23    has a felony conviction?

24          PROSPECTIVE JUROR NO. 21:  Yeah.

25          MR. MAGNER:  For what?

1          PROSPECTIVE JUROR NO. 21:  Heroin.

2          THE COURT:  And your brother --

3          PROSPECTIVE JUROR NO. 21:  My brother is dead now,

4    but he had quite a few felony convictions in New Orleans.

5          MR. MAGNER:  And so I take it you'd have a hard time

6    being fair --

7          PROSPECTIVE JUROR NO. 21:  I would have a hard time

8    being fair.

9          MR. MAGNER:  Okay.  Thank you, sir.

10         MR. BOTELER:  Your Honor, we would move to strike

11   Juror 21.

12         THE COURT:  Any objection?

13         MR. MAGNER:  No objections.

14         THE CASE MANAGER:  21.

15         THE COURT:  Next.  Thank you.

16          (Prospective Juror No. 21 returns to galley.)

17         You can come up.

18           (Prospective Juror No. 12 approaches.)

19         PROSPECTIVE JUROR NO. 12:  No. 12.

20         THE COURT:  Juror No. 12.

21         PROSPECTIVE JUROR NO. 12:  Reginald Thompson, Juror

22   No. 12.

23         THE COURT:  You want to explain the situation.

24         PROSPECTIVE JUROR NO. 12:  I was -- it's been about

25   40 years, 45 years ago.  I was charged with attempted theft

1    with a credit card.

2         THE COURT:  Okay.  That's 40 years ago.

3         PROSPECTIVE JUROR NO. 12:  I spent three weekends,

4    three weekends.  And my brother was charged with possession

5    of marijuana a long time ago.

6         THE COURT:  Would that affect your ability to be fair

7    and impartial in this case?  Could you listen to the evidence

8    and be fair?

9         PROSPECTIVE JUROR NO. 12:  No, it's been so long ago.

10        THE COURT:  It was a long time ago.

11        PROSPECTIVE JUROR NO. 12:  It wouldn't affect me.

12        THE COURT:  Do you have any?

13        MR. BOTELER:  No follow-ups, Your Honor.

14        MR. MAGNER:  No questions.

15        THE COURT:  Thank you.

16        PROSPECTIVE JUROR NO. 12:  Thank you.

17        (Prospective Juror No. 12 returns to galley.)

18             (Prospective Juror No. 24 approaches.)

19        THE COURT:  Juror No. 24?

20        PROSPECTIVE JUROR NO. 24:  Hi.  I'm an example of how

21   bad things happen to good people.

22        THE COURT:  Uh-huh.

23        PROSPECTIVE JUROR NO. 24:  I've had four incidences.

24   I was the victim of a stalker, of a convicted rapist.  He

25   kidnapped my little brother and her (sic) girlfriend, tried

1    to kill them and rape the girl.  He was caught and pled

2    insanity and hung himself in the jail.

3         THE COURT:  He was convicted of that crime?

4         PROSPECTIVE JUROR NO. 24:  Yes.  Yes.

5         THE COURT:  Was there a trial?

6         PROSPECTIVE JUROR NO. 24:  I'm sorry?

7         THE COURT:  Was there a trial --

8         PROSPECTIVE JUROR NO. 24:  I think he pled guilty by

9    insanity.  We were not -- I was not asked to go to the trial,

10   thank goodness.

11        I have a sister-in-law, which is also my best friend,

12   that was kidnapped and raped in the Hammond Square Mall broad

13   daylight.

14        My husband was shot by the Mad Dog killer back in

15   1981.  He shot him three times and then tried to run over him

16   and then shot him again.  However, he did survive.  They

17   never brought it to trial with my husband, but they brought

18   him sketches and he was a terrible, terrible man.

19        And let's see.  What was the other one?  I think

20   that's it.  Yeah.

21        THE COURT:  Any questions?

22        PROSPECTIVE JUROR NO. 24:  So, I mean, it's just bad

23   things.  I'm a good person.  I really am.  I've just had some

24   bad things happen.

25        MR. MAGNER:  Ms. Simmons, I'm sure you're a good

1   person, but I can tell you're very emotional and upset.

2          PROSPECTIVE JUROR NO. 24:  Yes, I'm emotional.

3          MR. MAGNER:  And I think you were upset last time we

4   met a few seconds ago, a few minutes ago.

5          PROSPECTIVE JUROR NO. 24:  Yes.

6          MR. MAGNER:  Would you -- understanding the

7   circumstances, would you have a difficult time being a fair

8   and impartial juror in a case such as this?

9          PROSPECTIVE JUROR NO. 24:  Like I said, I don't know

10  all the details, but if it involves some of the things that I

11  said, yes.

12         THE COURT:  Okay.  Thank you.

13         MR. MAGNER:  Thank you.

14         (Prospective Juror No. 24 returns to galley.)

15         We renew our objection as to Ms. Simmons, No. 24.

16         MR. BOTELER:  No objection based on -- I said no

17  objection to that.

18         Your Honor, quick question, do we have additional

19  jurors if need be?

20         THE COURT:  I'm sorry.  First, what was her number?

21         MR. MAGNER:  She was 24.

22         MR. BOTELER:  24.

23         THE COURT:  So there's only one more downstairs.

24  There's only one more prospective juror downstairs.  Judge

25  Fallon is calling a jury, so when he finishes, they'll --

1    because he called, what, 25?

2           THE CASE MANAGER:  Yes.

3           THE COURT:  Is his a civil trial?

4           THE CASE MANAGER:  His is criminal.

5           THE COURT:  His is criminal too.  We'll see how it's

6    going, but we may have more when he's done.

7           MR. MAGNER:  Maybe we can take stock after we finish

8    all these questions if I use my ten and he uses his six, if

9    we have enough.

10          MR. BOTELER:  We may not use all six.

11          THE COURT:  Huh?

12          MR. MAGNER:  And we may not use all ten.

13          THE CASE MANAGER:  Just to confirm, you struck 24?

14          THE COURT:  What?

15          THE CASE MANAGER:  Did you strike Juror 24?

16          THE COURT:  Yes.

17          MR. MAGNER:  We'll both be -- we'll be judicious.

18          THE COURT:  I know.  You still have a lot of people

19   in the audience.

20          MR. MAGNER:  Huh?

21          THE COURT:  We still have a lot of people to go.

22          MR. MAGNER:  I'm a pessimist.

23          MR. BOTELER:  Mr. Magner.

24             (Prospective Juror No. 17 approaches.)

25          MR. MAGNER:  Oh, sorry.

1          THE COURT:  Juror No. 17.  And you are --

2          PROSPECTIVE JUROR NO. 17:  Troy.

3          THE COURT:  -- Troy Looney?

4          PROSPECTIVE JUROR NO. 17:  Yes ma'am.

5          THE COURT:  You want to explain the situation?

6          PROSPECTIVE JUROR NO. 17:  What's that?

7          THE COURT:  You want to explain the situation?

8          PROSPECTIVE JUROR NO. 17:  Yeah.  The situation is in

9    1995 --

10         THE COURT:  I'm sorry?

11         PROSPECTIVE JUROR NO. 17:  In 1995 -- I don't know if

12   this is important or not, but my wife and I were arrested for

13   possession of marijuana and on misdemeanor charges and --

14         THE COURT:  That was 1995.  Would that interfere with

15   your ability to be fair and impartial here?

16         PROSPECTIVE JUROR NO. 17:  No.

17         THE COURT:  Any follow-up questions?

18         MR. BOTELER:  No, Your Honor.

19         MR. MAGNER:  No questions.

20                    (In open court.)

21         THE COURT:  All right.  Anyone else?

22         Wait.  I'm sorry.  So, Dena, we don't let them go.

23   She's leaving.

24                    (Off the record discussion.)

25                    (In open court.)

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  Next question.

2          All right.  So this is along the same lines, so if

3    you've already disclosed, you don't have to bring it up

4    again, but have you or any member of your family participated

5    in a criminal trial?  This includes if someone pled guilty or

6    no contest or if they served time for a crime or if they

7    participated as a witness or anything else.  Other than what

8    you have already disclosed in a criminal trial.  Anybody?

9          All right.  Other than what you have disclosed

10   already, have you or any member of your family or close

11   friend ever been falsely accused or has someone misidentified

12   you, a friend, or a loved one as a perpetrator of a crime?

13         Along the same lines, have you, your spouse, or

14   significant other, or any family member ever had to testify

15   in a trial other than what you've already disclosed?

16         All right.  Unless you've disclosed this already, are

17   you or have you ever served as a law enforcement officer?  By

18   law enforcement officer, I mean police officer, sheriffs and

19   their deputies, marshals, prosecuting attorneys, such as a

20   district attorney or United States attorney, an investigative

21   agent such as the FBI or the IRS.

22         All right.  Do you know individuals who work as

23   special agents for the FBI or IRS criminal investigation?

24         All right.  Would you tend to believe law enforcement

25   -- somebody?

```
 1          PROSPECTIVE JUROR NO. 6:  What about ATF?

 2          THE COURT:  Yes.  Come on up.

 3              (Prospective Juror No. 6 approaches.)

 4          WHEREUPON, the following proceedings were held at the

 5  bench:

 6          THE COURT:  Okay.  Tell us --

 7          PROSPECTIVE JUROR NO. 6:  Well, a very close -- my

 8  children consider them like their grandparents.  He is an

 9  investigator for the ATF.

10          THE COURT:  All right.  Would that fact make you feel

11  uncomfortable voting not guilty?

12          PROSPECTIVE JUROR NO. 6:  No.

13          THE COURT:  Would you tend to believe a law

14  enforcement officer's testimony more than anyone else's

15  because of this relationship?

16          PROSPECTIVE JUROR NO. 6:  No.

17          THE COURT:  Anybody?

18          MR. MAGNER:  No questions.

19          MR. BOTELER:  No questions, Your Honor.

20          PROSPECTIVE JUROR NO. 6:  Thank you.

21                          (In open court.)

22          THE COURT:  All right.  Do any of you tend to believe

23  or think you would tend to believe a law enforcement

24  officer's testimony more than anyone else's because they

25  are -- simply because they're law enforcement?
```

**OFFICIAL TRANSCRIPT**

```
 1          All right.  Is any member of your family or any close

 2   personal friend now serving or have they ever served as a law

 3   enforcement officer as I've just explained that term?

 4          Okay.  Come up.

 5          WHEREUPON, the following proceedings were held at the

 6   bench:

 7               (Prospective Juror No. 4 approaches.)

 8          THE COURT:  Okay.  Let's wait for them.

 9          PROSPECTIVE JUROR NO. 4:  Juror No. 4.

10          THE COURT:  Okay.  Juror No. 4.

11          PROSPECTIVE JUROR NO. 4:  Spring Gros.  I have my --

12   I'm living with someone and his brother-in-law is a

13   Terrebonne sheriff.

14          THE COURT:  Terrebonne sheriff?

15          PROSPECTIVE JUROR NO. 4:  Uh-huh.

16          THE COURT:  All right.  Would that relationship make

17   it difficult for you to vote not guilty?

18          PROSPECTIVE JUROR NO. 4:  No.

19          THE COURT:  Okay.

20          PROSPECTIVE JUROR NO. 4:  No.

21          THE COURT:  Would you tend to believe law enforcement

22   testimony more than anyone else because of that?

23          PROSPECTIVE JUROR NO. 4:  No.

24          THE COURT:  Any follow-up?

25          MR. MAGNER:  No questions.
```

1           MR. BOTELER:  No questions, Your Honor.

2           THE COURT:  Thank you.

3              (Prospective Juror No. 4 returns to galley.)

4           THE COURT:  Come up.

5                (Prospective Juror No. 17 approaches.)

6           PROSPECTIVE JUROR NO. 17:  My dad used to be -- my

7    dad used to be a bailiff in Jefferson Parish courthouse in

8    Gretna.

9           THE COURT:  Would that make it difficult for you to

10   vote not guilty because of that?

11          PROSPECTIVE JUROR NO. 17:  No.

12          THE COURT:  Would you tend to believe law enforcement

13   more because of that?

14          PROSPECTIVE JUROR NO. 17:  No.

15          THE COURT:  All right.

16          MR. MAGNER:  No questions.

17          MR. BOTELER:  No questions.  Thank you.

18               (Prospective Juror No. 20 approaches.)

19          THE COURT:  Juror No. 20.  Okay.

20          PROSPECTIVE JUROR NO. 20:  My brother's a police

21   officer in Jefferson Parish.

22          THE COURT:  Would that -- and you're Juror No. 20,

23   right?

24          PROSPECTIVE JUROR NO. 20:  20.

25          THE COURT:  And your name.

1          PROSPECTIVE JUROR NO. 20:  Todd Zapico.

2          THE COURT:  All right.  Would that fact make you

3    uncomfortable voting not guilty?

4          PROSPECTIVE JUROR NO. 20:  No.

5          THE COURT:  Would you tend to believe a law

6    enforcement's testimony more than anyone else because of that

7    relationship?

8          PROSPECTIVE JUROR NO. 20:  No.

9          THE COURT:  Any follow-up?

10          MR. MAGNER:  No questions.

11          MR. BOTELER:  No questions.

12          THE COURT:  Thank you.  All right.

13                    (In open court.)

14          THE COURT:  Okay.  So whether or not an immediate

15    family member or close personal friend is now serving as a

16    law enforcement officer, do you generally believe what other

17    police officers and other law enforcement witnesses say more

18    than what other people or witnesses would say?

19          Okay.  Is there anything you or a member of your

20    immediate family or close friend has experienced or perhaps

21    based on what you have seen or read in the news or in the

22    community that generally makes you less likely to believe

23    what police and other law enforcement witnesses say than any

24    other witnesses?

25          Are you or any member of your family at this time or

**OFFICIAL TRANSCRIPT**

1    any time in the past other than what -- other than what you

2    have disclosed already an official or employee of the United

3    States Government?

4         All right.  Do you or any member of your family have

5    any dealings with the United States or its agencies or with

6    the Defendant from which you are -- or they may profit?

7         Have you ever had or do you now have or do you

8    presently anticipate having a dispute or claim or case

9    against the United States, specifically the IRS, or with the

10   defendant?

11        Do you have any current cases pending in Second City

12   Court or any other court other than what you've already

13   disclosed?

14        Okay.  All right.  Do you know of any reason why you

15   may be prejudiced for or against the Government or the

16   Defendant personally or because she's a judge because of the

17   nature of the charges involved in this case or any other

18   circumstance?

19        Do you have any preconceived notions about the facts

20   of this case or the Defendant or the Government, which you

21   have not discussed in your responses to previous questions

22   today?

23        Do you hold any opinions about courts, defense

24   attorneys, prosecutors, or law enforcement officers, or

25   judges that would prevent you from fairly considering and

**OFFICIAL TRANSCRIPT**

1   deciding this case solely on the evidence?

2         Do you have any belief or opinion that the offenses

3   with which the defendant is charged are unique in the sense

4   that they should be pursued with extraordinary vigor, they

5   should not constitute an offense, they carry penalties, which

6   you may consider improper, or do you find the offenses

7   charged particularly offensive?

8         Have you or a close family friend or family member

9   ever studied law or the criminal justice system, other than

10  what you disclosed already?

11        You've already disclosed it, right?  You disclosed it

12  already, right?

13        PROSPECTIVE JUROR NO. 12:  Yes.

14        THE COURT:  Is there anything that you feel that

15  either the Government or the Defense might want to know about

16  you that we have not covered?

17        Okay.  If you were the United States attorney charged

18  with the responsibility of prosecuting or if you were a

19  defendant on trial here today charged with the same offenses

20  or if you were counsel for the defense, do you know of any

21  reason why you would not be satisfied to have this case tried

22  by someone in your frame of mind?

23        Other than -- I think we've covered this already, but

24  is there anything that would prevent you from understanding

25  the evidence presented in this matter and the law as it is

1   explained to you by the court other than what you might have

2   disclosed already?

3          Is there anything you wish to tell the lawyers or me

4   in private that might in any way pertain to whether or not

5   you should be a juror in this case?

6          (Sneezes.)  Excuse me.

7          MR. MAGNER:  Bless you.

8          THE COURT:  So this case is going to last about three

9   to four days, so anything extraordinary going on in your life

10  that would prevent you from serving on this jury this week?

11         All right.  Come up here.

12             (Prospective Juror No. 12 approaches.)

13         WHEREUPON, the following proceedings were held at the

14  bench:

15         PROSPECTIVE JUROR NO. 12:  Okay.  I take medication

16  every day.  I'm 63 years old.

17         THE COURT:  You take medication?

18         PROSPECTIVE JUROR NO. 12:  And I don't have my

19  medication with me, so if I was to serve --

20         THE COURT:  But you usually take it.  You have

21  medication that you usually take, so we're going to leave

22  today about 3:00, 3:15.

23         PROSPECTIVE JUROR NO. 12:  Pardon me?

24         THE COURT:  We're going to leave today -- we're going

25  to stop early about 3:00, 3:15, and then carry on from there.

1          PROSPECTIVE JUROR NO. 12:  Okay.  All right.  I would

2    be able to get it if I was --

3          THE COURT:  And we -- I don't know what kind of

4    medication you take, but we have snacks if you need to free

5    of charge back there, water and soft drinks and coffee if you

6    need to take it on a full stomach, you know.

7          PROSPECTIVE JUROR:  Okay.  Thank you.

8          THE COURT:  All right.  Thank you.

9           (Prospective Juror No. 12 returns to galley.)

10         Next.

11              (Prospective Juror No. 17 approaches.)

12         PROSPECTIVE JUROR NO. 17:  I'm a principal in a small

13   family business and we handle luggage -- lost luggage

14   delivery out of New Orleans and Nashville and our company

15   handles about 80 percent of lost luggage coming through the

16   airport.  And for me to be here for a prolonged period of

17   time it's going to have a serious impact on our business and

18   to service New Orleans metro area.  We deliver all airlines

19   out of New Orleans International except Delta and Southwest.

20         THE COURT:  I understand that.  But we do need people

21   to serve, and as you can see, it's -- we have a small group

22   of people here today.

23         PROSPECTIVE JUROR NO. 17:  Right.

24         THE COURT:  But it should only last -- it's not going

25   to last into next week.  Thank you.

1              Prospective Juror No. 17 returns to galley.)

2        Next.

3              (Prospective Juror No. 5 approaches.)

4        THE COURT:  Juror No. 5?

5        PROSPECTIVE JUROR NO. 5:  Shewanna.

6        THE COURT:  Yes.

7        PROSPECTIVE JUROR NO. 5:  Yes.  I own a salon in

8    Kenner, Louisiana.

9        THE COURT:  Where?

10       PROSPECTIVE JUROR NO. 5:  Kenner, Louisiana.

11       THE COURT:  Kenner.

12       PROSPECTIVE JUROR NO. 5:  And I'm in the process of

13   relocating and that's happening this week actually and I'm

14   the only person that's handling everything, so I don't know

15   how I can read -- you know, move anything around because it's

16   actually everything is scheduled.  So my -- the person -- the

17   building that I'm in, they're scheduled to occupy their

18   space, like, next week, so I'm moving.

19       THE COURT:  Do you have papers to show you got a

20   moving company coming?

21       PROSPECTIVE JUROR NO. 5:  No, I don't have a moving

22   company or anything like that.

23       THE COURT:  It's just you physically moving?

24       PROSPECTIVE JUROR NO. 5:  Yeah.

25       THE COURT:  Do you have any questions?

**OFFICIAL TRANSCRIPT**

1          MR. MAGNER:  Are some of these things that you can do

2   in the evening?

3          PROSPECTIVE JUROR NO. 5:  I work so I have to run the

4   salon and try to do all this at the same time.

5          MR. MAGNER:  Right.

6          PROSPECTIVE JUROR NO. 5:  I don't have any employees.

7   So it's just me.

8          THE COURT:  So you're just moving to another salon?

9          PROSPECTIVE JUROR NO. 5:  Yeah, I'm moving to another

10  location.  My salon is moving to another location in the

11  area.  So I'm pretty much moving the whole -- everything out

12  of the salon to a new space.

13         THE COURT:  So you knew you were coming for jury

14  service, right?

15         PROSPECTIVE JUROR NO. 5:  Huh?

16         THE COURT:  You've known you were coming to serve.

17         PROSPECTIVE JUROR NO. 5:  I just got this jury letter

18  on the 8th, which was Wednesday.

19         THE COURT:  Okay.  Anything further?

20         MR. BOTELER:  How much -- how big is your salon?

21         PROSPECTIVE JUROR NO. 5:  It's -- I'm moving from a

22  600 square feet to 1,200 square feet.

23         MR. BOTELER:  And you have a lot of stuff to move to

24  the new place?

25         PROSPECTIVE JUROR NO. 5:  Yeah.

1          MR. BOTELER:  And when do you have to leave by?

2          PROSPECTIVE JUROR NO. 5:  Monday is my date to

3     actually be moved into the new location.  So Saturday would

4     be my last day to be done, but I'm working in between moving.

5          THE COURT:  But you would be serving on a jury.  You

6     wouldn't be working, so you would have the evenings and the

7     weekend.

8          PROSPECTIVE JUROR NO. 5:  Well, that's the thing.  If

9     I'm here, then in the evening, I have to reschedule my

10    clients.  So if I'm here, I have to do my clients in the

11    evening.  I got people -- I'm trying to do a whole lot of

12    stuff simultaneously.  I didn't know I was going to be in

13    jury for a day.  I never done this before, so I didn't know

14    this --

15         THE COURT:  I know you've had ample opportunity to

16    disclose to the jury -- so this is --

17         PROSPECTIVE JUROR NO. 5:  I didn't know --

18         THE COURT:  So, you know, I can't excuse you at this

19    point.

20         PROSPECTIVE JUROR NO. 5:  Okay.

21         THE COURT:  Because I don't have any documentation

22    that you have a mover coming.  You haven't presented me with

23    a lease that --

24         PROSPECTIVE JUROR NO. 5:  I mean, I can bring a lease

25    in --

**OFFICIAL TRANSCRIPT**

1          THE COURT:  I need the lease now.

2          PROSPECTIVE JUROR NO. 5:  Oh, I didn't -- I mean -- I

3     understand.  I understand.

4          THE COURT:  I'm sorry.  There's nothing more I can

5     do.  Everybody has things.  You know what, I got a big trial

6     starting in two weeks and I got jury duty.  I told them I got

7     a trial, but they told me I need to show up.  So I'm sorry.

8          PROSPECTIVE JUROR NO. 5:  I'll figure something out.

9     Thank you.

10          THE COURT:  Thank you.

11                    (In open court.)

12          THE COURT:  Anybody else?

13          All right.  Let me ask you some questions that are

14     more specific to the charges here.  As you have heard, this

15     case involves an allegation that a person willfully filed

16     false tax returns.  Do you have any legal or morale

17     objections or reservations about the federal income tax

18     system?

19          More specifically, do you have any reservations with

20     the United States Government's prosecution of alleged

21     violation of federal income tax laws?

22          Do you or any member of your family or acquaintances

23     belong to any organization engaged in forms of tax defiance

24     or protest?

25          Do you or any member of your family or any of your

1   close friends have any specialized training, experience, or

2   education in accounting or tax preparation?

3         All right.  Y'all want to come up?

4         WHEREUPON, the following proceedings were held at the

5   bench:

6              (Prospective Juror No. 4 approaches.)

7         PROSPECTIVE JUROR NO. 4:  Juror No. 4.

8         THE COURT:  Okay.

9         PROSPECTIVE JUROR NO. 4:  I do accounting.  That's my

10  position.

11        THE COURT:  I'm sorry?  What?

12        PROSPECTIVE JUROR NO. 4:  I do accounting.  That's my

13  position.

14        THE COURT:  Okay.  She does accounting.  That's her

15  position.

16        Would you be able to listen to the evidence here?  I

17  don't know if accounting is -- do you do tax preparation?

18        PROSPECTIVE JUROR NO. 4:  Uh-huh.  For our sales tax.

19  I do our sales tax in our franchise --

20        THE COURT:  Do you do individual tax?

21        PROSPECTIVE JUROR NO. 4:  No.

22        THE COURT:  For other people?

23        PROSPECTIVE JUROR NO. 4:  No.  No.

24        THE COURT:  Any questions?

25        MR. MAGNER:  No questions.

1          MR. BOTELER:  No questions, Your Honor.

2          THE COURT:  All right.  Thank you.

3             (Prospective Juror No. 4 returns to galley.)

4          THE COURT:  Next.  Next.

5                (Prospective Juror No. 19 approaches.)

6          PROSPECTIVE JUROR NO. 19:  Registered tax preparer

7    for the IRS.

8          THE COURT:  You're a tax preparer for the IRS.

9          PROSPECTIVE JUROR NO. 19:  Not for the IRS, but I'm

10   registered with the IRS.

11         THE COURT:  Okay.  So you do tax preparation for

12   other people?

13         PROSPECTIVE JUROR NO. 19:  I did tax preparation.  I

14   did over 5,000 paid returns of compensation within the years

15   of 2006 and 2013.

16         THE COURT:  All right.  Would that make it difficult

17   for you to listen to evidence about tax preparation and be

18   fair and impartial?

19         PROSPECTIVE JUROR NO. 19:  I managed tax offices,

20   about five different tax offices for a management chain here

21   in the city of New Orleans.

22         THE COURT:  Any questions?

23         MR. MAGNER:  Are you an enrolled agent?

24         PROSPECTIVE JUROR NO. 19:  No, I'm not.

25         MR. MAGNER:  What are the credentials that you have?

1           PROSPECTIVE JUROR NO. 19:  It's a -- it's a PTIN

2    number.

3           MR. MAGNER:  Okay.  I gotcha.  Thank you.

4           MR. BOTELER:  During that time that you were running

5    a tax preparation, was your office ever audited by IRS civil

6    side?

7           PROSPECTIVE JUROR NO. 19:  No.

8           MR. BOTELER:  Did they ever do a due diligence audit

9    on the earned income tax credit?

10           PROSPECTIVE JUROR NO. 19:  No.  Nothing I've been

11    involved with.

12           MR. BOTELER:  At any point, would you or anyone that

13    you worked with in tax preparation contacted by IRS CI?

14           PROSPECTIVE JUROR NO. 19:  No.

15           MR. BOTELER:  -- investigations.  And based on your

16    experience there as a preparer, was there anything that would

17    impact your ability to be impartial and fair to both sides?

18           PROSPECTIVE JUROR NO. 19:  No.

19           MR. BOTELER:  Thank you, Your Honor.

20           MR. MAGNER:  One more question while we have you up

21    here, Mr. Willis.  So on our little chart, it says that your

22    employer is Camellia Grill.  Is that an additional job

23    from --

24           PROSPECTIVE JUROR NO. 19:  I'm no longer employed

25    there.

**OFFICIAL TRANSCRIPT**

1          MR. MAGNER:  Thank you.

2          THE COURT:  Thank you.

3          (Prospective Juror No. 19 returns to galley.)

