UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*************************************************************

UNITED STATES OF AMERICA

                          Criminal Action No. 22-2
VS.                       Section "G"
                          New Orleans, Louisiana
                          November 15, 2022

ERNESTINE ANDERSON-TRAHAN
*************************************************************

TRANSCRIPT OF JURY TRIAL
HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
UNITED STATES CHIEF DISTRICT JUDGE
VOLUME II


APPEARANCES:

FOR THE GOVERNMENT:          Brian Eugene Flanagan
                             DOJ-Tax
                             150 M Street NE
                             Suite 1.405
                             Washington, DC 20004

                             Marissa R. Brodney
                             Michael C. Boteler
                             DOJ-Tax
                             Tax Division, SCES
                             150 M Street NE
                             Washington, DC 20002


FOR THE DEFENDANT:           Michael William Magner
                             Thomas C. Wicker, IV
                             Jones Walker
                             Place St. Charles
                             201 St. Charles Ave.
                             Suite 5100
                             New Orleans, LA 70170

**OFFICIAL TRANSCRIPT**

```
ALSO PRESENT:                    Judge Ernestine Anderson-Trahan
                                 Kim Better
                                 Aaron Washington
                                 Timothy Moore
                                 Dewaiyne Horner
```

```
Official Court Reporter:         Nichelle N. Wheeler, RMR, CRR
                                 500 Poydras Street, B-275
                                 New Orleans, Louisiana 70130
                                 (504) 589-7775
```

```
    Proceedings recorded by mechanical stenography,
transcript produced via computer.
```

**OFFICIAL TRANSCRIPT**

I N D E X

**Page**

MOTION TO DISMISS COUNT 1                                    256
JUROR INTERVIEW                                             392

E X A M I N A T I O N S

| **Witness** | **Page** |
|---|---|
| TAMARA GRIFFIN-MAJORS | |
|    CROSS-EXAMINATION BY MR. WICKER | 262 |
|    REDIRECT EXAMINATION BY MR. FLANAGAN | 274 |
| LAUREN ROCHA | |
|    DIRECT EXAMINATION BY MR. FLANAGAN | 277 |
|    CROSS-EXAMINATION BY MR. MAGNER | 290 |
|    REDIRECT EXAMINATION BY MR. FLANAGAN | 296 |
| ALLISON KOTSAY | |
|    DIRECT EXAMINATION BY MS. BRODNEY | 298 |
|    CROSS-EXAMINATION BY MR. MAGNER | 327 |
|    REDIRECT EXAMINATION BY MS. BRODNEY | 343 |
|    RECROSS-EXAMINATION BY MR. MAGNER | 349 |
| KRYSTAL ANCAR | |
|    DIRECT EXAMINATION BY MR. FLANAGAN | 354 |
|    CROSS-EXAMINATION BY MR. MAGNER | 424 |
|    REDIRECT EXAMINATION BY MR. FLANAGAN | 454 |

1                 **P R O C E E D I N G S**

2            (Call to order of the court.)

3           <u>MOTION TO DISMISS COUNT 1</u>

4      THE COURT:  Good morning.  Before we bring the jury

5 in, I understand we have a couple of preliminary matters.

6      MR. BOTELER:  Yes, Your Honor.

7      THE COURT:  All right.

8      MR. BOTELER:  May I approach the podium?

9      THE COURT:  Yes.

10      MR. BOTELER:  Your Honor, just to let you know, we

11 recently uncovered new evidence.  On last Saturday, we

12 received an e-mail from the defense attorney regarding some

13 handwritten notes that deal with Count 1.  We did additional

14 research on that and have spoken to Ms. Ancar, who is her

15 CPA, last night, and based on those discussions, we uncovered

16 that Ms. Trahan had provided handwritten notes that listed

17 the legal fees to her accountant for the 2013 tax return.

18 Based on that information, which we already disclosed to Mr.

19 Magner, we were going to move orally to dismiss Count 1,

20 which is the 2013 tax year.

21      THE COURT:  All right.  Anything else that needs to

22 be heard on that.  So the motion is granted.  I've already

23 read the indictment, so when I bring the jury in, I have to

24 tell them that Count 1 has been dismissed.

25      MR. BOTELER:  Yes, Your Honor.

```
 1          THE COURT:  And that's the tax year 2013?
 2          MR. MAGNER:  Yes, Your Honor.  So I can't certainly
 3   prevent the Government from dismissing its count and I don't
 4   think I would be inclined to, but they have been -- the
 5   indictment has been read.  As you have stated, the Government
 6   opened, you know, discussing that.  That also is I think the
 7   lion's share of tax loss in the case.  So I think what I -- I
 8   would ask Your Honor is I would still need some latitude to
 9   be able to cross-examine witnesses, to be able to
10   cross-examine witnesses concerning those matters, because
11   there was this ongoing course of conduct between Judge Trahan
12   and her tax preparer.  I think that's all still relevant
13   particularly in the light of the fact that the Government has
14   --
15          THE COURT:  And we had a full day of testimony that
16   has been about that.  So I'll give you some leeway.  We just
17   don't want to waste time.  But when the jury comes in, I will
18   tell them that the Government has moved and I've granted
19   their motion to dismiss Count 1 of the indictment, which is
20   the tax year 2013.
21          MR. BOTELER:  And, Your Honor, just so you know, we
22   may have -- we are revising some of our summary charts that
23   were provided earlier to reflect that change, and once those
24   are completed, we will share them both with Mr. Magner and
25   with the Court.
```

1          MR. MAGNER:  As long as those numbers keep going

2  down, we'll go along with the plan.

3          MR. BOTELER:  They're not going up.

4          Thank you, Your Honor.

5          THE COURT:  Is there another issue?

6          MR. BOTELER:  Oh, Your Honor, just so you're aware,

7  we did provide that the Government may have an additional

8  exhibit in either its rebuttal case and it dealt with records

9  that we were provided connected to the therapist.

10          THE COURT:  All right.

11          MR. MAGNER:  And just for the sake of completeness --

12          THE COURT:  Do you know what it is?

13          MR. MAGNER:  Yes.  Therapist notes for a period of

14  time.

15          The notes that Mr. Boteler referred to we are adding

16  to our exhibit list.  I don't know that we've been

17  provided -- I don't think that list has been provided to the

18  court yet, but I can certainly provide a hard copy now.

19          THE COURT:  All right.  You're going to introduce

20  that to the jury?

21          MR. MAGNER:  I think so, yes.

22          MR. BOTELER:  Your Honor, we didn't see it in their

23  exhibit list, so that's why we presented it to Your Honor.

24          THE COURT:  All right.

25          MR. BOTELER:  Thank you.

1          THE CASE MANAGER:  You want to bring in the jury?

2          THE COURT:  Yes.

3          THE CASE MANAGER:  Bring in the jury.

4          THE COURT:  Can you hold them one second?

5          Sorry, I forgot something.

6          You can bring them back in.

7           (Whereupon, the jury enters the courtroom.)

8          THE COURT:  All right.  Have a seat.

9          Ladies and gentlemen, I'd like to make you aware that

10   the Government has moved to dismiss Count 1 of the indictment

11   covering tax year 2013.  I've granted that motion.  So you're

12   to disregard any testimony regarding tax year 2013.  All

13   right?  Which is Count 1 of the indictment.

14          MR. MAGNER:  And the same would be true that they

15   should regard any opening statement concerning --

16          THE COURT:  Exactly any evidence or statements

17   concerning tax year 2013.

18          MR. BOTELER:  Your Honor, the Government would just

19   mention that 2013 we do believe is relevant for some of the

20   reasons that Mr. Magner said.  May we approach, Your Honor?

21          THE COURT:  Yes.

22          MR. BOTELER:  Thank you.

23          WHEREUPON, the following proceedings were held at the

24   bench:

25          MR. WICKER:  One attorney, Judge?

1          THE COURT:  One.

2          MR. BOTELER:  Thank you, Your Honor.

3          I might start saying things the jury probably should

4     not hear.

5          Your Honor, what I was going to mention is that we do

6     think 2013 is relevant, not in the sense that we're saying

7     it's false, but it sets the benchmark for the amount of gross

8     receipts listed in that year and then she kept the same

9     amount across the years on the gross receipts on the wedding

10    fees.  And because -- we think that part is relevant because

11    the number kept going up, but she kept the same amount, so

12    hopes to show willfulness in the pattern of how the weddings

13    went up, she didn't report it and she knew that.

14         MR. MAGNER:  I mean, I think the camel's nose is

15    under the tent and we're both going to have to deal with the

16    evidence about '13.  So I think we will have to sort of feel

17    our way as we --

18         THE COURT:  I'll give you some leeway on that.  I

19    appreciate that, that -- I'll use the same analogy.

20         MR. BOTELER:  And that was what you said, like all

21    that was what my reference was --

22         THE COURT:  Okay.  All right.  So I'll clarify that

23    it needs to be relevant since --

24         MR. BOTELER:  Thank you, Your Honor.

25         MR. MAGNER:  And I'll pass up the notes that was

1   referred to your minute clerk and so you won't be surprised.

2   So it's not in our exhibit book.  So we're going to use that

3   as an exhibit.

4        MR. BOTELER:  Oh, yes.  And I think we previously

5   provided that to Your Honor.  I think we provided --

6        THE COURT:  Was it introduced into evidence?

7        MR. BOTELER:  No, we did it this morning with the MOI

8   before this.

9        MR. MAGNER:  Oh, that's your motion to dismiss?

10        MR. BOTELER:  Oh, no.  Nevermind.  He has it then.

11   Sorry.

12                      (In open court.)

13        THE COURT:  Just a point of clarification, because

14   you've already heard some of the evidence regarding Count 1

15   which covers the tax year 2013, I'm going to have to give the

16   lawyers a little leeway to try to explain and so they may

17   need to still reference 2013.  I told you to totally

18   disregard.  What I meant is what you previously heard to some

19   degree, just in the sense that she's no longer charged with

20   any fraud with regard to tax year 2013.  But to give you a

21   full context of -- and put things in perspective, they may

22   refer to 2013 in that regard, so consider 2013 only in those

23   limited purposes, but not for the purpose that she is any

24   longer being charged with -- with any wrongdoing from 2013.

25   All right.

1    Is that appropriate?

2    MR. BOTELER:  Yes, Your Honor.

3    THE COURT:  All right.  Thank you.

4    MR. MAGNER:  Yes, Your Honor.

5    THE COURT:  All right.  You want to proceed?  I know

6  our witness has something to do today.  Bring her back to the

7  stand.

8    MR. FLANAGAN:  I believe it's the Defense's witness.

9  We tendered, Your Honor.

10    THE COURT:  All right.  Your witness, but you

11  tendered to them?

12    MR. FLANAGAN:  Yes, Your Honor.  Thank you.

13    MR. WICKER:  Good morning, Your Honor.

14    THE COURT:  This is Ms. Majors?

15    Good morning, Ms. Majors.  Sorry for delaying you.

16    THE WITNESS:  Good morning.  I'm here.

17                TAMARA GRIFFIN-MAJORS,

18  previously called as a witness, being first duly sworn,

19  examined and testifies as follows:

20                CROSS-EXAMINATION

21  BY MR. WICKER:

22    Q.  Good morning, Ms. Majors.

23    A.  Good morning.

24    Q.  Thank you for returning this morning.  Just to recap

25  some of the Government's testimony from yesterday, you have

1   known Teena for a number of years, right?

2       A.  Yes.  Yes.

3       Q.  And y'all are close, right?

4       A.  Yes, that's my friend.

5       Q.  Okay.  And you became particularly close with her

6   after Katrina, right?

7       A.  Yes, after our kids went to the same school.

8       Q.  Okay.  And you moved to Algiers after Katrina, right?

9       A.  Yes.

10      Q.  And that's what precipitated your kids going to the

11  same school?

12      A.  Yes.

13      Q.  Okay.  And after y'all became particularly close, you

14  took on the role of her campaign manager, right?

15      A.  Yes.

16      Q.  And in that role, you really helped Teena out with

17  her organization, right?

18      A.  Yes.  We, you know, had to plan to go different

19  places and, you know, meet the community.

20      Q.  Gotcha.  And you'd say Teena's particular strength is

21  that she's an incredible people person, right?

22      A.  Yes.

23      Q.  She's very gregarious, right?

24      A.  Yes.

25      Q.  Very loving, right?

1     A.  Yes.

2     Q.  But organization is not her natural strong suit,

3  right?

4     A.  Well, I'm not going to sit here and say it's not her

5  natural strong suit, but, you know, we juggle a lot of

6  things.

7     Q.  And she relies on other people to help her with her

8  organization, right?

9     A.  Well, we support each other as moms.

10    Q.  Gotcha.  I want to talk -- transition into talking

11  about the wedding system.  You transitioned into chambers

12  after the election, right?

13    A.  Yes.

14    Q.  And just quick aside, Dee Henderson did not

15  transition with you into chambers, right?  She did not -- she

16  was not in the chambers staff?

17    A.  Who is Dee Henderson?

18    Q.  All right.  Thank you.

19        So you talked a lot yesterday about the entire

20  wedding system.  You would say that the wedding system was

21  informal, wouldn't you?

22    A.  Yeah.  Yeah.  It wasn't the main duty.  It was court.

23    Q.  Gotcha.  There was no booklet of information that you

24  kept all of the wedding information in for future reference,

25  right?

1   **A.**  No.  No.

2   **Q.**  For previous reference?

3   **A.**  The last administration, well, the judge's staff who

4   trained -- Wanda G., who trained me, they kind of just walk

5   you through it and talk you through it.

6   **Q.**  Gotcha.  There was no Excel spread sheet?

7   **A.**  Oh, definitely not for me.

8   **Q.**  And you said the court still used a typewriter when

9   you were there, right?

10   **A.**  Yes.  And they used a typewriter.

11       Let me be very clear.  It was the Vital Records

12   section because I guess the State hadn't went to computer

13   stuff for the marriage license, so there were these

14   triplicate forms and you would truly go to a typewriter in

15   chambers and type up the marriage license.  And eventually

16   they transferred to a digital electronic system as they

17   showed me yesterday.

18   BY MR. WICKER:

19   **Q.**  Gotcha.  But in keeping the licenses, the licenses

20   were not kept for the purpose of chambers tracking weddings,

21   were they?

22   **A.**  No.

23   **Q.**  Okay.  And you mentioned this, that informal system

24   was not started by Judge Trahan, right?

25   **A.**  No.

1   Q.   It was inherited from the previous administration?

2   A.   Yeah, it's judges doing weddings.

3   Q.   And you specifically learned certain steps from the

4   previous administration, right?

5   A.   I learned the steps from the previous administration.

6   Q.   And Lisa Hibbs was an important part of helping you

7   learn those steps?

8   A.   Yes, because she was from the previous administration

9   and she was presently on staff while I was there.

10   Q.   And that administration that she was with, she was

11   with K.K. Norman?

12   A.   Yes, Judge K.K. Norman.

13   Q.   And K.K. Norman is sometimes referred to as "the love

14   judge"?

15   A.   Yeah, she was referred to as "the love judge."

16   Q.   And she was referred to that because she did a lot of

17   weddings, right?

18   A.   Yeah, I would say that.

19   Q.   You knew Ms. Faye, right?

20   A.   Yes.

21   Q.   And Ms. Faye is Teena's mother, right?

22   A.   Uh-huh.

23   MR. WICKER:  Your Honor, I would like to show the

24   witness what I have marked as Defendant's Exhibit 1 just for

25   her.  I don't want to show it to the jury just yet.

1          THE COURT:  And I'm sorry.  The Government, make sure

2     they know what you're showing the witness.

3          MR. WICKER:  Yes, they do.

4          MR. FLANAGAN:  We have a copy, Your Honor.

5          MR. WICKER:  And here's an extra copy for the Court

6     just in case.

7          THE COURT:  And me, Dena.  It's not even an exhibit

8     yet.  All right.  Go ahead.

9     BY MR. WICKER:

10        **Q.**  Ms. Majors, can you identify this picture?

11        **A.**  Yes.

12        **Q.**  And who is in this picture?

13        **A.**  It's Teena, me, and our parents, our moms.  I have

14     some.  I live every day with them.

15             (Crying.)

16             I'm good.

17     BY MR. WICKER:

18        **Q.**  Take your time.

19        **A.**  Yes.

20          MR. WICKER:  Your Honor, at this time, we would like

21     to offer, file, and introduce and publish to the jury

22     Defendant's Exhibit 1.

23          THE COURT:  Any objection from the Government?

24          MR. FLANAGAN:  No objection.

25          THE COURT:  The exhibit can be published.

1      (Whereupon, Defense Exhibit 1 is admitted into evidence.)

2  BY MR. WICKER:

3      **Q.**  Ms. Majors, what does this picture mean to you?

4      **A.**  Happy times.

5      **Q.**  And does this picture bring back your memories of

6  Teena's relationship with her mother?

7          MR. FLANAGAN:  Objection, relevance.

8          MR. WICKER:  Your Honor, we're talking about --

9          THE COURT:  Overruled.

10     **A.**  I'm sorry.  What did you say?

11     **Q.**  Does this picture bring back your memories of Teena's

12  relationship with her mother?

13     **A.**  Yeah.

14     **Q.**  Can you talk about that relationship?

15     **A.**  Well, you know, we were two friends who had awesome

16  moms.  I'm not saying anyone else's mom's not awesome, but we

17  had the GOATs, greatest of all time, and they loved their

18  girls.

19          So we both babies of the family.  We have three

20  siblings.  She has two brothers and she's the baby girl and I

21  have a brother and sister and I'm the baby girl and these

22  ladies loved us.

23  BY MR. WICKER:

24     **Q.**  You would say that Teena was the apple of her mom's

25  eye?

1   **A.**   It looked like the apple because I know I was the

2   apple of mine and it looks familiar.

3   **Q.**   And you would say that Ms. Faye was the apple of

4   Teena's eye?

5   **A.**   Oh, my God, yes.  Teena, Teena.  Teeny, Teeny.

6   That's what she would call her.

7   **Q.**   Ms. Majors, during the time of this picture, wasn't

8   your mom going through dialysis as well?

9   **A.**   The crazy part -- the funny crazy part about this

10  particular picture is this is Teena's 50th, I believe, and my

11  mom had been struggling with dialysis and she was in the

12  hospital.  And Teena had this big thing and so just happened

13  they released her that day.  She was -- she out of the

14  hospital she went to this thing.  That's why she doesn't have

15  on a wig in this picture, but she had to be there with Teena

16  and Ms. Faye because it was a big deal.  She's making 50.

17  And she won't be here for my 50th, so I'm glad she had a good

18  time at hers.

19  **Q.**   You knew what it was like for Ms. Faye and your

20  mother to be determined mothers?

21  **A.**   Yes.

22  **Q.**   And as a daughter, wasn't it particularly difficult

23  to see your mother go through dialysis?

24  **A.**   Yes.  I brought her every Monday, Wednesday, and

25  Friday.

1     Q.   And your mother went like clockwork, right?

2     A.   Like clockwork.  She had an appointment.  She was a

3 very easy patient and I still couldn't keep her here.

4     Q.   And you know from personal experience that Ms. Faye

5 was not the easiest of patients, was she?

6     A.   It was a time.  She didn't like it.  I mean,

7 everybody has a different reaction.  My mom could come out of

8 dialysis like they gave her sugar water.  You know, she's

9 talking and she's this and that and Ms. Faye -- and she was

10 older.  It took her some days.  And then they go every other

11 day, so as soon as you start feeling better, it's time to go

12 back again.  So, yeah, she wasn't compliant or very easy.

13    Q.   And didn't that noncompliance make life more

14 difficult for Teena?

15    A.   She would fuss at her and try to, you know, tell her

16 the importance of it and, you know, because she's trying --

17 we're trying to keep these ladies here.  We're not in charge

18 of it, but if I had some bubble gum to hold it together.

19    Q.   You just said you weren't in charge of the whole

20 picture.  What role did Teena play in Ms. Faye's health

21 struggles?

22    A.   Oh, she was the primary.  You know, you know, being

23 the girl, you stand up and you become the primary caregiver

24 of your mom, your parents, you know.  That's what we do.  So

25 she was the primary person.  Like even though I was the baby

1 girl, I brought my mom to dialysis every Monday, Wednesday,

2 Friday.

3     **Q.**  And you're familiar with Teena's entire family

4 situation, right?

5     **A.**  Yeah, I knew Teena.

6     **Q.**  And you're familiar that she was, you know, not just

7 the only daughter, she was much closer in proximity than her

8 brothers, right?

9     **A.**  Yes.  Because she -- her mom lived in Algiers.  She

10 lived in Algiers.  One brother lives out of town and the

11 other -- you know, one live further out.  Again, you can have

12 a brother in a house.  When you a daughter and you know the

13 sacrifice of what your parents or your mom did for you, you

14 just that person.  You know, you just -- that's what you do

15 as a daughter.

16     **Q.**  It becomes your focus?

17     **A.**  Yeah.  And you pray for the children because you

18 really work hard with your mom.

19     **Q.**  Based on your observations, how did Ms. Faye's

20 struggles impact Teena?

21     **A.**  I mean, like any daughter -- and I can only speak --

22 because when Teena was going through that initially, my mom

23 was here, you know, and she was a compliant patient, you

24 know.  She went to the doctor.  She went to dialysis.  She

25 went -- she didn't have that.  So until I really sat in that

**OFFICIAL TRANSCRIPT**

1  seat on February 3, 2020, when my mom just didn't wake up, I

2  can't imagine fighting with her through it because I didn't

3  have to fight with her through it because I was able to bring

4  her to her appointments in peace.

5      **Q.**  Ms. Majors, yesterday referencing Ms. --

6      **A.**  I'm sorry.  Did I say February 20th?  My mom died

7  February 3, 2020.  Sorry.  I would have had her a little bit

8  longer on the 20th.

9      **Q.**  Sometimes stressors make things difficult to

10  remember, don't they?

11        MR. FLANAGAN:  Objection.

12        THE COURT:  What's your objection?

13        MR. FLANAGAN:  Relevance.  She's testifying to her

14  experience with her mother.  We understand they can get into

15  the experience with her mother, but they're conflating the

16  two, Your Honor.

17        THE COURT:  I'm going to overrule it.  They're close.

18  It's her experience and her perception of what Ms. Trahan was

19  going through and she was there at the time.  So I'm going to

20  allow it.

21  BY MR. WICKER:

22      **Q.**  Ms. Majors, yesterday, referencing Teena, you said

23  that "black women do what we need to do."  What did you mean

24  by that?

25      **A.**  Exactly what I said.  We -- I mean, I've only been a

1   black woman, so I can only speak from that place.  We do what

2   we need to do.  You know, everybody talk about mental health

3   today, but people been struggling and going through it.

4        You know, it's like -- it's a funny thing.  Teena and

5   I would have -- because her grandmother, which we not talking

6   about, but her grandmother was an important part before I

7   came into her life.  You weak.  Be strong.  Stand up.  Fight.

8   You know, that's -- and I had the same type of grandmother.

9        And we didn't know each other when our grandmother's

10  was alive, but it's like, you going to be beat.  You weak.

11  Stand up.

12       So we talk about mental health today.  We talk about

13  the trauma of here today, gone tomorrow.  We're dealing with

14  it now, but as a community, we didn't deal with that.  So

15  that's what I'm talking about as a black woman that, you

16  know, you just keep it going.

17  BY MR. WICKER:

18  Q.  Ms. Majors, you just mentioned community.  You're a

19  citizen of Algiers.  You're a former employee of Second City

20  Court.  You'd say you participate in the same community as

21  Teena, correct?

22  A.  Oh, yeah.

23  Q.  And based on your experiences, you would say that Ms.

24  Trahan's reputation in the community is that of an honest,

25  trustworthy, and person of integrity?

1    **A.**  Yes.  Yes, I would definitely say that.

2         MR. WICKER:  Thank you for sharing with us today,

3    Ms. Majors.

4         THE WITNESS:  Thank you.

5         THE COURT:  Any redirect?

6         MR. FLANAGAN:  May I have a moment, Your Honor?

7         THE COURT:  You okay?

8         THE WITNESS:  I'm okay.

9         THE COURT:  You need some water?

10        THE WITNESS:  You can't give me my mom.

11                        REDIRECT EXAMINATION

12   BY MR. FLANAGAN:

13    **Q.**  Good morning.  So when did this -- when did you

14   experience this with your mother?

15    **A.**  What?  The death or the -- her going through

16   dialysis?

17    **Q.**  When did that begin?

18    **A.**  Because my mom was who she was.  She had diabetes and

19   because -- I'm going to say because she was educated and she

20   could take care of her own business, I wasn't allowed in the

21   room while the doctor talked to her about her business.

22        And on one of those doctor visits while I was

23   outside, the doctor told her that she was in kidney failure,

24   and because my mom was who she was, she decided, I got a

25   cruise booked, I'm going to deal with this and don't you dare

1    tell my daughter anything.  I'ma deal with this when I get

2    back.

3            Well, December 2015 I'm going to believe, yeah,

4    because my son was in eighth grade.  December 2015 I get a

5    call from Carnival Cruise ship, I believe it is, to ask me at

6    -- first of all, at two o'clock in the morning, "May I speak

7    to Tamara Griffin-Major?"

8            "Yeah, I am."

9            "Are you the daughter of Brenda Griffin?"

10           "Yes, I am."

11           "There's been an accident, but we -- because of

12   HIPAA" -- but you called me and woke me up.

13           Sure enough, my mom's kidneys failed on the ship.

14   And I had to be at the dock -- thank God, the ship was coming

15   in.  I had to be at the dock.  And they don't let you go so

16   far because of the security, but they call me.

17           So I'm at the dock at six o'clock in the morning.

18   They have the ambulance there and this is 2015.  And they

19   come and I just want to know if I had a dead body I had to

20   deal with.  As we know, she died in 2020.  She was alive.

21           So they opened the ambulance, let me see.  We go to

22   Touro.  We start this whole process.

23           And you have to know my mom.  She was like, "I'm not

24   going to dialysis" and that's when my world is -- I'm falling

25   apart.  Like, you don't go to dialysis, how you going to

1   live?

2          So I became an overnight nurse.  I learned to do

3   peritoneal dialysis, which is dialysis at home.  So I did

4   that for about a year.

5   BY MR. FLANAGAN:

6       Q.  And that was in about 2015?

7       A.  Now we're in 2016 because she stayed in the hospital

8   15 days or so --

9       Q.  Ma'am, so from 2016 to 2020 was when you took on that

10  responsibility?

11      A.  No.  2015 I took on -- and let's go back.  Yeah, 2015

12  she had kidney failure on the ship.

13      Q.  And during that time, did you file your tax returns?

14      A.  I don't file -- well, yeah, I filed my tax returns,

15  but I don't do my own taxes.

16      Q.  So you stayed on top of your tax returns during that

17  time while taking care of your mother?

18      A.  Yeah, I filed.

19          MR. FLANAGAN:  No further questions.

20          THE COURT:  Thank you.  Thank you, Ms. Majors.

21          THE WITNESS:  Thank you.

22          Am I good to go?

23          THE COURT:  You can go.  Yes.  Please don't discuss

24  your testimony with anyone.

25          Do you have your next witness?

**OFFICIAL TRANSCRIPT**

1          MR. FLANAGAN:  Yes, Your Honor.  The Government calls

2    Ms. Lauren Rocha.

3          THE COURT:  Good morning, Ms. Rocha.

4          THE CASE MANAGER:  Please raise your right hand.

5               (Witness administered oath.)

6          THE WITNESS:  Yes.

7          THE CASE MANAGER:  Please have a seat.

8          If you could please speak directly into the

9    microphone, state and spell your name for the record.

10          THE WITNESS:  Lauren Rocha, L-a-u-r-e-n, R-o-c-h-a.

11                       LAUREN ROCHA,

12    being called as a witness, being first duly sworn, examined

13    and testifies as follows:

14                    DIRECT EXAMINATION

15    BY MR. FLANAGAN:

16      Q.  Good morning, Ms. Rocha.  Where do you work?

17      A.  At the Louisiana Supreme Court.

18      Q.  How long have you worked there?

19      A.  15 years and 7 months.

20      Q.  What is your position at the Louisiana Supreme Court?

21      A.  I'm the general counsel.

22      Q.  What does the general counsel do there in general

23    terms for the jury?

24      A.  Sure.  I advise the justices of the Louisiana Supreme

25    Court regarding legal issues about the administration of the

1    state judicial branch of government.

2        Q.  Are you familiar with the Judicial Administrators

3    Office within the Louisiana Supreme Court?

4        A.  Yes.

5        Q.  What's that office?

6        A.  That office is dedicated to administering the state

7    court system, helping to run that branch of government, pay

8    the judges, educate them, help run that branch of government.

9        Q.  As general counsel, what's your role with that

10   particular office within the court?

11       A.  I support that office as well and any issue they need

12   running the court system.

13       Q.  Can you explain what a Personal Financial Disclosure

14   Statement is through a Louisiana Supreme Court?

15       A.  Sure.  Each year judges -- elected judges in the

16   state are required to file with the Office of the Judicial

17   Administrator a form that discloses certain financial

18   holdings, certain real estate they own.  It's pursuant to a

19   Louisiana Supreme Court rule that judges are required to file

20   this form each year.

21       Q.  Who receives a copy of the form once it's filed?

22       A.  It's filed with the judicial administrator's office

23   but, in fact, my department takes those forms and tracks them

24   and keeps them.

