```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

****************************************************************
UNITED STATES OF AMERICA

                         Criminal Action No. 22-2
VS.                      Section "G"
                         New Orleans, Louisiana
                         November 16, 2022

ERNESTINE ANDERSON-TRAHAN
****************************************************************

                TRANSCRIPT OF JURY TRIAL
     HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
            UNITED STATES CHIEF DISTRICT JUDGE
                     VOLUME III
```

APPEARANCES:

FOR THE GOVERNMENT:           Brian Eugene Flanagan
                              DOJ-Tax
                              150 M Street NE
                              Suite 1.405
                              Washington, DC 20004

                              Marissa R. Brodney
                              Michael C. Boteler
                              DOJ-Tax
                              Tax Division, SCES
                              150 M Street NE
                              Washington, DC 20002


FOR THE DEFENDANT:            Michael William Magner
                              Thomas C. Wicker, IV
                              Jones Walker
                              Place St. Charles
                              201 St. Charles Ave.
                              Suite 5100
                              New Orleans, LA 70170

**OFFICIAL TRANSCRIPT**

```
ALSO PRESENT:                    Judge Ernestine Anderson-Trahan
                                 Kim Better
                                 Aaron Washington
                                 Timothy Moore
                                 Dewaiyne Horner
```

```
Official Court Reporter:         Nichelle N. Wheeler, RMR, CRR
                                 500 Poydras Street, B-275
                                 New Orleans, Louisiana 70130
                                 (504) 589-7775
```

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

I N D E X

| | Page |
|---|---|
| RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL | 574 |
| JURY CHARGE CONFERENCE | 710 |

E X A M I N A T I O N S

| **Witness** | **Page** |
|---|---|
| TAMARA JACOBSON | |
|    DIRECT EXAMINATION BY MS. BRODNEY | 471 |
|    CROSS-EXAMINATION BY MR. MAGNER | 484 |
|    REDIRECT EXAMINATION BY MS. BRODNEY | 489 |
| MICHAEL HALL | |
|    DIRECT EXAMINATION BY MS. BRODNEY | 496 |
|    CROSS-EXAMINATION BY MR. WICKER | 498 |
| DAVID CARRONE | |
|    DIRECT EXAMINATION BY MR. FLANAGAN | 503 |
|    CROSS-EXAMINATION BY MR. MAGNER | 528 |
|    REDIRECT EXAMINATION BY MR. FLANAGAN | 562 |
| SCOTT SIGL | |
|    DIRECT EXAMINATION BY MR. MAGNER | 586 |
|    CROSS-EXAMINATION BY MR. BOTELER | 624 |
|    REDIRECT EXAMINATION BY MR. MAGNER | 635 |
|    RECROSS-EXAMINATION BY MR. BOTELER | 639 |
| DEATRICE HENDERSON | |
|    DIRECT EXAMINATION BY MR. MAGNER | 642 |
|    CROSS-EXAMINATION BY MR. FLANAGAN | 658 |
| CORRINE SHELTON | |
|    DIRECT EXAMINATION BY MR. MAGNER | 664 |
|    CROSS-EXAMINATION BY MR. BOTELER | 679 |
|    REDIRECT EXAMINATION BY MR. MAGNER | 699 |

1                    **P R O C E E D I N G S**

2                    (Call to order of the court.)

3         THE COURT:  Bring in the jury.

4          (Whereupon, the jury enters the courtroom.)

5         THE COURT:  Good morning, everyone.  Thank you for

6    being here.

7         THE JURY PANEL:  Good morning.

8         THE COURT:  You can have a seat.

9         All right.  Are we ready to proceed, Government?

10        MS. BRODNEY:  United States calls Tamara Kluger

11   Jacobson.

12        THE CASE MANAGER:  Good morning.  Please raise your

13   right hand.

14                    (Witness administered oath.)

15        THE WITNESS:  Yes.

16        THE CASE MANAGER:  Thank you.

17        Please have a seat.  Speak directly into the

18   microphone.  State and spell your name for the record.

19        THE WITNESS:  Tamara Jacobson, T-a-m-a-r-a,

20   J-a-c-o-b-s-o-n.

21                     TAMARA JACOBSON,

22   being called as a witness, being first duly sworn, examined

23   and testifies as follows:

24                    DIRECT EXAMINATION

25   BY MS. BRODNEY:

**OFFICIAL TRANSCRIPT**

1    Q.   Good morning, Ms. Jacobson.

2    A.   Good morning.

3    Q.   What do you do for a living?

4    A.   I'm an attorney.

5    Q.   And how long have you been an attorney?

6    A.   Almost 30 years.

7    Q.   And where did you graduate from law school?

8    A.   Tulane.

9    Q.   Are you a member of the Louisiana Bar?

10   A.   I am.

11   Q.   And what firm are you currently working with?

12   A.   I have my own firm.

13   Q.   And what is it called?

14   A.   Law Office of Tamara Jacobson.

15   Q.   When did you form the Law Office of Tamara Jacobson?

16   A.   Probably about 18 or 19 years ago.

17   Q.   And what type of law does your firm practice?

18   A.   Mostly civil work, personal injury, medical

19   malpractice.

20   Q.   Do you have any other attorneys who work with you in

21   your law firm?

22   A.   I do have some other attorneys that work in the same

23   office as me.

24   Q.   And any other staff?

25   A.   Yes.

1    Q.   Can you explain, what are attorney's fees?

2    A.   The amount of money we collect for working on a case.

3    Q.   In a typical personal injury case, when do you

4    receive attorney's fees?

5    A.   It depends on the kind of case, but in my cases,

6    normally they're contingency fee cases, so at the conclusion

7    of the case if we've been successful.

8    Q.   So can you explain what is a contingency fee?  You

9    just used that term.  What is that?

10   A.   So it's like you see on the TV commercials where the

11   attorneys are saying we don't collect if you don't collect,

12   so we basically take a percentage of what we collect at the

13   end, again, if we're successful and that makes it -- that

14   avails people of being able to seek an attorney without

15   having to put money upfront on cases where they may not be

16   able to do that.  So it becomes the attorney who is taking

17   the chance and investing in the case.  And then at the end of

18   it, we'll get a fee if we're successful.  If we're not, then

19   we don't collect a fee.  So the person who asked us to help

20   them is not in any peril for having brought this case.

21   Q.   And what about in a medical malpractice case?  Does

22   it work the same way?

23   A.   It does work the same way.

24   Q.   So what is the typical amount that you would charge

25   for attorney's fees?

1    **A.**   So my contract today says it's a third if we can

2    resolve the case before having to file suit; and if we have

3    to file suit, it's 40 percent of the total amount collected.

4    To be honest, in almost all of our cases, we do some sort of

5    reduction of the fee because our -- in my office and I'm sure

6    many others our goal is that the client leaves with the most

7    amount of money.  We're not there to profit off of people,

8    you know, in an unfair way.

9    **Q.**   So sometimes you reduce the amount that the client --

10   sometimes you reduce the amount.  Can you just explain that a

11   little bit?

12   **A.**   Often we will reduce our fee so that the clients do

13   well, so -- and, you know, in a medical malpractice case, we

14   don't want somebody whose life has been altered and, you

15   know, has a terrible outcome and had a terrible injury or

16   accident and where we would make more money than they would,

17   which happens sometimes when you have costs and things like

18   that.  So we don't have to by contract, but in good

19   conscience, we will reduce our fee often so that they will

20   end up doing well on a case.

21   **Q.**   And that breakdown that you mentioned, the third and

22   the 40 percent, depending on whether it goes before suit or

23   after suit, is that breakdown a common breakdown among

24   attorneys in your field?

25   **A.**   I think so.  I really don't know.  That's how I've

**OFFICIAL TRANSCRIPT**

1  always done it.  Because as you can imagine, once we have to

2  file suit and pursue litigation, it's a lot more work.

3      Q.  So shifting gears a little bit.  When did you meet

4  Judge Trahan?

5      A.  Decades ago.  Many, many years ago.  I mean, I think

6  of her as a contemporary.  I think we're around the same age

7  and have been practicing give or take the same amount.

8      Q.  How did you meet?

9      A.  I believe that she was a law clerk at court and I

10 think that that's when we met.  And my memory is not great,

11 but if I remember well, she also worked at a firm many, many

12 years ago with one of my very best friends.

13     Q.  And how would you describe your relationship with

14 Judge Trahan?

15     A.  I like her very much.  It's very hard to be here.

16     Q.  Did Judge Trahan ever ask you to take on any cases?

17     A.  I did not remember that independently, but I now know

18 that there was a file that I did take over for her.

19     Q.  And why -- why was that?

20     A.  I cannot remember.  As I told you, it's one of two

21 things; one is that it became a complex medical malpractice

22 case, which it did, and I have a little bit more experience,

23 I think, in those matters than she did at that time, or --

24 and, again, I don't know which it is -- or she was going onto

25 the bench as a judge, and at that point, she has to get rid

1    of her civil cases and she's not the only judge who has asked

2    me to do that.  I'm proud to say there's several judges

3    locally who have, you know, given me their cases when they

4    can no longer pursue them.

5        Q.  And had Judge Trahan done any work on those cases

6    prior to bringing them to you?

7        A.  I think it's only one case as my memory serves me and

8    I'm certain that she would have done some work on the case.

9        Q.  And when you inherited that case from Judge Trahan,

10   what happened at the end of the case?

11       A.  This particular case that we're I believe going to

12   talk about is a medical malpractice case where a young lady

13   lost her nipples because of the plastic surgeon, he did an

14   inappropriate job, and we were fortunate to be successful in

15   this medical malpractice case.

16           And I don't want to waste everybody's time in telling

17   you, but first you have to go to a panel and win at panel or

18   not win and then pursue the case at court.  And so we went

19   through all those steps and, ultimately, the case settled,

20   but it was a lot of work.  There were a lot of depositions

21   and I don't know if I answered you.  Ultimately, we settled.

22   I hope I answered your question.

23           MS. BRODNEY:  Thank you.  I'd like to publish for the

24   witness only exhibit -- Internal Reference 81.

25           THE WITNESS:  Thank you for making that bigger.

**OFFICIAL TRANSCRIPT**

1            MS. BRODNEY:   There could be two pages to this

2      document.

3            THE WITNESS:   Yes.

4      BY MS. BRODNEY:

5      Q.   Let's start there, just very briefly, if you would,

6      just review these two pages on your own and look up when

7      you're done.

8      A.   I'm familiar with them, yes.

9      Q.   Okay.   Do you recognize these documents?

10     A.   I do.

11     Q.   And just generally, what are they?

12     A.   These are two printouts from my internal bookkeeping

13     system, I think it's called QuickBooks, and we would input

14     the information that you see there, and then we can print out

15     different reports.

16     Q.   Were these documents made and kept by your firm

17     during the ordinary course of its business?

18     A.   Yes, it was.

19     Q.   And was it a regular practice of your firm to make

20     and maintain such records?

21     A.   Yes.

22     Q.   And were these records created at or near the time

23     the information in them was acquired by your firm?

24     A.   I would guess that they would have been put in where

25     you see the date.   They would have been put in, but they

1   would have been printed on the date on the top left corner.

2   That would have been the date I think I was asked to produce

3   them.

4        Q.  Are you familiar with how your firm keeps records?

5        A.  Very.

6        Q.  And why do you keep records of payments to your firm

7   and for attorney's fees?

8        A.  So that I can first -- the most important thing I

9   think is that I can account to the client.  When they come

10  in, I can give them an accounting of where every penny goes

11  and sometimes they want to know every penny rightfully so.

12  The other reason is this is how we do our bookkeeping, you

13  know, how we pay the doctors that are owed and our recover

14  fee.

15       Q.  And does this record document payment to Judge

16  Trahan?

17       A.  I believe -- I believe so.  If you look at the third

18  line, there would have been a $4,000 payment on January 16,

19  2014, and that would have been the date that we wrote the

20  check.  I don't know when I would have given it to her.

21            MS. BRODNEY:  We can discuss that if Your Honor

22  accepts this as an exhibit.  Your Honor, the Government moves

23  to admit Exhibit 73 and publish.

24            MR. MAGNER:  Judge, I would object unless this could

25  be redacted.  There are some entries here going back to 2012,

**OFFICIAL TRANSCRIPT**

1   which are not relevant, you know, to this case.  It's not

2   within the tax years that are charged.  So --

3         THE COURT:  And they're to other people.

4         MR. MAGNER:  And relating to other people and other

5   attorneys.

6         THE COURT:  Which my concern is some of this might be

7   privileged as to other -- other people, so is there some way

8   you can quickly redact it?

9         MS. BRODNEY:  Your Honor, we could simply admit

10   page 2, which is only related to Judge Trahan and with

11   respect to the two years, they are relevant because as the

12   witness has mentioned they're the same case and to explain

13   that there are two payments -- well, I don't want to speak,

14   but they are relevant because it is part of the same -- there

15   was --

16         THE COURT:  Well, that's not my concern.  My concern

17   is she can't waive the privilege of those other clients and

18   that's privileged information on that.

19         MS. BRODNEY:  If we only look at page 2, page 2 does

20   not have --

21         THE COURT:  What I'm looking at right now?

22         MS. BRODNEY:  Page 1.  Page 1.

23         THE COURT:  Is this what I'm looking at right now?

24         MS. BRODNEY:  Yes.

25         THE COURT:  Can you see that, Mr. Magner?

1          MR. MAGNER:  I can.  The other issue is this is

2    cumulative.  I believe the Government has a check for $4,000,

3    which we don't contest.  I think that's the best evidence and

4    the rest of this really is cumulative and irrelevant.

5          THE COURT:  Right.  The second one is outside the

6    time frame.

7          MR. MAGNER:  It is.  It also is just confusing

8    because it really doesn't relate to the charges.

9          THE COURT:  Not only is 2012 not relevant, I mean,

10   2013 isn't relevant, you know, that's what she would have

11   reported to judicial or reported on her -- I mean, I don't

12   understand.  You can approach the bench.  2012, the second

13   one, I don't see the relevance.

14         MS. BRODNEY:  Can I approach Your Honor?

15         THE COURT:  Yes, and Mr. Magner.

16         WHEREUPON, the following proceedings were held at the

17   bench:

18         MS. BRODNEY:  So we have two issues.  So the check

19   alone does not establish that the payment is income.  It's a

20   check.  So in order to establish that that payment is income

21   that is reportable on taxes, then we need to establish with

22   evidence that that payment was for attorney's fees and this

23   is the evidence that shows that it was for attorney's fees.

24         THE COURT:  The $4,000 one?

25         MR. MAGNER:  We'll stipulate to the check.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  What?

2          MR. MAGNER:  We'll stipulate to the check.  We'll

3     stipulate that she received it.  We'll stipulate that it's an

4     income.  It's just these other QuickBook records are just --

5          MS. BRODNEY:  Just to explain.  As the witness was

6     saying, she was trying to explain that it was one case and to

7     complete the story of what happened in that case, it was --

8          THE COURT:  What happened in that case is irrelevant.

9     What happened in that case is irrelevant.  He's agreeing to

10    stipulate to the $4,000 that she got it as income and you can

11    say -- you can say that the parties have stipulated, the

12    parties stipulated that there was a $4,000 attorney's fee --

13         MR. MAGNER:  I'll even say that there's a $4,000

14    check; she received it and deposited it in her account.

15         MS. BRODNEY:  But the $4,000 check being received and

16    deposited in her account, that's not sufficient to establish

17    it was income for attorney's fees.  There's a stipulation

18    that --

19         MR. MAGNER:  I'll say that.

20         MS. BRODNEY:  -- this is for attorney's fees?

21         THE COURT:  He'll say that.  I'm not going to allow

22    that.  I looked at that and there's something on there I feel

23    I should not have seen.  I'm just telling you.

24         MS. BRODNEY:  Okay.  Thank you.

25                    (In open court.)

1        MR. MAGNER:  Judge, to move this along, we will

2  stipulate that approximately in January of 2014, Ms. Jacobson

3  provided Ms. Trahan with a check for $4,000 as fee income and

4  that it was deposited in Ms. Trahan's bank account.

5        THE COURT:  The jury is to -- they stipulated to

6  that.  So even though you don't see it on paper, there's some

7  issues -- there's some other things on there that none of us

8  should see because it has to do with other people's business.

9  Accept that as a fact.

10        MS. BRODNEY:  Thank you, Your Honor.

11        If we could now please publish what has already been

12  admitted into evidence as Exhibit 44.

13        THE COURT:  This is the check that Mr. Magner, the

14  Defense, just stipulated to, correct?

15        MS. BRODNEY:  Yes.

16  BY MS. BRODNEY:

17    Q.  Ms. Jacobson, do you recognize this document?

18    A.  I do.

19    Q.  What is it?

20    A.  A check out of my trust account.

21    Q.  And how much is the check for?

22    A.  4,000.

23    Q.  And when is it dated?

24    A.  January 16, 2014.

25    Q.  Was this check to Judge Trahan alone?

**OFFICIAL TRANSCRIPT**

1    **A.**  No.

2    **Q.**  Did this check --

3         THE COURT:  Didn't he just stipulate?

4         MS. BRODNEY:  He did stipulate.

5         THE COURT:  He stipulated it was an attorney's fee.

6    I'm just trying to move it along.

7         MS. BRODNEY:  Absolutely.

8    BY MS. BRODNEY:

9    **Q.**  And just one final question, reviewing this check,

10   did this check come from your office as payment to Judge

11   Trahan for attorney's fees?

12   **A.**  This check came from my office as part of my

13   attorney's fees.  As I've told you, I don't know how she

14   accounted for it.

15   **Q.**  But this check -- did this check constitute

16   attorney's fees?

17   **A.**  They were part of my fee.

18   **Q.**  And did you have an agreement with Judge Trahan to

19   pay her a part of your attorney's fees?

20   **A.**  Correct.

21   **Q.**  And was that for work that Judge Trahan did on the

22   case?

23   **A.**  I would -- it could be.

24        MS. BRODNEY:  Thank you.  I tender the witness.

25        MR. MAGNER:  If you can keep that up for just a

1    moment, please.

2                       CROSS-EXAMINATION

3    BY MR. MAGNER:

4        Q.  Good morning, Ms. Jacobson.

5        A.  Good morning.

6        Q.  Have you met with the Government in connection with

7    this case?

8        A.  Yes, sir.

9        Q.  And how many times?

10       A.  Twice.

11       Q.  And where were those meetings?

12       A.  I don't think it was this building.  One of their

13   offices.

14       Q.  Okay.  Probably in the U.S. Attorney's Office?

15       A.  I believe so.

16       Q.  Right.  And you had to come both times for those

17   meetings?

18       A.  Yes, sir.

19       Q.  And for this $4,000 check -- and did they prepare

20   your testimony?  Did they go over the questions they were

21   going to ask?

22       A.  I believe they were asking me about -- about the

23   information that they were going to ask.  Yes.

24       Q.  And how many people were at the last meeting?

25       A.  Six or seven maybe.

**1**  Q.  And were those the prosecutors in the case?

**2**  A.  Yes.

**3**  Q.  Were the case agents in the second row there?

**4**  A.  Yes, sir.

**5**  Q.  All right.  And that was all in connection with the

**6**  $4,000 check, correct?

**7**  A.  Yes, sir.

**8**  Q.  And at about a 30 percent tax rate, that would be

**9**  about $1,200 in taxes, right?

**10**  MS. BRODNEY:  Objection, Your Honor.

**11**  THE COURT:  What's your objection?

**12**  MS. BRODNEY:  Argumentative.

**13**  THE COURT:  Overruled.

**14**  A.  I heard you.  Yes, sir.  And that was what I thought

**15**  math wise.

**16**  Q.  Right.  And you took time out of your schedule to

**17**  meet with these six or so Government representatives?

**18**  A.  Yes.

**19**  Q.  Twice?

**20**  A.  Yes, sir.

**21**  Q.  And did you -- and you told them you didn't want to

**22**  be there, you didn't want to be involved in this case, right?

**23**  A.  No.  I'm very upset about being here.

**24**  Q.  And you're not aware of what, if any, expenses that

**25**  Judge Trahan had that would offset this $4,000, are you?

1    **A.**   I don't know that.  And to be candid, I gave that

2    example and I gave one example that I'll share with you that

3    I think a day or so before we visited, I told them that I had

4    received a check from another attorney that I think was for

5    about $3,000.  That attorney probably believed that it was

6    for all fee, but when the check came to me, I had $700 in

7    costs.  So I deposited the fee into my trust account.  I took

8    $300 -- $700 rather, sorry, in costs and the fee ended up not

9    being 3,000, it was 2,300.  But that was not something the

10   other attorney knew because I didn't realize I had 700 until

11   we got the check and did the accounting.  And I gave the

12   example.  It's the same example that I told them.

13       **Q.**   When you say them, you meant the government

14   lawyers --

15       **A.**   Yes.

16       **Q.**   -- and agents?

17       **A.**   Yes.  I wanted them to know what I was going-- I

18   mean, I'm an attorney.  I didn't want to say anything here

19   today that they wouldn't know I was going to say.

20       **Q.**   Could you describe in a little more detail your

21   relationship with Teena Trahan?

22       **A.**   I like her very much.  I have the highest regard for

23   her.  She and I have a very similar background.  Our moms

24   really worked very hard for us to become attorneys.  Neither

25   one of us take that for granted.

1        In this particular case, thinking back, she felt very

2   strongly about fighting for this lady.  It was a really

3   unfortunate and horrific case.  And she wanted -- you know,

4   we don't take on med-mal cases.  They're really, really hard.

5   They're really expensive.  And this may not have been one

6   that I would have taken because there was a lot of

7   allegations as to why these things happened that we didn't

8   know if we could overcome, but it was important to her that

9   we help this lady and that's just kind of characteristic of

10  her.

11  BY MR. MAGNER:

12       Q.  Are you familiar with her reputation in the community

13  for truthfulness and integrity and honesty?

14       A.  I believe so.  She's very, very well regarded.  It's

15  very difficult to be here.  I don't make any bones about

16  that.  I'm shocked that we're here.

17       Q.  Can you explain -- do you understand why?

18            MS. BRODNEY:  Objection.

19            THE COURT:  What's your objection?  He's just asking

20  her if she understands why she's here.  Overruled.

21       A.  I understand that there have been criminal charges

22  against her for being inaccurate on her taxes.  I'm surprised

23  that we're here given -- given the amount.

24            I used to be a federal law clerk.  I've worked in the

25  DA's office.  I have the highest respect for the government

**OFFICIAL TRANSCRIPT**

1  and the attorneys that I met with and the FBI agents have

2  been nothing but professional.  I have nothing negative to

3  say about them.  I'm very -- I'm still very surprised to be

4  here and it actually scares me a little bit.

5  BY MR. MAGNER:

6      Q.  Were you aware of Ms. Trahan's mother's illnesses?

7      A.  I was.

8      Q.  And how did you become aware?

9      A.  Again, we're dear friends.  I know that she was very

10  involved if not primarily involved in her care.  Her mom was

11  a really funny lady and Teena used to tell really amazing

12  stories about her childhood.  And, of course, when she was

13  sick, she would -- she would tell us that she was sick.  I

14  know she agonized over that as you could imagine.

15      Q.  And you understood her to be -- in all likelihood her

16  primary caregiver?

17      A.  Yes.  She was very, very involved in the care of her

18  mother.

19      Q.  And you met Ms. Faye?

20      A.  I did.

21      Q.  Before she passed?

22      A.  I did.  And she reminded me a lot of my mom.

23      Q.  And what were the circumstances of your meeting

24  Ms. Faye?

25      A.  I think that she had a little bit of a crush on

1    former Governor Edwards and my law partner had been friends

2    with him in years past.  And if I remember right, the

3    governor had written a book and was coming to town, something

4    having to do with the book.  I must have mentioned that to

5    Teena, and she said that her mom would have just been so

6    thrilled to meet him.  And so we made sure that she met him

7    and it was really something.

8        Q.  And we agree not to share that I had prosecuted

9    Governor Edwards, right?

10       A.  Yes.  We said we would keep that a secret from her.

11       Q.  Do you consider Teena Trahan one of the finest people

12   you've ever met?

13       A.  I have used those words before to everybody that has

14   asked me about her.  She's really good stuff.

15       Q.  Did you tell the Government that?

16       A.  I did.

17           MR. MAGNER:  Thank you.  No further questions.

18           THE COURT:  Any redirect?

19                       REDIRECT EXAMINATION

20   BY MS. BRODNEY:

21       Q.  Just a couple of questions to follow up.

22       A.  Yes.

23       Q.  Do you know if Judge Trahan was still working on the

24   case, the medical malpractice case, you've been discussing

25   while she was a judge?

1    A.   I can't remember.

2         MR. MAGNER:  Objection, it's not relevant.

3         THE COURT:  It's not relevant.  Sustained.

4  BY MS. BRODNEY:

5    Q.   You discussed receiving $3,000 in attorney's fees in

6  your example --

7    A.   Yes.

8    Q.   -- of which $700 constituted expenses?

9    A.   Yes, ma'am.

10    Q.   Can you -- how did you report that on your taxes to

11  the IRS?  In other words, how did you -- because this is --

12  because this is relevant because it was asked about and you

13  discussed it.

14         THE COURT:  Wait.  Don't tell her it's relevant.

15         MR. MAGNER:  I object to relevance.

16         THE COURT:  And why don't y'all approach the bench

17  before you get into that.

18         WHEREUPON, the following proceedings were held at the

19  bench:

20         MS. BRODNEY:  I apologize, Your Honor.

21         THE COURT:  She's not testifying as an expert in our

22  attorneys file there -- so, I mean --

23         MS. BRODNEY:  What I'm hearing --

24         THE COURT:  What if she says -- what if she says

25  something insane, like I don't file my taxes.

**OFFICIAL TRANSCRIPT**

1          MS. BRODNEY:  What I'm trying to get at is the

2     defense counsel has the distinction between gross receipts

3     and expenses, they're being conflated, income, and gross

4     receipts are different things.  So I'm just trying to ask

5     about her understanding as an attorney who reports attorney's

6     fees, which the jury has not yet had an opportunity to hear

7     from another attorney who reports attorney's fees how she

8     reports gross income as compared to gross receipts.

9          THE COURT:  This is -- you know, this is the issue

10    I'm now having is you stipulated that it was attorney's fees,

11    which is kind of generous because, you know, she got them as

12    attorney's fees, but that doesn't necessarily mean they were

13    all for -- it could have been attorney's fees and costs, you

14    know.  And I think that's a problem the jury has to

15    understand is that attorney's fees when we get it in a

16    contingency like this could be attorney's fees and costs.

17         MS. BRODNEY:  The distinction between gross receipts

18    and income, again, is relevant because costs are not relevant

19    to gross receipts, which is what is at issue here.  Reporting

20    of gross receipts does not -- the costs are not relevant to

21    reporting gross receipts.  Costs are relevant to income,

22    income that you take on.

23         THE COURT:  And the allegation is that she didn't

24    properly report --

25         MS. BRODNEY:  Gross receipts.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  I'm going to allow it.

2          MS. BRODNEY:  Thank you, Your Honor.

3                    (In open court.)

4          THE COURT:  You can proceed.

5    BY MS. BRODNEY:

6      Q.  Ms. Jacobson, just to clarify, as an attorney, you

7    testified that you received gross receipts and I'm sorry.

8    You testified that you received attorney's fees.

9      A.  Yes.

10     Q.  When you -- you also testified that you have costs

11   associated with your legal practice when you work on a case?

12     A.  Yes.

13     Q.  When you receive a check for attorney's fees, how

14   does that get reported on your taxes?  Can you explain that?

15     A.  Yeah.  So let me just back up to be clear.  So if

16   it's a case that I've handled from the beginning to the end,

17   I collect the fee out of the check that comes in from the

18   insurance company or whoever we're collecting it from.  That

19   check goes to my trust account out of the trust account, out

20   of the trust account -- which is out of the trust account, I

21   will then write a check to the client, I will then write a

22   check to the client, I will write a check to myself for fee,

23   and I will write a check to myself for whatever costs.  I may

24   write checks to doctors or whoever -- whatever other expenses

25   I'm paying directly that were not paid out of my cost

1    account.

2         If as in this case in the example I gave it's coming

3    from another attorney, what usually happens and it doesn't

4    always happen, is we will have communicated with them, we

5    have this amount in costs and then we come to an agreement on

6    the fee.  So the example I gave my office, I don't remember

7    why, but did not communicate that we had $700 in fee, and

8    when we agreed on the $3,000, I'm sorry, in costs -- when we

9    agreed on the $3,000 in fee and it arrived at my office, we

10   realized we also had $700 in cost.  So had it come over just

11   as fee, it might have just been put in my operating account,

12   but because there was a cost component to it, it was put into

13   the trust account and two checks were written.  One went back

14   to my cost account to reimburse myself for the costs.  I

15   understand that that's non-taxable if that's what you're

16   asking me.  I don't have to report that as income.  And the

17   portion of it that was not reduced by costs, I would then put

18   on my list of things that I then give to my accountant.

19   BY MS. BRODNEY:

20      Q.  So in explanation, are you explaining, are you saying

21   is there a difference between the total of amount of money

22   that could come in versus what you received as income after

23   taking out expenses?

24      A.  Absolutely.

25      Q.  And they are different things?

1      **A.**  Yes.

2          MS. BRODNEY:  No further questions.  Thank you, Your

3    Honor.

4          THE COURT:  So we're done with this witness?

5          MR. MAGNER:  I have no questions.

6          THE COURT:  All right.  Thank you.

7          THE WITNESS:  Thank you.

8          THE COURT:  I know it's difficult to be here, so I

9    appreciate you being here.

10         THE WITNESS:  Thank you.

11         THE COURT:  Okay.  You want to call your next

12   witness, Government?

13         MR. FLANAGAN:  Your Honor, if we could just have a

14   moment to discuss with opposing counsel.

15         THE COURT:  Sure.

16         MR. FLANAGAN:  Your Honor, I think we're going to

17   come to an expedient solution to the court, so if we could

18   take a break --

19         THE COURT:  I'm sorry.  Y'all want a break?

20         JUROR 3:  We've been waving our hand.

21         THE COURT:  I'm sorry.  I didn't see that.

22                     (Laughter.)

23         Let's take a 10- or 15-minute break.  I'm sorry.

24         THE CASE MANAGER:  All rise.

25         (Whereupon, the jury exits the courtroom.)

**OFFICIAL TRANSCRIPT**

1          THE COURT:  All right.  Y'all let Ms. White know when

2     you're ready.

3          MR. FLANAGAN:  Thank you, Your Honor.  Appreciate the

4     court's indulgence.

5                         (Recess taken.)

6                         (In open court.)

7          THE COURT:  Bring the jury in.

8           (Whereupon, the jury enters the courtroom.)

9          Welcome back.  Let's have a seat.

10         Is the Government ready to proceed?

11         MS. BRODNEY:  Yes, Your Honor.

12         THE COURT:  All right.

13         MS. BRODNEY:  The United States calls Michael Hall.

14         THE CASE MANAGER:  Good morning.  Please raise your

15    right hand.

16                    (Witness administered oath.)

17         THE WITNESS:  Yes, ma'am.

18         THE CASE MANAGER:  Thank you.

19         Please have a seat.  Please speak directly into the

20    microphone.  State and spell your name for the record.

21         THE WITNESS:  Yes.  Michael Hall, M-i-c-h-a-e-l,

22    H-a-l-l.

23                        MICHAEL HALL,

24    Being called as a witness, being first duly sworn, examined

25    and testifies as follows:

<u>DIRECT EXAMINATION</u>

BY MS. BRODNEY:

    **Q.**  Good afternoon, Mr. Hall.

    **A.**  Good morning.

    **Q.**  Good morning.  What do you do for a living?

    **A.**  I am an attorney.

    **Q.**  How long have you been an attorney?

    **A.**  20 years.

    **Q.**  Where did you graduate from law school?

    **A.**  Southern University Law Center.

    **Q.**  Are you a member of the Louisiana Bar?

    **A.**  I am.

    **Q.**  And what firm are you currently working for?

    **A.**  I have my own practice, Law Office of Michael Hall.

    **Q.**  When did you form the Law Office of Michael Hall?

    **A.**  So it was formally formed in 2006.  However, I didn't actually start operating until about September of 2012.  I joined another firm before I started operating my own.

    **Q.**  And what type of law does your firm practice?

    **A.**  We do family law and we do some personal injury work as well as succession work.

    **Q.**  Are there any other attorneys working at your firm?

    **A.**  Presently it's just me right now, the only attorney.

    **Q.**  Do you have any other staff?

    **A.**  Yes, I have an office manager.

1    Q.   Did Judge Trahan ever bring any cases to your firm?

2    A.   Once she got elected, I took over some cases that she

3    was handling.

4    Q.   And why was that?

5    A.   Because she had gotten elected to the bench, so she

6    couldn't practice anymore, so I took over.

7    Q.   And what kinds of cases?

8    A.   They were mostly family law cases and there were a

9    couple of personal injury cases.

10    Q.   I would -- now, in one of those situations where you

11    took over a case from Judge Trahan, did you receive

12    attorney's fees for those cases?

13    A.   So on the family law cases, I would -- it was

14    essentially -- it was a new lawyer, so it was a new contract

15    that I'm taking over with the client.  On the personal injury

16    cases, there would be attorney's fees and Judge Trahan

17    would -- she had previously worked on the cases, so she would

18    just get her fee -- for the portion of work that she had done

19    previously before me.

20    Q.   Understood.  So did Judge Trahan receive attorney's

21    fees from your firm after she was elected to the bench?

22    A.   On the personal injury case, yes, once it was

23    settled, if we went to trial on it, yeah, and it was a

24    recovery, correct.

25    Q.   I would like to direct your attention to what has

**OFFICIAL TRANSCRIPT**

1    already been admitted into evidence as Exhibit 43.

2         THE COURT:  Any objection?  Are you going to publish

3    it or see if he recognizes it first.

4         MS. BRODNEY:  Thank you.

5         THE COURT:  Mr. Magner, do you have any objection to

6    it being published?

7         MR. WICKER:  No objection, Your Honor.

8    BY MS. BRODNEY:

9    **Q.**  Mr. Hall, do you recognize this document?

10   **A.**  Yes.

11   **Q.**  Could you tell us, what is it?

12   **A.**  Certainly.  It is a copy of a check from my IOLTA

13   account from my law office.

14   **Q.**  And how much it is for?

15   **A.**  $6,650.

16   **Q.**  And when is it dated?

17   **A.**  January 22, 2014.

18   **Q.**  And to whom is it being paid?

19   **A.**  Ernestine Trahan.

20   **Q.**  And, Mr. Hall, what was this check for?

21   **A.**  It was a PI case, a personal injury case, that I had

22   taken over and resolved it and so this would have been the

23   portion that would have been due to Judge Trahan.

24        MS. BRODNEY:  I tender the witness.  Thank you.

25                        CROSS-EXAMINATION

**OFFICIAL TRANSCRIPT**

1    BY MR. WICKER:

2        **Q.**  Good morning, Mr. Hall.

3        **A.**  Good morning.

4        **Q.**  How you doing?