4          (Prospective Juror No. 30 approaches.)

5          PROSPECTIVE JUROR NO. 30:  Juror 30, Kevin Schulz.

6    I'm a CPA and I've done individual taxes.

7          THE COURT:  Okay.  How long have you been doing that?

8          PROSPECTIVE JUROR NO. 30:  I guess it was about eight

9    years.  It's been a few years since I've done it.

10         THE COURT:  Oh, so you haven't --

11         PROSPECTIVE JUROR NO. 30:  My experience was early on

12   and then when I started -- you know, got out of -- I say got

13   out of kind of, like, doing stuff on my own, you know, I

14   didn't stay up on them that much, so I just --

15         THE COURT:  Does that experience prevent you from

16   listening to the government's case impartially and rendering

17   a verdict according to the evidence?

18         PROSPECTIVE JUROR NO. 30:  I don't think.

19         THE COURT:  Would you be able to be fair and

20   objective with the defendant and listen to --

21         PROSPECTIVE JUROR NO. 30:  I think.

22         THE COURT:  -- both sides of the case?

23         MR. MAGNER:  So I may not have followed you.  You are

24   a CPA.

25         PROSPECTIVE JUROR NO. 30:  Uh-huh.

1          MR. MAGNER:  You're currently working as an

2    accountant?

3          PROSPECTIVE JUROR NO. 30:  No, I retired.  I was at

4    Entergy and, you know, once I started, you know, doing I

5    guess more financial analysis and, you know, at Entergy, I

6    quit being any kind of individual kind of tax worker.

7          MR. MAGNER:  Are you working now?

8          PROSPECTIVE JUROR NO. 30:  No, I'm retired.

9          MR. MAGNER:  Okay.  Congratulations.

10         THE COURT:  Thank you.

11         MR. BOTELER:  I have just a couple questions.

12         THE COURT:  I thought you asked them already.

13         MR. BOTELER:  No, Your Honor.  When the -- the time

14    that you worked as a tax preparer, did you ever have an

15    opportunity where you or any of your clients were audited by

16    the IRS?

17         PROSPECTIVE JUROR NO. 30:  No.

18         MR. BOTELER:  And how long ago did you prepare

19    individualized taxes?  I kind of missed that.

20         PROSPECTIVE JUROR NO. 30:  It's been -- it's probably

21    about -- I'm going to say about ten years, maybe eight years.

22         MR. BOTELER:  And then around the time you were

23    preparing tax returns, did you or your clients ever get

24    approached by IRS CI?

25         PROSPECTIVE JUROR NO. 30:  No.

1          MR. BOTELER:  No further questions, Your Honor.

2          THE COURT:  All right.  Thank you.

3                    (In open court.)

4          THE COURT:  All right.  Have you or any of your

5     family members or close friends been audited by the IRS for

6     your personal finances or business finances?

7          All right.  Have you ever been involved in an audit

8     of your employer's financial records conducted by the IRS or

9     by private accountants?

10          Have any of you ever been the primary caretaker for

11     another person suffering for a chronic illness or disease?

12     You want to come up?

13          WHEREUPON, the following proceedings were held at the

14     bench:

15          (Prospective Juror No. 6 approaches.)

16          PROSPECTIVE JUROR NO. 6:  My father had a stroke and

17     I took care of him with my mother for four years.  And then

18     my mother had brain cancer and lung cancer and so I took care

19     of her for the eight weeks until she passed away.

20          THE COURT:  If those events regarding this -- similar

21     to that in this trial, would you be able to be fair and

22     impartial and not unduly sympathetic and be able to look at

23     the facts and the evidence in this case?

24          PROSPECTIVE JUROR NO. 6:  Yeah, I believe I could be.

25          MR. MAGNER:  No questions.  Thank you.

1          MR. BOTELER:  Briefly, if you heard evidence that

2   someone was taking care of an elderly mother in her various

3   conditions, would that invoke into you any emotional response

4   back towards what your experiences were that may impact your

5   ability to be fair and impartial?

6          PROSPECTIVE JUROR NO. 6:  No, I mean, it's been five

7   years since my mom passed away.  So it's been a little bit of

8   time.  I mean, any time you think of your parent, like you

9   have sadness, but, I mean, it's been -- it's been a little

10  bit of time.  My dad died 20 years ago.

11         THE COURT:  Thank you.

12         MR. BOTELER:  Thank you.

13         (Prospective Juror No. 6 returns to galley.)

14           (Prospective Juror No. 17 approaches.)

15         PROSPECTIVE JUROR NO. 17:  Okay.  I don't know if I

16  -- completely sure if I understand the question or not.  I've

17  taken care of my mother-in-law and held her hand until she

18  died.  My brother -- two brother-in-laws had cancer and I was

19  with them until they took their last breath.  Now my

20  father-in-law is dying.

21         THE COURT:  Would that make it difficult for you to

22  be fair and impartial if you heard evidence about that --

23         PROSPECTIVE JUROR NO. 17:  No.  No.

24         THE COURT:  -- in regards to this trial?

25         PROSPECTIVE JUROR NO. 17:  No.

1          MR. BOTELER:  Just briefly when you said with your

2    mother-in-law, brother-in-law, and father-in-law, you helped

3    them in the weeks and months beforehand?

4          PROSPECTIVE JUROR NO. 17:  Yeah.  I was with them

5    until they died.

6          MR. BOTELER:  And how long ago was that?

7          PROSPECTIVE JUROR NO. 17:  It all started with my dad

8    in 2012 or '13, something like that, but I lost -- I lost a

9    bunch of family members in a short period of time.

10         THE COURT:  Thank you.

11         MR. BOTELER:  Thank you.

12                    (In open court.)

13         THE COURT:  All right.  Do either you or a close

14   family member or close friend or family member suffer from

15   severe anxiety or stress?

16         All right.  Let me ask you some more general

17   questions.  I'm going to go to each of you and ask you to

18   answer these same questions.  This is just to give the

19   lawyers a little bit more personal background of everybody

20   starting with No. 1 over here.

21         All right.  So I'll ask each juror to rise with the

22   one in the first seat.  Can you tell us what your name is?

23         PROSPECTIVE JUROR NO. 1:  Edward George Mason, III.

24         THE COURT:  And you're juror number?

25         PROSPECTIVE JUROR NO. 1:  1, G-1.

1       THE COURT:  All right.  Where did you go to school?

2       PROSPECTIVE JUROR NO. 1:  Valley Forge Academy.

3       THE COURT:  All right.  How much education do you

4  have?

5       PROSPECTIVE JUROR NO. 1:  High school and x-ray

6  school.

7       THE COURT:  All right.  So what do you do for a

8  living?

9       PROSPECTIVE JUROR NO. 1:  I am retired happily.

10      THE COURT:  What did you do before that?

11      PROSPECTIVE JUROR NO. 1:  Pardon?

12      THE COURT:  What did you do before you retired?

13      PROSPECTIVE JUROR NO. 1:  I worked as an x-ray

14  technologist and management with the State of Louisiana, LSU.

15      THE COURT:  Are you married or do you live with

16  someone?

17      PROSPECTIVE JUROR NO. 1:  Married.

18      THE COURT:  Does your spouse or partner work outside

19  the home?

20      PROSPECTIVE JUROR NO. 1:  Nope.  She's happily

21  retired as well.  She worked at the same hospital I did.

22      THE COURT:  Okay.  Do you have any children?  And if

23  so, what do they do?  How old are they and what do they do?

24      PROSPECTIVE JUROR NO. 1:  Two.  One is 39.  He works

25  at Evamor in Covington, the water plant.

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR NO. 1:  And daughter is 36 and she

3    is a freelance artist.

4          THE COURT:  Thank you.

5          Juror No. 2, can you tell us your name?  Where did

6    you go to school?

7          PROSPECTIVE JUROR NO. 2:  George Dickinson, III.  I

8    go by Bo.  Went to Holy Cross High School and Southern Miss,

9    so high school and four years of college.  Kinesiology, but

10   now I'm in sales, plastic and paper bags.  So I didn't really

11   use the kinesiology degree.  Married and two kids; one, 3,

12   and one, 1.

13         THE COURT:  All right.  Does your spouse or partner

14   work outside the home?

15         PROSPECTIVE JUROR NO. 2:  Yes, Ochsner Baptist --

16         THE COURT:  What does she do?

17         PROSPECTIVE JUROR NO. 2:  -- nurse.

18         THE COURT:  Oh, she's a nurse.  Okay.  Thank you.

19         PROSPECTIVE JUROR NO. 3:  I'm Joshua Haynes,

20   graduated from Ponchatoula Jr. -- Ponchatoula High School.  I

21   have two kids.  One is 3.  One is 5.  My wife works in-home

22   with the kids.  She's a stay-at-home mom.

23         THE COURT:  All right.  What did you say you do for a

24   living?

25         PROSPECTIVE JUROR NO. 3:  I work for a company called

**OFFICIAL TRANSCRIPT**

1    Graham Packaging.  We blow the containers for Folgers.

2           THE COURT:  Okay.  All right.  Thank you.

3           PROSPECTIVE JUROR NO. 4:  Spring Gros, Juror No. 4.

4    I do accounting.  I am currently living with someone.  He

5    does --

6           THE COURT:  Where did you go to school?

7           PROSPECTIVE JUROR NO. 4:  Ashuna (phonetic) High

8    School and I also did business management.

9           THE COURT:  Okay.  Go on.

10          PROSPECTIVE JUROR NO. 4:  One child, he's 32.  He

11   works as a machinist in Baton Rouge.

12          THE COURT:  And you said you live with someone.  What

13   do they do?

14          PROSPECTIVE JUROR NO. 4:  He does safety training.

15          THE COURT:  For what company?

16          PROSPECTIVE JUROR NO. 4:  RelyOn Nutec.

17          THE COURT:  Thank you.

18          PROSPECTIVE JUROR NO. 5:  Shewanna Hunter, No. 5.

19   Married.

20          THE COURT:  Where did you go to school?

21          PROSPECTIVE JUROR NO. 5:  Oh, Sarah T. Reed, New

22   Orleans.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR NO. 5:  I'm married.  I've been --

25   I'm a cosmetologist, owner of a salon.  I been -- I went to

1  dental tech school and I have two sons, a 29-year-old and I

2  have a stepson that's 29 years old.

3        THE COURT:  All right.  What do they do, if you know?

4        PROSPECTIVE JUROR NO. 5:  My younger son, by a month,

5  he is working at FedEx and the other son he's a truck driver.

6        THE COURT:  So are you married or live with someone?

7        PROSPECTIVE JUROR NO. 5:  Yes, I'm married.  My

8  husband is self-employed.

9        THE COURT:  A what?

10       PROSPECTIVE JUROR NO. 5:  He's self-employed.

11       THE COURT:  Okay.  What does he do?

12       PROSPECTIVE JUROR NO. 5:  He has a restroom trailer

13 business.

14       THE COURT:  Okay.  Thank you.

15       PROSPECTIVE JUROR NO. 6:  Hello.  My name is Melissa

16 Ziegler.  I am a secretary at an elementary school in

17 Mandeville.  I am married.  My husband is a teacher in the

18 same district.  We have four children -- let's see -- 7, 10,

19 11, and 16.  I went to Slidell High School.

20       THE COURT:  Okay.  Thank you.

21       Start over there on the other end.

22       PROSPECTIVE JUROR NO. 10:  Good morning.  My name is

23 Audrika Woods.

24       THE COURT:  Where did you go to school?

25       PROSPECTIVE JUROR NO. 10:  Warren Easton, SUNO.  I've

1    been all over.  I like to continue my education.

2           THE COURT:  So what kinds of things have you studied?

3           PROSPECTIVE JUROR NO. 10:  Pharmacy, psychology.  I'm

4    a home care specialist.  I'm single.  I have a 15- and

5    16-year-old.

6           THE COURT:  What do you do for a living now?

7           PROSPECTIVE JUROR NO. 10:  Wound care.

8           THE COURT:  Okay.

9           PROSPECTIVE JUROR NO. 10:  Yes, wound care

10   specialist.

11          THE COURT:  Are you married or live with someone?

12          PROSPECTIVE JUROR NO. 10:  No, I'm single.

13          THE COURT:  Okay.

14          PROSPECTIVE JUROR NO. 10:  I'm separated.

15          THE COURT:  Okay.  Thank you.

16          PROSPECTIVE JUROR NO. 10:  You're welcome.

17          PROSPECTIVE JUROR NO. 11:  Hi, I'm Chadwick Young,

18   No. 11.  I graduated from the Mississippi School for Math and

19   Science, Mississippi State University, University of Texas at

20   Austin and the New Orleans seminary, Baptist seminary.

21          THE COURT:  What did you study in college?

22          PROSPECTIVE JUROR NO. 11:  I have a Ph.D. in

23   astronomy.  I have an M-BIV (phonetic.  I'm a pastor and

24   professor in Thibodaux.

25          THE COURT:  All right.

**OFFICIAL TRANSCRIPT**

```
 1              PROSPECTIVE JUROR NO. 11:  I'm married.  I'm married.
 2    We have two kids, 14 and 17.
 3              THE COURT:  All right.  Does your spouse --
 4              PROSPECTIVE JUROR NO. 11:  She's a professor as well.
 5              THE COURT:  What does she teach?
 6              PROSPECTIVE JUROR NO. 11:  Physics and astronomy.
 7              THE COURT:  All right.  Thank you.
 8              PROSPECTIVE JUROR NO. 12:  Good morning.  My name is
 9    Reginald Thompson.  I graduated -- well, I graduated high
10    school.  I went to Delgado Community College in commercial
11    art.  I'm married for 40 years.  I have three children, a
12    lawyer, a preacher, and a teacher and --
13              THE COURT:  How old are your children?  What do they
14    do?
15              PROSPECTIVE JUROR NO. 12:  Pardon me?
16              THE COURT:  How old are your children and what do
17    they do?
18              PROSPECTIVE JUROR NO. 12:  Well, I'm 63 years old.  I
19    know the oldest is about 47.  40, I think.  But they -- my
20    youngest is 37 and I think 38, about -- wait.  They're four
21    years apart.  37 and -- I don't know their age.
22              THE COURT:  Close enough.  Do you know what they do?
23              PROSPECTIVE JUROR NO. 12:  I know they birthdays.  I
24    have to calculate it from there.
25              THE COURT:  That's good.  That's good.
```

**OFFICIAL TRANSCRIPT**

1            PROSPECTIVE JUROR NO. 12:  Okay.  But, you know,

2    that's me.

3            THE COURT:  All right.  Thank you.

4            PROSPECTIVE JUROR NO. 12:  Okay.

5            THE COURT:  If the lawyers have any questions, y'all

6    just raise your hand.

7            Okay.  Go ahead.

8            PROSPECTIVE JUROR NO. 13:  Bruce Stevens.  I went to

9    Terrebonne High, went to Nicholls a couple years.  I got two

10   daughters.  One is an accountant at Bayou Home Care in Houma.

11   One is at Nicholls, 21; oldest one is 30, youngest one's 31

12   (sic).  I work for Comcast Cable.  I been with them for

13   33 years in February.

14           THE COURT:  Okay.  Any follow-up?

15           PROSPECTIVE JUROR NO. 14:  My name is Robert Dillon

16   and I went to school in Marion and I didn't graduate, but I

17   got two kids.  My wife and --

18           THE COURT:  How old are your kids?

19           PROSPECTIVE JUROR NO. 14:  26 and 24.

20           THE COURT:  Do you know what they do?

21           PROSPECTIVE JUROR NO. 14:  They work for -- in

22   Arkansas.  They work for Nike.

23           THE COURT:  Okay.  Does your spouse work outside the

24   home?

25           PROSPECTIVE JUROR NO. 14:  No.

1          THE COURT:  All right.  Thank you.

2          PROSPECTIVE JUROR NO. 15:  My name is Byron Williams.

3   I'm married.  I have three kids.  My oldest is 46, 45, and

4   40.  I worked at -- I retired.  I worked at a coal plant in

5   Plaquemines Parish.  I was a supervisor over there for

6   42 years.  So now I'm retired.  But I still have a small

7   business of my own that -- I have a nightclub, restaurant set

8   up and trucking business.  So that's what I do.

9          THE COURT:  Thank you.

10          PROSPECTIVE JUROR NO. 15:  And that's it?

11          THE COURT:  That's it.

12          Any questions from counsel?

13          PROSPECTIVE JUROR NO. 16:  Good morning.  My name is

14   Rieko Bush.  I went to Okinawa Junior College.  I work for a

15   company called International Marine System and I do

16   electronic in store and my daughter is -- I only have one

17   daughter.  I'm a widow and she's 32 years old and she works

18   for State Marshal in Kentucky.

19          THE COURT:  All right.  Thank you.

20          PROSPECTIVE JUROR NO. 17:  Should I turn it on?

21          THE COURT:  Is it on?  There you go.

22          PROSPECTIVE JUROR NO. 17:  My name's Troy Looney.

23   I'm 61 years old and married.  I have two children, 31, 35,

24   and I have three grandchildren.  I work in the building

25   maintenance hotel business.

1          THE COURT:  Okay.  Thank you.

2          PROSPECTIVE JUROR NO. 18:  Hello.  My name is Mary

3   Royer.  I went to Northlake Christian school and attended

4   Southeastern Louisiana University for graphic design.  I

5   currently work for Rubio Enterprises in marketing and design,

6   which is a restaurant group, and I'm not married nor do I

7   have any children.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR NO. 19:  Jeffrey Willis.  I grew up

10  in Long Island, New York, went to Comsewogue Senior High

11  School in Long Island, Port Jefferson Station was the town.

12  I have a degree in culinary arts through Johnson & Wales,

13  spent 20 years in food service management, and then also did

14  tax preparation for a good many years.  And then currently

15  employed doing lost luggage recovery out of New Orleans

16  international and single, never been married, no children.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR NO. 19:  And also serve as a

19  commissioner in charge for Jefferson Parish for the poll

20  commissioners.

21         THE COURT:  All right.  Thank you.

22         PROSPECTIVE JUROR NO. 20:  Todd Zapico, No. 20.

23  University of New Orleans.  I'm a teacher.  My wife's a

24  teacher and three kids.

25         THE COURT:  All right.  What do you teach?

1          PROSPECTIVE JUROR NO. 20:  Kids with disabilities.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR NO. 22:  Good morning, Your Honor.

4  I'm Al Tritico.  I worked for many years as a journalist.  My

5  master's degree is in journalism and I'm currently a school

6  teacher.  Never been married, no kids.

7          THE COURT:  Thank you.

8          PROSPECTIVE JUROR NO. 23:  Good morning.  I'm Paula

9  M. Williams.  I graduated from East Jefferson High School,

10  some college at UNO.  I'm divorced with three kids and I'm a

11  banker.

12          THE COURT:  All right.  Thank you.

13          Did you say how old your kids are and what they do?

14          PROSPECTIVE JUROR NO. 23:  38.  She works for -- I

15  can't think of the name of the -- she's a finance manager.  I

16  can't think of the name of the company.  Middle child is a

17  lineman and baby boy is a professional baseball player.

18          THE COURT:  Thank you.

19          Well, you know we want to know who he plays for.  Who

20  does your son play for?

21          PROSPECTIVE JUROR NO. 23:  He was with the Phillies.

22          THE COURT:  Oh, wow.

23          PROSPECTIVE JUROR NO. 23:  He was injured so he

24  wasn't --

25          THE COURT:  Oh, he didn't play in the World Series.

1    PROSPECTIVE JUROR NO. 23:  But that's his team.

2    THE COURT:  Okay.

3    PROSPECTIVE JUROR NO. 25:  Good morning, Patti

4 Champagne, Juror No. 25, graduated from Thibodaux High

5 School, Nicholls State University.  I am the administrator of

6 the Center for Pediatric Therapy.  I have one child, Collin,

7 16, and I'm married to Jerome Champagne who is the operations

8 manager for Total Energies.

9    THE COURT:  Thank you.

10    PROSPECTIVE JUROR NO. 26:  Todd Bourgeois, graduated

11 from Riverside Academy, married three kids.  Me and my wife

12 retired.  Kids is 36, 34, and 28.  One works at Bayer as an

13 operator.  The other one's a lab technician for the State and

14 the other one is an occupational therapist.

15    THE COURT:  And what did you and your wife do before

16 you retired?

17    PROSPECTIVE JUROR NO. 26:  I worked at Noranda

18 Aluminum and my wife worked at Occidental.

19    THE COURT:  All right.  Thank you.

20    PROSPECTIVE JUROR NO. 27:  I'm No. 27, Emily

21 Capdeville.  I went to Franklin and UNO, English professor.

22 My husband is a construction manager and I have a

23 four-year-old.

24    THE COURT:  Thank you.

25    PROSPECTIVE JUROR NO. 28:  Hello, Juror No. 28, Henry

1    Selvant.  I graduated from Thurgood Marshall High School,

2    went to Dillard University.  Got my degree in physics.  I'm a

3    librarian right now, First Line District Schools.  I'm

4    married, have two sons, four-year-old and a newborn and my

5    wife is a manager at Roberts.

6            THE COURT:  Thank you.

7            PROSPECTIVE JUROR NO. 29:  Derrick Gerlich, graduated

8    from Palo Verde High School in Las Vegas, Nevada, and I'm

9    currently living here in Louisiana.  I'm a truck driver for

10   the -- a contractor for the postal service.  I got three kids

11   that live in Mississippi with their mom.  I'm separated.

12           THE COURT:  All right.  Thank you.

13           PROSPECTIVE JUROR NO. 30:  I'm Juror No. 30, Kevin

14   Schulz.  I graduated from Brother Martin and got a degree at

15   Southeastern in accounting.  I'm married, two kids, 26, 24;

16   son works at Impera Wealth and my daughter is still in

17   pharmacy school.

18           THE COURT:  All right.  Your wife?

19           PROSPECTIVE JUROR NO. 30:  My wife works for Fabragen

20   (phonetic).

21           THE COURT:  All right.  Thank you.

22           Anybody else back there?  That's it?

23           Dena, I think that's it.  Want to get the mic?

24           If you all will just give us a minute.

25           Counsel, do you all have any additional questions?

1    Any follow-up questions?  No?

2            MR. BOTELER:  Your Honor, no further questions.

3            MR. MAGNER:  None for the Defense, Your Honor.

4            THE COURT:  All right.  Well, you have your

5    opportunity now to exercise your -- you all want to approach

6    the bench?

7            WHEREUPON, the following proceedings were held at the

8    bench:

9            THE COURT:  Do you all have any more -- only one.  I

10   only need one.

11           Do you all have any more challenges for cause?

12           MR. MAGNER:  No.

13           MR. BOTELER:  No.

14           THE COURT:  So you let them stay at the table to do

15   their peremptories and you go back and forth?

16           THE CASE MANAGER:  Yes.  Yes.

17           THE COURT:  All right.  I'm going to give you all an

18   opportunity to exercise your peremptory challenges.

19           MR. MAGNER:  Three and two, three and two?

20           THE CASE MANAGER:  Yes.

21                      (In open court.)

22        (Whereupon, peremptory challenges were exercised.)

23           THE COURT:  All right.  We'll just give the lawyers

24   an opportunity to make their peremptory challenges.  I

25   explained to you before the challenges, so if you could just

1    be patient, it shouldn't take but a bit.

2         Is everybody okay?  Does anybody need to use the

3    restroom?  You can stand up in your seat if you want.

4         We have somebody, Dena.

5         Just come right back.  They'll be looking for you.

6         THE COURT:  All right.  Thank you for your patience.

7    I appreciate it very much.

8         The attorneys have done their work with regard to the

9    selection process and I'll go ahead and seat the 12 of you

10   who have been chosen to sit on the jury in this case plus one

11   alternate.

12        Now, when I call your name, I want you, you know, to

13   sit one, two, three, in these first rows.  So when someone

14   comes to your seat, if it's not you, if you don't mind

15   standing up and going to sit over there because you could

16   still be one of the other ones.

17        Okay.  Josh Tillman Haynes, you are Juror No. 1.

18        Spring Elaine Gros, you're Juror No. 2.

19        Audrika Marie Woods, you're Juror No. 3.

20        Chadwick Young, you're Juror No. 4.

21        Reginald Williams Thompson, you're Juror No. 5.  We

22   have Juror No. 5, Mr. Thompson.

23        Robert W. Dillon, you're Juror No. 6.

24        Byron Williams, you're Juror No. 7.

25        Rieko Bush, you're Juror No. 8.

1        Albert Tritico, you're Juror No. 9.  Albert Tritico.

2        The others, if you haven't been chosen, you can get

3 out of the jury box.

4        Paula Williams, you're Juror No. 10.

5        Todd Anthony Bourgeois, you're Juror No. 11.

6        Emily Elizabeth Capdeville, you're Juror No. 12.

7        And Henry Charles Selvant, you're the alternate.

8        Okay.  You can probably seat six and seven when we

9 come back in.  This is fine now.  It feels crowded.

10        All right.  The 12 of you who are in the jury box

11 will be the jury in this case.  And we have one alternate.

12        For the rest of you, I want to thank you for

13 reporting to jury service this morning.  Your jury service

14 aside from your right to vote is probably the most important

15 civic responsibility, so we really do appreciate you

16 reporting here today.  I don't know that your work in the

17 courthouse here is finished today, so you'll be reporting

18 downstairs to the jury administrator's office where you

19 reported this morning and you'll get further instructions

20 there as to whether more of your time today is needed.

21        Again, we really appreciate you taking the time out

22 of your busy schedules to be here and to participate in this

23 process.  The court security officer will now escort you back

24 to where you came from in the building and you'll get further

25 instructions there.  Thank you very much.

1    For those of you who have been chosen, you will

2  comprise the jury in this case.  The alternate juror will sit

3  with the jury, will have the same duties and obligations as

4  the jurors, and, of course, is expected to give the case the

5  same undivided attention that the 12 jurors are required to

6  give.  If the alternate does not replace a juror prior to the

7  jury's retiring to deliberate, the alternate will be

8  discharged and may not participate in deliberations.

9    My courtroom deputy will now administer the oath to

10  you as the jury in this case.

11    THE CASE MANAGER:  Please stand and raise your right

12  hand.

13    (Selected jury administered oath.)

14    JURY PANEL:  I do.

15    THE COURT:  You can have a seat.

16    I'm going to give you some preliminary instructions

17  before we start, but they are pretty long and I see it's

18  almost twelve o'clock.  I'm going to -- we'll take a recess

19  until 1:30.  Until 1:30.