25       Q.  And then what do you do with them?

1    **A.**  We file them.  We -- they are also now placed online,

2    so you can view them online.

3    **Q.**  Why is that?

4    **A.**  For litigants or during elections for the public to

5    know information about the judges in the state that they're

6    electing, and if there's any potential conflicts of interest,

7    just to know if parties that are appearing before the judge.

8    **Q.**  Is that -- setting aside why it's online, is that the

9    general purpose of the form itself, just to help everyone

10   identify conflicts?

11   **A.**  Yes.

12   **Q.**  What is the deadline for filing these financial

13   disclosure statements?

14   **A.**  They are due each year on May 15th, or if a judge

15   receives an extension to file his or her taxes, they are then

16   due 30 days after the filing of the taxes.

17   **Q.**  So May 15th is in relation to how far away is it from

18   tax day?

19   **A.**  From -- federal tax day is April 15th, so it's

20   30 days after federal tax day.

21   **Q.**  So is that by design?

22   **A.**  Probably.  Yes.

23   **Q.**  Well, what's the intent if you know?

24   **A.**  To -- yes, I think it's to give judges time to do

25   their taxes and then within 30 days then they file the form

1    with the court.

2        Q.  Does a lot of the information on this form overlap

3    with the information on a tax return?

4        A.  It's definitely much less.  The financial disclosure

5    that comes to the court is much, much less than is required

6    on a tax -- on a federal tax form.

7        Q.  And what financial information are judges supposed to

8    report on these financial disclosure forms?

9        A.  They're supposed to report all their income.  They're

10   supposed to report any immovable property that they own, any

11   real estate.  They're supposed to report certain stock

12   holdings, creditors, the names of certain creditors.  There's

13   probably more.  Those are the big ones.

14           MR. FLANAGAN:  At this time, I'd like to publish to

15   the witness Exhibit 7.  And I'd ask that we click through

16   Exhibits 7, 8, 9, 10, 11, 12, 13.

17           THE COURT:  Has Defense had an opportunity to look at

18   those exhibits?

19           MR. MAGNER:  In the interest of time, we have no

20   objection to the Government's Exhibits 7 through 13 if they

21   would like to move them now.

22           MR. FLANAGAN:  Government moves to admit Exhibits 7

23   through 13 into evidence.

24           THE COURT:  All right.  Those exhibits are admitted.

25       (Whereupon, Government Exhibits 7-13 are admitted into

1                              evidence.)

2          MR. FLANAGAN:  Providing Exhibit 7 through 13 to the

3    Court.

4          THE COURT:  It's accepted into evidence.

5          MR. FLANAGAN:  And permission to publish to the jury?

6          THE COURT:  Granted.

7    BY MR. FLANAGAN:

8      Q.  Do you have it up on your screen?

9      A.  Yes.

10     Q.  Is this a Personal Financial Disclosure Statement

11   like the ones we have just been discussing?

12     A.  Yes.

13     Q.  Can you tell from this document whose disclosure it

14   is?

15     A.  Yes.

16     Q.  Who is it?

17     A.  Judge Ernestine Anderson-Trahan.

18     Q.  And what period does this statement cover?

19     A.  Calendar year 2013, January to December.

20     Q.  What's the date of the report?

21     A.  May 14, 2014.

22     Q.  What does the stamp at the top right of the page

23   indicate?

24     A.  Received May 16, 2014.

25          MR. FLANAGAN:  If I could just have one moment.

1          THE COURT:  All right.

2          I want to remind the jury that she's not a -- Count 1

3   of the indictment referring to any fraud or any wrongdoing on

4   her taxes from 2013 have been dismissed.  So I'm just

5   allowing you some leeway.  All right.

6          MR. FLANAGAN:  Thank you, Your Honor.

7   BY MR. FLANAGAN:

8      Q.  And jumping to -- excuse me.  Turning to page 2, what

9   type of -- what information is reported in Section 4?

10     A.  Income.

11     Q.  And on this page, what income do you see being

12  reported?

13     A.  Her judicial income, income from the State or

14  political subdivision.

15     Q.  And turning to page 3.

16     A.  More income, income from the Judicial Expense Fund,

17  which is a political subdivision.

18     Q.  And turning to page 4, is this more income?

19     A.  Yes.  This would be income from businesses, but --

20  right.  And Section D is miscellaneous income.

21     Q.  And moving on to page 5, Subsection D -- and I call

22  it page 5, but what does it say at the bottom of the page

23  there?

24     A.  4a of 7.

25     Q.  What does that mean to you?

1     **A.**   When individuals -- when judges have multiple sources

2     of income to report, they just keep attaching additional

3     pages if they need to, so probably it was multiple pages

4     required to report the income.

5     **Q.**   And Subsection D, how much -- what is being reported

6     on Subsection D on this page 4a?

7     **A.**   Judicial income from being a wedding officiant.

8     **Q.**   And how much is being reported?

9     **A.**   Between $5,000 and $24,999.

10    **Q.**   And why is it in bands if you know?

11    **A.**   Certain income is not required -- it's only required

12    to be reported in a category instead of a specific amount.

13    It's defined in Supreme Court Rule 39 how it needs to be

14    reported, and income from the State or a political

15    subdivision has to be reported in an exact amount, but income

16    from other sources can be reported in categories.

17    **Q.**   Moving on to Exhibit 8, publishing Exhibit 8 to the

18    jury, what is Exhibit 8?

19    **A.**   Personal Financial Disclosure Statement.

20    **Q.**   For who?

21    **A.**   For Judge Ernestine Anderson-Trahan.

22    **Q.**   And what period does this cover?

23    **A.**   This covers calendar year 2014.

24    **Q.**   What's the date of this report?

25    **A.**   May 14, 2015.

1      Q.   And when was it received by the Judicial

2   Administrator's Office?

3      A.   May 18, 2015.

4      Q.   Turning to page 4, under Subsection D, what

5   information is reported on this page?

6      A.   Miscellaneous income.

7      Q.   What kind of miscellaneous income?

8      A.   The first entry is income from rental property in the

9   amount of -- between 5,000 and 24,999 and then the second

10  entry is settlements from work performed prior to becoming a

11  judge in the amount of -- between 5,000 and 24,999.

12     Q.   Moving on to page 7, what information is reported in

13  Subsection D?

14     A.   Miscellaneous income again, and this time from

15  weddings performed in the amount of 5,000 -- between 5,000

16  and 24,999.

17     Q.   Turn to the last page of this document.  What is this

18  page?

19     A.   This is an affidavit certifying that the information

20  is correct and true.

21     Q.   Would you please read starting at "who, upon first

22  being duly sworn"?

23     A.   Sure.  "Who, upon first being duly sworn, did depose

24  and say that the information contained in this Personal

25  Financial Disclosure Statement is true and correct to the

1    best of her knowledge, information, and belief."  She also

2    did -- she did also certify that she -- keep going?

3        Q.   Well, what did she check with regard to tax returns?

4        A.   That she has filed for an extension to file her

5    federal income tax return for the applicable reporting period

6    and then has filed for an extension to file her state income

7    tax return for the applicable reporting period.

8        Q.   Is this document notarized?

9        A.   Yes.

10       Q.   What is the date of the notarization?

11       A.   May 15, 2015.

12       Q.   Publishing Exhibit 9.  This is another Personal

13   Financial Disclose Statement for Judge Trahan?

14       A.   Yes.

15       Q.   What period does this cover?

16       A.   Calendar year 2015.

17       Q.   Submitted in August 2016?

18       A.   Correct.

19       Q.   Turning to page 4, what miscellaneous income did

20   Judge Trahan report in Subsection D?

21       A.   The first entry is income from rental property and

22   the amount of between 5,000 and 24,999.  And the second is

23   income from weddings performed in the amount of 5,000 --

24   between $5,000 and $24,999.

25       Q.   Turning to page 7, is this statement signed under

1  penalty of perjury?

2       A.  Yes.

3       Q.  I mean, this is an affidavit, excuse me.

4           Publishing Exhibit 10.  What's Exhibit 10?

5       A.  Another Personal Financial Disclosure Statement.

6       Q.  For who and for what reporting period?

7       A.  For Judge Ernestine Anderson-Trahan for reporting

8  period 2016.

9       Q.  And what's the date of the report itself?

10      A.  May 5, 2017.

11      Q.  Turning to page 3, what information is being reported

12  under Subsection B?

13      A.  Income from employers.

14      Q.  And what's included in income from employers?

15      A.  Income received from weddings in connection with her

16  job as a judge.

17      Q.  What amount of income is received?

18      A.  Between 5,000 and 24,999.

19      Q.  This is in a different block than we saw in the other

20  ones.  Does that mean anything to you?

21      A.  No.  I mean, we were not very technical when it comes

22  to the reporting.  As long as it's disclosed somewhere we're

23  pretty happy.

24      Q.  And, finally, turning to the last page, is there an

25  affidavit and a notarization?

1    **A.**  Yes.

2       MR. FLANAGAN:  I'm showing the witness Exhibit 11 and

3    publishing to the jury as well.

4    BY MR. FLANAGAN:

5    **Q.**  What is this document?

6    **A.**  So this is an amended Personal Financial Disclosure

7    Statement.

8    **Q.**  Where do you see amended?

9    **A.**  The word appears stamped above the title of our form.

10   **Q.**  So what time -- who is it for?

11   **A.**  For Judge Ernestine Anderson-Trahan.

12   **Q.**  And what reporting period is it for?

13   **A.**  It's for calendar year 2015.

14   **Q.**  When was this submitted to your office?

15   **A.**  On September 10, 2018.

16   **Q.**  Turning to page 4, what's reported under Section C?

17   **A.**  Under Section C is income from businesses and it's

18   income coming from a share of a lawsuit in the amount of

19   between 5,000 and 24,999.  It has an exact amount on there.

20   **Q.**  Was this information reported on the original 2014

21   financial disclosure that we saw?

22   **A.**  No, it was not.

23   **Q.**  Below that, what's the second entry under Subsection

24   D, miscellaneous income?

25   **A.**  Rental property, income from rental property and

1    income from weddings performed.

2        Q.   And what's the amount of income reported for weddings

3    in this document?

4        A.   Between $25,000 and $100,000.

5        Q.   Do you remember what she reported on her original

6    document?

7        A.   Between 5,000 and 24,999.

8        Q.   I'm showing you Government Exhibit 12.  What's this

9    document?

10       A.   It's another Amended Personal Financial Disclosure

11   Statement for judges.

12       Q.   For which judge?

13       A.   For Judge Ernestine Anderson-Trahan.

14       Q.   For what time period?

15       A.   For calendar year 2016.

16       Q.   And what was the date it was submitted to your

17   office?

18       A.   September 10, 2018.

19       Q.   Turning to page 4, what's reported under Subsection

20   D?

21       A.   Miscellaneous income and again --

22       Q.   And the second entry?

23       A.   Income from weddings performed in the amount of --

24   between $25,000 and $100,000.

25       Q.   So, again, this is greater than what was originally

1    reported?

2        A.   Correct.

3        Q.   I'm showing you Exhibit 13.  What's this document?

4        A.   Another Amended Personal Financial Disclosure

5    Statement for Judge Ernestine Anderson-Trahan.

6        Q.   What time period does this cover?

7        A.   Calendar year 2014.

8        Q.   When was it submitted to your office?

9        A.   April 5, 2021.

10           MR. FLANAGAN:  Turning to page 4.

11           THE COURT:  I think that was April 15th for the

12   record.

13           MR. FLANAGAN:  Excuse me?

14           THE WITNESS:  Oh, I'm sorry.

15           THE COURT:  Correct?

16           MR. FLANAGAN:  We can go back to page 1.

17   BY MR. FLANAGAN:

18       Q.   What's the date of this report?

19       A.   It looks like handwritten April 5, 2021, but it was

20   received in the Judicial Administrator's Office April 15th.

21       Q.   So when you say handwritten, what block are you

22   looking at?

23       A.   Block two.

24       Q.   And when you say "received," what are you looking at?

25       A.   This stamp in the upper right corner.

1    **Q.**  So now I'm moving on to page 4.  What's reported in

2  Subsection D?

3    **A.**  Miscellaneous income from weddings performed.

4    **Q.**  And how much is reported for income received for

5  2014?

6    **A.**  Between $25,000 and $100,000.

7        MR. FLANAGAN:  Tender the witness, Your Honor.

8                    <u>CROSS-EXAMINATION</u>

9  BY MR. MAGNER:

10   **Q.**  Good morning, Ms. Rocha.

11   **A.**  Good morning.

12   **Q.**  How are you today?

13   **A.**  I'm very well.  How are you?

14   **Q.**  Ma'am, are you an attorney?

15   **A.**  Yes.

16   **Q.**  And how long have you been practicing?

17   **A.**  I was admitted in 2001.

18   **Q.**  Okay.

19   **A.**  You can do the math.

20   **Q.**  Math is not my strong suit.  How long have you been

21  working for the Supreme Court?

22   **A.**  15 years and 7 months.

23   **Q.**  But you're not counting.

24        All right.  So as an attorney, you are aware that

25  judges sometimes make mistakes, correct?

1     **A.**   Yes.

2     **Q.**   Present company excluded.

3                        (Laughter.)

4     **A.**   Judges are human beings.

5     **Q.**   And sometimes they make mistakes of fact and

6     sometimes they make mistakes of law, correct?

7     **A.**   Correct.

8     **Q.**   And so the trial level of judges are generally the

9     district courts?

10    **A.**   Uh-huh.

11    **Q.**   And if the parties -- you need to answer out loud.

12    **A.**   Yes.

13    **Q.**   So if the parties think that the judge has made a

14    mistake, they can go to the Court of Appeals, correct?

15    **A.**   Yes.

16    **Q.**   And that's usually in most cases a panel of three

17    judges, correct, in the Court of Appeals?

18    **A.**   Correct.

19    **Q.**   And if the parties think that those three judges,

20    majority of those three judges made a mistake, they can then

21    go to the Supreme Court, correct?

22    **A.**   Correct.

23    **Q.**   And how many judges on the Supreme Court?

24    **A.**   On the Louisiana Supreme Court?

25    **Q.**   Yes, ma'am.

1      **A.**   There are seven.

2      **Q.**   And they vote and majority rules on whether or not to

3  sustain the earlier decision or overturn the decision, right?

4      **A.**   Correct.

5      **Q.**   And in some instances, even those judges on the

6  Louisiana Supreme Court can be appealed to the United States

7  Supreme Court?

8      **A.**   That's correct.

9      **Q.**   So our system has built into it remedies for judges

10  making mistakes, correct?

11      **A.**   That's correct.

12      **Q.**   I'm going to very briefly cover some of the

13  disclosure forms that you've already talked about if we could

14  please pull up Government Exhibit 7, which is the 2013

15  return.   And I noticed on this disclosure form this is

16  typewritten, correct?

17      **A.**   Correct.

18      **Q.**   Do you know who typed this up?

19      **A.**   I do not.

20          MR. MAGNER:   Okay.   If we could go to the

21  miscellaneous income section, I think they're all on page 4,

22  but I couldn't swear to it.   And go down below, please.   I

23  want to get to the section, Mr. Washington, related to

24  weddings.

25          MR. WASHINGTON:   Okay.

```
 1   BY MR. MAGNER:
 2      Q.  Okay.  And there we see for 2013 that Judge Trahan
 3   has declared the amount of income she received from
 4   officiating weddings at -- between 5,000 and 24,999, correct?
 5      A.  Correct.
 6      Q.  And you're aware that that is actually a correct
 7   number?
 8      A.  I am not.
 9      Q.  You haven't compared that to the government's
10   statistics in the case?
11      A.  No, we don't do that.
12          MR. MAGNER:  Now, let's go to the amended returns.
13   First, Government Exhibit 11, please.
14   BY MR. MAGNER:
15      Q.  And all of these I believe we're going to see that
16   the forms are handwritten?
17      A.  Correct.
18          MR. MAGNER:  All right.  And so, Mr. Washington,
19   please blow up the first half of that, the Boykin & Ehret.
20   BY MR. MAGNER:
21      Q.  There's a reference to fees received, a pro rata
22   share of a 2011 lawsuit of $9,471, correct?
23      A.  Correct.
24      Q.  And that comes from the name of -- the business is
25   Boykin & Ehret and you understand that to be a law firm
```

1   correct?  If you are.  If you are.

2       **A.**   I'm not familiar with it.

3           MR. MAGNER:  And if we could please go to the bottom

4   half.  And if you can blow that up, please.

5   BY MR. MAGNER:

6       **Q.**   And that shows on the amended return that weddings

7   performed, the amount of income received was between $25,000

8   and $100,000, correct?

9       **A.**   Correct.

10          MR. MAGNER:  Let's please go to Government

11  Exhibit 12.  And we'll go right to page 4.  And we see a

12  similar page here.  And if you would please blow up,

13  Mr. Washington, the bottom half.

14  BY MR. MAGNER:

15      **Q.**   And, again, we see weddings performed of $25,000 to

16  $100,000, correct?

17      **A.**   Correct.

18          MR. MAGNER:  And let's please go to Exhibit 13 and

19  blow up the bottom half, please.

20  BY MR. MAGNER:

21      **Q.**   Again, we see miscellaneous income, weddings

22  performed, that same $25,000 to $100,000?

23      **A.**   Correct.

24          MR. MAGNER:  And if you could please go to the first

25  page of this document, Aaron.

1          MR. WASHINGTON:  I'm having an input lag.

2   BY MR. MAGNER:

3      Q.  You made a point of saying this appeared to be

4   received by the Judicial Administrator's Office on April 15,

5   2021?

6      A.  Correct.

7      Q.  And that was before Judge Trahan was charged in this

8   case?

9      A.  I'm not aware of the time.

10     Q.  One way or another?

11     A.  Right.

12         MR. MAGNER:  One moment, Judge.

13         I'm sorry.  Just one more moment.  If we could go

14  back to Government Exhibit 7.

15         MR. WASHINGTON:  I'm sorry.  I'm having input lag.  I

16  have to reconnect.

17         What I'm looking for is the legal fee income.  I

18  think it's going to be on page 4 as well.  Let's try the next

19  page.

20         MR. WICKER:  That's it?

21         MR. MAGNER:  That's it.  If we could please go back,

22  Aaron, I'm sorry.

23         MR. WASHINGTON:  The top.

24         MR. MAGNER:  There we are.

25  BY MR. MAGNER:

1    **Q.**  At the very bottom there, we see it's No. 3,

2    description of the work, work performed prior to becoming a

3    judge, correct?

4    **A.**  Correct.

5    **Q.**  And it shows income of between $25,000 to $100,000?

6    **A.**  Correct.

7    **Q.**  And this is for 2013 and this is the report that was

8    typewritten, correct?

9    **A.**  Correct.

10   MR. MAGNER:  All right.  Nothing further.  I'll

11   tender the witness, Your Honor.

12   THE COURT:  All right.  Any redirect?

13   MR. MAGNER:  Thank you, ma'am.

14   MR. FLANAGAN:  One moment, Your Honor.  Sorry.

15   If we could pull up Exhibit 8, please.

16   <u>REDIRECT EXAMINATION</u>

17   BY MR. FLANAGAN:

18   **Q.**  Turning to the last page, does this statement say

19   that this financial disclosure is true and correct to the

20   best of her knowledge, information, and belief?

21   **A.**  Yes.

22   **Q.**  And how many amended returns -- how many amended

23   disclosures did we see?

24   **A.**  I don't fully remember, but I think it was three or

25   four.

1    **Q.**   Did we see one for '14?

2    **A.**   Yes.

3    **Q.**   Did we see one for '15?

4    **A.**   Yes.

5    **Q.**   Did we see one for '16?

6    **A.**   Yes.

7    **Q.**   And you don't know where that was in relation to the

8    start of the case?

9    **A.**   I do not know that, correct.

10    **Q.**   Do you know if they were all filed after July 2018?

11    **A.**   Yes, I think I remember.  Yes.

12         MR. FLANAGAN:  Can I briefly show -- briefly publish

13    to the witness -- excuse me.  I'll get the numbers.  11.

14    BY MR. FLANAGAN:

15    **Q.**   Was this one filed after July 2018?

16    **A.**   Yes.

17         MR. FLANAGAN:  Publish 12.

18    BY MR. FLANAGAN:

19    **Q.**   Was this filed after July 2018?

20    **A.**   Yes.

21         MR. FLANAGAN:  And publish 13.

22    BY MR. FLANAGAN:

23    **Q.**   And was this one filed after July 2018?

24    **A.**   Yes.

25         MR. FLANAGAN:  No further questions.

1          THE COURT:  All right.  You're free to go.  Please

2     don't discuss your testimony with anyone.  Thank you for

3     being here.

4          THE WITNESS:  Thank you.

5          THE COURT:  Want to call your next witness?

6          MS. BRODNEY:  Yes, Your Honor.  The United States

7     calls Allison Kotsay.

8          THE CASE MANAGER:  Please raise your right hand.

9               (Witness administered oath.)

10          THE WITNESS:  I do.

11          THE CASE MANAGER:  Please have a seat.

12          Please speak directly into the microphone.  State and

13     spell your name for the record.

14          THE WITNESS:  My name is Allison Kotsay,

15     A-l-l-i-s-o-n, K-o-t-s-a-y.

16                    ALLISON KOTSAY,

17     being called as a witness, being first duly sworn, examined

18     and testifies as follows:

19                    DIRECT EXAMINATION

20     BY MS. BRODNEY:

21     **Q.**  Good morning, ma'am.

22     **A.**  Good morning.

23     **Q.**  Ms. Kotsay, would you tell the members of the jury

24     where are you currently employed?

25     **A.**  I work for the Internal Revenue Service.

1    **Q.**   And how long have you worked for the Internal Revenue

2  Service or IRS?

3    **A.**   About six and a half years.

4    **Q.**   And what is your current position?

5    **A.**   I'm a court witness coordinator.

6    **Q.**   How long have you been a court witness coordinator

7  with the IRS?

8    **A.**   Two and a half years.

9    **Q.**   Generally speaking, what does a court witness

10  coordinator do?

11    **A.**   As a court witness coordinator, I represent the

12  commissioner of the Internal Revenue Service in his custodial

13  duties, so I would be tasked with gathering and retrieving

14  documents that are in the commissioner's possession and have

15  them certified and officiated for evidence in federal

16  criminal trials.

17    **Q.**   Are you familiar with how the IRS retains its

18  documents including tax returns and account transcripts?

19    **A.**   Yes.

20    **Q.**   As part of your current duties, do you retrieve tax

21  records such as tax returns?

22    **A.**   Yes, I do.

23    **Q.**   And have you testified before regarding IRS records

24  in criminal trials?

25    **A.**   Yes.

1    **Q.**  How many criminal trials have you testified in?

2    **A.**  Approximately six or seven.

3    **Q.**  Ms. Kotsay, as part of your duties, have you had

4    occasion to search the Internal Revenue Service records for

5    tax returns and other records related to Ernestine

6    Anderson-Trahan?

7    **A.**  Yes.

8    **Q.**  And how did you conduct that search?

9    **A.**  We use an internal system.  We call it the Integrated

10   Data Retrieval System, otherwise known as IDRS.  So we would

11   enter in the Social Security number of the taxpayer and we

12   would compare it to the last name, date of birth to verify

13   that it's the same person.

14        MS. BRODNEY:  Your Honor, we have Exhibits 14

15   through 34.  With Defense's -- if Defense agrees, we would

16   like to introduce them all at once if the Court would be

17   amenable.

18        MR. MAGNER:  14 through --

19        MS. BRODNEY:  34.

20        THE COURT:  Give him a minute to check it out.

21        MR. MAGNER:  We have no objection, Your Honor.

22        THE COURT:  All right.  You can admit them.

23        MS. BRODNEY:  Thank you.  The Government admits

24   Exhibits 13 through 34.

25     (Whereupon, Government Exhibits 14-34 were admitted into

1                            evidence.)

2          MS. BRODNEY:  And to clarify that was Exhibit 14.

3   Thank you.

4          Permission to publish page 2 of Exhibit 15 for the

5   jury and the witness?

6          THE COURT:  Any objection from the Defense?

7          MR. MAGNER:  I'm sorry?

8          THE COURT:  I said does the Defense have any

9   objection to this being published?

10         MR. MAGNER:  No.  No.  No.

11         THE COURT:  And you recognize the documents?  Yes?

12  Okay.

13         MS. BRODNEY:  Thank you.

14  BY MS. BRODNEY:

15     Q.  Ms. Kotsay, what is this document?

16     A.  This is a Form 1040, U.S. Individual Income Tax

17  Return for tax year 2014 for the taxpayer Ernestine A. and

18  Kenneth J. Trahan.

19     Q.  What is a Form 1040?

20     A.  A Form 1040 is the federal tax form that you would

21  use to report your income and then verify that income with

22  any taxes or payments that you've made.  So it's used to

23  rectify how much tax you either owe or would receive a refund

24  of for overpayment.

25     Q.  Now, to clarify, you mentioned two taxpayers' names

1  on this 1040.  Can you explain that?

2      A.  Well, this is a joint return.  So when you are a

3  married couple, you can file a joint return, and that would

4  include income from both taxpayers.

5      Q.  So I have some questions about different types of

6  income.  So starting, firstly, where does the 1040 report

7  income?

8      A.  That's going to be that top section there titled

9  income.

10      Q.  And does the 1040 report different types of income?

11      A.  Yes, it does.

12      Q.  To briefly discuss wage income, where do taxpayers

13  report income from wages?

14      A.  That's generally going to be the first line of the

15  income section.

16      Q.  And what line is that?

17      A.  In this particular case, it's Line 7.

18      Q.  And is there wage income on this tax return?

19      A.  Yes, there is.

20      Q.  And how much is that?

21      A.  $135,756.

22      Q.  It says "Attach Form(s) to W-2."  What are "Form(s)

23  W-2"?

24      A.  W-2s are information returns that are provided by an

25  employer to report the amount of income that you've earned

1   throughout a year.

2       **Q.**   Who creates a W-2?

3       **A.**   The employer.

4       **Q.**   And where does the employer send a form W-2?

5       **A.**   Those are sent to the employee and to the Internal

6   Revenue Service.

7       **Q.**   Now, does this tax return have W-2's attached to it?

8       **A.**    In this instance, I'm unable to tell, but it does

9   report W-2 income.

10          MS. BRODNEY:  Can we flip through?  Do you want to

11  flip?

12  BY MS. BRODNEY:

13      **Q.**   Did you have occasion to review the tax returns for

14  the years 2015 and 2016?

15      **A.**   Yes.

16      **Q.**   And did those tax returns also report wage income and

17  W-2's?

18      **A.**   Yes, they did.

19      **Q.**   Shifting gears a little bit.  That was wage income.

20  But what if an individual has their own business?  Where on a

21  tax return are they supposed to report income from that

22  business?

23      **A.**   That's going to be reported generally on Line 12.

24  It's going to pull the information from Schedule C.  So

25  Line 12 reads business income or loss.

1    Q.   And so to clarify, what is a Schedule C?

2    A.   The Schedule C is the form that you're going to use

3    to justify the amount of income that your business generated

4    and it's going to have a section that's going to provide for

5    you to list any expenses that you had and those expenses will

6    reduce the business's income.

7    Q.   And who is required to file a Schedule C?

8    A.   The business owner.

9    Q.   So does this return have Schedule C income?

10   A.   Yes, it does.

11   Q.   And where is that reported?

12   A.   That's on Line 12 in the amount of $7,709.

13   Q.   And where does that number come from?

14   A.   That comes from the Schedule C.

15   Q.   Okay.  So turning to page 28, what is this page?

16   A.   This is the Schedule C Profit or Loss From Business

17   for the tax year 2014.  The name of the proprietor is

18   Ernestine A. Trahan for the business -- principle business

19   listed in A is wedding.

20   Q.   And where does it report income?

21   A.   So gross receipts on Line 1, that's going to be the

22   business's income.

23   Q.   What are gross receipts?

24   A.   That's the total income that the business generated.

25   Q.   And where did you say that is located?

1        A.   In part one, under income, Line 1.

2        Q.   And what is the number listed for gross receipts

3   here?

4        A.   The amount here is 16,000.

5        Q.   Where does the Schedule C report expenses?

6        A.   That's going to be the second section there, Part 2

7   you'll see there are expenses listed there, so, for example,

8   20a reads rent or lease in the amount of $4,916.  Line 21

9   reads repairs and maintenance of $2,775 for a total expense

10  of $8,291.

11       Q.   And I see you mentioned those two expenses.  Is this

12  Line 15 insurance also an expense?

13       A.   I'm sorry.  What line?  Line 15?

14       Q.   Yes.

15       A.   Yes, it is also an expense.  I missed that one.

16       Q.   And what is the number listed on Line 29 as tentative

17  profit?

18       A.   $7,709.

19       Q.   Is that the same number we saw listed on Line 12 of

20  page 2 of the return?

21       A.   Yes, it is.

22       Q.   And you mentioned you reviewed this return, correct?

23       A.   Yes, I did.

24       Q.   Is there any income from attorney's fees listed on

25  this return?

1       **A.**   No, there are not.

2       **Q.**   How do you know that?

3       **A.**   I reviewed the return itself.

4       **Q.**   Moving on to page 4 of this return and directing your

5  attention to Line 78, what does it say on Line 78?