5        **A.**  I'm good.  How about yourself?  I'm here.

6        **Q.**  Mr. Hall, you met with the Government three times?

7        **A.**  Yes, two or three times.

8        **Q.**  And in October of 2021, you met with two special

9    agents, right?

10       **A.**  I don't recall the date, but I do recall meeting with

11   two special agents, yes.

12       **Q.**  Okay.  And then in September of 2022, you met with

13   six government people, right?

14       **A.**  Again, don't recall the date.  And I'm going to

15   assume you're saying like when I met with them maybe the

16   first time in preparation for this, yes.

17       **Q.**  During your second meeting, you met with six

18   government people, right?

19       **A.**  I would assume.  I'm not sure of the number, but it

20   was more than two this time, correct?

21       **Q.**  Including this whole trial team from DC?

22       **A.**  Yes.

23       **Q.**  Okay.  And then on the third time, you again met with

24   the trial attorneys from DC, right?

25       **A.**  Correct.

1    **Q.**  Okay.  And that's about a $6,600 check, right?

2    **A.**  The document that was shown 6,650, correct?

3    **Q.**  Yes.

4         MR. WICKER:  Aaron, can you pull up that document,

5    please?  It's now Government Exhibit 43.

6    BY MR. WICKER:

7    **Q.**  Mr. Hall, taking a look at this memo, wasn't a

8    portion of this check for cost reimbursement?

9         Oh, it just moved.  So I'll re-circle.

10        MR. MAGNER:  Could we publish it, please?

11        THE COURT:  Uh-huh.

12        MR. WICKER:  Yes, please publish.

13   **A.**  There were probably costs involved in it, yes.

14   **Q.**  So it's a $6,600 check and not all of it is for

15   attorney's fees, right?

16   **A.**  Right.  A portion of it included probably the costs

17   that were due from the case as well.

18   **Q.**  Gotcha.  Mr. Hall, you didn't go to law school to

19   become a businessman, did you?

20   **A.**  No.

21   **Q.**  And as a matter of fact, you rely on people in your

22   office to fill those types of gaps, right?

23   **A.**  On the business side, yes, I've got an office manager

24   and I have an accountant.

25   **Q.**  You have two people that fill that gap?

**OFFICIAL TRANSCRIPT**

1    **A.**   Right.

2    **Q.**   And if those people were gone today and you would

3    have some gaps in your office, right?

4    **A.**   Yep.  Yes, sir.

5    **Q.**   And gaps lead to mistakes, right?

6    **A.**   Generally speaking, they can, yep.  Yes, sir.

7    **Q.**   You were on the opposite side of Ms. Trahan for some

8    cases, right?

9    **A.**   Correct, before she got elected, yes, we did have

10   cases against each other.

11   **Q.**   And you -- I guess in your dealings with her as an

12   opposing counsel, you noticed that Dee Henderson was heavily

13   involved in Ms. Trahan's operation, right?

14   **A.**   Deatrice was her paralegal, yes, and between the

15   offices when we had cases together and we would communicate,

16   Deatrice was involved in it, yes.

17   **Q.**   And even from the other side, you noticed that

18   Deatrice was very solid?

19   **A.**   Yeah, she was solid.  Yes, and I dealt with her just

20   like they dealt with my office manager a lot too.

21   **Q.**   Gotcha.  Mr. Hall, you're an attorney.  You're in New

22   Orleans.  Based on your understanding of the community, is it

23   your belief that Ms. Trahan is a person of honesty,

24   trustworthiness, and a person of integrity?

25   **A.**   That's how I know her.  I know her personally.

1   That's -- that's --

2       **Q.**  You know her personally?

3       **A.**  I know her personally and that's how I know her,

4   correct.

5       **Q.**  Mr. Hall, do you remember every check you get over a

6   year's time?

7       **A.**  No, sir.

8       **Q.**  And that's why you have an accountant business

9   manager, correct?

10       **A.**  That is correct.

11       MR. WICKER:  Thank you.

12       MS. BRODNEY:  One moment, Your Honor.

13       THE COURT:  Sure.

14       MS. BRODNEY:  No further questions, Your Honor.

15       THE COURT:  Thank you, Mr. Hall, I know you're busy

16   and didn't want to come here so I appreciate you coming here.

17   And I don't have to tell you not to discuss your testimony

18   with anyone.

19       THE WITNESS:  Yes, ma'am.  Have a good day.

20       MR. FLANAGAN:  Government calls David Carrone.

21       THE COURT:  Good morning, Mr. Carrone.

22       THE CASE MANAGER:  Please raise your right hand.

23           (Witness administered oath.)

24       THE WITNESS:  I do.

25       THE CASE MANAGER:  Please have a seat.

1          THE WITNESS:  David Carrone.

2          THE CASE MANAGER:  Take a seat.

3          THE WITNESS:  I didn't hear your last comment.

4    Sorry.

5          THE CASE MANAGER:  Speak into the microphone.  State

6    and spell your name for the record.

7          THE WITNESS:  David Carrone, C-a-r-r-o-n-e.

8                          DAVID CARRONE,

9    Being called as a witness, being first duly sworn, examined

10   and testifies as follows:

11                       DIRECT EXAMINATION

12   BY MR. FLANAGAN:

13       Q.  Good morning, Mr. Carrone.

14       A.  Good morning.

15       Q.  Can you tell the jury your current position?

16       A.  I'm an Internal Revenue Service revenue agent.

17       Q.  And how long have you been with the Internal Revenue

18   Service?

19       A.  Over 36 years.

20       Q.  How long have you been a revenue agent?

21       A.  36 years.

22       Q.  Explain to the jury what a revenue agent does?

23       A.  We examine, investigate tax returns filed with the

24   IRS.  We verify the items on the return, look at the

25   applicable tax law, and determine that the correct tax was

**OFFICIAL TRANSCRIPT**

1    determined on a return.

2        Q.  Does that include individual income tax return?

3        A.  Individual, corporate, partnerships, S-corporations,

4    everything filed with the Internal Revenue Service.

5        Q.  What's your educational background?

6        A.  I have a bachelor of science from Louisiana State

7    University.

8        Q.  And what training have you received over your

9    36 years with the IRS?

10       A.  Extensive training.  Over the 36 years, on all

11   returns filed with us, not only have I received the training,

12   I've conducted training.

13       Q.  What does that mean?

14       A.  I train new revenue agents.  I've trained them in the

15   classroom to teach them the tax law and then I also train

16   them on the field, okay, here is the tax law, now, let's

17   apply it, fairly.

18       Q.  Were you assigned to the matter of United States v.

19   Ernestine Anderson-Trahan?

20       A.  Yes, sir.

21       Q.  What did you review in this matter?

22       A.  All the records, the tax returns, amended returns,

23   the marriage certificates, everything that was provided.

24       Q.  Did you look at bank records?

25       A.  Yes, sir.

1     **Q.**  Did you make any calculations based on these

2 documents?

3     **A.**  Yes, sir.

4     **Q.**  Did you calculate the gross receipts from those

5 records?

6     **A.**  Yes, sir.

7     **Q.**  And the tax liability from those gross receipts?

8     **A.**  Yes, sir.

9     **Q.**  And did you document these calculations?

10     **A.**  Yes, sir.

11     **Q.**  I'm showing the witness what's been marked as

12 Internal Reference 86.  Do you recognize this document?

13     **A.**  Yes, sir.

14     **Q.**  What is it?

15     **A.**  It's a spreadsheet that I prepared based on the

16 certificates of marriage that I have secured.

17     **Q.**  And what years does it cover?  We're looking at the

18 first page, but do you know how many years this spread sheet

19 covers?

20     **A.**  It was 2014, 2015, 2016.

21     **Q.**  And does it state how many marriages Judge Trahan

22 officiated each year?

23     **A.**  Yes, sir.

24     MR. FLANAGAN:  Government moves to admit as

25 Government Exhibit 73.  73.

1          THE COURT:  Mr. Magner?

2          MR. MAGNER:  No objection.

3          THE COURT:  It's admitted into evidence.

4    (Whereupon, Government Exhibit 73 is admitted into evidence.)

5          MR. FLANAGAN:  Providing it to the court.  Permission

6    to publish?

7          THE COURT:  Uh-huh.  Yes.

8    BY MR. FLANAGAN:

9      Q.  Starting with page 4 of 83, if we could zoom in, so

10   what's -- zoom in even more, but what's documented on this

11   page?

12     A.  This is where -- this is a spreadsheet where I list

13   each -- each marriage certificate by the filing date and

14   Bates number.

15     Q.  So maybe let's walk that through a bit.  How did you

16   make this document?

17     A.  I had each individual marriage certificate and I put

18   line by line into this spreadsheet that -- I have a full

19   accounting of all the marriage certificates, an account.

20     Q.  And maybe walk us through one row if you could, I

21   guess the columns that are in one row --

22     A.  Sure.

23     Q.  -- if that makes sense.

24     A.  The item column was just a way for me to keep track

25   of the total number of marriage certificates.  The Bates

**OFFICIAL TRANSCRIPT**

1  number is a reference number to the actual document, to the

2  marriage certificate.  So, for example, when you see

3  00015060, there's a corresponding document, a singular

4  document for that.

5       The next column is the year.  The next is a state

6  filing number.  So each marriage certificate has a unique

7  identifying number.  They have a state filing number, so that

8  way you know you can't -- you won't duplicate the same

9  marriage certificate twice.

10      The next column is the date of marriage, time of

11 marriage, the parish, the city.  And, again, the date of

12 marriage, the day of the week, and the time of the marriage

13 is duplicates.

14      MR. FLANAGAN:  Permission to publish what's into

15 evidence as Exhibit 4.

16      MR. MAGNER:  No objection.

17      THE COURT:  All right.  You may publish it to the

18 jury.

19 BY MR. FLANAGAN:

20   Q.  So is this one of the documents you were using to

21 populate the spreadsheet?

22   A.  Yes, sir.  It's exactly what I was just referring to.

23   Q.  So if we start at the top right, where did you get

24 the state file number for your spreadsheet?

25   A.  From that item right there.  This is the unique

1    identifying number of that certificate of marriage.

2        Q.  And then if you scroll down, where did you get the

3    date of marriage and time of marriage?

4        A.  The ceremony section, which is on this example as

5    January the 10th, 2014, at 1:30 p.m. in the city of New

6    Orleans, in the Parish of Orleans.

7        Q.  And if you go to the very bottom right, what's that

8    bottom right number that's cut off here?

9        A.  That's the Bates number.  That's what I was speaking

10   earlier regarding.  So you not only have a state filing

11   number for this document, we have a reference number to make

12   sure that -- I guess a duplicate type of system to make sure

13   that we accounted for all the records, an exhibit number so

14   to speak.

15       Q.  In reviewing these, would each of these marriage

16   licenses documenting marriages officiated by Judge Trahan?

17       A.  Yes, sir.

18       Q.  Returning to Exhibit 73, Internal Reference 86, and

19   did you do that for every one of these rows?

20       A.  Yes, sir.

21       Q.  Jumping to page 7 of this document and focusing on

22   that bottom there, what's documented at the bottom of this

23   document?

24       A.  That's why I aggregated the -- the rows, so that

25   means total weddings.  If you look -- there's 372

1    certificates of marriage listed, so that reconciles to that

2    number.

3        Q.   Did you also just identify weddings that occurred on

4    the weekend?

5        A.   Yes, sir.

6        Q.   And what math did you do at the bottom here?

7        A.   Well, the number of weddings or the number of

8    certificate of marriages times $80 to equal the $29,760 --

9    continue?

10       Q.   Yeah.  What's below that?

11       A.   The next item I looked at -- well, so now per

12   investigation, we determined that the gross receipts was

13   29,760 and we look at the tax return and it reflects income

14   of $16,000.  So simple math, subtracting the two, shows that

15   there's unreported income of $13,760 for that year.

16       Q.   Were you comparing that for that second line there,

17   gross receipts per original return.  Were you looking at the

18   original return for Judge Trahan reported?

19       A.   The Schedule C on the tax return that was

20   specifically labeled weddings.

21       Q.   And what did you -- based off of that math was the

22   amount at the bottom?

23       A.   $13,760.

24       Q.   Jumping ahead to page 11 of the same document, how

25   many marriage certificates did you count for 2015 according

**OFFICIAL TRANSCRIPT**

1   to this document?

2       A.  Right.  So this is another year, the subsequent year.

3   There were 415 weddings and just going over the same math,

4   the gross receipts I determined was 415 weddings times $80

5   for gross receipts of 33,200, went to the original tax return

6   with the Schedule C that was labeled weddings that indicated

7   gross income of $16,000, simple math between the two, you

8   know, the 33,200 minus the $16,000 reported on the return,

9   was an adjustment or a difference of $17,200.

10      Q.  Turning to page 16 is this the end of your count for

11  2016?

12      A.  Yes, sir.

13      Q.  And how many weddings did you count for 2016?

14      A.  463 weddings.

15      Q.  So what math did you do at the bottom here?

16      A.  463 weddings times $100 for gross receipts of

17  $46,300.  Reflected on the return was gross receipts of

18  $15,200.

19      Q.  And, again, where did you get that 15,200?

20      A.  Per Schedule C on the tax return labeled weddings.

21      Q.  And what math did you do?

22      A.  The $46,300 per the investigation less what was on

23  the return for a net adjustment of $31,100 of wedding income.

24      Q.  Did you also review Exhibit 2, which is a summary of

25  the marriage certificates provided by vital records?

1    **A.**  Yes, sir.

2         MR. FLANAGAN:  Permission to publish Exhibit 2.

3         THE COURT:  Any objection?

4         MR. MAGNER:  No objection.

5         THE COURT:  Go ahead.

6    BY MR. FLANAGAN:

7    **Q.**  Focusing just on 2014 to 2016, how did your numbers

8    compare with the numbers in Exhibit 2?

9    **A.**  This was a great reconciliation because my numbers

10   did reconcile to the numbers provided by the state.

11        MR. FLANAGAN:  I'm showing you -- showing the witness

12   now, not publishing yet, what's been marked as -- Internal

13   Reference 87.  Excuse me.  One moment.

14        Appreciate the court's indulgence, Your Honor.

15        THE COURT:  Sure.

16   BY MR. FLANAGAN:

17   **Q.**  Do you recognize this document?

18   **A.**  Yes, sir.

19   **Q.**  What is this document?

20   **A.**  I prepared this document based on the legal fee

21   income.  Go through the columns?

22   **Q.**  Just very briefly, what did -- what legal -- what did

23   you review to create this document?

24   **A.**  Checks, checks that were -- you know, went through

25   the process and were cleared.

**OFFICIAL TRANSCRIPT**

1     Q.   Were these checks written to Judge Trahan?

2     A.   Yes, sir.

3     Q.   From her bank records?

4     A.   Yes, sir.

5          MR. FLANAGAN:  Government moves to admit as

6     Government Exhibit 74.

7          THE COURT:  Any objection?

8          MR. MAGNER:  Oh, I'm sorry.  No objection.

9          THE COURT:  All right.  It's admitted into evidence.

10    (Whereupon, Government Exhibit 74 is admitted into evidence.)

11         MR. FLANAGAN:  Providing to the court --

12         THE COURT:  Oh, wait a minute.  Wait a minute.

13         Okay.  This is just -- I'm trying to avoid the same

14    problem we had with privileged information.  But this isn't

15    the client's, right?

16         MR. FLANAGAN:  I can clarify with the witness if the

17    Court would like a little more record.

18         THE COURT:  Sure.

19    BY MR. FLANAGAN:

20    Q.   Did you -- was the checks that you were comparing to,

21    were these checks that you got from deposits into Judge

22    Trahan's bank account with JPMC?

23    A.   I know I had the checks that were cleared through the

24    process.  I believe the answer's yes.

25         MR. FLANAGAN:  I can -- I'll publish to the witness

1    then, Your Honor?

2         THE COURT:  Yes.

3         No objection, right?

4         MR. MAGNER:  No objection.

5         THE COURT:  Okay.  Yes.

6         MR. FLANAGAN:  I can publish to the witness Internal

7    Reference 51.

8         THE COURT:  Wait a minute.  Was it the other one?

9    You meant to the jury?  The jury still hasn't seen it.

10        MR. FLANAGAN:  I thought I was still laying the

11   foundation to give the court assurances that we're not --

12        THE COURT:  So you're going through a few of them.

13   Okay.

14   BY MR. FLANAGAN:

15   Q.   And so for our record, what is this document?

16   A.   This is a check written from the Law Offices of

17   Clifton Davis to Ernestine Anderson-Trahan.

18   Q.   And as part of your work with the IRS, have you

19   reviewed bank statements before?

20   A.   Yes.

21   Q.   Does that top part look like a history of bank

22   records?

23   A.   Yes, sir.

24   Q.   Does it?

25   A.   It -- it -- can you be more specific with your

1  question?  In other words I'm looking at a canceled check

2  that was cleared through the bank.

3      MR. FLANAGAN:  Thank you.  At this time, the

4  Government moves to admit -- not this document, this is

5  already in evidence, but Government Exhibit 74, which I can

6  publish again for the court.  Oh, it was admitted.

7      THE COURT:  It was admitted.

8      MR. FLANAGAN:  Thank you, Your Honor.  Permission to

9  publish?

10      THE COURT:  Yes.

11  BY MR. FLANAGAN:

12  Q.  So I appreciate that, but would you now explain to

13  the jury what this document is?

14  A.  The first column is the Bates number.  It's just an

15  exhibit reference number to the check, one of the checks we

16  just saw.  The next column is the date that the check

17  written.  The payer is who dispersed the check, who wrote the

18  check to the other individual.  The payee with these checks

19  are Judge Ernestine Trahan and simply divided into what year

20  it pertains to, 2014, 2015, et cetera, whatever year it would

21  have been.

22  Q.  And how did you separate these checks from the check

23  at the bottom of the page?

24  A.  I -- the bottom check was reflected on the tax

25  return.  That is equal to the penny exactly what's reflected

1   on the Schedule C on the tax return.  So the other items in

2   the top were not on the tax return, so were not part of gross

3   receipts.

4          MR. FLANAGAN:  If I could have a moment, Your Honor.

5          THE COURT:  Yes.

6          MR. FLANAGAN:  I'll ask Ms. Better to pull up

7   Internal Reference 89 and if we could click through Internal

8   Reference 89, 90, and 91.  You see 89 -- let me make sure --

9   90 and then 91.

10  BY MR. FLANAGAN:

11     Q.  Do you recognize these documents?

12     A.  These are my reports.  These are the reports I

13  generate to determine the tax deficiencies.

14     Q.  For who?

15     A.  For our investigation, for the Internal Revenue

16  Service.

17     Q.  For --

18     A.  For Ernestine and Kenneth Trahan.

19     Q.  For 2014 to 2016?

20     A.  Yes, sir.

21         THE COURT:  Government moves to admit these three as

22  Exhibits 75, 76, and 77.

23         MR. MAGNER:  No objection.

24         THE COURT:  All right.

25         MR. FLANAGAN:  Provide them to the court.

1          THE COURT:  Yes, the exhibits are admitted.

2      (Whereupon, Government Exhibits 75-77 are admitted into

3                          evidence.)

4          MR. FLANAGAN:  Permission to publish 75, which is

5   Internal Reference 89.

6          THE COURT:  Yes, you may.

7   BY MR. FLANAGAN:

8      Q.  Would you explain to the jury what this is?

9      A.  This is what I was speaking of earlier, this is what

10  an IRS agent does.  To put it -- okay.  So just to break it

11  down in Section 1, based on the investigation and

12  examination, these are adjustments, which adjustments equals

13  changes to the tax return, increase in income, which is what

14  we're talking about here in this situation.  Sometimes it's a

15  negative.  We'll see a negative amount there and I'll explain

16  that there.

17          But just to go through it, Item A is an increase in

18  attorney's fees --

19  BY MR. FLANAGAN:

20     Q.  Before we get to that that, who is the taxpayer of

21  this report?

22     A.  Ernestine and Kenneth Trahan.

23     Q.  And what year does the report cover?

24     A.  This is one year, this is for 2014.

25     Q.  And now you're about to walk through I believe

1   Line 1a and I cut you off.  Can you please explain to the

2   jury what's Line 1a?

3       A.   1a is an increase of attorney's fees of $10,650.

4   Line --

5       Q.   How did you come to that number?

6       A.   That reconciled to the numbers we were just viewing

7   on my exhibits.

8       Q.   The last exhibit?

9       A.   Correct.  All these numbers reconcile to those

10  exhibits.  This is just following through the process.  This

11  is the end result as you go through.  And so Item B was the

12  change in the wedding income of 13,760 and we just saw that

13  number a few minutes ago.  C is what we call a statutory

14  adjustment.  Because you're changing these things, it

15  automatically changes self-employment, the reduction for that

16  adjustment.  So that's an -- we call a statutory judgment.

17  And then Item 2 is a total of these adjustments, you know,

18  what's the net change to the filed return, how would you

19  change that return, David, and that's what that is, the

20  $24,083.

21       So you have the changes.  Now we're going to come

22  back and we're going to add it to the taxable income

23  reflected on the original return and that's the 105,044.  So

24  you add those two numbers together and now we have the

25  corrected taxable income which is 129,127.  Now that you have

1  that number, you have to look at what's the applicable

2  federal tax and then we have charts and tables to go through

3  that process, but we have software to make that a lot

4  quicker, and so that Line 5 is the applicable tax of 23,994,

5  which is roughly about 18 percent of the tax.

6  BY MR. FLANAGAN:

7      Q.  Just to walk through that tax, you said we have

8  charts and stuff.  Who is we?

9      A.  The Internal Revenue Service.  We publish them.

10     Q.  What do you mean publish them?

11     A.  Publication 17, we publish that to the public.  This

12  is how you compute -- after you compute your taxable income,

13  look at this chart, and if you follow this chart, that's the

14  applicable tax.

15     Q.  So it is the IRS's tax rates, but it's available to

16  the public?

17     A.  Correct.

18     Q.  And to calculate this particular tax, you use the IRS

19  program, but it's the same program you see in any tax

20  preparation office?

21     A.  Yes, sir.  Similar, but a little different.

22     Q.  Okay.  So based off of that calculation, what was the

23  tax liability?

24     A.  So after you considered the tax liability was -- it

25  was 23,994 and now you need to look at credits which are

**OFFICIAL TRANSCRIPT**

1    Line 8 regarding to child care credit, education credit which

2    is usually a child that's in college, and that's got a

3    calculation.  So you now subtract that from the tax liability

4    and then you come with Line 9, which is a balance of 23,162.

5    And then there's another calculation, since an individual is

6    self-employed, they have to pay what we call self-employment

7    tax, which is similar to Social Security, and that was $860.

8    So you add these numbers together and you come up with the

9    total -- the bottom line total corrected tax liability, which

10   in this return is $24,022.  Now that you have -- this is the

11   correct number.  We have to give the tax preparer credit for

12   what they paid -- $16,654.

13        Q.  Is that paid or reported?

14        A.  Reported.

15        Q.  And then keep walking us through this sheet?

16        A.  You have additional payments, credits, and that's

17   463, which is another adjustment.  So at the end of the day,

18   what you have here, what is the deficiency?  How much does

19   the taxpayer owe?  And that's Line 14 and 15 of this -- this

20   report, which is 78 -- $7,831.

21        MR. FLANAGAN:  Permission to publish Exhibit 76,

22   Internal Reference 90?

23        THE COURT:  You can.

24   BY MR. FLANAGAN:

25        Q.  What's this document?

1    **A.**   Same report, different year.

2    **Q.**   Pulling it up for what year?

3    **A.**   This is 2015.

4    **Q.**   So what were the adjustments for attorney's fees in

5    2015?

6    **A.**   Attorney's fees were 5,000, wedding income was

7    $17,200.

8    **Q.**   Again, that's just the math that we saw in those

9    exhibits before?

10   **A.**   Exact math, correct.

11   **Q.**   And we can jump ahead as we walked through 1 already,

12   what did you do with these numbers?

13   **A.**   These are adjustments to the original filed return.

14   After going through the math that we just went through, we

15   determined that the tax deficiency or balance due is $6,072

16   for this year.

17   **Q.**   That's comparing the math based off of those gross

18   receipts compared to what was filed, is that correct?

19   **A.**   The gross receipts, the taxes paid, the credits,

20   everything is combined, self-employment tax also.

21        MR. FLANAGAN:   Publishing Exhibit 77, Internal

22   Reference 91.

23   BY MR. FLANAGAN:

24   **Q.**   What's this one?

25   **A.**   This is my report for 2016.

1    Q.  What were the adjustments in 2016?

2    A.  Wedding income of 31,100 and, again, the statutory

3 adjustment which is a negative of $416.

4    Q.  What was that tax?

5    A.  The bottom line balance due was $11,004 for this

6 year.

7    Q.  I'm showing the witness Internal Reference 110.  And

8 I'll note it's a six-page document, so if we could just

9 quickly just click through the pages for the witness.  But do

10 you recognize this document?

11   A.  These are my reports or exhibits.

12   Q.  Are they just putting together in one place the

13 reports we saw just a moment ago?

14   A.  It's a summary of everything that I spoke about so

15 far, correct.

16        MR. FLANAGAN:  The Government moves to admit as

17 Government Exhibit 92, excuse me, 78.  I apologize.  78, Your

18 Honor.

19        THE COURT:  Any objection?

20        MR. MAGNER:  No objection.

21        THE COURT:  All right.  It's admitted.

22 (Whereupon, Government Exhibit 78 is admitted into evidence.)

23        MR. FLANAGAN:  If I could have a moment.

24        Providing to the court.  And permission to publish

25 page 1.

**OFFICIAL TRANSCRIPT**

```
 1          THE COURT:  Yes.
 2   BY MR. FLANAGAN:
 3      Q.  So would you explain the jury what's page 1?
 4      A.  Well, these are the same numbers we just covered but
 5   what I'm specifically looking at each income item on a
 6   separate sheet per year and we're breaking it down for
 7   wedding income.  Column 1 is per investigation and then per
 8   the original return, what was reflected on the return, and
 9   then the change and adjustment for each particular year.
10   It's a summary of -- a different way of looking at what we
11   just saw, just a summary sheet.
12      Q.  Taking these numbers and putting them on one sheet to
13   make it nice and easy?
14      A.  To aggregate -- I guess to dissect into the different
15   categories of income.
16      Q.  And what were the total unreported marriage fees from
17   2014 to 2016?
18      A.  $62,060.
19      Q.  Publishing page 2, what's this page?
20      A.  It's the same exhibit you just saw except I added one
21   column.  It's the second column, the marriage fees reported
22   on the amended return filed by the taxpayer.
23      Q.  Well, did you see --
24      A.  That was presented to me.  I'm sorry.
25      Q.  Did you look at the amended returns?
```

1    **A.** Yes, sir.

2    **Q.** And you pulled these from the Schedule C?

3    **A.** Yes, sir.

4    **Q.** Understanding you looked at amended Schedule Cs, did

5    you also review Judge Trahan's transcript for 2014?

6    **A.** Yes, sir.

7    **Q.** Did you see whether she, in fact, filed an amended

8    24014 return?

9    **A.** My recollection is that 2014 was not filed, the

10   amended return was not filed.  The original return was filed.

11   **Q.** Still looking at -- comparing the Schedule Cs from

12   your account to the Schedule Cs on the amended returns, how

13   did these numbers compare?

14   **A.** Very similar.  A little off, but I think we -- I kind

15   of wanted to be on the more conservative side because we were

16   able to show like we saw previously how we came up with our

17   numbers, so we stuck with our numbers that we presented.

18   MR. FLANAGAN:  Showing the witness Government

19   Exhibit 35 into evidence.  It's already admitted into

20   evidence.

21   MR. MAGNER:  No objection.

22   MR. FLANAGAN:  Permission to publish?  Thank you.

23   BY MR. FLANAGAN:

24   **Q.** Would you please read when this document is dated?

25   **A.** October 18th, 2018.

**OFFICIAL TRANSCRIPT**
Page 523

1    Q.   And who is it to on the top left of this page?

2    A.   It is to the judiciary commission of Louisiana,

3    specifically to Michelle Beaty.  I'm sure you were talking

4    about who it was going to, the Judiciary Commission of

5    Louisiana.

6    Q.   Would you please read the first two paragraphs?

7    A.   "Please accept this second supplemental letter of

8    response on behalf of Judge E. Teena Anderson-Trahan

9    regarding the above-referenced matters.  Please find enclosed

10   Judge Anderson-Trahan's amended tax returns for 2015 and 2016

11   that she has filed with the Internal Revenue Service and the

12   Louisiana Department of Revenue.  Please also find enclosed a

13   copy of Judge Anderson-Trahan's 2017 tax returns that she has

14   also filed with the Internal Revenue Service and the

15   Louisiana Department of Revenue."

16   Q.   Publishing Exhibit 37, what's this?

17   A.   This is an amended return for 2016.

18   Q.   And turning to page 2?  When is it dated?

19   A.   It's dated by the taxpayer on October 12, 2018.

20   Q.   Publishing Exhibit 38, what is this document?

21   A.   This is an amended return for the tax year 2015.

22   Q.   And turn to page 2, when is this dated?

23   A.   October 12, 2018.

24   MR. FLANAGAN:  Showing the witness Exhibit 39.  And

25   publishing to the jury as well.

1   BY MR. FLANAGAN:

2       Q.   When is this letter dated?

3       A.   September 10, 2019.

4       Q.   Who is it to?

5       A.   The Judiciary Commission of Louisiana.

6       Q.   Would you please read the three paragraphs?

7            MR. MAGNER:   Judge, the document speaks for itself

8   and it's already been referred to a number of times.

9            THE COURT:   He's correct.

10            MR. FLANAGAN:   I'll move on.

11            THE COURT:   All right.   They'll have it as an

12   exhibit.

13            MR. FLANAGAN:   Thank you, Your Honor.

14   BY MR. FLANAGAN:

15       Q.   If we could return to Internal Reference 110,

16   Government Exhibit 78, page 3, what's this page?

17       A.   This is the spreadsheet regarding specifically just

18   the attorney's fees.

19       Q.   And how did you create this page?

20       A.   Well, Column 2 is the per investigation, per year,

21   2014, 2015, and 2016.   The second column are the legal fees

22   reported on the Schedule Cs, filed returns, and the third

23   column is the difference between the two, which is the same

24   numbers we've been seeing previously in my reports.

25       Q.   Based on your calculations on your report, what were

1    the total earned legal fees from 2014 to 2016?

2         A.   $15,650.

3         Q.   Publishing page 6, what's this page?

4         A.   This is the aggregate of both items we just saw

5    separate -- separately.  So this is the gross receipts for

6    the weddings and attorney fees per investigation, per year,

7    in Column 1 and then the gross receipts reported and the

8    gross receipts reported for each individual year.

9         Q.   What were the total unreported gross receipts from

10   2014 to 2016?

11        A.   $77,710.

12        Q.   Publishing page 4, what's this page?

13        A.   Okay.  This one has the aggregate of the income, but

14   it's less business expenses.  So this is really a net income

15   spreadsheet.  So there were expenses reflected on the

16   schedule Cs that were allowed.  So what you see here is for

17   each year the business income or business income per

18   investigation per year, 2014, 2015, and 2016, the business

19   income reported per year and the differences between the two.

20        Q.   And to be clear, the business income, is that what

21   this reports on Line 12 of the tax return itself?

22        A.   Correct.

23        Q.   What was the total unreported net income or business

24   income from 2014 to 2016?

25        A.   $77,710, which is the same figure we just saw because

1   we didn't change the expenses for these three years.

2   Q.   Turning to page 5, what's this page?

3   A.   So this is the aggregate of the tax -- when we went

4   through each one of my individual reports, this is the end

5   product from those reports as far as the tax deficiencies per

6   year.  So Column 1 is the -- what we just saw my 4549s, the

7   tax per investigation and taxes due reported and then the

8   American Opportunity Credit is an education credit for

9   college-aged students and the last column is the tax

10  deficiency for each individual year.

11  Q.   And before we get to the tax deficiency, the American

12  Opportunity Credit, is that just simple -- an automatic

13  calculation based off of the other changes?

14  A.   Yes.

15  Q.   So setting that --

16  A.   Statutory, correct.  We didn't change the tuition or

17  whatever was on the returns, correct.

18  Q.   Because earlier numbers changed on the returns, just

19  the math flows through?

20  A.   Math flows, correct.

21  Q.   So based off of that, what was the tax difference

22  from 2014 to 2016?

23  A.   $24,907.

24       MR. FLANAGAN:  Government tenders the witness.

25       THE COURT:  All right.

1                  (Discussion between counsel.)

2          MR. MAGNER:  Can I impose, Government Exhibit 78?

3   And if we could scroll to the page relating to the amended

4   returns, the amended schedules, thank you very much.  And

5   this is your Government Exhibit --

6          MR. FLANAGAN:  78.

7                     CROSS-EXAMINATION

8   BY MR. MAGNER:

9      Q.  Hello, Mr. Carrone.

10     A.  Hello.

11     Q.  Nice to see you again.  This is the schedule that you

12  prepared showing the -- tell me what this schedule is just so

13  we're clear.

14     A.  It's focused on the wedding income and it's the per

15  investigation column, the amended returns, and the original

16  reflected returns and the differences in the last column with

17  the total aggregate at the bottom.

18     Q.  Okay.  So with regard to the 2016 return, you

19  determined that the marriage fees based on your spreadsheet

20  that we talked about was $46,300, correct?

21     A.  Yes, sir.

22     Q.  I assume there's some rounding in there, correct, or

23  maybe not?

24     A.  No, I don't think there is.  Because that's

25  multiplied times $100.  Looks like 463 weddings times $100.

**Q.** And you know that Ms. Trahan and her husband, Kenneth, filed an amended return for 2016 and she reflected on the amended for $46,730, correct?

**A.** Correct.

**Q.** So she actually reported on the amended return more than you determined than she had received in terms of marriage fees, correct?

**A.** Correct.

**Q.** And the same is true for the 2015 return, she over-reported, I guess we could say by about $800 or so because she reported $34,000, correct?

**A.** I don't -- I don't know if I agree when you say over-reported because we kind of used a more conservative approach.  In other words, when I audit amended returns or go through the process, a taxpayer can have more in-depth records than what I have based on estimates because they may know, "Well, no, David, on that wedding I charged $120 and not $80" because, remember, I'm using an estimate really.

**Q.** I understand.  But using an estimate, Ms. Trahan and her husband reported more in marriage fees on the amended return than you calculated here, correct?

**A.** Correct.

**Q.** All right.  And I think there was some talk about the 2014 return not being filed yet.  Is that -- or do you think that was filed, the amended return?

1    **A.**  Digging into my recollection, I probably would have

2    to see the actual transcripts, but based on my recollection,

3    I do not believe that 2015, the amended return, was filed.

4        **Q.**  For '14?

5        **A.**  For '14.  I'm sorry.  But I would want to see the

6    actual transcripts to definitively comment on that.

7        **Q.**  But you did see that one was prepared by Ms. Trahan

8    and her tax preparer and she hit that on the nose the same

9    figure that you have here?

10       **A.**  That is correct.

11       **Q.**  Okay.