20    I'm going to give you some instructions before I give

21  you a recess, and then when you come back, I'm going to read

22  the preliminary instructions for you which will give you some

23  context of the rules you should be thinking about

24  preliminarily, how you should be listening to the evidence,

25  and I'll read you the indictment.  And then we're going to

1    have opening statements from the lawyers and maybe have some
2    time for a few witnesses before.
3            Today we are going to recess at 3:15 and reconvene
4    tomorrow at 9:00 a.m.  You'll get some instructions on where
5    to park so that, you know, your car doesn't get towed, you
6    don't get a ticket, we'll take care of that.  And my case
7    manager will give you some options where you can grab lunch
8    real quick and know that you have to come in and out of
9    security.
10           So we're about to take our first break.  Remember,
11   until the trial is over, do not discuss this case with anyone
12   including your fellow jurors, members of your family, people
13   involved in the trial, or anyone else and do not allow others
14   to discuss the case with you.  This includes discussing the
15   case in Internet chatrooms or through Internet blogs,
16   Internet bulletin boards, e-mails, social media, or text
17   messages.  If anyone tries to communicate with you about the
18   case, please let me know about it immediately.  Do not read,
19   watch, or listen to any news reports or any other accounts
20   about the trial or anyone associated with it, including any
21   online information.  Do not do any research such as
22   consulting dictionaries, searching the Internet, or using
23   reference materials and do not make any investigations about
24   this case on your own at all.
25           Finally, keep an open mind until all the evidence has

1    been presented and you have heard the arguments of counsel,

2    my instructions on the law, and the views of your fellow

3    jurors.  If you need to speak with me about anything, simply

4    give me a sign or hand a note.  You can just signal.  My case

5    manager will get it.

6         I ask you, when you're not in the courtroom, to

7    remain in the jury room.  My case manager will escort you to

8    that room and you can leave from there and come back to that

9    room.  You'll notice that there are two private restrooms

10   back there for your convenience and again some -- some

11   refreshments.

12        Once you begin to deliberate, the court will provide

13   any meals that you need, which are a little bit more

14   substantial than the snacks that you will find back there.

15        I'll explain this more in the preliminary

16   instructions, but I want you to know that, you know, as

17   jurors, you know, you're expected to be impartial and also to

18   appear impartial.  And when I say that, it's because, you

19   know, people are accustomed to, especially in New Orleans,

20   right, salutations, telling people "hi," you know, or just

21   being courteous, you know.

22        When you see the lawyers, when you see the witnesses,

23   you see the defendant, you want to just shake your head, say

24   "hello," but that's not appropriate because as I said you

25   want to appear -- you not only must be impartial, we have to

**OFFICIAL TRANSCRIPT**

1    appear impartial.  So don't be offended if they don't make

2    eye contact with you or they're not saying hello or good

3    morning.  I say those things because I'm here, I'm the judge,

4    and I talk to everyone equally, but I'm not having individual

5    conversations with any of them.  But I don't want you to be

6    offended by that because they have been instructed, they

7    know, and also the witnesses, they know they cannot have

8    contact with you and they're not supposed to be communicating

9    openly or subtlety with you.

10        So I just don't want you to be offended by that.  I

11   want you to understand what's going on.  But if it happens

12   that someone does talk to you in an elevator or in a restroom

13   that are part of the trial, you need to report that to me

14   immediately.

15        So try not to be in those places.  That's why we have

16   the private restrooms in the jury room, to avoid the

17   inadvertent encounter, you know, with you and witnesses or

18   the lawyers or other members of the trial.

19        And, again, if you need anything at all, you can ask

20   the marshal who will be seated outside the jury room to get

21   me a message or my case manager a message.  And there should

22   be a list of restaurants in there, right, so in walking

23   distance.  Give yourself enough time to go in and out of

24   security because it does take some time and you'll need your

25   juror badge to go in and out.

1        So with that, let's take our first break.  And what

2   did I say?  We'll be back promptly at 1:30 so we can get as

3   much of this under our belt as possible.

4        THE CASE MANAGER:  All rise.

5            (Whereupon, the jury exits the courtroom.)

6        THE COURT:  Does either party want the court to issue

7   a sequestration order?

8        MR. MAGNER:  Yes, Your Honor.

9        THE COURT:  All right.  I'll go ahead and issue that

10  before we break.

11       All right.  The Court hereby issues a sequestration

12  order for all fact witnesses in this case.  Fact witnesses

13  must leave the courtroom and are not to discuss their

14  testimony with other witnesses before or after they testify.

15  Counsel, agents of counsel, parties and agents of parties

16  shall not either directly or indirectly convey to any witness

17  the content of another witness's testimony.  Expert witnesses

18  or designated party representatives may remain in the

19  courtroom during the testimony of other witnesses.

20       And with that, we are adjourned until 1:30.  If any

21  questions arise, someone will be at the front desk and you

22  can communicate.

23       Do you have anything else?

24       MR. MAGNER:  Will the courtroom be locked during the

25  lunch hour?

```
 1          THE COURT:  No.

 2          MR. MAGNER:  No?

 3          THE COURT:  Well, would you like it locked?

 4          MR. MAGNER:  No.

 5          THE COURT:  All right.  So we won't lock it and I'll

 6    tell you, so there is a -- there's a Tulane in the court

 7    meeting tonight in the courtroom, so don't leave anything in

 8    the courtroom tonight.  I can't -- you know, but that will be

 9    the only night.  After that, if you want it to be locked in

10    here, you can.

11          MR. FLANAGAN:  Your Honor, from the Government, we

12    provided a Jencks binder in accordance with the Court's

13    order.  It had one more interview that was documented since

14    providing that --

15          THE COURT:  Do you have that for me?

16          THE LAW CLERK:  I'm not certain we have the --

17          MR. FLANAGAN:  I'm saying we have one more piece to

18    give the Court.

19          THE COURT:  Is there a Jencks binder that you put

20    together that you brought?

21          He doesn't know.  Where is it?

22          MR. FLANAGAN:  It's the skinnier one.

23          THE COURT:  So did you put the revised document in?

24          MR. FLANAGAN:  I will, Your Honor.

25          MR. MAGNER:  FBI is always a little slow getting
```

1    their paperwork in.

2         MR. FLANAGAN:  Providing the last 302 to the court.

3         THE COURT:  And, Counsel, Mr. Magner --

4         MR. MAGNER:  Yes, ma'am --

5         THE COURT:  -- you reviewed this?  You're okay with

6    this?

7         MR. MAGNER:  I've got a copy.

8         MR. FLANAGAN:  Previously provided to defense

9    counsel, ma'am.  Your Honor.

10        THE COURT:  All right.  Thank you.

11        And with that, we'll rejoin at 1:30.  Thank you.

12        MS. BRODNEY:  Thank you.

13        THE COURT:  Reconvene.

14

15                    (In open court.)

16        THE COURT:  Everyone have a seat.  Before I bring the

17   jury in, did you get the message that we're going to go

18   through 3:30?

19        ALL:  Yes, Your Honor.

20        THE COURT:  Okay.  I hope that doesn't cause any

21   problems, but I felt like we moved slower than I thought and

22   I want to make sure we get through as much as we can.

23        THE CASE MANAGER:  All rise for the jury.

24        (Whereupon, the jury enters the courtroom.)

25        THE COURT:  You can all have a seat.  Welcome back.

1    Members of the jury, when I make reference to jurors,

2    I'm referring to both jurors and the alternate juror.

3    Now that you have been sworn, I'll give you some

4    preliminary instructions to guide you in your participation

5    in the trial and to explain your duty as jurors.  At the end

6    of the trial, I will give you more detailed instructions.

7    You must follow all of my instructions on the law.

8    It will be your duty to find from the evidence what

9    the facts are.  You and you alone will be the judges of the

10   facts.  You will then have to apply to those facts the law as

11   the Court will give it to you.  You must follow that law

12   whether you agree with it or not.  Nothing the Court may say

13   or do during the course of the trial is intended to indicate

14   or should be taken by you as indicating what your verdict

15   should be.

16   You must pay attention throughout these proceedings.

17   Keep your eyes open.  If you need to make a phone call or to

18   go to the restroom and you cannot wait until the next

19   scheduled break, ask for a short recess, just raise your

20   hand, I'll know and we'll take a short recess.

21   I have no doubt that you, as jurors, are mindful of

22   your great responsibilities and certainly you are aware that

23   your conduct during this trial will be observed by the Court,

24   your fellow jurors, the defendant, the attorneys, and all the

25   parties and other persons both inside and outside this

1    courtroom.  I expect and your responsibility demands that you

2    be extremely careful in the manner in which you conduct

3    yourselves in order that no one will doubt that this case is

4    being fairly and impartially tried and that in the end

5    justice has been done.  For the same reasons, the attorneys

6    in the case, the defendant, the witnesses, and all others

7    identified with or connected with this trial or its

8    participants should be equally careful of their conduct.

9         During the course of the trial, jurors shall not

10   engage or attempt to engage or have any conversation or

11   communication of any kind whatsoever with any of the persons

12   connected with this trial, including the defendant, her

13   relatives or family, the attorneys for the government, or the

14   defendant, witnesses, or any other person identified with

15   this trial.  And, likewise, any person identified with this

16   trial shall not engage or attempt to engage in any

17   conversation or communication whatsoever with any juror.  If

18   this happens, I ask that you report it to me immediately.

19        Further, you as jurors should avoid allowing

20   yourselves to be placed in a position when outside of the

21   courtroom where discussions of the case may be -- being

22   conducted by any of the parties to the trial.  Furthermore,

23   the attorneys, the defendant, the witnesses, and other

24   persons who may be observing the trial are connected with it

25   in any way must be particularly careful not discuss and shall

1   not discuss the case where there is a possibility that you,

2   the jurors, may hear their remarks.  If such occurs, please

3   notify me immediately.

4        As I was explaining to you before the break, all of

5   us were trained to extend to acquaintances, perhaps even to

6   strangers, a "good morning," a "hello," or other neighborly

7   greeting.  You should not engage in such exchange with the

8   defendant, the attorneys for the defendant, the attorneys for

9   the government, or any other persons connected with this

10  trial, and you should not take offense to the fact that such

11  persons do not extend such greetings to you.  The reason that

12  such exchanges are not indulged in is because although they

13  seem innocent, they could nonetheless give the impression of

14  a lack of impartiality, and creating an impression of being

15  partial is as bad as being biased and should be avoided.

16       All of you should realize that if it is called to my

17  attention that these instructions have been violated, I will

18  have no alternative but to take appropriate action.  But I'm

19  confident that in view of the instructions I have given you

20  that this will not be required.

21       I'd like to at this time give you the following

22  specific instructions:  During the course of the trial, do

23  not talk about the trial with anyone else, not even your

24  family or your friends, not the people with whom you work.

25  Also, do not discuss the case amongst yourselves until I have

1   instructed you on the law and you have gone to the jury room

2   to make your decision at the end of the trial.  Otherwise,

3   without realizing it, you may start forming opinions before

4   the trial is over.

5        It is important that you wait until all the evidence

6   is received and you have heard my instructions on the rules

7   of law before you deliberate amongst yourselves.  Let me add

8   that during the course of the trial you'll receive all the

9   evidence you properly may consider to decide the case.

10  Because of this, do not attempt to gather information on your

11  own that you think might be helpful.  Do not engage in any

12  outside reading on the case.  Do not attempt to visit any

13  places mentioned in the case, and do not in any other way try

14  to learn about the case outside the courtroom.

15       I recognize that many of you use cell phones,

16  Blackberries, the Internet, and other tools of technology.

17  However, you must not use these tools to communicate

18  electronically with anyone about this case.  This includes

19  your family and friends.  You may not communicate with anyone

20  about this case on your cell phone, through e-mail,

21  Blackberry, iPhone, text messaging or on Twitter, through any

22  blog, or website, throughout any Internet chatroom, or by way

23  of any other social networking website, including Facebook,

24  MySpace, Linked In, You Tube, or any other method that I have

25  not specifically stated.

1          If any publicity about this case has come to your

2     attention before this moment, you must strike it from your

3     minds and completely disregard anything that has come to your

4     attention outside of this courtroom.  From this moment on,

5     you are not to read any newspapers or other accounts of this

6     trial, nor are you to view or listen to any television news

7     or radio reports or any other accounts of this trial.  This

8     is necessary because your verdict must be based solely on the

9     evidence presented in this trial in accordance with what you

10    hear and see in this courtroom and in accordance with the

11    Court's instructions on the law applicable to the case.

12          Finally, you're not to reach any conclusion in this

13    case until all the evidence has been presented.  The Court

14    has instructed you on the law applicable to the case for when

15    it has given it to you for your deliberation and decision.

16          If you would like to take notes during the trial, you

17    may do so.  On the other hand, you are not required to take

18    notes if you prefer not to do so.  Each of you should make

19    your own decision about this.  If you do not take notes --

20    I'm sorry.  If you do take notes, leave them in the jury room

21    when you leave at lunch and at night, and, remember, they are

22    for your own personal use.  They are not to be given to or

23    read to anyone else.

24          If you decide to take notes, be careful not to get so

25    involved in note-taking that you become distracted from the

1    ongoing proceedings.  Your notes should be used only as

2    memory aids.  You should not give your notes precedence over

3    your own independent recollection of the evidence.  If you do

4    not take notes, you should rely upon your own independent

5    recollection of the proceedings and you should not be unduly

6    influenced by the notes of other jurors.  Notes are not

7    entitled to any greater weight than the memory or impression

8    of each juror as to what the testimony may have been.

9    Whether you take notes or not, each of you must form and

10   express your own opinion as to the facts of the case.

11          You will notice that we do have an official court

12   reporter making a record of the trial.  However, we will not

13   have typed written transcripts of this record available for

14   your use in reaching a decision in the case.  So what she is

15   transcribing will not be for your use.  So make your own

16   notes or rely on your own memory.

17          In the morning when you arrive and during the day

18   when you're in the building and the court is in recess or for

19   any reason that the jury is not required to be in the

20   courtroom, I ask you to go to and remain in the jury room

21   under the direct supervision of the United States marshal or

22   court security officer until he or she advises you to enter

23   the courtroom.  Please do not remain in the halls.

24          The jury room is headquarters for the jury with

25   cokes, coffee, restrooms, and telephones.  You probably

1    noticed that.  There are two bathrooms right outside the jury

2    room.  If you need anything else, please ask the marshal or

3    court security officer for assistance.

4         Now, let me explain the rules for criminal cases.  As

5    you know, this is a criminal case.  There are three basic

6    rules about a criminal case that you must keep in mind.

7    First, the defendant is presumed innocent until proven

8    guilty.  The superseding indictment brought by the government

9    against the defendant is only an accusation, nothing more.

10   It is not proof of guilt or anything else.  The defendant is

11   there -- the defendant therefore starts out with a clean

12   slate.

13        Second, the burden of proof is on the government

14   until the very end of the case.  The defendant has no burden

15   to prove her innocence or to present any evidence or to

16   testify.  Since the defendant has the right to remain silent,

17   the law prohibits you from arriving at your verdict by

18   considering that the defendant may not have testified.

19        Third, the government must prove the defendant's

20   guilt beyond a reasonable doubt.  I will give you further

21   instructions on this point later, but bear in mind, that in

22   this respect, a criminal case is different from a civil case.

23   The burden is higher.

24        This criminal case comes to you by way of a

25   superseding indictment.  The superseding indictment reads as

**OFFICIAL TRANSCRIPT**

1    follows:  The grand jury charges that general allegations at

2    times relevant to this indictment, one, Defendant Ernestine

3    Anderson-Trahan was a resident of New Orleans, Louisiana, in

4    the Eastern District of Louisiana.

5         Two, beginning in or around January 2013 and

6    continuing through at least January 2022, Trahan was employed

7    as a judge with the Second City Court in the Parish of

8    Orleans in the Eastern District of Louisiana.  Trahan earned

9    annual wages from the Supreme Court of Louisiana and the

10   Judicial Expense Fund.  In addition to these wages, Trahan

11   received gross receipts from officiating marriage ceremonies.

12        Three, from 2013 to at least 2016, Trahan officiated

13   hundreds of marriage ceremonies each year.  In addition to a

14   standard marriage license fee payable to the court, Trahan

15   charged between approximately $80 to $100 in officiant fees

16   payable to her in cash for marriages she officiated during

17   regular business hours at the courthouse.  Trahan charged

18   higher officiant fees for marriages she officiated on

19   Valentine's Day, outside the courthouse, or outside normal

20   business hours.  In 2013, 2014, and 2015, in addition to the

21   income Trahan received from her employment as a judge and

22   from officiating marriage ceremonies, Trahan received gross

23   receipts from legal fees, including referral fees, and fee

24   sharing agreements for legal work that she performed

25   unrelated to her judicial income.

1          The Internal Revenue Service (IRS) is an agency of

2    the United States Department of Treasury, responsible for

3    administering the tax laws of the United States and

4    collecting taxes owed to the United States.

5          Count 1, No. 6, the grand jury incorporates by

6    reference herein all the information contained in paragraphs

7    1 through 5 of the general allegations as is fully set forth

8    herein and further alleges that, 7, on or about March 20,

9    2017, in the Eastern District of Louisiana and elsewhere, the

10   Defendant, Ernestine Anderson-Trahan, willfully made and

11   subscribed a joint U.S. individual income tax return, IRS

12   Form 1040, which was filed with the IRS for the calendar year

13   2013, which was verified by written declaration, that it was

14   made under the penalties of perjury in which Trahan did not

15   believe to be true and correct as to every material matter in

16   that return, failed to disclose gross receipts from legal

17   fees, and did not accurately report gross receipts from

18   officiating weddings.

19          The tax return reported, among other false items,

20   one, false business income, Line 12, of $24,518; number two,

21   false total income, Line 22, of $160,731 and, three, false

22   gross receipts of $16,000, Schedule C, Line 1, whereas Trahan

23   then and there knew she had under -- she had unreported gross

24   receipts from legal fees and substantially gross -- more

25   gross receipts from officiating weddings than she stated for

**OFFICIAL TRANSCRIPT**

1    the 2013 calendar year, all in violation of Title 26, United

2    States Code, Section 7206(1).

3          Count 2, No. 8, the grand jury incorporates by

4    reference herein all the information contained in paragraph 1

5    through 5 of the general allegations as is fully set forth

6    herein and further alleges that, 9, on or about July 2, 2015,

7    in the Eastern District of Louisiana and elsewhere, the

8    defendant, Ernestine Anderson-Trahan, willfully made and

9    subscribed a joint U.S. individual income tax return, IRS

10   Form 1040, which was filed with the IRS for the calendar year

11   2014, which was verified by written declaration that it was

12   made under the penalties of perjury in which Trahan did not

13   believe to be true and correct as to every material matter in

14   that return, failed to disclose gross receipts from legal

15   fees and did not accurately report gross receipts from

16   officiating weddings.

17         The tax return reported, among other false items,

18   one, false business income, Line 12, of $7,709; two, false

19   income -- false total income, Line 22, of $145,286, and,

20   three, false gross receipts of $16,000, Schedule C, Line 1,

21   whereas Trahan then and there knew she had unreported gross

22   receipts from legal fees and substantially more gross

23   receipts from officiating weddings than she stated for the

24   2014 calendar year, all in violation of Title 26, United

25   States Code, Section 7206(1).

**OFFICIAL TRANSCRIPT**

1          Count 3, paragraph 10, the grand jury incorporates by

2    reference herein all the information contained in paragraphs

3    1 through 5 of the general allegations as if fully set forth

4    herein and further alleges that, No. 11, on or about

5    October 17, 2016, in the Eastern District of Louisiana and

6    elsewhere, the defendant, Ernestine Anderson-Trahan,

7    willfully made and subscribed a joint U.S. individual income

8    tax return, IRS Form 1040, which was filed with the IRS for

9    the calendar year 2015, which was verified by written

10   declaration that it was made under the penalties of perjury

11   in which Trahan did not believe to be true and correct as to

12   every material matter in that the return, did not accurately

13   report gross receipts from officiating weddings and from

14   legal fees.

15          The tax return reported, among other false items,

16   one, false business income, Line 12, of $11,207; two, false

17   total income, Line 22, of $136,322; three, false gross

18   receipts from officiating weddings of $16,000, Schedule C,

19   Line 1, and, four, false gross receipts from legal fees of

20   $9,471, Schedule C, Line 1, whereas Trahan then and there

21   knew she had substantially more gross receipts including from

22   officiating weddings and from legal fees than she stated for

23   the 2015 calendar year, all in violation of Title 26, United

24   States Code, Section 7206(1).

25          Count 4, paragraph 12, the grand jury incorporates by

1  reference herein all the information contained in paragraphs

2  1 through 3 and 5 of the general allegations as if fully set

3  forth herein and further alleges that paragraph 13, on or

4  about November 18, 2017, in the Eastern District of Louisiana

5  and elsewhere, the defendant, Ernestine Anderson-Trahan,

6  willfully made and subscribed a joint U.S. individual income

7  tax return, IRS Form 1040, which was filed with the IRS for

8  the calendar year 2016, which was verified by written

9  declaration that it was made under the penalties of perjury,

10 in which Trahan did not believe to be true and correct as to

11 every material matter in that return, did not accurately

12 report gross receipts from officiating weddings.

13      The tax return reported among other false items, one,

14 false business income, Line 12 of $4,533; two, false total

15 income, Line 22, of $156,301, and three, false gross receipts

16 of $15,200, Schedule C, Line 1, whereas Trahan then and there

17 knew she had substantially more gross receipts, including

18 from officiating weddings that she stated for the 2016

19 calendar year, all in violation of Title 26, United States

20 Code, Section 7206(1), a true bill.

21      And this is signed by the United States Attorney,

22 Duane Evans, David Hubbert, Deputy Assistant Attorney General

23 of the U.S. Department of Justice Tax Division; Brian

24 Flanagan, trial attorney, U.S. Department of Justice Tax

25 Division; and William Montague, trial attorney, U.S.

1    Department of Justice Tax Division, New Orleans, Louisiana,

2    May 12, 2022.

3            The defendant has pleaded not guilty and has thereby

4    raised issues of fact to be tried by a jury.  The superseding

5    indictment returned by the grand jury is a formal document

6    that the government used to commence its charges against the

7    defendant and upon which it brings its case into court.  The

8    sole purpose of an indictment is to serve as an accusation or

9    charge with which the United States makes against the

10   defendant.  Thus, having commenced this proceeding and

11   informed the defendant of the crimes with which she is

12   charged, the superseding indictment has no other trial

13   purpose whatsoever.  It is not evidence against the accused

14   and affords no inference of guilt.  The government has the

15   burden of proof to establish guilt beyond a reasonable doubt.

16           I will give you detailed instructions on the law upon

17   the conclusion of presentation of the evidence to you and

18   those instructions will control your deliberations and

19   decisions.  But in order to help you follow the evidence, I

20   will give you a summary of the charges and elements of the

21   charges that the government must prove beyond a reasonable

22   doubt to prove its case against the defendant.

23           Counts 1, 2, 3, and 4:  Counts 1, 2, 3, and 4 charge

24   Ms. Anderson-Trahan with willfully making a false statement

25   on an income tax return in violation of Title 26, United

1    States Code, Section 7206(1).  Title 26, United States Code,

2    Section 7206(1) makes it a crime for anyone to willfully make

3    a false material statement on an income tax return.

4         For a defendant to be found guilty of this crime, the

5    government must prove each of the following beyond a

6    reasonable doubt:  First, that the defendant signed an income

7    tax return that contained a written declaration that it was

8    made under penalty of perjury; second, that in the return,

9    the defendant falsely stated her gross receipts; third, that

10   the defendant knew the statement was false; fourth, that the

11   false statement was material, and, fifth, that the defendant

12   made the statement willfully -- that is, with intent to

13   violate a known legal duty.

14        If you find from your consideration of all the

15   evidence that the government has proved each of these

16   elements beyond a reasonable doubt, then you should find the

17   defendant guilty of that charge.  If on the other hand you

18   find from your consideration of all the evidence that the

19   government has failed to prove any one of these elements

20   beyond a reasonable doubt, then you should find the defendant

21   not guilty of that charge.

22        Now, let me explain the course of trial.  Now that

23   you have a general idea of the charges and the elements

24   necessary to be proven by the government, let me explain how

25   this trial will proceed.  And let me tell you again, you will

1   get an instruction on the law.  I was just giving you a

2   summary.  So you will have those instructions with you at the

3   end of the case when you go into the jury room to deliberate.

4          But, first, counsel for the government and counsel

5   for the defendant have the opportunity to make opening

6   statements.  The government shall make its opening statement

7   at the beginning of the case.  The statement is nothing more

8   than an explanation of the government's theory of the case

9   and serves merely as an introduction to the evidence which

10  the government tends to produce in the course of the trial.

11         The defense may make an opening statement following

12  the opening statement of the government or may defer the

13  making of an opening statement until the close of the

14  government's case or may elect to make no opening statement

15  at all.  Like the government's opening statement, any defense

16  opening statement, if made, would be nothing more than an

17  explanation of the defendant's theory of the case.  The

18  defendant is not required to make an opening statement, but

19  may do so if she chooses.  She may choose not to do so and

20  rest upon the presumption of innocence to which she is

21  entitled.

22         As I pointed out to you earlier, the defendant is

23  presumed innocent until proven guilty beyond a reasonable

24  doubt.  What is said in opening statements, whether by the

25  government or the defense, is not evidence and proves

1    nothing.

2         Second, the government will introduce evidence in

3    support of the charges contained in the superseding

4    indictment.  Third, after the government has presented its

5    evidence, the defendant may present evidence, but the

6    defendant is not obliged to do so.  The burden is always on

7    the government to prove every element of the offenses charged

8    beyond a reasonable doubt.  The law never imposes on any

9    defendant in a criminal case the burden of calling any

10   witnesses or introducing any evidence.  Fourth, rebuttal

11   evidence may be introduced.  Fifth, at the conclusion of the

12   evidence, the parties will present oral argument in support

13   of their respective cases.  What is said in closing arguments

14   is not evidence.  Just as what is said in opening statements

15   is not evidence.

16        The arguments are intended to present to you the

17   contentions of the respective parties as to what the evidence

18   has shown and what inferences may be drawn from the evidence.

19   Counsel for the government has a right to open and close the

20   arguments because the government has the burden of proof.

21        Finally, I will instruct you on the applicable law

22   and you will then retire to deliberate and consider your

23   verdict, which must be unanimous on every count.  Although

24   you as a jury are the judges of the facts in this case, you

25   must accept and apply the law applicable to this case as it

**OFFICIAL TRANSCRIPT**

1   is given to you by the court.  The law applicable to this

2   case will be contained in these instructions, which I give

3   you during the course of the trial, and it is also your duty

4   to follow any such instructions.  I will provide a copy of

5   these instructions for you to take into the jury room for use

6   during your deliberations.

7        It is your duty to determine the facts and to

8   determine them from the evidence and the reasonable

9   inferences arising from such evidence, and in so doing, you

10  must not indulge in guesswork or speculation.

11       Evidence:  Evidence that you are to consider consists

12  of the testimony of witnesses, the exhibits admitted into

13  evidence, and any facts that the lawyers agree to or

14  stipulate to or that the court may instruct you to find.  The

15  term "witness" means anyone who testifies in person.