6       **A.**   Line 78 reads the amount you owe and the amount

7  listed is $4,768.

8       **Q.**   So to clarify, what does that number mean?

9       **A.**   That's going to be the amount of tax owed after the

10  information was entered onto the return and the total tax was

11  determined.

12       **Q.**   You talked about the total tax.  You mentioned gross

13  receipts.  Can you walk the jury through how gross receipts

14  impacts income on a tax return if at all?

15       **A.**   Yes.  So gross receipts is going to add to the

16  overall income that you're claiming for the year.  When

17  you're adding income, it's going to increase your tax

18  liability.

19       **Q.**   Can you walk the jury through how income on a tax

20  return impacts taxes owed, if at all?

21       **A.**   The more income -- generally the more income that you

22  earn, the higher your taxes are going to be.

23       **Q.**   Directing your attention to page 5, what is the date

24  in the "Sign Here" section?

25       **A.**   The date is July 2, 2015.

1    Q.   And above the signature line, can you read that text?

2    A.   Sure.  That is "Under penalties of perjury, I declare

3    that I have examined this return and accompanying schedules

4    and statements, and to the best of my knowledge and belief,

5    they are true, correct, and complete.  Declaration of

6    preparer other than taxpayer is based on all information of

7    which preparer has any knowledge."

8    Q.   And you mentioned that you have also reviewed the

9    2015 and 2016 tax returns?

10   A.   Yes, ma'am.

11   Q.   Are those returns also signed under penalty of

12   perjury?

13   A.   Yes, they are.

14   Q.   Under the signature line, what is that text box?

15   A.   That's an electronic signature.

16   Q.   And what is the occupation listed next to that

17   signature?

18   A.   Attorney.

19        MS. BRODNEY:  Moving on, I'd like to turn your

20   attention and publish Exhibit 16, please.  Please publish

21   page 2.

22   BY MS. BRODNEY:

23   Q.   Ms. Kotsay, what is this document?

24   A.   This is the Form 1040 U.S. Individual Income Tax

25   Return for 2015 and the taxpayers are Ernestine A. and

1  Kenneth J. Trahan.

2      Q.  And does this return have business income too?

3      A.  Yes, it does.

4      Q.  What is reported on Line 12?

5      A.  Line 12 is $11,207.

6      Q.  I'd now like to direct your attention to page 26.

7  What is page 26?

8      A.  This is the Schedule C for 2015, the Profit or Loss

9  From Business for the proprietor Ernestine A. Trahan and the

10  business is listed as wedding.

11      Q.  And what are the gross receipts reported for weddings

12  in 2015?

13      A.  On Line 1, you'll see that it reads 16,000.

14      Q.  And looking at Part II, are there any expenses

15  listed?

16      A.  Yes, ma'am.

17      Q.  Overall, what is the number listed in Line 28 for

18  total expenses?

19      A.  Total expenses reads $12,570.

20      Q.  And what is the tentative profit listed on Line 29?

21      A.  The profit or loss is $3,430.

22      Q.  Now turning to page 29, what is page 29?

23      A.  This is -- it threw me off because it read 28.  This

24  is the Schedule C Profit or Loss from Business for 2015.  The

25  name of the proprietor is Ernestine A. Trahan and the

1    principle business is attorney.

2        Q.  So to clarify, are there two Schedule C's on this

3    2015 return?

4        A.  Yes, ma'am.

5        Q.  What are the attorney gross receipts reported in

6    2015?

7        A.  Line 1 reads $9,471.

8        Q.  And looking at Part II, are there any expenses

9    listed?

10       A.  Yes, there are.  The total expenses here on Line 28

11   reads $1,694.

12       Q.  And what is the profit listed?

13       A.  Profit is Line 29, $7,777.

14       Q.  Now directing your attention back to Line 12 on

15   page 2 of the return if we could pull that up.  Does Line 12

16   represent the total when you add together the reported profit

17   from weddings and the profit from attorney's fees?

18       A.  Yes, it does.

19       Q.  And is that business income part of the total income?

20       A.  Yes.

21       Q.  So we've been talking about Line 12 and business

22   income, but is rental income also reported on this return?

23       A.  Yes.  That's going to be listed on Line 17.

24       Q.  Turning to page 32, what is page 32?

25       A.  This is the Schedule E.  It's the supplemental income

1   and loss for 2015 for Ernestine A. and Kenneth J. Trahan.

2       Q.  Now, what does it say Part 1b Line A?

3       A.  1b, Line A reads single family residence.

4       Q.  What does that mean?

5       A.  It's rental real estate.  It's like rental income.

6       Q.  For what?

7       A.  For a single family residence for the address listed

8   in Line 1a, 157 Stoval Street.

9           MR. MAGNER:  Excuse me, Your Honor.  I object at this

10  time.  The rental income is just not an issue in the case and

11  I don't know why we're spending any time.

12          THE COURT:  Counsel?

13          MS. BRODNEY:  Your Honor, this is relevant to

14  demonstrate what Ms. Trahan was capable of tracking during

15  the tax year given, that at issue is whether --

16          THE COURT:  I'll allow it.

17          MS. BRODNEY:  -- or not she was able to track

18  numbers.

19          THE COURT:  I'll allow it.

20  BY MS. BRODNEY:

21      Q.  What does it say in Line 23a for total rents

22  received?

23      A.  $8,880.

24      Q.  And what does it say in Line 23e?

25      A.  I'm sorry.  Can you repeat the question?

1    Q.   What does it say in Line 23e?

2    A.   That's the total amount reported on Line 20 for all

3    properties and it lists the amount as $6,113.

4    Q.   And what does it say in Line 26 for total rental

5    income?

6    A.   That amount is $2,767.

7    Q.   We talked about rental income on this 2015 return,

8    but was there rental income reported on the 2014 and 2016

9    returns?

10   A.   Yes.

11   Q.   With rental expenses also reported on each of those

12   returns?

13   A.   Yes, there were.

14        MS. BRODNEY:  We've been talking about income, but I

15   want to briefly talk about deductions.  I'm showing you

16   page 4 of that same return.  16.  Exhibit 16.  The same

17   return.

18   BY MS. BRODNEY:

19   Q.   Did Judge Trahan and her husband itemize deductions

20   on their return?

21   A.   Yes.

22   Q.   What does that mean?

23   A.   You can generally take two types of deductions.  One

24   would be the standard deduction.  So you'll see on the

25   left-hand side of this form, it will explain what the

1  standard deduction is depending on how you're filing, whether

2  single, married, or head of household.  When you itemize your

3  deductions, you're entitled to claim certain deductions for,

4  say, mortgage interests, charitable donations.

5     Q.   And what do deductions do to the taxes that a

6  taxpayer owes?

7     A.   It reduces your total tax.

8     Q.   What were the itemized deductions here?

9     A.   So on Line 40, the total amount reads $27,342.

10    Q.   And does Line 40 reference another associated

11 document?

12    A.   Yes, that's going to be the Schedule A.

13    Q.   Directing your attention to page 24.  What is

14 page 24?

15    A.   This is the Schedule A that I just mentioned.  It's

16 for itemized deductions for tax year 2015, but the taxpayers

17 listed are Ernestine A. and Kenneth J. Trahan.

18    Q.   Scrolling down, what does this form report as gifts

19 to charity?

20    A.   So the total gifts to charity on Line 19 reads

21 $20,855.

22    Q.   Directing your attention to page 11, what is page 11?

23    A.   This is a Form 8283.  It's used for non-cash

24 charitable contributions.

25    Q.   And does this form report five different donations?

1    A.   Yes, it does.

2    Q.   Does it list a donor's cost or adjusted basis for

3    each donation?

4    A.   Yes, that's going to be Column G.

5    Q.   Does it list a fair market value for each donation?

6    A.   Yes.  That's the next column over, Column H.

7    Q.   Now directing your attention to page 24, Line 17.

8    A.   So Line 17 reads other than by cash or check if any

9    gift of $250 or more, and that's where that information from

10   that prior form is translated.  So it reads $12,840.

11   Q.   We talked about itemized deductions on this return,

12   but were there itemized deductions on the 2014 and 2016

13   returns?

14   A.   Yes.

15   Q.   Directing your attention to page 4, what does it say

16   on Line 78?

17   A.   Line 78 is the amount you owe, and in this case, it

18   is $2,464.

19        MS. BRODNEY:  I would now like to publish Exhibit 17,

20   page 2, please.  Thank you.

21   BY MS. BRODNEY:

22   Q.   Ms. Kotsay, what is this document?

23   A.   This is the Form 1040 U.S. Individual Income Tax

24   Return for 2016 and the taxpayers listed are Ernestine A. and

25   Kenneth J. Trahan.

1    Q.   And what does it say on Line 12?

2    A.   Line 12 is the Schedule C business income or loss in

3    the amount of $4,533.

4    Q.   Turning to page 30, next page -- thank you -- what is

5    page 30?

6    A.   This is the Schedule C, Profit or Loss From Business

7    for tax year 2016 and the name of the proprietor is Ernestine

8    A. Trahan and the business -- principle business is wedding.

9    Q.   And were there gross receipts for this wedding

10   Schedule C for 2016?

11   A.   Yes, the total gross receipts $15,200.

12   Q.   And looking at Part II, are there any expenses listed

13   in Part II?

14   A.   Yes, the total expenses listed on Line 28 read

15   $10,667.

16   Q.   And what is listed on Line 29 for profit?

17   A.   That's going to be $4,533.

18   Q.   Is that the same number we saw listed on Line 12 of

19   page 2 of the return?

20   A.   Can we bring that back up?  Yes.

21   Q.   Directing your attention to page 4, what does it say

22   on Line 78?

23   A.   Line 78, amount you owe is $4,873.

24   Q.   Now I would like to direct your attention to what has

25   already been admitted as Exhibit 19.  Please publish

1    Exhibit 19.

2            Page 2.  Ms. Kotsay, what is this document?

3        A.   This is a Form 1040X.  It's an Amended U.S.

4    Individual Income Tax Return for Ernestine A. Trahan and

5    Kenneth J. Trahan and the tax year they are amending is 2016.

6        Q.   Can you just explain for the jury what is an amended

7    return?

8        A.   An amended return is a subsequent return that you're

9    going to file with the Internal Revenue Service to correct

10   your originally filed return.

11       Q.   And how do you know that it's an amended return?

12       A.   At the top, it does label it with the X following the

13   1040 and it's titled amended.

14       Q.   If we can scroll down a little bit, directing your

15   attention to the two stamps in the middle of the page, what

16   do they say?

17       A.   These are stamps that when we receive any documents

18   in, we do stamp them to indicate when -- when the document

19   was received.  The two different stamps just indicates -- so

20   the lower one, that's the -- that's the first -- I'm sorry.

21   The top one is when it was received.  That's the received

22   date of December 29, 2018.  It was received in Austin, Texas.

23   The following or the second stamp just indicates when it

24   moved from one department to the next.

25       Q.   Turning to page 3, go back one.  Looking at Part III,

1    Explanation of Changes, what does that say?

2        A.   This reads that the taxpayer corrected the amount of

3    Schedule C income earned and expenses.

4        Q.   Now, turning to page 7, what is this page?

5        A.   This is the Schedule C, Profit or Loss For -- From

6    Business for 2016.  The proprietor is Ernestine A. Trahan and

7    the principle business is listed as wedding.

8        Q.   And what is reported as gross receipts on Line 1 of

9    this amended 2016 return?

10       A.   $46,730.

11           MS. BRODNEY:  Could we please publish Judge Trahan's

12   original 2016 return identified as Exhibit 17 alongside the

13   amended 2016 return we have here.

14           MS. BETTER:  What page?

15           MR. BOTELER:  What page number?

16           MS. BRODNEY:  Yes, we're going to page 30.  Back one.

17   Thank you.  No.  Sorry, no.

18           MR. FLANAGAN:  There you go.

19           MS. BRODNEY:  Thank you.

20   BY MS. BRODNEY:

21       Q.   How do the gross receipts for weddings on the amended

22   Schedule C compare to the gross receipts from weddings on

23   Line 1 of the original 2016 Schedule C?

24       A.   So the subsequent Schedule C has added income, so

25   it's increased the gross receipts.  So originally filed

1   Line 1 read $15,200 and the subsequent Schedule C reads

2   $46,730.

3       Q.   In the amended 2016 return, what is reported on Line

4   11 for contract labor expenses on the Schedule C?

5       A.   There's nothing listed on Line 11.

6       Q.   And how does that compare to what is reported on Line

7   11 of the original Schedule C for 2016?

8       A.   The original Schedule C reports $2,100.

9       Q.   What does that mean?

10      A.   I don't understand your question.

11      Q.   What does it mean to see that difference?  Can you

12  just explain that?

13      A.   So they're taking away that contract labor expense.

14          MS. BRODNEY:  In the -- thank you for putting those

15  up side by side.

16  BY MS. BRODNEY:

17      Q.   In the amended 2016 return, turning back to page 2,

18  what is reported on Line 11?

19      A.   Line 11 is the total tax.  There's three different

20  columns there.  The first column is going to indicate what

21  was originally reported on the 1040 that we received.  The

22  Column B is going to be the net change, and Column C is going

23  to be the corrected figure.

24      Q.   So how much did the taxes go up because of the

25  changes to the return?

1      A.   The taxes increased by $10,696.

2           MS. BRODNEY:   I would now like to direct your

3      attention to Exhibit 18.   If we could please publish page 2

4      of Trial Exhibit 18.

5      BY MS. BRODNEY:

6      Q.   Ms. Kotsay, what is this document?

7      A.   This is similar to the last.   It's a 1040X Amended

8      U.S. Individual Income Tax Return for tax year 2015.   The

9      taxpayers are Ernestine A. and Kenneth J. Trahan.

10     Q.   And how do you know that it's an amended return?

11     A.   By the title of the form.

12     Q.   What about the title of the form?

13     A.   It specifically reads amended.

14     Q.   Thank you.

15          Directing your attention to the two stamps in the

16     middle of the page, what do they say?

17     A.   So this was received -- the bottom stamp, that's the

18     initial received date of March 10, 2019.   It was received at

19     the Internal Revenue Service in Austin, Texas.   The second

20     stamp just indicates that this was sent to a statutes unit on

21     March 13, 2019.

22     Q.   And turning to page 3, looking at Part 3, Explanation

23     of Changes, what does that say?

24     A.   This reads the taxpayer corrected Schedule C income

25     earned and expenses.

1    Q.   Turning to page 8, what is this page?

2    A.   This is the Schedule C Profit or Loss From Business

3    for tax year 2017.  The name of the proprietor reads

4    Ernestine A. Trahan and the principle business reads wedding.

5    Q.   And to clarify, what is the tax year that this

6    Schedule C relates to?

7    A.   2015.

8    Q.   What is reported as gross receipts on Line 1 for this

9    amended Schedule C?

10   A.   Line 1 reads $34,440.

11        MS. BRODNEY:  If we could please publish Judge

12   Trahan's original 2015 return identified as Exhibit 15

13   alongside the amended 2015 return.  The page number should be

14   26 for the original.

15   BY MS. BRODNEY:

16   Q.   How does that compare to the gross receipts from

17   weddings on Line 1 of the original 2015 Schedule C?

18   A.   There was an increase to gross receipts on the

19   subsequent Schedule C.  So the original was filed at 16,000

20   and it was changed to $34,440.

21   Q.   And in the amended 2015 return, what is reported on

22   Line 11 for contract labor expenses?

23   A.   On the --

24        MS. BRODNEY:  Scroll down on each one.  Thank you.

25   A.   So on the original, they've reported $2,100 and on

1    the subsequent Schedule C, that was removed so there's

2    nothing listed there.

3        Q.  And have you reviewed both of these documents

4    previously?

5        A.  Yes, I have.

6        Q.  Are there any changes in the Schedule C for

7    attorney's fees comparing page 10 of the amended return with

8    page 29 of the original return?

9        A.  Can we scroll down?  I think it's listed there, isn't

10   it?

11       Q.  For attorney's fees.

12           MR. BOTELER:  Are you referring to another page?

13   BY MS. BRODNEY:

14       Q.  My intent was to ask whether in your review you

15   noticed any changes to the attorney's fees on each of these

16   two returns.

17       A.  The attorney's fees didn't change.

18           MS. BRODNEY:  We can replace with just the amended

19   return.

20   BY MS. BRODNEY:

21       Q.  In the amended 2015 return, turning back to page 2,

22   what is reported on Line 11?

23       A.  Line 11 is the total tax.  The originally filed

24   return listed it as $13,856.  There was an increase of $5,617

25   for a corrected figure of $19,473.

1    **Q.**  How much did taxes go up if at all because of the

2    changes to the tax return?

3    **A.**  They were increased by $5,617.

4    **Q.**  I would now like to direct your attention to what has

5    already been admitted as Exhibit 20.  If we could please

6    publish page 2.  Ms. Kotsay, what is this document?

7    **A.**  This is the Form 1040 U.S. Individual Income Tax

8    Return for 2017.  The taxpayers listed are Ernestine A. and

9    Kenneth J. Trahan.

10   **Q.**  And what does it say on Line 12?

11   **A.**  Line 12 lists business income or loss in the amount

12   of $44,130.

13   **Q.**  Turning to page 33, what is this page?

14   **A.**  This is a Schedule C Profit or Loss From Business for

15   2017.  The name of the proprietor is Ernestine A. Trahan and

16   the principle business is listed as wedding.

17   **Q.**  And does this return report 16,000 for gross receipts

18   from weddings?

19   **A.**  No, it does not.

20   **Q.**  What does it report?

21   **A.**  45,000.

22   **Q.**  Turning down to the expenses section, what, if any,

23   expenses are listed on the 2017 Schedule C?

24   **A.**  The only expenses are listed on Line 27a in the

25   amount of $870.

1    Q.   Now, did Judge Trahan file an amended return for

2    2014?

3    A.   No.

4    Q.   How do you know?

5    A.   In my research, I searched our internal systems and I

6    did not locate an amended return for 2014.

7         MS. BRODNEY:   I would now like to direct your

8    attention to what has already been admitted as Exhibit 25.

9    If we could please publish page 1, page 2.   Thank you.

10   BY MS. BRODNEY:

11   Q.   Ms. Kotsay, what is this document?

12   A.   This is an account transcript for the Form 1040 for

13   the -- for the tax year 2016 and the account it's pulling

14   information from is for Ernestine A. and Kenneth J. Trahan.

15   Q.   Can you please explain what is an account transcript?

16   A.   So an account transcript is basically going to pull

17   information from our system.   It's going to list your

18   originally filed return.   It's also going to list any changes

19   that have been made to that tax period or that tax return

20   like amended return or any payments that might have been made

21   or adjustments, like an increase to tax or decrease to tax,

22   credits.   It's basically a history of the account.

23   Q.   And when was this account transcript pulled?

24   A.   At the top right corner you're going to see the

25   request date.   This account transcript was pulled October 4,

1    2022.

2        Q.  So this account transcript is accurate as of

3    October 4, 2022?

4        A.  That's correct.

5        Q.  Based on this transcript, did Judge Trahan owe any

6    taxes on her 2016 return?

7        A.  Yes.

8        Q.  How much did she owe when it was filed?

9        A.  When it was filed?  Looks like $5,557.03.

10       Q.  And did she make payments as of this date, October 4,

11   2022?

12       A.  I'd have to see the lower portion of the transcript.

13   I don't recall from memory.

14       Q.  Scroll down.

15       A.  No, there's no payments made aside from that third

16   line where it reads "Withholding."  That's technically a

17   payment, but that's been withheld from the W-2 from the wage

18   income.

19       Q.  So according to this account transcript, does Ms.

20   Trahan still owe money for the 2016 return?

21       A.  Yes.

22       Q.  Shifting gears a little bit, what are wage and income

23   transcripts?

24       A.  Wage and income transcripts are similarly a history,

25   but they're a history of any income that's been reported to

1   the Internal Revenue Service.

2       Q.  And how does income get reported to the Internal

3   Revenue Service?

4       A.  Different -- like your employee -- your employer

5   would report on a W-2 when you received that W-2.  That

6   information is also sent to the Internal Revenue Service, but

7   it could also be financial institutions.  Like, if you have a

8   mortgage interest payment, it could be banks.  It could be --

9   there's a number of third parties that would submit financial

10  documents to the Internal Revenue Service.

11      Q.  What is a Form 1099-MISC?

12      A.  Form 1099-MISC is used to report other types of

13  income outside of the W-2 income, the wages.

14      Q.  I would like to show you page 2 of Exhibit 32 if that

15  is possible to publish.  Ms. Kotsay, what is this document?

16      A.  This is the document that we were just discussing,

17  the Wage and Income Transcript, for the taxpayer listed here.

18  Well, it's listed by Social Security number in this case, but

19  it's for Ernestine L. Anderson and it's for tax year 2015.

20      Q.  And I would like to direct your attention to page 5.

21  What does this page say?

22      A.  So this is the Form 1099-MISC.  It was submitted by

23  Boykin & Utley.  I apologize if I am mispronouncing that.

24      Q.  So what information did the IRS receive about Judge

25  Trahan receiving payment from Boykin & Utley in 2015?

1          A.   So down towards the bottom of the page it lists

2     attorney's fees in the amount of $9,471.

3              MS. BRODNEY:   And I would request to publish

4     Exhibit 16, which is the 2015 tax return, page 29, next to

5     Exhibit 32, page 5.

6              MS. BETTER:   I'm sorry.   Was it 16?

7              MS. BRODNEY:   2016.

8              MS. BETTER:   And what page?

9              MS. BRODNEY:   I believe it was 29.

10             MS. BETTER:   29.   Thank you.

11             MS. BRODNEY:   Thank you.

12    BY MS. BRODNEY:

13         Q.   Do the gross receipts on this form match the

14    Form 1099 filed with the IRS by Boykin & Utley?

15         A.   Yes.

16         Q.   Did you review the 2014, '15, '16, and '17 Wage and

17    Income Transcripts all included as exhibits previously

18    admitted?

19         A.   Yes, I did.

20         Q.   Did those Wage and Income Transcripts document any

21    other forms 1099-MISC or law firms notify the IRS that they

22    had paid Judge Trahan?

23         A.   No.

24         Q.   Did the Wage and Income Transcripts document any

25    filings with the IRS for wedding income?

**OFFICIAL TRANSCRIPT**

1    **A.**  No.

2    **Q.**  Did the Schedule C we reviewed nonetheless report

3  wedding income?

4    **A.**  Yes.

5        MS. BRODNEY:  No further questions at this time.  I

6  tender the witness.

7        THE COURT:  All right.  Do you want to take a break

8  before we start this?

9        MR. MAGNER:  Yes, please.

10        THE COURT:  Let's take a 10-minute break.  If you

11  need a little bit more time, just let the marshal know.

12        THE CASE MANAGER:  All rise for the jury.

13        (Whereupon, the jury exits the courtroom.)

14        THE COURT:  All right.  Be back about 10:40.

15        Thank you.  Don't discuss your testimony with anyone.

16  You don't have to stay in the box.

17        MR. FLANAGAN:  Did you instruct the witness, Your

18  Honor?  I'm sorry if I missed it.

19        THE COURT:  I just did.

20                    (Recess taken.)

21                    (In open court.)

22        THE COURT:  All right.  Let's bring the jury in.

23        (Whereupon, the jury enters the courtroom.)

24        THE COURT:  All right.  Let's have a seat.  Let me

25  remind you you're still under oath.

1          THE WITNESS:  Yes, ma'am.

2                    CROSS-EXAMINATION

3    BY MR. MAGNER:

4        Q.  Good morning, Ms. Kotsay.

5        A.  Good morning.

6        Q.  Where are you from?  Where are you from?

7        A.  Pennsylvania.

8        Q.  Okay.  And you flew in for the trial?

9        A.  That's correct.

10       Q.  I assume you stayed overnight last night?

11       A.  That's correct.

12       Q.  So do you not work in the same office as the

13   government lawyers here in Washington, DC?

14       A.  No, I do not.

15       Q.  Two different offices?

16       A.  Yes.

17       Q.  Okay.  What is IRS Form 1?

18       A.  Without looking at it, I'm not that familiar with it.

19       Q.  If I were to suggest to you that that's the Taxpayer

20   Bill of Rights, would that jog your memory?

21       A.  Yes.

22       Q.  And are you familiar with that as sort of a

23   cornerstone document and philosophy of IRS?

24       A.  Yes, that's correct.

25       Q.  And one of those rights is that taxpayers have a

1   right to quality service, correct?

2       **A.**   Yes, that's correct.

3       **Q.**   Were you aware that the Government dismissed Count 1

4   relating to 2013 --

5           MS. BRODNEY:   Objection.

6   BY MR. MAGNER:

7       **Q.**   -- just this morning?

8           THE COURT:   I'm sorry?   What was the objection?

9           MS. BRODNEY:   Relevance and 403.

10          THE COURT:   Do you have a response to that?

11          MR. MAGNER:   Yes.   I'm asking if this witness is

12   aware --

13          THE COURT:   I think it's permissible.

14          MR. MAGNER:   Thank you.

15   BY MR. MAGNER:

16      **Q.**   Were you aware that the Government dismissed Count 1

17   just this morning?

18      **A.**   I'm not aware.

19      **Q.**   They didn't tell you that before you hit the stand

20   this morning?

21      **A.**   That's not why I'm here today.

22      **Q.**   But my question is, they didn't tell you before you

23   hit the stand?

24      **A.**   No, sir.

25      **Q.**   All right.   Are you aware that now the tax loss in

1   this case or the claimed tax loss in this case by the

2   Government is about $25,000 or less?

3       A.  I don't know.

4       Q.  Okay.  Your records would not reflect a payment by

5   Ms. Trahan on her taxes of about $20,000 last week?  That

6   hasn't caught up in the system yet?

7       A.  Correct.

8       Q.  Okay.  So that's not shown on the different schedules

9   -- and what schedule would that show up, those payments?

10      A.  The payments would show up on the account

11  transcripts.

12      Q.  All right.  And in fairness, you know, we didn't

13  expect that to be there, but that's not reflected in your

14  records?

15      A.  Correct.

16      Q.  Okay.  Thank you.

17          The Taxpayer Bill of Rights also memorializes the

18  right of the taxpayer to challenge the IRS's position and be

19  heard.  Are you familiar with that?

20      A.  Yes.

21      Q.  But in Ms. Trahan's case, she was never audited by

22  the IRS, was she?

23      A.  That's not something I'm aware of.

24      Q.  Because in reviewing all of those documents, there's

25  no indication whatsoever that she was audited by the IRS,

1   correct?

2       **A.**   Correct.

3       **Q.**   Nor was she liened or levied by the IRS, correct?

4       **A.**   I specifically didn't look for that.

5       **Q.**   Okay.  Did you see it when you reviewed all these

6   documents?

7       **A.**   I don't -- no.  I don't know.

8       **Q.**   So in this case, what the IRS did was go from zero to

9   criminal prosecution without any of those intermediate steps,

10  right?

11      **A.**   I don't know.  I wasn't part of the investigation.

12  I'm just a records -- custodial records keeper.

13      **Q.**   But you did not see any of evidence of an audit, levy

14  or a lien against her?

15      **A.**   Not to my knowledge.

16      **Q.**   And the Taxpayer Bill of Rights also provides for a

17  right to appeal an IRS decision in an independent forum.  Was

18  she given the opportunity to meet with the IRS and discuss

19  her taxes?

20      **A.**   Again, I wasn't part of the investigation, so it

21  wasn't anything that I was looking for.

22      **Q.**   But nothing in the documents that you reviewed?

23      **A.**   I did not --

24      **Q.**   -- showed that?

25      **A.**   Correct.

1     **Q.**  And, finally, the Taxpayer Bill of Rights enshrines a

2  right to a fair and just tax system, right?

3     **A.**  Correct.

4     **Q.**  Do you think it's fair and just to dismiss a whole

5  count of the Government's case on the second day of trial?

6  Do you think that's fair?

7     **A.**  I'm not here for my opinions.

8     **Q.**  Well -- but you're a human being.  You're a taxpayer.

9  You're a citizen of this country.  Do you think that's fair?

10        MS. BRODNEY:  Objection, Your Honor.

11        THE COURT:  Sustained.

12        MR. MAGNER:  I'd like to ask you some additional

13  questions concerning some of the Government's exhibits, and

14  the first one I'd like to turn to, Mr. Washington, is

15  Government Exhibit 19.

16        All right.  If you could blow up -- I'd like to be

17  able to see Line 1 and Line 11.  I think that works.  Thank

18  you.

19  BY MR. MAGNER:

20     **Q.**  So this is from Ms. Trahan's amended 2015 return,

21  correct?

22     **A.**  I didn't take note of the top of the page.

23     **Q.**  Sure.  Maybe pull back a bit so we can see.

24     **A.**  Yes.

25     **Q.**  You see there?

1    **A.**  Yes.

2    **Q.**  The amended return?

3    **A.**  Yes, sir.

4    **Q.**  And when there's an amended return, that's the

5    taxpayer saying I want to change, I want to correct an error

6    in my earlier return, correct?

7    **A.**  Correct.

8    **Q.**  All right.  And here -- and I think you talked about

9    it a little bit with the government lawyer -- she changed her

10   income -- I got a little echo here -- from 137 to 157 by

11   claiming additional income of $20,265, correct?

12   **A.**  Yes, that's correct.

13   **Q.**  And so that resulted in a change in taxes of $5,617,

14   is that correct?