12       **A.**  Yeah, I was just hesitating whether or not to say it

13   was filed, without seeing an actual IRS transcript that

14   verifies that.

15       **Q.**  Fair enough.

16           MR. MAGNER:  Could I impose upon you, Ms. Better, to

17   pull up what I believe is Government Exhibit 73, the

18   spreadsheet?

19   BY MR. MAGNER:

20       **Q.**  Now, this was a spreadsheet that you prepared?

21       **A.**  It's quasi.  I had an existing spreadsheet that I

22   added columns and manipulated.  So it's my spreadsheet, yes.

23       **Q.**  Okay.  But this is not a spreadsheet or document that

24   Ms. Trahan had when she prepared her taxes?

25       **A.**  No, sir.  No.

1    **Q.**  And did you have other people with the Internal

2    Revenue Service assist you in preparing this spreadsheet?

3    **A.**  Most of this was prepared by me.  I can't -- looking

4    through it, I mean, I entered most of these items.

5    **Q.**  Okay.  And you're a certified public accountant?

6    **A.**  No, I'm not.

7    **Q.**  Oh, you're not.  You have an accounting degree?

8    **A.**  Yes.

9    **Q.**  All right.

10   **A.**  But I'd like to comment that I teach CPAs on how to

11   do our job with 36 years of experience.

12   **Q.**  I understand.  And you brought that 36 years of

13   accounting experience and your work with the service to bear

14   in preparing this spreadsheet, correct?

15   **A.**  Correct.

16        MR. MAGNER:  And you spoke -- you can take that down,

17   please.  Thank you very much.

18   BY MR. MAGNER:

19   **Q.**  You're a revenue agent and that you regularly

20   audit -- I don't know if that's -- as a revenue agent, you

21   from time to time will audit people's taxes, correct?

22   **A.**  That's my profession, correct.

23   **Q.**  And that you will then send notices to people that

24   "Hi, I'm from the IRS, I'm here to audit your tax returns,"

25   right?

1      **A.**  Correct.

2      **Q.**  That was never done with Ms. Trahan, was it?

3      **A.**  I couldn't comment.  But also when you're asking me,

4   I'm on the civil side.

5      **Q.**  I understand.

6      **A.**  I mean, I can't comment on the criminal side because

7   I'm not familiar with that side.

8      **Q.**  But from your review of the files in this case,

9   you're aware that no one from the civil side ever contacted

10   Ms. Trahan and said, "We would like to sit down with you and

11   audit your tax returns"?

12      **A.**  I can't comment on that.  I'd have to look at the

13   transcript to see if there was any correspondence or any type

14   of postings that would indicate examination contacted the

15   employee or taxpayer.

16      **Q.**  I'll represent to you that there was no audit done.

17          MR. FLANAGAN:  Objection, he's testifying.

18          THE COURT:  Well he's trying to get to an answer,

19   and, quite frankly, you know, I'd like to know.  He's here.

20   He's on the civil side.  He was prepared to come to trial.

21   Why does he not know?  You know, I mean, so he -- so I'm

22   going to overrule.

23          MR. FLANAGAN:  Thank you, Your Honor.

24   BY MR. MAGNER:

25      **Q.**  So in your work on this case, you didn't investigate

1   whether anybody from the IRS contacted Ms. Trahan and asked

2   for an audit of her tax returns?

3       **A.**   Yeah.  Let me comment as a revenue --

4       **Q.**   Why don't you answer my question first.

5       THE COURT:  Answer the question first, and if you

6   feel like you need to elaborate, I'll give you an opportunity

7   but answer his question.

8       **A.**   Okay.  I would have to see the transcript but, no,

9   sir.

10      **Q.**   No, meaning you did not investigate that issue of

11  whether she was audited, correct?

12      **A.**   Correct.

13      **Q.**   All right.  And you do know that in general terms

14  when the IRS audits somebody they give them notice, correct?

15      **A.**   Letters, correct, correspondence.

16      **Q.**   A revenue agent such as yourself will go meet with

17  them and their tax preparer or their accountant, right?

18      **A.**   Correct.

19      **Q.**   And you'll ask for whatever documentation they have

20  to support their tax returns and the different income that

21  they've declared and the deductions against that income,

22  right?

23      **A.**   Correct.

24      **Q.**   And you give the people a chance to make their case

25  to you civilly as to why the tax returns are correct or fix

1   them if they're incorrect, right?

2       A.   Correct.

3       Q.   But if an audit was never done by Ms. Trahan, she was

4   never given that opportunity, was she?

5       A.   No, sir.

6       Q.   Okay.

7       A.   Well, yeah.  If an audit -- a civil audit has not

8   been conducted.

9       Q.   Do you know why one was never done in this case?  Can

10  you explain that?

11      A.   Well, for the Internal Revenue Service, I mean, we

12  have so many different -- different avenues of auditing a

13  taxpayer.  We have random audits.  We have specific audits.

14  I wouldn't know why or why not an individual would not be

15  audited or I wouldn't know why they were audited, but I would

16  not know why they were not audited.

17      Q.   And you're familiar with the Taxpayer Bill of Rights.

18  That's IRS Form No. 1, right?

19      A.   Yes, sir.

20      Q.   And basically that's the touchstone, the cornerstone

21  of IRS's approach to tax payers is that taxpayers will be

22  given fair notice, correct?

23      A.   Correct.

24      Q.   They will be given an opportunity to be heard?

25      A.   Correct.

1    **Q.**  That they will have an opportunity to even appeal a

2    civil tax decision to a higher authority if need be, right?

3    **A.**  Correct.

4    **Q.**  But if there was no audit in this case, that was

5    never anything that was afforded to Ms. Trahan, was it?

6    **A.**  No, sir.  If it was no civil examination, no.

7         MR. MAGNER:  Thank you.

8         I'd like to pull up if we could what's been marked

9    for identification Defense Exhibit 3.

10        That's 3?

11        MR. WASHINGTON:  (Nods head.)

12        MR. MAGNER:  I'm a little snake bit here, Judge.  I

13   apologize.  So I'm going to readjust.  I'm going to get the

14   hang of this.  It's only been 40 years.

15        THE COURT:  The trial's going to be over by the time

16   you figure it out.

17                         (Laughter.)

18        MR. MAGNER:  Go ahead and pull up what you have as 3

19   again.

20   BY MR. MAGNER:

21     **Q.**  This is a spreadsheet, I guess, that's the right word

22   that you prepared initially for this case, correct?

23     **A.**  Correct.

24     **Q.**  And you prepared it about 10 days ago, two weeks ago,

25   thereabouts?

1     A.   It was a couple modifications, correct.

2     Q.   Right.  But this was your original one, right?

3     A.   It appears so, yes.

4     Q.   And we would offer this as Defense Exhibit 3.

5          THE COURT:  All right.  Any objection?

6          MR. FLANAGAN:  No objection.

7          THE COURT:  All right.  It's accepted into evidence.

8     (Whereupon Defense Exhibit 3 is admitted into evidence.)

9          MR. MAGNER:  I'm sorry.  I don't know if we got in

10    sync.

11    BY MR. MAGNER:

12    Q.   About two weeks ago, you prepared it?

13         MR. WICKER:  Ask to publish.

14         MR. MAGNER:  Publish, please.

15    A.   Yes, sir.  I was making changes here and there so

16    probably likely.

17    Q.   And at that time, approximately two weeks ago, we

18    won't quibble about the date, you determined that the tax due

19    and owing was $42,873, correct?

20    A.   Correct.

21    Q.   All right.  Then you made some changes to that

22    spreadsheet roughly last week, I think, correct?

23    A.   Correct.

24         MR. MAGNER:  Could you please pull up Defense

25    Exhibit 4?

1           THE CASE MANAGER:  Mr. Magner, I need Exhibit 3.

2    BY MR. MAGNER:

3        Q.  And you made some changes to this chart based upon

4    some case-related expenses that I provided to the Government,

5    correct?

6        A.  Correct.

7        Q.  And so last week, the number came down to -- so you

8    recognize this spreadsheet, correct?

9        A.  I'm not seeing anything.

10          MR. MAGNER:  So the witness can see it, please.

11   Still no?

12          THE COURT:  I see it.

13          THE WITNESS:  Okay.  It just came up.

14   BY MR. MAGNER:

15       Q.  Got it.  Is this your spreadsheet from last week?

16       A.  Yes, sir.

17          MR. MAGNER:  We would offer Defense Exhibit 4 at this

18   time.

19          THE COURT:  Any objection?

20          MR. FLANAGAN:  No objection.

21          THE COURT:  All right.  It's admitted into evidence.

22    (Whereupon, Defense Exhibit 4 is admitted into evidence.)

23          MR. MAGNER:  Permission to publish?

24          THE COURT:  Permission to publish granted.

25   BY MR. MAGNER:

1    **Q.**  And last week you determined that the taxes due and

2    owing for Mr. and Mrs. Trahan was $37,874, correct?

3    **A.**  Correct.

4    **Q.**  And then Monday evening, as I understand it -- and I

5    offer Exhibit 4, Defense 4 at this time.

6         Then as I understand it, Monday evening, a decision

7    was made to dismiss the counts related to the 2013 tax

8    return, correct?

9    **A.**  Correct.

10   **Q.**  And did you understand that that was because the

11   Government did not believe in good faith that it could meet

12   its burden of proof for 2013?

13        MR. FLANAGAN:  Objection.

14        THE COURT:  Overruled.

15   **A.**  I was not given a reason.

16   **Q.**  Okay.  You were just told 2013 is out of here?

17   **A.**  That's correct.

18   **Q.**  Okay.  And so you prepared a revised spreadsheet,

19   correct?

20   **A.**  Correct.

21        MR. MAGNER:  Could we please pull up for the witness

22   Defense Exhibit 5.

23   BY MR. MAGNER:

24   **Q.**  Do you recognize this now revised spreadsheet?

25   **A.**  That should be the most current -- we've gone through

1   so many spreadsheets I'm just making sure that this is the

2   most current spreadsheet.  I think it is.

3         MR. MAGNER:  And you believe it is.

4         Okay.  And so at this time we would offer into

5   evidence Defense Exhibit 5.

6         THE COURT:  Any objection?

7         MR. FLANAGAN:  No objection.  If it's the same one I

8   want to be clear.  If it's different I would hope the

9   Defense --

10        THE COURT:  Why would it be different?

11        MR. MAGNER:  I'll represent I believe this is the

12  same one that the Government just --

13        MR. FLANAGAN:  It's just that it's in evidence, so I

14  want to make sure, Your Honor, there wasn't a change I didn't

15  understand.

16        THE COURT:  Okay.

17        MR. MAGNER:  So we offer Defense Exhibit 5 and ask

18  that that be published.

19        THE COURT:  All right.  You may publish it and it's

20  accepted into evidence.

21    (Whereupon, Defense Exhibit 5 is admitted into evidence.)

22   **Q.**  And we see now the third day of trial that the taxes

23  due and owing are $24,907?

24   **A.**  Correct.

25   **Q.**  Do you think if the trial went on for about three or

1  four more days we could get it down to, like, 0?

2      A.  The facts won't change.

3         MR. MAGNER:  Okay.  Let's talk about those facts.

4         Thank you.  You can take that down.

5  BY MR. MAGNER:

6      Q.  Did you on your own initiative investigate what other

7  case-related expenses that Judge Trahan had from her prior

8  legal -- prior legal work?

9      A.  No, sir.

10      Q.  All right.  So if she had additional expenses, you

11  did not adjust for that in any way in doing your

12  calculations, correct?

13      A.  Correct.

14         MR. MAGNER:  So I'm going to show you what's been

15  marked for identification as Defense Exhibit 6 and we're

16  going to change that 8 to a 6.  In fact, just for the sake of

17  clarity, I'll use mine on the Elmo.

18         MR. FLANAGAN:  Okay.  And, Your Honor, the Government

19  is going to object to relevance to these documents.

20         THE COURT:  I don't know what they are yet.

21         MR. MAGNER:  How do I get the Elmo on?

22         MR. WICKER:  Document camera.

23         MR. MAGNER:  Do I do control document camera?

24         MR. WASHINGTON:  It turns that on.  Use the document

25  that's on the screen for now.  When you present, you can use

1    the Elmo.

2        MR. MAGNER:  We'll do that.

3    BY MR. MAGNER:

4    Q.  So do you recognize these as checks that I believe

5    are already in evidence from Judge Trahan's bank account?

6    A.  I believe I do, yes, sir.

7    Q.  Okay.  And go to the -- so the first one is a check

8    dated May 30, 2012, correct?

9    A.  Yes.

10   Q.  If you could go to the next page, please, Aaron.  And

11   you see that, it's also a check dated May 30, 2012, correct?

12   A.  Correct.

13   Q.  And if you go to the next page, please, Aaron, and a

14   third check written to the Secretary of State dated May 30,

15   2012?

16   A.  Correct.

17   Q.  If Judge Trahan derived income in 2013 but had

18   expenses -- well, let me start up again.

19       If Judge Trahan had legal fee income in 2013, but

20   incurred expenses in previous years, she could take those

21   expenses as a deduction against that legal fee income,

22   correct?

23   A.  Cash basis taxpayers can only claim expenses in the

24   year they are paid.  Accrual is different.  But, no, a cash

25   basis taxpayer, the receipt of cash is in the year received

1    and expenses in the year paid.

2        Q.  All right.  But if Judge Trahan even knew what an

3    accrual system of accounting was, she could opt to account

4    for past expenses against current income, right?

5        A.  No, sir.

6        Q.  Okay.  Why is that?

7        A.  Cash basis taxpayers, I mean, accrual would require

8    -- first of all, you have to declare you're using an accrual

9    system, but on a cash basis, it's simple, cash in, cash out.

10       Q.  Okay.  But if she elected to use an accrual basis --

11       A.  Okay.  Elected.

12       Q.  She could offset her income with expenses that she

13   actually incurred from prior years, correct?

14       A.  Correct.

15       Q.  And that would be something she would want to discuss

16   with her accountant --

17       A.  Absolutely --

18       Q.  -- as a taxpayer --

19       A.  -- more complex system of accounting.

20       Q.  Right.  And in fairness, you've reviewed these tax

21   returns.  You do not see that this is being a very complex --

22       A.  Correct.

23       Q.  -- woman or system of accounting?

24       A.  Correct.

25       Q.  But she could do that if she met with an accountant

1    and made a conscious choice to do that?

2         A.  Correct.

3         Q.  All right.  But in any event, you did not account for

4    any of the expenses that she incurred for case-related

5    matters from 2012?

6         A.  No, sir.

7         Q.  Okay.  Still I would offer Defense Exhibit 6 at this

8    time because this is something that the revenue agent could

9    have looked at and could have taken into consideration?

10        MR. FLANAGAN:  Objection, because it's irrelevant, it

11   establishes that foundation that there was -- relevance is

12   the objection.

13        THE COURT:  I'm going to overrule.  I think it's

14   relevant because we're talking about her ultimate -- you have

15   talked about, the Government has talked about, her ultimate

16   tax liability and this is a -- the standard here we're

17   talking about here is willfulness, you know, which is a very

18   high standard and I think all of this information of what

19   could have or what should have been calculated, what she

20   could -- all that is relevant.  So I'm going to -- I'm going

21   to allow it.

22        MR. MAGNER:  And just for record purposes, I believe

23   these checks are already in evidence.  So I'd offer Defense

24   Exhibit 6 and ask that they be published.

25        THE COURT:  All right.  It's admitted into evidence

1    and, yes, you may publish.

2      (Whereupon, Defense Exhibit 6 is admitted into evidence.)

3          MR. MAGNER:  Did you do all three?

4          MR. WASHINGTON:  (Nods head.)

5    BY MR. MAGNER:

6      Q.  But in any event, you did not take into account in

7    your calculations expenses that she had incurred in 2012?

8      A.  I would not, correct.

9          MR. MAGNER:  All right.  Thank you.

10         Next I'm going to show you some checks from 2013.

11         We would offer these -- let me go ahead.  Sorry.

12   BY MR. MAGNER:

13     Q.  Do you recognize these as checks that appear to have

14   been payments for certain legal expenses from 2013?

15     A.  Yes, sir.

16         MR. MAGNER:  All right.  And maybe just scroll

17   through, Aaron, the pages for Mr. Carrone.  And I think we've

18   gone through them all.

19   BY MR. MAGNER:

20     Q.  Do you recognize these as checks that we have

21   submitted to the Government as being case-related expenses?

22     A.  Yes, sir.

23     Q.  And you took at least some of these into

24   consideration in revising your tax numbers, correct?

25     A.  Correct.

**OFFICIAL TRANSCRIPT**

1    **Q.**  All right.  So at this time, we would move into

2    evidence Defense Exhibit 7?

3         MR. FLANAGAN:  No objection.

4         THE COURT:  All right.

5         MR. MAGNER:  Please go back to the first one.

6    BY MR. MAGNER:

7    **Q.**  So there we see a check made payable to a Mabel

8    Tobias, correct?

9    **A.**  Correct.

10   **Q.**  And the notation is Tobias file refund in full?  Do

11   you see that?

12   **A.**  Correct.

13   **Q.**  You took that into consideration when you lowered the

14   tax numbers, correct?

15   **A.**  Yes, sir.

16   **Q.**  Please go to the next one.  And that's a tough one.

17   It's a name --

18        THE DEFENDANT:  Votrika.

19   BY MR. MAGNER:

20   **Q.**  Votrika King and it also shows a refund on file,

21   correct?

22   **A.**  Correct.

23   **Q.**  And please go to the next one.  This is a check to

24   Michael Hall relative to Brayden Benjamin for $400, correct?

25   **A.**  Correct.

1    **Q.**  And next we see a check made payable to Deatrice

2  Henderson?

3    **A.**  It appears so, yes.

4    **Q.**  With a reference of paralegal?

5    **A.**  Correct.

6    **Q.**  And do you understand that that was Judge Trahan's

7  paralegal and office manager from when she was in private

8  practice earlier?  Were you aware of that?

9    **A.**  I didn't know the details.  I just know I was

10  instructed to allow the expenses.

11    **Q.**  Who instructed you to do that?

12    **A.**  When -- during our investigation with Agent Moore.

13    **Q.**  That's this gentleman back here?

14    **A.**  Yes.

15    **Q.**  Okay.  Then the next check please, we see an expense

16  check to the Healthcare Center for $4,500.  Do you see that?

17  Do you see that, sir?  Are you having trouble seeing it?

18    **A.**  I can see it, yes.

19    **Q.**  And the reference there is a full and final

20  settlement of --

21        THE DEFENDANT:  Whitehead and Michael Glenn.

22  BY MR. MAGNER:

23    **Q.**  Whitehead and Michael Glen.  Do you see that?

24    **A.**  It appears so, yes.

25    **Q.**  And that's for $4,500, correct?

1     A.   Correct.

2     Q.   And then the final check, again, we see a check made

3   payable to Deatrice Henderson with a memo that says

4   paralegal?

5          THE DEFENDANT:   Lucy Bentley, fees, paralegal

6   payment.

7   BY MR. MAGNER:

8     Q.   Lucy Bentley, paralegal fees and payment.

9     A.   Correct.

10    Q.   So those were taken into consideration when you were

11  advised your taxes -- your tax numbers -- based upon the fact

12  that I provided these to the Government?

13    A.   Yes, sir, I recognize these checks.

14    Q.   And they made their way to you and you made the

15  appropriate adjustments?

16    A.   Correct.

17    Q.   Okay.  But this was not anything that you did on your

18  own, correct?  You did not go through Ms. Trahan's canceled

19  checks to see what other legal expenses there might have been

20  for '13, '14, '15, or '16, did you?

21    A.   I would not in my capacity on this case.

22    Q.   You would not and you did not?

23    A.   Correct.

24    Q.   But you spoke earlier of wanting to be fair and

25  conservative in coming to your numbers of the taxes owed in

1    this case.  You didn't figure that to be fair to Ms. Trahan

2    and to the jury that that's something that you should have

3    done before you came into court and say that she owes this

4    money in taxes, you didn't think that would be fair?

5        A.   Well, that column, we were specifically looking at

6    the amended return and being conservative on what income, the

7    higher number, the lower number, so as specifically

8    mentioning the lower number that we were using based on my

9    calculations and my estimates.

10       Q.   But fair is fair, right?  I mean, shouldn't that have

11   been something you took into consideration before you came

12   here and told these ladies and gentlemen what she owed in

13   taxes, that you really take into consideration what expenses

14   she may have had that have offset that income?

15       A.   In my capacity on this case, I generate the end

16   product report.  I'm not conducting an examination or

17   looking -- I'm given parameters, these are the records that

18   you're going to make your calculations on.  I don't make

19   those decisions in this type of capacity.

20            As I was trying to speak earlier on the civil side is

21   an examination where I look at all of the bank records and

22   it's my examination.  In this capacity, I'm a cooperating

23   agent.  I'm not conducting an examination.  I am assisting

24   criminal investigation, which means they're the guide,

25   they're the pilot of these airplanes.  I am getting the

1   information from them and doing what's instructed.  Two

2   different duties.  That's what I was trying to describe

3   earlier.  Civil, David Carrone is conducting an examination.

4   David Carrone determines what books and records I'm going to

5   get.  This is a different capacity for David Carrone, the

6   revenue agent.  I'm a cooperating agent.  I'm assisting Agent

7   Moore on the case.

8   BY MR. MAGNER:

9       Q.  Did I hear you say just a moment ago that criminal

10  investigative agent is the god of the case?  Did I mishear

11  that?

12      A.  Guidelines.

13          THE COURT:  You said guide.

14          THE WITNESS:  Guide.

15          THE COURT:  Guide.

16  BY MR. MAGNER:

17      Q.  Okay.  But he's the pilot?  I did hear you say that.

18      A.  Pilot, correct.

19      Q.  And so you're the sort of navigator and you basically

20  go where he tells you to go?

21      A.  I wouldn't say go, because I'm being handed the

22  records and these are the adjustments that criminal

23  investigation and DOJ and the U.S. attorneys are making on

24  this case.

25          THE COURT:  Approach.

1          WHEREUPON, the following proceedings were held at the

2   bench:

3          THE COURT:  Am I hearing what I think I'm hearing?

4   This is a criminal case, but what I'm hearing is that the

5   investigation is tailored to some presupposed outcome.  I

6   think that's what I'm hearing, that this case agent guides

7   him, this is -- he has all this civil responsibility and

8   authority where the stakes are much lower, but he's

9   testifying in a criminal case where this woman can go to

10  jail, but he's only allowed to say whatever it is that is

11  consistent with your theory of the case?  Is that what I'm

12  hearing?

13         MR. FLANAGAN:  Your Honor --

14         THE COURT:  I am very disturbed by this because you

15  have some ethical responsibilities, Counselor.

16         MR. FLANAGAN:  Understood.  Understood, Your Honor.

17         THE COURT:  And you work for the government.  If they

18  are doing that, you have a responsibility to be truthful.

19  You have responsibilities to the court.  What am I hearing?

20  I'll let the jury decide, but I'm troubled.

21         MR. FLANAGAN:  Understood, Your Honor.

22         THE COURT:  I've never heard that kind of testimony.

23  Probably because the witnesses are prepared better.

24         MR. FLANAGAN:  Your Honor, as heard, the Government

25  has gotten permission from the Defense, the Government has

1    provided to the witness, he's redone his calculations, and

2    the government has dismissed a count based off the

3    information brought to our attention.  Your Honor is -- the

4    guidelines for summary witness are -- that you instruct the

5    jury that he is testifying to the information that was given

6    to him and you can correct that it does not speak to all the

7    evidence in the case, that we understand that instruction.

8    Thank you, Your Honor.

9            THE COURT:  All right.  I'll give you some time.

10   That means he gets to redirect.

11           MR. FLANAGAN:  Thank you, Your Honor.

12                     (In open court.)

13   BY MR. MAGNER:

14      Q.  So what I understood you to say, Mr. Carrone, is that

15   you were doing what you were instructed to do by the

16   investigators, correct?

17      A.  Correct.  A cooperating agent is what I am on this

18   case.

19      Q.  Right.  And they're the pilot and they tell you where

20   they want you to go, right?

21      A.  I -- I just take an issue where to go.

22           THE COURT:  Let me just ask you:  So you're not an

23   objective witness?  Is that what you're saying?  You said you

24   are cooperating.  So you're cooperating with the Government.

25   You're not here on an objective basis.

**OFFICIAL TRANSCRIPT**

1        THE WITNESS:  Right.  Correct.  I'm given the

2   evidence secured and then I'm computing taxes based on that

3   evidence and applying the Internal Revenue code section,

4   whether that's income or not or expense or not and then

5   computing the tax liabilities.

6        THE COURT:  Okay.

7        THE WITNESS:  I don't issue subpoenas, summons, or

8   anything to gather records like I do on the civil side.  And

9   this is common.  This is a cooperating agent by definition.

10  BY MR. MAGNER:

11     Q.  This is common in the IRS?

12     A.  Yes.

13     Q.  This is how you all work?

14     A.  As a civil cooperating agent, yes.  With civil we

15  assist the criminal investigations side of our Internal

16  Revenue Service.  We assist from the bottom on.

17     Q.  Would you agree with me though to be fair to the

18  taxpayer and to observe the precepts of the Taxpayer Bill of

19  Rights that somebody should do a full accounting and audit of

20  her taxes and her books and records before a criminal case is

21  brought against her?

22     A.  I don't really know as far as -- I only know what was

23  presented to me.  I don't know all the documents that were

24  viewed to come -- or what filtering process that was done

25  before I received them.  So I can't really comment on whether

1    that was not done or whether it was done.

2       **Q.**  Okay.

3       **A.**  I'm not privileged to that information.

4       **Q.**  I understand.  Is there -- is there some like wall

5    between you and the criminal investigators in terms of what

6    you're able to look at?

7       **A.**  As I said I'm not the pilot.  I am only given the

8    information that is given to me in computing those tax

9    deficiencies and applying the applicable tax law.

10       **Q.**  All right.  You prepared your spreadsheet.  I think

11    it was Government Exhibit 73.  You told us that that was

12    something that you largely prepared?

13       **A.**  Correct.

14       **Q.**  And you made your calculations by basically so that a

15    strict numeric or arithmetic computation of those numbers and

16    determined -- and someone told you that she charged $80 a

17    wedding, right?

18       **A.**  Correct.

19       **Q.**  And then in the later years, someone told you that

20    she charged $100?

21       **A.**  Correct.

22       **Q.**  In doing that arithmetic calculation that you showed

23    us and that you prepared her -- prepared your spreadsheets,

24    you did not make any allowance for the fact that Judge Trahan

25    would waive the fees on some of her weddings that she

1    officiated?

2        A.   I was unaware or that I was just like once again that

3    was the information I was given.

4        Q.   But in this case, you were not given --

5        A.   Correct.

6        Q.   -- evidence that she would waive the fees from time

7    to time?

8        A.   That is correct.

9             MR. FLANAGAN:  Objection, facts not in evidence.

10            THE COURT:  That she waived fees, that's in evidence.

11            MR. FLANAGAN:  Withdrawn.

12   BY MR. MAGNER:

13       Q.   And consistent with the rules of sequestration, would

14   you expect that the criminal investigative agent would

15   provide you with that information so that your calculations

16   would be as accurate as possible?

17       A.   Yes.

18       Q.   You did not make any effort to adjust your figures to

19   reflect the fact that Judge Trahan would give her staff

20   bonuses for their hard work in preparing the wedding licenses

21   and assisting with the weddings, did you?

22       A.   I didn't see any documentation for that, no.

23       Q.   And Agent Moore never told you about that?

24       A.   Never saw any documentation, correct.

25       Q.   And then you talked about when the fees jumped from

**OFFICIAL TRANSCRIPT**

1    $80 to $100, were you aware that that extra $20, the delta

2    between the two, would be divided up among Judge Trahan's

3    chambers staff for their assistance with the weddings?

4         A.   Strictly computational.  As far as the logic behind

5    the numbers I can't comment to that or what happened with the

6    funds.  You know I did the computation, $80 or $100.

7         Q.   I don't think I'm talking about computations.

8    Nobody -- nobody told you that fact that that extra $20 would

9    be divided up and distributed periodically among Judge

10   Trahan's chamber staff?

11        A.   But that's my point.  I'm just doing the computation

12   based on the $80 or $100.  As far as the other details of

13   that, I wouldn't be privileged to that.

14        Q.   Okay.  And you wouldn't be and you weren't?

15        A.   Correct.

16        Q.   Gotcha.  In reviewing the tax returns that you did,

17   did you make any accounting for the depreciation of office

18   expenses and office equipment from Judge Trahan's prior legal

19   practice?

20        A.   I did not make any changes to expenses, period, so

21   the answer is no.

22        Q.   Did you give her any credit for the overhead expenses

23   that she incurred while she was still in her legal practice

24   and offset that against the legal fee income that she derived

25   in 2013?

**OFFICIAL TRANSCRIPT**

1      **A.**  I would say, yes, because in the aspect, whatever

2   return -- whatever expenses were declared on the returns I

3   allowed in full.  So whatever expenses the taxpayer put on

4   the return, I did not change those.  So whatever items you're

5   mentioning, was this allowed, then the answer is yes.  I

6   didn't make any changes to it.

7      **Q.**  Right.  So when I provided the Government with those

8   expense checks, you're telling me that you gave full credit

9   dollar for dollar?

10      **A.**  That is correct.

11      **Q.**  But what you didn't do was give her any credit for

12   like the rent expense, the power bill in her office, the

13   overhead expense she had for employees like Ms. Henderson,

14   pens, paper, pads, accounting software?  You didn't do

15   anything to account for that, did you?

16      **A.**  I wouldn't because in our world, the burden of proof

17   is on the taxpayer to provide those type of expenses.  I

18   wouldn't know.

19      **Q.**  But you understand in a criminal case and I

20   understand you're primarily civil.  In a criminal case, the

21   Government has that burden of proving their case beyond a

22   reasonable doubt and we have no obligation at all?

23      **A.**  And what I was talking about on the return, on the

24   tax return, we allowed all expenses in full, so we didn't

25   scrutinize those expenses.

1      **Q.**  Nor did you give her any type of credit for those

2    type of overhead expenses that we just talked about?

3      **A.**  I am unaware of any other expenses other than what's

4    on the returns and the checks provided.

5      **Q.**  Right and I accept that, that you were not aware.

6    But you did not give her any credit for that or did you ask

7    Agent Moore, hey, should we like give her some credit for her

8    overhead, her depreciation, the expenses she had in running

9    that law practice?

10     **A.**  No, not to my knowledge.  No.  Because a lot of

11   taxpayers operate out of their homes --

12          MR. MAGNER:  I don't think I have a question.

13          THE COURT:  There's not a question pending.

14          MR. MAGNER:  Could you please pull up for the witness

15   Defense Exhibit 8.

16   BY MR. MAGNER:

17     **Q.**  Can you see that?

18     **A.**  Yes, sir.

19     **Q.**  And we saw some very similar forms earlier for '14,

20   '15, and '16, correct?

21     **A.**  Correct.

22     **Q.**  And this is the same report that you did for 2013,

23   correct?

24     **A.**  Correct.

25     **Q.**  And you did this to the best of your knowledge and

1    ability?

2         A.  Yes, sir.

3              MR. MAGNER:  We would offer at this time Defense

4    Exhibit 8.

5              THE COURT:  All right.  Any objection?

6              MR. FLANAGAN:  No objection.

7              THE COURT:  It's accepted into evidence.

8       (Whereupon, Defense Exhibit 8 is admitted into evidence.)

9    BY MR. MAGNER:

10        Q.  Now you prepared this based upon the additional

11   information that I provided of these expenses, right?

12        A.  Item C, correct.

13             MR. MAGNER:  We can publish, please.

14   BY MR. MAGNER:

15        Q.  And there was an earlier version of this document

16   that you prepared, which did not reflect those expenses?

17        A.  Correct.

18        Q.  And you commendably modified that with the

19   information we provided?

20        A.  Correct.

21        Q.  Okay.  So your -- so this is an official IRS

22   Form 4949-A (sic), correct?

23        A.  Correct.

24        Q.  And you -- you put your electronic signature on this?

25        A.  Yes, sir.  I believe it's on page 2.

1    **Q.**  Go to the last page.  Yeah.  So that's your

2    electronic signature, correct?

3    **A.**  Yeah.

4    **Q.**  And you're saying -- and in the earlier version, you

5    said that this is true and accurate to the best of your

6    knowledge and belief?

7    **A.**  Yes, sir.

8    **Q.**  And your earlier version of this document was in

9    error because it did not reflect the deductions for those

10   business expenses, correct?

11   **A.**  There was additional information provided to make a

12   revision.  I wouldn't say it's error.  I said this is --

13   there was a prior copy that was revised.  I wouldn't say

14   error.

15   **Q.**  So the earlier version then -- let's come up with a

16   term we can agree on.  The earlier version was inaccurate and

17   was modified based upon additional information received,

18   fair?

19   **A.**  There was a correction, correct.

20   **Q.**  And the earlier version was inaccurate?

21   **A.**  Okay.

22   **Q.**  Okay.  Whatever inaccuracies were in the initial

23   version of this, you were not willful in any way with those

24   inaccuracies, were you?

25   **A.**  No, sir.

**OFFICIAL TRANSCRIPT**

1    Q.   Okay.  And if you were like some rogue revenue agent

2    and were willful, you could be prosecuted for that?

3    A.   Correct.

4    Q.   Okay.  But we may quibble about the words, but you

5    would agree with me that your earlier version was inaccurate

6    and that you then amended it to prepare Defense Exhibit 8?

7    A.   It was a prior version that was changed with the

8    modification, correct.

9    Q.   And that's what the IRS allows its employees to do

10   and encourages them to do is if there is an inaccuracy, you

11   need to go back and correct it?

12   A.   And it's common.  Additional information is provided

13   by the taxpayer and we have to supersede the prior copy with

14   a revised copy.  That's common.  Because taxpayers will find

15   additional documents.

16   Q.   Or if the IRS finds additional relevant documents,

17   they should make those same changes, correct?

18   A.   Correct.

19   Q.   And in your work in the case, I think you kind of

20   showed the -- told us about the parameters of it.  You've

21   never spoken to Ms. Trahan, correct?

22   A.   No, sir.

23   Q.   You've never spoken to any of her chambers staff?

24   A.   No, sir.

25   Q.   You weren't provided with any memoranda or interview

1    for those folks?

2        A.   No, sir.

3        Q.   You're a numbers guy and that's what you've come here

4    to testify about?

5        A.   That's correct.

6            THE CASE MANAGER:   Mr. Magner, No. 8, please.

7            MR. MAGNER:   One moment, Your Honor.

8    BY MR. MAGNER:

9        Q.   One final set of questions.   You testified about the

10   Michael Hall check.   Do you remember that?

11       A.   Not the details.   I know we were looking through

12   checks and I was just verifying who the payees or payer was.

13       Q.   If I reminded you that the check from Mr. Hall to

14   Ms. Trahan had a notation on there about expense

15   reimbursement, do you recall?

16           Well, let's be fair to both of us.   Government

17   Exhibit 43, if you would be so kind.   Thank you.   Thank you

18   very much.