16       The admission of evidence in court is governed by

17  rules of law.  From time to time, it may be the duty of the

18  attorneys to make objections and my duty as judge to rule on

19  those objections and thus decide whether you can consider

20  certain evidence.  You must not concern yourself with the

21  objections or the court's reasons for its rulings on them.

22  Do not hold it against lawyers who make objections.  You must

23  not consider testimony or exhibits to which an objection is

24  sustained or which has been ordered stricken.

25       There may be bench conferences in which lawyers and

1    the judge will talk low and the jury can't hear.  They will

2    be up here.  Some matters must be decided outside the hearing

3    of the jury because they are not admissible.  It's okay to

4    stand at your seat and stretch during these bench

5    conferences.  I'll try to make them as short as possible so

6    it's not a distraction to you and similarly if things have to

7    be -- if I have to hear matters outside of your presence,

8    know that that's a normal part of a trial, but I will make

9    them as short and succinct as I can so as not to waste your

10   time while you're here.

11        If I instruct you not to consider testimony or

12   evidence to which an objection is sustained or which has been

13   ordered stricken, you must completely ignore that material

14   and not take such evidence into consideration when deciding

15   the case or be influenced by it in any way.  Same way about a

16   question, if the question is denied or stricken, then you

17   have to put that out of your mind.

18        There are two kinds of evidence, direct and

19   circumstantial.  Direct evidence is direct proof of a fact,

20   such as testimony of an eyewitness.  Circumstantial evidence

21   is proof of facts from which you may infer or conclude that

22   other facts exist.  I will give you further instructions on

23   these as well as other matters at the end of the case, but

24   have in mind that you may consider both kinds of evidence.

25        You must not be influenced in any degree by any

**OFFICIAL TRANSCRIPT**

1   personal feelings or sympathy for or prejudice against any

2   party or their counsel.  No statement or ruling or remark

3   which I may make during the presentation of evidence is

4   intended to indicate my opinion as to what the facts are,

5   because you are to determine the facts.  In this

6   determination.  You alone must decide upon the believability

7   of the evidence and its weight and value.

8        The case is likely to take three to four days and

9   we'll typically begin at 9:00 a.m.  I will try to wrap up as

10  close to five o'clock.  If we have a witness on the stand,

11  you know, we want to let them finish, but I'll be -- you

12  know, we'll be polling you to see how much you can take.  If

13  you want to stay 'til 6:00 to finish up something one night,

14  I'm happy with that except for tonight, we have to end at

15  5:00.

16       All right.  So now we are going to proceed with

17  opening statements.

18                    OPENING STATEMENTS

19       MS. BRODNEY:  Good afternoon.  Ladies and gentlemen,

20  this is a simple case about lying.  Judge Ernestine

21  Anderson-Trahan failed to report around $100,000 on her tax

22  returns.  Evidence will show that in 2013, 2014, 2015, and

23  2016, Judge Trahan knew how much money she earned.  She knew

24  she had to pay taxes on the income she earned and yet

25  evidence will show that over these four years Judge Trahan

1    did not report around $100,000 on her tax returns.  Because

2    she didn't report this money, what she owed in taxes

3    decreased.

4         Judge Trahan was completely capable of reporting her

5    income truthfully and indeed did report it truthfully when

6    she wanted to.  But she gave false numbers to the IRS to keep

7    her taxes down.

8         My name is Marissa Brodney.  And alongside attorneys,

9    Brian Flanagan and Michael Boteler and paralegal Kim Better,

10   we represent the United States in this case.  We will present

11   to you the evidence that shows that Judge Trahan willfully

12   filed false individual income tax returns, and as the Court

13   mentioned, it will be your responsibility at the end of trial

14   to determine whether we have met our burden to prove beyond a

15   reasonable doubt that Judge Trahan committed the charged

16   offenses.

17        And now I'm going to spend a few minutes to walk

18   through the evidence you will see and the testimony you will

19   hear so that you can be prepared to critically evaluate that

20   evidence throughout trial.

21        Judge Trahan has had an accomplished career.  She

22   went to law school and practiced law for over 20 years.  She

23   even became a partner in a law firm, which she ran under her

24   name called Trahan & Davis.  There, she did personal injury

25   cases and other types of cases that her clients needed help

1   with.

2          In 2012, she ran for election to become a judge at

3   the Second City Court.  The race was contested and she won.

4          After becoming a judge in 2013, Judge Trahan heard

5   different kinds of cases.  For example, she presided over

6   evictions, disputes between landlords and tenants, small

7   claims, and she heard personal injury cases where people made

8   claims for amounts under $25,000.  She held court around

9   three days per week and issued rulings directly from the

10  bench after hearing argument from the parties before her.

11         Testimony will reveal that as a judge, Judge Trahan

12  is familiar with what it means to swear an oath to tell the

13  truth.  People swear an oath to tell the truth in her

14  courtroom all the time.  And as documents will show, Judge

15  Trahan signed each of the tax returns she submitted under

16  penalty of perjury.  In other words, swearing to tell the

17  truth.  She was required to follow the law and to submit tax

18  returns that she knew to be accurate.

19         Judge Trahan earned money in three main ways.  First,

20  she earned a salary for her work as a judge on the Second

21  City Court.  These wages were reported to the IRS on forms

22  W-2 and wages and taxes were withheld automatically.  Second,

23  Judge Trahan earned money from fees she collected by

24  officiating weddings while serving as a judge.  Income from

25  officiating weddings was not reported to the IRS on forms

1   W-2.  Judge Trahan officiated more than 1,000 weddings over

2   this four-year period and she only accepted cash payment for

3   her fees.  Testimony will demonstrate that she officiated

4   these weddings in her courtroom on a beautiful balcony

5   overlooking the Mississippi River and occasionally offsite.

6       Third, Judge Trahan earned money from attorney's

7   fees, also called legal fees, for work that she did on cases

8   before becoming a judge and which just happened to finish

9   after she became a judge.  Sometimes, as you will hear from

10   the witness stand, attorneys collect money for their work on

11   cases only when that case concludes, even if the work that

12   they did on those cases happened years beforehand.

13       Judge Trahan referred several of her cases to other

14   attorneys when she became a judge and they agreed, but Judge

15   Trahan would receive a portion of the attorney's fees for

16   those cases when they were completed.  Income from these

17   types of legal fees does not get reported to the IRS

18   automatically on forms W-2, but they -- sometimes legal fee

19   income can get reported to the IRS in other ways.

20       What is at issue in this case relates to Judge

21   Trahan's reporting of legal fee income and wedding income.

22   You will see a pattern of non-reporting or underreporting

23   these two streams of income within a four-year period.

24       First, you will hear about wedding income.  Evidence

25   will show that in 2013, 2014, 2015, and 2016, Judge Trahan

1    never correctly reported the fees she earned by officiating

2    weddings.  Each year, she earned more money than she reported

3    to the IRS.  Her numbers with respect to weddings weren't off

4    by just a little bit.

5         You will see evidence that the amount of money Judge

6    Trahan made from officiating weddings each year went up, but

7    she reported that it stayed the same, and in 2016, even

8    reported that her income from weddings went down.  The

9    evidence will show that Judge Trahan knew the figures

10   reported on her tax returns were wrong.  Evidence will

11   establish that she knew the number of weddings increased in

12   2015 because that was the year when same sex marriage was

13   legalized and so more people could and did get married.  She

14   knew that.  She began charging more for weddings in 2016

15   precisely because it was going to be a busier year for

16   weddings requiring her and her staff to do more, and so she

17   changed her fee from $80 a wedding to $100 a wedding.

18        Judge Trahan was conducting more weddings and

19   charging more for them bringing in more money.  And yet for

20   2016 you will see that Judge Trahan wrote down a number for

21   her tax preparer that reflected income from weddings of even

22   less than she had reported the year before.  This number that

23   she wrote down was only about a third of what she actually

24   made from officiating weddings that year.  That year she

25   actually made more than $46,000 from officiating weddings.

**OFFICIAL TRANSCRIPT**

1    But she reported making only $15,200.  More weddings and a

2    higher fee for weddings means more money, not less.

3         And each year, starting in 2013, then 2014, then

4    2015, and then 2016, Judge Trahan officiated more weddings

5    per year.  It is simple math.  She officiated weddings.  She

6    charged for weddings, and so officiating more weddings means

7    bringing more money in.  You will see the marriage

8    certificates that provided proof of how many weddings Judge

9    Trahan performed each year and you will learn that Judge

10   Trahan knew she had these certificates in her possession.

11        When a marriage license was issued from Second City

12   Court and a ceremony was performed, Judge Trahan's staff kept

13   a copy of the marriage license.  They kept that copy at the

14   office and sent another copy to Vital Records.  You will see

15   that years later when the Louisiana Judiciary Commission

16   started asking some questions, Judge Trahan instructed her

17   clerks to organize and to collect and organize the wedding

18   certificates stored in her office.

19        To arrive at the correct amount of money earned for

20   officiating weddings was easy.  The wedding certificates were

21   counted and then multiplied by $80 or $100.  Judge Trahan had

22   her accountant prepare amended tax returns for the 2013

23   through 2016 tax years with the correct amount of wedding

24   fees.  It was doable.  She knew how to do it and she did it,

25   but only after the judiciary commission asked her if she was

**OFFICIAL TRANSCRIPT**

1    accurately reporting her income to the IRS.

2         Then you will hear about attorney's fees.  You will

3    see evidence that Judge Trahan reported none of the

4    attorney's fees she earned on her 2013 or 2014 tax returns.

5    You will see that later in 2015 Judge Trahan did report some

6    of the attorney's fees, but not all.  She only reported the

7    legal fee income that had already been reported to the IRS on

8    what are called forms 1099-MISC.  All of the legal fee income

9    that she earned that was not already reported to the IRS by

10   somebody else did not make it onto Judge Trahan's tax

11   returns.  The truth was Judge Trahan earned tens of thousands

12   of dollars in attorney's fees in 2013, 2014, and 2015.

13        You will see bank statements, which show that several

14   large checks written to Judge Trahan were deposited into her

15   bank accounts.  You will hear testimony that those checks

16   were for her legal fees.

17        Now, one of the terms you will hear in this trial is

18   gross receipts.  Gross receipts means something simple.  It

19   is just how much money did people pay Judge Trahan overall

20   for legal fees, how much money did they pay overall for

21   marriages.

22        Gross receipts is different from income or from

23   profit.  Income factors in things like expenses.  For

24   example, if Judge Trahan had expenses tied to her legal

25   business, then the income would be gross receipts minus

1   expenses.  But it all comes back to that overall number,

2   gross receipts.

3       You will see that Judge Trahan knew she had to report

4   gross receipts on her tax returns.  And she did report gross

5   receipts from officiating weddings.  She reported them.  They

6   were just not true.  She really made more money than what she

7   reported to the IRS.  She also knew she had to report gross

8   receipts from legal fees.  She reported gross receipts from

9   legal fees she earned when she ran a law firm.  And in 2015,

10  when some of her legal fees were reported to the IRS by

11  someone else, she reported those specific legal fees, but not

12  others.

13      She also reported her legal fees on financial

14  disclosure forms that she was required to file with the

15  Louisiana Supreme Court.  But when those fees weren't already

16  reported by other people to the IRS, when it was going to

17  cost her money to self-report them on her taxes because it

18  would have meant alerting to the IRS to the existence of that

19  income, she didn't report them.

20      In 2014, she disclosed her legal fee earnings to the

21  Louisiana Supreme Court on May 15, 2015.  About two months

22  later, she did not report those legal fees on her tax return.

23  Even when Judge Trahan was filing false tax returns, she owed

24  money to the IRS.  Had she reported accurate numbers, she

25  would have owed even more.

1      You will see that during the years at issue here,

2  Judge Trahan faced her share of life's challenges, but at the

3  same time, she held court multiple days per week, she

4  officiated more than 1,000 marriages.  Judge Trahan stayed on

5  top of her work as a judge.  She did not need any prolonged

6  periods of time off or other special accommodations.  She was

7  able to stay on top of renting a home she owned and she was

8  able to track to the dollar deductible expenses and donations

9  to charity each year.  But you will see a different story

10  when it came to reporting her income.

11      When it came to reporting her wedding fee and legal

12  income, Judge Trahan made a series of choices.  She made a

13  choice to give her accountant false numbers at tax time.  She

14  made a choice to report numbers she knew to be false to the

15  IRS.  She made a choice to lie in order to keep her taxes

16  down.  And she made that same choice to lie on four different

17  tax returns.

18      When Judge Trahan signed each of her 2013, 2014,

19  2015, and 2016 tax returns, she swore under penalty of

20  perjury that they were true, correct, and complete.  She knew

21  they were false and she submitted them anyway.  As a result,

22  Judge Trahan did not report around $100,000 in money she

23  earned over four years to the IRS when the law required her

24  to do so.

25      THE COURT:  Before you move on, I want counsel to

1   approach and Ms. Butler.  One counsel from there.  Ms.

2   Butler.

3        MR. FLANAGAN:  Better.

4        THE COURT:  Butter.  Better.  What is it?  Butler?

5        MR. BOTELER:  Ms. Better.

6        WHEREUPON, the following proceedings were held at the

7   bench:

8        THE COURT:  One attorney.  I don't need all of -- one

9   attorney from the government.

10        So Ms. Butter.

11        MS. BETTER:  Better.

12        THE COURT:  Better?

13        MS. BETTER:  Uh-huh.

14        THE COURT:  Okay.  I understand you're a paralegal,

15   correct?

16        MS. BETTER:  Yes, ma'am.

17        THE COURT:  Okay.  So repeatedly the government has

18   said that Ms. Butter -- Better represents the government --

19        MS. BETTER:  Right.

20        THE COURT:  -- and she's sitting at counsel table.

21        I'm a little offended at what you're trying to --

22   what you may be trying to create.  You want to show some

23   diversity, you know.  I'm offended by this.

24        Okay.  Who is the gentleman in the back?  Is he a

25   paralegal?

1            MR. MAGNER:  That's Mr. -- yes, he's an IT fellow.

2            THE COURT:  Okay.  So I'm going to clear it for the

3    jury.

4            Because you can't practice law without a license,

5    ma'am.  And they just represented to this court that you were

6    representing the government.  You're not even an appropriate

7    client representative.

8            MS. BETTER:  Right.  I understand.

9            THE COURT:  So I'm going to clear it up and decide if

10   this -- how far this has gone since you said it before and

11   whether or not this requires some sort of discipline.  This

12   woman can't practice law.  You cannot be representing to this

13   court and this jury that she's here to represent the United

14   States.  That was highly inappropriate and very offensive.

15           I'm going to correct it for the jury.

16           What's his name?

17           MR. MAGNER:  Aaron Washington.

18           THE COURT:  Aaron Washington.

19           All right.  Thank you.  Have a seat.

20           MS. BETTER:  Thank you.

21                        (In open court.)

22           THE COURT:  Ladies and gentlemen of the jury, in

23   introducing their team, the United States referenced

24   Ms. Butter who is a paralegal as representing the United

25   States.  She's not licensed to practice law as a paralegal,

1    so she can't represent the United States, nor is she a client

2    representative.  She's a paralegal at the table and equal to

3    Mr. Aaron Washington who is the paralegal with the firm of

4    Jones Walker I imagine.

5         I just wanted to clarify that for you.  She's not a

6    lawyer sitting at a table.  There are certain legal

7    requirements.  I have to make sure that that's clear.

8         All right.  You want to proceed?

9         MR. MAGNER:  Thank you.

10        Hello, ladies and gentlemen.  Thank you again for

11   your time and attention on behalf of Ms. Trahan, and her

12   family, her husband Kenneth, and the rest of her family here.

13        I'm going to tell you the rest of the story now.  The

14   government doesn't always get it right and that's

15   particularly true of the IRS.  That's why we have trials so

16   that you make the decision as to what the facts are and apply

17   them to the law.

18        As you all know from your own life experience, life

19   is complicated and things fall through the cracks.  Ms.

20   Trahan made mistakes on her taxes.  We're the first to admit

21   it.  She's mortified.  She's embarrassed to be here, but

22   she's here to defend her good name because she has not

23   committed these crimes that she is accused of.  She's

24   embarrassed that she owes about $38,000 in taxes.  She's

25   whittling that down.  She made a big payment just very

1    recently on that amount.

2            But listening to the indictment -- and the indictment

3    just so you understand, these government lawyers write the

4    indictment, okay?  And they present it to a grand jury, which

5    looks a lot like you.  And then if a majority of the grand

6    jury thinks that they go forward, they go forward.  But this

7    is merely an accusation from the government lawyers.

8            Let's take a look at the chart, please.  You heard,

9    you know -- in reading the indictment, you heard like

10   hundreds of thousands of dollars, you know, and tens and

11   thousands of dollars.  We don't quibble with what the

12   government says she owes.  And this is basically what they

13   say she owes; $37,000 over four years.  Roughly that's about

14   $9,500 a year that she owes.  She's paying it down.  She's

15   going to continue to pay it down.  She has every intention of

16   paying every cent to the IRS.  And although she was careless

17   in preparing her taxes, you're going to hear a lot of

18   mitigating circumstances as to why, but she was never

19   willful.

20           The judge gave you an explanation of what the

21   elements that the government must prove beyond a reasonable

22   doubt.  She was never willful in what she did.  The legal

23   standard for willfulness is that it's the highest possible

24   standard in a criminal case.  Tax cases are different because

25   the tax laws are so complicated because people don't

1  understand them and because people are sort of struggling

2  along to figure it all out.  Tax cases are the only cases

3  where ignorance of the law is, in fact, a defense.

4       I expect the judge will instruct you and that's who

5  you have to listen to at the end of the case that a person's

6  conduct is not willful if she acted through negligence, even

7  gross negligence, inadvertence, or justifiable excuse or

8  mistake.  And that is what we have here.

9       And to carry its burden of proving that Ms. Trahan

10  acted willfully, the government must prove the absence of

11  good faith on her part, the absence of mistake, the absence

12  of carelessness.  They will not be able to do that.

13       So quite simply, Ms. Trahan made mistakes, but those

14  mistakes don't rise to willfulness.  They are felony criminal

15  charges and we don't prosecute citizens for making mistakes

16  on their taxes.

17       When I think of willful, you know, I think of, you

18  know, a young child, maybe me as a young child where my

19  mother said I was willful and that's where I like refused to

20  do something that she told me.  That's not the case here.

21  The lady made mistakes and that's what we're going to show

22  you.

23       Let me give you a little bit more history on Teena

24  Trahan.  In 2012 she was in a small private practice.  She

25  handled family law, successions, and personal injury cases.

1  She decided to run for Second Circuit -- Second City Court in

2  Algiers, basically small claims court.  She's Judge Wapner.

3  She's not Judge Judy.  Okay.  She's Judge Wapner.  Okay.  So

4  that's the kind of cases she would handle over there on the

5  Westbank.  There's a First City Court and that's over here on

6  the Eastbank in the civil district court.

7        She ran in her neighborhood.  That's where she grew

8  up and where she was raised by her mother, Ms. Faye, Faye

9  Anderson, and you'll hear a good bit about Ms. Faye.  It was

10 her experience in politics when she ran for this judgeship

11 and it turned out not to be a good one and you'll hear a

12 little bit about why.

13       Now, Ms. Faye was a force of nature.  She was the

14 single biggest relationship in Ms. Trahan's life and you'll

15 hear why that's so important.  Ms. Faye made sure that her

16 daughter received a good education.  She was the first black

17 girl to go to the private school where she went.  She went to

18 college.  Then she went to law school.  She married Kenneth,

19 had two children, and practiced law.  But sometimes people

20 get an itch to be judge and that's what she decided to do.

21       Now, Ms. Trahan was never very organized.  She was a

22 very good lawyer, a very good judge, but she had other people

23 there to help her with the business side, with the

24 administrative side of law practice that she didn't have as a

25 judge.  She was very diligent with regard to her clients,

1    with regard to her court docket, but she was never a good

2    business person.  And she had a -- before she became a judge,

3    she had an office manager, a lady by the name of Dee

4    Henderson who you will hear from.

5         Dee kept things on the rail.  She kept things

6    organized.  She made sure all the bills got paid, that the

7    paperwork was done appropriately.  She tried to bring Dee

8    with her, but she couldn't pay Dee enough to work at the

9    court.  So there wasn't anyone else then to keep track of the

10   books, to pay the court reporters, to pay the doctors, to pay

11   the court costs.

12        So when she left private practice and took the

13   judgeship in 2013, she still had some fees coming in.  She

14   received approximately roughly $50,000 in fees in that first

15   year and it was her intention that she would declare those on

16   her taxes, but she had to offset them from the expenses she

17   had for court reporters and doctors and paralegal fees and

18   stuff like that and that was her intention to do that.  It

19   fell through the cracks.  It didn't happen.  Why didn't it

20   happen?

21        Well, there are a whole lot of reasons I'm going to

22   get to.  In addition, probably the most important thing,

23   though, was her physical condition, her illnesses but more

24   importantly her mother's illnesses, which I'm going to talk

25   to you about in some detail here.

1          In addition, for that legal fee income, she didn't

2     receive any W-2's or any 1099 forms that she would give to

3     her tax preparer to show that income and then offset that

4     with her expenses.

5          To make matters worse, her tax preparer -- her tax

6     preparer is a friend and you'll hear from her, Krystal Ancar.

7     Her computer crashed and she lost her files on her computer

8     and Teena thought that Krystal filed the tax returns and

9     Krystal thought that Teena filed the tax returns, but they

10    were like Charlie Brown and Lucy and the fly ball fell

11    between them.

12         They didn't discover that that 2013 return wasn't

13    filed until 2017, and at that point, she panicked.  She

14    immediately filed the 2013 return, long since forgetting

15    about that income that she got in 2013.

16         So in any event, she becomes a judge.  January 2013.

17    She received no real training on how to be a judge and what

18    her duties were expected to be.  She succeeded another judge

19    by the name of K.K. Norman.

20         K.K. Norman was known as "the love judge."  That's

21    only in New Orleans, right, could you have something like

22    this.  She married hundreds of people.  She would marry

23    hundreds of people on Valentine's Day.  She was famous for

24    marrying couples at the courthouse.  She inherited that job

25    responsibility.  But no one really told her how to do it.

1          There was a fee that people would have to pay in cash

2     for the license.  It's $27.50 and they would put that money

3     in a cash box.  Every couple weeks they would bring it to the

4     bank and pay them over to the state for the licenses itself.

5          Judge Norman, as did all of the city court judges,

6     charged about $80 per couple for officiating the wedding.

7     There was no real system for it.  The staff took the cash.

8     They paid it to Ms. Trahan.  There was no real bookkeeping

9     system.  The other judges at First City Court over here on

10    the Eastbank handled it the same way.

11         She had a very busy docket.  She had to handle every

12    eviction that came into her court.  She had every small claim

13    in the city of New Orleans, not just on the Westbank, but on

14    the Eastbank as well.  She had a very busy docket, which as

15    counsel said, she handled very well.  But these licenses and

16    the payment for the licenses were not handled in a

17    professional way and never had been in the history of the

18    court.

19         Okay.  Then to sort of top it off, in 2013, she

20    learned the hard lesson about politics and she wound up

21    getting sued by the young woman that she ran against for the

22    job.  This completely through her for a loop.  She was sued

23    in federal court and she had to deal with that by an unhappy

24    opponent who had a very influential political father.  And

25    she dealt with that for 18 months and it really threw her for

1    a loop.  She wasn't dismissed from that lawsuit until about

2    18 months later.

3         She continued on as a judge doing the best she could

4    and then everything really started going awry for her.

5    Counsel talked about having some challenges.  Well, she had

6    some challenges like Job had challenges.  So along with

7    raising two teenage children, being the primary breadwinner

8    for her family while her husband Kenneth struggled with his

9    business, she suffered some serious health issues herself.

10        Over the next few years, she had a heart issues,

11   sinus surgery.  She had a hysterectomy.  She had low back

12   pain and so forth.

13        And if we can pull up the next set of exhibits, I'm

14   going to go through them very quickly.

15        But they're nothing compared to her mother's

16   situation.  Her mother, Ms. Faye, who is in her 80s winds up

17   with diabetes, kidney failure, Alzheimer's, metastatic breast

18   cancer that metastasized into her brain.  She's the daughter

19   in the family.  She's the caregiver.  She's the one who had

20   to do everything for her mother.

21        I'm just going to go through these very quickly here.

22   We'll have a little bit more time later.  So this is a

23   timeline that we prepared, both for Ms. Trahan and her

24   mother, Faye Anderson, and it starts almost just when

25   Ms. Trahan takes the bench.  Her mother has eye surgery.

1    She's having hemorrhaging, probably all relating to her

2    kidney problems.  So she has surgery in May of 2013.

3          In December of that year, Teena started having chest

4    palpitations, so she has to go to the cardiologist for that.

5          We're going to continue on.

6          Then in December of that year, she underwent a

7    hysterectomy.  I don't know much about hysterectomies, but I

8    can't imagine it's fun, not particularly when you're taking

9    care of your 80-year-old mother.

10          Go on.

11          In May of 2014, Faye is admitted to the emergency

12    room for a stroke.  She continues to have problems, suffers

13    from multiple falls over the weekend.  Who is the person who

14    has to deal with Ms. Faye?  It is Ms. Trahan.  And if any of

15    you have that situation of taking care of an elderly loved

16    one, you know how stressful it can be.  But it gets worse.

17          She then has her own sinus surgery in October of that

18    year and then her mom is diagnosed with not only

19    hypertension, but Alzheimer's disease and the late effects of

20    cerebrovascular disease.  This is the stuff that's leading to

21    her strokes.

22          She goes on.  In February of 2016, Ms. Faye is

23    supposed to be going to dialysis three times a week.  She was

24    a force of nature as a young woman, but as an older woman,

25    she's just horsey.  She just won't cooperate.  She just won't

1    go to dialysis and Teena is the one who has to deal with it.

2    So the daughter made me come to the emergency room.  That's

3    because she hadn't had her dialysis the way she was supposed

4    to.

5          Goes on.

6          Teena continues to have her sinus problems.  She

7    has -- she sits down with her primary care physician for an

8    hour and the primary care physician realizes that this woman

9    is under exceptional stress, that she is suffering from

10   anxiety and so he prescribes an antidepressant, antianxiety

11   medication, and sends her to therapy during this period of

12   time.  So, yes, she had life challenges, but these are the

13   kind of challenges that were overwhelming for her.

14         And this is not a pity party here, ladies and

15   gentlemen.  I'm just presenting you with the real facts of a

16   woman who is coping with life's challenges while trying to

17   take care of her kids, while trying to run a busy court,

18   while trying to handle every small claim in the city of New

19   Orleans, and do it appropriately.

20         I'm probably showing my age here now, but my parents

21   used to talk about the Cobbler's children.  Does that mean

22   anything to you?  So the Cobbler's children and the

23   shoemaker, you know, worries about everyone else, so his

24   children has no shoes.  That's what Ms. Trahan is dealing

25   with during this time period.