15   **A.**  Yes.

16   **Q.**  That she reported that she did with her tax preparer

17   and submitted that to the IRS, right?

18   **A.**  Yes.

19   **Q.**  Would you imagine that that $5,617 is probably less

20   than your travel expenses, the government lawyer's travel

21   expenses --

22        MS. BRODNEY:  Objection, Your Honor.

23   BY MR. MAGNER:

24   **Q.**  -- staying in a hotel, flying here several times?

25        THE COURT:  What's your objection?

1            MS. BRODNEY:  Relevance and 403.

2            THE COURT:  And what?

3            MS. BRODNEY:  Rule 403.

4            THE COURT:  I'm going to overrule it.

5    BY MR. MAGNER:

6        Q.  I mean, that's a de minimus amount relative to the

7    expenses that the Government has incurred in putting on this

8    case, right?

9        A.  Unfortunately, I'm just here as a fact witness.

10       Q.  Right.  But you answered all the government lawyers

11   questions without any reservations, right?

12       A.  Based on facts.

13       Q.  Okay.  But have you ever seen a prosecution with a

14   claimed tax loss of $25,000 or less?  Have you ever been

15   involved in your six or seven cases that you testified?

16       A.  I don't know.

17       Q.  Well, you testified in six or seven cases.  Did any

18   of those involve a claimed tax loss of $25,000 or less?

19       A.  I couldn't tell you offhand.

20       Q.  Okay.  And I don't mean this to be ugly, but in

21   looking at these tax returns, you're looking at the numbers,

22   correct?

23       A.  I'm more verifying that these are actual IRS records.

24       Q.  Right.  And you haven't made any effort to analyze or

25   look at Ms. Trahan's life circumstances when these returns

1    were filed, have you?

2        A.  No, I'm just a fact witness.  I'm here as a custodian

3    of records.

4            MR. MAGNER:  All right.  So let's move on to

5    Government Exhibit 20, please.  And that may be the same.

6    No, this is different.

7    BY MR. MAGNER:

8        Q.  So this -- this is the amended tax return for 2016,

9    correct?

10       A.  Correct.

11           MR. MAGNER:  All right.  And if we can blow up Lines

12   1 and 11 on this one, please.

13   BY MR. MAGNER:

14       Q.  And so on this return that Ms. Trahan filed with the

15   assistance of her tax preparer, Krystal Ancar, she reported

16   to the IRS an additional $33,000 in income, correct?

17       A.  Correct.

18       Q.  Resulting in an additional tax liability of $10,696,

19   right?

20       A.  Correct.

21       Q.  And if we can pull back on that, can you tell us when

22   that was filed?

23       A.  December 29, 2018.

24       Q.  All right.  And this was part of the IRS's official

25   records in this case?

1       **A.**  Yes.

2           MR. MAGNER:  Please go to Exhibit 21.

3   BY MR. MAGNER:

4       **Q.**  And this is Ms. Trahan's 2017 return?

5       **A.**  Yes.

6           MR. MAGNER:  And maybe blow up the bottom half,

7   Aaron.

8   BY MR. MAGNER:

9       **Q.**  And so there, she reports wages, salaries, and tips

10  of $152,000, correct?

11      **A.**  Correct.

12      **Q.**  Business income of $44,000, true?

13      **A.**  Correct.

14      **Q.**  16, Line 16, 16b, what is that?

15      **A.**  I don't know.

16      **Q.**  Okay.

17      **A.**  It reads pensions and annuities taxable amount.

18      **Q.**  All right.  But that goes into income.  That goes to

19  show her income to the IRS, right?

20      **A.**  Correct.

21      **Q.**  And then an additional $807 in Line 17 and do you

22  know what that is?

23      **A.**  That reads rent, real estate, royalties,

24  partnerships, S-corporations, trust.  It's information pulled

25  from the Schedule E.

1    **Q.**  Right.  And then Line 22 shows her total income of

2  $201,000, correct?

3    **A.**  Correct.

4      MR. MAGNER:  All right.  And what I'd like to do is

5  go to -- no, that's fine.  Thank you.  You can take that

6  down.

7      Let's please go to Government Exhibit 24.  And let's

8  go to the first page.

9  BY MR. MAGNER:

10   **Q.**  This is one of the account transcripts that you spoke

11  of?

12   **A.**  Correct.

13   **Q.**  And in response to the government lawyer questions,

14  you testified you didn't see any evidence of payment other

15  than what was withheld by her employer.  Do you recall those

16  questions?

17   **A.**  Yes.

18      MR. MAGNER:  All right.  Let's go to the next page.

19  And so let's do the top half first, please, Aaron.  Get my

20  little red dots out of there.

21  BY MR. MAGNER:

22   **Q.**  So I think this code, 806, we didn't -- you weren't

23  referred to this particular document, but that's what you

24  referred to there as there's a withholding by the employer of

25  $10,949?

1    **A.**  Yes.

2    **Q.**  So it goes to the IRS, the taxpayer never sees that,

3    but, technically, you don't consider that a payment?

4    **A.**  No.  It's considered a payment, but it's just a

5    little different.

6    **Q.**  Okay.  I think I'm with you.

7         Then there's a credit to the account.  Can you tell

8    us what that is?

9    **A.**  Not without looking at the return.

10   **Q.**  All right.

11   **A.**  That's a generic tax -- transaction code right there.

12   **Q.**  Okay.  It could be some type of tax credit or

13   something like that?

14   **A.**  Correct.

15   **Q.**  And then I notice that they're -- were there

16   penalties for late payment and interest charged for the late

17   payment, correct?

18   **A.**  Yes.

19   **Q.**  And the IRS is going to -- they're going to collect

20   those interest and penalties, correct?

21   **A.**  Yes.  Penalties and interest continue to accrue on

22   the account until the balance is paid in full.

23   **Q.**  Right.  And then we see a reference there to code 971

24   and that references an installment agreement, correct?

25   **A.**  Yes.

1    **Q.**   And Ms. Trahan had installment agreements with the

2    IRS to pay her back taxes, true?

3    **A.**   According to this document, yes.

4    **Q.**   Okay.  And then we see that in June of 2017, which

5    was long before the judiciary commission took any action, she

6    established an installment agreement with the IRS, correct?

7    **A.**   Yes, that's correct.

8        MR. MAGNER:  And now if we can show the bottom half

9    of that document.

10   BY MR. MAGNER:

11   **Q.**   And we see repeated payments in 2017 and 2018 of

12   $450, $361, $500, and then repeated payments of $500, right?

13   **A.**   Yes.

14   **Q.**   And the government lawyer did not point these out to

15   you, did she?

16   **A.**   No.

17       MR. MAGNER:  Please go to Government Exhibit 29.  And

18   we're going to work our way backwards a little bit here.

19   BY MR. MAGNER:

20   **Q.**   So tell us what this document is, Government

21   Exhibit 29 (sic).

22   **A.**   This document was pulled from one of our internal

23   systems, the accounts management system.  This is going to be

24   a history of contact that the taxpayer had with our customer

25   service representatives or somebody else within the IRS.

1    Q.   Right.  And so -- and generally speaking, a taxpayer

2    calls the IRS number, speaks if they're talking to a human

3    being, and there's a record made of those conversations,

4    correct?

5    A.   Yes, that's correct.

6    Q.   And there is a reference there for 3/22/21 of a

7    compliance check done and that shows all required returns are

8    filed, correct?

9    A.   Yes.

10    Q.   And then there's a sentence below that that says TP.

11    That's taxpayer, right?

12    A.   Yes.

13    Q.   "Stated she will continue to pay on her IA."  That's

14    installment agreement?

15    A.   Yes.

16    Q.   "That is active and will submit the paperwork about

17    the OIC department."  What's the OIC department?

18    A.   That's offer and compromise.

19    Q.   So that's a program where a taxpayer can negotiate

20    with the IRS to come up with a plan to satisfy their tax

21    obligations, correct?

22    A.   Essentially, yes.

23    Q.   And that's a sign of good faith on the part of the

24    taxpayer, right?

25    A.   That would be an assumption.  I can't --

1      Q.  But as a human being, citizen, that would be evidence

2   of good faith on the part of the taxpayer, right?

3      A.  I would think so.

4      Q.  It would be distinguished from any kind of willful

5   behavior on her part?  I know you don't want to answer that

6   --

7          MS. BRODNEY:  Objection, Your Honor; outside the

8   scope of what the witness is here to testify about.

9          THE COURT:  I'm going to sustain it, but not for

10  those reasons.

11         MR. MAGNER:  Okay.

12         THE COURT:  The jury will decide what's willful,

13  Counsel.

14  BY MR. MAGNER:

15     Q.  And then we move down to 2018 and we see similar

16  entries there, do we not?  So under the compliance check, it

17  says all required returns filed, right?

18     A.  Yes.

19     Q.  And then it has an expedited IA, which I assume is

20  installment agreement.  What is an expedited installment

21  agreement?

22     A.  It's been a long time since I've been in that

23  department, so I don't quite remember specifically.  There's

24  just different types of installment agreements.

25     Q.  Okay.  And I think it says $50,000 or less, which I

1    guess is self-explanatory.  Does not qualify for mirroring?

2    Can you explain that?

3        A.   Mirroring is when there is a joint return or a joint

4    balance and they would split the balance so that it's

5    reflected on both taxpayer's accounts.

6        Q.   And then it says the agreement is for $500 per month

7    starting on 2/28/18, correct?

8        A.   Correct.

9        Q.   All right.  Let's go to the next page, please.

10   Again, each of these entries is a reflection of the taxpayer

11   contacting the IRS to discuss issues, work out problems, get

12   install agreements, that sort of thing, right?

13       A.   Yes, it's any contact that they've made.

14       Q.   And so then we see for July 17, 2017, we likewise see

15   a compliance check done, all required returns filed, true?

16       A.   Yes.

17       Q.   And we see an agreement, installment agreement, of

18   $450 per month, correct?

19       A.   Yes.

20       Q.   So we're working our way backwards.  So at least at

21   this point, Ms. Trahan agreed to pay $450 a month and then

22   later and I think in '18 it went up to $500 a month, correct?

23       A.   Can you scroll back up?

24       Q.   Sure.  So here in '17, Ms. Trahan entered into

25   agreement to pay $450 a month, right?

1    **A.**  Yes.

2    **Q.**  But on the previous page we saw on 2018 that it had

3    gone up to $500 per month, right?

4    **A.**  I don't recall from memory.  That's why I was asking

5    if you could scroll up.

6    **Q.**  We'll let the jury take a look at that.

7    **A.**  Okay.

8    **Q.**  And a month before, in June of 2016, it states TP,

9    taxpayer, wants installment agreement for $335, 28th.  What

10   does that mean?  Does that mean for the 28th of the month?

11   **A.**  Correct.  Yes.

12   **Q.**  And it goes on to say history installment agreement

13   was recently set up for a higher amount.  So that's again

14   some back and forth between the IRS and the taxpayer, right?

15   **A.**  Not necessarily.  In this case, it appears that

16   something was received, so this wasn't a phone call.

17   **Q.**  Okay.  This is something the IRS is doing on its own?

18   **A.**  No.  It states there that they received a

19   pre-assessed IA or installment agreement exception, so

20   something was sent in and an employee was working the case.

21   So it indicates that because she was already set up on an

22   installment agreement they just closed this case with no

23   action.

24   **Q.**  Okay.  I think I understand.  And if we could please

25   go to Government Exhibit 39.

1           THE CASE MANAGER:  That's not in evidence.

2           MR. MAGNER:  It's not in evidence?  Then I'll move

3    on.

4           One moment, Your Honor.

5           THE COURT:  Uh-huh.

6           MR. MAGNER:  No further questions, I tender the

7    witness, Your Honor.

8           THE COURT:  Any redirect?

9           MS. BRODNEY:  One moment, Your Honor.

10          THE COURT:  Sure.

11                     REDIRECT EXAMINATION

12   BY MS. BRODNEY:

13      Q.  Hello, Ms. Kotsay.

14      A.  Hello.

15      Q.  In reviewing the 2017 return and the amended 2016 and

16   amended 2015 returns, were they all filed after July 12,

17   2018?

18      A.  Can we bring up the document?  I don't remember.

19      Q.  Yes, of course.

20          MS. BRODNEY:  Can we pull up the 2017 transcript.

21   Should be Exhibit 26 I believe, page 2.

22   BY MS. BRODNEY:

23      Q.  So this is the 2017 transcript?

24      A.  Yeah.

25      Q.  And when was this received?  When was the return

1   received?

2        **A.**   October 15, 2018.

3            MS. BRODNEY:   And can we pull up Exhibit 25, 25 or

4   24.  Apologies.  Can we pull up Exhibit 18 at page 3.

5   BY MS. BRODNEY:

6        **Q.**   What is this document?

7        **A.**   This is the Form 1040 U.S. Individual Income Tax

8   Return for 2015.

9            MS. BRODNEY:   We're looking for the amended return.

10  Thank you.

11  BY MS. BRODNEY:

12       **Q.**   What is this document?

13       **A.**   This is the Amended 1040X Amended U.S. Individual

14  Income Tax Return for 2015.

15           MS. BRODNEY:   And can we move to the signature page

16  or the received date.  That's fine.

17  BY MS. BRODNEY:

18       **Q.**   Was this document received by the IRS after July 12,

19  2018?

20       **A.**   Yes.

21           MS. BRODNEY:   And now can we move to the amended 2016

22  return.

23  BY MS. BRODNEY:

24       **Q.**   Is this the amended 2016 return?

25       **A.**   Yes, it is.

1   **Q.**   And when was this document received by the IRS?

2   **A.**   December 29, 2018.

3   **Q.**   I would like to go back and discuss for a moment the

4   ACS history that Mr. Magner showed you, which I believe is

5   Exhibit 28.  Looking at the portion of the page on page 6,

6   turning to page 6, middle of the page, that begins 2016,

7   December 12th, right there, can you tell us essentially --

8        MR. MAGNER:  I'm sorry, Counsel.  I think you said

9   28.  But I believe it's 29.  Am I correct?

10       MS. BRODNEY:  The exhibit?

11       MR. FLANAGAN:  28.

12       MS. BRODNEY:  I have 28.

13       MR. MAGNER:  Okay.  My apologies.

14  BY MS. BRODNEY:

15  **Q.**   Actually what does this section say?

16  **A.**   The taxpayer called in and the employee who took the

17  call did -- there's a checklist that we work from and so they

18  were doing a compliance check to determine if this taxpayer

19  was eligible for an installment agreement.  In order to be

20  eligible for an installment agreement, you have to be

21  compliant with the Internal Revenue Service in terms of

22  filing.  So this indicates that they advised the taxpayer

23  that she was missing 2012 and 2013 returns.  In order for her

24  to be on an installment agreement, she's required to become

25  compliant, so she needed to file those returns.  The employee

1    made an indication on the account.  That's what the TDI

2    created means.  It's that tax delinquency and that they

3    advised that she would be receiving a notice requesting the

4    returns.

5         They sent her the Form 9465.  That's the form for the

6    installment agreement request.  They advised her to submit

7    that with her return.  And then the WOEA, that means Warning

8    of Enforcement Action.  They advised her that if she didn't

9    fulfill this request or file these returns and get on an

10   installment agreement, that she could be levied or liens

11   filed against her.

12   BY MS. BRODNEY:

13   Q.  So a few clarifying question, does this section

14   indicate that the IRS was in conversation with Ms. Trahan

15   about these topics?

16   A.  Yes.

17   Q.  And the IRS advised her -- provided her with a

18   warning in this context?

19   A.  Yes.

20   Q.  And the IRS was working with her to tell her what she

21   needed to do in order to get on a payment plan?

22   A.  Yes.

23   Q.  Did the IRS provide her with an extension of time in

24   order to file her 2012 and 2013 returns for this purpose?

25   A.  In this specific note, it indicates that they gave

1   until January 15, 2017, to file the missing returns.

2       Q.   And you have reviewed this document, correct?

3       A.   Yes.

4       Q.   Did the IRS further extend that deadline in other

5   instances?

6       A.   Yes.  I believe just above this note, there's another

7   note she had called in requesting an extension to file.

8       Q.   I'd like to direct your attention to the 2014

9   transcript, which I believe is Exhibit 23.  And to clarify,

10  when we discussed a transcript earlier and we discussed

11  withholdings, we were discussing the 2015 transcript,

12  correct?

13      A.   Yes.

14      Q.   And Mr. Magner discussed with you the 2014

15  transcript?

16      A.   Yes.

17      Q.   Looking at the second page of this 2014 transcript,

18  this transcript, does it show payments on an installment

19  plan?

20      A.   Yes, it does.

21      Q.   Does that indicate that the IRS was accepting

22  payments from Judge Trahan and working with her on her tax

23  debt?

24      A.   Yes.

25      Q.   I'd like to direct your attention to Exhibit 24, the

1    2015 transcript.  And recognizing, again, when is this

2    transcript accurate as of?

3        A.  October 4, 2022.

4        Q.  Because that's when this was pulled?

5        A.  Correct.

6        Q.  Looking at page 2 of this account transcript, when

7    did payments start?

8        A.  The first transaction code indicating a payment, it's

9    the 670 transaction code and it's October 29, 2018.

10       Q.  Is that after July 12, 2018?

11       A.  Yes.

12       Q.  I'd like to direct your attention to the 2016

13   transcript, which is Exhibit 25, page 3.  And, actually, I

14   apologize.  Can we go back one page to identify this

15   document?  What is this document?

16       A.  This is the account transcript for the Form 1040 tax

17   period 2016.

18       Q.  And now returning to page 3, was an installment

19   agreement established for 2016?

20       A.  No.

21       Q.  Direct your attention to the bottom of the page.  Is

22   there an indication that an installment agreement was

23   established?

24       A.  No, it's a pending installment agreement.  That

25   doesn't mean that the installment agreement was established.

1      Q.  A few lines below that?

2      A.  I apologize, yes.

3      Q.  Were there any payments made towards this installment

4  agreement as of the date of this transcript?

5      A.  No, there were not.

6          MS. BRODNEY:  I tender the witness.

7          THE COURT:  All right.

8          MR. MAGNER:  Can I do some brief cross on what was

9  covered on redirect?

10         THE COURT:  Approach the bench.

11         Oh, you're not going to call her back, right?  I'll

12  allow it.  I'll allow it.

13         MR. MAGNER:  Thank you.

14         I'd like to go back to that same ACS document, which

15  we have as Government Exhibit 29.  And that's how we pulled

16  it up.

17         THE COURT:  Okay.

18         MR. MAGNER:  And we'll sort that out --

19         THE COURT:  Defense Exhibit 29 --

20         MR. MAGNER:  -- on the break --

21         THE COURT:  Government Exhibit something else, right?

22                      RECROSS-EXAMINATION

23  BY MR. MAGNER:

24     Q.  So as I understand your testimony, Ms. Kotsay, that

25  -- let me see if I can find it.

1           MR. MAGNER:  Could we please go back to -- I think

2       it's Bates No. 42374.

3       BY MR. MAGNER:

4           Q.  And what you told us is that Ms. Trahan had a

5       conversation with somebody at the IRS and it was discovered

6       at that time that the 2013 and 2012 returns had not been

7       filed.

8           A.  Yes.

9           Q.  Okay.  Now, these documents don't reflect that Ms.

10      Trahan believed that her tax preparer had filed the returns

11      and the tax preparer believed that she had filed the tax

12      returns --

13          MS. BRODNEY:  Objection.

14      BY MR. MAGNER:

15          Q.  -- and that there was a screw up --

16          THE COURT:  Hold up.

17          MS. BRODNEY:  Lack of --

18          THE COURT:  Sustained.

19          MR. MAGNER:  That's what I'm trying to establish.

20      BY MR. MAGNER:

21          Q.  That's what I'm trying to establish, they don't

22      reflect the conversations between Ms. Trahan and her tax

23      preparer, Ms. Ancar, correct?

24          A.  Correct.  Yes.

25          Q.  But what they do reflect is that after that contact

1    with the IRS Ms. Trahan then became compliant and those

2    returns were filed, correct?

3         **A.**   Correct.

4              MR. MAGNER:  Thank you.  No further questions.

5              THE COURT:  All right.  We can dismiss her?

6              Thank you.  Don't discuss your testimony with anyone,

7    but you're free to go.

8              Next witness?

9              MR. FLANAGAN:  Your Honor, we have documentary

10   evidence to present without calling a live witness.

11             THE COURT:  Okay.

12             MR. FLANAGAN:  And if I can confer with counsel about

13   these exhibits because it does appear our numbers are off.

14             THE COURT:  Okay.

15             MR. FLANAGAN:  Thank you, Your Honor.

16             At this time, the Government moves to admit

17   Exhibits 35, 36, 37, 38, and 39 into evidence.  They're

18   documents from the judiciary commission.

19             THE COURT:  Any objection from --

20             MR. MAGNER:  No objection, Your Honor.

21             THE COURT:  All right.  Documents are accepted into

22   evidence.

23        (Whereupon, Exhibits 35-39 are admitted into evidence.)

24             MR. FLANAGAN:  One moment, Your Honor.

25             THE CASE MANAGER:  Counsel, did you say 39 also?

1          MR. FLANAGAN:  Yes, we did.  Thank you.  Providing 39

2     to the court.

3          THE COURT:  All right.  Accepted into evidence.

4          MR. FLANAGAN:  Next, we're going to move bank records

5     into evidence, excuse me, business records without calling a

6     live witness.

7          I appreciate the Court's indulgence.  At this time,

8     we move into evidence Government Exhibits 40, 41, 42, 43, 44.

9          THE COURT:  I'm going to ask the lawyers to make

10    sure.  The Court issued a sequestration order, so make sure

11    you don't have any witnesses in the audience.

12          MR. FLANAGAN:  I'm providing the Court with 40,

13    provided to Defense, but any objection?

14          MR. MAGNER:  What's 40?

15          MR. WICKER:  It's the --

16          MR. MAGNER:  No objection.

17          MR. FLANAGAN:  41, showing a copy to the Defense.

18          MR. MAGNER:  No objection, Your Honor.

19          THE COURT:  It's accepted into the record.

20     (Whereupon, Government Exhibits 40 and 41 are admitted into

21                            evidence.)

22          MR. FLANAGAN:  Showing counsel 42.

23          MR. MAGNER:  No objection.

24          THE COURT:  All right.

25          MR. FLANAGAN:  Providing a copy to the Court.

1          THE COURT:  It's accepted into evidence.

2 (Whereupon, Government Exhibit 42 is admitted into evidence.)

3          MR. FLANAGAN:  Showing 43 to Defense.

4          MR. MAGNER:  No objection.

5          MR. FLANAGAN:  Providing a copy to the Court.

6          THE COURT:  All right.  It's accepted into evidence.

7 (Whereupon, Government Exhibit 43 is admitted into evidence.)

8          MR. MAGNER:  No objection.

9          MR. FLANAGAN:  Providing a copy of 44 to the court.

10          Government moves to admit -- excuse me, Government

11 moves to admit Government Exhibit 45.

12          THE COURT:  Motion granted.  It's accepted into

13 evidence.  Hearing no objection from Defense.

14          MR. MAGNER:  No objection, Your Honor.

15 (Whereupon, Government Exhibit 45 is admitted into evidence.)

16          MR. FLANAGAN:  Government moves to admit Government

17 Exhibit 46.

18          MR. MAGNER:  No objection, Your Honor.

19          THE COURT:  All right.  It's accepted into evidence.

20 We had a 45?

21 (Whereupon, Government Exhibit 46 is admitted into evidence.)

22          THE CASE MANAGER:  Yes.

23          THE COURT:  I just missed that one.

24          MR. FLANAGAN:  Government moves to admit Government

25 Exhibit 47.

```
 1          THE COURT:  All right.  No objection from the
 2   defense?
 3          MR. MAGNER:  No objection, Your Honor.
 4          THE COURT:  Motion granted.  It's accepted into
 5   evidence.
 6   (Whereupon, Government Exhibit 47 is admitted into evidence.)
 7          MR. FLANAGAN:  The Government calls Ms. Krystal
 8   Ancar.
 9          THE COURT:  All right.  Sit up here, Ms. Ancar.
10          THE CASE MANAGER:  Good morning.  Can you please
11   raise your right hand?
12                 (Witness administered oath.)
13          THE WITNESS:  Yes, ma'am.
14          THE CASE MANAGER:  Please have a seat.  Please speak
15   directly into the microphone.
16          State and spell your name for the record.
17          THE WITNESS:  Krystal Ancar, K-r-y-s-t-a-l,
18   A-n-c-a-r.
19                      KRYSTAL ANCAR,
20   Being called as a witness, being first duly sworn, examined
21   and testifies as follows:
22                    DIRECT EXAMINATION
23   BY MR. FLANAGAN:
24     Q.  Good morning, Ms. Ancar.
25     A.  Good morning.
```

**OFFICIAL TRANSCRIPT**

1   Q.   Would you tell the jury what you do for a living?

2   A.   I am a tax preparer in tax representation.

3   Q.   And how long have you been a tax preparer?

4   A.   Since 2000.

5   Q.   How many returns do you prepare in a given year?

6   A.   Upward of 500.

7   Q.   Do you own your own business?

8   A.   Yes, sir, I do.

9   Q.   What's the name of that business?

10  A.   Ancar Accounting and Tax Services.

11  Q.   How long have you had that business?

12  A.   Since 2000.

13  Q.   Are you a CPA?

14  A.   No, sir, I am not.

15  Q.   What's a CPA?

16  A.   A certified public accountant.

17  Q.   And so you don't have the certification.  Is that the

18  difference?

19  A.   Correct.  I'm an enrolled agent.

20  Q.   But understanding that you're not a certified public

21  accountant, you still perform tax preparation services,

22  right?

23  A.   Correct.

24  Q.   So would you explain to the jury what you do as a tax

25  preparer?

1   **A.**   I receive information from clients.  I take the

2   information they have and I prepare the return based upon

3   that information.

4   **Q.**   Do you audit your clients?

5   **A.**   No, sir, I do not.

6   **Q.**   What does that mean?

7   **A.**   That would mean going through their documentation

8   that they have to verify their numbers are correct.  I don't

9   go through bank statements.  I take what they give me and I

10   prepare the return.

11   **Q.**   What, if anything, do you tell your clients about

12   that policy?

13   **A.**   That they're responsible to have the documentation to

14   prove the numbers that we're using based upon completing the

15   return.

16   **Q.**   Do you know Judge Ernestine Anderson-Trahan?

17   **A.**   Yes, sir, I do.

18   **Q.**   How do you know her?

19   **A.**   I met her in 2006 to do my mother's succession.  One

20   of my clients referred me to her.

21   **Q.**   And so just to be clear, you were -- you were

22   Attorney Trahan's client?

23   **A.**   Correct.

24   **Q.**   Did she ever become your Ancar tax preparation

25   services' client?

1    **A.**  Yes, sir, she did.

2    **Q.**  When was that?

3    **A.**  A few years after I met her.  I'm sorry.  I don't

4    remember the exact date.

5    **Q.**  Did you prepare financial information for her when

6    she was at a law firm?

7    **A.**  Yes, I prepared the return.

8    **Q.**  So you started doing some type of tax prep services

9    before she took the bench.  Is that safe to say?

10   **A.**  Yes.

11   **Q.**  Did you prepare financial information for her

12   campaign?

13   **A.**  I completed the state compliance, yes.

14   **Q.**  What does that mean?

15   **A.**  I was in charge of tracking all of the deposits and

16   all of the expenditures that was going through the campaign

17   account.

18   **Q.**  How would you describe your relationship with Judge

19   Trahan?

20   **A.**  We're associates.

21   **Q.**  What do you mean by associates?

22   **A.**  I've known her since she started my succession.  I

23   was closer to her after my mother passed, which is the reason

24   why I met her, and then as time went on, we've talked but --

25   we've talked.

1     **Q.**  Would you get together for lunch?

2     **A.**  Yes.

3     **Q.**  With this history, did you give Judge Trahan any

4 special treatment preparing her tax returns?

5     **A.**  No, sir, I did not.

6     **Q.**  Did you treat her differently from any of your

7 clients?

8     **A.**  No, sir, I did not.

9     **Q.**  So how so?

10    **A.**  I would do the same thing for every client.  If you

11 don't have any information, I'll ask you.  I'll try to go

12 over your return, tell you what we have, what we've used

13 before, and allow you time to get it.

14    **Q.**  Before we get into the tax returns you prepared for

15 Judge Trahan, let's talk about your business a little more

16 generally.  Do you keep records as part of your business?

17    **A.**  I do.

18    **Q.**  Where do you keep those records?

19    **A.**  In an electronic file.

20    **Q.**  And you said earlier that you run Ancar Accounting &

21 Tax Services?

22    **A.**  Yes, sir.

23    **Q.**  Are you the only employee there?

24    **A.**  Yes, sir.  I do have a seasonal employee, just

25 seasonal.

1    Q.   Seasonal being tax season, January to April?

2    A.   Correct.

3    Q.   But is it safe to say you're responsible for keeping

4    the records at Ancar?

5    A.   Yes, sir.

6    Q.   So how does the process work to prepare Judge -- and

7    did you prepare Judge Trahan's 2014, 2015, and 2016 tax

8    returns?

9    A.   Yes, sir.

10   Q.   How did the process work to prepare Judge Trahan's

11   tax returns?