19           Would you mind blowing up the top half.

20           Do you see the memo section there, the reference

21   section there where it says "cost reimbursement"?

22       A.   Yes.

23       Q.   You just applied the entire amount of the $6,650

24   check without making any allowance for the fact there was a

25   cost reimbursement there, correct?

1       A.   I allowed the check, correct.

2       Q.   Now, with all these other issues, with these expenses

3    that were not accounted for with fees being waived, with

4    bonuses to Judge Trahan's staff, with overhead depreciation,

5    reimbursement of costs, if the trial went on for another few

6    days, we really probably could get down to zero, couldn't we?

7       A.   That would be speculative.

8            MR. MAGNER:  No further questions.  Tender the

9    witness.

10                      REDIRECT EXAMINATION

11   BY MR. FLANAGAN:

12      Q.   So starting with the difference between a cash method

13   of the accounting versus -- what was the other term?

14      A.   Accrual.

15      Q.   So what's the difference between the two?

16      A.   Cash is what most taxpayers use, individual returns

17   especially.  Accrual methods are mostly on the corporate

18   side, but you will see some individuals.  Cash method to try

19   to pare it down is kind of like the way we do our checkbooks.

20   We receive the cash that year when we write checks or

21   distribute money that year.  Accrual system is different.

22   Accrual is like a corporation with a sophisticated system

23   says, you know what, we're going to have to pay this expense

24   next year for $50,000.  We know we accrued it, but let's put

25   it in our books now, because we're going to put that

1  liability in our books.  So it gets more into liabilities and

2  assets and how you account for future expenditures, future

3  income, so it breaks down.  It's very complex.

4      Q.  Does a taxpayer have to elect accrual accounting

5  method?

6      A.  I'd have to look at the particular -- there are

7  divisions of very specific rules for construction companies

8  and everything and I believe that or usually in the first

9  return, the first Schedule C or the first return, the

10  taxpayer has to elect a method that's going to be used

11  consistently through the process.

12      Q.  Did you review the Schedule Cs in this case?  Did you

13  see the Schedule C?

14      A.  Yes, I had the returns.

15      Q.  Were the returns in the Schedule Cs specifically, did

16  they reflect a cash method of accounting?

17      A.  Yes, they did.

18      Q.  So, again, on the cash method, that means a 2015

19  expense ends up on a 2015 return?

20      A.  That's correct.

21      Q.  And a 2012 expense ends up on a 2012 return?

22      A.  Income and expenses in the year received.

23          MR. FLANAGAN:  Government requests permission to

24  publish what's been admitted into evidence as 54, excuse

25  me -- 59, Internal Reference 66.

1  BY MR. FLANAGAN:

2      Q.  What is this document?

3      A.  I don't have it on my screen.  I have it now.

4          This is a 2012 1040 individual tax return filed with

5  the federal government for Ernestine Anderson-Trahan and

6  Kenneth Trahan.

7  BY MR. FLANAGAN:

8      Q.  If we go to page 16 of this document -- not 16,

9  excuse me.

10         MR. MAGNER:  Judge, I believe this is beyond the

11 scope of my cross-examination.  It also relates to 2012,

12 which is not one of the tax years at issue here.

13         MR. FLANAGAN:  Your Honor, I'm happy to approach, I'm

14 happy to discuss this now.

15         THE COURT:  Yeah, come on.

16         WHEREUPON, the following proceedings were held at the

17 bench:

18         THE COURT:  Yes.

19         MR. MAGNER:  So my objection was it's beyond the

20 scope of my cross-examination.  If it's relevant, it's

21 marginally relevant because it involves 2012, which is not

22 one of the tax years at issue.

23         THE COURT:  Yeah, so why is it?

24         MR. FLANAGAN:  And I agree and I objected to him

25 admitting 2012 expenses and he made a big show that he didn't

1    account for 2012 expenses and the government's response is

2    the reason he didn't account for 2012 expenses is because she

3    got credit for those expenses on her 2012 tax return.  He's

4    already put out there the government is cheating her by not

5    looking through these expenses.

6         THE COURT:  I don't know -- I didn't -- I lost track

7    of the fact that it was expenses from 2012.  So, I mean, I

8    can just instruct the jury to disregard any evidence of costs

9    she may have incurred in 2012.  So we don't --

10         MR. MAGNER:  That may solve the problem.

11         THE COURT:  So you don't have to go through that.

12         MR. FLANAGAN:  Counsel?

13         THE COURT:  Mr. Magner.

14         MR. FLANAGAN:  I believe there was an exhibit so I'll

15    get that exhibit number.

16         MR. MAGNER:  My problem is, he didn't look at it.

17    That was my point, they never looked at 2012.

18         THE COURT:  They didn't look at any, but to the

19    extent that you showed an exhibit about 2012 --

20         MR. MAGNER:  Right, that was --

21         THE COURT:  Was it demonstrative?  He didn't look at

22    2012 -- the thing is, 2012 might have been relevant at the

23    start at the trial, but it's just not relevant now.

24         MR. FLANAGAN:  Your Honor, we never charged 2012.  We

25    never said 2012 was false.  We saw she had income in '12 and

1   had expenses in '12.  It's relevant to show she knows how to

2   claim expenses in '12.  We're fine with remedy of striking

3   all of 2012 is where we are.

4        MR. MAGNER:  I'm not asking for that because the

5   reason I went into it is to show that this revenue agent

6   didn't even bother to look and it was evidence of the

7   incompetence of the government's investigation.  That was my

8   primary purpose.

9        MR. FLANAGAN:  And we were never investigating '12 as

10  a false tax return.

11       THE COURT:  Okay.  Counsel, you have to admit, I

12  mean, these are criminal charges and the fact that -- how

13  this -- it's coming out in these investigations that the

14  ultimate tax liability is an issue, let the jury decide,

15  because she was taking these things into account, to

16  prosecute, I don't know whether it amounts to willfulness.

17  But for now, I'll tell the jury that, you know, anything

18  related to 2012, what they've seen is irrelevant, but it is

19  not part of the litigation to the extent that they saw costs

20  from 2012 to disregard.

21       MR. FLANAGAN:  Thank you, Your Honor.

22       MR. MAGNER:  Thank you, Your Honor.

23                 (In open court.)

24       THE COURT:  Ladies and gentlemen, let me instruct you

25  any costs you may have seen regarding the tax year 2012 is

**OFFICIAL TRANSCRIPT**

1    irrelevant.  Mr. Magner might have introduced an exhibit with

2    2012, so we're not examining -- 2012 nor 2013 are at issue.

3    She's not being accused of any crime or anything occurring in

4    2012 or 2013.  So to the extent that you may have seen

5    evidence about some costs she incurred that wasn't taken into

6    account in 2012, disregard it and that will narrow what we

7    have to deal what we have with this witness.  Thank you.

8          You can proceed, Counselor.  You're okay with that

9    instruction?

10         MR. FLANAGAN:  Thank you, Your Honor.

11   BY MR. FLANAGAN:

12     Q.  You testified to your calculations as to the gross

13   receipts on the tax returns, correct?

14     A.  Correct.

15     Q.  For those costs that Judge Trahan reported in her tax

16   returns, did you give her the tax benefits of those costs as

17   reported on those returns?

18     A.  In full.

19         MR. FLANAGAN:  Government requests to publish

20   Government Exhibit 17 to the witness and the jury.

21         THE COURT:  No objection?  Go ahead and publish it.

22   BY MR. FLANAGAN:

23     Q.  And what's this document?

24     A.  This is the 2016 individual 1040 return filed with

25   the IRS for Ernestine and Kenneth Trahan.

1    **Q.** I'm going to go to page -- maybe page 27. Excuse me.

2    That's page 30 on the PDF. I believe it's page 31 of the

3    document itself. And so your math is related to this line

4    item, Line Item 1, correct?

5    **A.** Correct.

6    **Q.** What's included in Part II of this Schedule C?

7    **A.** The expenses declared on the return. This is all the

8    expenses filed or, you know, offsetting income on the tax

9    return.

10   **Q.** And the math that you testified to would explain how

11   the changes to Line 1 flows through the rest of this

12   document, impacts the total income, total tax, is that

13   correct?

14   **A.** Correct.

15   **Q.** But while it's flowing through, you are still giving

16   Judge Trahan credit for all the expenses identified on lines

17   8 through 27?

18        MR. MAGNER: Your Honor, I object as leading, but I

19   also believe that it's quite misleading because he did a

20   simple arithmetic or I'm sorry arithmetic computation of what

21   he believed the wedding income was.

22        THE COURT: Okay. If you wanted to clarify that at

23   the end, I think it's clear that from your examination --

24        MR. FLANAGAN: It's misleading.

25        THE COURT: Well, not that you're misleading. With

**OFFICIAL TRANSCRIPT**

1    that exception, clearly this is just mathematical from what

2    was on her form and Mr. Magner pointed out that there was

3    other information out there.  Satisfied with that

4    instruction, Mr. Magner?

5           MR. MAGNER:  Yes, ma'am.

6           THE COURT:  All right.

7    BY MR. FLANAGAN:

8       Q.  So turning to Government Exhibit 73, Internal

9    Reference 86 on page 16, what was the arithmetic computation

10   that you did in this case?

11          MR. MAGNER:  Your Honor, I object.  It's repetitive,

12   it was gone onto on direct and it really is cumulative at

13   this point.

14          THE COURT:  It is.  I'm going to give you a little

15   leeway, but we've seen this information a couple of times now

16   so.

17   BY MR. FLANAGAN:

18      Q.  Understanding that you teach CPAs, did you use any

19   particular tricks to do 463 times 100?

20      A.  No, sir.

21      Q.  Going to Internal Reference 110, which is Government

22   Exhibit 78, and if I could have a moment, Your Honor.

23          THE COURT:  Okay.  Let me ask you about this:  Is

24   this the old schedule or is this the more recent?

25          MR. FLANAGAN:  This is the more current one in the

1    government exhibit --

2         THE COURT:  But has it been updated.

3         MR. FLANAGAN:  It currently is, Your Honor, been

4    admitted as Government Exhibit --

5         THE COURT:  No, I know that.  I thought this

6    information was updated and now -- am I misunderstanding?

7    Now the number is actually 24,000, Mr. Magner?

8         Why don't y'all approach because this is getting

9    confusing.

10         MR. MAGNER:  It's a different chart.

11         MR. FLANAGAN:  It's page 1.

12         THE COURT:  It's a different chart, but is it the

13    most accurate chart?

14         MR. FLANAGAN:  We can approach.

15         WHEREUPON, the following proceedings were held at the

16    bench:

17         THE COURT:  So I'm just trying to -- you're kind of

18    losing me here.  I thought that was the chart at one point,

19    but now because more information has been gathered, you're

20    picking information, no longer 2013 is in there, the number

21    is much lower, right?

22         MR. MAGNER:  I don't think any of it's accurate, but

23    this is what is already in evidence, what they put in

24    evidence.  It's the first page of a five- or six-page

25    document.

**OFFICIAL TRANSCRIPT**

1          MR. FLANAGAN:  It's the three-line one is the current

2    one.  You won't see Count 1.  That's how you know it's what

3    the Government is admitting --

4          THE COURT:  All right.  I just want to be clear about

5    that.

6          MR. FLANAGAN:  Thank you, Your Honor.

7                         (In open court.)

8    BY MR. FLANAGAN:

9      Q.  Let's go to page 6 of Government Exhibit 78.  Page 6,

10   please.  So this chart is the chart with Counts 2, 3, and 4,

11   is that correct?

12     A.  Correct.

13     Q.  And Mr. Magner walked through changes to Counts 1 and

14   different portions of the chart, correct?

15     A.  Correct.

16     Q.  But have these numbers, Counts 2, 3, and 4 ever

17   changed?

18     A.  No, sir.

19         MR. FLANAGAN:  One moment.

20         Nothing further.

21         THE COURT:  All right.  Thank you.

22         Do you have another witness?  We're getting close to

23   lunch.  We're not taking lunch until 12:15.

24         MR. FLANAGAN:  United States rests.

25         THE COURT:  All right.  So we will -- counsel

```
 1    approach.

 2          Any problem with me -- they do have what will be

 3    about 15, 20 minutes before lunch.  It's about 15 or

 4    20 minutes before lunch.

 5          MR. MAGNER:  So come up?

 6          THE COURT:  Yeah, why don't y'all come up.

 7          MR. FLANAGAN:  Your Honor, may we excuse the witness.

 8          THE COURT:  Oh, yes.  Sorry about that.  Thank you so

 9    much for your testimony.

10          MR. FLANAGAN:  Remind him.

11          THE COURT:  Oh, yes, please don't discuss your

12    testimony.

13          WHEREUPON, the following proceedings were held at the

14    bench:

15          THE COURT:  Because of all the stuff that happened

16    yesterday during lunch, someone approaching --

17          MR. FLANAGAN:  I'm having a tough time hearing.

18    Sorry.

19          THE COURT:  Because of everything that happened

20    during lunch, you know, the witness, somebody got sick, I'm

21    sequestering them for lunch, I just ordered their lunch, but

22    it's not going to get here until 12:15.  Do we have motions

23    to entertain or are we going into the defense side is what

24    I'm asking?

25          MR. MAGNER:  I can do my motion right now or we can
```

1    do it after they leave.

2         THE COURT:  We can't do it in front of them.

3         MR. MAGNER:  And I won't be very long.

4         MR. FLANAGAN:  I don't think we have anything for

5    them.  I don't know if I understand.  Is there matters for us

6    to do?

7         THE COURT:  No, I'm just saying, if there weren't any

8    motions that had to be heard outside of their presence -- you

9    know what, you can turn the white noise off.  He can't hear

10   me.

11        Am I on the mic?

12                   (In open court.)

13        THE COURT:  We're going to go ahead and -- there's

14   some matters that we need to take care of outside the

15   presence of the jury.  We're going to roll that into lunch,

16   to try to move it all along quickly.  Lunch should be here

17   shortly.

18        With that, we're going to go ahead and adjourn until

19   1:30, 2:00?

20        MR. FLANAGAN:  1:30.

21        MR. MAGNER:  1:30.

22        THE COURT:  We're recessed for lunch until 1:30.

23        THE CASE MANAGER:  All rise.

24        (Whereupon, the jury exits the courtroom.)

25        THE COURT:  You can have a seat.

<u>RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL</u>

1

2          MR. MAGNER:  Judge, now that the Government has

3     rested, the Defense would move pursuant to Federal Rule of

4     Criminal Procedure 29 for a judgment of acquittal.  We do not

5     believe that the Government has submitted sufficient evidence

6     to sustain its burden of proving that the defendant made

7     false statements on her tax returns in a willful fashion.  We

8     don't believe that any reasonable juror could conclude that

9     they have and we would move for a dismissal and a judgment of

10    acquittal at this time.

11          In particular, I would note that there is no

12    documentary evidence that Ms. Trahan signed the 2016 return,

13    nor did she sign the e-file form.  I think it's in 8879 and

14    that is an essential element of the government's proof to

15    show that --

16          THE COURT:  Hold on a second.  He's got to close the

17    door.  Proceed.  Sorry.

18          MR. MAGNER:  That she actually signed the tax return

19    or the e-file requests.  That's an essential element of the

20    crime and --

21          THE COURT:  So that's only for 2016?

22          MR. MAGNER:  2016.

23          THE COURT:  So you specifically move for dismissal of

24    2016 -- that would be count --

25          MR. MAGNER:  So that would be Count 4, but we move to

**OFFICIAL TRANSCRIPT**

1    dismiss all the remaining three counts due to the

2    government's substantial failure of proof of willfulness in

3    this case.  That's about it.

4         Also, if we could make it clear for the record that

5    Count 1, when it was dismissed, was dismissed with prejudice.

6    We would like to have that clarified as well.

7         THE COURT:  Yes.

8         MR. FLANAGAN:  No objection to Count 1.

9         THE COURT:  All right.  Thank you.

10        MR. FLANAGAN:  Is that all?

11        MR. MAGNER:  That's it.  Yes.  Thank you.

12        THE COURT:  Start with '16 if you don't mind.

13        MR. FLANAGAN:  2016, yes.  To that signature point,

14   the documentary evidence that has been submitted to the jury

15   is the tax return itself.  It has an electronic signature

16   next to her name.

17        THE COURT:  What exhibit is that?

18        MR. FLANAGAN:  Excuse me.  It's Exhibit 17.  It's the

19   2016 tax return.

20        THE COURT:  Can I get a copy of that, Dena?  I'll

21   give her a minute to look through that.

22        MR. MAGNER:  Can we indulge Ms. Better to pull it up

23   so we can see.

24        THE COURT:  Can you pull it up.

25        MR. FLANAGAN:  And I don't want to cheat, Your Honor.

1    I heard you say this says dot-dot-dot for the record.

2         MR. MAGNER:  That would be my point, it has five

3    dots.  That's not a signature and neither Ms. Ancar nor the

4    Internal Revenue Service have a signed return, nor a signed

5    8879 e-file form.

6         MR. FLANAGAN:  And that signature, that dot-dot-dot

7    is the electronic signature that's created when someone

8    e-files their return.  That's how the process works.

9         THE COURT:  Is there something to tell, I mean, that

10   you could determine that it was actually them?  I mean, I

11   have an electronic signature and it's an electronic

12   signature.

13        Let's research that.  Let's see, if there's something

14   other than an actual signature that can substitute.

15        MR. FLANAGAN:  That's one part of the documentary

16   evidence.

17        The other part is the work papers for the e-file form

18   and, Your Honor, we submitted this to the court so we would

19   be up-front about this document.

20        THE COURT:  Well, I mean, that's fine, but does it --

21   I still --

22        MR. FLANAGAN:  The e-filed exhibit --

23        THE COURT:  I'm sorry.  Let me finish.  I still have

24   to decide based on that motion.  Just because admitted --

25   evidence is admitted for -- doesn't mean that I have to

1   consider the weight of it at this point.

2        MR. FLANAGAN:  Understood.

3        So the other piece that we would ask Your Honor to

4   consider is Government Exhibit 71, which is the e-file from

5   Ms. Ancar's records.  And I understand defense counsel's

6   point to be this is an unsigned document from Ms. Ancar's

7   records.

8        THE COURT:  Okay.  This isn't signed either.

9        MR. FLANAGAN:  Yes, Your Honor.  So this is the

10   unsigned document and the testimony that you heard from

11   Ms. Ancar yesterday, if I may, is that this is her copy of

12   the records.  She provided the original to Judge Trahan and

13   Ms. Ancar testified under oath that she would not have

14   submitted this without first obtaining Judge Trahan's

15   signature.

16        THE COURT:  The problem I have with that is Ms. Ancar

17   also testified that maybe it's not -- was it the 2013 that's

18   not relevant here, but that she thought it had been filed,

19   but then it wasn't filed?  Am I correct?  Some year wasn't

20   filed and she -- she -- because her computer -- there's no

21   way that she can prove that it was actually filed.  So, you

22   know, again, that goes to the weight.  She said in general

23   terms I don't think she had -- she didn't come across to me

24   to have that kind of specific knowledge, but she was talking

25   about generally she wouldn't have done that unless she had

1    filed the document.  I imagine for the document -- the tax

2    year that it wasn't actually filed for some reason or

3    another.

4            MR. FLANAGAN:  And I understand that point, Your

5    Honor.  Two responses to that.  The first is if it's an issue

6    with Ms. Ancar's credibility, then that goes to the jury.

7    The second is, I do believe that is evidence that Ms. Ancar,

8    works and all, takes that step of filing the return the most

9    seriously and she does not file until we are done and the

10   client has said file.  And so, yes, you have an unfiled '13

11   (sic) returns --

12           THE COURT:  I think it's an issue for fact.  It's an

13   issue of fact for the jury to decide whether or not 2016 was

14   actually filed.

15           All right.  Move on to the -- you know, what evidence

16   demonstrates willfulness.

17           MR. FLANAGAN:  With regards to the 2014 return, with

18   regards to that willfulness piece, in 2014, you have

19   Government Exhibit 8.  It's a financial disclosure from Judge

20   Trahan provided to the judiciary commission, two months

21   before filing her tax return, the timing, if I may, where she

22   reports to the judiciary commission attorney's fees.  And

23   then two months later --

24           THE COURT:  Is that the right one?

25           THE CASE MANAGER:  Yes.

```
 1          THE COURT:  So Ms. Ancar said she actually prepared

 2    that.

 3          MR. FLANAGAN:  My understanding is that 2013 was the

 4    one Ms. Ancar prepared and 2014 on Ms. Trahan did it herself.

 5          MR. WICKER:  Your Honor, Ms. Ancar testified that she

 6    prepared all financial disclosures that were typed up.

 7          THE COURT:  Yes, she did testify to that.  That's

 8    what she said.

 9          MR. FLANAGAN:  And Judge Trahan signed this return

10    and two months later filed a tax return without the same

11    attorney's fees on the return.  She's presumed to know the

12    contents --

13          THE COURT:  Again, I'm going to say Ms. Ancar said

14    all the financial disclosures that were typed she did and

15    that she submitted the tax return to her.

16          MR. FLANAGAN:  Understood on that piece.  This is

17    also income that Judge Trahan received and deposited into her

18    account, so she's aware that she received this income in

19    2014.

20          THE COURT:  But how have you not shown that that's

21    just not merely neglect, even gross neglect.  I mean,

22    willfulness is a level of, you know, I'd say calculated

23    indifference and just the fact that she -- her accountant

24    prepared the financial disclosure and it's on that, but it's

25    not on the -- not on her tax returns.  I don't know that that
```

1   seems -- you know, if that's an element of willfulness

2   because financial disclosures are very, very public and they

3   are published, right?  I think they're online.  They're now

4   online for us too.  So, you know, that's a clear way that if

5   you have hidden something from the IRS, everybody is going to

6   know and if somebody is inclined to report it, they're going

7   to report it.  So why would someone willfully disclose

8   finances on their financial disclosure and then not put it on

9   there -- why is that willful?

10       MR. FLANAGAN:  And respectfully, Your Honor, at this

11  point, we are -- taking these actions and inferring into the

12  mind of Judge Trahan and that's why it goes to the jury,

13  because they have to decide her willfulness.

14       THE COURT:  Unless there's no reasonable jury that

15  could find that to be willful and that's what I'm being asked

16  to decide right now.

17       MR. FLANAGAN:  In the light most favorable to the

18  Government and the Government has presented evidence that it

19  is wrong.

20       THE COURT:  Do you have anything other than that?

21       MR. FLANAGAN:  The weddings, Your Honor.

22       THE COURT:  Let's talk about that.

23       MR. FLANAGAN:  The weddings in 2014, according to

24  testimony that you have heard from Mr. George, from the 2014

25  marriage certificates themselves, she performed 372 marriage

**OFFICIAL TRANSCRIPT**

1    certificates -- officiated 372 weddings.  That times $80 is

2    simple math and that's well over the $16,000 she reported.

3         THE COURT:  What if I were a juror and I said, you

4    know, it looks like, this women is kind of mess, you know,

5    friends helping friends, right?  She doesn't have

6    high-powered -- all respect to Ms. Ancar, she's a wonderful

7    person and she's done a good job, but I mean, it just looks

8    like pulled some average -- it started out 16,000.  They kept

9    it and she made it lower, I mean 15,200 that third time

10   but --

11        MR. FLANAGAN:  Because it's not an average, it went

12   up.

13        THE COURT:  Not an average.  I mean, she started out

14   16,000 and carried over 16,000.

15        MR. FLANAGAN:  Right.  And so if she starts at

16   16,000, that's 200 weddings a year.  By her report to the

17   judiciary commission and she had 300 certificates in her

18   office, she later learned that count was also wrong, but by

19   her own records in her office, she was off by 50 percent.  It

20   went from 200 to 300.  That's an inventory change.  The

21   number of weddings at that point is a scale that goes to

22   willfulness, that in itself, that scale changed as evidence

23   of willfulness.  And to the point with Ms. Ancar, Ms. Ancar

24   was very clear.  She can't help create these weddings.  She

25   has to get them from Judge Trahan.  This isn't a back and

 1   forth.  She has to take the number Judge Trahan gives her.

 2       THE COURT:  And the judge is relying on her staff to

 3   keep track of it and -- right?

 4       MR. FLANAGAN:  No.  The point is government --

 5       THE COURT:  That's what the testimony was and, you

 6   know, I mean, we're very fortunate here.  We have a very

 7   sophisticated computer system.  I don't think weddings are

 8   part of their docket.  I didn't hear that.  I mean, it's just

 9   people trying to keep track and there are people that might

10   come get a license but you have somebody else.  I mean, I

11   know -- it's an issue of -- it's an issue I guess of fact,

12   but you know...

13       MR. FLANAGAN:  To Your Honor's point about chambers,

14   they were keeping track of these licenses for the state.

15   Judge Trahan had a staff, knew how to rely on that staff for

16   other parts of her chambers, and by 2014, she's gone through

17   the process of reporting this income.  So if she -- if she

18   started from an innocent, oh, my gosh, I'm going to be asked

19   at the end of the year to report this stuff, that should have

20   been corrected in 2014 when she met with her accountant to

21   prepare her 2013 tax returns.  So from 2014 on, if she wasn't

22   on notice, someone's going to want to know how much she made

23   from weddings.  That notice should have happened when she

24   went to that preparer.  So the fact that she didn't go to her

25   staff --

1          THE COURT:  And so the issue is that just negligence,

2  you know, bad management, is that willful?

3          MR. FLANAGAN:  And that goes to the jury, Your Honor.

4          THE COURT:  How much money are we talking about?

5  That's what I was going to -- is this a misreporting of

6  $24,000 or $77,000?  Do we know where we are on that?

7  Because to me that's another element of --

8          MR. FLANAGAN:  If I could have one moment, Your

9  Honor.

10         THE COURT:  Sure.

11         MR. FLANAGAN:  And if Your Honor is looking for the

12  specific amount for 2014 --

13         THE COURT:  No, I was looking for all together.  2014

14  is the issue where there was unreported for the weddings.

15         MR. FLANAGAN:  Right.  Well, 2014, '15, and '16 all

16  have unreported weddings and Your Honor can see those in 62,

17  the math of what's unreported or 78.

18         THE COURT:  This is the issue I have.  These are

19  factual issues for the jury, but this isn't a civil trial

20  where they have to decide what's more likely than not.  This

21  is a criminal trial where they have to decide beyond a

22  reasonable doubt.

23         MR. FLANAGAN:  Understood, Your Honor.

24         THE COURT:  And so, I mean, I'm not -- I'm going to

25  deny the motion at this point, but you've made it.  I can

**OFFICIAL TRANSCRIPT**

1   come back and reconsider it I guess if I need to, but I'll go

2   ahead and let it go to the jury.

3        MR. FLANAGAN:  Thank you, Your Honor.

4        MR. MAGNER:  Would it be fair to say, Judge, I'm not

5   trying to put words in your mouth, but you're reserving your

6   final decision on this until after the jury returns a

7   verdict?

8        THE COURT:  Yes.

9        MR. MAGNER:  Thank you.

10        THE COURT:  All right.  Let's all go get something to

11   eat if you can, if you have time.  Anything else we need to

12   do before?

13        MR. FLANAGAN:  Your Honor, we had given the court a

14   memorandum yesterday morning we hadn't put on the record.

15   Would Your Honor like to do that now?

16        THE COURT:  What was that memorandum?

17        MR. FLANAGAN:  It was to alert the court as to

18   context of dismissing Count 1.

19        THE COURT:  Yes.  You want to put this in the record?

20        MR. FLANAGAN:  Yes, Your Honor.

21        THE COURT:  I'm sure there's no objection.

22        MR. MAGNER:  No objection.

23        THE COURT:  I'm just going to tell you, so, you know,

24   I've read the indictment and the indictment goes back to the

25   jury when they deliberate.  So, you know, we're just going to

1  scratch through Count 1 with a pen, to be honest.  That's

2  about all I can do at this point.  I don't think trying to

3  submit -- edit it could be misleading and inappropriate.  If

4  you're okay with that, that's how we can submit it to them.

5  You all can explain in your closing.

6        MR. FLANAGAN:  Thank you, Your Honor.

7        THE COURT:  Is there anything else?

8        No?  I'll try to get you -- I'm just looking at a

9  final draft of the jury instructions, which will possibly

10  change because there's some missing information.  With that,

11  we'll adjourn for lunch.  Thank you.

12                    (Recess taken.)

13                    (In open court.)

14      THE COURT:  Are we ready to bring the jury in?

15        MR. FLANAGAN:  Yes, Your Honor.

16        THE COURT:  All right.  Bring the jury in.

17      (Whereupon, the jury enters the courtroom.)

18        All right.  Welcome back.  Let's have a seat.

19        We'll now begin with the Defense.

20        MR. MAGNER:  May it please the court, the Defense

21  calls Scott Sigl.

22        THE CASE MANAGER:  Good afternoon.  Raise your right

23  hand.

24                 (Witness administered oath.)

25        THE WITNESS:  I do.

**OFFICIAL TRANSCRIPT**

1          THE CASE MANAGER:  Have a seat.  If you will speak

2     directly into the microphone, state and spell your name for

3     the record.

4          THE WITNESS:  My name is Scott Sigl, S-i-g-l.

5                        SCOTT SIGL,

6     Being called as a witness, being first duly sworn, examined

7     and testifies as follows:

8                     DIRECT EXAMINATION

9     BY MR. MAGNER:

10        Q.  Good afternoon, Mr. Sigl.

11        A.  Good afternoon.

12        Q.  What do you do for a living?

13        A.  I am a paralegal.

14        Q.  At my law firm?

15        A.  Yes, I am.

16        Q.  And describe for us generally what you do, the type

17    of work you do as a paralegal?

18        A.  I do chronological medical summaries.  I also set up

19    notices of deposition, filing pleadings and other responsive

20    pleadings in that nature.

21        Q.  Tell us a little bit more about the chronological

22    medical summaries that you prepare?

23        A.  I normally review the medical records, mainly records

24    that are significant even though they may be mundane and put

25    them in chronological medical order in summarized format to

**OFFICIAL TRANSCRIPT**

1    assist attorneys in the event of them taking the deposition

2    of said individual.

3        Q.  All right.  And I would imagine most of the time you

4    do that it's in connection with personal injury cases?

5        A.  Yes.

6        Q.  All right.  Did we ask you to review the medical

7    records of Ms. Ernestine Trahan and her late mother, Ms. Faye

8    Anderson?

9        A.  Yes.

10       Q.  And have you -- have you done that?

11       A.  Yes, I have.

12       Q.  Tell us generally what you did and how you went about

13   preparing a medical records summary in the case.

14       A.  I went through each of the individual set of records

15   from each of the medical providers.  I then went through

16   them, reviewed them, and then -- sorry, blanking.

17       I then pulled the medical records and put them in

18   chronological medical order and summarized each of the visits

19   that were significant.

20   BY MR. MAGNER:

21       Q.  And did you prepare a timeline in connection with

22   your work?

23       A.  Yes, I did.

24       Q.  And did that timeline reflect both Ms. Trahan and her

25   late mother?

1      A.  Yes, it did.

2      Q.  All right.  We're going to try to get right down to

3   business.  I would like to show you for identification what

4   we have marked as Defense Exhibit 9 and our internal

5   reference is 24.  And do you see that as the first page of

6   the Ochsner medical records for Ernestine Trahan?

7      A.  Yes.

8      Q.  And just go a couple pages in.  I think there are

9   869 pages.  We'll only go through about 800.  No, I'm just

10  kidding.  Just a few to acquaint yourself that these were the

11  Ochsner records for Ms. Trahan.

12     A.  Yes, they were.

13     Q.  And did you rely on those records to prepare your

14  medical records timeline summary?

15     A.  Yes, I did.

16     Q.  And did the records appear complete to you?

17     A.  Yes, they did.

18         MR. MAGNER:  We would offer at this time Defense

19  Exhibit 9.

20         MR. BOTELER:  No objection, Your Honor.

21         THE COURT:  All right.  It's accepted into evidence.

22    (Whereupon, Defense Exhibit 9 is admitted into evidence.)

23         MR. MAGNER:  Would you please pull up Defense

24  Exhibit 10.

25  BY MR. MAGNER:

1    **Q.**  And do you recognize this as being a 618-page

2    document of West Jefferson records for Ms. Faye Anderson?

3    **A.**  Yes, I do.

4    **Q.**  And you relied on these records as well to prepare

5    your summary, correct?

6    **A.**  That is correct.

7         MR. MAGNER:  We offer Defense Exhibit 10 at this

8    time.

9         MR. BOTELER:  No objection, Your Honor.

10        THE COURT:  All right.  It's accepted into evidence.

11    (Whereupon, Defense Exhibit 10 is admitted into evidence.)

12   BY MR. MAGNER:

13   **Q.**  I'm showing you now what we've marked for

14   identification as Defense Exhibit 11.  And do you recognize

15   these as being the Ochsner medical records for Faye Anderson?

16   **A.**  That is correct.

17   **Q.**  And you likewise used these records in preparing your

18   medical records summary?

19   **A.**  That is correct.

20        MR. MAGNER:  We would offer Defense Exhibit 11 at

21   this time.

22        MR. BOTELER:  No objection, Your Honor.

23        THE COURT:  All right.  It's accepted into evidence.

24    (Whereupon, Defense Exhibit 11 is admitted into evidence.)

25   BY MR. MAGNER:

1   **Q.** I'm now showing you what we marked for identification

2   as Defense Exhibit 12, three volumes.  Do you recognize these

3   as the Crescent City Physicians medical records for Faye

4   Anderson?

5   **A.** Yes, they are.

6   **Q.** And that's a group of doctors that practice primarily

7   out of Touro Infirmary?

8   **A.** That's correct.

9   MR. MAGNER:  We would offer Defense Exhibit 12 at

10   this time.

11   MR. BOTELER:  No objection, Your Honor.

12   THE COURT:  It's accepted into evidence.

13   (Whereupon, Defense Exhibit 12 is admitted into evidence.)

14   BY MR. MAGNER:

15   **Q.** I'm now showing you what we've marked for

16   identification as Defense Exhibit 13.  Do you recognize these

17   as the records of the New Orleans Kidney Center relative to

18   Faye Anderson?

19   **A.** Yes, they are.

20   MR. MAGNER:  We would offer Defense Exhibit 13 at

21   this time.

22   MR. BOTELER:  No objection.

23   THE COURT:  It's accepted into evidence.

24   (Whereupon, Defense Exhibit 13 is admitted into evidence.)

25   BY MR. MAGNER:

1      **Q.**   I'm showing you now what we've marked for

2   identification as Defense Exhibit 14.  Do you recognize these

3   as the first volume of the Touro Infirmary records relative

4   to Faye Anderson?

5      **A.**   That is correct.

6          MR. MAGNER:  We would offer Exhibit 14 at this time.

7          MR. BOTELER:  No objection, Your Honor.

8          THE COURT:  It's accepted into evidence.

9     (Whereupon, Defense Exhibit 14 is admitted into evidence.)

10   BY MR. MAGNER:

11     **Q.**   I'm now showing you what we've marked for

12   identification as Defense Exhibit 15.  Do you recognize these

13   as the Touro Infirmary records for Ms. Anderson, Volume II?