1      It goes on.  Now she's been diagnosed with cancer.

2  And it's not just cancer, it's Stage IV breast cancer that

3  metastasizes into her brain and goes on.

4      And, finally, you know, as we go on into '17, Faye's

5  condition gets worse and worse and worse.  Her burden gets

6  even more and more difficult.

7      Finally, in June of '17 -- and these are our tax

8  years, the 2013 through 2016 tax years.  Finally, Ms. Faye is

9  admitted to the ER.  She can't breathe.  She's put on a

10  ventilator and she dies soon thereafter.

11      Again, this is not a pity party.  What this is,

12  though, is somebody who is overwhelmed with her life, who is

13  on antidepressants, who is having a very difficult time, all

14  the while taking care of everybody else.

15      This exhausted her bandwidth.  She's exhausted.  She

16  was depressed.  She was anxious.  She was barely hanging on

17  all the while trying to handle her court and marry people.

18      So how did this affect her taxes?  So for the

19  weddings, what she did was that very first year, 2013, she

20  estimated how much she earned from officiating the weddings.

21  She estimated about $16,000 a year.  And she was close.  It

22  was more like 24,000 I think, but she did declare the income,

23  but she did not declare the entire amount because she

24  estimated.  Because she was just running in place.  And then

25  what happened each year after that, she just continued that

1    $16,000 figure from year to year until the last year when she

2    had given her staff some extra bonuses, so she went down to

3    15,200.

4           Was she careless?  Absolutely.  Did she intend to do

5    it?  Was she willful?  Absolutely not.

6           It wasn't easy actually as counsel suggested to

7    determine how much she made.  There was no bookkeeping

8    system.  There was no accounting system.  They had copies of

9    the licenses, but she went back and forth particularly when

10   the judiciary commission started asking questions trying to

11   figure out how many weddings she actually did and she did

12   report that to the judiciary commission to try to get

13   everything squared away and everything right.

14          Since then, she's been desperately trying to get her

15   affairs in order.  She's amended her tax returns.  She's

16   reported them appropriately and she's doing what she can to

17   get straight with the IRS.

18          But when you have records like this and this is the

19   kind of -- you know, this is the Cobbler whose children have

20   no shoes, when you have records like this, it's awfully

21   difficult to figure out what it is you're dealing with and

22   how much you've earned and how much you owe and how you're

23   going to get it straight with the IRS.  Basically she's

24   barely holding on and she doesn't have much to work with, you

25   know, during this period of time.

1          But what she does and this -- I forget what year this

2    is.  I think this is 2016.  This is her effort when she sits

3    down with her tax preparer to try to tell her how much she

4    earned, how much she owes, and how much she had in the way of

5    expenses.  But she goes forward and so she amends her tax

6    returns.

7          This is one of those.  You can see, I think, this is

8    2015.  She files an amended return.  She tries to make it as

9    conservative as she possibly can and so you can see there,

10   these aren't anything you're familiar with most likely, but

11   you can see the original amount of income, gross income, she

12   reported was originally $137,000.  She amended the return to

13   show the additional income that she received of $20,000 for a

14   correct amount of $157,000.  So she -- again, she's trying to

15   get right with the government.

16         How does this change in terms of her tax obligations?

17   So for 2015, she originally paid 13,000 or almost 19 -- or

18   I'm sorry, almost $14,000.  She owes an additional $5,617 for

19   a total of $19,473.  She's been digging herself out of the

20   hole slowly and surely.

21         But then without really -- without any audit by the

22   IRS, without any liens or levies by the IRS, she's then

23   indicted for what is a relatively modest amount of taxes

24   owed.  The simple truth, ladies and gentlemen, and you know

25   this from your own lives and from your own dealings and from

1    your own life experiences, people make mistakes and these

2    mistakes aren't crimes.  They're mistakes.  These matters are

3    handled routinely by the IRS and you're going to have to ask

4    yourself what's different about this case, why are they

5    pursuing this case as aggressively as they are.

6            It's particularly hard to understand when you're

7    dealing with a woman who is the mother of two teenagers, a

8    wife who does most of all of the housekeeping, whose husband

9    is having difficulty with his own business, when you're a

10   judge in a small claims court with a busy docket, when you've

11   run for office, you learn the hard way politics is just a

12   dirty business and you wind up getting sued for no good

13   reason and then get dismissed 18 months later, and when you

14   have a multitude of your own illnesses, your mother's

15   illnesses, and you're the responsible one.  This is Teena

16   Trahan's story.

17           Was her life a mess?  Yes.  Was her taxes a mess?

18   Yes, they were.  Was she willful in any way?  No.  It really

19   was just the opposite and I believe that's what the evidence

20   will show.

21           So at the end of the day, that's what you'll have to

22   decide, were her actions the result of negligence,

23   carelessness.  The government will have to prove that it

24   wasn't beyond a reasonable doubt.  We have no real issue with

25   the amount of taxes that she owes.  This is not a who done

1    it.

2         You know, we show -- that first chart I showed you

3    was actually the government's chart and you'll see later on

4    in the trial.  That's -- those are their numbers.  And, you

5    know, the accountants may quibble a little bit on the broad

6    strokes, but that's their number.  We essentially agree with

7    it.

8         She should not be convicted of a crime for making

9    mistakes.  That's not our system and that's why one is

10   entitled to a jury of her peers because we don't convict

11   people of willful tax felonies for making mistakes.  So at

12   the end of the trial, we're going to ask you to return the

13   only just and fair verdict in this case and that's one of not

14   guilty.

15        Thank you, ladies and gentlemen.

16        THE COURT:  Thank you.

17        So the parties have a stipulation of fact.  I'm going

18   to read this stipulation of fact.  It's offered to you

19   because it's not one that anyone has to prove.  They've

20   agreed on this fact.

21        And it reads:  Comes now the United States of America

22   by and through its undersigned attorneys and the defendant,

23   Ernestine Anderson-Trahan, by and through her undersigned

24   attorneys, and hereby stipulate that the following facts are

25   true and shall be treated as proved in this case:  By letter

1   dated July 12, 2018, the Judiciary Commission of Louisiana

2   requested Judge Ernestine Anderson-Trahan's counsel to

3   provide information on whether Judge Trahan reported to the

4   Internal Revenue Service all money earned from officiating

5   wedding ceremonies on an annual basis.

6           The above stipulation is hereby entered into this

7   13th day of November, 2022.  It's signed by the defendant's

8   counsel, Ms. Trahan, and the -- counsel for the United

9   States.

10          All right.  Counsel, you ready for your first

11  witness?

12          MR. MAGNER:  Can we take a very short break?

13          THE COURT:  Absolutely.

14          MR. MAGNER:  Or I can just sneak out.

15          THE COURT:  You want to take 10 minutes?

16          MR. MAGNER:  Five minutes?

17          THE COURT:  All right.  Five minutes.  You all can

18  make a call, whatever.  Don't talk about the case though.

19          THE CASE MANAGER:  All rise.

20          THE COURT:  Check if the snacks are sufficient.

21          You have to go.  We can't talk about you if you stay.

22  We're not going talk about you.  Just kidding.

23              (Whereupon, the jury exits the courtroom.)

24          All right.  We'll take a short recess.

25                          (Recess taken.)

1                    (In open court.)

2          (Whereupon, the jury enters courtroom.)

3          THE COURT:  All right.  You can have a seat.

4          Is the Government prepared to move forward with its

5     first witness?

6          MR. FLANAGAN:  Yes, Your Honor.  The Government calls

7     Mr. Devin George.

8          THE CASE MANAGER:  Would you please raise your right

9     hand?

10                    (Witness administered oath.)

11          THE WITNESS:  I do.

12          THE CASE MANAGER:  Please have a seat.  Please speak

13     directly into the microphone.  State and spell your name for

14     the record.

15          THE WITNESS:  Devin George, D-e-v-i-n G-e-o-r-g-e.

16                    DEVIN GEORGE,

17     Being called as a witness, being first duly sworn, examined

18     and testifies as follows:

19                    DIRECT EXAMINATION

20     BY MR. FLANAGAN:

21      Q.  Good afternoon, Mr. George.  What do you currently do

22     for a living?

23      A.  Currently, I am the deputy assistant secretary for

24     the Office of Public Health.  I oversee the center for

25     finance and operations, which includes the Bureau of Vital

1   Records and Statistics, the Bureau of Health Informatics, the

2   Bureau of EMS, the Bureau of Legislative Governmental

3   Affairs, and Bureau of Budget and Administrative Services.

4        Q.   That's plenty.  How long have you had that position?

5        A.   Since August 15th of this year.

6        Q.   So just a couple months?

7        A.   Yes.

8        Q.   What did you do prior to that?

9        A.   Prior to that, I was state registrar of the Bureau of

10  Vital Records which oversees all the birth certificates,

11  death certificates within the state as well as Orleans Parish

12  marriage licenses and data for marriage and data for divorce

13  from across the state.

14       Q.   How long have you had that position?

15       A.   I was in that position for almost eight years.

16       Q.   What were your responsibilities as bureau director?

17       A.   Oversaw all the daily operations, the filing, the

18  registration, the issuance, amendment of any birth or death

19  certificate that was filed with this issuance of Orleans

20  Parish marriage licenses from our office and issuance of

21  certified copies of marriage licenses, marriage certificates

22  from our office.

23       Q.   So -- and we'll break that down, the difference

24  between licenses and certificates in just a moment.  But I

25  think you may have said it, but does the state registrar

1    issue marriage licenses?

2         A.   Correct.

3         Q.   How does that work?

4         A.   In Orleans Parish, the Bureau of Vital Records and

5    then the First and/or Second City Court is authorized in

6    statute to issue marriage licenses, which is basically

7    allowing someone to get married.  They come in.  They file an

8    application, provide the necessary documentation that's in

9    accordance with law, and then the marriage license is issued

10   to the couple.  And that basically gives them the ability to

11   go have the ceremony after -- unless the waiting period is

12   waived, you know.  After the waiting period, they can have

13   that ceremony.

14        Q.   Let's be clear upfront.  Is there a difference

15   between a marriage license and a marriage certificate?

16        A.   So the marriage license is what allows you to get

17   married.  Once the marriage occurs, then the officiant will

18   sign the license along with the two parties and two witnesses

19   and then file that back to the issuing authority.  And then

20   based off that, once it's filed, then there's a certified

21   copy of that marriage that's issued.

22        Q.   So starting with the licenses, issuing this license

23   to a couple to get married, you may have said it, but in case

24   I missed it, who can issue a marriage license?

25        A.   Anywhere else in the state, it's usually the clerk of

**OFFICIAL TRANSCRIPT**

1    court in the parish.  And then in Orleans Parish, it is our

2    office and then the First and Second City Court can issue it.

3        Q.  So when a court issues a marriage license, what's

4    that process?

5        A.  Same process as far as what, you know, the couple

6    does.  The couple would come in, same documentation, but then

7    whenever the license is returned to that office, they would

8    then basically usually batch it and every so often send us

9    those licenses to be filed in Vital Records because we would

10   maintain and be custodian of all Orleans Parish marriage

11   licenses and so that we can issue certified copies.

12       Q.  So since you maintain all those copies or your office

13   does, how do these courts report their licenses to you?

14       A.  They -- on a routine basis and it would depend on the

15   court.  They would -- all the licenses that were filed in

16   their office, they would have a -- what we would call like a

17   transmittal sheet with each license that they are providing

18   to us, that goes on top along with all the original licenses

19   that were returned to them, bring that to our office and then

20   we would officially file them within our records.

21       Q.  So now moving to the marriage certificates part, does

22   the state registrar keep marriage certificates?

23       A.  We issue marriage certificates on security paper

24   based off of that original license that was filed in our

25   office.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And do you keep all the marriage licenses filed with

2    your office?

3    **A.**   Yes.

4    **Q.**   Why do you do that?

5    **A.**   We're statutorily mandated to maintain all Orleans

6    Parish marriage licenses for 50 years.  After that 50-year

7    period, they're transferred to state archives.

8    **Q.**   How does your office keep the marriage certificates?

9    **A.**   We keep them in our archives.  Whenever we file them,

10   they're assigned a state file number and that's how we -- I

11   mean, that's how we locate and know where they go.  And then

12   how to retrieve them if we need them.  But they're also filed

13   with, you know, the same archives as our birth records and

14   death records for the state.

15   **Q.**   Does the state registrar issue certified copies of

16   marriage certificates?

17   **A.**   For Orleans Parish, yes.

18   **Q.**   What's the process for issuing a certified copy?

19   **A.**   So if someone comes in, requests a certified copy of

20   a marriage certificate, they would fill out the application,

21   pay the fees, and then we would issue a certified copy of

22   that document.

23   **Q.**   A part from the physical copy of each certificate,

24   does the state registrar keep a database of marriage

25   certificates?

1    **A.**   Yes, we do.

2    **Q.**   What database?

3    **A.**   It's basically what -- it's in the same database as

4    all of our other birth records, death records, and, you know,

5    statistics for marriage and the Orleans Parish marriage

6    records data for or -- other -- for divorces and then all of

7    our issuance of certified copies of all those documents is

8    all within the system that we call LEERS.

9    **Q.**   How long has LEERS been in place?

10   **A.**   LEERS has been in place since 2010.  For marriages,

11   it's been in place since 2011.

12   **Q.**   As director, are you familiar with this database?

13   **A.**   Yes.

14   **Q.**   In your experience, does it produce an accurate

15   result?

16   **A.**   Yes.

17   **Q.**   Can you search that database by marriage officiant?

18   **A.**   We can search the data files from the database from

19   marriage officiant, but you wouldn't be able to just -- just

20   a user would not be able to search it by officiant, but based

21   off of the data files that we -- that come out of LEERS from

22   what's been input, we can run some queries and searches on

23   that.

24   **Q.**   Do you know Judge Ernestine Anderson-Trahan?

25   **A.**   I do.

1      Q.   Do you see her in the courtroom?

2      A.   Yes, she's in the white.

3           MR. MAGNER:  We'll so stipulate, Judge.

4           MR. FLANAGAN:  As long as we're stipulating to

5      identification, we can move on.

6      BY MR. FLANAGAN:

7      Q.   Have you been to her courthouse?

8      A.   Yes, I have.

9           MR. FLANAGAN:  I'm showing the witness -- I don't

10     mean to publish to -- at this time, I'm showing the witness

11     what's been marked as Government Exhibit 1.

12     BY MR. FLANAGAN:

13     Q.   Do you recognize it?

14     A.   Yes.  This is the Algiers courthouse.  This is where

15     Second City Court is located.

16     Q.   And this is a two-page exhibit.  Showing the witness

17     the next page, do you recognize this?

18     A.   This is a sign that's on the Algiers courthouse that

19     says "Marriage licenses and marriage ceremonies."

20     Q.   Is it a fair and accurate depiction of the Second

21     City Court courthouse?

22     A.   Yes.

23          MR. FLANAGAN:  Your Honor, the Government moves to

24     admit Government Exhibit 1 into evidence.

25          MR. MAGNER:  No objection, Judge.

1          THE COURT:  It's accepted into the record.  You may

2    publish it to the jury.

3     (Whereupon, Government Exhibit 1 is admitted into evidence.)

4          MR. FLANAGAN:  I'll publish to the jury and provide a

5    copy to the court -- excuse me -- the original to the court.

6          And I expect the Court will have no issue of

7    correcting me if I'm unfamiliar with the procedure.

8          THE COURT:  Sure.  And this is Government's

9    Exhibit 1 --

10          MR. FLANAGAN:  This is Government's Exhibit 1.

11          THE COURT:  -- or 1 and 2?  1 --

12          MR. FLANAGAN:  1 is a two-page document, Your Honor.

13    Thank you.

14          THE COURT:  Thank you.

15          MR. FLANAGAN:  And showing the witness, showing the

16    jury, showing the court page 1 of that exhibit.

17    BY MR. FLANAGAN:

18      Q.  Now that the jury can see it, what is this?

19      A.  This is the Algiers courthouse, which is where Second

20    City Court is.

21      Q.  Where in relationship to the -- you've been here?

22      A.  Yes.

23      Q.  Where in relationship to the river is this

24    courthouse?

25      A.  It's on a street right along -- I think it's Morgan

1   Street right along the river just on the other side of the

2   levee from the river.

3       Q.  It's a nice view?

4       A.  Oh, yes.  I believe you can see St. Louis Cathedral

5   and French Quarter from on top of the levee.

6       Q.  And what's the second page?

7       MR. FLANAGAN:  Showing the witness the second page of

8   the exhibit.

9       A.  This is a sign that's on the building that says,

10  "marriage licenses and marriage ceremonies."

11      Q.  Was that sign there when you visited the courthouse?

12      A.  I believe so, yes.

13      Q.  When did you visit the courthouse?

14      A.  I believe it was sometime in 2014 after I become

15  state registrar that, you know, I did visit the courthouse on

16  processes and kind of interactions between our offices and

17  then again in 2015.  I did obtain my marriage license here

18  just to avoid any type of conflict of interest with my staff.

19      Q.  Did you train any member -- oh, excuse me.

20      To be clear, how many judges are at this courthouse?

21      A.  I believe they rotate between the First City Court

22  and the Second City Court to provide coverage.

23      Q.  When you visited, were you meeting with -- which

24  judge were you meeting with?

25      A.  Judge Trahan.

1    **Q.**  And did you train Judge Trahan or members of her

2    chambers on how to issue marriage licenses?

3    **A.**  I spoke to Judge Trahan about, you know, interactions

4    of our offices and overall processes, and then we have field

5    staff that actually do the training that go out with our

6    stakeholders and do the training on the system and kind of

7    the processes and things like that.  So they would be the

8    ones that would have gone out and actually done the training

9    of her staff.

10         MR. FLANAGAN:  Removing the exhibit.

11   BY MR. FLANAGAN:

12    **Q.**  Did you compile all the marriage certificates of

13   weddings officiated by Judge Ernestine Anderson-Trahan from

14   2013 to 2018?

15    **A.**  My staff did, yes.

16    **Q.**  How did your staff do it?

17    **A.**  By pulling the -- from our data files of marriages

18   that were performed, pulling those that had Judge Trahan

19   listed as the officiant.

20         MR. FLANAGAN:  I'm showing the witness Exhibit 2.

21   BY MR. FLANAGAN:

22    **Q.**  Do you recognize this exhibit?

23         THE WITNESS:  Nothing on the screen.

24         MR. FLANAGAN:  Can we publish to the witness, not to

25   the members?  The witness is -- did I hear you correctly?

**OFFICIAL TRANSCRIPT**

```
 1    You can't see it?
 2           THE WITNESS:  It just says out of range.
 3           THE CASE MANAGER:  It's on there now.
 4           MR. FLANAGAN:  And I hear you --
 5           THE WITNESS:  Can you repeat the question?
 6           MR. FLANAGAN:  -- have a scratch in your throat, if
 7    you want to help yourself to a glass of water with the
 8    Court's indulgence.
 9    BY MR. FLANAGAN:
10       Q.  So now that you can see it, do you recognize this
11    document?
12       A.  Yes.  This is the document that we had compiled with
13    a summary overview.
14       Q.  A summary of what?
15       A.  From year 2012 to 2018 of officiants, of four judges
16    that officiated marriages during that time frame.
17           MR. FLANAGAN:  I ask that we show the witness
18    Exhibits 3, 4, 5, and 6 just briefly.
19    BY MR. FLANAGAN:
20       Q.  Have you seen these exhibits before?
21       A.  Yes.
22       Q.  Showing the witness Exhibit 3, Exhibit 4,
23    Exhibit 5 --
24       A.  Yes.
25       Q.  -- Exhibit 6 --
```

1      **A.**  Yes.

2      **Q.**  -- what are Exhibits 3 through 6?

3      **A.**  They're printouts of marriage license -- marriage

4   licenses that are within our system.  And that were filed

5   with Vital Records.

6      **Q.**  Are these the no kidding licenses that go along with

7   that chart that we saw before?

8      **A.**  Yes.

9      **Q.**  And who officiated each of these weddings according

10  to these licenses?

11     **A.**  On the one I'm looking at, it's Ernestine Lillie

12  Anderson-Trahan.

13          MR. FLANAGAN:  At this time, the Government moves to

14  admit Exhibits 2 through 6.  It's Government Exhibits 2

15  through 6.

16          MR. MAGNER:  No objection, Your Honor.

17          THE COURT:  All right.  It's admitted into evidence.

18  You may proceed.

19          MR. FLANAGAN:  So that's signaling to the court

20  they're large exhibits, Your Honor.

21      (Whereupon, Government Exhibits 2-6 are admitted into

22                      evidence.)

23          MR. FLANAGAN:  Okay.  Providing a copy.  Providing

24  the court with Exhibit 2.

25          And I'm providing them one at a time.  I can provide

1    them just altogether to the court if there's no objection

2    from defense.

3            THE COURT:  As an *in globo* exhibit?  I don't know

4    what you're talking about.

5            MR. FLANAGAN:  3, 4, 5, and 6, I'm taking them out of

6    the binder and giving them to the Court.  If the Court wants

7    the binder, I'm happy to provide her a copy.

8            THE COURT:  4, 5, and 6 you want to admit with this

9    witness?

10           MR. FLANAGAN:  Yes, Your Honor.

11           THE COURT:  And the defense has no objection?

12           MR. MAGNER:  No objection, Your Honor.

13           MR. FLANAGAN:  Thank you.

14           Now admitted into evidence, I'd like to publish

15   Exhibit 2.

16           THE COURT:  All right.  Any objection?

17           MR. MAGNER:  No objection.

18           THE COURT:  All right.  Proceed.

19   BY MR. FLANAGAN:

20      Q.  So if would you explain to the jury, what is

21   Exhibit 2?

22      A.  So this is based off of the file we ran, the number

23   of marriages performed by four judges of city court between

24   2012 and 2018 where the judge was listed as the officiant of

25   the marriage.

1      Q.   And how many weddings did Judge Trahan officiate in

2    2013?

3      A.   282.

4      Q.   And how many in 2014?

5      A.   372.

6      Q.   How many in 2015?

7      A.   415.

8      Q.   How many in 2016?

9      A.   463.

10      Q.   And how many in 2017?

11      A.   473.

12      Q.   How many in 2018?

13      A.   189.

14      Q.   I understand that number is a little smaller.  Did

15    you run this search during the year 2018?

16      A.   Yes, we did.

17      Q.   Showing you page 3, what is page 3?  I'll wait for

18    the page to pull up.  But what is page 3?

19      A.   This is the backup documentation for the summary

20    sheet which shows every record that was in our database that

21    had Judge Trahan as the officiant of the marriage and this

22    would show, you know, record by record the year of the

23    marriage 2018, the state file number, the date of the

24    marriage, the time of the marriage, and then the parish and

25    city of the marriage.

1     **Q.**  So would you walk us through how to read just that

2     first row.

3     **A.**  Sure.  The year would be the year, the occurrence of

4     the marriage.  The SFNO would be our state file number that

5     we assign to a record once it's filed with our office.  Date

6     of marriage is DOM.  TOM is time of marriage.  The M place is

7     marriage place and it's county or parish name and then

8     marriage place, city name.

9          MR. FLANAGAN:  Publishing Exhibit 3.

10    BY MR. FLANAGAN:

11    **Q.**  What is Exhibit 3?

12    **A.**  This is a printout of a marriage that was filed with

13    our office on the left.  The system assigns a license number

14    anytime a license is issued.  And then once it is filed with

15    Vital Records, it is assigned the state file number, which is

16    on the right-hand side.  It includes the -- both spouses'

17    information and demographic information, whether there was a

18    covenant marriage and then the name of the issuing official,

19    the date and time of issuance, and the expiration date along

20    with the title and issuing facility for the license.

21    **Q.**  Can you tell who officiated the ceremony?

22    **A.**  So under the ceremony information block, Judge

23    Anderson-Trahan, Ernestine Trahan, officiated the wedding on

24    January 17, 2013.

25    **Q.**  And I said this is a 282-page document.  Do the other

1  282 pages contain other licenses officiated by Judge Trahan

2  in 2013?

3      **A.**  Yes.

4      **Q.**  Moving on to Exhibit 4, what's page 1 of Exhibit 4?

5      **A.**  Same thing, a printout from our system of a 2014 -- a

6  marriage that occurred in 2014 with the spouse information,

7  the license to marry, the name of the issuing official, when

8  it was issued, where, and then the ceremony information.

9      **Q.**  Again, can you tell who officiated this ceremony?

10      **A.**  Ernestine Lillie Anderson-Trahan.

11      **Q.**  And does this document contain those marriage

12  certificates produced by your search of the 2014 --

13      **A.**  Yes, it does.

14      **Q.**  -- marriage certificates officiated by Judge Trahan?

15      **A.**  Yes, it does.

16      **Q.**  Moving on to Exhibit 5, it's page 1 of Exhibit 5.

17  What is -- again, what is this document?

18      **A.**  It's a printout from our LEERS system of a marriage

19  that occurred in 2015 with both spouse information, the

20  license to marry, who issued the license, the ceremony

21  information.

22      **Q.**  And is Exhibit 5 those 415 certificates of marriage

23  for the weddings officiated by Judge Trahan in 2015?

24      **A.**  Yes.

25      **Q.**  Moving on to Exhibit 6, what's page 1 of Exhibit 6?

1    **A.**   It's a printout from our system of a marriage that

2    occurred in 2016 with the spouse information, the license to

3    marry information, and then the ceremony information.

4    **Q.**   And Exhibit 6 are those 463 certificates of marriage

5    for marriages officiated by Judge Trahan?

6    **A.**   Yes.

7         MR. FLANAGAN:   In 2016.  Excuse me.

8         Removing the exhibit.

9    BY MR. FLANAGAN:

10   **Q.**   Do you know if anything happened in 2015 that

11   increased the number of weddings that were happening in

12   Orleans Parish?

13   **A.**   In Orleans Parish and around the country, the -- in

14   2015, the Supreme Court passed down the *Obergefell v. Hodges*

15   decision.

16   **Q.**   And just to make sure we understand, what was -- did

17   the *Obergefell v. Hodges* decision legalize same sex marriage?

18   **A.**   Yes.

19   **Q.**   And in Orleans Parish, was same sex marriage legal

20   before that decision?

21   **A.**   No, it was not.

22   **Q.**   Did your office actually observe a change to how --

23   the number of weddings based on that decision?

24   **A.**   Yes, we did see an increase in the number of

25   marriages as a result of same sex marriage and then that kind

1   of came down in subsequent years, but it still was higher

2   than previous years prior to the decision.

3       Q.   Showing you page -- did your office make any changes

4   as a result of that decision, as to the marriage licenses

5   themselves?

6       A.   So we did.  We did issue out to all the clerks and

7   then also made changes to our LEERS system where the

8   application for the marriage -- when a couple would come in,

9   they could, you know, select bride, groom, or spouse for

10  either party and, you know, independently.  And then that's

11  what we would enter into the system based off what they chose

12  there.

13       MR. FLANAGAN:  I believe this is -- for the record,

14  this is page 392 of Exhibit 5.  Request permission to publish

15  this to the jury and to the witness.