12   A.   A client will come in, provide their source

13   documents.  I use those source documents to complete the

14   return.  We may have some verbiage in between, just

15   conversation to make sure that we're capturing all the

16   information for the return.

17   Q.   You said a client, but, again, you didn't treat Judge

18   Trahan differently.  So did you meet with Judge Trahan the

19   same way?

20   A.   Yes.

21   Q.   Is she doing joint returns with her husband?

22   A.   Yes, sir.

23   Q.   So who would come in to meet with you?

24   A.   Mainly Judge Trahan.  However, I would talk to her

25   husband.

1       Q.   When Judge Trahan came in, what did you ask her?

2       A.   If this was all of her source documents, if she's

3   providing me her income and all of her expenses.

4       Q.   Did you ask for all of her income?

5       A.   Yes, sir.  I can't say every time I said

6   specifically all of your income, but the verbiage in the

7   conversation was can you provide me your income that you've

8   received for the year.

9       Q.   What, if anything, did you explain about the need to

10  report all of your income?

11      A.   We would just go over the factor of if we've captured

12  everything, all of the W-2's she may have, any interest

13  income from banks, interest income from mortgage statements,

14  any other income that you may have that you've done.

15      Q.   Did you explain that you were not auditing her?

16      A.   Not in 100 percent of those words, but I've never

17  asked for bank statements.

18      Q.   What would you do if Judge Trahan didn't have

19  documents when you were meeting with her?

20      A.   Write a note, write something down on paper, or she

21  would write it down and ask her, "Can you go get this

22  information?"

23      Q.   And with the documentation she did provide to you,

24  what did you do with that information?

25      A.   I would use that to prepare the return.

1    **Q.**  Did you report anything that didn't come from Judge

2  Trahan?

3    **A.**  No, sir.

4    **Q.**  Did you change any of the numbers that she gave you?

5    **A.**  No, sir.

6    **Q.**  Did she actually come in and have a conversation with

7  you so that you could prepare her return?

8    **A.**  Yes, sir.

9    **Q.**  What happened after you prepared a return?

10   **A.**  If we were complete, I would complete the returns,

11 make sure they were signed and submit the return.

12   **Q.**  Also, did you give the returns to her?

13   **A.**  Yes.

14   **Q.**  Did you sign them for her?

15   **A.**  No.

16   **Q.**  Well, who signed them?

17   **A.**  The taxpayer.

18   **Q.**  Did you file them for her?

19   **A.**  Electronically, yes.

20   **Q.**  So for electronic returns, did you tell her when you

21 were going to file them?

22   **A.**  After she signs, I have 72 hours to file it.  So

23 pretty much after someone leaves, I file their returns.

24   **Q.**  What about paper returns?  Did you file paper returns

25 for her?

1      **A.**   They have to be mailed in.

2      **Q.**   So if she had to sign a paper return, what was that

3  process?

4      **A.**   You provide a copy of the paper return, give it to

5  the client.  They sign it and then it's mailed in.

6      **Q.**   Who would mail it in?

7      **A.**   Typically the client.

8          MR. FLANAGAN:  If I could have a moment.

9          I'm showing you just the reference -- just the

10  witness -- Internal Reference No. 55.

11  BY MR. FLANAGAN:

12      **Q.**   Do you recognize this document?

13      **A.**   Yes.

14      **Q.**   What is this document?

15      **A.**   It's a cover sheet that I provided with the tax year

16  2016.

17      **Q.**   And if we could click through it, you identified the

18  first page as a cover sheet, but what are the following

19  pages?

20      **A.**   The actual tax return.

21      **Q.**   Does that include the papers from the tax preparation

22  process?

23      **A.**   She's still clicking.

24          MR. FLANAGAN:  And with the Court's indulgence, I can

25  also provide the witness with a hard copy as long as she

1    doesn't flip past any other exhibits.

2          THE COURT:  Is everything in that binder?

3          MR. FLANAGAN:  That's the thing.  I can give her just

4    this one.

5          THE COURT:  Yeah, why don't you do that.

6          MR. FLANAGAN:  Providing a copy to the witness.  I'll

7    make sure opposing counsel knows what I'm showing.

8          MR. MAGNER:  Okay.

9          MR. FLANAGAN:  Providing a copy to the witness.

10          THE WITNESS:  It's the return and all supporting

11    documents.

12          MR. FLANAGAN:  At this time, the Government moves to

13    admit that document as Government Exhibit 48.

14          THE COURT:  Any objection?

15          MR. MAGNER:  No objection, Your Honor.

16          THE COURT:  All right.  It's admitted into evidence.

17    (Whereupon, Government Exhibit 48 is admitted into evidence.)

18          MR. FLANAGAN:  Retrieving the exhibit from the

19    witness and marking it for the court.

20          Publishing the next exhibit in line to the witness.

21          MR. MAGNER:  This is 15?  It's your 56?

22          MR. FLANAGAN:  Well, it's going to be 49.

23          And may I approach the witness?

24          THE COURT:  Uh-huh.  Yes, you may.

25    BY MR. FLANAGAN:

1    **Q.**   Do you recognize what I just handed you?

2    **A.**   Yes, sir.

3    **Q.**   What is it?

4    **A.**   Tax year 2015.

5    **Q.**   What about tax year 2015?

6    **A.**   A copy of the return and all of the supporting

7    documents.

8    **Q.**   For Judge Trahan?

9    **A.**   Yes.

10   **Q.**   Were these records from your office that you

11   provided?

12   **A.**   Yes.

13        MR. FLANAGAN:  Retrieving the exhibit from the

14   witness.

15        Government moves to admit this exhibit as Government

16   Exhibit 49.

17        MR. MAGNER:  No objection, Your Honor.

18        THE COURT:  All right.  It's accepted into evidence.

19   (Whereupon, Government Exhibit 49 is admitted into evidence.)

20        MR. FLANAGAN:  Providing a copy to the court, the

21   original to the court.  Excuse me.

22             (Discussion among counsel.)

23        MR. FLANAGAN:  Showing the witness Internal Reference

24   No. 57.

25   BY MR. FLANAGAN:

1    Q.   Do you recognize these documents?

2    A.   Yes, sir.  It's 2014, tax return 2014.

3    Q.   Did you give -- did you produce records as part of

4    this investigation?

5    A.   I provided records to you, yes, sir.

6    Q.   And was 2013 and 2014 in one cover sheet?

7    A.   (Nods head.)

8    Q.   All right.  Do those look to be year 2014 records?

9    A.   Yes.

10        MR. FLANAGAN:  Government moves to admit Government

11   Exhibit 50.

12        MR. MAGNER:  No objection.

13        THE COURT:  All right.  Motion granted.  It's

14   accepted into evidence.

15   (Whereupon, Government Exhibit 50 is admitted into evidence.)

16        MR. FLANAGAN:  Marking and providing to the court.

17        Showing the witness Internal Reference No. 58.

18        MR. MAGNER:  Okay.

19   BY MR. FLANAGAN:

20   Q.   Do you recognize 58?

21   A.   Yes, sir.

22   Q.   Excuse me.  Do you recognize what I just handed you?

23   A.   Yes, sir.

24   Q.   What do those appear to be?

25   A.   2013 amended returns.

1      Q.  Do those appear to be your records from amending

2  Judge Trahan's 2013 return?

3      A.  Yes.

4          MR. FLANAGAN:  Government moves to admit as

5  Exhibit 51.

6          MR. MAGNER:  No objection.

7          THE COURT:  All right.  Motion granted.  It's

8  admitted into evidence.

9  (Whereupon, Government Exhibit 51 is admitted into evidence.)

10         MR. FLANAGAN:  Retrieving from the witness, marking

11  and providing to the Court.

12         Permission to show the witness what's been marked

13  Internal Reference 59?

14         THE COURT:  You can approach.

15  BY MR. FLANAGAN:

16     Q.  Do you recognize what I just handed you?

17     A.  Yes, sir.

18     Q.  What is this?

19     A.  Tax year 2017.

20     Q.  Are those your work papers for 2017?

21     A.  Yes.

22     Q.  Excuse me.  Your records from preparing Judge

23  Trahan's 2017 tax return?

24     A.  Yes.

25         MR. FLANAGAN:  Government moves to admit as

1   Government Exhibit 52.

2         THE COURT:  Any objection?

3         MR. MAGNER:  No objection, Your Honor.

4         THE COURT:  Motion granted.  The exhibit is accepted

5   into evidence.

6   (Whereupon, Government Exhibit 52 is admitted into evidence.)

7         MR. FLANAGAN:  Retrieving from the witness, marking,

8   and providing to the Court.

9         THE COURT:  Thank you.

10        MR. FLANAGAN:  Permission to show the witness

11  Internal Reference 60.

12        THE COURT:  You may approach.

13        MR. FLANAGAN:  Thank you, Your Honor.

14  BY MR. FLANAGAN:

15     Q.  Ms. Ancar, do you recognize that document?

16     A.  Yes.

17     Q.  What is that?

18     A.  Tax year 2012.

19     Q.  Are those records of the tax preparation of Judge

20  Trahan and Kenneth Trahan's 2012 tax return?

21     A.  Yes.

22        MR. FLANAGAN:  Government moves to admit as

23  Government Exhibit 53.

24        THE COURT:  Any objection?

25        MR. MAGNER:  No objection.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  All right.  Motion granted.  The exhibit

2    is accepted into evidence.

3    (Whereupon, Government Exhibit 53 is admitted into evidence.)

4          MR. FLANAGAN:  Retrieving from the witness, marking,

5    providing to the Court.

6    BY MR. FLANAGAN:

7      Q.  So these records that we just went through, there's

8    sometimes hundreds of pages, correct?

9      A.  Correct.

10     Q.  So with that, let's break down a little bit of how

11   you actually go through the process of preparing Judge

12   Trahan's tax returns.  Do you provide your clients with a

13   client engagement letter?

14     A.  I do.

15     Q.  What is a client engagement letter?

16     A.  It discusses the engagement that we're going to have.

17     Q.  What does it tell the client?

18     A.  It tells the client that I will retrieve their

19   documents and I'm going to do the return based upon the

20   documents provided and that I do not audit the client.

21     Q.  Showing the witness internal reference 61.  Just the

22   witness.  What is this document?

23     A.  Engagement letter for 2012.

24     Q.  Who is it addressed to?

25     A.  Ernestine L. Anderson-Trahan and Kenneth J. Trahan.

1    Q.   When do you provide this to the client?

2    A.   Once the return is printed out, it comes out in a

3    package.

4    Q.   It's an automatic process?

5    A.   It's an automatic thing within my software, yes.

6         MR. FLANAGAN:   Government moves to admit this exhibit

7    as Government Exhibit 54.

8         THE COURT:   Any objection?

9         MR. MAGNER:   No objection, Your Honor.

10        MR. FLANAGAN:   So it's been accepted by the Court,

11   provided to the Court, Exhibit 54.

12   (Whereupon, Government Exhibit 54 is admitted into evidence.)

13        And permission to publish?

14        THE COURT:   Yes.   Yes.

15   BY MR. FLANAGAN:

16   Q.   Would you please read the second paragraph, second

17   full paragraph, starting with "We will prepare"?

18   A.   "We will prepare your 2012 individual and/or business

19   federal and state income tax return in accordance with the

20   appropriate tax laws and regulations.   We will depend on you

21   to provide the information we need to prepare -- prepare

22   complete and accurate returns.   We may ask you to clarify

23   some items but will not audit or otherwise verify the data

24   you submit."

25   Q.   Would you please read the fifth paragraph starting

1    with "Should we."

2      A.   "Should we encounter instances of undeclared tax law

3    or potential conflicts in the interpretation of the law, we

4    will outline the reasonable causes -- the reasonable courses

5    of action and the risks and consequences of each.  We will

6    ultimately adopt on your behalf the alternative you select."

7          Moving to the next page, would you please read the

8    fourth paragraph, starting with "Our engagement to prepare"?

9      A.   "Our engagement to prepare your 2012 tax return will

10   conclude with the delivery of completed return to you (if

11   paper filing) or your signing and the sequential submittal of

12   your tax return (if e-filing).  If you have not selected to

13   e-file your returns with our office, you will be solely

14   responsible to file the return with the appropriate taxing

15   agent.  Please review your returns carefully before signing

16   and filing them."

17     Q.   Did you give this letter to Judge Trahan when

18   preparing her 2012 tax return?

19     A.   It would have been once it was prepared and printed,

20   yes.

21     Q.   Did you give her similar letters when preparing her

22   '13, '14, '15, and '16 tax returns?

23     A.   Yes.

24     Q.   I'm showing you Exhibit 62, oh, excuse me, Internal

25   Reference 62.  Do you recognize this document?

1      **A.**   Yes.

2      **Q.**   What is it?

3      **A.**   Engagement letter for 2013.

4      **Q.**   Who is it addressed to?

5      **A.**   Ernestine L. and Kenneth J. Trahan.

6           MR. FLANAGAN:  Government moves to admit this exhibit

7    as Government Exhibit 55.

8           THE COURT:  Any objection?

9           MR. MAGNER:  No objection.

10          THE COURT:  All right.  It's accepted into evidence.

11   (Whereupon, Government Exhibit 55 is admitted into evidence.)

12          MR. FLANAGAN:  Providing a copy to the Court --

13   excuse me.  The original, Your Honor.  And permission to

14   publish.

15          THE COURT:  Permission to publish granted.

16   BY MR. FLANAGAN:

17     **Q.**   So would you just tell the jury what this document

18   is.

19     **A.**   It's an engagement letter for tax year 2013.

20     **Q.**   Does it again explain to the client that you're going

21   to prepare their return based off of what they give you?

22     **A.**   Yes, sir.

23     **Q.**   Removing the exhibit, showing to the witness Internal

24   Reference 63.  Do you recognize -- excuse me.  Do you

25   recognize Exhibit 63?

1      A.   Yes.

2      Q.   Excuse me.  Do you recognize Internal Reference No.

3   63?

4      A.   Yes.

5      Q.   And what is it?

6      A.   It's an engagement letter for tax year 2014.

7      Q.   Who is it addressed to?

8      A.   Ernestine A. and Kenneth J. Trahan.

9           MR. FLANAGAN:  Government moves to admit as

10   Government Exhibit 64 -- excuse me, 57 -- 56, Your Honor.

11   56.

12           MR. MAGNER:  No objection.

13           THE COURT:  All right.  Motion granted.  It's

14   accepted into evidence.

15   (Whereupon, Government Exhibit 56 is admitted into evidence.)

16   BY MR. FLANAGAN:

17      Q.   So how did you make these?

18           MR. FLANAGAN:  Permission to publish?

19           THE COURT:  Permission granted.

20   BY MR. FLANAGAN:

21      Q.   So how did you make these letters?

22      A.   They come from my tax program.

23      Q.   So what does that mean?

24      A.   I purchase a tax software program that --

25      Q.   So what happens when you hit print on a tax return?

1     **A.**   It prints out the entire copy of the return, all of

2  the schedules, any kind of supporting worksheets, my

3  engagement letters.

4     **Q.**   So the engagement letters we just saw, it comes out

5  when you hit print?

6     **A.**   Yes.

7     **Q.**   Is that a new part of the program?

8     **A.**   No.

9     **Q.**   That's been in place since 2012?

10    **A.**   Yes.

11          MR. FLANAGAN:  Can I have a moment?

12          If we can show the witness internal reference 64.

13  BY MR. FLANAGAN:

14    **Q.**   Do you recognize this document?

15    **A.**   Yes.

16    **Q.**   What is this?

17    **A.**   It's Form 1040 for 2016.

18    **Q.**   Is this from your copy of the Form 1040?

19    **A.**   Yes.

20          MR. FLANAGAN:  Government moves to admit as

21  Government Exhibit 57.

22          MR. MAGNER:  No objection.

23          THE COURT:  All right.  Motion granted.  Document is

24  accepted into evidence.

25  (Whereupon, Government Exhibit 57 is admitted into evidence.)

1  BY MR. FLANAGAN:

2      Q.  Showing the witness Internal Reference 65, what is

3  this document?

4      A.  Form 1040, 2015.

5      Q.  From your records?

6      A.  Yes.

7          MR. FLANAGAN:  Government moves to admit as

8  Government Exhibit 58.

9          MR. MAGNER:  No objection.

10         THE COURT:  All right.  Motion granted, it's accepted

11 into evidence.

12 (Whereupon, Government Exhibit 58 is admitted into evidence.)

13 BY MR. FLANAGAN:

14     Q.  Showing the witness Internal Reference 66, do you

15 recognize this?

16     A.  Yes, Form 1040 for 2012.

17     Q.  From your records?

18     A.  Yes.

19         MR. FLANAGAN:  Government moves to admit as

20 Government Exhibit 59.

21         MR. MAGNER:  No objection.

22         THE COURT:  Motion granted.  The document is accepted

23 into evidence.

24 (Whereupon, Government Exhibit 59 is admitted into evidence.)

25 BY MR. FLANAGAN:

1    **Q.**  Showing the witness Internal Reference 67.  Do you

2  recognize this document?

3    **A.**  Yes.

4    **Q.**  What is it?

5    **A.**  Form 1040X for 2016.

6        MR. FLANAGAN:  Government moves to admit as

7  Exhibit 60.

8        MR. MAGNER:  No objection.

9        THE COURT:  Motion granted.  It's accepted into

10  evidence.

11  (Whereupon, Government Exhibit 60 is admitted into evidence.)

12  BY MR. FLANAGAN:

13    **Q.**  Showing the witness Internal Reference 68, what is

14  this?

15    **A.**  Form 1040X, 2015.

16    **Q.**  From your records?

17    **A.**  Yes.

18        MR. FLANAGAN:  Government moves to admit Exhibit 61.

19        MR. MAGNER:  No objection.

20        THE COURT:  Motion granted.  Document is accepted

21  into evidence.  It's accepted into evidence.

22  (Whereupon, Government Exhibit 61 is admitted into evidence.)

23  BY MR. FLANAGAN:

24    **Q.**  Showing the witness Internal Reference 69, what's

25  Exhibit 69?

1     **A.**  Form 1040X, 2014.

2     **Q.**  From your records?

3     **A.**  Yes.

4     **Q.**  For Judge Trahan?

5     **A.**  Yes.

6          MR. FLANAGAN:  Government moves to admit Exhibit 62.

7          MR. MAGNER:  No objection.

8          THE COURT:  Motion granted.  The document is accepted

9     into evidence.

10    (Whereupon, Government Exhibit 62 is admitted into evidence.)

11    BY MR. FLANAGAN:

12    **Q.**  Showing the witness Internal Reference 70, do you

13    recognize Exhibit 70?

14    **A.**  Yes.

15    **Q.**  What is it?

16    **A.**  Form 1040X, 2013.

17    **Q.**  For Judge Trahan?

18    **A.**  Yes.

19    **Q.**  From your records?

20    **A.**  Yes.

21         MR. FLANAGAN:  Government moves to admit as 63.

22         MR. MAGNER:  No objection.

23         THE COURT:  Motion granted.  It's accepted into

24    evidence.

25    (Whereupon, Government Exhibit 63 is admitted into evidence.)

1   BY MR. FLANAGAN:

2       Q.  So we walked through the engagement letter and

3   admitted the returns themselves.  When a client comes in, how

4   does the process actually work?

5       A.  They provide me their source documents.  I use those,

6   prepare the return.

7       Q.  So what do you mean by source document?

8       A.  W-2's, 1099-MISC, 1099 Interest Statements, mortgage

9   interest papers, any kind of forms that are provided.

10      Q.  What if they don't have forms for that kind of work?

11      A.  I would ask them to see if they can provide any or

12  pull a transcript from the IRS.

13      Q.  And if they don't have those?

14      A.  The best thing I can do is ask.

15      Q.  Ask what are we going to put down on this piece of

16  paper?

17      A.  What was your income?  What was your expenses?

18      Q.  And if that's all we've got, then that's what we're

19  going to put on the return, is that right?

20      A.  Yes, sir.

21      Q.  I'm showing you Internal Reference 71.  What is this?

22      A.  A sheet from Judge Trahan.

23      Q.  And what did you do with this information?

24      A.  I used the information on it to prepare the return.

25      Q.  And what does it say under --

1          THE COURT:  Are you going to publish this for the

2   jury?

3          MR. FLANAGAN:  Government moves to admit this as

4   Exhibit 64.

5          MR. MAGNER:  No objection.

6          MR. FLANAGAN:  Permission to publish?

7          THE COURT:  Yes.

8          MR. FLANAGAN:  Providing Exhibit 64 to the Court.

9          THE COURT:  It's admitted into evidence.

10  (Whereupon, Government Exhibit 64 is admitted into evidence.)

11  BY MR. FLANAGAN:

12     Q.  So what is this?

13     A.  Information from Judge Trahan.

14     Q.  So whose handwriting are we looking at?

15     A.  Judge Trahan.

16     Q.  And what's at the top left?

17     A.  Charitable givings.

18     Q.  And what does she write out there?

19     A.  The donations that she's provided for the year.

20     Q.  What do you do with that information?

21     A.  Put it on a Schedule A.

22     Q.  What's at the bottom right?

23     A.  Lillie's information for school uniforms, tuition,

24  supplies, and summer camp.

25     Q.  And where does that information come from?

1      **A.**   Judge Trahan.

2      **Q.**   Is this just like a little post-it that she gives

3   you?

4      **A.**   She wrote the notes on a post-it.

5      **Q.**   And for supplies for Lillie, she identifies it to

6   150?

7      **A.**   Yes.

8      **Q.**   What do these checkmarks mean?

9      **A.**   I used it and put it on the return.

10      **Q.**   So how does your process work once you get this

11   information to you?

12      **A.**   I'll tabulate and add up the numbers and then put it

13   on the appropriate return, check it that I've touched it and

14   put it on the return.

15      **Q.**   So what do the checkmarks mean to you?

16      **A.**   That I put it on the return.

17      **Q.**   And what's the bottom left?

18      **A.**   Wedding information.

19      **Q.**   And who's handwriting is that?

20      **A.**   Judge Trahan.

21      **Q.**   What do you do with that information?

22      **A.**   Put it on a Schedule C.

23      **Q.**   Does she provide any other documentation for her

24   wedding income?

25      **A.**   No, sir.

1    Q.  Did she provide you with an explanation as to why she

2    doesn't have any documents from officiating weddings?

3    A.  No, sir.

4    Q.  I see that -- what was the number that she gave you

5    this year?

6    A.  15,200.

7    Q.  I see that it's crossed out and then 200 is written

8    underneath it.  Did you cross that out?

9    A.  No.

10   Q.  Turning to page 2 of this exhibit, what is this page?

11   A.  It's my internal worksheet.

12   Q.  How did you use this worksheet to prepare Judge

13   Trahan's tax return?

14   A.  I take the information, put it on the worksheet, make

15   sure I match it to the year prior if we had anything on those

16   years, to make sure we capture all of the expenses that we

17   had the year prior.

18   Q.  So let's walk that through.  So why do we see two

19   columns on this worksheet?

20   A.  One is for the year of 2015, which was the previous

21   year, and one is for the current year of 2016.

22   Q.  Why do you reference the previous year on your

23   worksheet?

24   A.  To ensure that we don't miss anything that was used

25   the year prior.

1      **Q.**   And so looking about a third of the way down the page

2  where it says gross receipts and sales, what did you write

3  down?  Is this your handwriting?

4      **A.**   Yes, it's my handwriting.

5      **Q.**   So what did you write down?

6      **A.**   15,200.

7      **Q.**   And where did this come from?

8      **A.**   Judge Trahan's post-it.

9      **Q.**   You didn't do any math to move it from her post-it to

10  your worksheet?

11      **A.**   No.

12      **Q.**   Explain why there were two columns.  Did you ask any

13  questions why 2016 you made less money than 2015?  Excuse me?

14      **A.**   No, sir.

15      **Q.**   Did you talk about whether she had more weddings in

16  2016 than 2015?

17      **A.**   I didn't ask for the amount of weddings that she

18  performed.

19      **Q.**   Did you talk about what she charged in 2016 versus

20  2015?

21      **A.**   No, sir.

22      **Q.**   Why?

23      **A.**   I don't audit a client.  She provided the

24  information.  I did the return.

25      **Q.**   Publishing Internal Reference 64, Government

1  Exhibit 57, is this a tax return that you prepared for Judge

2  Trahan?

3      A.   Yes.

4      Q.   And turning to page 4, is this the Schedule C that

5  you prepared based off the information she gave you?

6      A.   Yes.

7      Q.   So what does it say from Line 1?

8      A.   15,200.

9      Q.   So where did that number come from?

10     A.   My worksheet.  Ultimately, the information provided

11 from the client.

12     Q.   That was 2016.  Was the process the same in the other

13 years?

14     A.   Yes, sir.

15     Q.   Showing the witness Internal Reference 72, do you

16 recognize this document?

17     A.   Yes, sir.

18     Q.   What is it?

19     A.   2015 Schedule C worksheet.

20     Q.   For who?

21     A.   Judge Trahan.

22          MR. FLANAGAN:  Government moves to admit as

23 Government Exhibit 65.

24          MR. MAGNER:  No objection.

25          THE COURT:  Motion granted.  It's accepted into

1   evidence.

2          (Whereupon, Government Exhibit 65 is admitted into

3   evidence.)

4          MR. FLANAGAN:  Providing to the Court.

5          Permission to publish?

6          THE COURT:  Yes.

7   BY MR. FLANAGAN:

8      Q.   So whose handwriting is this?

9      A.   Mine.

10     Q.   How did you prepare this document?

11     A.   Based on the information provided.

12     Q.   Looking about a third of the way down on gross

13  receipts or sales, why are there three numbers this time?

14     A.   The printed numbers are from 2014.  If you notice, I

15  have something that says court cases, so she provided me the

16  information for that.  And then you'll see 16,000, which is

17  referencing the weddings.

18     Q.   So were there two different numbers for 2015 we're

19  trying to capture?

20     A.   Yes.

21     Q.   And that's 16,000 for weddings or -- excuse me --

22  16,000 for weddings.  You kind of have to move over in the

23  other column to make space?

24     A.   Yes.

25     Q.   So we're going to see two Schedule C's in 2015?

1      **A.**  Yes, sir.

2      **Q.**  Starting with that court case, what did Judge Trahan

3   tell you about that court case?

4      **A.**  The total amount earned was $9,471.33.

5      **Q.**  Showing the witness Internal Reference 73, what's

6   this document?  Do you recognize this document?

7      **A.**  Yes.

8      **Q.**  What is it?

9      **A.**  2015, 1099-MISC.

10     **Q.**  With payment to who?

11     **A.**  Ernestine Anderson-Trahan.

12         MR. FLANAGAN:  Government moves to admit as

13   Government Exhibit 66.

14         MR. MAGNER:  No objection.

15         THE COURT:  All right.  Motion granted.  Document is

16   accepted into evidence.

17   (Whereupon, Government Exhibit 66 is admitted into evidence.)

18         MR. FLANAGAN:  Permission to publish?

19         THE COURT:  Granted.

20   BY MR. FLANAGAN:

21     **Q.**  So what's this?  Could you explain to the jury what

22   we're looking at?

23     **A.**  A 1099-MISC.

24     **Q.**  What's a 1099 generally speaking?

25     **A.**  It's non-employee compensation, meaning you're not an

1  employee of the person who paid you.

2  Q.  But what is this document explaining to that person?

3  A.  This document explains how much money they've

4  received from that particular payer.

5  Q.  And it's tough to make out, but can you see, was that

6  the $9,000 that we saw in the other page?

7  A.  Yes.

8  Q.  It's not in block 14?

9  A.  Yes.

10  Q.  Who gets a copy of this 1099?

11  A.  The recipient and the payer who is paying it as well

12  as the IRS.

13  Q.  So what did Judge Trahan tell you when she gave you

14  this document?

15  A.  She provided it to me and told me it was legal cases.

16  Q.  Did she tell you she made any other money in 2015

17  from legal cases?

18  A.  I don't recall, but I would say this is what she

19  provided for me.

20  Q.  Did you ask if this is all her income?

21  A.  In a discussion making sure that we've captured all

22  of the income.

23  Q.  Did you have any way with the information you had of

24  looking through and figuring out if she had other court cases

25  in 2015?

1      A.   No, sir.

2      Q.   Did she give you papers to see what she made in 2015?

3      A.   No.

4      Q.   Did she give you her bank records?

5      A.   No.

6      Q.   So returning to Government Exhibit 65, Internal

7      Reference 72, what did you do when you got this 1099?

8      A.   Wrote it on my worksheet.

9      Q.   Did you create other Schedule C's that year?

10     A.   According to this sheet, yes, two of them.

11     Q.   So how did you do that without a 1099?

12     A.   I was provided the information from Judge Trahan.

13     Q.   Turning to page 2, what's this document?

14     A.   Information provided from Judge Trahan.

15     Q.   And is this where she walked through her other stuff,

16     2015?

17     A.   Yes.

18     Q.   Does it say that she made -- show the whole page.

19     Does it say $16,000 from wedding anywhere on here?

20     A.   No, I don't see it.

21     Q.   So how did she tell you that she had $16,000?

22     A.   She verbally told me.

23     Q.   Did she provide any explanation for why she didn't

24     have any records?

25     A.   No, sir, and I didn't ask.

1      **Q.**  Did you do anything to check whether she, in fact,

2  made 16,000?

3      **A.**  No, sir.

4      **Q.**  So what did you do with the number she gave you?