14     **A.**   That would be correct.

15     **Q.**   And there are four volumes in Volume II, Part II?

16     **A.**   Okay.

17     **Q.**   Does that sound correct?  Do you want to

18   double-check?

19     **A.**   Repeat the question.

20          MR. MAGNER:  May I approach?  Okay.

21          THE WITNESS:  Yes.

22          MR. MAGNER:  We would offer Defense Exhibit 15 at

23   this time.

24          MR. BOTELER:  No objection, Your Honor.

25          THE COURT:  Thank you.  It's accepted into evidence.

1    (Whereupon, Defense Exhibit 15 is admitted into evidence.)

2  BY MR. MAGNER:

3       Q.  Now, showing you what we've marked for identification

4  as Part 3 of Ms. Anderson's Touro Infirmary records which we

5  have marked as Defense Exhibit 16.

6       A.  That is correct.

7            MR. MAGNER:  We would offer Defense Exhibit 16 at

8  this time.

9            MR. BOTELER:  No objection, Your Honor.

10           THE COURT:  Thank you.  It's accepted into evidence.

11    (Whereupon, Defense Exhibit 16 is admitted into evidence.)

12  BY MR. MAGNER:

13       Q.  Sir, I'm now showing you what we've marked for

14  identification as Defense Exhibit 17.  These are the Touro

15  Infirmary records relative to Ernestine Trahan?

16       A.  That is correct.

17       Q.  And you used these five volumes in the completion of

18  your medical records summary, correct?

19       A.  Yes, I did.

20           MR. MAGNER:  We would offer Defense Exhibit 17 at

21  this time.

22           MR. BOTELER:  No objection, Your Honor.

23           THE COURT:  It's accepted into evidence.

24    (Whereupon, Defense Exhibit 17 is accepted into evidence.)

25  BY MR. MAGNER:

1    **Q.**  Sir, I'm now showing you what we marked for

2  identification as Defense Exhibit 18, the Touro Infirmary

3  records Part II, relative to Ernestine Trahan.  Do you

4  recognize those?

5    **A.**  Yes, I do.

6    **Q.**  And you relied on these to prepare your medical

7  records summary, correct?

8    **A.**  That's correct.

9    MR. MAGNER:  We would offer 18 at this time.

10    MR. BOTELER:  No objection, Your Honor.

11    THE COURT:  It's accepted into evidence.

12   (Whereupon, Defense Exhibit 18 is admitted into evidence.)

13  BY MR. MAGNER:

14    **Q.**  Sir, I'm now showing you what we've marked for

15  identification as Defense Exhibit 19.  Do you recognize these

16  as Part 3 of Ms. Trahan's Touro Infirmary records?

17    **A.**  That is correct.

18    **Q.**  And you used these to prepare your summary chart,

19  correct?

20    **A.**  Yes, sir.

21    MR. MAGNER:  We offer 19 at this time.

22    MR. BOTELER:  No objection.

23    THE COURT:  It's accepted into evidence.

24   (Whereupon, Defense Exhibit 19 is admitted into evidence.)

25    MR. MAGNER:  And, Judge, just for clarity's sake, I

1    think we have agreed with the Government that these records

2    will be part of the record, but they will be maintained under

3    seal to protect people's privacy.

4             MR. BOTELER:  Correct, Your Honor.  We had that

5    pretrial motion, yes, we agree with those and several other

6    exhibits.

7             THE COURT:  Ms. White, please note that.

8             MR. MAGNER:  And, generally speaking, correct me if

9    I'm wrong, I believe the same will be true for many of the

10   tax records as well.  Those will be kept under seal --

11            MR. BOTELER:  Correct, and the marriage certificates,

12   like the bulk marriage certificates.

13            THE COURT:  They should.  I noticed some Social

14   Security numbers going through and on the tax records I did

15   see --

16            MR. BOTELER:  That and the marriage certificates,

17   like the actual one.

18            THE COURT:  All right.  You have a note by all of

19   that?

20            THE CASE MANAGER:  (Nods head.)

21                 (Discussion between counsel.)

22   BY MR. MAGNER:

23     Q.  Mr. Washington is now pulling up a document, do you

24   see that before you?

25     A.  Yes, I do.

1      **Q.**  And do you recognize this as your medical records

2  summary?

3      **A.**  That is correct.

4      **Q.**  All right.

5          MR. MAGNER:  We would offer -- so strike that.

6  BY MR. MAGNER:

7      **Q.**  Are the records that you summarized voluminous?

8      **A.**  Yes, they are.

9      **Q.**  Do you believe that a summary would assist the

10  jury --

11                      (Beeping sound.)

12          THE COURT:  Can everyone make sure your phones are

13  turned off?

14          MR. MAGNER:  Just glad it wasn't me.

15                      (Laughter.)

16          THE COURT:  Or me.  I have to punish myself.

17                      (Laughter.)

18  BY MR. MAGNER:

19      **Q.**  Do you believe the medical records summary that you

20  prepared will assist the jury in understanding these

21  voluminous records?

22      **A.**  Yes, it would.

23      **Q.**  Now, you have not included each and every visit or

24  hospital stay in your summary, have you?

25      **A.**  No, sir.

1    **Q.**  You tried to reference the most significant ones?

2    **A.**  That is correct.

3    **Q.**  All right.

4        MR. MAGNER:  We would offer at this time Government

5    Exhibit 20.

6        MR. BOTELER:  I'm sorry.  Do you mean Defense

7    Exhibit 20?

8        THE COURT:  Yes.  I think you mean Defense

9    Exhibit 20.

10       MR. MAGNER:  I do.

11       THE COURT:  You don't have to stipulate that it's the

12   Government Exhibit.

13       MR. MAGNER:  Right, Defense Exhibit 20.

14       MR. BOTELER:  And no objection, Your Honor.

15       THE COURT:  Thank you.  It's accepted into the

16   record.

17   BY MR. MAGNER:

18   **Q.**  So try to orient the jury, Mr. Sigl -- oh, can we

19   please publish Defense Exhibit 20?

20       THE COURT:  Yes.  Permission to publish granted.

21   BY MR. MAGNER:

22   **Q.**  Try to orient the jury, if you will, for how you

23   prepared this summary.

24   **A.**  Well, I did each -- both Ms. Anderson and

25   Ms. Trahan's records separately and I worked from the years

1   between 2013 through -- to 2019 in regards to Ms. Trahan and

2   2013 through 2017 for Ms. Anderson.

3       Q.   And 2017 is when Ms. Anderson passed away?

4       A.   That is correct.

5       Q.   And it appears that the -- you have little lines here

6   that are different colors, the darker color for Ms. Anderson?

7       A.   That's correct.

8       Q.   And the lighter blue color for Ms. Trahan?

9       A.   Yes.

10      Q.   And some are on top and some are on bottom.  Does

11  that have any particular significance?

12      A.   Only for ease of reading it because if they're all on

13  the same thing it would get cluttered.

14      Q.   All right.  We're going to refer to one particular

15  document right up front, but maybe just take us through,

16  like, that top line there just so the jury understands your

17  methodology here.  So for like May 20, 2013, here, what are

18  you -- what does your summary show?

19      A.   Ms. Anderson underwent eye surgery for renal

20  hemorrhaging at MediCrest, which is now Ochsner Westbank.

21      Q.   And renal hemorrhaging, that would relate to the

22  kidneys?

23      A.   Renal -- yes, that would be it.

24      Q.   So then the next entry is -- on the top -- let's

25  go -- so then about three months later on August 26th,

1    Ms. Anderson goes back to the doctor in connection with her

2    vision?

3        A.   Yes.   In the previous -- the previous eye surgery was

4    for her left and the 8/26/2013 visit she was complaining

5    about poor vision in her right eye.

6        Q.   Then November 4, 2013, Ms. Trahan goes to her OB/GYN

7    for her annual visit?

8        A.   Yes.

9        Q.   And so forth as we go down the chart, correct?

10       A.   That is correct.

11       Q.   All right.  I'd like to pull up -- I'd like to show

12   you what we marked for identification as Defense Exhibit 21

13   which is Internal Reference 35.   And do you see that before

14   you?

15       A.   Yes, I do.

16       Q.   And what is this, sir?

17       A.   This is a ledger detail of where Ms. Anderson

18   received her eye surgery for her left eye.

19       Q.   And in essence, this is an invoice for that eye

20   surgery?

21       A.   Yes.

22       Q.   Were we not able to find an actual medical record for

23   that?

24       A.   Unfortunately, no.

25       Q.   All right.  But it does show that, in fact, she did

1   receive the eye surgery?

2       A.  That is correct.

3       MR. MAGNER:  We would offer Defense Exhibit 21 and

4   ask that it be published, please.

5       MR. BOTELER:  No objection, Your Honor.

6       THE COURT:  All right.  Admitted into evidence and

7   you can publish it.

8    (Whereupon, Defense Exhibit 21 is admitted into evidence.)

9       MR. MAGNER:  All.  Right we can take that down and go

10  back to the chart, please.

11  BY MR. MAGNER:

12      Q.  So then we see some other entries here in 2013, for

13  example, December 6, 2013, Ms. Trahan underwent an

14  echocardiogram?

15      A.  That is correct.

16      Q.  And it looks like about 10 days later, she underwent

17  a stress test?

18      A.  That is correct.

19      Q.  And that would be in connection with her heart

20  health, her cardiac?

21      A.  That would be correct.

22      Q.  And are there going to be references in your chart to

23  Ms. Trahan complaining of heart palpitations and other

24  similar issues?

25      A.  Yes.

1    Q.   All right.  If we can please go to the next page.

2         So then on December 19, 2013, --

3                        (Cell phone ringing.)

4         THE COURT:  Hold on a second.

5         MR. MAGNER:  We good?

6         THE COURT:  We got it turned off?

7         JUROR:  I got it this time.

8         MR. MAGNER:  We don't want any probation here.

9    BY MR. MAGNER:

10   Q.   On December 19, 2013, Ms. Trahan underwent a

11   hysterectomy?

12   A.   That is correct.

13   Q.   We see some follow-up visits in connection with that

14   in the ensuing weeks and months, correct?

15   A.   That is correct.

16   Q.   We see another echocardiogram in March of 2014?

17   A.   Yes.

18   Q.   And then Ms. Anderson on May 24th had a doctor visit

19   for dizziness, hypertension and diabetes, correct?

20   A.   May or March.

21   Q.   March.  You're right?

22   A.   Yes, that is correct.

23   Q.   All right.  So if we can please pull up our next

24   exhibit, Exhibit 22, if you can please pull that up on the

25   screen so we can ask the witness to identify it, please?

1           MR. WASHINGTON:  36?

2           MR. WICKER:  Yes.

3    BY MR. MAGNER:

4       **Q.**  And do you recognize that?

5       **A.**  Yes.

6       **Q.**  And what is that?

7       **A.**  This is a -- from May 9, 2014, this is Ms. Anderson's

8    admission history for having left leg weakness, and she also,

9    when she got -- when she woke up, she tried to get out of her

10   bed and her left side was inoperable.

11      **Q.**  Meaning she couldn't move it?

12      **A.**  That's correct.

13          MR. MAGNER:  We would offer at this time Defense

14   Exhibit 22.

15          MR. BOTELER:  No objection, Your Honor.

16          MR. MAGNER:  Ask that it be published.

17          THE COURT:  It's accepted into evidence.

18    (Whereupon, Defense Exhibit 22 is admitted into evidence.)

19          MR. MAGNER:  If we can go back to the chart, summary

20   chart.  Thank you.

21          And now if we could pull up Defense Exhibit 23.

22          MR. WICKER:  37.

23          MR. MAGNER:  Which is 37, our Internal Reference 37.

24   BY MR. MAGNER:

25      **Q.**  And what is this, sir?

**OFFICIAL TRANSCRIPT**

1   **A.**  This is the May 14, 2014, visit post-ER visit after

2   Ms. Anderson suffered a stroke.

3   **Q.**  All right.  And we don't need to spend a good amount

4   time on it, but this reflects the different medications that

5   she's on?

6   **A.**  That's correct.

7   **Q.**  And in your review of the records, did you see

8   indications where Ms. Anderson was resistant to taking her

9   medications and resistant to undergoing certain treatment

10  like dialysis?

11  **A.**  Yes.

12  MR. MAGNER:  We would offer Defense Exhibit 23 at

13  this time and ask that it be published.

14  MR. BOTELER:  No objection, Your Honor.

15  THE COURT:  All right.  It's accepted into evidence.

16  (Whereupon, Defense Exhibit 23 is admitted into evidence.)

17  MR. MAGNER:  All right.  If we could please go back

18  to the summary chart.  Please go to the next page.  I'm

19  sorry.  Before we do that, I'm sorry.  I apologize.

20  BY MR. MAGNER:

21  **Q.**  So for -- in 2014, do we see a reference there on

22  May 20th of Ms. Anderson suffering from multiple falls?

23  **A.**  That is correct.

24  **Q.**  And do we see in October of 2014 Ms. Trahan

25  undergoing sinus surgery?

**OFFICIAL TRANSCRIPT**

1      A.   That's correct.

2      Q.   And then in April of 2015, what is the reference

3   there?

4      A.   Ms. Anderson was diagnosed with hypertension,

5   Alzheimer's disease, and late effects of cerebral vascular

6   disease.

7      Q.   All right.  And, again, those are found in the

8   records for the Crescent City physicians?

9      A.   Correct.

10      Q.   And those are the Touro doctors, correct?

11      A.   Correct.

12      Q.   And on April 13th, Ms. Trahan is complaining of heart

13   palpitations, correct?

14      A.   That is correct.

15          MR. MAGNER:  All right.  If we can have our next

16   exhibit.

17   BY MR. MAGNER:

18      Q.   I'm now showing you what we marked for identification

19   as Defense Exhibit 24, Internal Reference 38.

20          MR. WICKER:  38.

21   BY MR. MAGNER:

22      Q.   And what is this, sir?

23      A.   This is a follow-up visit on May 20, 2014.

24      Q.   All right.  And that's for Ms. Faye, correct?

25      A.   That is correct.

1          MR. MAGNER:  Could we please scroll down just a

2     little bit.  And I offer Defense Exhibit 24 at this time.

3          MR. BOTELER:  No objection, Your Honor.

4          MR. MAGNER:  We ask that it be published.

5          THE COURT:  You can publish it and it's accepted into

6     the record.

7       (Whereupon, Defense Exhibit 24 is admitted into evidence.)

8     BY MR. MAGNER:

9       Q.  And, again, we see the list of medications that

10    Ms. Faye has been prescribed?

11      A.  That is correct.

12      Q.  And some of her current health conditions, correct?

13      A.  That is correct.

14          MR. MAGNER:  And go to the next exhibit.

15          MR. WICKER:  Reference 27, Exhibit 25.

16    BY MR. MAGNER:

17      Q.  I'm showing you what's been marked for identification

18    as Defense Exhibit 25.  Do you see that?

19      A.  That is correct.

20      Q.  And what does that refer to?

21      A.  This is a -- this is a notification to patient,

22    Ernestine Trahan, that her surgery is going to be scheduled

23    on October 16, 2014, and the surgery will consist of

24    endoscopic sinus surgery.

25          MR. MAGNER:  All right.  We'd offer Defense

1    Exhibit 25 at this time.

2           MR. BOTELER:  No objection, Your Honor.

3           THE COURT:  Thank you.  It's accepted into evidence.

4     (Whereupon, Defense Exhibit 25 is admitted into evidence.)

5           MR. MAGNER:  I ask that it be published.

6           THE COURT:  Permission to publish granted.

7    BY MR. MAGNER:

8       Q.  Sir, I'm showing you what's been marked for

9    identification as Defense Exhibit 26.  Our internal reference

10   is 39.  What is this, sir?

11      A.  This is an office visit for Ms. Faye Anderson on

12   April 13, 2015.

13          MR. MAGNER:  We would offer Defense Exhibit 26 at

14   this time.

15          MR. BOTELER:  No objection, Your Honor.

16          THE COURT:  It's accepted into evidence.

17    (Whereupon, Defense Exhibit 26 is admitted into evidence.)

18          MR. MAGNER:  Ask that it be published.

19          THE COURT:  Yes, you may publish it.

20   BY MR. MAGNER:

21      Q.  And this reflects that Ms. Faye Anderson is being

22   treated for diabetes, hypertension, and Alzheimer's, correct?

23      A.  That is correct.

24      Q.  And it shows active problems of unspecified transient

25   cerebral.  Do you know what that means in just very general

1    terms?

2        A.   This unspecified transient cerebral is basically

3    she's suffering affects from cerebral vascular disease, which

4    could cover anything from an aneurysm to a stroke.

5        Q.   All right.  And the chief complaint at that point is

6    memory loss?

7        A.   That is correct.

8            MR. MAGNER:  All right.  We'd offer Exhibit 26 at

9    this time.  I may have done that already.

10           MR. BOTELER:  I have no objection but I thought it

11   was already in.

12           THE COURT:  He thought it was in already.  It's in.

13   It's accepted into evidence if it wasn't already.

14     (Whereupon, Defense Exhibit 26 is admitted into evidence.)

15   BY MR. MAGNER:

16       Q.   Sir, I'm now showing you what we marked for

17   identification as Defense Exhibit 27.  What is this, sir?

18       A.   This is an ER visit of Ms. Anderson.

19       Q.   And what's the date?

20       A.   February 2, 2016.

21       Q.   Okay.  I think I may have gotten a little ahead of

22   ourselves on the chart, but we'll go back to it.  And what

23   are Ms. Faye's complaints at this time?

24       A.   Ms. Anderson is reporting that she has swelling in

25   both legs for the past three weeks.  She states -- "Patient

1    stated," which is Ms. Anderson, "my daughter made me come

2    today."

3          MR. MAGNER:  We would offer Defense Exhibit 27 at

4    this time.

5          MR. BOTELER:  No objection, Your Honor.

6          THE COURT:  It's accepted into evidence.

7          MR. MAGNER:  And ask that it be published.

8          THE COURT:  It can be published.

9    (Whereupon, Defense Exhibit 27 is admitted into evidence.)

10   BY MR. MAGNER:

11     Q.   And so the reference there to my daughter made me

12   come, this is a lady who has been diagnosed with Alzheimer's,

13   the cerebral vascular problems you told us about, and she

14   states that her daughter made her come, right?

15     A.   That is correct.

16     Q.   And she only had one daughter and that was

17   Ms. Trahan, correct?

18     A.   Yes.

19          MR. MAGNER:  Let's go back to the summary chart if we

20   could.  I think we've gotten a little bit ahead of ourselves.

21   Let's go to the next page, please.

22          And just go back for one moment, Mr. Washington,

23   please.

24   BY MR. MAGNER:

25     Q.   Did we ask you to put in the day that federal taxes

1  are due into your chart?

2      **A.**  No.

3      **Q.**  I'm sorry?

4      **A.**  No.

5      **Q.**  Did somebody else do it?

6      **A.**  That is correct.

7      **Q.**  Okay.  Somebody else at the law firm?

8      **A.**  Yes.

9      **Q.**  Okay.  And that doesn't necessarily mean that the

10  taxes were actually filed on that date, but it was just sort

11  of a general reference?

12      **A.**  That is correct.

13      **Q.**  All right.  Let's go to the next page, please.  We

14  see again Ms. Trahan having heart tests, correct?

15      **A.**  That is correct.

16      **Q.**  And the next month in October 2015 she's complaining

17  of palpitations, correct?

18      **A.**  That is correct.

19      **Q.**  And I think the February 2, 2016, was the entry that

20  we just referred to?

21      **A.**  That is correct, sir.

22      **Q.**  All right.  And we see another reference here, 13 or

23  12 or 13 days later of Ms. Anderson again complaining of

24  swelling in both legs for the past two weeks?

25      **A.**  That is correct.

1          MR. MAGNER:  Could we please pull up that exhibit.

2  BY MR. MAGNER:

3     Q.   I'm showing you now what we've marked for

4  identification as Defense Exhibit 28.  Is that that record?

5     A.   That is correct.

6          MR. MAGNER:  All right.  We would offer Exhibit 28 at

7  this time.

8          MR. BOTELER:  No objection, Your Honor.

9          MR. MAGNER:  We ask that it be published.

10          THE COURT:  All right.  It's accepted into the record

11  as evidence and you may publish it to the jury.

12          MR. MAGNER:  Thank you.

13    (Whereupon, Defense Exhibit 28 is admitted into evidence.)

14          MR. MAGNER:  Can we just scroll down a little bit.

15  BY MR. MAGNER:

16     Q.   And those are the chief complaint there, right, about

17  the leg swelling?

18     A.   Yes.

19          MR. MAGNER:  We would give Ms. Dena Exhibit 28.

20          Back to the summary chart, please.

21  BY MR. MAGNER:

22     Q.   And do we see then again about a month or six weeks

23  later Ms. Anderson being admitted to the emergency room for

24  continued swelling and a diagnosis of nephrotic syndrome?

25     A.   Yes.

1      Q.   Can you tell us generally what that is?

2      A.   Nephrotic syndrome is associated with the kidneys.

3  It usually indicates that the individual is on or well on

4  their way for renal failure.

5      Q.   Okay.  And that's your kidneys shutting down?

6      A.   Yes.

7      Q.   Do we have that exhibit.  I'm now showing you what we

8  marked for identification as Defense Exhibit 29.  Is that a

9  reflection of that visit?

10     A.   That is correct.

11          MR. MAGNER:  We would offer Defense Exhibit 29 at

12  this time.

13          MR. BOTELER:  No objection, Your Honor.

14          THE COURT:  It's accepted into evidence.  You want to

15  publish it or not?

16          MR. MAGNER:  Ask to be published, please.

17    (Whereupon, Defense Exhibit 29 is admitted into evidence.)

18          MR. MAGNER:  Could you just scroll down a little bit.

19          Okay.  Thank you.

20          Let's please go to the back to the chart.

21          THE COURT:  You know -- okay.  It's published.  I

22  thought you hadn't published it.

23          MR. MAGNER:  Okay.  Please go to the next page.

24  BY MR. MAGNER:

25     Q.   And we see there that Ms. Faye is then diagnosed with

1    segmental membranous glom -- I'm not even going to try.  Can

2    you tell us what that is?

3        A.   Glomerulopathy is dealing with diabetes.

4        Q.   Okay.  And that's a continuing problem that you saw

5    with Ms. Faye?

6        A.   Yes, it was.

7        Q.   All right.  And then about 16 days later, you see an

8    entry there for Ernestine Trahan, do we not?

9        A.   That is correct.

10       Q.   And what does that reflect?

11       A.   That reflects that she is still having chronic sinus

12   issues even after the sinus surgery.

13       Q.   And what else?

14       A.   She was also -- she was diagnosed with anxiety as an

15   acute reaction to exceptional stress.

16       Q.   All right.  And that is on April 21, 2016, six days

17   after when tax returns would have been due for the 2015 tax

18   year, correct?

19       A.   That would be correct.

20            MR. MAGNER:  Do we have that exhibit?

21   BY MR. MAGNER:

22       Q.   I'm showing you what's been marked for identification

23   as Defense Exhibit 30, do you have that before you?

24       A.   The -- I'm not seeing anything.  Oh.

25            THE COURT:  You see it now?

1          MR. MAGNER:  Can you see anything?

2          THE WITNESS:  Now I see it.

3  BY MR. MAGNER:

4     Q.  And is this that same visit we just spoke of a moment

5  or two ago?

6     A.  That is correct.

7          MR. MAGNER:  We would offer Defense Exhibit 30 at

8  this time.

9          MR. BOTELER:  No objection, Your Honor.

10         THE COURT:  It's accepted into evidence.

11         MR. MAGNER:  And ask that it be published.

12         THE COURT:  Yes, you may publish it.

13         MR. MAGNER:  Go back to the first page of that

14  document.  All right.  And then to the top of the next page.

15  BY MR. MAGNER:

16    Q.  Does that show that Ms. Anderson -- I'm sorry --

17  Ms. Trahan had been under a lot of stress caring for her ill

18  mother?

19    A.  That is correct.

20         MR. MAGNER:  Please go up.  I guess down.  I'm sorry.

21  BY MR. MAGNER:

22    Q.  And then there's a questionnaire there -- a little

23  lower or a little higher -- a questionnaire where Ms. Trahan

24  was asked how often she's exhibited or felt certain symptoms,

25  correct?

**OFFICIAL TRANSCRIPT**

1    **A.**  Yes.

2    **Q.**  And so there's reference there for feeling nervous,

3    anxious, or on edge.  She answered with a 3, correct?

4    **A.**  Yes.

5    **Q.**  That was nearly every day?

6    **A.**  Yes.

7    **Q.**  Okay.  And then not being able to stop or control

8    worrying, that was a 2, meaning more than half the days,

9    correct?

10   **A.**  Yes.

11        MR. MAGNER:  Okay.  We can take that down please.

12        Go back to the chart.  And please go to the next

13   page.

14   BY MR. MAGNER:

15   **Q.**  And we're in the summer of 2016, Ms. Anderson is

16   going back to Touro in connection with her hypertension and

17   diabetes, correct?

18   **A.**  That is correct.

19   **Q.**  And in September of that year, Ms. Faye is being

20   admitted to the emergency room for left arm and leg numbness?

21   **A.**  Yes.

22   **Q.**  And then what is the diagnosis for that?

23   **A.**  Transient ischemic attack.

24   **Q.**  Is that a TIA?

25   **A.**  TIA, that's correct.

1    **Q.** Is that sometimes referred to as a mini stroke?

2    **A.** That is correct.

3    **Q.** There is a reference there to diagnosed with left

4    breast cancer, correct?

5    **A.** That is correct.

6    **Q.** That is when Ms. Faye was diagnosed with breast

7    cancer?

8    **A.** Yes, sir.

9    **Q.** And that was Stage IV breast cancer?

10   **A.** That is correct.

11   **Q.** And that mean it's metastasized throughout her body?

12   **A.** And it's inoperable.

13       MR. MAGNER:  Let's go to -- do we have that exhibit

14   next?

15   BY MR. MAGNER:

16   **Q.** I'm showing you now what's marked for identification

17   as Defense Exhibit 31.  And do you recognize this, sir?

18   **A.** Yes.

19   **Q.** And this is that TIA, that transient ischemic attack?

20   **A.** Yes.

21       MR. MAGNER:  We would offer Exhibit 31 at this time.

22       MR. BOTELER:  No objection, Your Honor.

23       THE COURT:  It's admitted into evidence and, yes, you

24   may publish.

25    (Whereupon, Defense Exhibit 31 is admitted into evidence.)

1            MR. MAGNER:  Please go to the next page of the

2    summary chart, please.

3    BY MR. MAGNER:

4        Q.  And we see references there on October 4th.  What was

5    the visit for then?

6        A.  Ms. Anderson underwent surgery for placement of a

7    right internal jugular catheter and a needle biopsy of the

8    left breast.

9        Q.  And that was following the original diagnosis of

10    metastatic breast cancer?

11        A.  That is correct.

12        Q.  Now showing what we marked for identification as

13    Defense Exhibit 32.  Do you see that?

14        A.  Yes.

15        Q.  And what is this, sir?

16        A.  This is a -- this is of a surgery, an operative

17    report, for Ms. Faye Anderson dated October 4, 2016.

18            MR. MAGNER:  All right.  We'd offer Defense

19    Exhibit 32 at this time.

20            MR. BOTELER:  No objection, Your Honor.

21            THE COURT:  All right.  It's admitted into evidence.

22            MR. MAGNER:  Ask that it be published.

23            THE COURT:  Yes, you may publish it.

24      (Whereupon, Defense Exhibit 32 is admitted into evidence.)

25    BY MR. MAGNER:

1    **Q.**  And we see the post-operative diagnosis there as

2    end-stage renal disease, correct?

3    **A.**  That is correct.

4    **Q.**  And I think we can probably all guess what that is,

5    but can you tell us for the record.

6    **A.**  End stage renal disease is Ms. Anderson was suffering

7    kidney failure.  Her kidneys weren't operating normally and

8    she had to undergo dialysis.

9         MR. MAGNER:  Okay.  If we can please go back to the

10   chart.

11   BY MR. MAGNER:

12   **Q.**  And we see continued visits there for Ms. Anderson at

13   the Kidney Center?

14   **A.**  That is correct.

15   **Q.**  And sometimes she would go.  Sometimes she would go

16   late.  Sometimes she would not go at all, correct?

17   **A.**  That is correct.

18        MR. MAGNER:  Please go to the next page of the chart.

19   BY MR. MAGNER:

20   **Q.**  And we see a hospital admission there for Ms. Faye to

21   the emergency room for symptomatic anemia?

22   **A.**  That is correct.

23   **Q.**  And can you shed any light on what that is?

24   **A.**  Unfortunately I cannot.

25   **Q.**  Okay.  More oncology visits in November, correct?

1     **A.**  That is correct.

2     **Q.**  Ms. Trahan would go for her mammogram in November?

3     **A.**  Yes.

4     **Q.**  And she did not show for her OB/GYN appointment,

5  correct?

6     **A.**  That is correct.

7     **Q.**  And then in December we have more oncology visits for

8  Ms. Faye, correct?

9     **A.**  That is correct.

10        MR. MAGNER:  Please go to the next page.

11 BY MR. MAGNER:

12    **Q.**  Again, we see more of the same, correct?

13    **A.**  That is correct.

14    **Q.**  More dialysis, more oncology visits.  You understood

15 that Ms. Faye lived on the Westbank in Algiers part of New

16 Orleans?

17    **A.**  Yes.

18    **Q.**  And what Touro center did she go to for her medical

19 treatment?

20    **A.**  I believe it was the one in New Orleans.

21    **Q.**  Okay.  In the Garden District?

22    **A.**  That is correct.

23    **Q.**  And where would she go -- and how would she get to

24 the dialysis treatments that she was undergoing?

25    **A.**  Mainly her daughter, Ms. Trahan, would bring her.

1    Q.   Okay.  And do we see a lot of references there to

2  early termination of dialysis treatment?

3    A.   That is correct.

4    Q.   And that was sort of a repeated pattern?

5    A.   Yes.

6    Q.   Okay.  So somebody would have to take Ms. Faye to

7  dialysis and she would insist on leaving early?

8    A.   That would be correct.

9    Q.   And do we see references to her then being admitted

10  to the emergency room complaining about kidney-related

11  problems shortly thereafter?

12    A.   That would be correct.

13    Q.   Please go to the next page and this one here is one

14  such visit on January 11, 2017, correct?

15    A.   That is correct.

16    Q.   Could we please have that -- showing you what we've

17  marked for identification as Defense Exhibit 33.  And what is

18  this, sir?

19    A.   This is an early termination treatment against

20  medical advice for Ms. Faye Anderson.

21    Q.   And you understand that these dialysis treatments

22  take upwards of three or four hours?

23    A.   That is correct.

24         MR. MAGNER:  We'd offer Exhibit 33 at this time and

25  ask that it be published.

1          MR. BOTELER:  No objection, Your Honor.

2          THE COURT:  It's admitted into evidence and you can

3     publish it to the jury.

4      (Whereupon, Defense Exhibit 33 is admitted into evidence.)

5          MR. MAGNER:  Back to the summary chart, please.

6     Okay.  Are we onto the next page?

7          MR. WICKER:  Go back one.

8          MR. MAGNER:  Go back one.  Now go forward.  Thank

9     you.  Forward one more.

10          Again, we see a lot of repetition here, which we

11     won't belabor.  Please go to the next page.

12     BY MR. MAGNER:

13     Q.  We're into 2017 at this point.  We see more of the

14     similar kind of treatment, correct?

15     A.  That is correct.

16     Q.  And then on March 7, 2017, Ms. Faye underwent a

17     construction of an arteriovenous fistula for dialysis

18     treatment?

19     A.  That is correct.

20     Q.  Can you tell us at least in general terms what that

21     is?

22     A.  It is basically a procedure in order to create a --

23     the fistula is more along the line of enhancing dialysis

24     treatment.

25     Q.  I'm showing you now what's marked for identification

1    as Defense Exhibit 34.  And is this the operative report

2    relative to that?

3         A.  Yes, it is.

4         Q.  Is it something like creating a port for them to be

5    able to do the dialysis?

6         A.  That is correct.

7              MR. MAGNER:  We'd offer 34 and ask that it be

8    published at this time.

9              MR. BOTELER:  No objection, Your Honor.

10             THE COURT:  All right.  It's accepted into evidence

11   and you can publish it for the jury.

12     (Whereupon, Defense Exhibit 34 is admitted into evidence.)

13             MR. MAGNER:  Let's go back to the chart, please.

14   Next page please.

15   BY MR. MAGNER:

16        Q.  More of the same more dialysis, more oncology visits,

17   no shows, leaving early, coming late, correct?

18        A.  That is correct.

19             MR. MAGNER:  Let's go to the next page.

20   BY MR. MAGNER:

21        Q.  And now we're into the spring of 2017, correct?

22        A.  Yes.

23        Q.  More of the same throughout that time period in April

24   of 2017, correct?

25        A.  Most definitely.

1      **Q.**  And April 15, 2017, is when we as taxpayers are

2   expected to file our 2016 tax return, correct?

3      **A.**  Yes.

4      **Q.**  Please go to the next page.  Go into April and May of

5   2017, again, more of the same, correct?

6      **A.**  Yes.

7      **Q.**  And these are the month or two after tax day, right?

8      **A.**  That is correct.

9      **Q.**  Please go to the next page.  Again, into June of

10   2017, we see more oncology and dialysis treatments, correct?

11      **A.**  That is correct.

12      **Q.**  And then in June of 2017, was Ms. Faye admitted to

13   the emergency room?

14      **A.**  That is correct.

15      **Q.**  And what was she admitted for?

16      **A.**  She was admitted for diminished mental capacity,

17   shortness of breath and put on a ventilator due to

18   respiratory failure.

19          MR. MAGNER:  Do we have that document?

20   BY MR. MAGNER:

21      **Q.**  Do you see that before you?

22      **A.**  Yes, I do.

23      **Q.**  And what is that, sir?

24      **A.**  This is the intake, the ER intake report, for

25   Ms. Anderson where she was admitted due to shortness of

1   breath and was -- shortness of breath and let's see.

2       Q.   Is it referencing the daughter stated something?

3       A.   Yes.  "Ms. Anderson called the daughter because she

4   was acutely short of breath and was transferred to the ER."

5       Q.   All right.  And I think we identified this as Defense

6   Exhibit 35.  Does this show that emergency room visit?

7       A.   Yes, it does.

8       Q.   And that is on June 14, 2017?

9       A.   Yes, it is.

10      MR. MAGNER:  We would offer Defense Exhibit 35 at

11  this time.

12      MR. BOTELER:  No objection, Your Honor.

13      THE COURT:  All right.  It's accepted into evidence

14  and --

15      MR. MAGNER:  Ask that it be published --

16      THE COURT:  -- may be published to the jury.

17   (Whereupon, Defense Exhibit 235 is admitted into evidence.)