16  BY MR. FLANAGAN:

17       Q.   Can you see that?

18       A.   Yes.

19       Q.   And you walked it through, but with this exhibit in

20  front of you, can you tell us what we should be looking for

21  in this document?

22       A.   Both parties had chose the label to be spouse.

23       Q.   And what year is this, this document?

24       A.   This was a marriage that occurred in 2015.

25       Q.   Was this an option before *Obergefell v. Hodges*?

1      **A.**   No, it was not.

2           MR. FLANAGAN:  If I could have a moment, Your Honor.

3           THE COURT:  Uh-huh.

4    BY MR. FLANAGAN:

5      **Q.**   Do you know when that decision was made in 2015?

6      **A.**   I believe it was -- I believe it was made in May.

7      **Q.**   Just ballpark is fine.

8      **A.**   Yeah, around May, maybe.

9           MR. FLANAGAN:  Removing this exhibit and publishing

10   Exhibit 2.

11   BY MR. FLANAGAN:

12     **Q.**   Understanding you ran this search or your team ran

13   the search in 2018, before that, had anyone asked for these

14   numbers before?

15     **A.**   No.

16     **Q.**   Understanding no one had asked, how long had this

17   database existed?

18     **A.**   We had another database prior to LEERS, but with

19   LEERS, it had existed since 2011.

20     **Q.**   Did Judge Trahan ever ask your office as far as you

21   know how many weddings did I do in a certain year?

22     **A.**   Not that I'm aware of, no.

23     **Q.**   Not aware of her asking in 2013?

24           MR. MAGNER:  Objection; repetitive.

25           MR. FLANAGAN:  It's a different question, Your Honor.

1          THE COURT:  Overruled.

2     **A.**  No.

3     **Q.**  She didn't ask in '13?

4     **A.**  No.

5     **Q.**  In '14?

6     **A.**  No.

7     **Q.**  '15?

8     **A.**  No.

9     **Q.**  '16?

10    **A.**  No.

11    **Q.**  '17?

12    **A.**  No.

13    **Q.**  And this database was there that entire time?

14    **A.**  Yes.

15         MR. FLANAGAN:  No further questions, ma'am -- Your

16  Honor.

17         THE COURT:  You tender the witness?

18         MR. MAGNER:  Thank you, Judge.

19         THE COURT:  You tender the witness?

20         MR. FLANAGAN:  Ma'am?

21         THE COURT:  You tender the witness?

22         MR. FLANAGAN:  Yes, Your Honor.

23                    CROSS-EXAMINATION

24  BY MR. MAGNER:

25    **Q.**  Good afternoon, Mr. George.

1      **A.**   Afternoon.

2      **Q.**   I got a few questions for you.

3      **A.**   Okay.

4           MR. MAGNER:  Could we pull up Government Exhibit 2,

5  please.

6           MR. WASHINGTON:  Mike, hit "Defense 2."

7           MR. MAGNER:  I'm sorry.  There we go.  Thank you very

8  much.

9  BY MR. MAGNER:

10     **Q.**   Mr. George, is it your understanding that the other

11  three judges shown on Exhibit 2 are on the Eastbank in the

12  First City Court?

13     **A.**   I believe they were in the First City Court, yes.

14     **Q.**   And did they handle the weddings essentially the same

15  way and the wedding licenses essentially the same way?

16     **A.**   First City Court does not issue or at the time did

17  not issue marriage licenses.  Only Second City Court.

18     **Q.**   You're correct.  In terms of how they conducted the

19  weddings and officiated the weddings, did they handle them

20  essentially the same way as Judge Trahan?

21     **A.**   I wouldn't know how either would handle or, you know,

22  officiate weddings.

23     **Q.**   That's not anything you researched?

24     **A.**   No.

25     **Q.**   When the marriage licenses come to you, there's no

1    way to tell from the licenses how much was charged for

2    officiating the wedding, is there?

3        **A.**   No.

4        **Q.**   And so, likewise, there's no indication on them where

5    the fees were waived by Judge Trahan, correct?

6        **A.**   That's correct.

7        **Q.**   And are you aware, in fact, that she would waive the

8    fees for some of the couples who were married?

9        **A.**   I would not know that because that's not in my

10   purview.

11       **Q.**   You said you had some dealings with Judge Trahan in

12   the past.  Can you tell us generally what those were?

13       **A.**   In 2014, I think I was speaking to going to the

14   office and, you know, in 2014 we had talked about, you know,

15   processes and the interaction between our offices.  Again, I

16   would -- returned in 2015, in December, and obtained my own

17   marriage license just to --

18       **Q.**   You talked about not wanting to have a conflict --

19       **A.**   Yeah, with my staff issuing.  Yes.

20       **Q.**   Better sort of safe than sorry?

21       **A.**   Right.

22       **Q.**   And when you dealt with Judge Trahan, she was

23   cooperative with you?

24       **A.**   Yes.

25       **Q.**   She was helpful?

1   **A.**   Yes.

2   **Q.**   She was a very pleasant woman?

3   **A.**   Yes.

4   **Q.**   And in terms of the training that you talked about,

5   that was done by your staff members and her staff members,

6   correct?

7   **A.**   Correct.

8   **Q.**   You have a lady named Jemima who does the training?

9   **A.**   She has done some, yes.

10   **Q.**   Okay.  And she did it at Second City Court, correct,

11   if you recall?

12   **A.**   Possibly.  Possibly so.

13   **Q.**   All right.  Had you previously dealt with Judge

14   Trahan's predecessor, Judge Norman, K.K. Norman?

15   **A.**   I had not.  My staff had.  I had not dealt directly

16   with Judge Norman.

17   **Q.**   Okay.  Did you know generally that she was the

18   "wedding judge," "the love judge"?

19   **A.**   I knew that, you know, she issued a lot of licenses

20   from Second City Court.

21   **Q.**   In terms of the -- generally the licenses themselves,

22   you received licenses where Judge Trahan did not officiate at

23   the wedding, correct?

24   **A.**   Correct.

25   **Q.**   So, for example, if I needed to get a marriage

1   license, I would go to Second City Court or your office and

2   get a license and then I could be married by my priest,

3   Rabbi, or pastor?

4       **A.**  That is right.

5       **Q.**  And that's captured in the larger collection of

6   marriage licenses supervised by your office?

7       **A.**  Correct.

8       **Q.**  When you went there in December, I'm sorry, in 2015,

9   did you deal with Judge Trahan then?

10      **A.**  I believe her staff handled everything, but I did

11  speak to her, you know.  So while I was there, yes, we did

12  speak.

13      **Q.**  And she was professional in every way?

14      **A.**  Yes.

15      **Q.**  So if I understand your testimony correctly, the

16  judges in First City Court don't issue licenses.  Instead,

17  they come to your office for the licenses, correct?

18      **A.**  The judges?

19      **Q.**  Let me rephrase that.  People want to get a license

20  on the Eastbank.  They don't go to First City Court.  They

21  come to your office for a wedding license, correct?

22      **A.**  Correct.

23      **Q.**  All right.  And after the same sex marriage decision,

24  was there a period of time where your office did not issue

25  marriage licenses?

1      A.   We did.   We issued marriage licenses throughout.   We

2   were not able to issue same sex marriage licenses up until a

3   certain point.

4      Q.   And there was a -- yeah, there was a gap in service

5   where your office did not issue those licenses, but Judge

6   Trahan, in Second City Court did, correct?

7      A.   I do not know if she did or not, but we could not

8   until July 8th.

9      Q.   How long a gap was there when you were not issuing

10   licenses for same sex weddings?

11      A.   I guess that would be, like, roughly maybe like one

12   to two months.

13           MR. MAGNER:   Okay.   I think that's all I have.   Thank

14   you, Mr. George, for your time.

15           Tender the witness.

16           MR. FLANAGAN:   Just to clarify, if I can show the

17   witness, publish to the jury Exhibit 3.   I'm going to try to

18   touch the computer.   Someone's doing it for me.   No?

19                          REDIRECT EXAMINATION

20   BY MR. FLANAGAN:

21      Q.   Just to clarify what we just heard, focusing on this,

22   if we can scroll down on this page -- and a little bit

23   higher, just a little bit, right there -- so it says "License

24   to Marry" and "Ceremony."   There's two different blocks in

25   this document, is that correct?

1      A.   Correct.

2      Q.   So who is the issuing official and license to marry?

3      A.   Ernestine Anderson-Trahan.

4      Q.   And she can do that because her court at Second City

5   Court can issue licenses?

6      A.   Correct.  Yes.

7      Q.   And who officiated the ceremony in this?

8      A.   Ernestine Anderson-Trahan.

9      Q.   And she can do that because she's a judge?

10     A.   Correct.

11     Q.   So it's two different roles, correct?

12     A.   Correct.

13     Q.   But her court can be a one-stop shop where you can

14   get both done at the same place?

15          MR. MAGNER:  Objection to leading.

16          MR. FLANAGAN:  It's redirect.

17          MR. MAGNER:  Whether it's redirect, it's leading.

18          THE COURT:  It doesn't matter.  Sustained.

19   BY MR. FLANAGAN:

20     Q.   Understanding it's -- so what service could her

21   chambers -- could her courthouse -- excuse me.

22          So what could a couple do at that -- at the Second

23   City Court if they wanted to?

24     A.   The judge could waive the waiting period that's

25   mandated by statute.  The judge can waive that waiting period

1    and, you know, perform -- officiate a wedding ceremony.

2        Q.  What if the court -- when you were closed, for

3    example, what if a couple wanted to get a license, but didn't

4    want to get married by Judge Trahan?  What, if anything,

5    could they do?

6        A.  They could, you know, get a waiver by a judge,

7    including Judge Trahan, and then, you know, go and be married

8    by a licensed officiant.

9        Q.  So it doesn't have to be Judge Trahan who does these

10   wedding ceremonies?

11       A.  Correct.

12       Q.  Just her court happens to be one of the places that

13   can issue them?

14       A.  Correct.

15           MR. FLANAGAN:  All right.  Now returning to

16   Exhibit 3 -- excuse me.  Exhibit 2.

17   BY MR. FLANAGAN:

18       Q.  This chart, are we looking at marriage licenses?

19       A.  Marriage licenses, yes.

20       Q.  Marriages -- excuse me.

21       A.  That were filed with our office, you know, for

22   marriages that occurred between 2012 and 2018.

23       Q.  Did she officiate each of these ceremonies in these

24   licenses?

25       A.  Yes.

1      **Q.**  And is that different than issuing the license?

2      **A.**  Yes.

3           MR. FLANAGAN:  Nothing further.

4           THE COURT:  All right.  Thank you.  And thank you for

5      your time.

6           Please don't discuss your testimony with anyone.

7           THE WITNESS:  Yes.

8           THE COURT:  All right.

9           MR. FLANAGAN:  United States calls Ms. Christina

10     Dugas.

11          Would you please approach the witness stand?

12          THE CASE MANAGER:  You can have a seat.  Go ahead.

13          Would you please raise your right hand?

14                (Witness administered oath.)

15          THE WITNESS:  I do.

16          THE CASE MANAGER:  Please have a seat.

17          If you will speak directly into the microphone, state

18     and spell your name for the record.

19          THE WITNESS:  Christina Dugas, C-h-r-i-s-t-i-n-a

20     D-u-g-a-s.

21                     CHRISTINA DUGAS,

22     called as a witness, being first duly sworn, examined and

23     testifies as follows:

24                     DIRECT EXAMINATION

25     BY MR. FLANAGAN:

1    **Q.**  And I'm sorry, ma'am.  It's just difficult to see

2    you.  I saw you took a bag.  You don't have any papers with

3    you in front of you, do you?

4    **A.**  No, I do not.

5    **Q.**  All right.  Good afternoon, Ms. Dugas.  What city and

6    state do you live in?

7    **A.**  New Orleans, Louisiana.

8    **Q.**  Did you ever get married at the Algiers courthouse?

9    **A.**  I did.

10   MR. FLANAGAN:  I'm showing the witness what's already

11   been entered into evidence as Exhibit 1, also published to

12   the jury.

13   BY MR. FLANAGAN:

14   **Q.**  What is this?

15   **A.**  That's the Algiers courthouse in which I was married.

16   **Q.**  Why did you get married there?

17   **A.**  My husband was Catholic and I had been married

18   before, so I wasn't allowed to be married in the Catholic

19   church.  So we chose the Algiers courthouse.

20   **Q.**  Is there anything aesthetic about the courthouse that

21   you liked?

22   **A.**  Oh, it's absolutely beautiful.

23   **Q.**  How did you get there?

24   **A.**  We took the ferry.

25   **Q.**  Is there anything particularly memorable about that

1   ferry ride?

2       A.   Yes.   My husband wanted the judge to ensure that

3   "obey" was in our vows.   It was a joke.

4       Q.   So who did officiate your ceremony?

5       A.   Judge Trahan.

6       Q.   What did the courthouse -- were you married inside

7   the court or outside?

8       A.   Inside the court.

9       Q.   How did the courthouse look when you were married?

10      A.   Just a regular courthouse.   It was older furniture.

11  They had the judge's bench and then some seating arrangements

12  behind it.

13      Q.   Were there any decorations?

14      A.   No, no decorations.

15      Q.   Do you remember when you got married at the Algiers

16  courthouse?

17      A.   February 21, 2013.

18      Q.   Do you remember if there was a fee for having Judge

19  Trahan officiate your marriage?

20      A.   Yes.

21      Q.   What was that fee?

22      A.   $100.

23      Q.   How do you remember?

24      A.   Actually, Judge Trahan's assistant let me know that

25  it would be $100 and she gave me some directions to some ATMs

1   close by.

2       Q.   What was that $100 for?

3       A.   That's an excellent question.  I don't know.

4       Q.   Was there a separate fee for the marriage license

5   itself?

6       A.   Yes, there was.

7       Q.   So that $100 was separate from the marriage license

8   fee?

9       A.   Correct.

10      Q.   What was the marriage license fee?

11      A.   $25.

12      Q.   So what did you -- so putting the marriage license

13  fee aside, what did you do with the $100 fee that you were

14  supposed to pay for the wedding itself?

15      A.   I handed a hundred dollar bill to Judge Trahan's

16  assistant.

17      Q.   Did you get a receipt?

18      A.   Yeah -- no.

19      Q.   Did the assistant explain why you had to pay in cash?

20      A.   No, she did not.

21      Q.   Did you ask to pay with a credit card?

22      A.   No, I didn't.

23      Q.   Did you ask to pay with check?

24      A.   No, I did not.

25      Q.   I'm showing you Exhibit 3, page 187.  This is already

1    into evidence.  Do you recognize this document?

2       A.   I do.

3       Q.   What is this?

4       A.   This is our marriage license.

5       Q.   And then if we could scroll down to the bottom, who

6    officiated this wedding?

7       A.   Judge Trahan.

8       Q.   Did you take this license back to Vital Records?

9       A.   No.

10      Q.   What did you do with this license?

11      A.   Actually, once it was completed, I just had to wait a

12   few weeks and Vital Statistics sent it in the mail.

13      Q.   How long was the wedding?

14      A.   Maybe 15 minutes.

15           MR. FLANAGAN:  Government tenders the witness.

16           THE COURT:  All right.  Thank you.

17                        CROSS-EXAMINATION

18   BY MR. WICK:

19      Q.   Good afternoon, Ms. Dugas.  I just have a couple of

20   questions.  You met with the government first in

21   January 2021, correct?

22      A.   Yes, sir.

23      Q.   And you remember that meeting?

24      A.   Yes.

25      Q.   And during that meeting, you told the government that

1    you paid either $80 or $100.  Do you recall that?

2         A.  No, I don't.  It was a $100 bill.

3         Q.  Okay.  January 2021 is earlier in time than today,

4    right?

5         A.  Correct.

6         Q.  So you would have been closer in time in terms of

7    your recollection of what occurred, right?

8         A.  Yes.

9         Q.  Okay.  Ms. Dugas, I'm going to ask you a couple

10   sensitive questions.  And I don't intend to pry too much, but

11   I just want to let you -- they're relevant to this case.

12         Ms. Dugas, you suffer from post-traumatic stress

13   disorder, correct?

14         A.  I do.

15         Q.  You experienced stressful events in your past life

16   that affect your ability to recall certain things, right?

17         A.  Yes, I do.

18         Q.  They affect your function, correct?

19         A.  Yes, they do.

20         Q.  And stressful events can affect a person's ability to

21   function, correct?

22         A.  Yes.

23         MR. WICK:  Thank you.

24         MR. FLANAGAN:  One moment, Your Honor.

25         THE COURT:  Okay.

**OFFICIAL TRANSCRIPT**

1                    <u>REDIRECT EXAMINATION</u>

2    BY MR. FLANAGAN:

3       Q.   Understanding that background, do you remember paying

4    $100?

5       A.   Yes, actually I do.  My husband always had cash in

6    his wallet.  He was an older Cajun gentleman, so I think

7    people understand that he always had a hundred dollar bill in

8    his wallet because we didn't need to go to the ATM.

9            MR. FLANAGAN:  Understood.

10           THE COURT:  Are y'all done?  Is this it?  You're done

11   with the witness?

12           MR. FLANAGAN:  Oh, yes, Your Honor.

13           THE COURT:  You may step down.  And please don't

14   discuss your testimony with anyone.

15           All right.  Call your next witness.

16           MR. BOTELER:  Thank you, Your Honor.  United States

17   calls Lisa Hibbs to the stand.

18           THE CASE MANAGER:  Would you please raise your right

19   hand?

20               (Witness administered oath.)

21           THE WITNESS:  I do.

22           THE CASE MANAGER:  Please take a seat and speak

23   directly into the microphone.

24           State and spell your name for the record.

25           THE WITNESS:  Lisa Hibbs, L-i-s-a H-i-b-b-s.

1                           LISA HIBBS,

2    called as a witness, being first duly sworn, examined and

3    testifies as follows:

4                        DIRECT EXAMINATION

5    BY MR. WICK:

6        Q.   Good afternoon, Ms. Hibbs.  What do you currently do?

7        A.   I'm a court reporter.

8        Q.   And how long have you been a court reporter?

9        A.   Since 1980.

10       Q.   And at some point in time, did you work as a court

11   reporter in the Second City courthouse?

12       A.   Yes.

13       Q.   And where is that located?

14       A.   225 Morgan Street.

15       Q.   And is it next to the river?

16       A.   Yes.

17       Q.   And what does it look across?

18       A.   The French Quarter.

19       Q.   Now, how long did you work at Second City Court?

20       A.   From 2006 until August of this year.

21       Q.   And what judges did you work for?

22       A.   Judge Norman and Judge Trahan.

23       Q.   And how long did you work for Judge Norman?

24       A.   Until she retired in '12.

25       Q.   And how long did you work for Judge Trahan?

1        A.   The remainder of the time.

2        Q.   And after you left working for Judge Trahan, what did

3    you do next?

4        A.   I'm a freelance court reporter.

5        Q.   Did you know Judge Trahan before you started working

6    for her?

7        A.   No.

8        Q.   And how would you describe your relationship with

9    Judge Trahan?

10       A.   She was my boss.

11       Q.   Okay.  And did you socialize with Judge Trahan

12   outside of work?

13       A.   A wedding possibly, you know, shower, somebody was

14   getting married.

15       Q.   It was primarily a work relationship?

16       A.   Yes.

17       Q.   Were you aware of an election in 2012 for the Second

18   City Court judge position?

19       A.   Yes.

20       Q.   And was that when Judge Norman was leaving the bench?

21       A.   Yes.

22       Q.   Did you assist Judge Trahan in the election?

23       A.   No, I didn't know her then.

24       Q.   Were you aware that other judges ran for election?

25       A.   Yes.

1     **Q.**  And do you recall how many other attorneys ran for

2  that position?

3     **A.**  Maybe four or five.  I don't remember exactly.

4     **Q.**  And do you know whether or not there was a runoff

5  after the first election?

6     **A.**  There was.

7     **Q.**  And do you remember who Judge Trahan ran against?

8     **A.**  I don't remember her name.

9     **Q.**  And when I say -- and Judge Trahan was elected?

10     **A.**  Yes.

11     **Q.**  And once Judge Trahan was elected to the position as

12  a judge, did she decide to retain you as the court reporter?

13     **A.**  Yes.

14     **Q.**  Now, can you just describe for me who else worked in

15  Judge Trahan's courtroom?

16     **A.**  We have a minute clerk and a law clerk.

17     **Q.**  And did you also work in her chambers as a court

18  reporter?

19     **A.**  Yes.  Yes.

20     **Q.**  And can you just explain to the jury what a minute

21  clerk is?

22     **A.**  She ran the office.  She kept the docket, you know,

23  when people needed a court date.

24     **Q.**  And who were the minute clerks while you worked for

25  Judge Trahan?

1    A.   Tammy Major and then Shandelle Dorsey.

2    Q.   And what does a law clerk do?

3    A.   Research for the judge or anything the judge needs

4    her to do.

5    Q.   And while you were there, do you remember who the law

6    clerks were?

7    A.   Alexis Buffington, Danielle Barringer, Trishelle

8    Lambert, and now Jasmine Bandy.

9    Q.   Now, how was the office set up?  Like, for instance,

10   did the judge have her own office?

11   A.   Yes.

12   Q.   And did you and the other staff members have your own

13   offices?

14   A.   I shared an office with the law clerk.  Minute clerk

15   had her own office.

16   Q.   Minute clerk had her own office.  Was there a

17   conference room that the judge had access to?

18   A.   On our floor, yes.

19   Q.   Were there any other judges located in the Second

20   City courthouse?

21   A.   No, just the one judge.

22   Q.   If Judge Trahan had records that were being kept,

23   where were they kept at in the office?

24   A.   In either the conference room or in the file cabinets

25   in her office.

1    **Q.**  And what were your responsibilities as a court

2    reporter?

3    **A.**  To take -- just like she's doing here (indicating) in

4    court, but I also acted as the crier, so I called the docket

5    and, you know, did other functions.

6    **Q.**  So when you say "a court reporter," you would

7    transcribe testimony that's going on in court?

8    **A.**  Yes.

9    **Q.**  And you mentioned a crier.  What is a crier?

10   **A.**  Well, we didn't have a crier, so I had to call the

11   docket, you know, call the cases in the order that they

12   needed to be called in.

13   **Q.**  And did you also assist in Judge Trahan's office with

14   answering phones?

15   **A.**  Yes.

16   **Q.**  And as the court reporter, I assume you were in court

17   a fair amount?

18   **A.**  All the time.

19   **Q.**  All the time.  So what type of cases did Judge Trahan

20   handle as a judge on the Second City Court?

21   **A.**  Evictions, small claims, and some small docket,

22   regular docket cases.

23   **Q.**  And what -- what is a small claims case?  What is

24   that?

25   **A.**  Any suit that's filed that's under 5,000.

1      Q.   Could that be like property damage cases?

2      A.   It could be a car wreck.  It could be a dog bite.  It

3  could be a lease -- somebody trying to get their lease, their

4  deposit back from a lease.

5      Q.   So like a landlord tenant issue?

6      A.   It could be a landlord suing the tenant for damages.

7      Q.   And when you say a regular case, that's less than

8  25,000, what do you mean by that?

9      A.   Over 5,000 less than 25,000.

10     Q.   Okay.  That could be like a personal injury case?

11     A.   Yeah, car wreck or something.

12     Q.   All right.  And what were the eviction cases?  You

13  mentioned that too.

14     A.   What were they?

15     Q.   Yeah.  What would be an eviction case?

16     A.   If somebody didn't pay their rent.

17     Q.   And were you the main court reporter for Judge

18  Trahan?

19     A.   Yes.

20     Q.   About how often per week did Judge Trahan hold court?

21     A.   Two or three times a week.

22     Q.   And did Judge Trahan also assist with cases at First

23  City Court?

24     A.   Yes, once a week.

25     Q.   And what type of cases did she hear at First City

1   Court?

2        A.   Evictions and small claims only.

3        Q.   No regular cases?

4        A.   No regular cases.

5        Q.   And how would you describe -- how busy was the court

6   calendar at Second City Court?

7        A.   Busy.

8        Q.   Would the number of cases vary by time of year?

9        A.   Sure.  Always.

10       Q.   And what would happen on the two days that court

11  wasn't being held?

12       A.   We were in our office doing work.

13       Q.   In the court proceedings in Second City Court, did

14  the parties present testimony under oath?

15       A.   Sure.

16       Q.   Sort of like what you're doing today?

17       A.   Absolutely.

18       Q.   And who administered the oath?

19       A.   Me.

20       Q.   And do you remember what the oath was?

21       A.   Sure.

22       Q.   And what was it?

23       A.   You solemnly swear the testimony you're about to give

24  will be the truth, the whole truth, nothing but the truth so

25  help you God.

1    **Q.**   And how often was it given?

2    **A.**   Before every -- before every case.

3    **Q.**   And while you were there working as a court reporter,

4    were there any instances in which Judge Trahan found someone

5    in contempt for lying?

6    **A.**   Sure.

7    **Q.**   Now, in addition, you mentioned, like, Judge Trahan

8    would hear evictions and small claims.  How would Judge

9    Trahan give her opinion or her decision on those cases?

10   **A.**   Most of the time ruled from the bench.  Sometimes she

11   took them under advisement.

12   **Q.**   And how long after hearing the case would she rule

13   from the bench?

14   **A.**   Immediately.

15   **Q.**   And if she took it under advisement, what do you mean

16   by that?

17   **A.**   If she needed to look up some law or have the law

18   clerk look it up.  I don't know any more than that honestly.

19   **Q.**   Would there be like a written opinion later or

20   written order?

21   **A.**   I believe if she took it under advisement, she had to

22   state the reasons why, but, again, I'm not the law clerk so I

23   had no involvement in that.

24   **Q.**   Now, a part from, like, a vacation or normal

25   holidays, were there any times that you observed that Judge

1    Trahan took, like, a large amount of time off from her duties

2    as a judge?

3        A.   Only if she had some medical issue going on or

4    medical issues in her family.

5        Q.   All right.  Do you recall them being a lot of days or

6    sporadic?

7        A.   No.  Sporadic.

8        Q.   How about when judge -- were you aware that Judge

9    Trahan did assist in taking care of her mother?

10       A.   Of course.

11       Q.   And did she take off a large number of days to take

12   care of her mother?

13       A.   I don't know large number, but she took off time when

14   she needed to.

15       Q.   And when Judge Trahan was taking care of her mother,

16   what, if any, impact did you observe on Judge Trahan's

17   ability to act as a judge?

18       A.   I mean, I guess I don't understand your question.

19       Q.   Did you -- during the time period that Judge Trahan

20   was taking care of her mother, did you see any change in her

21   ability to, like, rule from the bench or handle cases?

22       A.   I mean, you know, that's a -- I know I went through

23   it too.  It's a hard time.  You're trying to navigate, you

24   know, work and taking care of your loved one, but, I mean, I

25   don't -- I didn't find really much difference other than

1    sometimes she might have been preoccupied, you know.