5      **A.**  Put it on my worksheet.

6      **Q.**  And what did you do with that worksheet?

7      **A.**  Put it on the Schedule C.

8      **Q.**  What else is on this piece of paper, starting with

9  the top?

10     **A.**  Information for her rental property.

11     **Q.**  And here she identifies, what kind of expenses from

12  the rental property?

13     **A.**  Floors, looks like windows, electrician, taxes,

14  Lowe's.

15     **Q.**  And how much were windows?

16     **A.**  189 times 3.

17     **Q.**  Was there a tax form for that?

18     **A.**  I'm sorry?

19     **Q.**  Was that a tax form that went along with this windows

20  189?

21     **A.**  Yes.

22     **Q.**  Did she provide you with information about here's how

23  I paid 189 for windows?

24     **A.**  No, sir.  She provided me this form, this sheet.

25     **Q.**  And then what did you do with this information?

1      **A.**   Put it on her return.

2      **Q.**   Showing the witness or publishing Government

3   Exhibit 58, Internal Reference No. 65, turning to page 8,

4   what's page 8?

5      **A.**   Schedule E.

6      **Q.**   What does that mean?

7      **A.**   It's the document that you would report rental income

8   and expenses.

9      **Q.**   And what's reported on Line 19?

10      **A.**   Other, Statement 1, $2,610.

11      **Q.**   So what does "Statement 1" mean?

12      **A.**   I would have listed out expenses and it's too many to

13   go on this form, so it's all listed out on Statement 1.

14      **Q.**   Turn to page 16.  What is this page?

15      **A.**   The expenses that Judge Trahan listed out.

16      **Q.**   And does it match the information that she gave you?

17      **A.**   Yes.

18      **Q.**   Down to the dollar?

19      **A.**   Yes.

20      **Q.**   And what do those expenses do to her rental income,

21   her net income?

22      **A.**   They're deductions to reduce the rental income.

23      **Q.**   What did you discuss with your clients once you

24   completed the return?

25      **A.**   I told her how much she would owe, or if she would

1    get a refund, how much was her refund.

2        Q.  Before we go on with that, showing the witness

3    Internal Reference 74, what's this document?

4        A.  It's a letter from Judge Trahan's attorneys.

5        Q.  And did you use this document to prepare 2013 and

6    2014 amended returns?

7        A.  Yes, I did.

8            MR. FLANAGAN:  Government moves to admit as

9    Government Exhibit 67.

10           MR. MAGNER:  No objection.

11           MR. FLANAGAN:  Providing to the Court.

12           THE COURT:  It's accepted into evidence.

13   (Whereupon, Government Exhibit 67 is admitted into evidence.)

14   BY MR. FLANAGAN:

15       Q.  Before we talk about this further, show -- we were

16   showing the witness Internal Reference 75.  What is this

17   document?

18       A.  Form 9465, Installment Agreement Request.

19       Q.  For what year?

20       A.  2016.

21           MR. FLANAGAN:  Government moves to admit as

22   Government Exhibit 68.

23           MR. MAGNER:  No objection.

24           THE COURT:  All right.  It's accepted into evidence.

25   (Whereupon, Government Exhibit 68 is admitted into evidence.)

1        How much more do you have, Counselor?  Restaurants

2   close at 2:00, so I want to try to give the jury an

3   opportunity to get lunch.

4        MR. FLANAGAN:  I think this would be a good breaking

5   point for lunch.  We have probably about 45 more minutes.

6        THE COURT:  Does that work, Jury?

7        JURY PANEL:  (Affirmative Responses.)

8        THE COURT:  So we'll come back at 1:30?  Is that

9   enough time?

10        All right.  So we're adjourned until 1:30.

11        You're not to discuss your testimony with anyone and

12   remember you're still under oath.  Just hold on a second.

13        THE CASE MANAGER:  All rise.

14        (Whereupon, the jury exits the courtroom.)

15        THE COURT:  We'll reconvene at 1:30.

16                  (Recess taken.)

17                  (In open court.)

18        THE COURT:  Before I bring the jury in, there's an

19   issue that has arisen.  So can the lawyers approach my bench?

20   One lawyer from each side.

21        WHEREUPON, the following proceedings were held at the

22   bench:

23        THE COURT:  So Juror No. 5 has reported that when he

24   went out for lunch someone, who is a spectator in the

25   courtroom, came up to him and was telling him information

1    about -- he said, "I can't talk."  But the person said, "I

2    can talk to you."

3          I contacted the marshals who tried to find the

4    person, but, you know, I'm trying to decide if I handle this

5    openly in public or if we just take it in my chambers.  I

6    need to talk to the juror.  I need to know, you know, what

7    was told to him and I have to be sure that whatever was told

8    to him he understands he's got to put it out of his mind,

9    right.

10         So what's your preference, for me to bring him in by

11   himself in open court or to go in my conference room?  And

12   everything will be on the record.

13         MR. BOTELER:  Everything on the record?  Yes, Your

14   Honor.

15         THE COURT:  So let's just go to my chambers.  I'll

16   take another brief recess.  Just go to my chambers and I'll

17   just bring Juror No. 5 back.  Tell my case manager to make

18   sure none of this is going on in front of the jurors so that

19   they don't know.  He just reported it to the case manager.

20         MR. MAGNER:  Do we know what was said?

21         THE COURT:  We're going to let him tell us.

22         MR. MAGNER:  All right.  Thank you, Your Honor.

23                    (In open court.)

24         THE COURT:  We're going to take up a matter in my

25   conference room.  I'll have a status conference with the

1   lawyers, so we'll reconvene.  Hopefully, we can get that done

2   in about 15 or 20 minutes.  So if the lawyers will just meet

3   me in my conference room.

4           MR. MAGNER:  Judge, the Defense is flexible, you

5   know, on this matter, but would you like Ms. Trahan to be

6   back in chambers with us?

7           THE COURT:  She can.

8           MR. MAGNER:  Okay.

9           THE COURT:  If the Government wants a representative

10  with them, you can.

11          MR. BOTELER:  Yeah, we have no objection.

12          THE COURT:  Nichelle, if you can set up in my

13  conference room.

14          All right.  We'll try to handle this matter briefly.

15  Let's take a recess.

16                          (Recess taken.)

17                          (In chambers.)

18                          JUROR INTERVIEW

19          THE COURT:  Okay.  So towards the end of lunch, Juror

20  No. 5 --

21          THE CASE MANAGER:  Yes.

22          THE COURT:  -- contacted chambers or --

23          THE CASE MANAGER:  He walked into the courtroom.  He

24  cracked the door up to the courtroom.  He said he had a

25  question about something.  He started to talk to you guys,

1    but I said, "I'm here."

2         MR. MAGNER:  Is that Mr. Thompson, the older black --

3         THE CASE MANAGER:  I just know No. 5.  I don't know

4    his last name.  I went and talked to him in the hallway

5    outside the jury room and he told me what happened.

6         THE COURT:  Just give us a general -- because I'm

7    going to have him come in, but before I do that, I want you

8    all to know what I knew that is driving my decision to make

9    sure that I talk to him myself with you all present.

10        THE CASE MANAGER:  He told me he went outside during

11   lunch and the guy apparently rode the elevator down with him

12   and the juror smokes.  He asked the guy if he had a lighter.

13   He said, "Yes."

14        And the guy was, like, "So you're on the jury."

15        He said, "Yes, but I can't talk to you."

16        He said, "Well, I can talk about it."  He said, "They

17   didn't even -- the IRS didn't even audit her."

18        And he was like, "I can't talk to you about this."

19        And then the guy got in a black GMC truck and drove

20   away, heavy set black guy, walks with a limp, long-sleeved

21   brown sweater.

22        THE COURT:  So I told her to contact the marshal

23   service first of all to give a description of the person who,

24   you know, spoke with -- because apparently they knew enough

25   of the rules to know that somebody shouldn't have been

1   talking and, you know, we just -- nobody can tamper with the

2   jury one way or the other, right?  And so they have a

3   description of the person, but he was gone.

4            THE CASE MANAGER:  Correct.

5            THE COURT:  How did we find out he was sitting in the

6   courtroom?

7            THE CASE MANAGER:  The -- he rode the elevator down

8   when they left for lunch.

9            THE COURT:  So he might have been in the courtroom?

10           THE CASE MANAGER:  Yes.

11           THE COURT:  But we don't know if he would be back.

12           THE CASE MANAGER:  Correct.

13           THE COURT:  But the juror said if he spots the person

14   in the courtroom to let us know and we'll report it to the

15   marshals.

16           So for me, if there's any kind of contact with the

17   juror, I have to address it.  So as -- as I said in the

18   courtroom, I wanted to know what your preference was to

19   either address it out there in open court, it's going to be

20   on the record or address it here in my chambers conference

21   room with the agreement that both the defense and the

22   government have decided to have -- to talk to the juror in

23   your presence, just to be sure, number one, you know, we have

24   his story straight, you know, from one person to another.  We

25   want to make sure -- and, number two, I want to make it clear

1   to him that any information he heard outside of the courtroom

2   he's to put it outside of his mind.  He isn't to share that

3   information.  We don't want the whole jury tampered with and

4   just ask him if he can be -- continue to be fair and

5   impartial.  So that would be the extent of my questions.

6          Anybody else have --

7          MR. MAGNER:  No, I think that's fine, Judge.  I just

8   will note for the record that before lunch in cross-examining

9   Ms. Kotsay I did bring out the fact that Ms. Trahan had not

10  been audited, so that's something they already have heard.

11         THE COURT:  Okay.

12         MR. MAGNER:  And --

13         THE COURT:  Which is a good point to make.

14         MR. MAGNER:  And also I have not seen it, but I'm

15  told that there was a FOX 8 reporter, Lee Zurik, on the case

16  last night and he had been following the case for several

17  years.  So I would just ask maybe at the end of the day if

18  you can remind the jury again, you know, to not look at the

19  press.

20         THE COURT:  Sure.  Sure.  I will.

21         MR. MAGNER:  Thank you.

22         THE COURT:  Okay.  All right.  So if we can just

23  bring in Juror No. 5.  We don't know his name.

24         THE CASE MANAGER:  Yes.

25         THE COURT:  I'll call him Juror No. 5.

1          THE CASE MANAGER:  Judge, Mr. Thompson.

2          THE COURT:  Okay.  Hello, Mr. Thompson, how are you?

3      You're not in trouble, all these lawyers in here.

4      Can you sit right here by me for a second?

5      First, I want to thank you for following my direction

6  and reporting the fact that someone talked to you.

7          JUROR NO. 5:  Okay.

8          THE COURT:  Can you tell us what happened when you

9  first encountered the gentleman?

10         JUROR NO. 5:  I was going to eat, and when I got out

11 the building, I didn't have my lighter, you know.  So I asked

12 the guy -- he didn't start the conversation with me.  I asked

13 him for a light and he said he had a light in the truck.

14         So I walked over to the truck and we started

15 conversations because he had a 2019 GMC and I have a 2018

16 Silverado and I started a conversation about the transmission

17 because there's a problem with the transmission.  It jerks.

18         I'm telling you the whole story.  It jerks when it

19 goes into second gear and he saw the badge and he said, "Oh,

20 you're on the jury."  I guess he got on the elevator.

21         I said, "I can't talk about the case."

22         He said, "I can talk about it."  He said, "But, yeah,

23 they didn't give her an audit or nothing."

24         I said, "I can't talk about that."  So I walked off

25 and that was it.

1        THE COURT:  All right.  Hearing that information,

2    first of all, can you put that experience out of your mind

3    and not --

4        JUROR NO. 5:  Yeah, it's not going to influence my

5    decision.

6        THE COURT:  So you think you can remain fair and

7    impartial?

8        JUROR NO. 5:  Pardon me?

9        THE COURT:  You can remain fair and impartial?

10        JUROR NO. 5:  Oh, yeah.

11        THE COURT:  Can you refrain from sharing with the

12    rest of the jurors any of this information?  We don't want

13    them to --

14        JUROR NO. 5:  Well, I told them somebody tried to

15    talk with me about the case.

16        THE COURT:  Did you tell them what he said?

17        JUROR NO. 5:  No.

18        THE COURT:  Okay.  All right.  I think that's fine

19    and that -- because you reported it, which is a very good

20    example for them to see if somebody does try to talk with

21    them.  I am going to remind you and all the jurors not to

22    read the newspaper, not to look at the news, because it might

23    be covered with that.  I want to thank you for reporting it

24    to me and I think you handled it admirably.

25        JUROR NO. 5:  Okay.  Thank you.  I don't think -- I

1    think he was just having a general conversation.

2         THE COURT:  And it led to you.

3         JUROR NO. 5:  I can talk about it, but you couldn't.

4         THE COURT:  I'm going to make clear too to the

5    spectators they really can't talk to you.  He was not

6    supposed to talk to you.  Nobody should be talking to a

7    juror, so I'll make that clear to the spectators in the

8    audience.

9         JUROR NO. 5:  Oh, okay.

10        THE COURT:  Nobody is supposed to talk to jurors, but

11   you certainly did the right thing.

12        JUROR NO. 5:  Okay.

13        THE COURT:  I want to thank you for that.

14        Do you have any questions of me?

15        JUROR NO. 5:  No, I don't have any.

16        THE COURT:  Well, thank you.

17        JUROR NO. 5:  I didn't want to get in trouble.  My

18   daughter's an attorney and I didn't want to put any influence

19   like, "Daddy, no, you know."

20                      (Laughter.)

21        THE COURT:  Well, as parents, we're always looking

22   out for our kids.  I remember my kids were teenagers and I

23   had to remind them, you got to look out for me, too.

24        Well, thank you.  You can return.  And please don't

25   mention the specifics of our conversation.

1          THE CASE MANAGER:  Take a right and I'll take you

2     back to the jury room.

3          MR. MAGNER:  Can we talk a little scheduling?

4          THE COURT:  No, I want to finish talking about this.

5          Is everybody satisfied with his response?

6          MR. BOTELER:  Yes, Your Honor.  This sounds like it

7     was a brief interaction, and based on what he said, Juror

8     No. 5 said, it did not impact him and he hasn't disclosed it

9     to others.

10          THE COURT:  So I want to be clear we don't feel

11     there's any reason to remove this juror?

12          MR. MAGNER:  No, ma'am.

13          MS. BRODNEY:  No.

14          THE COURT:  And you don't believe this is cause for a

15     mistrial?

16          MR. BOTELER:  No, ma'am.

17          MR. MAGNER:  No, ma'am.

18          THE COURT:  I want to get that on the record.  All

19     parties have stipulated that this juror can remain and this

20     is not the basis for a mistrial or any other motion or cause.

21          All right.  Okay.  And I will -- and you're

22     comfortable -- I'm going to go back in the courtroom, remind

23     all the jurors not to look at the news and, number two,

24     remind everyone in the courtroom whether they are a witness

25     particularly part of the trial, anything, that they should

1    not be trying to contact or speak to the jurors.

2         All right.  So there was a --

3         MR. MAGNER:  Scheduling.  So I gather the

4    Government's going to go to closing, and if you could give me

5    your best estimate of when that would be.

6         MR. FLANAGAN:  This one is the long one.  The next

7    three are going to be lightning fast.

8         MR. BOTELER:  The last witness may take a little bit.

9    Then Corrine will be longer.

10        MR. MAGNER:  How much longer?

11        MR. FLANAGAN:  Hour.

12        MR. BOTELER:  Maybe a little bit more.

13                     (Knock on the door.)

14        THE COURT:  Wait a second.

15        THE CASE MANAGER:  Just seeing if you need me back in

16   here.

17        THE COURT:  Not unless you just want to hang out.

18        MR. BOTELER:  I would say hour and a half if I'm

19   guessing.

20        THE COURT:  So you'll finish today?

21        MR. BOTELER:  Yes, Your Honor.

22        MR. MAGNER:  So the Government was going to call a

23   woman by the name of Deatrice Henderson.  We would call her

24   and we need to call her this afternoon because she has some

25   scheduling problems.  So we can do that --

1        THE COURT:  So you want to call that witness.  How do

2   you want to do this?  Before the Government rests?

3        MR. MAGNER:  I don't think we need to do that.  Hour

4   and half.  That will take us to 3:30-ish.  And I think we

5   would have her on the stand in half an hour.

6        THE COURT:  I asked you in case they're going to

7   close their case and that will be your first witness.

8        MR. MAGNER:  Yes, ma'am.

9        THE COURT:  Because I have to make room in case there

10  are any motions in between the two.  And what I'm trying

11  to -- so then you'll start your case.  So I don't like the

12  jury just sitting around, but I have to wait for all the

13  evidence before we can do our charge conference.  So I try to

14  work that in so that we either do it around lunch time or we

15  do it earlier in the morning before they come in or we do it

16  late at night until we're done.  So I try to make it, you

17  know -- just know that sometimes it takes a while.

18  Sometimes -- you don't have many disputes about the jury

19  charges already, but it's going to be based on the evidence.

20  So things might have changed.

21        MR. MAGNER:  So let's take the scheduling issue a

22  little bit farther.  So they rest somewhere around 3:30.  We

23  call Ms. Henderson.  Maybe we call another witness.  That

24  takes us to the end of the day.  I suspect we have half a day

25  tomorrow.

1          MR. BOTELER:  And the Government would probably have

2     one rebuttal witness that would be short.

3          MR. MAGNER:  Is that Dr. Marshall?

4          MR. BOTELER:  Yes.

5          MR. MAGNER:  So I offer that in terms of --

6          THE COURT:  I think maybe around -- we should

7     close -- this is before closing arguments, so it's looking

8     like close to lunch time, maybe an early lunch, 11:00 or so.

9     And that's what we -- maybe I'll give them two hours, a bit

10    longer period, and that will give us time.  Y'all can get a

11    bite to eat and get to the charge conference because I will

12    give you a draft of the charge and you can look over them.

13         MR. MAGNER:  This evening?

14         THE COURT:  I can't do this evening because I

15    can't -- unless you're telling me something.  I have to wait

16    and see.  So I can't really give it to you tonight.  No.  My

17    law clerk.  It may be possible, but what happens is we

18    will --

19         MR. MAGNER:  I understand.  I don't know if either of

20    us asked for a character evidence jury instruction, so we

21    would have asked for the pattern Fifth Circuit charge on

22    character evidence.

23         THE COURT:  Is there something -- I know you all

24    submitted something that was very similar, but it was from

25    the Seventh Circuit as opposed to the Fifth Circuit charge.

1          MR. FLANAGAN:  Yes, Your Honor.  Understanding the

2     difference from our first go around is the good faith

3     instruction Defense wants.  What we're now responding with is

4     you can give good faith if you can give this specific --

5          THE COURT:  Did you share that charge with him?

6          MS. BRODNEY:  Yes.

7          MR. FLANAGAN:  When we filed with the court.

8          THE COURT:  We can get to it at the charge

9     conference.

10          MR. MAGNER:  I think we can.

11          MR. FLANAGAN:  Your Honor, it is one more sentence.

12     That's the plain dispute.

13          MR. MAGNER:  We'll talk about that.

14          THE COURT:  That gives us something to think about.

15     Anything -- all right.  So we can get back -- we can get back

16     in the courtroom.  All right.  Thank you.

17                         (Recess taken.)

18                         (In open court.)

19          THE COURT:  Let's bring in the jury.

20          (Whereupon, the jury enters the courtroom.)

21          You can all have a seat.  I just want to remind --

22     remind the jurors in particular there may be some -- that you

23     should refrain from looking at newspaper articles or the

24     news.  There may be some coverage of this trial because you

25     have to make a decision solely on what you hear in the

1    courtroom.  So even if you inadvertently heard any

2    information, I ask that you put that information out of your

3    mind and focus only and make your decision only on what you

4    heard here in the courtroom from the witness's testimony and

5    the evidence that has been put into the record.

6         Also, I want to state to any spectators here that

7    although you're not part of the trial, you're not a witness,

8    you're not a jury, you're not with the defense or necessarily

9    the defense team or the government's team.

10        You're not to interact with jurors either.  When

11   jurors are in this process, they have to focus on the

12   information they have here, and although in my preliminary

13   instructions, I was instructing the jurors and the litigants

14   and their lawyers and their teams about not talking about the

15   case in the presence of the jury or interacting with the jury

16   in any way, that does extend to the public.

17        This is a very important and sacred process that

18   these juries and the jurors are serving a very important

19   public purpose.  So I ask members of the public and those

20   spectators to understand that those rules apply to you as

21   well.  You're not to talk about the case in the presence of a

22   juror or interact with our jurors in any way, and if you do,

23   they've been instructed to report it to me and there could be

24   consequences for those actions.

25        And with that, if the Government would like to

1    proceed.

2          MR. FLANAGAN:  Yes, Your Honor.  The Government would

3    like to resume Ms. Ancar's testimony.

4          THE COURT:  Thank you for your patience, Ms. Ancar.

5    Remember that you're still under oath.

6    BY MR. FLANAGAN:

7       Q.  Ms. Ancar, before we broke, I think I was showing you

8    a Form 9465.  Is this that form?

9       A.  Yes, sir.

10      Q.  So explain to the jury what is a Form 9465.

11      A.  It's an installment agreement.  When you have a

12   balance due, you can have up to 72 months to pay off that

13   balance if you provide the form.

14      Q.  So is this Judge Trahan's form for 2016?

15      A.  Yes.

16      Q.  And did you create this form for her?

17      A.  Yes.

18      Q.  How did you do it?  Looking at Line 7 down.

19      A.  Again, it's populated and produced via my software.

20   It shows the balance due and then it says how much the

21   payment would be divided by, the payment amount total due

22   divided by 72 months.

23      Q.  So is this just an automatic calculation if it's

24   below a certain threshold?

25      A.  Yes.

1    **Q.**  Is this a plan that you came up with and explained to

2    Judge Trahan?

3    **A.**  The question usually is would you like an installment

4    agreement or will you pay your balance in full and whichever

5    way the client decides is the way we go.

6    **Q.**  From this form, do you know what the client decided?

7    **A.**  To do an installment agreement.

8        MR. FLANAGAN:  Showing the witness Internal Reference

9    76.

10       I realize we are able to do this with the tech now.

11   It's almost muscle memory at this point.

12       THE COURT:  You said "internal reference," so it's

13   not an exhibit yet?

14       MR. FLANAGAN:  No.  We're going to move it in in just

15   a second.

16       THE COURT:  Okay.  I just wanted to know.

17       MR. FLANAGAN:  And 76 should be up for the court.  As

18   I said, I do apologize.  We do have digital copies of these.

19   BY MR. FLANAGAN:

20   **Q.**  What is this?

21   **A.**  The Form 9465, Installment Agreement Request.

22   **Q.**  For 2015?

23   **A.**  Yes.

24       MR. FLANAGAN:  At this time, the Government moves to

25   admit as Exhibit 69.

1          MR. MAGNER:  No objection.

2          THE COURT:  All right.  It's accepted into evidence.

3     (Whereupon, Government Exhibit 69 is admitted into evidence.)

4          MR. FLANAGAN:  Retrieving from the witness, providing

5     a copy to the court, tendering the original to the court.

6          THE COURT:  All right.

7          MR. FLANAGAN:  And permission to publish.

8          THE COURT:  Permission granted.

9     BY MR. FLANAGAN:

10         Q.   So is this the same form for 2015?

11         A.   Yes.

12         Q.   Did you create this document for Judge Trahan?

13         A.   Yes.

14         Q.   Did you give her the option of a payment plan or

15    making one big payment?

16         A.   Yes.

17         Q.   And what did she pay?

18         A.   According to this form?

19         Q.   Uh-huh.

20         A.   She would have to pay $34 a month for 72 months.

21         Q.   Publishing to the witness Internal Reference 77,

22    what's this document?

23         A.   Same thing.

24         Q.   Is this the internal installment agreement plan for

25    2012 for Judge Trahan?

1    **A.**  Yes.

2         MR. FLANAGAN:  At this time, the Government moves to

3    admit as Government Exhibit 70.

4         THE COURT:  Any objection?

5         MR. MAGNER:  No objection.

6         THE COURT:  It's accepted into evidence.

7    (Whereupon, Government Exhibit 70 is admitted into evidence.)

8    BY MR. FLANAGAN:

9         **Q.**  Publishing to the witness Internal Reference 78,

10   what's this document?

11        **A.**  Form 8879.  It's an electronic signature

12   authorization.

13        **Q.**  For who and for what year?

14        **A.**  For tax year 2016, Ernestine A. Trahan and Kenneth J.

15   Trahan.

16        MR. FLANAGAN:  Government moves to admit Government

17   Exhibit 78 -- excuse me, 71.  Excuse me 71.

18        THE COURT:  Any objection?

19        MR. MAGNER:  No objection.

20        THE COURT:  All right.  It's accepted into evidence.

21   (Whereupon, Government Exhibit 71 is admitted into evidence.)

22        MR. FLANAGAN:  Permission to publish?

23        THE COURT:  Yes.

24        MR. MAGNER:  Can we see the bottom of the exhibit?

25   Thank you.

1                    (Discussion between counsel.)

2    BY MR. FLANAGAN:

3        Q.  You've seen this before, but explain to the jury what

4    is an 8879?

5        A.  It's the electronic signature for a tax return.

6        Q.  So what does this form let you as the tax preparer

7    do?

8        A.  Electronically file the return.

9        Q.  And you said before, but whose form is this?

10       A.  For Ernestine A. Trahan and Kenneth J. Trahan.

11       Q.  And is this the copy that was from your files for

12   2016?

13       A.  Yes.

14       Q.  Scrolling down a bit, did they -- did you receive

15   authorization to file an electronic return for 2016 by PIN?

16       A.  Yes.

17       Q.  Is this return -- is this document actually signed?

18       A.  This one is not signed.

19       Q.  So why not?

20       A.  I can't answer that for you.  I mean, the originals

21   were signed.  This may be one that I printed out in order to

22   submit to you guys from my system.

23       Q.  So do you give the client -- who keeps the originals

24   of this form?

25       A.  If they have them, they went home and signed them and

1  faxed them.  They would keep the originals.  If they

2  submitted the originals back to my office because they had to

3  take one out to make sure another spouse signed, then I would

4  get an original.

5      Q.  So understanding that you don't have a signed copy in

6  your records, do you know that you would have gotten a

7  signature for this form?

8      A.  Yes.

9      Q.  How do you know that?

10     A.  I get it for every client in order to file it.

11     Q.  Can you file it without getting a signature?

12     A.  No, I cannot.

13         MR. FLANAGAN:  Publishing Internal Reference 79.

14  BY MR. FLANAGAN:

15     Q.  What's this form?

16     A.  Form 8879 for 2015.

17     Q.  For Judge Trahan for 2015?

18     A.  Yes.

19         MR. FLANAGAN:  Move to admit as Government

20  Exhibit 72.

21         MR. MAGNER:  No objection.

22         THE COURT:  All right.  It's accepted into evidence.

23  You can publish it to the jury.

24  (Whereupon, Government Exhibit 72 is admitted into evidence.)

25         MR. FLANAGAN:  Providing to the court.  Publishing to

1   the jury.

2   BY MR. FLANAGAN:

3       Q.   So what's this form?

4       A.   Form 8879, electronic signature form.

5       Q.   And looking down about halfway down the page, who

6   signs this form?

7       A.   The clients.

8       Q.   And they are?

9       A.   Ernestine Trahan and Kenneth Trahan.

10      Q.   Removing the exhibits, is that how the process works

11  every year?  They give you the information.  You put it on a

12  tax return and you give it to them to sign?

13      A.   Yes.

14      Q.   Do you have your records for the original 2014

15  return?

16      A.   No, sir, my server crashed.

17      Q.   When did it crash?

18      A.   During the tax season in 2017.

19      Q.   It's a busy time in 2017 for you?

20      A.   Yes.

21      Q.   And had you moved your files to a digital copy by

22  that point?

23      A.   Yes.

24      Q.   So understanding you don't have the records from

25  2014, that same process, meet with you, give you forms, you

1   give a return.  That's how it worked?

2      **A.**  Yes.

3      **Q.**  She put anything on her 2014 tax return that she

4   didn't give you?

5      **A.**  No.

6      **Q.**  Do you know that Judge Trahan used to work at a law

7   firm?

8      **A.**  Yes.

9      **Q.**  I'm showing you Internal Reference 66.  It's admitted

10  into evidence as 59.  What's this document?

11      **A.**  Form 1040, 2012.

12      **Q.**  For Judge Trahan?

13      **A.**  Yes.

14      **Q.**  Turning to page 6, what's page 6?

15      **A.**  Page 2 is Schedule E.

16      **Q.**  So what's a Schedule E?

17      **A.**  It's where business information is reported for

18  either Subchapter S or partnership return.

19      **Q.**  And so looking at Line 28, what organization is

20  reporting income in this form?

21      **A.**  Trahan & Davis.

22      **Q.**  And looking at line -- excuse me, below that in A

23  where it says nonpassive income and loss, what was the

24  nonpassive income for Trahan & Davis?

25      **A.**  51,946.

1    Q.   Did Judge Trahan report expenses for this law firm?

2    A.   Yes.

3    Q.   How did she do that?

4    A.   She would have provided it to me.

5    Q.   And how did you document it on this form, if at all?

6    A.   It would have been the same thing.  On this form,

7  particularly, the expenses that were not reimbursed by the

8  firm are documented on this form.