18  BY MR. MAGNER:

19      Q.   And you might be able to do it with your finger.

20  Where did you see the reference about the daughter?

21      A.   It would be -- (indicating.)

22      Q.   Acutely SOB, short of breath?

23      A.   Correct.

24      Q.   And transferred to the emergency room, correct?

25      A.   That is correct.

1      **Q.**  We can go back to the summary chart.  And then three

2    days later, do we see on June 17th that Ms. Anderson passed

3    away?

4      **A.**  That is correct.

5          MR. MAGNER:  Do we have that next exhibit?

6    BY MR. MAGNER:

7      **Q.**  I'm showing you now what's been marked for

8    identification as Defense Exhibit 36.  Do you see that?

9      **A.**  That is correct.

10     **Q.**  And this is that -- the hospital note for that event,

11   correct?

12     **A.**  That is correct.

13         MR. MAGNER:  We would offer Defense Exhibit 36 at

14   this time.

15         MR. BOTELER:  No objection, Your Honor.

16         THE COURT:  It's accepted into evidence.

17         MR. MAGNER:  Ask that it be published?

18         THE COURT:  You can publish it to the jury.

19    (Whereupon, Defense Exhibit 36 is admitted into evidence.)

20         MR. MAGNER:  Please go back to the chart.  Is there a

21   next page there?

22   BY MR. MAGNER:

23     **Q.**  And we see continuing visits there for Ms. Ernestine

24   "Teena" Trahan, correct?

25     **A.**  That is correct.

1      **Q.**  All right.  And then you stopped your analysis for

2      these purposes for this chart at the end of 2017, correct?

3      **A.**  That is correct.

4           MR. MAGNER:  One moment, Your Honor.

5           That's all I have.  Sir, I tender the witness.

6                          <u>CROSS-EXAMINATION</u>

7      BY MR. BOTELER:

8      **Q.**  Good afternoon.

9      **A.**  Good afternoon.

10     **Q.**  Now where do you work again?

11     **A.**  I work at Jones Walker.

12     **Q.**  And how long have you worked at Jones Walker?

13     **A.**  Five years, sir.

14     **Q.**  And Jones Walker is the law firm where Mr. Magner

15     works at?

16     **A.**  That is correct.

17     **Q.**  Now have you testified in court before?

18     **A.**  Yes.

19     **Q.**  About how many times?

20     **A.**  Just once before.

21          MR. BOTELER:  If you can up Defense Exhibit 20,

22     reference number 62, the big summary chart?

23          Thank you.

24          And, Your Honor, may I publish the Defense Exhibit

25     No. 20, which is that summary chart?

1          THE COURT:  Yes.

2          MR. BOTELER:  Thank you.

3    BY MR. BOTELER:

4      Q.  And you prepared what we see before us?

5      A.  I did the chronological medical summary.  The exhibit

6    on display right now was done by somebody else.

7      Q.  What do you mean by that?

8      A.  This was prepared by another individual.

9      Q.  So the chart was prepared by somebody else?

10     A.  Yes.  But it used my input from my chronological

11   medical summary.

12     Q.  And how did you do that input?  In what form?

13     A.  I used my initial -- my initial listing was via

14   spreadsheet.

15     Q.  Like an Excel spreadsheet?

16     A.  That is correct.

17     Q.  So that Excel spreadsheet was chronological?

18     A.  That is correct.

19     Q.  And so if I would look at like the descriptions, were

20   those the descriptions that you put on?

21     A.  Yes.

22     Q.  So if we look at the one for November 4, 2013, that

23   would have been your description from the particular

24   document?

25     A.  Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.** And were some of your descriptions changed?

2    **A.** No.

3    **Q.** So whether -- like a prior version of your

4    spreadsheet?

5    **A.** I'm sorry?  Repeat.

6    **Q.** Let me rephrase it.  Were any of the words used, like

7    where it would say visit or all these medical terms, changed

8    after you provided your spreadsheet to Mr. Magner?

9    **A.** Not to my knowledge, no.

10    **Q.** Now, you seem quite experienced with medical issues

11    and apparently have looked at a lot of different medical

12    records here.  Have you seen those in other cases you've

13    worked on?

14    **A.** Explain.

15    **Q.** All right.  Have you done a similar summary like this

16    before?

17    **A.** Yes, I have.

18    **Q.** About how many times?

19    **A.** Too many to count to be quite honest.  I've been

20    doing this -- chronological medical summaries I've done over

21    my entire career over the past 24 years.

22    **Q.** And so you're familiar with like normal preventive

23    care visits people would have?

24    **A.** Yes.

25    **Q.** So people would go to the doctor on a yearly basis

1   for like a check-up?

2       **A.**   Yes.

3       **Q.**   And some people would have other types of annual or

4   routine preventative care check-ups?

5       **A.**   That is correct.

6       **Q.**   And in your chart, you did include many of those

7   annual and routine check-ups?

8       **A.**   Yes.

9           MR. BOTELER:   Now, if we can go, I think, two more

10  pages.   I'm sorry.   Go back one more page.

11  BY MR. BOTELER:

12      **Q.**   Do you see on -- on your chart where it says "Tax

13  Day"?   It says April 15, 2014?

14      **A.**   Yes, I see it.

15      **Q.**   And you testified before if I recall correctly you

16  didn't put that on the chart?

17      **A.**   No, I did not.

18      **Q.**   So someone else placed that on the chart?

19      **A.**   Yes.

20      **Q.**   Now, if we go to the next page, again, you see

21  another Tax Day listed?

22      **A.**   Yes.

23      **Q.**   April 15, 2015?

24      **A.**   That is correct.

25      **Q.**   And if we turn one more page over, do you see an

1    entry of when the tax return was actually filed?

2        A.   No, sir.

3        Q.   So there was no entry on that date of July 2, 2015?

4        A.   That's not shown on the display.

5        Q.   All right.  So if we go back one, I see this starts

6    at 9/30, do you see a July 2, 2015, entry for the filing of

7    the 2015 tax return listed?

8        A.   For filing?

9        Q.   Yes.

10        A.   No, just Tax Day.

11            MR. BOTELER:  If we now -- go back to the second

12    page, I'd like to show you on page -- if we go one more page

13    over and one more and one more page.  Thank you.

14    BY MR. BOTELER:

15        Q.   Do you see the entry for April 21, 2016?

16        A.   Yes.

17        Q.   And you see a list in there, a diagnosis, anxiety as

18    acute reaction to exceptional stress?

19        A.   That is correct.

20            MR. BOTELER:  I direct your attention to defense

21    exhibit -- one moment, Your Honor.

22            I direct your attention to Defense Exhibit 30, which

23    was reference number 58, for us.  Your Honor, may -- oh it is

24    published.  Thank you.

25    BY MR. BOTELER:

1    **Q.**  And is this Defense Exhibit 30 the reference to the

2    April 21, 2016, visit?

3    **A.**  Yes.

4         MR. BOTELER:  If we can turn to the second page.

5    Highlight the top part.  Thank you.

6    BY MR. BOTELER:

7    **Q.**  Previously, Mr. Magner showed you this exhibit and he

8    highlighted this statement here that she's under a lot of

9    stress for caring for her ill mother?

10   **A.**  That is correct.

11   **Q.**  And what does it say right before that?

12   **A.**  She had no previous issues with anxiety or

13   depression.

14   **Q.**  So prior to this visit of April 21, 2016, Judge

15   Trahan did not have any issues with anxiety or depression?

16   **A.**  As far as I know, no.

17   **Q.**  And if we go back to the summary chart, if we go back

18   to the prior entries, did you recall having any entry that

19   listed anxiety in it before April 21, 2016?

20   **A.**  As far as I can recall, no.

21   **Q.**  So even in 2015, you didn't see a report where Judge

22   Trahan was diagnosed with anxiety?

23   **A.**  Not that I recall.

24   **Q.**  If we go back to Exhibit 30, reference number 58, if

25   we can go back to -- thank you.  In addition, Mr. Magner

**OFFICIAL TRANSCRIPT**

1    highlighted this GAD-7 questionnaire for you?

2        **A.**   Yes.

3        **Q.**   And he noted was she feeling nervous or anxious or on

4    edge?

5        **A.**   Yes.

6        **Q.**   And also are there other entries such as was she

7    having trouble relaxing?

8        **A.**   That's correct.

9        **Q.**   And what was listed next to that?

10       **A.**   Zero, sir.

11       **Q.**   And what did that mean?

12       **A.**   Zero under the scale means not at all.

13       **Q.**   And right underneath relaxing, what does that say?

14       **A.**   Being restless, that it's hard to sit still, she

15   rated it as a zero.

16       **Q.**   And underneath of that, what does it say, becoming

17   easily annoyed or irritated?  What was next to that?

18       **A.**   One, which under the scale means several days over

19   the last two weeks.

20       **Q.**   And down at the bottom, was there a total score?

21       **A.**   Yes, it would be 9.

22       **Q.**   And what does that mean in the scale over here?

23       **A.**   In the anxiety severity, she is listed as having mild

24   anxiety.

25       **Q.**   And if we go down one more page, the next page, and

1    what do you see at the top under Assessment?

2         A.   Anxiety, has acute reaction to exceptional stress,

3    painful breasts, allergic rhinitis, unspecified allergic

4    rhinitis type.

5         Q.   So under assessment, this is the first time you saw

6    anxiety diagnosed with respect to Judge Trahan?

7         A.   As far as I can recall, yes.

8         Q.   And down below, do you see where it notes some

9    treatment options where it says "PT has opted for a trial

10   CBT."  Do you see that?

11        A.   Yes.

12        Q.   And what is CBT?

13        A.   Cognitive behavioral therapy.

14        Q.   And in decision, does it list the patient also opted

15   for a trial of cardio exercise?

16        A.   That is correct.

17        Q.   And in this, does it indicate that she was providing

18   any medications for anxiety?

19        A.   No.

20        Q.   Now, when we return back to Defense Exhibit No. 20 --

21   the chart, reference number 62 thank you -- again, you see

22   one listed for April 15, 2016, for tax day?

23        A.   Yes, sir.

24        Q.   And if we turn to the next page and turn one more

25   page, do you see where the date was listed for the tax

1   return, for the 2015 when it was actually filed?

2       A.   No, sir.

3       Q.   So do you see an entry for October 17, 2015, listed

4   where -- when the tax return was filed?

5       A.   No, sir.

6           MR. BOTELER:  Now, I'm going to jump forward a few

7   more pages to near the end.  So if we can head to -- keep

8   going, one more page, one more, if we can get to where it

9   says June of '17.  Thank you, Ms. Better.

10  BY MR. FLANAGAN:

11      Q.   Do you see the entry for June 7, 2017?

12      A.   Yes.

13      Q.   And what happened that day?

14      A.   Ms. Anderson was a no-show for treatment.

15      Q.   Do you see one for June 17, 2017?

16      A.   Yes.

17      Q.   And was that the day Ms. Anderson passed away?

18      A.   That is correct, sir.

19      Q.   Now, if we turn to the next page, at this point, the

20  only appointments are for Ms. Trahan?

21      A.   Yes.

22      Q.   And so Ms. Trahan had a physical exam on June 29,

23  2017?

24      A.   Yes.

25          MR. BOTELER:  I'm going to direct your attention to

1    Defendant Exhibit 9, which is reference number 24 and if we

2    can go to page 762.

3         MS. BETTER:  Defendant's?

4         MR. BOTELER:  It's Defendant's Exhibit No. 9, but our

5    internal reference is No. 24.  And if we can go to page 762.

6    BY MR. BOTELER:

7    Q.  At the top of page 762, do you see where it shows an

8    office visit?

9    A.  Yes.

10   Q.  And was that office visit June 29, 2017?

11   A.  That is correct.

12   Q.  And do you see where it says "review of systems"?

13   A.  Yes.

14   Q.  If we go down to where it says "psychiatric and

15   behavioral," do you see that?

16   A.  Yes.

17   Q.  And down over, do you see where it says "the patient

18   is not nervous/anxious"?

19   A.  That is correct.

20        MR. BOTELER:  Now if we can zoom out and scroll down.

21   BY MR. BOTELER:

22   Q.  And do you see at the top where it says "Physical

23   Exam"?

24   A.  Yes.

25   Q.  And do you see where it says "Psychiatric" down at

1    the bottom?

2        A.   Yes.

3        Q.   And does it say she has a normal mood and affect?

4        A.   That is correct, sir.

5        Q.   So according to this visit on June 29th, Judge Trahan

6    reports that she is not anxious.

7        A.   That's what the record says.

8        Q.   Now, if we go back out to the timeline, the last page

9    of it -- thank you -- and you see three additional

10   appointments?

11       A.   Yes.

12       Q.   And none of those three lists that she was anxious or

13   stressed?

14       A.   No.

15       Q.   And on here, did you list when the 2016 tax return

16   was filed?

17       A.   No.

18       Q.   All right.  Do you see an entry for November 18,

19   2017, which was the filing date of the 2016 tax return?

20       A.   No, sir.

21       Q.   And so that filing of that tax return would be after

22   the period of June 29th, right?

23       A.   Yes.

24       Q.   And after on June 29th when she said she was not

25   anxious?

1      **A.**   That is correct.

2          MR. BOTELER:  Your Honor, the Government tenders the

3    witness.

4          THE COURT:  Thank you.  Any redirect?

5          MR. MAGNER:  Could we pull up D-30, again, please?

6          I can just put it on the Elmo.  Let's do that.  Do I

7    need to hit something.

8          THE CASE MANAGER:  No, I'm connecting.

9                        REDIRECT EXAMINATION

10   BY MR. MAGNER:

11     **Q.**   This is that same exhibit, Mr. Sigl?

12     **A.**   Yes.

13     **Q.**   With Dr. Marshall and --

14         MR. BOTELER:  Your Honor, just for purposes of --

15   which exhibit is it?

16         MR. MAGNER:  D-30.

17         MR. BOTELER:  Thank you.

18   BY MR. MAGNER:

19     **Q.**   Can you read the portion that says "At least

20   60 minutes"?

21     **A.**   "At least 60 minutes were spent today with the

22   patient in the office, which more than 50 percent of the

23   time, was spent on evaluation and counseling regarding the

24   primary encounter diagnosis was anxiety as acute reaction to

25   exceptional stress."

1    **Q.**  And above the diagnosis for that visit was what?

2    **A.**  "Patient counseled on potential avenues to treat her

3    anxiety/depression including CBT, exercise, and medications."

4    **Q.**  And above that in bold print, what's the diagnosis?

5    **A.**  "Anxiety as acute reaction to exceptional stress."

6    **Q.**  And below that, what does it say, "Patient has

7    opted"?

8    **A.**  "Patient has opted for a trial of CBT."

9    **Q.**  And you understand that Ms. Trahan did, in fact, go

10   see a therapist?

11   **A.**  That is correct.

12   **Q.**  And that was a woman by the name of Corrine Shelton?

13   **A.**  Yes.

14   **Q.**  And were you aware --

15       MR. BOTELER:  Objection, I was going to ask for the

16   foundation since the Shelton records are not listed in the

17   group that came through.

18       MR. MAGNER:  I was asking if he was aware.

19       THE COURT:  Sustained.

20   BY MR. MAGNER:

21   **Q.**  And how are you aware that Ms. Trahan went to Corrine

22   Shelton?

23   **A.**  I was aware that she was seeing a therapist, but I

24   did not have the medical records involved to add it to the

25   chronological medical summary.

1    **Q.** All right.  And were you made aware that she, in

2    fact, took medication?

3    **A.** Yes.

4    **Q.** Paxil and then Lexapro?

5    **A.** That is correct.

6    **Q.** Now, on the second page of that same document, you

7    see reference there in highlighting that Ms. Trahan was under

8    a lot of stress caring for her ill mother?

9    **A.** That is correct.

10   **Q.** And that she was feeling nervous, anxious, or on edge

11   nearly every day, correct?

12   **A.** For the past two weeks at this assessment.

13   **Q.** And that she was not able to stop or control worrying

14   more than half of her days, correct?

15   **A.** That is correct.

16   **Q.** She feared at this point afraid that something awful

17   might happen between several days and more than half of her

18   days, correct?

19   **A.** That is correct.

20   **Q.** She was asked how difficult have these problems made

21   it for you to do your work, take care of things at home, or

22   get along with other people and what did she answer?

23   **A.** She stated "Somewhat difficult."

24   MR. MAGNER:  Thank you very much, sir.

25   MR. BOTELER:  Your Honor, very brief re-cross?

**OFFICIAL TRANSCRIPT**

1        MR. MAGNER:  I would object, Your Honor.  I think we

2   covered it in detail.

3        MR. BOTELER:  It would be very brief based on one of

4   the questions he just asked.

5        THE COURT:  Approach.

6        MR. BOTELER:  Yes, Your Honor.

7        WHEREUPON, the following proceedings were held at the

8   bench:

9        THE COURT:  You know, with regard to the government's

10   witnesses, they were in your case-in-chief as you were doing

11   direct and cross, and so this is their case so I don't know

12   if you get another --

13        MR. BOTELER:  Well, Your Honor, I would just note I

14   know Mr. Magner did that at least one occasion where he did

15   come back and ask a couple extra questions.

16        THE COURT:  And that was because he called him once,

17   he called them on cross and then direct, right?

18        MR. BOTELER:  Well --

19        THE COURT:  That would have been -- who was it?

20        MR. BOTELER:  I'm trying to remember which witness

21   it's was.  I'm sorry, Your Honor.  I have one quick question

22   about the medication.  It wasn't on the timeline.  It

23   happened after the timeline and he just left it kind of open.

24        MR. MAGNER:  I think you covered that.

25        THE COURT:  What?

**OFFICIAL TRANSCRIPT**

1          MR. MAGNER:  I think he covered it all.

2          THE COURT:  I'll let him ask one question.

3          MR. BOTELER:  Thank you, Your Honor.

4                    (In open court.)

5                  RECROSS-EXAMINATION

6  BY MR. BOTELER:

7     Q.  One quick question.  On redirect Mr. Magner asked if

8  you had ever seen -- Judge Trahan was prescribed medication.

9  Do you remember that question?

10    A.  Yes.

11    Q.  And you responded that "yes, she was"?

12    A.  Yes.

13    Q.  And was that prescription provided to her after 2017?

14    A.  Unfortunately, I wouldn't know.

15         MR. BOTELER:  Your Honor, may I show one record to

16  the witness?  Let me pull it up just to him.

17         THE COURT:  It's exhibit?

18         MR. BOTELER:  Yes, it's exhibit already entered into

19  it.

20         THE COURT:  Let defense counsel know what it is.

21         MR. BOTELER:  One moment, Your Honor, so I can pull

22  up the right page.

23         THE COURT:  Sure.

24         MR. BOTELER:  Your Honor, I'm showing the witness

25  Exhibit 9 on 629.  And may I publish this to the jury?  It

**OFFICIAL TRANSCRIPT**

1   was already admitted, Defense Exhibit 9?

2          THE COURT:  Yes.

3          MR. BOTELER:  Thank you.

4   BY MR. BOTELER:

5      Q.  Do you see the top date of this document?

6      A.  Yes.

7      Q.  And what's the date?

8      A.  July 17, 2018.

9      Q.  All right.  Now, if we go down to the bottom part of

10  this page, and do you see the plan for Judge Trahan?

11     A.  Yes.

12     Q.  And do you see what's listed under anxiety?

13     A.  Yes.

14     Q.  And what is -- is that where you see her prescribed

15  medication for anxiety?

16     A.  That is correct.

17     Q.  And so that was in July of 2018?

18     A.  Yes.

19         MR. BOTELER:  No further questions, Your Honor.

20         MR. MAGNER:  Nothing further.

21         THE COURT:  Thank you.  You may take a seat.  And

22  you're not to discuss your testimony with anyone, right?

23  He's -- he's not really a fact witness.  We want to apply the

24  sequestration order to him?

25         MR. FLANAGAN:  Yes, Your Honor, with the

1    understanding of speaking to counsel.

2          MR. MAGNER:  At this time, Defense would call

3    Deatrice Henderson.

4          MR. BOTELER:  Your Honor, would it be okay if we take

5    a short little bathroom break?

6          THE COURT:  Yes.  Yes.

7          MR. BOTELER:  Thank you, Your Honor.

8          THE COURT:  Let's take 10 minutes.

9          THE CASE MANAGER:  All rise.

10         (Whereupon, the jury exits the courtroom.)

11         THE COURT:  All right.  We'll be back in 10 minutes.

12                      (Recess taken.)

13                      (In open court.)

14         THE COURT:  We can bring in the jury?  We can bring

15   in the jury?

16         MR. FLANAGAN:  Government's ready.

17         THE COURT:  Thank you.

18         (Whereupon, the jury enters the courtroom.)

19         THE COURT:  Y'all can have a seat.  Thank you.

20         Counsel, call your next witness.

21         MR. MAGNER:  Ms. Henderson, would you please take the

22   witness stand.

23         THE CASE MANAGER:  If you will please raise your

24   right hand.

25                      (Witness administered oath.)

**OFFICIAL TRANSCRIPT**

1          THE WITNESS:  I do.

2          THE CASE MANAGER:  Thank you.

3          Please have a seat.  Speak directly into the

4     microphone speak and spell your name for the record.

5          THE WITNESS:  My name is Deatrice Henderson,

6     D-e-a-t-r-i-c-e; Henderson, H-e-n-d-e-r-s-o-n.

7                    DEATRICE HENDERSON,

8     Being called as a witness, being first duly sworn, examined

9     and testifies as follows:

10                   DIRECT EXAMINATION

11    BY MR. MAGNER:

12         Q.  Good afternoon, Ms. Henderson.

13         A.  Good afternoon.

14         Q.  Tell us what you do for a living.

15         A.  I serve as the deputy commissioner for the Louisiana

16    Office of Alcohol and Tobacco Control.

17         Q.  And do you know the defendant, Ernestine "Teena"

18    Trahan?

19         A.  Yes, sir, I do.

20         Q.  And how do you know Ms. Trahan?

21         A.  She's my friend.

22         Q.  And do you know her also professionally?

23         A.  I do.

24         Q.  Okay.  And how did you know her in a professional

25    capacity?

1    A.   I came to meet Ernestine while employed at

2    Middleberg, Riddle & Gianna and she had gone on to work with

3    State Farm, and after deciding to depart from State Farm she

4    wanted to do private practice and she approached me about

5    coming to join she and Clifton Davis in a private practice

6    venture.

7    Q.   And did they, in fact, form that law firm, she and

8    Ms. Davis?

9    A.   Yes, sir, they did.

10    Q.   And what type of legal work did they do?

11    A.   General practice, pretty much a lot of personal

12    injury, succession work, name changes, domestic work, family

13    law work, things of that nature.

14    Q.   And that was Teena's practice primarily?

15    A.   I would say more than not.  The criminal practice

16    portion of the firm was predominantly Clifton.  She did not

17    do any criminal law, but she pretty much was the strength of

18    everything else.

19    Q.   Family law successions, personal injury work?

20    A.   Correct, domestic work.

21    Q.   A real sort of general practice?

22    A.   Yes, sir.

23    Q.   And what was your role in that firm?

24    A.   I served there as the administrator and also did

25    paralegal work there.

1    **Q.**   Okay.  And did you have the opportunity to see

2    Ms. Trahan in her work capacity at that law firm?

3    **A.**   Oh, definitely, yes.

4    **Q.**   And during what period of time?

5    **A.**   I'm sorry, but I don't remember the years.

6    **Q.**   Okay.  If Ms. Trahan left the firm at the end of 2012

7    and took the bench in early 2013, can you place it?

8    **A.**   I would say probably going back from there, maybe 10

9    to 11 years, somewhere in there.

10    **Q.**   Okay.  And did you have an opportunity to observe her

11    work practices?

12    **A.**   Definitely, yes.

13    **Q.**   And over an extended period of time?

14    **A.**   Yes.

15    **Q.**   Was Ms. Trahan an organized person?

16    **A.**   Not at all.

17                        (Laughter.)

18    **Q.**   Can you -- can you expand upon that?

19    **A.**   I'm sorry?

20    **Q.**   Can you expand upon that?

21    **A.**   Ernestine is -- she is not organized to the degree

22    that -- I did not want her to have original documents when

23    they would come into the firm.  It was the running joke that

24    she not be able to -- if she saw something that was opened

25    from the mail, she could not have it immediately.  It was the

**OFFICIAL TRANSCRIPT**

1   practice that it would have to be -- she would only be

2   entrusted with a copy, because she would always say she did

3   not have it, but she always had it.

4        Q.   Describe her desk at the law firm.

5        A.   Hm.  Um, you could not see it.

6        Q.   How so?

7        A.   She just had things, they were all of her -- she

8   would call them her things, "These are my things."  And she

9   could very well maybe -- from time to time she may be able to

10  locate something if she had seen it recently, but for the

11  most part, she just had things all about the desk.  That was

12  just her.

13       Q.   Now, did that extend to her law practice and how she

14  dealt with her clients?

15       A.   No.  She was -- she was a very good lawyer.  She's a

16  very good lawyer in that if she has a task she's very, you

17  know, task oriented.  She can do the task.  She just has to

18  be steered to make certain that she meets that particular

19  deadline.  So if she has an appointment, you have to

20  basically make sure she's on point and ready for the client

21  when they come in.

22       Q.   So if Ms. Trahan would meet with a client and there

23  would be like a follow-up scheduled appointment, how would

24  you handle that?

25       A.   So she would meet with -- she would do the initial

**OFFICIAL TRANSCRIPT**

1   consultation.  Once she would determine the course of action,

2   whatnot, she would basically chart out all of the facts of

3   the matter, whatever pleadings she wanted to, of course, have

4   constructed and then it would come to me for an initial

5   draft.  And then once we would do the initial draft, she

6   would take that draft and basically tailor it to her

7   preference, but that was to ensure that we were ready for

8   that follow-up appointment.

9       Q.   How did you and Teena handle the business and

10  administrative tasks that occur in a law office?

11      A.   She was not involved in any administrative tasks.

12      Q.   Why was that?

13      A.   Because they were sure to be late.  She just -- she

14  is one that if you tell her what it is -- we would basically

15  tell her things weekly or, you know, for the day, but, you

16  know, for a stretch of time, no.

17      Q.   Did you -- did you ever take a vacation while you

18  worked with Teena in the law office?

19      A.   Not a real vacation, no.

20      Q.   Did you take a short vacation?

21      A.   Maybe a day or so here or there, but I was not

22  allowed to die or to go anywhere for a long -- a length of

23  time.

24      Q.   Who told you that you were not allowed to die?

25      A.   Ernestine and Clifton.

1                           (Laughter.)

2       Q.   Did you try to implement some practices in the firm

3   to kind of keep Teena in the guardrails and under control in

4   terms of organization?

5       A.   Yes.

6       Q.   What were they?

7       A.   It depended upon what the need was.  So as I said, of

8   course, we put that practice in place to ensure that, of

9   course, we'd have something timely for the person to have to

10  review when they would come back for their second

11  consultation.

12           Then also with regard to any appointments, we would

13  make sure that she was aware of whatever appointments she

14  would have, such that she would ensure that she was there and

15  ready for her appointments.

16  BY MR. MAGNER:

17      Q.   Who handled the -- strike that.

18           Tell us about the bookkeeping and accounting

19  practices at the firm particularly with regard to Teena's

20  practice.

21      A.   Okay.

22      Q.   What kind of things would happen regularly and who

23  would handle them.  Let's start with like a personal injury

24  case.

25      A.   So for a personal injury case, when that case was

1   concluded, basically I would work up what we called the

2   settlements, a settlement disbursement sheet, and that sheet

3   would basically, it would delineate the funds in total,

4   basically beginning with the total settlement amount and it

5   would disburse line by line, it would basically set forth how

6   the money was going to -- how checks from the trust account

7   would be entitled and the amount of each of the checks from

8   the trust account and that would basically tally and it would

9   equal the same amount that you begin with, which is the

10  settlement amount.

11      Q.  And who would do all that bookkeeping and accounting

12  work?

13      A.  I did.

14      Q.  Let's come up with a hypothetical.  Let's say

15  Ms. Teena settled a case for Ms. Jones for $50,000 and there

16  would be a contingency fee typically?

17      A.  Correct.

18      Q.  All right.  So she would then take her fee out of

19  that $50,000, right?

20      A.  Correct.

21      Q.  How would you then account for the other expenses in

22  the case?

23      A.  So from the settlement funds, the first thing that

24  would come out would be the attorney's fee.  So if that was

25  33 and a third or 40 percent, if the matter went to trial, so

1    we would take that out -- and from there, the amounts that

2    were left, of course, we would take care all of the medical

3    expenses or -- and/or any liens, Medicaid, Medicare, anything

4    like that, Legal Wings bills, any expense in the case.

5        Q.  Legal Wings are process servers, they serve

6    subpoenas?

7        A.  Yes.  Yes.  Well, they were our courier.  Actually,

8    they would do our filings of documents.  And any -- expenses

9    that were on any case would basically be delineated there and

10   the balance of the finances would be disbursed to the client.

11   The client would -- now, out of the attorney's fees, the way

12   that the attorney would be paid was that there was an

13   agreement in house between the partners that the person, the

14   attorney, would basically get one-half of those fees and the

15   other half would basically go into the pot to sustain the

16   maintenance of the office.

17       Q.  The office would have overhead expenses?

18       A.  Absolutely.

19       Q.  Someone had to buy the computers and the file

20   cabinets and all the desks and all that kind of stuff?

21       A.  All of that, Xerox machines, computers, salaries, all

22   of that.

23       Q.  So those bookkeeping and accounting functions that

24   you just spoke of, you handled all of those?

25       A.  Yes, sir.

1    Q.  Would you have ever let Teena handle them?

2    A.  Absolutely never.

3    Q.  Why not?

4    A.  First and foremost, I -- the thing was was that we

5    didn't want to -- we wanted to make certain that there was

6    not a dual implementation from the beginning and --

7    Q.  Meaning just like getting in each other's way?

8    A.  For instance -- yes.  And so you may do something one

9    way and I may do it another.  And we may actually do the same

10   thing not knowing, so we never ever had a practice of doing

11   it that way.  Teena and Clifton deemed that I was the more

12   organized of the three of us.

13   Q.  You were the mom?

14   A.  Yes.  And so as a result, it was entrusted to me to

15   handle.  Now, I would do an accounting of both the operating

16   and the trust accounts each month so that they would be aware

17   of where the account stood and what was actually coming and

18   going from the account, such that they would be brought up to

19   speed.

20   Q.  So let me just back up a second.  The deal that Teena

21   and Cliff Davis had was that if Teena brought in the case,

22   when you've accounted for all the expenses, she would get

23   half of the fee, correct?

24   A.  Correct.

25   Q.  And the other half would go towards the overhead of

1   the office?

2       **A.**   That's correct.

3       **Q.**   Including you?

4       **A.**   Correct.

5       **Q.**   You were part of that overhead, right?

6       **A.**   I'm the overhead, yes.

7       **Q.**   And I don't mean to disparage you --

8       **A.**   Oh, no, it's quite all right --

9       **Q.**   It's much more than overhead.  When Teena left the

10  law practice and took the bench, did you go with her?

11      **A.**   I did not.

12      **Q.**   Did the law firm make a -- did Teena make a lot of

13  money at the law firm?

14      **A.**   She did not.

15      **Q.**   Were there years where you made more money than

16  either Teena or Cliff?

17      **A.**   Definitely.

18      **Q.**   Okay.  Was that a sustainable financial arrangement?

19      **A.**   No.  And grossly unfair, unfortunately, but it was,

20  you know, I mean, they brought me on to do the job and I

21  think that they both felt it unfair too, of course.  I mean,

22  that was their arrangement with me and they took care of

23  their obligations, even if it meant that that obligation was

24  to their detriment.

25      **Q.**   Was that generally your experience with Teena, that

1    she honored her obligations?

2        **A.**  Yes.

3        **Q.**  Did you find her to be a truthful and honest and high

4    integrity person?

5        **A.**  She is.

6        **Q.**  And was that her reputation in the community?

7        **A.**  It is.

8        **Q.**  All right.  So, of course, Teena took you with her

9    when she went to the bench?

10       **A.**  No.

11       **Q.**  Okay.  Why not?

12       **A.**  Well, it was not advantageous for me to go and I had

13   some other aspirations.  So as a result of that, you know, I

14   did not elect to go with her.

15       **Q.**  You had other ambitions and you wanted to do other

16   types of work, correct?

17       **A.**  Correct.

18       **Q.**  Could Teena pay you what you were used to getting

19   paid when she was on the bench?

20       **A.**  No.

21       **Q.**  Any hard feelings between the two of you?

22       **A.**  Oh, no.  None.

23       **Q.**  I'm showing you a couple of checks that are already

24   in evidence as Defense Exhibit 7.  After --

25            MR. FLANAGAN:  Your Honor, relevance, permission to

1    approach.

2         MR. MAGNER:  It's already in evidence.

3         MR. FLANAGAN:  Permission to approach, Your Honor.

4         THE COURT:  And bring whatever it is, so I can see

5    it.

6         WHEREUPON, the following proceedings were held at the

7    bench:

8         MR. FLANAGAN:  Your Honor, we're about to do this

9    again.  This is --

10        MR. MAGNER:  This is '13.

11        MR. FLANAGAN:  -- 2013 expenses, this count has been

12   dismissed.  He's going to say we didn't account for these

13   dismisses -- these checks and these expenses.

14        THE COURT:  What are you using it for?

15        MR. MAGNER:  To show how they handled the checks and

16   the bookkeeping and the accounting in the firm including

17   after she left and would pay Ms. Henderson back.

18        MR. FLANAGAN:  He's not going towards the government

19   didn't account for this.

20        MR. MAGNER:  No.  No.  No.

21        MR. FLANAGAN:  Thank you, Your Honor.

22                   (In open court.)

23        MR. MAGNER:  Aaron, do you have 7?  Can you pull 7

24   up?

25        MR. WASHINGTON:  It's stalled.

1           MR. MAGNER:  I'll use the Elmo.

2    BY MR. MAGNER:

3      Q.   So do you see this check dated July 21, 2013?

4      A.   Yes, sir.

5      Q.   And do you know what this represents?

6      A.   Yes, it's a check for paralegal services.

7      Q.   And was this in connection with a case that

8    Ms. Trahan had handled before she left for the bench?

9      A.   I'm certain that it is, but because I don't see -- I

10   can't link it to which case particularly, but yes.

11     Q.   Okay.  And even after she left, did she pay you the

12   work that you did as a paralegal in connection with that

13   case?

14     A.   Yes.

15     Q.   Okay.  Did Ms. Trahan honor her obligations to you

16   even after she became a judge and a pooh-bah and left?

17     A.   She did.

18     Q.   And, likewise, I'm showing another check dated

19   September 20, 2013.  Is this another payment by Ms. Trahan to

20   you for paralegal services?

21     A.   Yes, sir.

22     Q.   And for $9,500?

23     A.   Yes, sir.

24     Q.   Even though this was work that you had done prior to

25   her taking the bench, right?

1    **A.**   Correct.  It was work prior to the bench and

2    ongoingly even after a little bit after.

3    **Q.**   Right.  Because when she left the firm, she referred

4    out her pending cases to other lawyers?

5    **A.**   Correct.