2        Q.  So you did not find much difference?

3        A.  Huh-uh.  No.

4        Q.  Do you know if Judge Trahan took any vacations in,

5    like, 2017?

6        A.  I don't know years.  I mean, yes, she took vacations

7    through the years.

8        Q.  Do you know if she ever took a vacation to Las Vegas?

9        A.  I don't remember.

10        MR. WICK:  Objection, Your Honor, relevance.

11        THE COURT:  Counsel?

12        MR. BOTELER:  Your Honor, later on I was going to

13   connect the dots with what -- Judge Trahan has been able to

14   take vacations when their response is that she was so

15   preoccupied with medical expenses to help further show that

16   she had -- could --

17        THE COURT:  I don't think that that has any

18   relevance, Counsel.  Sustained.

19   BY MR. BOTELER:

20        Q.  Now, Ms. Hibbs, were marriage licenses issued from

21   Second City Court?

22        A.  Yes.

23        Q.  And were you involved in that process?

24        A.  Yes.

25        Q.  And what was your role?

1    **A.**  If somebody came in for a license and I was available

2    to do it, I would do the license.

3    **Q.**  And when a marriage license was issued from Second

4    City Court, were some of the marriages conducted at the

5    court?

6    **A.**  Yes.

7    **Q.**  And were sometimes marriages conducted elsewhere?

8    **A.**  Yes.

9    **Q.**  And did you receive any training on how to process

10   marriage licenses?

11   **A.**  About five minutes.  We did it on a typewriter, so it

12   was just a -- you know, you put the application in and you

13   typed it up.  That was it.

14   **Q.**  Was that back in 2006?

15   **A.**  Yes.

16   **Q.**  And then after 2006 you continually learned how to do

17   marriage licenses?

18   **A.**  Yes.

19   **Q.**  And so when Judge Trahan became a judge, did you need

20   additional training?

21   **A.**  Yes, at some point, the state gave us or hooked us up

22   with their system, their LEERS system they called it and we

23   had to get trained on how to do it via Internet.

24   **Q.**  So what is the LEERS system?

25   **A.**  I don't know what it stands for.  It's LEERS.  We

1  were hooked into the state -- the Vital Records website to do

2  the license.

3      Q.  And so this was a way you could type it into the

4  computer --

5      A.  Yes.

6      Q.  -- to access it rather than just a typewriter?

7      A.  Yes.

8          MR. BOTELER:  Your Honor, I would like to show the

9  witness and publish what was previously admitted as

10  Exhibit No. 6 on page 6.

11         THE COURT:  Let's see if the witness recognizes it.

12         MR. BOTELER:  Maybe try page 7.  Yeah, that one.

13         All right.  Thank you.

14         Was that page 7, Ms. Better?

15         I just want to know what number it is.

16         That one.

17         MS. BETTER:  This one?

18         MR. BOTELER:  One more page.  Yes, thank you.  That

19  one.

20  BY MR. BOTELER:

21      Q.  Ms. Hibbs, what do you see on the screen?

22      A.  A marriage license.

23      Q.  And when you look at the marriage license, do you see

24  where it shows, like, state file number?  Are you familiar

25  with that?

1     **A.**  I see that up there, but we didn't generate that.

2     **Q.**  And then on the marriage license, it would list the

3  groom and the bride?

4     **A.**  Uh-huh.  Yes.

5     **Q.**  And if you go down a little farther, you'll see where

6  it shows license to marry.  It says name of issuing official?

7     **A.**  Yes.

8     **Q.**  Who is that?

9     **A.**  Me.

10    **Q.**  And then do you see where it says ceremony?

11    **A.**  Yes.

12    **Q.**  And who performed that ceremony?

13    **A.**  Judge Trahan.

14    **Q.**  When you would go and prepare a marriage license,

15  would you go back to fill in, like, who officiated the

16  wedding?

17    **A.**  When -- when Judge Trahan did them, we usually did it

18  at the same time.  When another officiant did them, they were

19  sent back to us, and when they were sent back to us, we

20  filled in the info at that time.

21    **Q.**  And when you would fill it in later and they had a

22  different officiating, you would put a different name under

23  officiating?

24    **A.**  Yes.

25    **Q.**  Now, Ms. Hibbs, how much was the fee for the marriage

1   license?

2       A.   27.50.

3       Q.   And how was it paid?

4       A.   Cash only.

5       Q.   Were you involved at all in collecting the fee?

6       A.   Sure.  If I did the license, yes.

7       Q.   And were the other members of Judge Trahan's staff

8   involved in collecting the marriage license fee?

9       A.   If they did the license, yes.  Whoever did the

10  license collected the money.

11      Q.   And what would happen to the marriage license fee?

12      A.   We had a till that we put the money in.  Is that what

13  you mean?  Physically?

14      Q.   Yes.  So you would take the money and put it in a

15  till?

16      A.   Yes.

17      Q.   What did it look like?

18      A.   A metal box, money box.

19      Q.   And what would happen to the money that was in that

20  money box?

21      A.   At some point, it was deposited I suppose, but I

22  didn't have -- I didn't partake in that.

23      Q.   Now, if Judge Trahan officiated the wedding, where in

24  the courthouse would the ceremony take place?

25      A.   Mostly in the courtroom, sometimes on the balcony,

1   sometimes outside if there were a lot of people.

2      **Q.**  And how long would the ceremony take normally?

3      **A.**  15, 20 minutes.

4      **Q.**  And were you present at some of the ceremonies?

5      **A.**  Sometimes.

6      **Q.**  Did you ever sign as a witness?

7      **A.**  Sometimes.

8      **Q.**  And why would you sign as a witness?

9      **A.**  Because some couples elope and it's just the two of

10  them.  They don't have guests with them.  They need two

11  witnesses.

12     **Q.**  Now, were there particular times of the year when,

13  like, Judge Trahan would conduct more weddings?

14     **A.**  Yes.

15     **Q.**  And when would that be?

16     **A.**  Spring, fall, and holidays.

17     **Q.**  Was there any particular, like, day of the week that

18  was more popular?

19     **A.**  Fridays.

20     **Q.**  Now, was there a separate marriage fee when Judge

21  Trahan conducted the wedding?

22     **A.**  Yes.

23     **Q.**  And how much was that?

24     **A.**  80 and then it went up to 100.

25     **Q.**  Why did it go up to 100?

1     **A.**   When they initiated the same sex marriages, we went

2     up.  We just knew it would be so much busier we went up.

3     **Q.**   Whose decision was it to increase it to 100 after the

4     same sex marriage?

5     **A.**   I assume Judge Trahan's.

6     **Q.**   Was it your decision?

7     **A.**   Oh, no.

8     **Q.**   And was the basis on did you have an expectation that

9     you would have more weddings after that?

10    **A.**   Yes.

11    **Q.**   In fact, did you have more weddings after that?

12    **A.**   Yes.

13    **Q.**   Prior to legalizing same sex marriage, the cost was

14    $80?

15    **A.**   Yes.

16    **Q.**   And how was that charged?  In what form?  Cash?

17    Check?

18    **A.**   Cash.

19    **Q.**   And why was it in cash?

20    **A.**   We didn't have any kind of TeleCheck or credit card

21    machine, so that's the only form we took.  Some people

22    brought money orders.

23    **Q.**   And who would collect the cash?

24    **A.**   Whoever was dealing with that customer.

25    **Q.**   And if you collected the cash, what would you do with

1  it?

2    **A.**  I believe we -- we used to put it in Judge Trahan's

3  desk.  I don't really remember, but I think that's what we

4  did with it.

5    **Q.**  And Judge Trahan's desk would be in her office --

6    **A.**  In her office.  Yes, in her office.

7    **Q.**  Now, were there any times when Judge Trahan kind of

8  waived the fee?

9    **A.**  Yeah.  Friends or family or yeah.

10   **Q.**  And if a wedding took place after hours, did Judge

11 Trahan charge more?

12   **A.**  Sometimes.

13   **Q.**  Do you know how much more?

14   **A.**  No.

15   **Q.**  Was there an additional charge for weddings on

16 Valentine's Day?

17   **A.**  Yes.

18   **Q.**  And do you know how much more?

19   **A.**  I don't remember how much more.  It's just because we

20 decorated the courtroom and we gave them flowers sometimes.

21 So we charged a little bit more.

22   **Q.**  And how about for weekends?  Did Judge Trahan charge

23 more for weekends?

24   **A.**  I believe so.

25   **Q.**  Now, if a couple wanted to get married at the

1    courthouse, how did they go about scheduling it?

2        A.  They generally called.  Sometimes they stopped in if

3    they were local and set it up.

4        Q.  And would you be one of the ones who would receive a

5    phone call?

6        A.  Yes.

7        Q.  And how would you go about to schedule the wedding?

8        A.  We had little slips of paper that, you know, that

9    generated name, address, their phone numbers, the date they

10   wanted it, the time they wanted it, just an information

11   sheet.

12       Q.  And where was that, like, slip kept?

13       A.  We had an agenda book that we clipped them in on that

14   day, whatever the date was.

15       Q.  What would happen if a couple wanted to get married

16   on the day that Judge Trahan wasn't available?

17       A.  Then we'd either schedule it a different day or went

18   somewhere else.

19       Q.  So Judge Trahan didn't have to conduct a wedding if a

20   person asked them to do --

21       A.  No.

22       Q.  And once the wedding occurred, what would happen to

23   those reservation slips?

24       A.  We threw them away.

25       Q.  Was there any notation kept of those slips at all?

1    **A.**  No.

2    **Q.**  And when a couple was paid a fee to have the wedding

3    officiated, did you keep any records of the amount of fee

4    that was paid?

5    **A.**  No.

6    **Q.**  Do you know whether or not anyone else at the office

7    kept such records?

8    **A.**  I don't know.

9    **Q.**  Did Judge Trahan at any point discuss with you of how

10   she was going to keep track of the fees she received?

11   **A.**  No.

12   **Q.**  What, if anything, did Judge Trahan ask you to do on

13   how to keep track of those fees?

14   **A.**  I'm sorry?  Say that again.

15   **Q.**  Did Judge Trahan ask you to help keep track of those

16   fees?

17   **A.**  No.

18   **Q.**  Now, you saw, like, a copy of a marriage license

19   earlier.  Did Judge Trahan's office keep copies of those

20   marriage licenses?

21   **A.**  Yes, we kept copies of the licenses.

22   **Q.**  And where were they kept?

23   **A.**  We had a file cabinet in Judge Trahan's office.

24   **Q.**  And at any point, did they get more voluminous that

25   they were moved to other locations?

1    **A.**   Yeah.  I think the minute clerk would purge them.

2   You know, I don't know if it was yearly.  I don't know her

3   time frame, but, yeah, the file cabinet was only so big.

4    **Q.**   And when you say "purge," did you throw them away --

5    **A.**   No.  No.  We kept them, but they just went into a

6   file box and went into the conference room.

7    **Q.**   In addition to keeping a copy of the marriage

8   license, was a copy sent also to the office of Vital Records?

9    **A.**   The original.

10    **Q.**   And how did that happen?

11    **A.**   We haven't done this in a few years, but monthly, we

12   had to make -- well, through the month, I believe the minute

13   clerk made a running total -- listing of each license because

14   at the end of the month, we had to bring them to Vital

15   Records, physically bring them, so that they were in their

16   possession.  Because once we brought them there, we no longer

17   were the custodians of that record, they were.  But we kept

18   the carbon copies for lack of a better word in our office.

19    **Q.**   So one copy was kept with Judge Trahan in her court?

20    **A.**   Right.

21    **Q.**   And then one copy or the original was sent to the

22   office?

23    **A.**   Yes.

24    **Q.**   Of Vital Records?

25    **A.**   Yes.

1    **Q.**   So you both had a set?

2    **A.**   Yes.

3    **Q.**   Now, at some point in 2018, did you become aware of a

4    judicial commission inquiry into Judge Trahan regarding

5    weddings?

6    **A.**   Yeah, at some point.  I don't know what year it was

7    but, yes.

8    **Q.**   But around that time, were you and other court staff

9    requested to collect and organize marriage certificates?

10   **A.**   Yes.

11   **Q.**   And who requested it?

12   **A.**   I'm not even sure to tell you the truth.  We were

13   just asked to do it.

14   **Q.**   Who asked you to do it?

15   **A.**   I don't know --

16        MR. WICK:  Asked and answered.  She already answered

17   that question.

18   **A.**   I don't know.

19        THE COURT:  Have you answered the question?

20        THE WITNESS:  I don't know who asked me.

21   BY MR. BOTELER:

22   **Q.**   What role did you take in collecting the marriage

23   certificates?

24   **A.**   Well, when you say "collecting," we weren't

25   collecting.  The only thing I remember -- and, again, this

1    was a long time ago, was we were just separating Judge

2    Trahan's -- the ones -- the weddings she actually performed

3    versus the weddings that other officiants performed.  That's

4    all I remember that we were doing.

5        Q.  When you say "we," who do you mean?

6        A.  The three of us in the office.

7        Q.  And after you separated the wedding licenses between

8    the ones performed by Judge Trahan and others, do you know

9    what happened next to it?

10       A.  No.

11       Q.  Were you asked to count the marriage certificates?

12       A.  Possibly.  I really don't remember.

13       Q.  And do you remember where you pulled -- where those

14   marriage licenses were pulled when you were separating where

15   they came from?

16       A.  Where they came from?  The file boxes.

17       Q.  And those were the file boxes in the conference room?

18       A.  Probably, yeah.

19           MR. BOTELER:  Court's indulgence.  One moment.

20   BY MR. BOTELER:

21       Q.  Had you separated them before?

22       A.  Not that I remember.

23           MR. BOTELER:  Your Honor, tender this witness.

24           THE COURT:  All right.  Thank you.

25                        CROSS-EXAMINATION

**OFFICIAL TRANSCRIPT**

```
 1  BY MR. WICK:
 2      Q.  Good afternoon, Ms. Hibbs.
 3      A.  Hi.  How are you?
 4      Q.  Ms. Hibbs, you worked for Judge K.K. Norman before
 5  Judge Trahan, right?
 6      A.  Yes.  Yes.
 7      Q.  You said that?
 8      A.  Yes.
 9      Q.  And you had a certain level of institutional
10  knowledge from working for Judge Norman, right?
11      A.  Yes.
12      Q.  And you were the only person that was part of
13  transitioning over from Judge Norman's court to --
14                      (Beeping.)
15          THE COURT:  Hold on a second.
16          What is that noise?
17          MS. BETTER:  It's my laptop shutting down, Your
18  Honor.
19  BY MR. WICK:
20      Q.  That was part of transitioning over from Judge Norman
21  to Judge Trahan?
22      A.  Yes.
23      Q.  And in your observation, Judge Norman did things the
24  exact same way as Judge Trahan in terms of weddings, correct?
25      A.  Absolutely.
```

1    **Q.**  Maybe some minor differences, like she read a poem

2  during the ceremony?

3    **A.**  Yeah.  Yeah.

4    **Q.**  But the paperwork was all the same, right?

5    **A.**  Yes.

6    **Q.**  Judge Norman didn't keep a spread sheet logging her

7  entries of weddings, right?

8    **A.**  I have no idea.

9    **Q.**  She didn't mark it down in a book that you know of?

10    **A.**  Not that I know of.  I don't know.

11    **Q.**  It was only a three-person office, right?

12    **A.**  Right.

13    **Q.**  And when the transition occurred, knowing that it was

14  just a three-person office, would other people -- the other

15  two people on staff, if there was a point of clarification,

16  sometimes they would ask you about how Judge Norman did

17  things previously, right?

18    **A.**  Sure.

19    **Q.**  And so you were part of transitioning to continue

20  that same sort of process, right?

21    **A.**  Yes.

22    **Q.**  It was consistent?

23    **A.**  Very consistent.

24    **Q.**  No different?

25    **A.**  No different.

1    Q.   Did Judge Norman ever advertise for weddings?

2    A.   Not that I know of.

3    Q.   Judge Trahan never advertised for weddings, did she?

4    A.   No.

5    Q.   And people just showed up for the weddings, right?

6    A.   Yes.  Yes.

7    Q.   Because apparently the courthouse is very nice,

8    right?

9    A.   Yes.  Internet.

10   Q.   Gotcha.  So we talked about the records being kept in

11   a spread sheet and that didn't happen.  We talked about how

12   they weren't logged on some physical paper.  The --

13        MR. BOTELER:  Objection, Your Honor.  That's not a

14   question.

15        MR. WICK:  It's a summary of what she just

16   testified to --

17        THE COURT:  He's about to ask a question.  Overruled.

18   BY MR. WICK:

19   Q.   The way that Judge Trahan kept the physical licenses

20   themselves was no different than the way that Judge Norman

21   kept them, right?

22   A.   Exactly.

23   Q.   And it was your understanding that Judge Norman

24   advised Judge Trahan on how to keep these wedding issues,

25   correct --

**OFFICIAL TRANSCRIPT**

1      A.   As far as I know --

2           MR. BOTELER:  Objection, calls for hearsay.

3           MR. WICK:  Your Honor, she worked for both

4   administrations.

5           THE COURT:  Overruled.

6           MR. WICK:  Please answer the question.

7           THE COURT:  Please answer the question.

8           THE WITNESS:  What was the question?  I'm sorry.

9   BY MR. WICK:

10      Q.   It's your understanding that Judge Norman advised

11   Judge Trahan on how to handle these weddings?

12      A.   Oh, yes.

13      Q.   And the paperwork that accompanied the weddings?

14      A.   Yes.

15      Q.   I want to talk quickly about the size of your docket,

16   the docket.

17      A.   Uh-huh.  Okay.

18      Q.   Counsel touched on the docket.  You mentioned that --

19   it's a solid workload, right?

20      A.   Yes.

21      Q.   And that solid workload is at Second City Court,

22   right?

23      A.   Both.

24      Q.   It's at both?

25      A.   Both Second and First, yes.

1    Q.   So if you take just the Second City Court workload,

2  you're handling all evictions?

3    A.   All evictions on the Westbank.

4    Q.   You're handling all small claims?

5    A.   All small claims for the Westbank.

6    Q.   What else are you handling?

7    A.   And regular docket if there are any.

8    Q.   And that's a decently sized docket?

9    A.   Yes.   And judgment debtor rules or motions or

10  anything else that gets put on the docket.

11    Q.   Okay.   Gotcha.   And how would you compare the size of

12  the First City Court docket to the size of the Second City

13  Court docket?   Wouldn't you say they were about equal?

14    A.   They're about equal, yeah.

15    Q.   So it was really a double docket if you will?

16    A.   Right.

17    Q.   Okay.   And that takes a good bit of time?

18    A.   Yes, it does.

19    Q.   And it took a particularly good bit of time sometimes

20  with Judge Trahan, right?   She listened to everybody *ad*

21  *nauseam*, right?

22    A.   Yes.

23    Q.   Sometimes it could be frustrating from your end if

24  she would allow a litigant to go on, right?

25       THE COURT:  All right.  I'm going to stop you, T.C.

1    Don't testify.  So ask a question and let the witness answer.

2    BY MR. WICK:

3        Q.  Could it be frustrating for you sometimes?

4        A.  Sometimes you get tired of listening to it quite

5    frankly.

6        Q.  Why did Judge Trahan allow that?

7        A.  Because she wanted the people to be heard.  If she

8    didn't listen, they would complain that she didn't listen, so

9    she listened.

10       Q.  And based on your observations, were many of the

11   cases just people attempting to be heard?

12       A.  Yes.

13       Q.  And Judge Trahan allowed that to happen?

14       A.  Yes.

15           MR. WICK:  Thank you.

16   BY MR. WICK:

17       Q.  Let's talk about Judge Trahan's mother's health

18   issues.  There were times when Judge Trahan went into court.

19   You would say she appeared scatterbrained, right?

20       A.  Well, preoccupied.

21       Q.  Preoccupied?

22       A.  Uh-huh.

23       Q.  And you would have to remind her of certain things in

24   order for her to keep going, right?

25           THE COURT:  Mr. Wicker, don't lead the witness.

1          MR. WICK:  Yes, Your Honor.

2     BY MR. WICK:

3       Q.   How would you help Judge Trahan when she appeared

4     preoccupied?

5       A.   Sometimes I'd slip her a note, you know, under the

6     glass, just --

7       Q.   And was that note -- did that function as a reminder?

8       A.   Yes.

9       Q.   And was that note based on your institutional

10    knowledge of having worked at the court for some time?

11      A.   Yes.

12      Q.   So just to summarize, you would say Judge Trahan

13    needed reminders of certain things while she was dealing with

14    grief?

15      A.   At times.

16      Q.   So what observations did you personally make that

17    made it clear that she was preoccupied?

18      A.   I really don't remember any specifics.  I just know

19    it was a very bad time for her, you know.  I really don't

20    remember any specifics.

21      Q.   Gotcha.  I want to take a quick step back.  You know,

22    we talked about the transition.  We talked about how it was a

23    small office.  Did Dee Henderson -- was she part of that

24    transition?  Did Dee Henderson work in chambers with you?

25      A.   No.  No, she didn't work in the chambers.

1    **Q.**  Okay.

2    **A.**  I mean, she was around.  She was the judge's friend,

3    but as far as I know, she didn't work there.

4    **Q.**  Right.  She no longer was employed with Judge Trahan

5    in a professional capacity?

6    **A.**  Not that I know of.

7    **Q.**  Okay.  Based on your observations, was it clear that

8    Judge Trahan had a full plate otherwise?

9    **A.**  Otherwise.

10   **Q.**  Outside of work?

11   **A.**  Sure.

12   **Q.**  She had children?

13   **A.**  She had children.  She had a life, yes.

14   **Q.**  And that life was more than full, right?

15   **A.**  Yeah.  Sure.

16   **Q.**  I want to talk about that extra $20 that the

17   government asked you about.  Isn't it true that that extra

18   $20 was set aside a part from Judge Trahan's fee?

19   **A.**  I believe so.

20   **Q.**  And intermittently that extra $20 would be spread out

21   to the three people that worked in chambers?

22   **A.**  Yes.

23   **Q.**  So that extra $20 was not actually given to Judge

24   Trahan at all?

25   **A.**  Right.

1    **Q.**  Did you ever meet Ms. Faye?

2    **A.**  Yes.

3    **Q.**  And would you say that Ms. Faye was a strong-willed

4    woman?

5    **A.**  Yes.

6    **Q.**  And as a strong-willed woman, did you ever notice

7    that she was difficult sometimes in her old age?

8         MR. BOTELER:  Objection, relevance.

9         THE COURT:  Sustained.  I mean, I'm sorry.

10   Overruled.  I didn't mean to say sustained.

11        MR. WICK:  Thank you.

12   **A.**  I have an elderly parent too.  Yeah, they can be

13   trying at times, but precious.

14   **Q.**  Ms. Hibbs, would you say that Judge Trahan's strength

15   was self-organization?

16   **A.**  I --

17   **Q.**  I know you don't feel comfortable talking about your

18   former boss --

19        MR. BOTELER:  Objection, Your Honor, as to the

20   commentary.

21        THE COURT:  Sustained.

22   BY MR. WICK:

23   **Q.**  Didn't Judge Trahan rely on the people on her staff

24   to help fulfill self-organization?

25   **A.**  Yes.

1    **Q.**   To complete organizational tasks?

2    **A.**   Sure.

3    **Q.**   And her strength was as a people person, right?

4    **A.**   She was definitely a people person.

5    **Q.**   She's incredibly gregarious?

6    **A.**   Absolutely.

7    **Q.**   Great boss to be around?

8    **A.**   Perfectly, perfectly great boss.

9    **Q.**   Ms. Hibbs, you spent a bunch of time at Second City

10   Court.  You were a court reporter in the legal community.

11   Wouldn't you say you are familiar with Judge Trahan's

12   reputation?

13   **A.**   Sure.

14   **Q.**   And that reputation is one of honesty, integrity, and

15   truthfulness?

16   **A.**   Absolutely.

17       MR. WICK:  Let me just visit with my co-counsel.

18       THE COURT:  So you're done?

19       MR. WICK:  (Nods head.)

20       THE COURT:  Redirect?

21       MR. BOTELER:  Yes, Your Honor.

22       THE COURT:  All right.

23                    REDIRECT EXAMINATION

24   BY MR. BOTELER:

25   **Q.**   Now, Ms. Hibbs, I'm going to first direct you back to

1    the $100 fee.

2        **A.**   Uh-huh.

3        **Q.**   At some point in time, the fee went from $80 to $100,

4    correct?

5        **A.**   Yes.  Yes.

6        **Q.**   When it was $80, did you ever receive a portion of

7    that fee?

8        **A.**   No.

9        **Q.**   When it increased to $100 and you were paid that

10   $100, what would you do with that cash?

11       **A.**   What would I do with it?

12       **Q.**   Yeah.

13       **A.**   Put it in a wallet --

14           MR. WICK:  Objection, Your Honor; relevance.  What

15   she would do with the $100 --

16           THE COURT:  Okay.  Sustained.

17   BY MR. BOTELER:

18       **Q.**   When you received the marriage fee of $100 from a

19   couple, what would you do with that --

20       **A.**   Oh, I see.

21       **Q.**   -- with that money?

22       **A.**   I see what you're saying.  I think we would just put

23   it on the judge's desk or in her top drawer when she wasn't

24   there so it wasn't sitting on top of the desk.

25       **Q.**   Would you take $20 out of that $100 fee and keep it

1    to yourself?

2         **A.**   No.  No.  No.

3         **Q.**   And then put 80 on her desk?

4         **A.**   No.  No.  We'd put the 20 -- the extra 20 in an

5    envelope in the money till.

6         **Q.**   And how often would you receive back a portion?

7         **A.**   Not very -- occasionally.  I don't know times.

8         **Q.**   When you say "occasionally," what do you mean by

9    that?

10        **A.**   Every few months.

11        **Q.**   And about how much would you receive every few

12   months?

13        **A.**   I don't even remember honestly.

14        **Q.**   Was it like $1,000?

15        **A.**   Oh, God, no.  No.  No.

16        **Q.**   Like $500?

17        **A.**   No.  No.  No.  It was --

18        **Q.**   Like 300?

19        **A.**   It was probably less than 100.  I don't remember.

20        **Q.**   So less than $100?

21        **A.**   Uh-huh.

22        **Q.**   And you would receive that, what, once every two,

23   three months?

24        **A.**   Few months, yeah.

25        **Q.**   So maybe $600 total?

1    **A.**  I don't know.

2    **Q.**  So do you know for certain that Judge Trahan was

3    giving you and splitting among everybody the $20 extra?

4    **A.**  I mean, it went in an envelope and every now and then

5    the minute clerk would give us some money.  That's all I

6    know.

7    **Q.**  Now, you mentioned how busy Second City Court was.

8    **A.**  Uh-huh.

9    **Q.**  A lot of people came in, a lot of cases.