9    Q.   And at -- that's Line B?

10    A.   Yes.

11    Q.   And was the unreimbursed expenses 15,023?

12    A.   Correct.

13    Q.   So Judge Trahan was able to give you expenses down to

14  the dollar for 2012 on unreimbursed expenses?

15    A.   Yes.

16    Q.   Did you know if she received contingency -- excuse me

17  -- contingency fees?

18    A.   I wouldn't know that.

19    Q.   Do you know if she continued to receive money from

20  this law firm even after leaving the law firm?

21    A.   I wouldn't know unless I'm told.

22    Q.   When she left the law firm, did you ever have a

23  conversation with her about, hey, as these cases settle,

24  we're going to have to keep track of this?

25    A.   We have, as well as she told me she had some cases

1    that were going to settle.

2        Q.  And so what did you say when she told you that?

3        A.  I said, okay, we just needed to know the income that

4    she got.

5        Q.  And so, well -- excuse me.  We looked at the 2015 and

6    2016 returns reporting 16,000, 15,200 gross receipts from

7    weddings.  Did Judge Trahan ever tell you she made more than

8    $16,000 in gross receipts?

9        A.  No, sir, and I did not ask.

10       Q.  Did you ever file additional returns showing more

11   than $16,000 of gross receipts or prepare additional returns

12   showing more than $16,000 of gross receipts?

13       A.  Yes, sir, I filed amended returns.

14       Q.  Before we get to those, during the 2017, what was the

15   process for filing Judge Trahan's 2017 return.  Was it the

16   same?

17       A.  Same process.

18       Q.  I'm showing Internal Reference 59 for the court

19   that's in evidence as Government Exhibit 52.  Turning to

20   page 5, what's page 5?

21       A.  Form 1040, 2017.

22       Q.  And what's reported on Line 12?

23       A.  $44,130.

24       Q.  And is that going to be supported by a Schedule C?

25       A.  Yes.

1      **Q.**   Turn to page 8.   Excuse me.   Publish to the jury,

2   please.   So are we looking at Line 12 of Judge Trahan's tax

3   return?

4      **A.**   Yes.

5      **Q.**   So if we could turn to page 8, what is this page?

6      **A.**   Schedule C.

7      **Q.**   And what is reported in Line 1 of the 2017 Schedule C

8   for weddings?

9      **A.**   45,000.

10      **Q.**   Did you ask why this number was more than the other

11   years?

12      **A.**   No, sir.

13      **Q.**   Did you do anything different about how you prepared

14   this return?

15      **A.**   No, sir.

16      **Q.**   What does it report in Lines 8 through 27?

17      **A.**   Line 27 has another expense of $870.

18      **Q.**   But no other expenses?

19      **A.**   No other expenses.

20      **Q.**   Were there expenses for the other years that you

21   prepared these Schedule C's?

22      **A.**   I believe so.

23      **Q.**   Did you do anything different when it came to

24   expenses?

25      **A.**   No, sir.

1    **Q.**  Turning to page 61, whose writing is this?

2    **A.**  Some are mine, some are hers.

3    **Q.**  Okay.  Well, then moving down the page to weddings,

4    whose handwritings is weddings, income 45,000?

5    **A.**  The writing to the left is mine.  The writing to the

6    right is the clients.

7    **Q.**  To the left, is that the checkmark or is that the

8    word weddings?

9    **A.**  Weddings, income, expenses possibly to checkmark.

10   **Q.**  So is this you laying out a checklist, hey, I need

11   this information?

12   **A.**  Correct.

13   **Q.**  And she comes back with 45,000?

14   **A.**  Correct.

15   **Q.**  And did you prepare an amended return for 2016?

16   **A.**  Potentially.  I don't recall.  If you show it to me,

17   I can definitely answer for you.

18   **Q.**  I'll show you Internal Reference 67.  It's in

19   evidence as 60.

20   **A.**  Yes, sir.

21   **Q.**  How is the process for amended return different from

22   a regular return -- original, excuse me.

23   **A.**  The amended return is just different information,

24   either additional income, additional expenses.

25   **Q.**  So what was the change on this return?

1      A.   Can you move up the page?

2           MR. FLANAGAN:   Offer to show the witness page 2.

3    BY MR. FLANAGAN:

4      Q.   And what does it say in Part 3?

5      A.   "Taxpayer corrected the amount of Schedule C income

6    earned and expenses."

7      Q.   And this is -- if we could go back out, this is

8    another document that's not signed, correct?

9      A.   Correct.

10     Q.   But you prepped it, printed it, and gave a copy to

11   the taxpayer?

12     A.   Yes, amended returns have to be mailed in.

13     Q.   Because it has to be mailed in, you're not going to

14   have a finished copy, you're going to give it to Judge

15   Trahan, is that correct?

16     A.   Correct.

17          MR. FLANAGAN:   Permission to publish.

18          THE COURT:   Granted.

19   BY MR. FLANAGAN:

20     Q.   And so for the jury, what do we see on -- what was

21   the difference on this return?

22     A.   We corrected income earned and expenses.

23     Q.   When someone tells you they have to change their

24   return, do you ask for more documentation?

25     A.   I ask for whatever information they need to correct

1    it because I don't audit.

2    Q.  Is it a more -- if someone is coming in to change

3    their return, are you more inclined to say, okay, you must

4    know what you're doing because we're changing something?

5    A.  I'm under the impression that you've calculated

6    something else that maybe you had missed before so you went

7    back and found your records and now you're reporting things

8    correctly because that's what you want to do.

9    Q.  Turning to page 3, what's page 3?

10   A.  Form 9465, Installment Agreement.

11   Q.  And what's page 4?

12   A.  Form 1040, 2016.

13   Q.  And looking at Line 12, what's the Line 12 on this

14   new 2016 return?

15   A.  $38,163.

16   Q.  Turning to page 7, what's page 7?

17   A.  Schedule C.

18   Q.  And what's the Line 1 in this new Schedule C?

19   A.  $46,730.

20   MR. FLANAGAN:  One moment, Your Honor.

21   I'm showing the witness Internal Reference 68.  It's

22   into evidence as 61.  So permission to publish.

23   THE COURT:  Permission granted.

24   BY MR. FLANAGAN:

25   Q.  What is Government Exhibit 61?

1    **A.**   Form 1040X for 2015.

2    **Q.**   And turning to page -- for who?

3    **A.**   For Ernestine A. Trahan and Kenneth J. Trahan.

4    **Q.**   So what's in Column A of this amended return?

5    **A.**   The information provided on the original return

6    submitted.

7    **Q.**   What's in Column B?

8    **A.**   The change.

9    **Q.**   What's in Column C?

10   **A.**   The corrected amount.

11   **Q.**   So what was the change in income on this 2015 amended

12   return?

13   **A.**   The income increased by $20,265.

14   **Q.**   And looking at Line 11, what was the change in taxes

15   on this amended return?

16   **A.**   $5,617.

17   **Q.**   And turning to the next page, page 2, in Part III,

18   what were the changes to this tax return?

19   **A.**   "Taxpayer corrected Schedule C income earned and

20   expenses."

21   **Q.**   Do you know if that was just to the wedding Schedule

22   C?

23   **A.**   I can't recall.  If you show it, I can answer.

24   **Q.**   Turning to page 7, what's page 7?

25   **A.**   A Schedule C.

1      **Q.**   And is this the amended one you prepared based off

2   information Judge Trahan gave you?

3      **A.**   Yes.

4      **Q.**   And what's in Line 1 of this amended Schedule C?

5      **A.**   $34,440.

6      **Q.**   Turning to page 9, what's page 9?

7      **A.**   Schedule C.

8      **Q.**   For what?

9      **A.**   For attorney practices.

10     **Q.**   And what's Line 1 of this Schedule C?

11     **A.**   $9,471.

12     **Q.**   Is that the same as what was on the original 2015

13   return?

14     **A.**   Yes, sir.

15     **Q.**   Did Judge Trahan or her representatives ask you to

16   prepare amended 2013 and 2014 returns as well?

17     **A.**   I believe so, yes.

18     **Q.**   What was that process like?

19     **A.**   Same thing, I got the corrected income and added it

20   to the returns.

21     **Q.**   Did Judge Trahan come in to give you this

22   information?

23     **A.**   She did.

24     **Q.**   How did she give it to you?

25     **A.**   She provided a letter.

1          MR. FLANAGAN:  Showing the witness Internal Reference

2     74, it's admitted into evidence as Exhibit 67.  Since it's

3     admitted, permission to publish, Your Honor?

4          THE COURT:  No problem, right?

5          MR. MAGNER:  No, Judge.

6          THE COURT:  Go ahead and publish it.

7     BY MR. FLANAGAN:

8          Q.   So what's this document?

9          A.   It's a letter Judge Trahan provided to me to

10    recalculate the amount of income for 2013 and 2014.

11         Q.   So would you please read the first paragraph?

12         A.   "Please accept this letter of supplemental and

13    amended response on behalf of Judge E. Teena Anderson-Trahan

14    to my prior letter of September 11, 2018.  Based upon

15    documentation recently obtained and reviewed by Judge Trahan,

16    please be advised that she performed 282 weddings in 2013 and

17    372 weddings in 2014."

18         Q.   So whose handwriting is on the right of this letter?

19         A.   Mine.

20         Q.   So what are -- what are you writing there?

21         A.   I'm recalculating the amount of weddings which you

22    see circled.

23         Q.   So for 2013 on the right corner I see 282 times 80.

24    Is that your handwriting?

25         A.   Yes.

1     **Q.**  Where did you get the 80 from?

2     **A.**  I would have had a discussion with Judge Trahan.

3     **Q.**  She told you to use 80?

4     **A.**  (Nods head.)

5     **Q.**  Is that yes?

6     **A.**  Yes.  I'm sorry.  Yes.

7     **Q.**  Moving down where it says 2014, what math are you

8 doing underneath 2014?

9     **A.**  Same thing, taking the weddings, multiplying it by

10 the amount.

11     **Q.**  That wedding number you got from this form?

12     **A.**  Yes.

13     **Q.**  And that amount you got from Judge Trahan?

14     **A.**  Yes.

15     **Q.**  What did you do once you did this math?

16     **A.**  Put it on a Schedule C and amended the return.

17        MR. FLANAGAN:  I'm showing the witness Internal

18 Reference 69.  It's admitted as Government Exhibit 2.

19        The Government asks to publish.

20 BY MR. FLANAGAN:

21     **Q.**  What is this page?

22     **A.**  1040X for 2014.

23     **Q.**  For Judge Trahan?

24     **A.**  Yes.

25     **Q.**  Turning to page 2, what was the change?

1      A.   "Taxpayer added additional Schedule C income and
2   removed Schedule C expenses per counsel."
3      Q.   Turn to page 6.  What's page 6?
4      A.   The Schedule C.
5      Q.   Why does this one look a little bit different?
6      A.   My software elected a Schedule C-EZ.
7      Q.   So what is a Schedule C-EZ for the jury?
8      A.   No difference.  It's just not, per se, a long form.
9   It's just a shorter version of Schedule C.
10     Q.   And what's Line 1 of this Schedule C-EZ?
11     A.   The income, $29,760.
12     Q.   And was all supporting documentation for that change
13  from that letter?
14     A.   Yes.
15     Q.   Did you file this return for Judge Trahan?
16     A.   I would have printed it, but it's an amendment so it
17  has to be mailed in.
18          MR. FLANAGAN:  Tender the witness.
19          THE COURT:  Okay.
20          MR. MAGNER:  Hello, Ms. Ancar.
21          THE WITNESS:  How are you, sir?
22          MR. MAGNER:  A little trouble seeing you there.
23          THE WITNESS:  I'm a little vertically challenged,
24  sir.
25                         (Laughter.)

1          MR. MAGNER:  I understand.

2          THE WITNESS:  I'm trying my best, but...

3          MR. MAGNER:  I'm going to get organized here for a

4    sec.

5          Let's go to Government Exhibit 60, which I think we

6    just referred to a few moments ago.  And, actually, I'm going

7    to try to make this a little easier.  The tax returns

8    themselves.  Forgive me.

9          If we could, let's please go, Aaron, to Government

10   Exhibit 18.  And the next page.  What I'm looking for is the

11   amended return for 2015.

12         Could counsel help me?  The numbers have gotten kind

13   of all mixed up.

14              (Discussion between counsel.)

15         That's going to be 19?  All right.  19, please,

16   Aaron.  There we go.  Thank you.  And blow up just that top

17   half if we could.

18                       CROSS-EXAMINATION

19   BY MR. MAGNER:

20      Q.  So just so we're clear, Ms. Ancar, this is an amended

21   tax return that you filed on behalf of Ms. Trahan, correct?

22      A.  Correct.

23      Q.  And in this amended tax return, which was filed and

24   looks like received by the service in April of 2019, Ms.

25   Trahan told the IRS that she had actually earned more money

1   than she originally reported, correct?

2        A.   Correct.

3        Q.   And you worked with her in preparing this, correct?

4        A.   Correct.

5        Q.   And her intention of doing that was to provide the

6   IRS with the most accurate information she could at that

7   time, correct?

8        A.   Yes, sir.

9        Q.   She was trying to get right, get straight with the

10  government, right?

11       A.   Yes, sir.

12       Q.   All right.  And we've talked about this now a couple

13  times with other witnesses.  That then resulted -- if you

14  could scroll down a little bit to Line 11, that resulted in

15  additional taxes of $5,617 correct?

16       A.   Correct.

17       Q.   All right.  And was Ms. Trahan cooperative with you

18  when you were preparing this amended return?

19       A.   Yes, sir.

20       Q.   Did she act in good faith with you in your dealings

21  with her in preparing this return?

22       A.   Yes, sir.

23       Q.   Did she provide you all the material that you asked

24  for and that she had available to do this?

25       A.   Yes, sir.

1            MR. MAGNER:  All right.  Now, if we could please go

2    to -- I'm going to guess the very next exhibit, so in

3    numerical sequence.  Can you help me with that?

4    BY MR. MAGNER:

5        Q.  Okay.  So then this is the amended return for 2016,

6    correct?

7        A.  Yes, sir.

8        Q.  Ms. Trahan reported additional income of $33,180,

9    correct?

10       A.  Yes, sir.

11       Q.  And if you go to Line 11, she had to pay additional

12   tax of $10,696, correct?

13       A.  Yes, sir.

14       Q.  Again, she was cooperative with you when she -- when

15   she prepared this with your assistance?

16       A.  Yes.

17       Q.  And in your dealings with her, she never tried to

18   fudge the numbers or asked you to pump up deductions or

19   anything like that, did she?

20       A.  No, sir.

21       Q.  She was always straight with you as far as you could

22   tell?

23       A.  Yes, sir.

24            MR. MAGNER:  And, now, if you could please go to

25   Government Exhibit 67.  It's the correspondence.  I think our

1   numbers are off.  Is it still by one?

2         Maybe if I could ask Ms. Better, would you be so

3   kind?

4         MR. BOTELER:  Which exhibit number?

5         MR. MAGNER:  So I'm looking for your now marked and

6   admitted Exhibit 67.  That looks right.

7   BY MR. MAGNER:

8   Q.  So this is a letter from Ms. Trahan's attorney, Steve

9   Scheckman, correct?

10  A.  I'm not sure of the attorney, but, yes, it's a letter

11  from an attorney.

12  Q.  And you were provided a copy of this letter?

13  A.  Yes.

14  Q.  And the purpose of that was to get the most accurate

15  records of Ms. Trahan's -- the weddings she officiated,

16  correct?

17  A.  Yes, sir.

18  Q.  And it shows in the second paragraph that -- why

19  don't you just read it for me.  That might be the simplest

20  thing, starting with Judge Trahan's prior representation?

21  A.  It says "Judge Trahan's prior representation to the

22  Judiciary Commission under cover of the letter dated

23  September 11, 2018, that she performed 209 weddings in 2013,

24  299 weddings in 2014 was based upon the copies of the

25  marriage certificates maintained by her court, which she

1   believed at the time to be an accurate compilation of all of

2   the marriages in which she officiated during those two years.

3       Judge Trahan recently had the opportunity to review

4   additional marriage certificates that were not previously in

5   her court's possession and, therefore, this supplemental and

6   amended letter is being submitted for the Commission's review

7   and consideration."

8   BY MR. MAGNER:

9       Q.  So your understanding, Ms. Ancar, was that Ms. Trahan

10  made an initial determination of how many weddings she

11  conducted, correct?

12      A.  Correct.

13      Q.  Then she got additional information in terms of the

14  certificates and then she updated that information, correct?

15      A.  Correct.

16      Q.  And you obtained a copy of this letter so that you

17  could help her prepare amended returns with the most accurate

18  information possible?

19      A.  Correct.

20      Q.  And so then you just did the math on the side here on

21  the amount of weddings that was being reported and how much

22  she earned from those weddings, correct?

23      A.  Correct.

24      Q.  Now, you've known Ms. Trahan -- you can take that

25  down, Ms. Better, thank you so much -- for how long,

1    Ms. Ancar?

2        A.   Since 2006.

3        Q.   2006?

4        A.   Yes, sir.

5        Q.   And you first became acquainted with her how?

6        A.   I was referred by one of my clients for a succession.

7    My mother had passed away in 2005.

8        Q.   And so she handled your mother's estate?

9        A.   Yes.

10       Q.   You worked with her as an attorney?

11       A.   Yes.

12       Q.   You trusted her to handle your important family

13   business?

14       A.   Yes.

15       Q.   And she did so, correct?

16       A.   Correct.

17       Q.   She was --

18            THE COURT:  Hold on just a second.

19            There's no eating or drinking in the courtroom.  So

20   if you have food or drink, please take it outside the

21   courtroom.

22            All right.  Go ahead.

23   BY MR. MAGNER:

24       Q.   And she was professional with you?

25       A.   Yes, sir.

1    Q.   You developed a relationship of trust with her?

2    A.   Yes, sir.

3    Q.   And then you continued to have a relationship with

4  her over the next 10, 15 years, correct?

5    A.   Correct.

6    Q.   And you have a little side business that you do.  You

7  do refereeing?

8    A.   I do.

9    Q.   And you get little paychecks for -- what do you

10  referee?

11   A.   Basketball, volleyball, football.  I no longer do it

12  because of COVID, but, yes, prior to that I did.

13   Q.   All right.  And so you get, like, little checks.

14  We're not talking about big money here, but you get checks

15  and you asked Ms. Trahan to deposit those checks in a joint

16  bank account, correct?

17   A.   Yes.

18   Q.   Because your mom had passed?

19   A.   Correct.

20   Q.   And you wanted to have somebody that could handle

21  that money with you?

22   A.   Yes.

23   Q.   And, again, this is based upon your relationship --

24  relationship of trust with Ms. Trahan, correct?

25   A.   Correct.

1  **Q.** You became aware that she ran for judge in 2012 and

2 took the bench in 2013, correct?

3  **A.** Correct.

4  **Q.** And shortly after that, her opponent, a woman by the

5 name of Kiana, sued her and her campaign, correct?

6  **A.** I believe so, yes, sir.

7  **Q.** Okay.  And she became very upset and very stressed by

8 that, correct?

9  **A.** Yes.

10  **Q.** And you knew her well enough to know about her

11 mother's illness?

12  **A.** Yes, sir.

13  **Q.** And you understood that Ms. Trahan was exceptionally

14 close with her mother?

15  **A.** Yes.

16  **Q.** And unusually close even for a mother, daughter --

17 you know, only daughter --

18    THE COURT:  Hold on one second.  Hold on one second.

19 I don't want this to be a distraction.

20    But the lady who was drinking, you have to leave.

21 You can't just put the drink down.

22    SPECTATOR:  Oh, I'm sorry.

23    THE COURT:  This is public property, and if you

24 destroy the carpeting, it's taxpayer dollars going to waste.

25    SPECTATOR:  I'm sorry, Your Honor.  I apologize.

1   BY MR. MAGNER:

2       Q.  Their relationship was exceptionally close for mother

3   and daughter, correct?

4       A.  Yes.

5       Q.  And Ms. Trahan always worried about her mother

6   particularly when she got up there in age and started getting

7   sick, right?

8       A.  Yes, sir.

9       Q.  And her illness caused her a great deal of worry and

10  consternation, right?

11      A.  Yes.

12      Q.  And she did not function very well because of that,

13  correct?

14      A.  Yes, sir.

15      Q.  Can you describe that in any more detail for the jury

16  so they understand how -- how it appeared it affected her?

17      A.  As any daughter, when you are concerned that your

18  loved one will pass or something may happen to them, it's

19  just extra stress and you're worried.  Sometimes you don't

20  want to know -- you don't want to appear because you don't

21  want to know an answer.

22          So at times she would call me and say, "Please go

23  check on my mama.  She's not answering the phone."  And I

24  would gladly go do it because I didn't have a mother.

25  BY MR. MAGNER:

1   **Q.**   And so you got to know Ms. Faye as a result of that,

2   correct?

3   **A.**   Yes.

4   **Q.**   And there would be times where Ms. Trahan couldn't

5   leave the bench or couldn't tear her away from what she was

6   doing, but she called her mother and the mother didn't answer

7   the phone, right?

8   **A.**   Right.

9   **Q.**   And without being morbid about it, she was always

10  afraid that her mother had died, right?

11  **A.**   Yes.

12  **Q.**   So she'd send you to the house and you would have to

13  bang on the door, right?

14  **A.**   Yes.   One time I banged on the door so loud her

15  mother came to the door and said, "Why you banging on the

16  door like the police?  I'm in the back of the house.  I'm

17  coming."

18         Like, I'm sorry.  I don't know because the call I got

19  was like, she hasn't been answering.  Please go check, so

20  your thoughts is you got to bang on the door.

21  BY MR. MAGNER:

22  **Q.**   Is it fair to say Ms. Faye was very strong-willed?

23  **A.**   Yes.

24  **Q.**   So this is not the nicest way to say it, but she was

25  difficult, she was horsey, right, sometimes?

1      **A.**   She was her own person.

2      **Q.**   Right.  A much nicer way.

3                          (Laughter.)

4      **A.**   In a polite way.

5      **Q.**   And Ms. Trahan had repeated problems trying to get

6      her mother to go to dialysis, right?

7      **A.**   Anywheres (sic).

8      **Q.**   I'm sorry?

9      **A.**   Any -- any doctor appointment but, yes, sir.

10     **Q.**   But particularly that?

11     **A.**   Yes, sir.

12     **Q.**   And she would say things to you -- Ms. Faye would say

13     things to you like, "I'm Teena's mother, she's not my

14     mother," right?

15     **A.**   Specifically, she would say --

16            MR. FLANAGAN:  Objection --

17     **A.**   I'm Tinny's --

18            MR. FLANAGAN:  -- calls for hearsay.

19            MR. MAGNER:  Present sense impression, Judge.

20            THE COURT:  I'm going to sustain the objection.

21     BY MR. MAGNER:

22     **Q.**   Okay.  And as time wore on, when Ms. Trahan was on

23     the bench, her worries increased and her mother's physical

24     condition worsened, correct?

25     **A.**   Yes, sir.

**OFFICIAL TRANSCRIPT**

1    **Q.**  And that took a significant toll on her?

2    **A.**  Yes, sir.

3    **Q.**  Now, would you agree that Ms. Trahan's recordkeeping,

4    bookkeeping, was very poor?

5    **A.**  Yes, sir.

6    **Q.**  All right.  Are you from New Orleans?

7    **A.**  From lower Plaquemines Parish.

8    **Q.**  Okay.  So as a tax preparer, you are familiar with

9    the concept of, like, the little old lady coming to her tax

10   preparer with a Schwegmann bag full of receipts, right?

11   **A.**  Yes.

12   **Q.**  Okay.  You've got that mental image in your mind?

13   **A.**  Yes, sir.

14   **Q.**  But Ms. Trahan wasn't even that organized, was she?

15   **A.**  No, sir.

16        MR. MAGNER:  Okay.  I'm dating myself I think

17   referring to Schwegmann.

18        Let's pull up, please, Government Exhibit 64.

19        I'm guessing that's the -- could I impose again?  I'm

20   sorry.  Just in the interest of time, Ms. Better, I believe

21   it's Government 64.

22        Your internal reference number was Government 76.

23   Does that help?

24        MS. BRODNEY:  That's 69.

25        MR. BOTELER:  Are you referring to the Schedule C

1    documentation?

2          MR. MAGNER:  Yes.

3          MR. BOTELER:  That would be our Internal 71.  There's

4    one showing up now.

5          MR. MAGNER:  There we go.  Okay.  Let me just make

6    sure it's the right one.  Yeah.  Okay.

7    BY MR. MAGNER:

8       Q.  So would this be -- just so we're clear for the

9    record, what exhibit number are we referring to here?

10         MR. BOTELER:  Exhibit No. 64.

11         MR. MAGNER:  Thank you so much.  Oh, I had it right.

12   BY MR. MAGNER:

13      Q.  Okay.  This would be the kind of record you'd get

14   from Ms. Trahan?

15      A.  At times, yes, sir.

16      Q.  All right.  And she would try to list her charitable

17   giving during the year, right?

18      A.  Yes, sir.

19      Q.  And also she had two children, I think, during this

20   period of time, her son Toussaint was going to Jesuit High

21   School?

22      A.  Potentially.

23      Q.  And then went on to college a little later at

24   Morehouse?

25      A.  Yes.

1    Q.   And her daughter Lillie was going to McGehee School?

2    A.   Yes.

3         MR. MAGNER:   And so she would try to keep -- oh, I'm

4    sorry.  Can we put that up on the screen?  It's in evidence.

5    Thank you.

6    BY MR. MAGNER:

7    Q.   So the charitable giving up here on the left and

8    these school expenses on the bottom right here, these would

9    be the kind of records that you would get from Ms. Trahan,

10   correct?

11   A.   Yes.

12   Q.   There was some talk earlier about the weddings and

13   why it was 15,200.  And do you see a reference there of 700

14   times 3 for employees?

15   A.   Yes.

16   Q.   And what did you understand that to be?

17   A.   That she had three people that she was paying $700 a

18   piece to.

19   Q.   As sort of bonuses to her staff?

20   A.   Yes.

21        MR. MAGNER:   Okay.  If we could please go to the next

22   page.

23   BY MR. MAGNER:

24   Q.   And so you would take what Ms. Trahan would give you

25   and you would do your best to try to figure out what were the

1   legitimate deductions you could take against her income,

2   right?

3       A.   Correct.

4       Q.   So you would do things like you ask her how much her

5   cell phone bill was, right?

6       A.   Yes, sir, I did.

7       Q.   And you basically have that to -- to make a business

8   deduction for cell phone use, correct?

9       A.   Yes.  Because she would tell me people would call on

10  the cell phone or she would have to go somewheres (sic) and

11  utilize the cell phone.

12      Q.   So you didn't claim the entirety of the cell phone

13  expenses.  You just took half, right?

14      A.   Correct.

15      Q.   And then there is some references here to contract

16  labor.  Would that be in connection with her staff bonuses?

17      A.   Yes, sir, that was the 700 times 3.

18      Q.   Okay.  And then her insurance benefits, what kind of

19  insurance would that be?  Would that be for the car?

20      A.   Correct.

21      Q.   And did you take all of her car expenses or did you

22  try to apportion it in some way?

23      A.   Try to take a portion.

24      Q.   And.  Again, you're trying to do all this based upon

25  little scraps of paper, right?

1      **A.**  Correct.

2      **Q.**  Okay.  And then we see just some other entries here,

3  the donations, the charitable donations, and so forth,

4  correct?

5      **A.**  Correct.

6          MR. MAGNER:  If we could go to the next page.  Is

7  that it?

8          MR. WASHINGTON:  Yeah.

9  BY MR. MAGNER:

10     **Q.**  So that was typical of how you worked with Ms. Trahan

11  in parsing through the limited financial records that you

12  had, correct?

13     **A.**  Correct.

14         MR. MAGNER:  This is the other Schedule C paperwork.

15         MR. FLANAGAN:  I think that he's going to have 73.

16         MR. MAGNER:  If you could try pulling it up as G-73,

17  Aaron.

18         MR. FLANAGAN:  72.

19         MR. MAGNER:  I have 065.

20         MR. BOTELER:  Which is our 72.

21         MR. MAGNER:  I'll just use the Elmo then.  How do I

22  do that?

23         MR. WASHINGTON:  Document Camera.

24         MR. MAGNER:  One more time?

25         MR. WASHINGTON:  Document Camera.

1          THE COURT:  Mr. Magner, did you break my Elmo?

2                      (Laughter.)

3          MR. MAGNER:  Dena, is there something I'm supposed to

4    do?

5          So you're vertically challenged.  I'm technically

6    challenged.

7          THE WITNESS:  It's okay.

8          THE CASE MANAGER:  I'm resetting it.

9          MR. WICKER:  Should I turn it off on this end?

10          THE CASE MANAGER:  No, just leave it.

11   BY MR. MAGNER:

12     Q.  Okay.  And this was the same worksheet that you

13   prepared for 2015, correct?

14     A.  Correct.

15     Q.  And you compared it to the 2014 in that second greyed

16   out column here, right?

17     A.  Yes, sir.

18     Q.  Okay.  And you did this essentially in the same way,

19   trying to work with Ms. Trahan to determine what her income

20   was and what her expenses were, correct?

21     A.  Yes, sir.

22     Q.  And you did this based on -- on that, correct?

23     A.  Yes, sir.  And any verbal communication we would have

24   had.