6    **Q.**   And this Lucy Bentley fees and payment, is that

7    something you remember working on that case?

8    **A.**   Absolutely.  It was a beast.

9    **Q.**   Okay.  And did you find that as a general matter

10   Ms. Trahan would do everything she could to honor her

11   financial obligations?

12   **A.**   Always.

13   **Q.**   Did you ever deal with her in terms of taxes or

14   discuss taxes with her?

15   **A.**   I never dealt with her with regard to taxes or

16   discussed any of her taxes, although I do remember that she

17   had a tax debt at some point.  She did not talk to me about

18   it at length or anything, but I knew she had a tax debt that

19   she was tenacious about, ensuring that she took care of it.

20   She was a nervous Nelly that she had to make sure she made

21   these payments.

22   **Q.**   I think when we met previously you talked about her

23   being dogmatic in connection with her taxes?

24   **A.**   Oh, yes, with regard to that tax, that was the one

25   that I knew of.  Whatever that was, she was just making

1    certain in the forefront of her cranium, I have to pay this.

2    And every time she -- and this was when we were in the

3    practice.  And whatever it was, I remember she says whenever

4    she would get money, that's the first thing she would say, I

5    have to pay this debt.  I have to pay this.

6        Q.   Did you keep up with her after she took the bench in

7    January of 2013?

8        A.   Keep up with her in what way?

9        Q.   On the telephone or just as friends.

10       A.   Yes.

11       Q.   Did you become aware at some point after she took the

12   bench that she had been sued by the young woman who ran

13   against her?

14       A.   Yes.

15       Q.   And that it took quite a while before that lawsuit

16   was dismissed?

17       A.   Correct.

18       Q.   What effect did that have on her in those -- about

19   year and a half time period?

20       A.   She was humiliated.  She was -- she was extremely

21   taxed and felt extremely violated and just -- she wasn't

22   herself.  She wasn't.

23       Q.   And, ultimately, that case against her was dismissed,

24   correct?

25       A.   Correct.

1    Q.   Were you familiar with her relationship with her

2  mother, Ms. Faye?

3    A.   Definitely, yes.

4    Q.   Tell us about that?

5    A.   She is the baby and she is -- she was very much the

6  baby with her mother and hoarded her mother all to herself as

7  though she were an only child, the favorite, but she adored

8  her mother and her mother adored her.  And she was -- when

9  Ms. Faye even fell ill, there was a time where in the

10  hospital, she pretty much was in bed with her mother.  She

11  just was a little girl and that was her -- that's her mom.

12  And so it was definitely -- so it was a devastating stretch

13  of time for her.  It was very hard.

14    Q.   Was it a long stretch, Ms. Faye's illness?

15    A.   It was.  It was.

16    Q.   And you had the opportunity to see her over an

17  extended period of time.  Can you describe how -- what

18  effect, if any -- I'm sorry, I didn't mean to --

19    A.   That's okay.

20    Q.   Could you describe what effect it had on Ms. Trahan's

21  functioning, if you can?

22    A.   I think she was -- she was really committed to her

23  obligation and all of her obligations and she has this

24  mentality of push.  She will push through.  But the reality

25  is, if she could have gotten in someplace and just curled up

1    embryonically, she just was -- that was her mom and her mom

2    was failing in front of her and it was a lot.  It was more

3    than she was accustomed to handling.  It was just a lot.

4        Q.  Was she a whiner?  Was she a complainer?

5        A.  No, she's not a whiner.  She's not a complainer.

6    She's much more tender and much more fragile when it comes to

7    her mother, extremely tender and fragile when it comes to her

8    mom.

9        Q.  Now, were you originally subpoenaed by the Government

10   to testify in this case?

11       A.  I was.

12       Q.  And when were you told that you would not be needed

13   by the Government?

14       A.  Yesterday -- late afternoon yesterday.  It was

15   yesterday.  I was here so long I can't remember.

16           MR. MAGNER:  May I have just one moment, Your Honor?

17           THE COURT:  Uh-huh.

18           MR. MAGNER:  Tender the witness.  No further

19   questions.

20                        <u>CROSS-EXAMINATION</u>

21   BY MR. FLANAGAN:

22       Q.  Good afternoon.

23       A.  Hi.

24       Q.  So in your experience working with Judge Trahan in

25   the law firm, she was a very good lawyer?

1     **A.**   Yes.

2     **Q.**   She was task oriented?

3     **A.**   Yes.

4     **Q.**   As long as you steered her towards that task --

5     **A.**   Correct.

6     **Q.**   -- she was able to perform and identify all those

7     details necessary to complete that task?

8     **A.**   No.  Of course, there were times where she would work

9     independent of me.  I don't want to make it seem as though I

10    was her Seeing Eye dog and she didn't know how to do

11    anything, you know, from moment to moment.  But as it related

12    to making certain that the flow -- we had an influx or flow

13    of clients that needed to come in, some were follow-ups and

14    we wanted to ensure that that which had been discussed in

15    their previous visit, that that task had been completed.  So

16    I had to help her with regard to those things.

17    **Q.**   Once you pointed her to that task, was she able to

18    perform that task?

19    **A.**   Absolutely.

20    **Q.**   And at times that included personal injury cases?

21    **A.**   Yes.

22    **Q.**   Where she's litigating thousands of dollars?

23    **A.**   Sure.

24    **Q.**   Tens of thousands of dollars?

25    **A.**   Why wouldn't -- I mean, there were times where we had

1   larger settlements than others, but we were a small practice.

2       **Q.**  And while she was doing -- excuse me.  Was there a

3   time in 2012 in particular that she was not only managing a

4   docket, but running for judge?

5       **A.**  Correct.

6       **Q.**  And she was able to handle those tasks?

7       **A.**  I can't comment with regard to her running for judge

8   because I was not --

9       **Q.**  Did she win?

10      **A.**  I was not at all a part of that, so that was totally

11  separate and apart from the law office.

12      **Q.**  Even though you weren't a part of her campaign, she

13  was able to run a successful campaign?

14      **A.**  I can't comment.  I was not part of the campaign.

15      **Q.**  Understood.  But your experience was once you put

16  things in the forefront of Judge Trahan's mind, she was able

17  to complete that task?

18      **A.**  She was.

19      **Q.**  And in your experience, your observations with her

20  working with her at the law firm, taxes were at the forefront

21  of her mind?

22      **A.**  When you say taxes were -- that was not something

23  that we discussed ongoingly.  There was that one instance

24  where I had that experience with her with regard to a tax

25  debt and I know that she was very concerned about honoring

1   that debt.  And my understanding was that she was taking care

2   of it.  I was in no way a part of it, so I can't attest to

3   anything about that.  So that was an isolated instance.

4        Q.  And understanding it was an isolated instance, when

5   was that --

6        A.  I can't tell you when it was.  I know we were in

7   practice.  She was not running for judge at that time.

8        Q.  She was at the firm?

9        A.  She was at the firm practicing as an attorney there.

10       Q.  And that put taxes at the forefront of her cranium?

11  Was that your testimony?

12       A.  Yes.  At that moment, in that conversation, yes.

13       Q.  And so when she left for the bench, you did not go

14  with her?

15       A.  I did not.

16       Q.  Did you know -- did you know who were the members of

17  her chambers staff?

18       A.   Initially when she left I believe Tammy Major.  I

19  remember Tammy being her minute clerk.  I think Lisa was her

20  court reporter.  And I don't remember who at that time was

21  her law clerk.  I don't recall.

22       Q.  So you are aware of at least three different members

23  of her legal staff that she could delegate to?

24       A.   As I said, I remember Lisa and I remember Tammy.

25  Their work functions, how they flowed, I have no affiliation.

**OFFICIAL TRANSCRIPT**

1    I can't comment about that.  I don't know what their

2    interactions were.

3        Q.  So you can't speak to personally, personal experience

4    how she ran her chambers?

5        A.  Oh, not at all.

6        Q.  You can't speak to from your personal observation how

7    she officiated weddings?

8        A.  No.

9        Q.  And you can't speak to from your personal observation

10   how she prepared her tax returns?

11       A.  No.

12           MR. FLANAGAN:  Government tenders the witness.

13           MR. MAGNER:  No further questions, Your Honor.

14           THE COURT:  Thank you.

15           THE WITNESS:  You're welcome.

16           THE COURT:  Please don't discuss your testimony with

17   anymore.  All right.  I appreciate you being here.

18           THE WITNESS:  You're welcome.

19           MR. MAGNER:  May we approach?

20           THE COURT:  Yes.

21           WHEREUPON, the following proceedings were held at the

22   bench:

23           MR. MAGNER:  So, Judge, we were going to call the

24   therapist next and there was some suggestion that there was

25   going to be some kind of *Daubert* hearing.  Is that something

1    the Government still wants?

2         THE COURT:  You want to do that or you want to waive?

3         MR. BOTELER:  Your Honor, we don't need to have a

4    *Daubert* hearing.  We did receive the records finally and that

5    was sufficient for us to able to provide an effective cross

6    if needed.

7         THE COURT:  So are you going to qualify the witness

8    or are we going to stipulate to the witness --

9         MR. MAGNER:  I'll qualify her briefly.

10        THE COURT:  And then you can voir dire the witness if

11   you want to or you can stipulate at the end of that that

12   she's qualified to speak --

13        MR. MAGNER:  Yes, Your Honor, I'll listen and may

14   stipulate.

15        THE COURT:  Thank you.

16                       (In open court.)

17        MR. MAGNER:  Your Honor, at this time, the Defense

18   calls Corrine Shelton.  We'll go get Ms. Shelton.

19        THE COURT:  Good afternoon.

20        THE CASE MANAGER:  Please raise your right hand.

21                  (Witness administered oath.)

22        THE WITNESS:  Yes.

23        THE CASE MANAGER:  Thank you.  Please have a seat.

24        MR. MAGNER:  Hello, Ms. Shelton.

25        THE CASE MANAGER:  Can you please speak directly into

1    the microphone.  State and spell your name for the record.

2         THE WITNESS:  Corrine Shelton, C-o-r-r-i-n-e,

3    S-h-e-l-t-o-n.

4                    CORRINE SHELTON,

5    Being called as a witness, being first duly sworn, examined

6    and testifies as follows:

7                    DIRECT EXAMINATION

8    BY MR. MAGNER:

9        Q.  Good afternoon, Ms. Shelton.

10       A.  Good afternoon.

11       Q.  We just met today for the first time?

12       A.  I'm sorry?

13       Q.  We just met today for the first time?

14       A.  That is correct.

15       Q.  We've spoken on the telephone once or twice?

16       A.  Yes.

17       Q.  Tell us what you do for a living, ma'am.

18       A.  I am a licensed professional counselor and a licensed

19   marriage and family therapist, as well as an ordained

20   minister.

21       Q.  And how long have you been working as a therapist?

22       A.  Since 2009.

23       Q.  All right.  Tell us about your educational background

24   that led you to work as a therapist.

25       A.  I have an undergraduate degree majoring in sociology,

1    minoring in psychology and then I have a master's degree in

2    marriage and family therapy.

3        Q.   And that was from Holy Cross --

4        A.   Our Lady of Holy Cross College.

5        Q.   Have you had formal -- let me strike that.

6             What other training have you had since getting your

7    master's degree in counseling?

8        A.   Nothing that earned a degree, but of course we're

9    required to receive continuing education in order to maintain

10   the license.

11       Q.   And what are you licensed as?

12       A.   A professional counselor and a marriage and family

13   therapist.  I hold two licenses.

14       Q.   And you said you're ordained as a minister?

15       A.   Yes.

16       Q.   Did you attend seminary?

17       A.   No, I did not.

18       Q.   And how did you get your ordination as a pastor?

19       A.   I'm a part of an organization called Christian

20   International Network of Ministries whereby your life is

21   examined in the course of your walk with God and you take

22   many, many courses over the years through church.  And then

23   there's a laying on of hands through a presbytery ministry

24   whereby ministers called of God recognize the calling upon

25   your life and set you in office.

1    **Q.**  And looking at your letterhead, you're an MA, that's

2    your masters in counseling, correct?

3    **A.**  Yes.

4    **Q.**  You're NCC.  What does that stand for?

5    **A.**  National certified counselor.

6    **Q.**  And that's a recognized certifying body?

7    **A.**  Yes, it is.

8    **Q.**  And you're an LPC-S.  What's that?

9    **A.**  Supervisor, licensed to supervise other counselors

10   who are receiving their license as a professional counselor.

11   **Q.**  And that's where they do their own clinical training?

12   **A.**  Correct.

13   **Q.**  And you supervise them?

14   **A.**  Supervise them once a week for one hour for over a

15   period of two years.

16   **Q.**  And they come to you and talk about the different

17   work that they're doing with clients, correct?

18   **A.**  Correct.

19   **Q.**  And you're an LMFT?

20   **A.**  Licensed marriage and family therapist.

21   **Q.**  And is that also -- by whom are you licensed?

22   **A.**  The State of Louisiana.

23   **Q.**  Okay.  And you've been doing this type of work since

24   2009?

25   **A.**  Well, you know, you have to graduate and

1    post-graduation you have to intern.  So I've actually been

2    doing the work since graduation in 2006.

3        Q.   Okay.  And have you worked in those fields

4    continuously since that time?

5        A.   Absolutely.  Uh-huh.

6        Q.   Could you tell the ladies and gentlemen a little bit

7    about what your practice consists of, tell us roughly what

8    you do in a given week or two?

9        A.   Okay.  I see clients -- I work with individuals,

10   couples, and families, and in the given week, I'm going to

11   see between 20 and 25 clients in my office in a private

12   setting and I've been doing that since 2014.

13       Q.   And your practice is in Marrero on the Westbank?

14       A.   Yes, it is.

15           MR. MAGNER:  All right.  We would tender Ms. Shelton

16   as a licensed therapist.

17           MR. BOTELER:  No objection, Your Honor.

18           THE COURT:  All right.  She's accepted as a licensed

19   therapist.

20   BY MR. MAGNER:

21       Q.   All right.  Have you treated Ms. Ernestine "Teena"

22   Trahan?

23       A.   Yes, I have.

24       Q.   And when did you first meet Ms. Trahan?

25       A.   I met her in October of 2016.

1    Q.   And what were her complaints at that time?

2    A.   She was terrified because she feared the death of her

3    mother.  She was experiencing what I called pre-grief.  She

4    came in because her mother had been recently diagnosed with

5    cancer.

6    Q.   And you used the word "terrified," that's a pretty

7    strong word.

8    A.   Uh-huh.

9    Q.   Could you explain that?

10   A.   The state of mind that she was in, she was very, very

11   tearful throughout the interview and throughout subsequent

12   sessions and she was just afraid her mother was not going to

13   make it.  She said, "I just don't know what I'm going to do

14   without my mother."  She seemed to have a very, very close

15   relationship and she was highly, highly anxious over what

16   that diagnosis seemed to mean to her.

17   Q.   And had she expressed to you similar problems that

18   she had encountered recently with regard to a grandmother?

19   A.   Yes.  Her grandmother had passed away prior to her

20   mother and she said she -- she -- the way she described it is

21   it almost took me out.  You know, she said, "If you think I'm

22   bad now," she said, "when my grandmother passed, it almost

23   took me out."  She said they were all very, very close.  It

24   was a very close, loving relationship from what she

25   describes.

1    Q.   Would it be fair to say she was distraught when she

2    came to you?

3    A.   She was distraught.  She was sad.  The anxiety was

4    over the top though because, you know, when I define anxiety,

5    I recognized it and, you know, it led me into the direction

6    of diagnosing her the way did.

7    Q.   How did you assess her clinically?

8    A.   I used an instrument called the Burns anxiety

9    inventory whereby it's a self-report.  She would, you know,

10   check off answers to -- I think it's about 22 questions

11   rating each item in terms of severity and how severe it was,

12   the symptoms were.

13   Q.   And can you tell us a little bit more about this

14   assessment?

15   A.   Well, the assessment -- the assessment will have

16   items on it asking about specific symptoms such as is she

17   experiencing nervousness, worry, fear, feelings that things

18   around her are strange or normal, feeling detached from all

19   or part of her body, sudden unexpected panic spells,

20   apprehension or a since of impending doom, feeling tense,

21   stressed, uptight and so on and so forth, unable to sleep and

22   so she would rate all of these things as not at all,

23   somewhat, moderately, or a lot.

24   Q.   Did you feel that she was candid with you concerning

25   describing her emotions at that time?

1     A.   Oh, yeah.  I felt that she was candid.  She was also

2    desperate for help.  She kept saying, "I need help.  I don't

3    know how to handle this."  And it was obvious that it was

4    interfering with her ability to function to me.  Because I

5    work with so many people who are dealing with anxiety.  It's

6    one of the most common diagnoses in psychotherapy.  And I

7    recognize her as being a very severe case.  This is why I

8    gave her this particular inventory as opposed to, let's say,

9    a depression inventory or one to measure her levels of anger

10   or things like that.  I recognize that she was -- anxiety is

11   when you're faced with a challenge and you don't believe that

12   you have what it takes to meet that challenge.  You know, she

13   just didn't feel like she had what it took to go into this

14   transitional phase of our life.  We're all going to lose our

15   parents, but it seemed like for her it was not even

16   understanding, like something she had never even considered,

17   I'm going to lose my mom and it was very, very hard on her.

18     Q.   And did you continue to counsel her and see her for a

19   period of time?

20     A.   I did.  And it wasn't long that I saw her, but I did

21   continue to see her.  She -- we always say counseling works

22   if you do the work, and she stood out in my mind even though

23   it was, what, six years ago.  She stood out in my mind

24   because she did the work.  She was very eager to do the work.

25     Q.   Did you feel that you had formed a therapeutic bond

1    with her where she could be open with her about her

2    experiences and her emotions?

3         **A.**   Yes, I did.

4         **Q.**   And from your experience, is a black woman of her age

5    more likely to confide in a black woman of similar age than

6    she might be to say a white general practitioner at Touro

7    Infirmary?

8         MR. BOTELER:   Objection, leading and -- I'll

9    withdraw.

10        **A.**   I do.  And she specifically stated that, that she

11   wanted a black therapist.

12        **Q.**   Okay.  And a woman?

13        **A.**   And a woman.

14        **Q.**   So what was your assessment of her at that time in

15   those first couple of visits?

16        **A.**   I assessed that she was, of course, highly anxious --

17   I diagnosed her with an adjustment disorder with anxiety.  I

18   made that diagnosis even though anxiety has -- it has the

19   longest list of differential diagnoses of all of the

20   psychological disorders and I had to distinguish which form

21   of anxiety she had that I could diagnose her with because

22   there are others, like generalized anxiety disorder.  There

23   is specific non-specified anxiety disorder.  I chose

24   adjustment disorder because of the time period.  It was a

25   recent diagnosis whereby I saw that her symptoms had

1  progressed to this point to where she was literally in crisis

2  when I saw her.  So that's why I chose that diagnosis based

3  on the recency of her medical diagnosis of her mother,

4  notwithstanding that she did express that prior to her

5  mother's recent diagnosis, her mother was very ill, had a

6  myriad of illnesses that were all very serious, in which my

7  client, Ernestine, was very involved in the care on a very

8  personal level in a hands-on way.

9      Q.  When you talk about differential diagnosis of

10  adjustment disorder with anxiety, tell us what you mean by

11  differential diagnosis?

12      A.  It's simply the process whereby I have to consider

13  other diagnosis that contain the same symptoms and I have to

14  further evaluate to determine, like I said, which diagnosis

15  would be best for her and which best suits the symptoms that

16  I see with her, given the time frame that she has had these

17  symptoms.

18      Q.  Are there diagnostic criteria of rating the severity

19  of -- I'm sorry -- of a -- of adjustment disorder with

20  anxiety?

21      A.  Yes, there are.  And I've already stated some of

22  them, but they have to do with the recency of the crisis that

23  presented itself in her life.  It's kind of situational, and

24  so based on that situation where on top of all of these other

25  sicknesses that her mom had now, she has the big C.  And, you

1   know, when we hear cancer, we typically kind of -- we know

2   that's a serious diagnosis and it can be terminal.  So, yes,

3   that was -- it was recent.  It was a recent very serious

4   crisis that she was facing, the length of time for the

5   diagnosis that I chose, a person would be very highly

6   anxious, you know, for a period -- a period related to the

7   recency of that situation.

8        Q.  Did you rate her condition as severe?

9        A.  Persistent, severe, kind of like synonymous in terms

10   of mental health.

11        Q.  So severe relates to -- so the quality of her problem

12   and persistent relates to the ongoing nature of it, right?

13        A.  Right.  And when I did the anxiety inventory, she

14   scored 62 out of a possible 63.

15        Q.  So that's not good?

16        A.  That's not good.  30 and above, that puts her in the

17   severe range.

18        Q.  So how did that affect in your estimation of her

19   functioning in her daily life?

20        A.  Well, anxiety is a highly, highly emotional state of

21   mind, and when the brain is highly emotional, it is an

22   irrational brain.  It's like -- there's -- there's substances

23   that flood the brain, like adrenalin and cortisol, they flood

24   the brain.  When you have something that provokes your

25   emotion in that way.  And when it does, it's going to cause

1  the brain to shut down to give you the ability for fight or

2  flight.  We as normal individuals, and rationally thinking

3  individuals and even dignified individuals are not likely to

4  go running screaming in the street, you know, help, help, or

5  fire, fire.  We have to be a little bit of out of our minds

6  with that instinct for survival going.  And so the brain kind

7  of shuts down and it's an irrational brain with high levels

8  of emotion.  And when those high levels of emotion remain

9  over a period of time, the person is not going to be in

10  full -- fully cognizant as they would be if their brain were

11  free and without these levels of adrenalin and cortisol

12  flooding their brains.

13      Q.  So just so we're clear, you're not saying that she

14  was psychotic?

15      A.  No, I'm not.

16      Q.  You're not saying that she was incompetent?

17      A.  No, I'm not.

18      Q.  But did you believe within a reasonable degree of

19  certainty that she had some functional impairment as a result

20  of her severe anxiety?

21      A.  Absolutely.

22      Q.  And did you give her some -- I'm trying to think of

23  the right word -- some methods for her to try to deal with

24  that anxiety?

25      A.  Yes, I did.

1     Q.   Just give us some idea generally of what you

2  recommended for her?

3     A.   Well, cognitive behavioral therapy is the therapy

4  that I used and with that in mind, to help you understand

5  what that is, thoughts create feelings; feelings don't just

6  arrive out of nowhere.  Thoughts are going to create a

7  feeling.  The feeling is going to create the anxious behavior

8  and the responses to your anxious thoughts.  Okay, so I had

9  to -- provide what I call psycho education where I helped her

10  to understand the way her brain was made and I gave her -- I

11  showed her the diagram of the anxious brain and how it's X'ed

12  out and how she was to use her own body's oxygen and this is

13  a tool, a five-step tool called STOPP, S-T-O-P-P, where STOPP

14  stands for she would stop herself when she found herself

15  about to have an anxious episode.  She would stop herself and

16  she would tell herself to think.  The T is for think, so that

17  you can get your wits about you.  Take deep breaths now that

18  you're thinking.  Now that you're taking deep breaths, oxygen

19  is the antidote for the adrenalin.  So now that you're taking

20  these deep breaths, you know your brain is being released to

21  you again.  You can observe the thoughts that are creating

22  these feelings and then the first P is pull back from these

23  unhelpful thoughts, my mom is going to die, what am I going

24  to do, I'm not going to be able to make it.  You're going to

25  pull back from those anxious thoughts and you're going to

1    replace those anxious thoughts with more helpful thoughts.

2    That's what the second P is for, practice what works.  And so

3    I gave her a list of anxiety-reducing affirmations that she

4    was to meditate on daily.  She was to choose two or three in

5    the mornings and just go throughout her day, and as she would

6    go throughout her day, she would be able to manage the

7    anxiety and try to retain her full -- her fully functioning

8    brain.  It takes time.  You don't get like this overnight.

9    It doesn't really work overnight, but if you're persistent,

10   it's going to work sooner rather than later.  I also taught

11   her --

12       Q.  Before you go on, was she receptive to your

13   technique?

14       A.  She was extremely receptive.  I call her a star

15   patient.

16       Q.  And did you ever get the impression that she was a

17   whiner or a complainer or a malingerer or anything of that

18   sort?

19       A.  I don't think I got to talk to her outside of these

20   problems enough to know her in that way.  I felt that what

21   she told me was so serious and so present and so just

22   overwhelmingly a part of what her day-to-day experience was

23   at the time, I didn't really get a chance to know her that

24   way.

25       Q.  Okay.  Did you feel that she was sincere in the

1    complaints that she offered to you?

2         A.   Very much so.

3         Q.   And you talked -- I think you were ready to tell us

4    about another technique that you taught her?

5         A.   We also used things like progressive muscle

6    relaxation whereby you begin to -- at the top of your head

7    and you're going to work your way all the way down to the

8    bottom of your feet and you're going to imagine yourself

9    taking each component of your body one at a time and mentally

10   imagining yourself relaxing that part of your body.  As you

11   take a deep breath, you can do this through the accompaniment

12   of mood music and there are those types of tools,

13   candlelight, things like that.  So we use that.  Of course,

14   we use prayer.  I encouraged her to exercise because that's a

15   good way to relieve stress in the body and she's a woman of

16   faith, and so we talked about using faith, prayer, scriptures

17   and things like that.

18        Q.   Did she also to your knowledge take medication in

19   connection with her anxiety?

20        A.   I think we mentioned medication, but I don't have

21   that in my records, so I don't think that -- I probably

22   encouraged her or asked her about it.  I can't testify

23   100 percent to say that's what we talked about because

24   unfortunately I did not record that in my records.

25        Q.   So we saw some records a few moments ago of her

1    taking Paxil --

2         MR. BOTELER:  Objection, lack of foundation for this

3    witness.

4         MR. MAGNER:  Let me finish.

5         THE COURT:  I'm going to sustain it.  Lay a

6    foundation --

7         MR. MAGNER:  Sure.

8         THE COURT:  -- of why she would know that.

9    BY MR. MAGNER:

10        Q.  Sure.  Are you familiar generally with the types of

11   medication that people take when they're depressed or

12   anxious?

13        A.  Yes, I am.  But I would like to say that counselors

14   take a wellness approach, meaning that it's a non-medicinal

15   approach.  We might encourage the use of medicine, but we

16   help clients to understand their own biology and help them to

17   understand how their biology creates certain mental health

18   symptoms and how they can use their own biology to counter

19   those symptoms.  So we don't typically -- I don't prescribe

20   medicine.  I can't prescribe medicine, but I will refer

21   clients, always refer clients to get a physical, a health

22   physical, and ask them if they're interested in medicine.  A

23   lot of people choose counseling versus psychology or

24   psychiatry because they don't want to take medicine.

25        Q.  And is Prozac one of those types of medications?

1      **A.**  Yes, it is.

2      **Q.**  And you discussed the issue of her taking medication

3  at some point?

4      **A.**  I probably referred her to get some medicine if she

5  desired to.

6      **Q.**  To an MD?

7      **A.**  Right.

8      **Q.**  Because you can't write a --

9      **A.**  Right, I cannot do that.

10      MR. MAGNER:  One moment, Your Honor.

11      I'll tender the witness.  Thank you very much,

12  Ms. Shelton.

13      THE WITNESS:  You're welcome.

14      THE COURT:  Wait.  Wait.  You have to sit there.

15  He's going to let the other lawyer -- I know you're trying to

16  get out of here.  Lock the doors.  Lock the doors.  Can't

17  leave.

18      MR. BOTELER:  Your Honor, one moment.

19          (Discussion between counsel.)

20              CROSS-EXAMINATION

21  BY MR. BOTELER:

22      **Q.**  Good afternoon, Ms. Shelton.

23      **A.**  Good afternoon.

24      **Q.**  Now, Ms. Shelton, before coming in to trial today,

25  did you meet -- did you speak with Mr. Magner?

1    **A.**   Yes.

2    **Q.**   How many times?

3    **A.**   You mean since the beginning of August?

4    **Q.**   Yes.

5    **A.**   Maybe we've e-mailed maybe three or four times.  I've

6    spoken to him by phone maybe once.  I think.  And then once

7    today outside in the hallway.

8    **Q.**   And was that yesterday out in the hallway?

9    **A.**   Today.

10   **Q.**   Today out in the hallway.  And what did you discuss

11   today?

12   **A.**   He kind of told me how long I would be on the stand,

13   who would be coming before me.  He asked me if I had a chance

14   to -- did I need copies of my case summary, did I need copies

15   of the paperwork that I had submitted.

16   **Q.**   And you mentioned paperwork or case studies?

17   **A.**   Uh-huh.  Case summary.

18   **Q.**   When you work as a therapist, do you take notes?

19   **A.**   Yes.

20   **Q.**   And do you keep track of various records of your

21   therapy?

22   **A.**   Yes.

23   **Q.**   And what do you generally call that?

24   **A.**   Case notes.

25   **Q.**   Case notes.  And at some point in time, did you

1   receive a subpoena from the United States?

2       A.   Yes.

3       Q.   And did they -- did the United States request copies

4   of your records?

5       A.   Yes.

6            MR. BOTELER:  Your Honor, may I approach the witness?

7            THE COURT:  Uh-huh.

8   BY MR. BOTELER:

9       Q.   Ms. Shelton, do you recognize this document?

10      A.   Correct.  Uh-huh.  I do.

11      Q.   And what is this?

12      A.   These are the notes that I submitted.

13      Q.   Are these notes related to your treatment of Judge

14  Trahan?

15      A.   Yes.

16      Q.   And did you keep these notes in the ordinary course

17  of business?

18      A.   Yes.

19      Q.   And is it the practice of your therapy to keep such

20  notes?

21      A.   Yes.

22           MR. BOTELER:  Your Honor, the Government moves into

23  evidence Government Exhibit No. 79.

24           MR. MAGNER:  Your Honor, I'm going to object that

25  these are duplicative of her testimony.  She's here.  She can

1  testify.  There's no impeachment purpose here.  We just think

2  it's hearsay and cumulative.

3  　　　　　THE COURT:  It's business records you say?

4  　　　　　MR. BOTELER:  Yes, Your Honor.

5  　　　　　THE COURT:  What's your exception to hearsay?

6  Business record?

7  　　　　　MR. BOTELER:  Yes, Your Honor.

8  　　　　　THE COURT:  I'm not making an argument for you.

9  　　　　　MR. BOTELER:  Yes, it is a business record, Your

10  Honor.  It was prepared in the course of her --

11  　　　　　THE COURT:  So it's not hearsay.  I'll allow it.

12  　　　　　MR. BOTELER:  Thank you, Your Honor.

13  　　　　　Your Honor, may I retrieve it so I can show it on

14  the --

15  　　　　　THE COURT:  You can.

16  　　　　　MR. BOTELER:  Thank you.

17  　　　　　Yes, please.  May I publish it to the jury using the

18  Elmo?

19  　　　　　THE COURT:  Yes.

20  BY MR. BOTELER:

21  　　Q.  Now, Ms. Shelton, what's the first page of Government

22  Exhibit 79?

23  　　A.  What is the first page?

24  　　Q.  Yes.  What does this show --

25  　　A.  That is the session log, the dates in which she was

**OFFICIAL TRANSCRIPT**

1    seen.

2        Q.   And when you say "session log" is this a list of all

3    the times you met with Judge Trahan?

4        A.   Yes.

5        Q.   And what's the first entry?

6        A.   10/6.

7        Q.   October 6th?

8        A.   Uh-huh.

9        Q.   And if we go down to the bottom, what year is that?

10       A.   '16.

11       Q.   So your first time you met with Judge Trahan was

12   October 6, 2016?

13       A.   Yes.

14       Q.   And then you met with Judge Trahan a total of eight

15   times?

16       A.   Uh-huh.  Yes, sir.

17       Q.   So initially weekly, correct, when you look at that?

18       A.   Just about.  Uh-huh.

19       Q.   And then there was a break, a long break, from

20   January 26th to June 22nd?

21       A.   Yes.

22       Q.   Now, was that January and June would have been in

23   2017?

24       A.   Yes.

25       Q.   Before October 6, 2016, had you ever treated Judge

1    Trahan?

2         A.   No, I did not.

3         Q.   So you didn't treat her in 2015?

4         A.   No, I did not.

5         Q.   And did not treat her in 2014?

6         A.   No, I did not.

7         Q.   In your meetings with Judge Trahan, did you ever

8    request copies of her medical records?

9         A.   No, I did not.

10        Q.   So when you conducted your treatment, you did not

11   have access and did not review her medical records?

12        A.   No, I did not.

13        Q.   I'm going to direct your attention to your notes on

14   October 6, 2016.  And just to be clear, is this your

15   handwriting?

16        A.   Yes, it is.  Unfortunately, yes.

17        Q.   Actually, I thought it was pretty decent.  And,

18   Ms. Shelton, so what does this document record?  What date

19   does this record your notes from?

20        A.   October 6, 2016.

21        Q.   So this was notes of your very first meeting with

22   Judge Trahan?

23        A.   Yes.  Uh-huh.

24        Q.   And in this, do you see where you say the client was

25   referred by a colleague?

1      **A.**   Uh-huh.

2      **Q.**   Do you get a lot of cases from referrals?

3      **A.**   Yes.

4      **Q.**   And when -- you wrote in the notes here that her

5    mother was newly diagnosed with breast cancer?

6      **A.**   Yes.

7      **Q.**   And you mentioned on direct that was a serious issue

8    that Judge Trahan had to deal with, right?

9      **A.**   Yes.

10     **Q.**   And it was that recency due to her mother's diagnosis

11   with cancer that was a large cause of this anxiety --

12     **A.**   Yes.

13     **Q.**   And in fact, under right above it, you really do note

14   that this was really tough on Judge Trahan at this moment in

15   time?

16     **A.**   Yes.

17     **Q.**   And due to the recency of this diagnosis, was Judge

18   Trahan as you described kind of getting in the process of

19   grieving?

20     **A.**   Absolutely.

21     **Q.**   So she was facing the reality of her mother passing

22   away?

23     **A.**   Yes.

24     **Q.**   And down here you mentioned in here you provided the

25   Becks Anxiety inventory test?

**OFFICIAL TRANSCRIPT**

1    **A.**  Yes, that's a typo.  That's a mistake.  It should say

2    the Burns anxiety test.

3    **Q.**  I'm sorry.  And in that test, she scored very high on

4    it?

5    **A.**  Yes.

6    **Q.**  I'm going to just direct you to the test.  Now, when

7    you do the Burns anxiety inventory test, does it indicate how

8    the individual has been feeling in the past, like, week or

9    so, past several days?

10   **A.**  Yes.  They're supposed to score it based on how

11   they've been feeling, uh-huh, for the past several days.

12   **Q.**  For the past several days?

13   **A.**  Uh-huh.

14   **Q.**  It doesn't necessarily measure how they felt like a

15   year ago?

16   **A.**  Right.

17   **Q.**  Or six months ago?

18   **A.**  Correct.

19   **Q.**  Or even a month ago?

20   **A.**  Uh-huh.

21   **Q.**  So it kind of focuses on those last -- like several

22   days last week?