10    **A.**  Yes.

11    **Q.**  And you discussed how Judge Trahan would listen

12    intently to people.

13    **A.**  Yes.

14    **Q.**  Would she listen and pay attention to the details?

15    **A.**  Of course.

16    **Q.**  Because details were important to her?

17    **A.**  Sure.

18    **Q.**  And when you would hear her make a decision from the

19    bench, did you hear her incorporate those details of what the

20    people said?

21    **A.**  You mean would she give them reasons for her --

22    **Q.**  Right.

23    **A.**  Most of the time.  Yeah.  If it was a money issue,

24    she would delineate how much -- you know, why she was

25    deducting this from that.  Yeah, she gave reasons.

1       Q.   And by giving the details and the reasons, she helped

2   the people be able to be heard?

3       A.   Sure.

4       Q.   And you mentioned -- you did -- she did have a staff,

5   right?  Judge Trahan had a staff of three?

6       A.   A staff?

7       Q.   Yes, of three people?

8       A.   Yeah.  Sure.

9       Q.   And so, for instance, the minute clerk would help

10  keep track of the schedule?

11      A.   Yes.

12      Q.   And you and everyone in the staff would help keep

13  track of weddings?

14      A.   Yes.

15      Q.   And was that also the same with Judge Norman?

16      A.   Yes.

17      Q.   So Judge Norman had like a minute clerk?

18      A.   Yes, and a law clerk.

19      Q.   And a law clerk?

20      A.   Yes.

21      Q.   And would all of them help keep track of all the

22  different court cases?

23      A.   Yes.

24      Q.   And so for a court to run, they need people to help

25  do the organizational side of it?

1     **A.**   Sure.

2     **Q.**   Now, at some point in time, were you aware of an

3     article that Judge Trahan was quoted in or cited regarding

4     gay marriage?

5     **A.**   No, not that I remember.

6     **Q.**   You also mentioned that at some point in time Judge

7     Trahan was at times preoccupied?

8     **A.**   Yes.

9     **Q.**   Do you remember about the date when that happened?

10    **A.**   It was all around the time of her mom passing.  In

11    that time frame.

12    **Q.**   And so all around the time her mom passed, so was

13    that, like, in 2017, 2016?

14    **A.**   I honestly don't know.

15    **Q.**   But did you have to pass her notes like that?  Did

16    you see her preoccupied in 2013?

17    **A.**   No.

18    **Q.**   How about 2014?

19    **A.**   Probably not.

20    **Q.**   2015?

21    **A.**   I mean, I don't -- I don't know when her mother got

22    sick.  I don't remember what year her mother died honestly.

23    **Q.**   But when you were talking about preoccupied, that was

24    right around the time her mother passed away?

25    **A.**   Yes.  Yes.

1    **Q.**  And when you said you would pass a note, what were

2  the notes like?

3    **A.**  What were they like?

4    **Q.**  Yeah, what were you passing?

5    **A.**  Oh, it would be a post-it note and if I -- I really

6  don't remember any instances, but if -- if I -- if I knew

7  that -- what she was saying was not correct, I'd send a note

8  and say, no, you can't do that.  But I don't remember any

9  instances.

10    **Q.**  Was it a rare occurrence?

11    **A.**  Yeah, it wasn't very often.  It was just -- and, you

12  know, mostly during evictions.

13        MR. BOTELER:  No further questions, Your Honor.

14        THE COURT:  Thank you.

15        All right.  You may be excused.  Please don't discuss

16  your testimony.

17        THE WITNESS:  Okay.

18        THE COURT:  Thank you for your time.

19        Can we call another witness?  Is everybody okay?  You

20  want to take one more at least?  Y'all good?

21        THE JURY PANEL:  (Affirmative responses.)

22        THE COURT:  Okay.

23        MR. FLANAGAN:  Your Honor, we have another witness.

24  It's going to be about that long, so keeping an eye on the

25  clock, I don't know --

1          THE COURT:  Okay.  That's fine.

2          MR. FLANAGAN:  Excuse me.  Excuse me.

3          The Government calls Ms. Major.

4          THE COURT:  Who?  What's the name?

5          MR. FLANAGAN:  Tamara Major, ma'am.

6          Your Honor, and we are talking to counsel.  It may be

7    longer than anticipated.

8          THE COURT:  It's fine.  We'll pick up tomorrow.

9          MR. FLANAGAN:  So start?  Yes, Your Honor.

10          THE COURT:  Ma'am, are you going to come up here?

11   I'm sorry.  They're not telling you where to come.  Come sit

12   right here.  Right up here.

13          And you can leave me that coat when you leave because

14   I think it's beautiful.

15          THE WITNESS:  If you let me leave, I'll leave it.

16          THE CASE MANAGER:  Can you raise your right hand?

17               (Witness administered oath.)

18          THE WITNESS:  Yes.

19          THE CASE MANAGER:  Please have a seat.  If you will

20   speak directly into the microphone and state and spell your

21   name for the record, please.

22          THE WITNESS:  Tamara, T-a-m-a-r-a; Griffin,

23   G-r-i-f-f-i-n, hyphen; Major, M-a-j-o-r.

24                    TAMARA GRIFFIN-MAJOR,

25   Being called as a witness, being first duly sworn, examined

1   and testifies as follows:

2                    <u>DIRECT EXAMINATION</u>

3   BY MR. FLANAGAN:

4       **Q.**  And where do you work, ma'am?

5       **A.**  Algiers Charter School Associations.

6       **Q.**  What do you do there?

7       **A.**  I'm the chief operating officer.

8       **Q.**  How long have you had that job?

9       **A.**  I've been at Algiers for a number of years.  I don't

10  know off the top of my head.  I taught, then I left, and then

11  I came back in, like, spring 2014 and I've been there ever

12  since.

13      **Q.**  And do you know the defendant, Judge Ernestine

14  Anderson-Trahan?

15      **A.**  Yes, that's my friend.

16      **Q.**  So how did you first become friends with Judge

17  Trahan?

18      **A.**  I've been knowing Judge Trahan for just through

19  social events for a number of years.  And after Hurricane

20  Katrina my family and I moved to Algiers because we lived in

21  New Orleans East and lost everything.  So we decided to move

22  to Algiers and that relationship grew because our kids

23  started going to school together.

24      **Q.**  So I understand you were friends with Judge Trahan.

25  Did you ever come to work for Judge Trahan?

1    **A.**   Yes.  Yes.  I worked for her January 2013 until like

2    the spring of 2014.

3    **Q.**   So I understand that time frame, January '13 to

4    spring '14, where were you working together?

5    **A.**   Oh, at Second City Court.

6    **Q.**   Did you work on her campaign to become judge?

7    **A.**   Yes.

8    **Q.**   When was that campaign?

9    **A.**   2012 I'm going to say.

10   **Q.**   But once elected, what was Judge Trahan's position?

11   **A.**   She was a judge of Second City Court.

12   **Q.**   And what was your position?

13   **A.**   I was her minute clerk.

14   **Q.**   And if you could just explain to the jury, what is

15   the responsibilities of a minute clerk?

16   **A.**   A minute clerk really, you know, sets the trial

17   dates, talk to the attorneys, just help out with, you know,

18   things around the office.  But it's really -- your main job

19   is setting those trial dates.

20   **Q.**   And who else worked in Judge Trahan's chambers?

21   **A.**   We had a court reporter, Lisa.  I don't remember

22   Lisa's maiden name.  I think it's Hibbs now, her married

23   name, and we have Alexis Selico Dunn-Buffington I believe is

24   her name now that she's married.

25   **Q.**   And do you know if -- what were their roles?

1        **A.**   Alexis was the law clerk and Lisa was a court

2   reporter.

3        **Q.**   Did Judge Trahan hire both of them?

4        **A.**   Oh, she's the judge in the chambers.  I would believe

5   so.

6        **Q.**   Do you know if Ms. Hibbs worked for a different judge

7   before --

8        **A.**   Yeah, she worked for the previous judge.

9        **Q.**   Did you and Ms. Dunn-Buffington come in at the same

10  time and start working for Judge Trahan?

11       **A.**   Yes.  Yes.

12       **Q.**   Can you describe what sort of cases Judge Trahan

13  handled as the judge?

14       **A.**   Evictions and some small claims.

15       **Q.**   Financial disputes?

16       **A.**   Yeah, if that's what you guys want to call it.

17       **Q.**   And just to clarify, so your role as minute clerk,

18  where would you actually sit and work?

19       **A.**   The time you walk into the chambers, the first desk

20  was my desk.  It's like the first -- like, when you walk into

21  chambers, I'm the first person you would see.

22       **Q.**   Is chambers different than the courtroom itself?

23       **A.**   Yes.  Yes.

24       **Q.**   Okay.

25       **A.**   Chambers is like an office setting and the courtroom

1    is like what you see here.

2        Q.   So when court's going on, you're actually working in

3    a different room, is that correct?

4        A.   Yes.  Yes.

5        Q.   I understand you were working in a different room.

6    Do you know if Judge Trahan heard testimony as part of her

7    responsibilities?

8        A.   Oh, I'm sure she did.

9        Q.   During that time that you worked with Judge Trahan,

10   did you have the opportunity to observe how she handled her

11   caseload?

12       A.   Well, I would go in and out of court if there was a

13   need for me to do something or bring something inside of

14   court.

15       Q.   From your observations, how would you describe her

16   ability to effectively manage her caseload?

17       A.   I don't know if that's a fair question.  My

18   observation.  My observation with what background?

19       Q.   From what -- understanding you weren't in the

20   courtroom, but from working with her, how did she --

21       A.   She was a judge that knew the law, you know.  She was

22   a judge.  She had went to school for this.

23       Q.   During the time that you worked for her, did you --

24   did you observe her personal responsibilities interfere with

25   her ability to carry out those professional responsibilities

1   that she was trained for and that she was elected for?

2       A.   Her personal responsibilities, she was a -- if you

3   want me to tell you about her personal, she was a mom, she

4   was a wife, she was a daughter -- well, she's a mom, she is a

5   wife, she still is a daughter even though, you know, her mom

6   is deceased.  But, you know, she had responsibilities in her

7   personal life.

8       Q.   I understand she had those responsibilities.  Did you

9   see that impact her ability to do her position?

10      A.   In -- from 2013 to '14, you know, I mean, as black

11  women, we do what we need to do.  So did I see her pass out

12  on the floor?  No.  But she had an ill mother, she have

13  children, she has a family to take care of.

14      Q.   Was the court still running from 2013 to 2014?

15      A.   Yeah.

16      Q.   I'm going to transition now.

17      A.   Okay.

18      Q.   In addition to her regular responsibilities, did

19  Judge Trahan and her chambers also issue marriage licenses?

20      A.   Yes.

21      Q.   If a couple wanted to get married in New Orleans,

22  besides going to Judge Trahan, what -- where else could they

23  go?

24      A.   If a couple -- well, you can go anywhere if you want

25  to get married, but if they wanted it to happen at Second

1  City Court, they came to Second City Court.  You can go

2  across the river.  You can go to any judge to get married I

3  believe.

4      Q.  What about getting licenses?

5      A.  The license, unless there's another place, you can

6  only go to Second City Court and like Vital Records.  Those

7  were the two places, but they may have some other places.

8  I'm not -- you know, I don't know.  That's the two places I'm

9  aware of.

10      Q.  Sure.  And did Judge Trahan officiate weddings for

11  some of the couples who wanted to get a license from Second

12  City Court?

13      A.  Yeah.

14      Q.  Did she officiate weddings for every couple that got

15  a license?

16      A.  No.

17      Q.  Can you give an example of how a couple would get a

18  license, but then not go to Judge Trahan?

19      A.  Well, it's the same as if you went to Vital Records

20  and you were getting married, but you just got a license for

21  the ceremony that may take place Saturday because you're

22  getting married at a church or somewhere else.  If you came

23  to Second City Court, you may have a wedding on a Saturday or

24  even later that day and you just don't want the judge or

25  maybe have a pastor or someone doing it.

1    **Q.**  What happened after they went and got that ceremony?

2    Did they have to bring the license back to you?

3    **A.**  No.  No.  The license, I think, the judge -- well,

4    whoever did it would send it over to Vital Records.

5    **Q.**  So were there more -- were there couple -- excuse me.

6    Were there more couples who received marriage licenses from

7    Second City Court than Judge Trahan actually officiated their

8    ceremony?

9    **A.**  I really don't have an exact number to say yes or no

10   to that, but something you shouldn't do, if I have to say --

11   you know, because people come in.  Some get married.  Some

12   don't, so, you know, there's really no measuring I have to

13   say that.

14   **Q.**  So that was a poorly worded question.  So is there a

15   different number for people who got licenses and a different

16   number for people who actually got married there?

17   **A.**  Oh, yes.  Definitely.

18   **Q.**  Thank you.

19        When Judge Trahan did officiate weddings, what time

20   of day did she normally conduct the weddings?

21   **A.**  As long as the court was open, you could come in and

22   get a license.

23   **Q.**  What about a wedding?

24   **A.**  Yeah, if we were available and, you know, court

25   wasn't going on, you know, you can get a license, you can

1    have a ceremony.

2        Q.  Did she conduct weddings after court was closed on

3    any occasions?

4        A.  Well, there were some people that had special

5    circumstances where they wanted different things and, yes,

6    that was an option.

7        Q.  Did she conduct weddings on weekends?

8        A.  Yeah.  If someone wanted Judge Trahan to marry them

9    on a weekend, you know, they can get married on a weekend.

10        Q.  Where did Judge Trahan officiate weddings?

11        A.  Really wherever people desired.  We was at Second

12    City Court, so Second City Court, if you know the history of

13    it and the previous judge was known as "the love judge."  So

14    she officiated weddings all over, so that kind of rolled with

15    the new administration.  So some people chose the balcony.

16    Some people chose the chambers.  Some people chose the

17    courtroom.  You know, it would really -- what they decided as

18    a couple.

19            MR. FLANAGAN:  I'm showing the witness what's entered

20    into evidence as Government Exhibit 3, page 193.

21            THE WITNESS:  Let me get my glasses.

22            MR. FLANAGAN:  And permission to publish to the jury

23    as well.

24            THE COURT:  Any objection?

25            MR. WICK:  No, Your Honor.

**OFFICIAL TRANSCRIPT**

1          THE WITNESS:  Okay.  I can see what's on the screen.

2     BY MR. FLANAGAN:

3          Q.  So what are we looking at?

4          A.  You're looking at a State of Louisiana Certificate of

5     Marriage.

6          Q.  And who issued this marriage license?

7          A.  Oh, me.  My name, right there.  Name of issuing --

8     right in the mid part.  I don't know if you have touch

9     screen.  Yeah, right there.

10         Q.  And who officiated the ceremony for this couple?

11         A.  Performing ceremony, Ernestine Anderson-Trahan.

12         Q.  And when was this particular wedding?

13         A.  July 17, 2013.

14         Q.  Where did it take place?

15         A.  Oh, at the courthouse, 225 -- wait.  Yeah, 225 Morgan

16    Street.

17         Q.  Is that the address for the courthouse?

18         A.  Yes.  I believe so unless you have another address.

19         Q.  I'm asking you.

20         A.  Huh?

21         Q.  I'm asking you.

22         A.  Oh, okay.  I'm like, I guess.  It's on Morgan Street.

23    I don't remember.

24         Q.  Did Judge Trahan charge couples for officiating

25    weddings?

1    **A.**  Yes.

2    **Q.**  During the time that you worked there, how much did

3    she charge couples?

4    **A.**  Like 75, $80.  I don't remember the exact amount.

5    Whatever we did at the time I was there, it was what the

6    previous judge did.  I was trained by Wanda G, who was the

7    minute clerk of the previous judge and we pretty much kind of

8    followed suit at the time I was there with what was done

9    previously.

10   **Q.**  And Ms. Hibbs worked for that previous judge too?

11   **A.**  Yes, the court reporter.  So we had in-house

12   training.

13   **Q.**  How did Judge Trahan take payment for officiating

14   weddings?

15   **A.**  What you say?

16   **Q.**  How did Judge Trahan take payment for officiating

17   weddings?

18   **A.**  Oh, they paid cash.

19   **Q.**  Could they pay with credit card or check?

20   **A.**  No.  And I'm just going to tell you, at this time,

21   this is an electronic version, but when we got to the

22   courthouse, we were still typing marriage licenses, so there

23   was no way of electronic anything unfortunately at that time.

24   The marriage license was typed and it was on a triplicate

25   form and, you know, you went to the typewriter and typed it

1   up.  So, no, it was a cash process.  And, again, the previous

2   judge operated in that same manner.

3       Q.   So who collected the cash?

4       A.   We collected -- like, when they paid for either the

5   ceremony, the license, those different things, whoever was

6   handling it at that time, staff I'm going to say.

7       Q.   What did you do -- did you ever -- you said we, but

8   did you ever personally take the money?

9       A.   Yeah.  Yeah.  Yeah.  As a staff member, you know, I

10  went through the process with the marriage license.

11      Q.   What did you do with the cash that you collected?

12      A.   Well, the cash for -- if the person was getting a

13  marriage license, you would put it, like, in a lockbox, I

14  would call it, in a drawer.  But if judge was performing a

15  ceremony, I would just, like, place it on her desk or

16  something like that.

17      Q.   When did you give it to -- so for the --

18  understanding one went in a lockbox, put that aside.  The

19  fees for the marriage itself, when did you give that to Judge

20  Trahan?

21      A.   Well, it went on her desk because the lockbox was in

22  the judge's office, which is in the chambers.  So all those

23  things kind of happened together.

24      Q.   And based off of your observations of the team of the

25  staff, did the others do the same thing?

1        **A.**   I'm going to say -- well, I can't say I observed,

2   but, of course, you know, it was like no system, you must do

3   this, you must do that.  But Lisa was there before, so, you

4   know, it wasn't like she was saying you need to do something

5   different, so...

6        **Q.**   Did you personally receive any of the fees that you

7   collected -- any portion of the fees that you collected for

8   weddings?

9        **A.**   No.

10        **Q.**   During the time that you worked there, did anyone

11   from Judge Trahan's chambers issue a receipt to couples

12   showing how much they paid?

13        **A.**   Not that I'm aware of.

14        **Q.**   Do you know why not?

15        **A.**   Yeah.  I'm going to go from -- the previous judge --

16   it's not like we decided not to use receipt books.  It's not

17   something even the previous administration told us about or

18   even Lisa who was there.  It's just something we didn't do.

19   It wasn't part of the practice, I guess, I would recall.

20        **Q.**   Did anyone ever ask for receipts?

21        **A.**   I don't recall.

22        **Q.**   Could couples pay in advance for these weddings?

23        **A.**   Yeah, some people would come and get their license

24   and decide they not dressed, they want to get married

25   tomorrow, and they decide to come back the next day to get

1  married.  But they have the cash, so they want to make sure

2  they have the money.

3      Q.  So how did you keep track of who had paid in advance?

4      A.  Well, if it's like -- again, it wasn't a true system.

5  You know, you might write it on a little sticky, in all

6  honestly, with a paper clip, and be like this -- you know,

7  these people they come back.  We never had like, oh, I paid

8  you and we don't know where the money -- you know.  It wasn't

9  like a true-nothing system, yeah, while I was there.

10     Q.  Did anyone -- the time you were there, did anyone

11 keep track of the number of weddings Judge Trahan officiated?

12     A.  No.  The only thing I would have to as the minute

13 clerk keep record of is what we sent to Vital Records and I'm

14 sure you're aware.  Like, when someone gets a marriage

15 license, you have to send the license, like a copy or

16 something, over to Vital Records to say that they got a

17 marriage license, you know.  I don't know what happens once

18 it get over there.

19     Q.  So this is the fee that goes into a separate box in

20 the box?

21     A.  Yes.

22     Q.  So let's talk about that fee now.  So as far as you

23 know, who set that fee?

24     A.  It was something from the courts or legislation, you

25 know.  It's the State, you know.  We just was giving Vital

1    Records -- this how much a marriage license cost.

2        Q.  Did the fee also set that -- did the fee -- excuse

3    me.  Did the State also accept payments in cash?

4        A.  I don't know.

5        Q.  Did you collect cash for the payment of that fee?

6        A.  Yeah.  Yeah.

7        Q.  And did you give any receipts for the licenses for

8    that $20 fee that went into the lockbox?

9        A.  No.

10       Q.  Where did the money for the marriage license fees go?

11       A.  The marriage license money went into the lockbox.

12       Q.  And what was actually -- what was eventually done

13   with that money from the lockbox?

14       A.  A money order or check went to the State and then

15   there was a portion that was kept to the chambers.  I don't

16   really remember the difference.  It's like -- I think the fee

17   was 27.50 and there was a portion of the 27.50 that was kept

18   in chambers.

19       Q.  And when you paid over that fee to the state, did you

20   keep track of the number of licenses that made up that fee?

21       A.  Well, on the list that you would send to Vital

22   Records, it would be some -- and, again, this is 2013.  It

23   would be some -- that number that would go to the state.

24       Q.  So let's walk through this list.  What was that list

25   that went to Vital Records?

1      **A.**  That list was people who were married like in the --

2  got license in the month of November.

3      **Q.**  Whose responsibility was it to track the people who

4  got licenses in November?

5      **A.**  I will be the one that -- and, I mean, other people

6  in the chambers if I got too busy or whatever, but I mainly

7  would type up this list and put it in an envelope with the

8  copy of the marriage license and it go over to Vital Records

9  for whatever -- their recordkeeping.

10      **Q.**  So how did the process work once you gave it to Vital

11  Records?

12      **A.**  I don't know.  It just went over there.  I never

13  personally went to Vital Records.  Whoever -- like on

14  Wednesdays, the judge would have to go to the Eastbank and

15  whichever staff person, like the court reporter would go or

16  the law clerk, they would also go to Vital Records, just drop

17  off this big envelope to them, letting them know the license

18  that was processed in our chambers.

19      **Q.**  And so how often did you keep track of this list of

20  licenses that were issued?

21      **A.**  I would try to send it over monthly if I remember it

22  correctly.

23      **Q.**  So while you were responsible for tracking marriage

24  licenses, did the State receive an accurate accounting of the

25  marriage licenses that Second City Court issued?

1      **A.**  I would say the best I could because that was a way

2    that couples can only track -- say if they got married

3    offsite, so meaning I come and get my marriage license, but I

4    let my pastor marry me, but my pastor for whatever reason

5    never send the license to the State or Vital Records, I can

6    come back or I can go and say, hey, I bought a license on

7    this day and they can track it, that kind of thing.

8      **Q.**  So was it your responsibility to give the State an

9    accurate list of the licenses that Second City Court issued?

10     **A.**  I gave the State a copy of what I had in front of me.

11     **Q.**  Did Judge Trahan ever ask you to track the wedding

12   she officiated the same way the State asked you to track the

13   licenses that were issued?

14     **A.**  No.

15          MR. FLANAGAN:  Tender the witness.

16          THE COURT:  All right.  Thank you.

17          MR. WICK:  Your Honor, I'm happy to go now.  I expect

18   this to go past 5:00.

19          THE COURT:  Go ahead.

20          Y'all want to start?

21          PROSPECTIVE JUROR 12:  My parking ends at 5:00.

22   Sorry.

23          THE COURT:  Oh, no.

24          Well, we want to break for the evening?

25          Counsel, you okay?

**OFFICIAL TRANSCRIPT**

1          THE WITNESS:  Do y'all need me back tomorrow?

2          THE COURT:  Yeah.

3          THE WITNESS:  Can we please continue because I have

4    obligations and I pushed everything back and forth, like for

5    real.

6          THE COURT:  You're going to get a ticket?

7          She might get a boot on her car and we got to be out

8    of here at 5:30.

9          You want us to try to start earlier?  You'd be the

10   first witness at 9:00.

11         THE WITNESS:  I have an 8:30, 8:45.

12         THE COURT:  Counsel?

13         MR. WICK:  You want us to approach, Your Honor?

14         THE WITNESS:  Can we take a break and then we can get

15   more time?

16         THE COURT:  An event is going to start happening in

17   here at about 5:15, 5:30.  I can't cut his questions short.

18         She's under subpoena?

19         MR. FLANAGAN:  She's under subpoena, Your Honor.

20         THE COURT:  Sorry.

21         THE WITNESS:  I know.

22         THE COURT:  Come back in the morning.

23         All right.  So you're not to discuss your testimony

24   with anyone.  You're still under oath.  I want to try to

25   accommodate her.

1          Can we start at 8:30?

2          Where are you driving from?  Can we start at 8:30?

3          PROSPECTIVE JUROR 2:  We had to be here at 7:15 this

4    morning.

5          THE COURT:  I know, but some people drive from --

6    anybody have a problem getting here at 8:30?

7          THE JURY PANEL:  No.

8          THE COURT:  Raise your hand if you have a problem.

9    You have a problem, ma'am?

10         PROSPECTIVE JUROR 12:  No.

11         THE COURT:  So we'll start at 8:30, try to help you a

12   little bit.

13         Thank you for your time.

14         So let's recess at -- we're going to start at 8:30,

15   so if you can get here by 8:15.

16         PROSPECTIVE JUROR 12:  What about our books?

17         THE COURT:  They leave the books back there in the

18   jury room?

19         PROSPECTIVE JUROR 2:  In the jury room.

20         THE COURT:  Leave it in the jury room.

21         Y'all may be excused until the morning.

22            (Whereupon, the jury exits the courtroom.)

23         THE COURT:  If we can be here at 8:00.

24         You'll be excused for the evening.  If you get here

25   by 8:15, we'll start here promptly.  I promise.  Thank you.

**OFFICIAL TRANSCRIPT**

1    Thank you for your patience.

2        All right.  Is there anything else we needed,

3    Counsel?

4        Remember, take your stuff tonight because there will

5    be people in this courthouse -- the courtroom starting

6    tonight.

7        MR. MAGNER:  If we can get the government's list of

8    witnesses for tomorrow, we can be ready.

9        THE COURT:  Share them with me, if there any exhibits

10   I need to be prepared for.

11       MR. FLANAGAN:  Yes, Your Honor.

12       THE COURT:  Thank you.  So, again, any questions?

13       MR. FLANAGAN:  What time for us in the morning, Your

14   Honor?

15       THE COURT:  If you can get here, 8:00, 8:15, if there

16   are any preliminary matters, we can take them up.  Start

17   right at 8:30 p.m.

18       MR. FLANAGAN:  Yes, Your Honor.

19       THE COURT:  Thank you.  Thank you for your patience

20   and indulgence.

21                    (Recess taken.)

22                     * * * *

23        (WHEREUPON, the proceedings were adjourned.)

24                     * * * *

25                 REPORTER'S CERTIFICATE

1           I, Nichelle N. Wheeler, RMR, CRR, Official Court
Reporter, United States District Court, Eastern District of
2   Louisiana, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and
3   understanding, from the record of the proceedings in the
above-entitled and numbered matter.

4

5                      /s/ Nichelle N. Wheeler
                     Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**
Page 252