25     Q.  And you did your best to prepare these tax returns in

1    good faith with this type of information, right?

2        A.  Yes, sir.

3        Q.  And you likewise believed that Ms. Trahan was acting

4    in good faith, correct?

5            MR. FLANAGAN:  Objection.

6        A.  Yes.

7            MR. FLANAGAN:  Objection --

8            THE COURT:  Overruled.

9            MR. FLANAGAN:  -- calls for speculation.

10           THE COURT:  Overruled.  They were working closely

11   together.

12   BY MR. MAGNER:

13       Q.  And so we're clear, what you just told me was not

14   speculation on your part.  This was based upon a 15-year

15   relationship that you had with this woman, right?

16       A.  Correct.

17       Q.  And you're familiar with her reputation in the

18   community?

19       A.  Yes, sir.

20       Q.  And her reputation to the community is one of

21   honesty, integrity, and truthfulness, right?

22       A.  Yes, sir.

23           MR. MAGNER:  What's our next number?

24           MR. WICKER:  2.

25           MR. MAGNER:  Okay.

1          I'm going to show you what I've marked for

2  identification as Defense Exhibit 2.  Not for -- it's not in

3  evidence yet, Judge, so I would just like to show it to the

4  witness.

5          THE CASE MANAGER:  Is it just on the Elmo?

6          MR. MAGNER:  I'm sorry?

7          THE CASE MANAGER:  Is it just on the Elmo?

8          MR. MAGNER:  Yes.

9          THE CASE MANAGER:  Is it showing on your screen?

10         THE WITNESS:  No, ma'am.

11         THE CASE MANAGER:  The Elmo is only --

12         MR. WICKER:  You can just give her a copy.

13         MR. MAGNER:  That's fine.

14  BY MR. MAGNER:

15     Q.  Do you recognize these handwritten sheets, ma'am?

16     A.  Yes, sir.

17     Q.  And what are they?

18     A.  That would be Judge Trahan's expenses, what she's

19  written down.

20     Q.  And on the first page, do you see references to '13

21  and '12?

22     A.  Yes, sir.

23     Q.  And on the second page, do you see additional

24  expenses that Ms. Trahan would have given to you?

25     A.  Yes, sir.

1     **Q.**  And you see a reference there to -- I see 10/31/14 --

2         THE COURT:  Are you going to publish this to the

3  jury?

4         MR. MAGNER:  I'm sorry?

5         THE COURT:  She's familiar with it.  Are you going to

6  publish this to the jury?

7         MR. MAGNER:  It's not in evidence yet.  I was having

8  her identify it first and then I was going to introduce it.

9         THE COURT:  Okay.  Because you're going into great

10  detail.

11         MR. FLANAGAN:  The government is not going to object

12  to this exhibit.

13         MR. MAGNER:  Okay.  That makes it easier.  We would

14  offer then Defense 2, D-2 into evidence.

15         THE COURT:  All right.  There being no objection,

16  it's accepted into evidence.  You can publish it for the

17  jury.

18     (Whereupon, Defense Exhibit 2 is admitted into evidence.)

19  BY MR. MAGNER:

20     **Q.**  So these are similar handwritten entries that you

21  received from Ms. Trahan?

22     **A.**  Yes, sir.

23     **Q.**  And, generally speaking, on the left, are those -- is

24  that Ms. Trahan's handwriting?

25     **A.**  That is.

1    **Q.**  And on the right here, I'm marking with my thumb and

2    down here, well, let's -- is that your handwriting that's a

3    little bit neater?

4    **A.**  Yes, sir.

5    **Q.**  Okay.  And this is from your efforts to do her 2013

6    tax return?

7    **A.**  Yes, sir.

8    **Q.**  And in dealing with Ms. Trahan in preparing her

9    returns, you would have to remind her sometimes of needing

10   the paperwork to take certain legitimate deductions, right?

11   **A.**  Correct.

12   **Q.**  So she would come to you on occasion and she wouldn't

13   have the records for her mortgage interest, for example,

14   correct?

15   **A.**  Correct.  We would write it on paper and I would ask

16   her to call and get the information.

17   **Q.**  Okay.  So you would task her to do things?

18   **A.**  Yes, sir.

19   **Q.**  And she would hopefully do it, right?

20   **A.**  She would do it, yes, sir.

21   **Q.**  But in any event, when you're dealing with her, she

22   did not show any guile in dealing with you, correct?

23   **A.**  No, sir.

24        MR. MAGNER:  There we go.  Look at that.  Better

25   lucky than good.

1   BY MR. MAGNER:

2       Q.   And the next page, similar, these are the expenses

3   for the rental property that the Trahans owned in Houma,

4   correct?

5       A.   Yes, sir.

6       Q.   And she would gather those expenses and you would

7   probe her for additional information, right?

8       A.   Correct.

9       Q.   And she would gather that together and I see, like,

10  there are entries there at the bottom for, like, safe box and

11  church, and that appears to be in your handwriting, correct?

12      A.   Correct.  Everything underneath the little dotted

13  slash lines is my handwriting.

14      Q.   Okay.  And would it be fair to say that you would ask

15  her, you know, "Teena, didn't you tithe to your church last

16  year?"

17      A.   Correct.  Correct.

18      Q.   And she would give you those figures?

19      A.   Yes, sir.

20      Q.   And do you know what safe box is?

21      A.   That would be a safe deposit box.

22      Q.   Like a safe deposit box like at a bank or something?

23      A.   Yes.

24      Q.   And we talked a few moments ago.  You would deduct

25  some of her car mileage, right, for when she would have to

**OFFICIAL TRANSCRIPT**

1    travel for weddings?

2        **A.**   Correct.

3        **Q.**   Would you deduct all of her car mileage?

4        **A.**   No, sir.

5        **Q.**   How would you then apportion that?

6        **A.**   I would ask her where she went, if she could recall,

7    and then I would Map Quest the miles to get accurate miles.

8        **Q.**   Right.  So if she told you that she did a wedding in

9    Lakeview, you would Map Quest from her home in Algiers to

10   Lakeview, for example?

11       **A.**   Yes, sir, wherever she started.

12       **Q.**   Now, do you recognize whose handwriting this is?

13       **A.**   To the left is my handwriting with the bullet points

14   and then most of the calculated numbers are from her and then

15   there's still some from me.

16       **Q.**   So this is mostly you, right?

17       **A.**   Yes, sir, trying to tell her this is the information

18   I need to complete an accurate return for her based on the

19   prior year's return.

20       **Q.**   And then it looks like in the bottom right-hand

21   corner she would come back to you with some of her charitable

22   deductions, right?

23       **A.**   Correct.

24       **Q.**   I'm going to show you this page.  Do you recognize

25   this page which starts with August and September on the top

1   left and has $25,920?

2       A.   Yes, sir.

3       Q.   Okay.  And you met with the Government last night,

4   correct?

5       A.   Correct.

6       Q.   And you went through all of these documents and tried

7   to explain them to the government as best you could, correct?

8       A.   Yes, sir.

9       Q.   And do you now understand -- well, let's talk about

10  -- so we see $25,920, correct?

11      A.   Yes, sir.

12      Q.   And then you see a $4,500 check, right?

13      A.   Yes, sir.

14      Q.   And then something for "Bill TD."  Do you know what

15  that means?

16      A.   I'm assuming it was something for Trahan & Davis, but

17  I don't know exactly.

18      Q.   Okay.  And then we see $9,500.  And do you understand

19  that that references Deatrice?

20      A.   I knew it was a payment that she had made, yes, sir.

21      Q.   Okay.  And has this refreshed your recollection that

22  this was an attempt on Ms. Trahan's part to account for her

23  business income from her previous legal practice in 2013?

24      A.   Yes, sir.

25      Q.   Okay.  And you spoke with the Government about that.

1    You answered their questions last night to the best of your

2    ability, and it was following that that the government

3    dismissed Count 1 in this case, correct?

4            MR. FLANAGAN:  Objection, Your Honor.

5            THE COURT:  What's your objection?

6            MR. FLANAGAN:  Relevance, 403.

7            THE COURT:  All right.  Overruled.

8            MR. MAGNER:  Thank you.

9    BY MR. MAGNER:

10       Q.  And do you understand that $51,550 is ballpark, what

11   the Government claims she earned in 2013 from her prior law

12   practice?

13           MR. FLANAGAN:  Objection, lack of personal knowledge.

14           MR. MAGNER:  If she knows.

15           THE COURT:  Overruled.

16           Answer it, if you know.

17       A.  I don't know the number that they're searching for,

18   but I know this is the number that was calculated based upon

19   what she had written in trying to remember what was her

20   income.

21       Q.  Okay.  Thank you very much.

22           And then for whatever reason, the 2013 return never

23   got filed, correct?

24       A.  Correct.

25       Q.  You thought that Ms. Trahan had filed it and she

1    thought that you had filed it, right?

2         A.  Somewheres (sic) in the middle, it just was not

3    filed.

4         Q.  And then how long was it before you discovered that

5    it had not been filed?

6         A.  I was preparing someone else's 2017 return that came

7    in.  I noticed that that return was not filed.  I called her

8    and said, "You have not filed your 2013 return."  And her

9    immediate reaction was, "Oh, my God.  I need to file it."

10        Q.  So she panicked and immediately filed it, correct?

11        A.  Correct.

12        Q.  But she never did the calculations for her 2013 legal

13   fee income nor did she deduct the expenses for that on that

14   '13 return, correct?

15        A.  Correct.

16        Q.  And in the ensuing four years, would it be fair to

17   say a lot happened in Ms. Trahan's life that was very

18   difficult for her to deal with, right?

19        A.  Yes, sir.

20        Q.  Was this really anything other than a screw up?

21             MR. FLANAGAN:  Objection, 704, ultimate issue.

22             THE COURT:  She can speak to it from her professional

23   point of view because we don't know who forgot to -- to do

24   what, so in her professional opinion, I think she can --

25   overruled.

1    BY MR. MAGNER:

2        Q.   And I'm not casting any blame here, but just

3    basically this got gummed up, right?

4        A.   In my profession life, events happen and some things

5    get overlooked.

6        Q.   When you prepared the amended returns, you did the

7    2013 and 2014 returns, amended returns, but those did not get

8    filed, correct?

9        A.   Once the amended returns are done, I print them out

10   and provide them to the client.

11       Q.   Okay.  But then the '15 and '16 returns, we know and

12   we saw on your direct examination that those were filed with

13   the certs, correct?

14       A.   Correct, I electronically filed those.

15       Q.   And fair to say that you did not take many deductions

16   against her income for the wedding expenses, correct?

17       A.   Correct.

18       Q.   You tried to be as conservative as you possibly could

19   to avoid any problems on those amended returns, correct?

20       A.   When I asked her for any kind of information, she

21   said, "This is what I have."  I prepared the return based

22   upon what I had and provided her the returns.

23       Q.   Right.  So if she had some expenses for her staff

24   just now in the context of these amended returns, if she gave

25   bonuses to her staff and she paid for some decorations and

1    she had some flowers and some fancy stationary for the

2    wedding, you just decided you were not going to include those

3    expenses to be as conservative as possible, right?

4         A.   I was told based upon a conversation that she had

5    that she was not going to have any expenses.

6         Q.   Okay.

7              THE CASE MANAGER:  Mr. Magner, the exhibit.

8              MR. MAGNER:  We sometimes need people to keep us

9    organized in our lives.

10             THE WITNESS:  We do.

11             MR. MAGNER:  Okay.  Ms. Better, I'm really taking

12   advantage here.  Could you please pull up what I have

13   originally as your Reference 7, 2013 financial disclosures?

14             MR. BOTELER:  Exhibit 7.

15             MR. MAGNER:  It's still Exhibit 7?

16             MR. BOTELER:  Yeah.

17   BY MR. MAGNER:

18        Q.   This is the only typewritten financial disclosure

19   form that I think we have.  Do you recall typing this

20   document up?

21        A.   If it was typed, it was definitely me.

22        Q.   Okay.  The kind of messy handwritten ones, those were

23   all Teena, right?

24        A.   Yes.

25        Q.   Okay.  But you prepared this and it was -- looks like

1    it was received on May 16, 2014, correct?

2         A.   Correct.

3         Q.   And I think if we can please go to page 4 and we see

4    Subsection D Miscellaneous Income, correct?

5         A.   Correct.

6         Q.   And we see the bottom half a description of the

7    nature of services rendered, excuse me, and that was work

8    performed prior to becoming a judge?

9         A.   Yes.

10        Q.   And it's reported at $25,000 to $100,000?

11        A.   Correct.

12        Q.   Okay.  Now, that was based on information that Ms.

13   Trahan provided you, correct?

14        A.   Correct.

15        Q.   You, her tax preparer, correct?

16        A.   Something completely separate from tax preparation

17   and this is just dealing with her campaign stuff.  She

18   provided the information.  I typed it in, so it looked

19   presentable and neat for her to submit.

20        Q.   Right.  But my point is, she asked you to type up

21   this form?

22        A.   Correct.

23        Q.   And she told you that she made $25,000 to $100,000 in

24   income from her work prior to becoming a judge, right?

25        A.   Yes.

1          MR. MAGNER:  I beg the Court's pardon.  Could I ask

2    you to please pull up Government Exhibit 71?

3    BY MR. MAGNER:

4        Q.  So counsel asked you about this e-file form and he

5    noted that this was not signed by Ms. Trahan, correct?

6        A.  Correct.

7        Q.  And we don't have a signed copy of this e-file return

8    for 2016, right?

9        A.  I do not, no.  No, sir.

10       Q.  So we have no documentary evidence that Ms. Trahan

11   reviewed that 2016 return and authorized you to e-file it?

12       A.  If that's what you're saying, but I wouldn't have

13   e-filed without me discussing something with her.

14       Q.  Okay.  In terms of being able to prove that through

15   documentary evidence --

16       A.  There is none.

17       Q.  -- we can't do that?

18       A.  Correct.

19       Q.  And so the 2016 return itself, that's not signed by

20   Ms. Trahan either, correct?

21       A.  Correct.

22       Q.  Because it was e-filed?

23       A.  Correct.

24          MR. MAGNER:  One moment, Your Honor.

25   BY MR. MAGNER:

1    **Q.**  So in terms of the different deductions that Ms.

2    Trahan would take on the returns that you prepared, would you

3    have to prompt her to get the information to get the

4    deductions so you could file the most accurate tax return you

5    could?

6    **A.**  At times, yes, sir.

7         MR. MAGNER:  All right.  That's all I have.

8         Thank you, Your Honor.  I tender the witness.

9         MR. FLANAGAN:  I'm going to start by publishing to

10   the witness Defense Exhibit 2 with the Court's permission.

11   It's in evidence as Defense Exhibit 2.

12        THE COURT:  Yes.

13        MR. FLANAGAN:  We're going to use the Elmo because we

14   don't have a digital copy.

15                    <u>REDIRECT EXAMINATION</u>

16   BY MR. FLANAGAN:

17   **Q.**  So Defense Exhibit 2, did these documents come from

18   your records?

19   **A.**  No, sir.

20   **Q.**  When did you receive these Government's -- excuse me

21   -- receive these documents?

22   **A.**  In an e-mail from my attorney, I believe, yesterday

23   morning.

24   **Q.**  Yesterday morning was the first time you got these?

25   **A.**  I would have gotten them before then because they

1    have my checkmarks and my handwriting on it, so it would have

2    been used in the beginning to prepare her return.  However, I

3    must have asked for some additional information.  She took it

4    home and potentially --

5        Q.  And we will walk through the conversation you had

6    with Judge Trahan you had in 2014 in just a moment.  But when

7    you were subpoenaed to provide records regarding 2013, 2014,

8    did you have these records in your records?

9        A.  I did not have them.  My hard drive crashed and so I

10   lost all of the documentation I had stored.

11       Q.  And you hadn't seen them since then until Monday

12   morning when you got them?

13       A.  Correct.

14       Q.  And what the Government has was the records you gave

15   to the Government, right?

16       A.  Correct.

17       Q.  So Monday evening you spoke with the Government about

18   these records?

19       A.  Yes.

20       Q.  And after that, the Government dismissed Count 1?

21       A.  That's what I'm hearing.

22       Q.  Understanding that -- so now we understand where

23   these records come from, what was the conversation that took

24   place as best as you can remember based on these documents?

25       A.  I would have to say that we were possibly looking for

1    additional deductions to make sure we had an accurate return.

2    She took them home to try to find out anything extra that she

3    had.  That is the best answer that I can say to you.

4        Q.  How do you mark once you're done with a certain piece

5    of information on the tax return?

6        A.  I put checkmarks just to know that I've moved it from

7    the client's records to my spread sheet or to the tax return.

8        Q.  And understanding you talked about this financial

9    income, do you have any checkmarks next to it?

10       A.  I do not.

11           MR. FLANAGAN:  I'm showing the witness the part of

12   the page with the 51,000 just for the record.

13   BY MR. FLANAGAN:

14       Q.  So based off of that, what was your recollection of

15   the conversation you had with the defendant back in 2014?

16       A.  I must have asked her to verify that she had all of

17   her income and she must have taken this home to do the due

18   diligence of that.

19       Q.  And as far as you remember, you were preparing this

20   2013 return relatively timely?

21       A.  Correct.

22       Q.  Meaning sometime in tax season in calendar year 2014?

23       A.  Correct.

24       Q.  Because tax day is, you know, the following April.

25   So in April of 2014, you told Judge Trahan, "Listen, to file

1    all your returns, I need all of your legal income"?

2       A.  Correct.

3       Q.  Okay.  I know we're jumping around a lot, but do you

4    remember if you prepared an amended 2016, amended 2015, and a

5    2017 return all around the same time?

6       A.  I don't recall.  I'm sorry.

7       Q.  Would seeing the documents help?

8       A.  That potentially could because it would have a date

9    and I would at least be able to answer you.

10          MR. FLANAGAN:  Pulling up Internal Reference 59,

11   page 2.

12          MR. MAGNER:  Your Honor, we don't take issue with

13   that if that would help, that they were filed all around the

14   same time.

15          THE COURT:  All right.  Defense stipulates to the

16   fact that they were all filed -- the amended were all filed

17   at the same time.

18          MR. FLANAGAN:  And the original 2017 because that's

19   what I'm about to show.  Those are all --

20          MR. MAGNER:  Yes, we so stipulate.

21          THE COURT:  Yes.

22   BY MR. FLANAGAN:

23      Q.  So understanding they're all around the same time,

24   I'm showing you Internal Reference No. 59.

25      A.  Okay.

1          MR. FLANAGAN:  It's Exhibit 52, so we ask to publish.

2          THE COURT:  Okay.  You can publish it.

3    BY MR. FLANAGAN:

4      Q.  When was 2017 -- this 2017 tax return e-filed based

5    on these signatures?

6      A.  The last day of the extension is October 15, 2018.

7      Q.  Is that before or after July 2018?

8      A.  October would be after July of 2018.

9      Q.  Okay.  So turning to tax returns that were filed

10   before July 2018, showing the witness what's in evidence as

11   Government Exhibit 17 -- 17.  Turn -- let's go forward, I

12   believe, two more pages but we'll see.  One more page.

13         Explain to the jury what this is.

14     A.  This is the bottom portion of the Form 1040.

15     Q.  And I apologize, but do you know what year this is

16   for?

17     A.  I would say 2016 because it says 2016 down at the

18   bottom in parentheses.

19     Q.  And then going back to that page then.  And so what

20   does it say at the top for your signature?  Can you read

21   that?

22     A.  Those are the asterisks from the electronically filed

23   Form 8879.

24     Q.  And what's the occupation of that signer, not the

25   spouse, but that one?

1      **A.**   Attorney.

2      **Q.**   So what does that -- explain to the jury what that

3   means that this document was digitally signed.

4      **A.**   That means that I did not change her occupation.  I

5   clicked through the buttons, kept going, moved through, the

6   attorney was still there and I did not change it to represent

7   her true profession.

8      **Q.**   But this document was filed with the IRS, correct?

9   This is what a digital signature means?

10     **A.**   It was.

11     **Q.**   And you did it on behalf of Judge Trahan, correct?

12     **A.**   Yes.

13     **Q.**   So how do you know that you were authorized to sign

14   this document for her?

15     **A.**   I would have had an 8879 signed.  I wouldn't have

16   just sent it in because I wanted to send it in.

17     **Q.**   Is that your practice?

18     **A.**   It's my practice to make sure they're all signed.

19     **Q.**   Have you ever filed one of these without getting the

20   client's authorization to file on their behalf?

21     **A.**   No.

22     **Q.**   Why is that?

23     **A.**   I'm not supposed to.

24     **Q.**   Is that a biggy as far as tax preparation business

25   goes?

1        MR. MAGNER:  Objection; leading.

2        THE COURT:  Sustained.

3        MR. FLANAGAN:  Moving on.

4        Showing the witness Internal Reference 56.  It's in

5    evidence as Government Exhibit 49, so we request to publish.

6    Or excuse me.  I apologize.

7        Showing the witness Internal Reference 72.  It's in

8    evidence as 65.

9        And go to page 2.

10        Permission to publish.  And can we go to page 2,

11    please.

12    BY MR. FLANAGAN:

13    Q.  So as far as attention to detail, what information

14    was Judge Trahan able to give you about home expenses?

15        Excuse me.  What is that at the top?

16    A.  That was for the expenses for her rental property.

17    Q.  And what information was -- what details was she able

18    to provide?

19    A.  She listed floors, windows, electrical, taxes, my

20    handwriting showing Lowe's and then I'm not sure what the

21    last one was, but we probably discussed it at the time.

22    Q.  And scrolling down, what's this middle part with

23    Algiers?

24    A.  She has Algiers courthouse that she would have paid

25    125 for something and then churches that she would have made

1    contributions to.

2        Q.   And she's able to keep track of a $25 donation, $25

3    donation, $50 donation?

4        A.   Yes, sir, she listed it.

5        Q.   And you asked her these things?

6        A.   Yes, sir.

7        Q.   And she was able to give you those answers, but you

8    also asked for all of her wedding income, correct?

9        A.   Yes, sir.

10       Q.   Showing the witness Internal Reference 71, admitted

11   as Government Exhibit 64.  And as far as weddings, she was

12   able to give you her mileage looking at the bottom of this

13   document, correct?

14       A.   Yes, sir.

15       Q.   For 300 miles?

16       A.   Yes.

17       Q.   For 2016, how did you document payments that Judge

18   Trahan was giving to her chambers members?

19       A.   Potentially on 1099-MISC.

20       Q.   Excuse me.  But for -- what does this 700 times 3

21   mean?

22       A.   That's money that she would have paid out for some

23   sort of services that was performed.

24           MR. FLANAGAN:  One moment, Your Honor.

25   BY MR. FLANAGAN:

**OFFICIAL TRANSCRIPT**

1    Q.   How many clients do you see a year?

2    A.   Anywheres from 375 to 500.

3    Q.   Is it unusual to see clients with just their

4    handwritten lists and that's the best you can do with that

5    documentation?

6    A.   No, it's not unusual.

7    Q.   So when they come in with that handwritten list, do

8    you take their numbers for what they are?

9    A.   I do because I do not audit.

10   Q.   You don't audit their income?

11   A.   No, sir.

12   Q.   You don't audit their expenses?

13   A.   No, sir.

14   Q.   And Judge Trahan knew after going to you for 2012,

15   2013, 2014 you weren't going to do this audit?

16        MR. MAGNER:  Objection to leading; it's repetitive

17   and argumentative.

18        THE COURT:  Sustained.

19   BY MR. FLANAGAN:

20   Q.   We also reviewed an amended 2014 tax return.  Do you

21   know if Judge Trahan ever submitted that amended 2014 tax

22   return?

23   A.   I wouldn't know if anything was mailed off.

24   Q.   Do you know if the IRS was ever told that you

25   prepared a 2014 amended tax return?

1      **A.**  I wouldn't know.

2      **Q.**  But in preparing that tax return, did you give that

3   information, that tax return to Judge Trahan?

4      **A.**  I would have to say I did.  I don't recall back --

5   whatever year that was -- you're referencing to.

6      **Q.**  When you give her any amended tax return, do you

7   explain to her how much in taxes she owes?

8      **A.**  Yes.  I would say what's the amount owed or refund

9   that's provided.

10      **Q.**  And you explain that to the client when you complete

11   that tax return?

12      **A.**  Yes.

13      MR. FLANAGAN:  Nothing further.

14      THE COURT:  All right.  Thank you, Ms. Ancar.  Please

15   don't discuss your testimony with anyone and you're free to

16   go.

17      Do you all want to take a quick break?

18      Okay.  Let's take a 10-minute break.

19      THE CASE MANAGER:  All rise.

20      THE COURT:  All right.  We're adjourned.

21      (Whereupon, the jury exits the courtroom.)

22      (Recess taken.)

23      (In open court.)

24      THE COURT:  Before we bring the jury in, we have one

25   of our jurors who is not feeling well, but perhaps it's

1  something that -- it's almost 4:00.  If we just recess, maybe

2  he'll feel better tomorrow.  We only have one alternate and

3  we have a couple more days to go.  So I would rather let him

4  see if he can feel better.

5       Do you have any objection to that?

6       MR. MAGNER:  We have one witness who had a problem

7  coming tomorrow and I just asked Mr. Wicker to see if it's a

8  possibility if we stop early today if she perhaps come in the

9  afternoon --

10      THE COURT:  Let's see because I don't think --

11  Ms. White, I don't think we -- I'm not going to make him sit

12  through a witness.  He is --

13      MR. MAGNER:  He's that bad?

14      THE COURT:  Probably ate something that disagreed

15  with him over lunch.  So I think it will clear up because we

16  tried to contact the nurse.  They're gone.  He doesn't want

17  to go to the hospital.

18      MR. MAGNER:  I just hope it wasn't my

19  cross-examination.

20      THE COURT:  What?

21      MR. MAGNER:  I hope it wasn't my cross-examination.

22      THE COURT:  Anything is possible, Mr. Magner?

23                  (Laughter.)

24      MR. MAGNER:  Well, while we've got a little break, I

25  messed something up.  The witness who is going to introduce

1    the medical records summary slipped into the courtroom during

2    Ms. Ancar's testimony and I didn't see him until I walked

3    out.  And I shooed him out, but he is in technical violation

4    of the sequestration order and it's my fault and I apologize.

5    I don't think anything that he heard would possibly affect

6    his testimony.

7         MR. BOTELER:  Your Honor, we did speak with Mr.

8    Magner ahead of time.  We understand his testimony is just

9    going to be related to introducing the medical records chart,

10   so it should not be influenced at all by what he heard.

11        THE COURT:  But I'll ask you, you have other people

12   here, you know, with your team.

13        MR. MAGNER:  We're going to keep a closer eye.

14        THE COURT:  I'm trying to look, but I'm trying to

15   focus too on your objections, so I can't keep track.

16        MR. MAGNER:  We solved our problem with

17   Ms. Henderson.  She can come in the afternoon.

18        THE COURT:  I hate to bring him out, but let the -- I

19   need to let the jury know what's going on, so I need to bring

20   them back in and tell them not to look at the news or

21   anything like that.  But I won't bring him in because he's

22   sick.  Is it okay with you all if just the marshal or my case

23   manager reminds him and lets him leave?  Is that okay with

24   the Government?

25        MR. BOTELER:  That's fine with the Government.

**OFFICIAL TRANSCRIPT**

1          MR. MAGNER:  That's fine.

2          THE COURT:  I just think it's for the best not to

3     strike a juror at this time.

4               (Discussion held off the record.)

5          THE COURT:  Ms. White, can you tell that juror we'll

6     reconvene tomorrow at 9:00 a.m.

7          Your witness is coming in the afternoon, right?

8               (Whereupon, the jury enters the courtroom.)

9          THE COURT:  You can have a seat.

10         As you probably figured out, one of your fellow

11    jurors is sick.  And so we only have one alternate.  So I

12    don't want to strike him from the jury.  I think he will be

13    feeling better tomorrow when I give him -- and it's already

14    nearly four o'clock.  So what I'm going to do is with the

15    consent of the parties adjourn for today, we'll start

16    tomorrow at 9:00, and hopefully he will be feeling better.

17         All right.  And so I apologize, but I think it is the

18    best thing to do.

19         JUROR:  We do too.

20         THE COURT:  All right.  I just want to remind you not

21    to read the newspapers or listen to the news about this case.

22    If you inadvertently hear anything, please keep it out of

23    your mind and get yourself out of the situation.  We want you

24    to make a decision based solely on what you hear in the

25    court.  So drive safely and we'll see you in the morning.

**OFFICIAL TRANSCRIPT**

1          JUROR:  Your Honor, 9:00?

2          THE COURT:  9:00.

3              (Whereupon the jury exited courtroom.)

4          MR. FLANAGAN:  Your Honor, someone left a notebook.

5          THE COURT:  All right.  Is there anything else we

6    need to take care of?

7          MR. BOTELER:  Nothing from the United States.

8          MR. MAGNER:  Nothing, Judge.

9          THE COURT:  Okay.  See you in the morning.

10                         * * * *

11          (WHEREUPON, the proceedings were adjourned.)

12                         * * * *

13                    REPORTER'S CERTIFICATE

14          I, Nichelle N. Wheeler, RMR, CRR, Official Court
     Reporter, United States District Court, Eastern District of
15   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
16   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

17

18              ___/s/ Nichelle N. Wheeler___
                   Official Court Reporter
19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**
Page 467