23   **A.**  Uh-huh.

24   **Q.**  Is that a yes?

25   **A.**  Yes.

1    **Q.**  And after Ms. -- after Judge Trahan came in and you

2    realize that she needed help, you went and helped provided

3    her with steps to help her with her anxiety?

4    **A.**  Yes.

5    **Q.**  And I think you mentioned it's called STOPP for

6    anxiety management?

7    **A.**  Yes.  Yes.  That was one of the tools, the CBT tools.

8    **Q.**  One of the CBT tools?

9    **A.**  Uh-huh.

10   **Q.**  And what was CBT again for the jury?

11   **A.**  Cognitive behavioral therapy.

12   **Q.**  And so that's a way to treat people without medicine?

13   **A.**  Uh-huh.  Yes.

14   **Q.**  And if I recall correctly what you said in direct is

15   that Judge Trahan stood out in your mind because she did the

16   work?

17   **A.**  Yes, she was -- she was really desperate because my

18   sense was that with all of the illnesses that proceeded the

19   cancer diagnosis, her coping resources were being depleted up

20   to that point.  That's what made her -- reacting this way,

21   the potential loss of her mother makes sense to me because I

22   think we all live knowing that the circle of life dictates

23   we're going to lose our parents and that's just the way it

24   goes.  And I didn't understand why she was so depleted of the

25   ability to cope with this, but I think it was the illnesses

1    that preceded this diagnosis, that just set her up not to be

2    ready to and prepared to handle this in a healthy yeah, way.

3        Q.   But just to be clear, when you did the anxiety test,

4    it was focused on what conditions she had exhibited or

5    symptoms in the past --

6        A.   Of the previous several days, right.

7        Q.   And you hadn't treated her before October?

8        A.   I had not.

9        Q.   And you noticed that a big event was the diagnosis of

10   her mother with cancer?

11       A.   Yes.

12       Q.   Let me direct your attention to the second session.

13   And do you recognize this second page?

14       A.   Yes, I do.

15       Q.   And is this for Judge Trahan's treatment on

16   October 13, 2016?

17       A.   Yes, it is.

18       Q.   And I note at the very top -- what do you see?

19       A.   "Client's mood is not as anxious as the last

20   session."

21       Q.   So she's beginning to do better?

22       A.   She's beginning to do better using her tools, uh-huh.

23       Q.   You knew what I was going to ask next.  What did you

24   write next, the client reports?

25       A.   That she had been using her tools and found them to

**OFFICIAL TRANSCRIPT**

1  be helpful.

2  Q.  So in other words, she's taken into using the tools

3  that you were giving her?

4  A.  Yes.

5  Q.  And so she begin to see improvement?

6  A.  Uh-huh.

7  Q.  And in this, does she also mention whether or not

8  she's getting some additional help, some assistance?

9  A.  She said she had occasional help from her brother and

10  a 90-year-old aunt with the sitting duties, having to sit

11  with her mom.

12  Q.  And then in your treatment session, as you mentioned,

13  that you would begin to urge her to accept the normalcy of a

14  parent preceding children in death?

15  A.  Yes.

16  Q.  Even though it is difficult, it is part of this life?

17  A.  Gaining perspective, a better perspective.

18  Q.  And is that something unfortunately many of us at

19  some point will have to encounter?

20  A.  Right.

21  Q.  And, in fact, by changing the way you look at this

22  perspective, it helps decrease anxiety?

23  A.  It's possible, yes.

24  Q.  I'm showing you the notes on October 20th?

25  A.  Uh-huh.

1   **Q.**   Again, I start at the top.  What does -- what do you

2   have in your notes?

3   **A.**   That she stated she was working on -- working hard on

4   developing a healthier perspective on the possibility of

5   losing her mother.

6   **Q.**   So she's working hard at trying to get the treatment?

7   **A.**   Uh-huh.

8   **Q.**   And then down later, we heard some questions about

9   medication?

10   **A.**   Uh-huh.

11   **Q.**   And here you asked --

12   **A.**   I did have it in there.

13   **Q.**   And so you asked her if she would like some

14   medication?

15   **A.**   Uh-huh.

16   **Q.**   But what did she say?

17   **A.**   She'd prefer to overcome her symptoms using the tools

18   she'd been introduced to in therapy thus far.

19   **Q.**   I also note in there you do note that she is still a

20   bit of a mess?

21   **A.**   She's still having the crying spells and she's -- you

22   know, she's doing better.

23   **Q.**   She's doing better?

24   **A.**   But she's frustrated by the day-to-day grind of the

25   care for her mom and the occasional help was almost stated,

1    you know, a little bit sarcastically, like she would have

2    liked more help.

3        Q.   But you also note here, she's continuing to do

4    better?

5        A.   Yes.

6        Q.   Than when she first came in?

7        A.   Yes.  Yes.  Uh-huh.

8        Q.   You see the notes here?

9        A.   Uh-huh.

10       Q.   And this for November 3, 2016?

11       A.   Uh-huh.

12       Q.   And you wrote that the client reports that she feels

13   a difference within herself as it relates to her mental

14   state.  Do you see that?

15       A.   Yes.

16       Q.   And what do you have written next?

17       A.   She says she can see her way clearer than previously

18   meaning she's beginning to know she's going to be okay as

19   events unfold and events referred to with the possible loss

20   of her mother.

21       Q.   And, again, you begin to continue to see improvement

22   in her ability to handle the transition with her mother?

23       A.   The possible death of her mother, uh-huh.

24       Q.   And then here is November 10th, November 10, 2016.

25   Again, this is another treatment date, right?

1    **A.**   Yes.

2    **Q.**   But this one has a little bit of a different

3    beginning where Judge Trahan presented with great excitement

4    over experience using her STOPP tools.  In your notes, you

5    indicate how she encountered an anxious situation but used

6    those tools to help overcome it.

7    **A.**   Yes.

8    **Q.**   And as a result, does your client seem very hopeful

9    as a result of this victory?

10   **A.**   Uh-huh.

11   **Q.**   Yes, she did?

12   **A.**   Say that again.

13   **Q.**   I'm sorry.  Was that yes?

14   **A.**   I'm sorry.  Would you ask your question again.

15   **Q.**   Sorry about that.  Based on your notes, the client in

16   this case, Judge Trahan seemed very hopeful as a result of

17   her victory using your tools?

18   **A.**   Yes.  Yes.

19   **Q.**   And then you had another visit on December 8, 2016,

20   and this one you went over all the different things that

21   Judge Trahan had to be grateful for?

22   **A.**   Uh-huh.

23   **Q.**   And, in fact, by doing this exercise of focusing on

24   what to be grateful for, it helps reduce anxiety?

25   **A.**   Yes.

1    **Q.**  But also this particular one, did you actually do a

2  second test?

3    **A.**  I did do a second inventory, a follow-up inventory,

4  uh-huh.

5    **Q.**  And what was the score of this second one?

6    **A.**  A 16.

7    **Q.**  So this was a huge drop from October 6th of 2016?

8    **A.**  Yes.

9    **Q.**  All right.  So in October 6th of 2016, she had a

10  score of 62?

11    **A.**  Yes.

12    **Q.**  And using your treatment and your therapy, she had

13  dropped in August, I'm sorry, not August, December 8th of

14  2016 down to a '16?

15    **A.**  Yes.

16    **Q.**  And then if you scored -- and what would a score of

17  16 be?

18    **A.**  Mild anxiety.

19    **Q.**  So she went from severe at the top?

20    **A.**  Uh-huh.

21    **Q.**  All the way down to mild?

22    **A.**  To mild, uh-huh.

23    **Q.**  Let me show you the test.  Do you see the --

24    **A.**  Yes.

25    **Q.**  -- the date of this?

1    **A.**   Uh-huh.

2    **Q.**   So was this the test that was taken?

3    **A.**   Yes, the inventory.

4    **Q.**   The inventory.  And, again, as we mentioned before,

5    it focuses on how you've been feeling the past several days?

6    **A.**   Right.

7    **Q.**   And, like, for instance, we go to No. 7, difficulty

8    concentrating, what's that?  Do you see what was marked?

9    **A.**   Yes.

10   **Q.**   Okay.  Where it says difficulty concentrating --

11   **A.**   She said -- she said not at all.

12   **Q.**   And what does down here mean, election?

13   **A.**   Oh, she was clarifying that feeling, tired, weak, and

14   easily exhausted was related to a recent election I think, to

15   an election.  I don't know how recent it was, but she noted

16   that -- that those feelings were related to an election.

17   **Q.**   So you understood that she had run for election or

18   been involved in an election?

19   **A.**   Yes.

20   **Q.**   And because of that, that kind of made her a little

21   tired?

22   **A.**   Yeah.  You know, that goes to what I was saying

23   earlier, that her mother's recent diagnosis was almost the

24   straw that broke the camel's back in terms of anxiety.  She's

25   been dealing with a lot of things leading up to that

1   diagnosis, which made me understand why her resource -- her

2   coping resources were so depleted she had been in that state,

3   that emotional mind, for a very, very long time before I saw

4   her.

5       Q.   Go back to that.  You didn't look at her medical

6   records before October of 2016?

7       A.   Not her medical record, but from her report regarding

8   her life, what she had been dealing with with her mom, how

9   long she had been dealing with it and how it had affected her

10  mental state.

11      Q.   And when you conducted this Burns treatment in

12  December 8th, you saw marked improvement?

13      A.   I saw marked improvement, yes.

14      Q.   I'm going to show you the note from January 26, 2017.

15  And at the top, what does -- does it say the client did well

16  during the holidays?

17      A.   Uh-huh.

18      Q.   And that she did not feel the need to request a

19  session?

20      A.   I go on sabbatical from mid-December through

21  February 1st every year, but I offer my clients the ability

22  to call me in a crisis, reach out to me if they're in a

23  crisis.  And rarely does anyone reach out because they're

24  sensitive to my need for my time as well.  So she was

25  sensitive and that's my assumption, and she said she did not

1    feel the need to request a session.

2    Q.   In fact, you wrote in your notes that she did well

3    during the holidays?

4    A.   She said she did well.  Uh-huh.

5    Q.   And then here, again, she says the state -- stated

6    the trip went well and she continues to see a reduction in

7    her anxiety related to her mother's condition?

8    A.   Yeah, when you see the word still, I'm referring to

9    the things that had not gone so well prior to that.  When I

10   stated that she was -- even though she took time away, she

11   didn't feel that the people who were left to care for her

12   mother were as responsible as she would have liked them to be

13   and she was frustrated about that.  So --

14   Q.   But just to be clear, you still wrote in your notes

15   that she continued to see a reduction in her anxiety --

16   A.   She still worked to try to see the positives, yes.

17   Q.   So she was implementing the tools that you provided

18   her?

19   A.   Yes.  Yes.

20   Q.   And then there's a gap in the notes, and so the next

21   one and your last treatment -- this is like -- we just saw

22   one for January, this is June, several months later.

23   A.   Uh-huh.

24   Q.   And during that period of time, you didn't have

25   another treatment with --

1      **A.**   I didn't have a session with her, no.

2      **Q.**   And she didn't request another session during that

3   period of time?

4      **A.**   No, she did not.

5      **Q.**   And on this one, she did come back to report to you

6   some of the sad news that she encountered?

7      **A.**   Yes.

8      **Q.**   But she also came back to tell you that she

9   successfully used your tools?

10     **A.**   Uh-huh.

11     **Q.**   And then based on that, that while she naturally

12   grieved her mother's death, she saw that her perspective was

13   healthier?

14     **A.**   Yes.

15     **Q.**   And that at this point, you wrote down the client

16   terminated and will attend if needed.  So at that point, the

17   client has terminated the treatment?

18     **A.**   Yes.

19     **Q.**   And after that treatment session, Judge Trahan did

20   not come back to you?

21     **A.**   No, she did not.  She had been coping with what she

22   had to cope with before the cancer diagnosis, and my -- you

23   know, it seemed that she would continue to do that.  We

24   always ask when people come in to therapy why now and so, of

25   course, that was a question when she presented over the

1    mother's cancer diagnosis.  Prior to that as bad as things

2    were, she did not feel or friends had not urged her you

3    really need to get help.  And so she had been coping prior to

4    seeing me and in probably inappropriate ways because she did

5    complain about some health issues that she was having which

6    made me note that her anxiety was affecting her health.  So

7    she coped prior to seeing me in inappropriate ways and

8    unhealthy ways and once we dealt with how she was looking at

9    the loss of her mother, she had gotten ahold and a grip on

10   that aspect of what she was dealing with.

11        Q.  So your treatment was very successful and very

12   helpful to her?

13        A.  She worked very hard.  I give all the credit to her,

14   not my treatment, but to her, because she worked very hard to

15   try to get her sanity stabilized to be able to go the

16   distance with the rest of that crisis.

17        Q.  And she was -- as you described her, she was a star

18   patient?

19        A.  She was a star patient.  In terms of determination,

20   yes, she was.

21        Q.  And just going back to the first page, just to be

22   clear, the last time you saw her was on June 22, 2017?

23        A.  Yes.

24        Q.  And you did not see her after that?

25        A.  Not during that time period, no.

1    **Q.**  So you didn't see her again in 2017?

2    **A.**  No.

3         MR. BOTELER:  Your Honor, the Government tenders the

4    witness.  But first I'm going to hand up Exhibit 79.  Thank

5    you.

6                         REDIRECT EXAMINATION

7    BY MR. MAGNER:

8    **Q.**  Ms. Shelton, I'll be brief.  I believe you stated

9    earlier that Ms. Trahan's anxiety was long-term and

10   persistent?

11   **A.**  Severe and persistent.

12   **Q.**  And that it had been going on for a very, very long

13   time before she came to see you?

14   **A.**  Before she came to me, she was dealing with highly

15   anxiety-provoking situations.  I had not had a chance to

16   measure, work with, determine the severity prior to seeing

17   me, but the day that I saw her and evaluated her, I knew that

18   it was an -- and I don't -- it's rare to get scores that

19   high, 62 out of 63.  People fall within the 40s and 50s when

20   they have high anxiety.  Of course, I can make assumptions

21   based on a score that high and with a case history that I'm

22   being given regarding what she had been dealing with.  So I

23   knew that she had been dealing with anxiety for a while

24   before even seeing me.

25   **Q.**  And so, for example, if her Ochsner records show --

1   may we have the -- that in April of that same year that she

2   told her GP that she was under a lot of stress caring for her

3   ill mother and that she was feeling nervous, anxious and on

4   edge nearly every day, and she was not able to stop or

5   control worrying more than half of her days, that would be

6   consistent with her observations that her problems were

7   persistent and long-term?

8       **A.**  Yes.

9       **Q.**  And she even told you that this anxiety that she had

10   even went back to when she was caring for her grandmother who

11   had passed?

12      **A.**  Yes.

13      **Q.**  You had said something just a moment ago about her

14   coping with -- with her anxiety in inappropriate ways.  Can

15   you expand upon that?

16      **A.**  Meaning using some of the tools that I gave her

17   regulating her briefing, accepting help, you know, she was

18   totally not willing to put her mother into a facility.  I --

19   I risk my life if I were to even bring that up to her because

20   she was so determined to give that hands on personalized care

21   to her mom, but that may not have been the best course of

22   action for her because of all the other things she had on her

23   plate and the responsibilities that she had.  So appropriate

24   ways would be healthy ways and effective ways.  Inappropriate

25   ways would be doing it all myself, overeating, you know,

**OFFICIAL TRANSCRIPT**

1   worrying, having panic attacks, things like that.

2      Q.   And she was having all those things?

3      A.   Yes.

4      Q.   And would it surprise you that her general

5   practitioner said that in April of that year she was

6   suffering from anxiety as an acute reaction to exceptional

7   stress?

8      A.   No, not at all.

9      Q.   And we've talked a little bit about the -- her

10  mother's cancer.  Were you aware also that her mother was an

11  Alzheimer's patient?

12     A.   I knew there was memory loss.  Yes.

13     Q.   Okay.  And that can be very stressful for a

14  caregiver, correct?

15     A.   Uh-huh.

16     Q.   And, in fact, on that first visit on October 6th,

17  Ms. Trahan told you that her mother also had diabetes, loss

18  of vision, cannot drive, lesions on her brain, which caused

19  seizures, fainting, spells, and memory loss?

20     A.   Yes.

21     Q.   She had kidney failure, needing dialysis and that

22  Ms. Trahan brings her to dialysis three times a week?

23     A.   Yes.

24     Q.   And you mentioned some of this earlier, she was

25  grieving at this point as though her mother had already

 1   passed?

 2       A.   That's what I noted.  I called it pre-grief.

 3       Q.   And so she was an emotional dumpster fire?

 4       A.   Uh-huh.  Yes.

 5       Q.   And that she had reductions in her anxiety was a good

 6   thing, correct?

 7       A.   Absolutely.

 8       Q.   But she continued to have anxiety and continued to

 9   have problems thereafter, correct?

10       A.   Yeah, and I want to make it clear that I treated her

11   specifically and worked with her specifically on being able

12   to normalize the course of life that she was in, the

13   transitional phase that she was in whereby her mother was ill

14   and her mother was probably going to pass away.  I

15   specifically focused my work with her on changing the way she

16   looked at that, gaining a better perspective on that.  I

17   sensed a hurriedness and this is the work I had to do with

18   her and that's what we did.  If she had returned later, I

19   would have been able to work with her on other things, but I

20   only worked with her relative to the death of her mother and

21   how that it had caused this spike in her anxiety.

22       Q.   Right.  So she was worried about what eventually

23   would happen?

24       A.   Yes.

25       Q.   And it happens to us all, but she's also very

1    frustrated about the fact that she had to coax her mother to

2    comply with her medication regimen, correct?

3        **A.**   Yes.

4        **Q.**   Again, not unusual for an Alzheimer's patient,

5    correct?

6        **A.**   Yes.  Yes.

7        **Q.**   They can be horsey and difficult, right?

8        **A.**   Uh-huh.  Uh-huh.

9        **Q.**   And she said she has to call and check on her mother

10   throughout the day to ensure that her meds are taken?

11       **A.**   I had the feeling that Ms. Trahan was going -- you

12   know, she was fighting an uphill battle.  I didn't get the

13   sense that her mother really wanted to hang around and she

14   was being oppositional in terms of the treatment regimen that

15   was established for her.  So it was up to her daughter to

16   make her take her meds, you know, make her want to go and get

17   her treatments.  It was up to her and she was fighting this

18   uphill battle that really wasn't -- it was a losing battle.

19       **Q.**   Oppositional is a much nicer word than horsey.  Thank

20   you for that.

21           And then finally this is about two or three sessions

22   or three or four sessions in, she told you that she's still a

23   mess right now, correct?

24       **A.**   Uh-huh.

25       **Q.**   But that she's doing better?

**OFFICIAL TRANSCRIPT**
Page 703

1   **A.**   Yes.

2   **Q.**   And this was somebody who wanted to do better and

3   wanted to improve her situation?

4   **A.**   Yes.

5       MR. MAGNER:   I think that's all I have.   Thank you

6   very much.

7       THE COURT:   All right.   Now you can leave.

8       MR. MAGNER:   Now you can.

9       THE COURT:   Unlock the doors, Marshal.

10       Please don't discuss your testimony with anyone and

11   thank you again for your time.

12       MR. MAGNER:   And, Judge, we need a few minutes to

13   discuss what, if anything, we're going to do next.

14       THE COURT:   We need to let the jury go and take a

15   short break?

16       MR. MAGNER:   Would that be okay?   I think we just

17   need 5 or 10 minutes.

18       THE COURT:   Maybe we'll be wrapping up today?

19       MR. MAGNER:   We may.

20       THE COURT:   All right.   Let's take 10 minutes.

21       THE CASE MANAGER:   All rise.

22       THE COURT:   No need for you to just sit there.

23   Stretch your legs for about ten minutes.

24       (Whereupon, the jury exits the courtroom.)

25       THE COURT:   Okay.   Do you need me in here?

1           MR. MAGNER:  No, ma'am.

2                     (Recess taken.)

3                     (In open court.)

4           THE COURT:  Close the door a second.  I'm going to

5    bring them back in.  You have to rest in front of the jury.

6           MR. MAGNER:  We're going to rest.

7           MR. BOTELER:  The Government will not be calling a

8    rebuttal witness.

9           THE COURT:  Okay.  So you have to rest in front of

10   the jury.  You have to rest your entire case.  And then I

11   will dismiss them for the evening.  We will have our charge

12   conference and bring them in first thing in the morning for

13   closing arguments and deliberations.

14          Let's bring them in.

15           (Whereupon, the jury enters the courtroom.)

16          THE COURT:  All right.  Let's have a seat.

17          Counsel.

18          MR. MAGNER:  Your Honor, at this time the Defense

19   rests.

20          THE COURT:  Okay.

21          MR. BOTELER:  And, Your Honor, the Government also

22   rests its case.

23          THE COURT:  All right.  With that, sorry, this is

24   part of the process, there's some business we have to take

25   care of out of the presence of the jury, so I'm going to go

**OFFICIAL TRANSCRIPT**

1    ahead and adjourn since it's a quarter to 5:00 for the

2    evening.  But when you come back tomorrow at nine o'clock

3    we'll hear closing arguments.  I will read you the jury

4    instructions and you can begin your deliberations.  So drive

5    safely and see you in the morning.

6              THE CASE MANAGER:  All rise.

7              (Whereupon, the jury exits the courtroom.)

8              THE COURT:  So I've been trying to look into that

9    issue of whether or not the -- what is it the 2017 return,

10   2016 return, that had the asterisk as a signature, but then

11   there was the consent form signed by the defendant.  And

12   although there's not a lot of authority, was something from

13   the circuit in the '70s, similar, closer, I think that's

14   sufficient to establish her signature on that particular

15   document.  And I'm saying that because I don't want that to

16   be an issue in your closing arguments.  I'm not going to

17   instruct the jury on that.

18             MR. MAGNER:  I want to argue that point.  I

19   understand your ruling is such, but Ms. Ancar, Krystal Ancar,

20   did say there was no documentary evidence to show that she,

21   in fact, signed it, and I don't think I would make a big

22   point of it but --

23             THE COURT:  Well, you know, my issue, if that was a

24   real issue, she didn't sign the tax return, they're not on

25   the record at the -- you know, with the IRS aside, I mean,

1    why would you wait to bring that now?  I mean, that's almost

2    like malpractice.  Why would you wait to raise it for the

3    first time now?  I mean, that's something that, you know,

4    could be found.  It is the government's burden to prove, but

5    what I'm saying is, then I'm going to have to instruct them

6    on the law if you say that and I'll have to make a conclusion

7    of law because I don't know that that is -- I don't know that

8    that's a fact issue.  I think that may be a law issue.  We

9    continue to try to look at it.

10          What's the government's point of view on that?  If

11   y'all can give me some better authority about it, we're just

12   trying --

13          MR. BOTELER:  Your Honor, we can try to find better

14   authority soon, but our understanding is the pattern jury

15   instruction was electronic signature from the Fifth Circuit,

16   we used that and --

17          THE COURT:  But it's not an electronic signature.

18   It's not that.

19          Did we have a pattern on electronic signature?  I

20   don't know.  I probably pulled it out.

21          MR. MAGNER:  Even Mr. Flanagan said it was a fact

22   issue for the jury to find and there is disputed evidence on

23   whether that was signed.

24          MR. BOTELER:  Your Honor, what Mr. Flanagan

25   mentioned, we had testimony from Allison Kotsay, who is the

1    IRS representative, that's how returns are filed and today

2    all returns are electronically filed almost and that's the

3    way they're all accepted and signed.  And also, Your Honor,

4    as Mr. Flanagan argued earlier on the Rule 29, it's not just

5    it has to be signed, it has to be subscribed and it was

6    subscribed in this sense, that this return was approved by

7    Judge Trahan as what Ms. Ancar said and it was submitted.

8    And then if you look at the amended return, it's --

9         THE COURT:  There is an IRS document filed.  There is

10   no IRS document?  There's no 2017 --

11        MR. MAGNER:  I think it's the 8879.  That is the

12   authorization that Ms. Trahan would have given Ms. Ancar to

13   e-file.  That is unsigned.  And what we have are just five

14   asterisks on a piece of paper.  Again, this is not going to

15   be the centerpiece --

16        THE COURT:  So the authorization is unsigned.  The

17   authorization to file electronically is unsigned.  It's not

18   dot-dot-dot.  It is unsigned.

19        MR. MAGNER:  The authorization is unsigned.

20        THE COURT:  Okay.  All right.  Then that is a factual

21   issue.

22        MR. MAGNER:  Okay.  Thank you.

23        We would renew our previous --

24        THE COURT:  I'm sorry, did you need to tell me

25   something?

**OFFICIAL TRANSCRIPT**

1          Since we are -- they rested their case, but anyway,

2     since the defendant -- I need to be clear that the defendant

3     understands that -- I'm sorry, Ms. Trahan, Judge Trahan, I'm

4     sorry.

5          THE DEFENDANT:  I'm sorry.

6          THE COURT:  That's okay.  I just have to go over with

7     you you have a right to -- you can come up to the podium.

8     That you understand that you have a right to testify in your

9     own defense.

10          THE DEFENDANT:  I do understand.

11          THE COURT:  And that you voluntarily and you

12     voluntarily waive that right and consent to waiving that

13     right to testify?

14          THE DEFENDANT:  Yes, I waive my right to testify.

15          THE COURT:  Ms. White, should I ask something else?

16          THE CASE MANAGER:  That's it.

17          THE COURT:  I just have to be sure that I have that

18     on the record.

19          MR. MAGNER:  The Defense also would renew its

20     previously urged motion for a judgment of acquittal based

21     upon a failure of the government's proof.

22          THE COURT:  I have that motion under advisement.

23          MR. MAGNER:  Thank you.

24          THE COURT:  All right.  So with that, have -- you all

25     want to take a minute to --

1          MR. MAGNER:  We have not had a chance to read the

2     instructions.

3          THE COURT:  So if you can be in chambers by 5:00,

4     give you about 10 minutes, and then we'll be with the court

5     reporter.  We'll be in my conference room.

6          MR. BOTELER:  Yes, Your Honor.  Thank you.

7          THE CASE MANAGER:  All rise.

8          MR. MAGNER:  And we'll waive the defendant's

9     attendance at the charge conference.

10          THE COURT:  Okay.

11                         (Recess taken.)

12                         (In chambers.)

13                    JURY CHARGE CONFERENCE

14          THE COURT:  So this is our charge conference in

15     *United States versus Ernestine Anderson-Trahan*.

16          All right.  So Jury Charge No. 1, any objection?

17     It's the opening standard.

18          MR. MAGNER:  No, ma'am.

19          THE COURT:  2, due to the following instructions, any

20     objection?

21          MR. MAGNER:  No.

22          MR. FLANAGAN:  No, Judge.

23          THE COURT:  Number 3, preemption of innocence, burden

24     of proof, reasonable doubt?

25          MR. FLANAGAN:  No, Judge.

1        MR. MAGNER:  I guess on 3 we would include the

2    italicized language there since she did not testify.

3        THE COURT:  Okay.  Yes.  Thank you for picking that

4    up.  Okay.  Include that.

5        Four?

6        MR. WICKER:  No objection.

7        THE COURT:  No objection.  All right.  5?

8        MR. MAGNER:  No objection.

9        MR. WICKER:  No objection.

10       THE COURT:  Six, Credibility of Witnesses?  Let me

11   see, the testimony should be (reading) -- take that out,

12   right?

13       MR. WICKER:  Yes.  And then there's also a line in

14   the second paragraph, third line, including the defendant.

15       THE COURT:  Take that out.

16       MR. WICKER:  Yes.

17       THE COURT:  You following?

18       THE LAW CLERK:  Yes.

19       THE COURT:  Number 7, Character Evidence?

20       MR. MAGNER:  No objection.

21       THE COURT:  All right.  No objection, government?

22       MR. BOTELER:  No.

23       THE COURT:  Okay.  8, we have to fill in the blank,

24   right?

25       MR. MAGNER:  I don't know that there was any

1  impeachment by evidence of untruthful character.

2      MR. BOTELER:  I don't remember either.

3      MR. FLANAGAN:  We agree with that.

4      THE COURT:  Take No. 8 out altogether?

5      MR. BOTELER:  Yes, ma'am.

6      THE COURT:  8.

7      Expert opinion testimony?

8      MR. MAGNER:  Looks good.

9      MR. FLANAGAN:  No objection.

10     THE COURT:  On or about?

11     MR. FLANAGAN:  No objection.

12     MR. MAGNER:  No.

13     MS. BRODNEY:  Quick charge.

14     THE COURT:  Consider only crime charged, I don't know

15 how to put that.

16     MR. WICKER:  We would add willfully on the second

17 line.

18     THE COURT:  Let me see.  You are hear to decide

19 whether the government has proved beyond a reasonable doubt

20 that the defendant is guilty of willfully --

21     MR. WICKER:  Willfully falsely reporting.

22     THE COURT:  Actually, I kind of like -- if you have

23 any objection to that, I thought that --I was bothered by the

24 whole instruction because of that.  That is the government's

25 burden.

1          MR. BOTELER:  Yes, Your Honor.

2          MR. FLANAGAN:  We agree with that.  Yes, Your Honor.

3          THE COURT:  Okay.  Everything else okay with that

4    one?

5          MR. MAGNER:  Yes.

6          MR. BOTELER:  On the top should be considered only

7    the crimes charged if we do it more than once --

8          THE COURT:  I usually take that out.  It's just for

9    us to go.  Everything parenthetical under jury charge it's

10   just for us to kind of summarize.  We take that out so you

11   know.

12

13         12?

14         MR. FLANAGAN:  No objection.

15         MR. MAGNER:  No objection.

16         THE COURT:  13?

17         MR. FLANAGAN:  No objection.

18         MR. MAGNER:  No objection.

19         THE COURT:  14?

20         MR. WICKER:  We don't think that there were any

21   summary and charts that were not received in evidence, so we

22   don't think that this applies.

23         THE COURT:  Okay.

24         MR. FLANAGAN:  Government agrees.

25         THE COURT:  Okay.  Take 14 out.

```
 1              MR. WICKER:  And then No. 15.

 2              MR. FLANAGAN:  Seems appropriate.

 3              THE COURT:  Seems appropriate.

 4              MR. WICKER:  Number 16 is Scott Sigl.

 5              THE COURT:  Oh.

 6              MR. MAGNER:  S-i-g-l.

 7              THE COURT:  S-c-o-t-t?

 8              MR. WICKER:  Yes, S-i-g-l.

 9              MR. FLANAGAN:  So I think it's in addition to David

10   Carrone, not in lieu of David Carrone.

11              THE COURT:  Testimony by David Carrone and, right,

12   Scott, you got that?

13              THE LAW CLERK:  Yes, Your Honor.

14              THE COURT:  And take out the parenthetical, right?

15              MR. WICKER:  Yes.  Yes.

16              THE COURT:  Charts or summaries prepared or relied

17   upon by the witnesses.

18              MR. WICKER:  Yes.

19              THE COURT:  Everything else okay with that?

20              MR. WICKER:  Yes, ma'am.

21              THE COURT:  All right.  Okay.  You see the second

22   page?

23              MR. FLANAGAN:  We agree with page 19.

24              THE COURT:  All right.  17?

25              MR. FLANAGAN:  No objection, Your Honor.
```

1          THE COURT:  All right.  18?

2          MR. FLANAGAN:  No objection, Your Honor.

3          THE COURT:  Y'all okay?

4          MR. MAGNER:  Yes.

5          MR. WICKER:  Yes.

6          THE COURT:  And 19?

7          MR. WICKER:  No objection.

8          MR. FLANAGAN:  None from the government.

9          MR. MAGNER:  We're not going to submit --

10         THE COURT:  You got to tell me what it is.

11         MR. MAGNER:  We're not going to submit one.

12         THE COURT:  Take 20 out.  And --

13         MR. FLANAGAN:  No objection.

14         THE COURT:  I need the verdict form.  Anything else?

15         MR. BOTELER:  Nothing from the United States, Your

16    Honor.

17         MR. MAGNER:  No.

18         THE COURT:  So we'll get him to make the corrections.

19    We'll e-mail it to you.

20         MR. MAGNER:  That would be great.

21         THE COURT:  So you don't have to sit around and you

22    will have hard copies in the morning.

23         MR. WICKER:  I spoke to Dena.  We're going to revise

24    our witness -- or exhibit list rather to be aligned with how

25    they were introduced and I'll send that to the chambers

1    e-mail this evening and --

2         THE COURT:  Are you okay with that?

3         MR. BOTELER:  Yes.

4         MR. FLANAGAN:  We'll do ours as well.

5         THE COURT:  I'll leave that.  I'm not -- I'll let

6    Dena handle that.

7         He's going to get the verdict form.

8         MR. FLANAGAN:  We won't do any reference numbers,

9    right?  It will be what the jury sees as exhibits.

10        MR. BOTELER:  Yeah, Exhibit 1 through 79 or whatever.

11        THE COURT:  Yes.  And then do you all want the jury

12   to have all the exhibits?  And I have to send them back with

13   the indictment.  I'll let you see it.  I just scratched

14   through Count 1, the way it's written, the superseding

15   indictment.

16        I need another copy of the superseding indictment.  I

17   put it back in here because I scratched that out.  They can

18   see that in the morning.  I don't think there's anything

19   particularly -- here you can have -- I'm not being stingy.

20        MR. FLANAGAN:  Thank you.

21        THE COURT:  Everybody can have their own.

22        MR. FLANAGAN:  Thank you, Your Honor.

23        MR. MAGNER:  Looks good to me.

24        THE COURT:  Simple.

25        Okay.  No objection?

1          MR. BOTELER:  No objection.

2          MR. MAGNER:  No objection.

3          MS. BRODNEY:  No objection.

4          THE COURT:  Okay.  Wow.  We'll make these corrections

5     and thank you all so much.  See you in the morning.

6          MR. BOTELER:  And it was 45 minutes for closing?

7          MR. MAGNER:  How much are you going to use for

8     rebuttal?

9          THE COURT:  You have to reserve.

10         MR. MAGNER:  That's what I'm going to ask.

11         MR. BOTELER:  I'm going to reserve 10 minutes.

12         THE COURT:  Remember to tell Dena that in the morning

13    because she is keeping track of the time.

14         MR. FLANAGAN:  Will the court or the court

15    administrator give a warning?

16         THE COURT:  Just ask her to do that, give a warning a

17    minute, whatever you want, a minute, five minutes, maybe five

18    minutes and then a minute.

19         MR. BOTELER:  So we can ask her in the morning.

20         THE COURT:  Do that.  I'll forget.  She'll gladly do

21    that.

22                         *  *  *  *

23         (WHEREUPON, the proceedings were adjourned.)

24                         *  *  *  *

25                  REPORTER'S CERTIFICATE

**OFFICIAL TRANSCRIPT**

1          I, Nichelle N. Wheeler, RMR, CRR, Official Court
Reporter, United States District Court, Eastern District of
2    Louisiana, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and
3    understanding, from the record of the proceedings in the
above-entitled and numbered matter.

4

5                          /s/ Nichelle N. Wheeler
                          Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**