UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

                            Criminal Action No. 22-2
VS.                         Section "G"
                            New Orleans, Louisiana
                            November 17, 2022

ERNESTINE ANDERSON-TRAHAN
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF JURY TRIAL
HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
UNITED STATES CHIEF DISTRICT JUDGE
VOLUME IV


APPEARANCES:

FOR THE GOVERNMENT:          Brian Eugene Flanagan
                             DOJ-Tax
                             150 M Street NE
                             Suite 1.405
                             Washington, DC 20004

                             Marissa R. Brodney
                             Michael C. Boteler
                             DOJ-Tax
                             Tax Division, SCES
                             150 M Street NE
                             Washington, DC 20002



FOR THE DEFENDANT:           Michael William Magner
                             Thomas C. Wicker, IV
                             Jones Walker
                             Place St. Charles
                             201 St. Charles Ave.
                             Suite 5100
                             New Orleans, LA 70170

**OFFICIAL TRANSCRIPT**

```
ALSO PRESENT:                    Judge Ernestine Anderson-Trahan
                                 Kim Better
                                 Aaron Washington
                                 Timothy Moore
                                 Dewaiyne Horner
```

```
Official Court Reporter:         Nichelle N. Wheeler, RMR, CRR
                                 500 Poydras Street, B-275
                                 New Orleans, Louisiana 70130
                                 (504) 589-7775
```

```
    Proceedings recorded by mechanical stenography,
transcript produced via computer.
```

**OFFICIAL TRANSCRIPT**

I N D E X

| | Page |
|---|---|
| CLOSING ARGUMENTS | 723 |
| JURY QUESTION NO. 1 | 784 |
| JURY QUESTION NO. 2 | 789 |
| JURY QUESTION NO. 3 | 798 |

1    <u>**P R O C E E D I N G S**</u>

2    (Call to order of the court.)

3    THE COURT:  Good morning.  Have you all had an

4    opportunity to review the jury instructions with the edits

5    from last night?

6    MR. MAGNER:  We have for the defense, Your Honor, and

7    they're acceptable.  Thank you.

8    THE COURT:  All right.  The Government?

9    MR. BOTELER:  Yes, Your Honor.

10   THE COURT:  And so I showed you how we're going to

11   strike through the superseding indictment, and did I catch

12   everything that needed to be caught on that?

13   (Affirmative responses.)

14   Okay.  So when we bring the jury back in, we'll start

15   with closing arguments and then I'll instruct them on the

16   law.  Okay?

17   Bring in the jury.

18   (Whereupon, the jury enters the courtroom.)

19   THE COURT:  Good morning, everyone.  Have a seat.

20   At this time, we'll have closing arguments and then I

21   will instruct you on the law and read the verdict form to

22   you.  Counsel?

23   MR. BOTELER:  Thank you, Your Honor.

24   THE COURT:  Since the Government has the burden of

25   proof, have you asked to reserve any time?

1        MR. BOTELER:  Yes, Your Honor.  And I also asked for

2   warnings, which she will provide to me.

3        THE COURT:  Okay.

4                      CLOSING ARGUMENTS

5        MR. BOTELER:  Thank you, Your Honor.

6        And may it please the Court, ladies and gentlemen of

7   the jury, we all go through seasons of life.  It's natural.

8   Sometimes things are going well.  Sometimes you can be a

9   successful attorney, have a thriving law practice.  You can

10  run for election and become a judge.  Things are going well.

11  But as we saw and we heard, there's also times in your life

12  where things aren't going as well.  We've all been there at

13  times when we may have lost a loved one or we've had to care

14  for a family member.  Yes, it's tough.  And there might be

15  times where that starts to impact you.  You're right.  That

16  is tough.  And we heard witnesses on the stand.  You heard

17  from friends of Judge Trahan, employees, that she had a great

18  relationship with her mother, Faye Anderson, and that

19  Ms. Anderson had some tough times, especially in 2016 until

20  she passed in 2017.  Yes, that had an impact on Judge Trahan.

21  It was difficult.

22       And you heard Ms. Major on the stand.  She testified

23  how close she was with Judge Trahan and her mother, but

24  Ms. Major also spoke to you about her own mother, the impact

25  it had on her and in the seasons of life there are times that

1    are difficult.

2         And you saw the picture of Ms. Major, Judge Trahan,

3    Ms. Anderson, and Ms. Major's mom.  You saw all that.  And,

4    yes, those are true feelings.  Those are true life

5    experiences.  That is a season of life.  But you also saw

6    Ms. Major, when she was asked a question, well, during this

7    time, Ms. Major said you still keep it going and during this

8    time, Ms. Major was asked what about your taxes?  She said

9    she stayed on top of those.  And during this time, yes, Judge

10   Trahan dealt with grief.  She had to help take care of an

11   elderly parent and those can be tough, but Judge Trahan

12   continued to do a lot during this time.

13        She was able to be a judge, judge of Second City

14   Court.  It was a busy court.  She heard evictions, small

15   claims, regular claims, which was like personal injury cases.

16   She was able to sit, as you are in court, hear testimony,

17   hear it under oath, have people put under oath to tell the

18   truth and she would listen.  And you heard them say sometimes

19   Judge Trahan may have listened too much, but she was a people

20   person.  She wanted to give them their day in court.

21        But also Ms. Hibbs, her court reporter, who worked

22   for her during this period, also noted that she was very

23   detail-oriented.  She would listen and make decisions from

24   the bench.  And she did that during this time.  She was able

25   to do that.  Not only that, you saw Mr. George list hundreds

1   and hundreds of weddings that Judge Trahan did each year and

2   they kept rising.  Over a period of time, she did over a

3   thousand weddings and it was a beautiful courthouse.  It had

4   a nice balcony.  You can see why it was popular, but Judge

5   Trahan was able and capable of handling all of those

6   weddings.

7        And you also saw Ms. Henderson, her long-time friend,

8   who spoke to her (sic) about when she worked at the law firm

9   and Ms. Henderson said she was the one who kind of kept track

10  of things and organizing, but Ms. Trahan knew to ask

11  Ms. Henderson for help and she knew that Ms. Henderson would

12  give her a reminder.  And what would happen when

13  Ms. Henderson would give her a reminder?  Judge Trahan was

14  task-oriented and she would do that.  She would take that

15  reminder and go and complete the task.  She would do it well.

16  She was a successful lawyer and that's why she got elected.

17  She was a good lawyer, a good judge, and she was doing this

18  during this time, the season of life.

19        And also she had a court and she had staff.  You saw

20  Ms. Hibbs.  You heard from Ms. Major.  They were there.  They

21  could help her too.  And they did help her like keep track of

22  the docket.  Someone would keep track of maybe give a

23  reminder, you were there, but she did have help there.  But

24  what other things did she do?  She had the staff help her

25  with marriage licenses and they kept records of them.  They

1    put them in Judge Trahan's office and then later moved it to

2    her conference room.  They were able to schedule these

3    weddings for her.  They were able to write down reservation

4    slips.  They didn't keep those slips.  They got rid of them,

5    but they were keeping track of this stuff for Judge Trahan.

6    And it wasn't just keeping track.  Judge Trahan knew what was

7    going on.  You saw Devin George in the numbers.  The weddings

8    kept going up and up each year.

9        In 2015, as Mr. George mentioned same sex marriage

10   became legal and that caused a big opportunity.  You heard

11   Ms. Hibbs mention that.  They knew they were going to be

12   busier and they charged more.  So Judge Trahan knew weddings

13   were going up and knew she was charging more, and so she was

14   able to handle more money.  She was able to collect that

15   cash.  She was able to use it.  But when it came time to

16   report her taxes, she was also able to report expenses that

17   she did, her labor, her mileage, working on floors and

18   windows, able to keep track of all that.  You know what she

19   was also able to keep track of, her wedding fee income.  She

20   was able to keep track of that.  She knew how much money she

21   was making and she knew she was making a lot more than

22   16,000.  She knew she was making a lot more in 2016, more

23   than 15,000.  And she knew when she gave those numbers to

24   Ms. Ancar those were false.

25       Now, soon after we finish our closing arguments, the

1  judge will instruct you on the law, on the different

2  elements.  As you heard before, the Government has dismissed

3  Count 1 and you will be asked to render a decision on

4  Counts 2 through 4 and each one is filing a false tax return.

5  And I'll just mention the elements for you, but the judge

6  will instruct you further.  There are really five elements.

7  One, the defendant signed the return under penalties of

8  perjury, that there was a false statement on it, and in this

9  case, the gross receipts, that the defendant knew the

10  statement was false, that it was material, which means it had

11  an impact on the tax return, and, finally, whether it was

12  willful.

13        With respect to the tax returns filed under penalties

14  of perjury, each tax return has what's called a jurat.

15        If we could pull up Exhibit 72.

16        Your Honor, may I publish Exhibit 72?

17        THE COURT:  Yes.  Absolutely.  It's part of the

18  closing.

19        MR. BOTELER:  Exhibit 72 is what is what's referred

20  to as an 8879.  Ms. Ancar provided that to Ms. Trahan to get

21  her to sign to get permission to file these returns under

22  penalties of perjury.  And if we go to 71, which is for 2016,

23  yes, as you saw yesterday, yesterday or the day before,

24  Ms. Ancar said this is one that she provided also to Judge

25  Trahan.  The copy that she kept was unsigned, but Ms. Ancar

1    stated the original was signed.  She gave it back to Judge

2    Trahan.

3         And then you saw Mr. Magner cross Ancar on this

4    position, like, well, how do you know?  She goes, well,

5    that's my practice.  I would not have filed a return without

6    getting that signature.  So it was authorized for the 2016

7    tax return and it was signed and subscribed to by Judge

8    Trahan.

9         Now, in addition, if we go to Exhibit 78, the tax

10   returns are false in the sense -- and to a very material

11   matter.  Everyone agrees the wedding fees are wrong.  Judge

12   Trahan filed amended returns.  The numbers are essentially

13   the same as the Government.  And it was simple to figure out.

14   You just take the number of weddings.  You multiply it by 80

15   or you multiply it by 100 in 2016.  So everyone knows the

16   gross receipts are wrong.  That's not a question.

17        Now, if we go to the heart of the case and this is

18   what you heard most about was willfulness.  Was Judge Trahan

19   willful in providing those gross receipts numbers to Ms.

20   Ancar?  Was she willful?  Did she knowingly give false

21   numbers or was it a mistake or was it just negligence?

22        Now, I want to refer to Defendant's Exhibit 20.  I

23   think this is a good way to start.  This is that huge

24   timeline that you saw that defense counsel's paralegal

25   prepared.  And I want to focus on the last page.  And if you

1    want to talk about it, it didn't list when the tax return was

2    filed for 2016.  They list tax day.  They didn't list when

3    the tax return.  In 2016, the tax return was filed on

4    November 7, 2016, and so let's look at what was going on in

5    Judge Trahan's life at that time.

6         You saw Ms. Shelton.  You heard her testify.  In

7    October of 2016, it was really tough for Judge Trahan.  We

8    heard it.  We saw the evidence, the anxiety tests.  So in

9    2016, her mom had just been diagnosed with cancer and that

10   caused it to spike and then Ms. Shelton provided treatment to

11   Judge Trahan and then you saw each time, each visit it got

12   better, it got better, it got better because Judge Trahan was

13   getting the tools to deal with anxiety.  We have seasons of

14   life.  Sometimes we hit a part where it is very tough and no

15   doubt that was very tough, grieving the loss of a parent or a

16   parent about to die.  Anyone would feel grief.  Anyone would

17   feel anxious, but she got tools and that's when you have to

18   look at the time.

19        So what happened that her anxiety continued?  Now, if

20   you saw, in January of 2017, Judge Trahan had been doing much

21   better.  She was improved.  She was using the tools.  She was

22   a star patient as Ms. Shelton said.  Judge Trahan put her

23   mind to work hard.  And so by June, when her mom passed away,

24   she went back to Ms. Shelton.  That was the first time she

25   had been to Ms. Shelton in five months.  And what did she

1   tell Ms. Shelton?  She said, well, she's naturally grieving

2   her mother's passing.  She says her perspective is healthy,

3   proper grieving, and so she stopped treatment.  And, in fact,

4   if you also look at Defendant's Exhibit 9, page 762, she also

5   right around this time went and visited her doctor and in

6   this, you even see where she reported to her doctor that she

7   is not nervous or anxious.  So like I said there are seasons

8   of life.  She is doing better.  She is capable in June of

9   2017.  And during that time, she's working as a judge.  She's

10   handling court and so that's the time when her 2016 return is

11   being prepared is after that, several months after in

12   November.

13        And so you heard Ms. Ancar testify about the process

14   she would do with Judge Trahan to prepare the return.  She

15   would talk to Judge Trahan.  Judge Trahan would give her

16   notes and numbers.  So, for instance, Exhibit 71 -- I'm

17   sorry, Exhibit 64.  And these were some of these handwritten

18   notes.  Yes, they're handwritten.  They may look a little

19   sloppy.  But, you know what, they have real numbers on them.

20   They keep track of real items.  And you heard Ancar testify

21   on the stand, getting handwritten notes was not unusual.  We

22   don't all do super Excel sheets and super long timelines.

23   And as it is, you just handwrite it.  But Judge Trahan kept

24   track of it.  She kept track of her charitable giving.  She

25   kept track of the expenses tied to school.  And when you look

1   at her tax returns, she was keeping track of her rental

2   income, because she rented a property during this time

3   period.  She was able to handle being a landlord.  She was

4   able to handle the expenses tied to keeping a rental property

5   up and running and renting it out.  And even if we go to the

6   charitable deductions on her tax return, you'll notice she

7   had specific numbers for when she was giving money to various

8   charities, when she was donating clothes and all that and you

9   will see this time and time again in each of the returns.

10   These are very specific numbers.  She was able to keep track

11   of them.

12          So if we go back to Exhibit 64 and we look at the

13   wedding fee, Ancar said she wasn't doing an audit.  She was

14   relying upon Judge Trahan to give her that number.  And Judge

15   Trahan gave a couple numbers there for weddings.  One, she

16   listed $700 times 3.  That was what she was giving to her

17   staff for a bonus.  So you heard testimony she raised it to

18   100 bucks and she was going to give some of it back to her

19   staff.  And so when she lists 15,000 as gross receipts or

20   income, all the money she got from the 400-some-odd weddings,

21   she was going to deduct the $2,100 she paid to the staff.  So

22   it wasn't reducing the gross receipts and -- reduce the gross

23   receipts made it less income.

24          But she also kept track of miles, 300 miles, so she

25   kept track of when she did weddings and where.  I focus a lot

1    of times on these details because it was what she was able to

2    do.  She was able to keep track of her numbers.  That number

3    15,200, that number was wrong and all the other numbers may

4    be right, but that's the one she didn't keep track of and

5    there's a reason why.

6          First of all, she knew that number was wrong.  If we

7    look at the weddings in Exhibit 2, which Devin George showed,

8    what you'll notice every year the weddings go up, up, and up,

9    goes up, up, up.  But what does she report?  She reports a

10   flat line on her tax return, 16,000; 16,000, and then in 2016

11   she drops it to 15.  But what was the real amount?  Over

12   $45,000.  Three times that amount.  And she knows when she

13   handed that number of 15,000 to her accountant that number

14   was wrong.  She knew she was doing more weddings and more

15   weddings and more weddings.  And she knew that because also

16   same sex marriage became legal in 2015.  And you heard both

17   from Devin George and Ms. Hibbs and that also caused a second

18   thing.  It caused her to increase the amount of money to

19   $100.  So if you're charging $100, more, which is more and

20   you're doing more weddings, anyone would know that's going

21   up.

22         And it's not just that knowledge.  If you heard about

23   how Judge Trahan got the money, they would go and drop the

24   cash on her desk in the chambers and it would start to add

25   up.  She knew she was getting more cash.  She felt it.  She

**OFFICIAL TRANSCRIPT**

1    could use it.

2         And during this time, as we mentioned, we have

3    seasons of life and there's a reason like you saw the

4    timeline and I tried to show certain moments on the timeline

5    because when this tax return was done, Judge Trahan as sad as

6    it was, yes, she did lose her mom in June of that year and

7    I'm not going to say that was not tough, but she had a

8    healthier perspective.  And she was not having the stress of

9    taking care of her mom.  She had the healthier perspective.

10   She didn't need -- she wasn't needing treatment because she

11   was able to do a lot.  And she was able to file the correct

12   returns, but she chose not to.

13        And one of the things you may want to know, why did

14   she choose not to?  I mean, that is a big question.  We all

15   want to know why.  What was your motive to do it?  In some

16   ways, it is about money.  It is about taxes and how much you

17   have to pay.  So if Judge Trahan correctly filed a 2016 tax

18   return, she would have owed $15,000.

19        So if we would look at her original return on page 4,

20   the one that she filed that was false she indicated which was

21   Exhibit 17, she owed $4,800.  So when she filed the return,

22   she still owed money that she had to pay.  So even though she

23   made $45,000 in doing weddings and didn't use any of that to

24   pay her taxes, instead she owed 4,800.  But then when you

25   look at her amended return, you see on Exhibit 19 at page 2,

1   when she amended it, she would owe another $10,000.  So when

2   you add it together, now it's $15,000.  If she filed it

3   correctly, that's what she had to pay and she didn't want to

4   pay that.  But it's not just that amount.  It adds.  The

5   money keeps adding up and that's when you keep underreporting

6   your income, it keeps it lower, so to try to reduce how much

7   you add.  And you heard Ms. Henderson say that Judge Trahan

8   had problems with the IRS even before becoming a judge.  This

9   wasn't the first time.  In fact, if you look at Exhibit 43,

10  Ms. Trahan has had problems with the IRS for a bit.  And when

11  she owes this $15,000 to the IRS in 2016, it was going to be

12  added to what she owed for prior years, for '13 and '14.

13          And what I want to note is you heard testimony --

14  well, the IRS didn't do this, IRS didn't do that, but you

15  know what the IRS was doing?  They were working with Judge

16  Trahan in December of '16, 2016.  They were working with

17  Judge Trahan.  Trahan wanted an installment agreement to pay

18  for a 2014 tax return, and so the IRS said, well, you got to

19  file '12 and '13.  And so they gave her additional time to do

20  it, but they also warned her, if she wasn't going to get

21  compliant, there was a possibility she was going to get hit

22  with liens and levies.

23          And if we scroll up, you will know the IRS gave her

24  time.  They did give her additional months and time so she

25  can have the time she need to file those returns.  And

1   eventually she did get an installment agreement and did start

2   paying 2014.  But you know one thing that was happening

3   during this period, we scroll up, these returns, what the IRS

4   didn't know is, Judge Trahan wasn't necessarily acting in

5   good faith.  That 2014 return, when she asked for an

6   installment agreement, was false because it underreported the

7   wedding income.  You know what, that 2015 tax return was

8   false because that also underreported the wedding income.

9   And so was 2016.  And each one add on each other.  There was

10  a reason she tried to keep that down, because that money

11  could keep going up and up and up.

12        As I mentioned, it was a pattern of false returns.

13  Now, if we go back to the 2015 tax return, I agree -- when

14  that was filed in October of 2016 and that was during the

15  toughest part of what Judge Trahan was feeling and you saw

16  the stuff.  You saw Ms. Shelton.  You heard the testimony.

17  It was tough, but even during tough times, like Ms. Majors,

18  sometimes you just keep it going.  And Judge Trahan was

19  keeping it going.  She was still able to handle court cases.

20  You heard from Ms. Hibbs that maybe she needed a reminder,

21  but with the reminder, she could keep going.  She could keep

22  moving.  She was able to conduct hundreds of marriages.  She

23  still held a busy docket.  She wasn't taking a lot of time

24  off.  She was working as a judge.  She was able to do a lot

25  and keep track of a lot.  Yes, she may have needed help, like

1  Ms. Hibbs, she got reminders and just like Ms. Ancar, you

2  heard her, she would talk to Judge Trahan and she would,

3  like, hey, what expenses do you have?  Let me ask you about

4  this.  And Ms. Ancar always did ask about what was your

5  wedding income.  How much money did you make?  Judge Trahan

6  needed help.  Ms. Ancar was there to remind her, I need this,

7  I need that, but Judge Trahan kept giving the wrong number to

8  Ancar.

9       Well, if you look at the 2015 return, there were some

10  handwritten notes on Exhibit 65.  And you saw this earlier.

11  There was a list of handwritten notes and it may have looked

12  a little messy at times, but, you know what, a lot of us

13  don't necessarily have the best handwriting.  But the numbers

14  were accurate.  They were detailed.  They were focused on how

15  much windows cost, how much floors cost on the rental

16  property.  They kept track of donations to church, to home

17  insurance, mortgage deductions.  There was a lot of numbers

18  on it.  There was a lot of attention to detail with those

19  numbers.  They were all there to help her get deductions and

20  help list expenses to reduce her tax liability.

21       But the one thing again, she provided all those

22  numbers with great detail, but when it came time for the

23  wedding fees, again, she just reports 16,000.

24       Now, 2015, she also knew that number was wrong.  So

25  what happened in 2015, that was the year same sex marriage

1   became legal in about July -- June, July of 2015 and the

2   weddings went up.  Judge Trahan had a discussion with her

3   staff about it.  They expected to be busier.  In fact, they

4   were busier.  So, again, the numbers went up.  If you saw the

5   real math, it wasn't 16,000.  It was double.  Double.  And if

6   she reported it, she would have had to pay more in taxes.

7        And sometimes you heard about, like, expenses, Judge

8   Trahan listed expenses on these returns, contract labor,

9   mileage, those are listed.  She kept track of those.  But she

10  continually underreported the amount she actually made.

11       Now, if we go to the tax return, you would have seen

12  if she would have owed -- if filing a proper tax return --

13  owed $8,000.  On the tax return itself which was Exhibit 17,

14  she still owed $2,400 more than what she reported.  If she

15  added the additional gross receipts, as you look at her

16  amended return, which is on Exhibit 19, she would have owed

17  another five and a half thousand dollars.  You're right.

18  Each number sounds little on itself, but it adds.  It adds.

19  If you have five-point thousand (sic) to 24, you get 8,000.

20  If you had the $15,000 before it adds up.  It isn't just one

21  small number and that's a practice and a pattern and that's

22  what we saw in the history.  It was a pattern of

23  noncompliance.  It's not an isolated incident and it goes

24  before and after some of the tough seasons of life.

25       And the pattern continued in 2014, and in 2014, the

1    tax return was filed on July 2, 2015.  And, again, what was

2    going on in Judge Trahan's life around that time?  Well, it

3    was difficult.  She was helping care for an elderly parent.

4    She was continuing to run her courtroom.  But, you know, at

5    that time, she still had coping skills.  You heard

6    Ms. Shelton say in October one of the reasons it probably was

7    difficult in 2016 was that her coping skills had been

8    decreased, but back in 2015, she still had those coping

9    skills.

10           You saw the note from her physician in April of 2016,

11   and in the note, Judge Trahan said, I didn't have problems

12   with anxiety or stress before that point.  And in that point,

13   that's where she got diagnosed with mild anxiety.  And that

14   was in April of 2016.  If you go back even farther to '14,

15   when she filed that return, she had the coping skills.

16           And as with the other return, again, she reported

17   $16,000 on her wedding fee.  That's the number she gave her

18   accountant.  But she knew the year before she did 2013 that

19   lasted through '14, the numbers kept going up, year after

20   year, the weddings kept going up.  The more weddings you do,

21   the more money you make.  Hers stayed flat as she reported to

22   the tax preparer.  That wasn't a mistake.  That was

23   intentional.  Because as you saw in '14, as you saw '15, '16,

24   it keeps adding up.  Every time you cut it, you cut it, you

25   owe more and more and she didn't want to pay.

**OFFICIAL TRANSCRIPT**

1      I know this has been a little bit of a long trial.

2   It's been a bit from the very beginning.  I just want to

3   highlight something that happened on the very first day of

4   trial, in the very first moment of trial.  I'm not sure if

5   you remember it or not.  But there was a factual stipulation

6   entered in by both parties.  That means both parties agreed

7   to what was said and that is something for you to consider.

8   And as read by the judge, it said by letter dated July 12,

9   2018, the Judiciary Commission requested Judge Ernestine

10  Anderson-Trahan's counsel to provide information on whether

11  Judge Trahan reported to the Internal Revenue Service all

12  moneys earned from officiating wedding ceremony on an annual

13  basis.  That July 12, 2018, date is important because when

14  that inquiry started, that's when Judge Trahan started to do

15  those amended returns.  That's when Judge Trahan started to

16  change to try to get out of trouble.  She knew she was in

17  trouble.

18      So you will see -- you will hear and you saw these

19  amended returns, each one of those amended returns are after

20  that date.  It wasn't before.  That's the dividing, that she

21  got caught.

22      And you heard from Ms. Hibbs who was on the stand,

23  she talked to you.  She said she was informed of this

24  judiciary commission.  What happened after that?  Ms. Hibbs

25  said they went back in Judge Trahan's chambers and to the

1    conference room and they got these boxes of marriage

2    certificates.  Now, that was one way to keep track.  Every

3    time someone got married they get a marriage certificate.

4    You heard from Ms. Hibbs, you heard from others and where

5    would those marriage certificates be stored.  One would go to

6    vital records to Devin George.  You saw his big numbers and

7    chart.  And the other would stay in Judge Trahan's chambers.

8    And once after this inquiry, they pulled those out.  They

9    organized them and segregated them.  So they pulled out only

10   the ones that Judge Trahan officiated.  Because you remember

11   down at the bottom of the list who officiated.  Sometimes it

12   was a different pastor or someone else.  And then all you had

13   to do was simply count.  You can see some of the exhibits.

14   You do one, two, three, four, if you count 299 or you

15   multiply it by 80, 362 multiply it by 80, because you saw

16   those numbers were then given to Ms. Ancar.  There's a sheet

17   with a page where they responded to the judiciary commission

18   and on it it's just a list of number of what, a nexus times

19   eight.  It wasn't hard to compute it.  It was actually fairly

20   easy.

21          And not only that, Devin George had a number.  You

22   saw them up on his chart.  He had the numbers.  Judge Trahan

23   did not use those numbers.  Instead, what did Judge Trahan

24   do?  She used $16,000 every year for that, other than 2015 --

25          THE CASE MANAGER:  Counsel, five minutes.

**OFFICIAL TRANSCRIPT**

1          MR. BOTELER:  Thank you.

2          Every year but the numbers kept going up.  In 2013,

3    it was 282 weddings.  2014 went up to 372 weddings.  That's

4    the increase.  You do more weddings.  You get more money.

5    You see it.  You see it coming up piling on the desk.  You

6    see the cash.  In '15, it went up to 415.  Again more.  In

7    2016, it went up to 463.  More.  And then in 2016, she was

8    charging $100.  More money.  And you still keep reporting the

9    same?

10         In 2017, you actually did file that return and she

11   did properly list kind of her gross receipts.  That return

12   was filed after July 18, 2018.  That is when she got caught

13   and that's when she started to change.  But I know you've

14   heard testimony and you saw Mr. Magner point out, yeah, these

15   amounts may have been little at certain times, but they add

16   up.  They add up.  15,000, that's a lot of money.  If you had

17   any more, 8,000; 24,000, it starts to add up to be real

18   money.  And Judge Trahan didn't want to pay.  That's what was

19   going on.

20         As I mentioned, there were seasons of life.  Yeah,

21   she had some tough periods, but you saw the false returns in

22   '16, if you look at that, she was past certain seasons of

23   life.  She was under -- she had her tools.  Her anxiety had

24   dropped and that's the year where she even had the largest

25   amount where she underreported by over three times.

1       Now, when you look over this period of time, you saw

2  your income come up and up.  Under these tax returns, you

3  sign them under penalties of perjury.  And you heard

4  testimony that Judge Trahan, in her court, her people, every

5  day, three days a week, put under oath and told to tell the

6  truth.  She knew the importance of it.  And it was important

7  to tell the truth.  US tax system relies upon truthful

8  responses.  And those returns that Judge Trahan filed were

9  not truthful.  They were false.

10      Thank you.

11      MR. MAGNER:  Good morning, ladies and gentlemen.

12  We'll get to him in a minute.

13      Ladies and gentlemen --

14      MR. BOTELER:  Objection, this picture wasn't in

15  evidence.

16      MR. MAGNER:  It's a demonstrative.

17      THE COURT:  It's a demonstrative.  It doesn't have to

18  be in evidence.

19      MR. MAGNER:  As I said, we'll get to him in just a

20  minute.

21      Mr. Boteler made a convincing argument that Ms.

22  Trahan made mistakes and should pay her taxes.  The first

23  thing I told you was that she acknowledges her mistakes and

24  that she has paid her taxes and will continue to pay her

25  taxes.  But good people make mistakes.  These are all very

1    nice people, but they came in here Monday morning and told

2    you that this woman had willfully violated the federal tax

3    laws with regard to her 2013 return.  But they acknowledged

4    their mistake because they are good people and they turned

5    tail and dismissed that count the very next morning.  It was

6    a mistake.  They could not meet their burden of proof and

7    even they acknowledged that and dismissed the first count of

8    the indictment and a good part of the claim tax loss that

9    they claim.

10            So what about our friend here?  They say that even a

11   dog knows the difference between somebody who kicks it and

12   somebody who trips over it.  And somebody who trips over it

13   has made a mistake.  Do you think that there's any chance

14   that this woman kicked a dog metaphorically speaking?  No,

15   she made mistakes.  We all make mistakes.  The government

16   makes mistakes.  Government agents make mistakes.

17            The Government when they first came into court did

18   not even mention to you what their burden of proof was, that

19   they had to prove that the case -- that Ms. Trahan acted

20   willfully.  They didn't mention it to you in their opening

21   and I'm not sure I heard very much of that in their closing

22   argument either.  But the judge is going to instruct you that

23   a person is not willful if she acted through negligence, even

24   gross negligence, inadvertence, justifiable excuse or mistake

25   or due to her good faith misunderstanding of the law.  That's

1   the law.  That's what the Government should be up here

2   discussing, but they're just glossing over that.  You can't

3   gloss over the law.  You just can't gloss over what their

4   burden is of proof for proving their case beyond a reasonable

5   doubt.

6          More importantly what the Government has never

7   acknowledged to you and I submit that this is not only a

8   mistake, but this is a fundamental mistake, and that is they

9   have the burden of proving that and you'll hear it from the

10  judge, they have to prove that her actions were not the

11  result of negligence, gross negligence, carelessness and so

12  forth.  And a person who believes in good faith that their

13  actions complied with the law does not act willfully even if

14  his belief is unreasonable.  But that's what they have to

15  prove.  They've got to prove beyond a reasonable doubt that

16  her actions were not the result of carelessness.  They

17  haven't even come close to that.  They haven't even

18  acknowledged that that is their burden.

19         You'll hear it in the judge's instructions and I want

20  you to listen very carefully.  Ms. Trahan made mistakes.  I

21  believe that was the first word out of my mouth, but she did

22  not make those mistakes willfully.  We don't convict our

23  fellow citizens of felony tax crimes for mistakes.  We don't

24  do that, because that's not the law and we don't do that

25  because that could happen to any one of us.

1          If the government decided in arbitrary fashion that

2     they -- for whatever reason that we made a mistake on our tax

3     returns, it could happen to any one of us, ladies and

4     gentlemen.  If for whatever reason, and we don't know the

5     reason, for whatever reason the government decides that they

6     want to come after you, this is your government.  You have a

7     right to expect better of them.

8          Now, the judge is also going to tell you about

9     reasonable doubt and the part I want to tell you about most

10    carefully is proof beyond a reasonable doubt is proof of such

11    a convincing character that you would be willing to rely and

12    act upon it without hesitation in making the most important

13    decisions of your own affairs.  Would you rely on that IRS

14    agent who testified yesterday about your own affairs?  Would

15    you rely -- and wouldn't you consider it reasonable doubt if

16    the government came in here and after the first day of trial

17    dismissed 25 percent of their case when they don't even

18    discuss what their burden of proof is under the law, when

19    they're not candid with you that they have the burden of

20    proving that she did not act as a result of carelessness and

21    that they didn't even mention in their opening statement the

22    problems that she was undergoing with her family, her mother,

23    her life situation in their opening statement at all?  They

24    obviously had to address it in their closing, but I don't

25    think they did so convincingly.

**OFFICIAL TRANSCRIPT**

1      And we talked a great deal about Teena Trahan as a

2  daughter, as a judge, but she's also a wife, she's also

3  raising a teenage son at the time and a daughter in grade

4  school, that she was barely getting by and she was doing for

5  others at all time and not taking care of herself and not

6  taking care of her own business the way she should.

7      And Mr. Boteler must have heard a very different

8  testimony from Ms. Shelton, the therapist.  Ms. Shelton told

9  you that this woman was -- I think the phrase she used was

10  ready to, like, crawl up into a ball and I think the word she

11  used was embryotic, basically just curl over like that as she

12  was going through her life.  She said that the stress that

13  she was undergoing was severe.  It was persistent.  And

14  counsel tried to suggest to you that this was just like a one

15  or two-week thing, but we know that it was persistent because

16  she complained of the same things in her hour-long annual

17  physical to her general practitioner, Dr. Marshal, that she

18  was suffering from acute and exceptional stress during this

19  time in her life.

20      Don't you think it's reasonable doubt and you could

21  each have your own reasonable doubt.  You could have 12

22  different reasonable doubts and it's still reasonable doubt

23  and you must find the defendant not guilty.  But one

24  additional aspect of reasonable doubt is you have a revenue

25  agent whose figures of what the tax loss in this case get

1    lower and lower and lower with each new bit of information

2    that they receive.  Did they get that information on their

3    own?  No.  They have introduced reams of her bank records?

4    Did they look at them?  No.  I had to provide them with those

5    records of her expenses and then they grudgingly kept

6    lowering and lowering and lowering the figure.

7         Mr. Boteler said that on that little handwritten

8    sheet of paper, they were able to keep track of these

9    expenses, how do they know?  They've never looked.  They've

10   never audited her.  They never looked in her records to see

11   what justifiable expenses she really had.  They didn't do it

12   because the pilot didn't tell the revenue agent to do it.

13        I thought -- my hearing isn't the best these days.  I

14   thought that the revenue agent said the criminal investigator

15   is the God and what he said was the guide.  But he said that

16   they were the pilot and he didn't do one thing more than what

17   the pilot told him to do.  So he never looked at the expenses

18   that she incurred.  That's wrong.  That is shocking and it

19   should be shocking to you just as Ms. Jacobson told you

20   yesterday that it was scary that she had to meet with six

21   government representatives in a case like this over $4,000

22   check and she had to do it several times.  You should be

23   scared.  You should be scared.  You are the representatives

24   of the community.

25        MR. BOTELER:  Objection, on telling the jury they

1    should be scared.

2          THE COURT:  Approach for a second.  I think I'm going

3    to overrule you.

4          I'll overrule it.  I'll overrule it because of the --

5    some of the statements -- I'll give a warning -- that you

6    made when you said the, you know, things in life is of the

7    same kind.  It's the same kind of comparison.  Move forward.

8          MR. MAGNER:  Thank you.

9          That's what Jacobson told you.  You are the

10   representatives of the community here.  You are interposed

11   between a fellow citizen and a government that acts

12   arbitrarily, irrationally.  Go back to your civics class in

13   high school.  The states would not have passed the bill of

14   rights, the first ten amendments to the constitution

15   unless -- I mean, they wouldn't have passed the constitution,

16   they wouldn't have ratified it unless there was a bill of

17   rights.  That bill of rights, that first ten amendments, are

18   protections for you and for your fellow citizens against an

19   arbitrary unfair government.  And one of those rights in the

20   bill of rights is the right to a jury trial and that is to

21   protect you, your family, your friends, and a citizen such as

22   Ms. Trahan from an arbitrary government.

23         I asked Mr. Carrone about the taxpayer bill of rights

24   and the right to a fair and just tax system.  Do you think

25   that that man was fair to her?  Do you think he was fair to

1  her when he didn't even look at her expenses, just took what

2  the pilot told him to do?  No, that's not fair.

3      The first IRS witness, Ms. Kotsay, even she had to

4  acknowledge it took some pressing, it took some

5  cross-examination, that when Ms. Trahan set up these

6  installment payment plans with her that that was a sign of

7  good faith.  Do you remember that?  Do you remember how

8  difficult it was, you know, where I had to like draw that out

9  of her, that that was, in fact, a sign of good faith?  Those

10  were not objective, fair witnesses and you have a right and

11  have a right to expect better of your government.  And you

12  have the right to challenge what that government says as did

13  Ms. Trahan, as shown in the taxpayer bill of rights.

14      So I like Mr. Carrone, the IRS fellow who testified

15  yesterday, but I was shocked by what he said.  I was shocked

16  by the fact that he put blinders on and did not do a real

17  audit of Ms. Trahan.  That was shocking to me.  So what

18  didn't he look at?

19      He didn't look at the amount of the additional legal

20  expenses that she had, the reimbursements to paralegal,

21  Ms. Henderson, the reimbursement on that check from Mr. Hall.

22  He didn't even bother looking at anything and he wouldn't

23  have looked at anything if I hadn't force-fed it to the

24  government.  He didn't look at the fact -- he did an

25  arithmetic computation.  He didn't look at the fact that Ms.

1   Trahan would waive wedding fees from time to time for people

2   who got married before her.  He didn't look at the fact that

3   she would give bonuses to her staff and that when her fee

4   went up from $80 to $100 that that difference was then

5   distributed to the staff who had to, like, type up all of

6   these wedding licenses.

7        And counsel suggested to you that somehow was

8   available to her, she never had those statistics.  When the

9   issue arose what they had to do was go -- and find all the

10  marriage licenses, go through them, and count them.  And they

11  counted them.  They provided that to the Judiciary Commission

12  and then they went back and found additional records.  And

13  they provided that to the Judiciary Commission.  That was

14  what that letter was all about.  That's good faith.  That's

15  somebody who is trying to do the right thing and trying to

16  correct mistakes.

17        Mr. Carrone, the revenue agent, didn't even consider

18  the reimbursements that she had from her prior legal income,

19  didn't even think about the overhead that she incurred in her

20  law practice.  Ms. Henderson, Dee Henderson, who testified

21  yesterday said that after they paid all the expenses on a

22  case, the different lawyers would get half of the fee and the

23  rest went to overhead, to pay for the computers, and the file

24  cabinets and the rent.  Didn't even think about that.

25  Depreciation is something that is kind of technical, but you

1    don't need to worry about it because Mr. Carrone didn't even

2    think about it.  He didn't consider the bonuses that she paid

3    to her staff members and she -- and they ignored anything

4    that her friends and associates and chambers staff told them.

5    He didn't look at any of the memorandum interview.  That

6    should be shocking to you, that this is your government

7    representative doing that.  He knew and he acknowledged that

8    other information was out there, didn't want to look.  Had

9    those blinders on.  Was too quick on the draw to charge this

10   lady and then have to dismiss part of the case.

11        I said jokingly I thought initially to Mr. Carrone

12   that about ten days ago his tax loss figure was $42,000.

13   Then I provided some information, it went down to $37,000.

14   And then within the last day or two, it went down to $24,000.

15   I joked that if the trial kept going for a couple more days

16   that that may go down to 0.  I don't know that that's a joke

17   anymore, particularly in light of the fact that she's paid

18   $20,000 recently towards her tax debt.

19        But if you're focused merely on winning, okay, on

20   getting the scalp of a public official, if that's all your

21   focus is, you're not going to worry about the facts of the

22   case.

23        I asked Mr. Carrone when he did his computations, did

24   you do it on an official government form, like this

25   Form 4549, and he acknowledged that he did.  He acknowledged

1    that his reports, his earlier reports, I'm talking about two

2    weeks ago and a week ago, were all inaccurate.  Okay.

3          What should be goose for the -- what should be good

4    for the goose is good for the gander.  The government is

5    allowed to make mistakes, but she's not allowed to make

6    mistakes, one of your fellow citizens?  That's crazy.  That's

7    crazy and you should not put up with that.

8          He signed -- he signed his report.  Why isn't he

9    charged if that's what the standard is?

10          Now, again, you know, counsel suggested that, oh,

11   mama died and, oh, it was hard.  This was a woman who was

12   just under unbelievable stress and, yes, she did better, yes,

13   she tried to cope with it.  She learned some coping

14   mechanisms.  But look at these figures here that she suffers

15   from anxiety, nervousness, worry, and fear a lot, that she

16   has the feelings that are strange and unreal a lot.

17          Counsel brought up the fact that in addition to the

18   coping techniques that she learned from her therapist that

19   she was on medication and I messed it up.  I can't remember

20   now whether it was Paxil or Prozac, but it was an

21   anti-depressant, but it was the things she was doing to keep

22   soldiering on from day to day and doing her work.  And the

23   work never suffered.  Government acknowledges that.  She was

24   a good judge.  She was a good lawyer.  You know, she listened

25   to all of the people.  She would listen in small claims

**OFFICIAL TRANSCRIPT**

1    court, you know, just think of, you know, listening you all
2    have watched Judge Judy.  She's not Judge Judy.  She's Judge
3    Wapner, but you listen to these people going in there and
4    just yacking, you know, about whatever their perceived wrong
5    is, whatever their perceived dispute is.  She let everybody
6    have their big fat say and that must have been hard to do
7    when you're dealing with all your own personal problems, but
8    she did it.  She took care of her husband, Ken.  She took
9    care of her son Toussaint.  She took care of her daughter
10   Lillie.  She took care of everyone except herself.  And
11   that's why we're here, ladies and gentlemen.  The cobbler's
12   children.  I'm probably showing my age here, but it is
13   something that comes back to me from my childhood.  Something
14   my mother would have said.
15          Now, I don't want to hurt her feelings and I think
16   we've sort of alluded to this.  Ms. Trahan is disorganized
17   and scattered on her best day.  You heard from her office
18   manager, Dee Henderson.  They couldn't even find her desk,
19   you know, it was so covered with stuff.  You know people like
20   that.  Maybe you are a person like that and you need somebody
21   like a Dee Henderson who -- there she is, to keep you on
22   track to handle your bookkeeping and accounting and your
23   business.  You know, I'll confess to you, ladies and
24   gentlemen, I've never looked at my tax returns because I've
25   got one of those people, I've got a Dee to take care of that

1    stuff.  And, you know, not all of us do and when she lost Dee

2    she lost her -- the person who kept her on the rails.

3          You heard from -- you probably forgotten this.

4    There's a Ms. Dugas and my associate here called her

5    Ms. Dugas, kind of made me cringe, but Ms. Dugas talked about

6    getting married and there was some confusion whether it was

7    $80 or $100 in her interviews, but she told you she had

8    post-traumatic stress disorder and that that affected her

9    functioning.  Okay?  Again, what's good for the goose is good

10   for the gander.  The government's witness talked about how

11   stress affected her functioning.  Why isn't the same true of

12   Ms. Trahan here?

13         You heard from Krystal and Krystal told you, Krystal

14   is the accountant, that she would have to ask Teena for the

15   information for her taxes.  Didn't you have some mortgage

16   interest, you know, Teena that you had?  Go get me those

17   records.  Didn't you have additional expenses?  Didn't you

18   have, you know, reimbursements that you had to do?  There was

19   a going back and forth there, but Krystal was the one who she

20   depended on to make sure that these taxes were done right.

21   Okay?

22         And I like Ms. Ancar.  You probably liked her too.

23   She's a very nice lady, but what we saw is that she claimed

24   that these tax returns were e-filed and that she would do the

25   e-filing.  What happened for 2013 is that they never got

1  e-filed.  They never got filed.  I don't know if that is

2  Ms. Trahan's fault or if it is Ms. Ancar's fault, but it just

3  didn't happen.  It sort of sounds like from the way it

4  preceded it was probably the accountant's fault.  And that

5  happened.  And as soon as she learned about it and you'll see

6  in those transcripts of her conversations with the IRS as

7  soon as she heard about it and learned about it, she got

8  those tax returns filed.  Now, she didn't go back and figure

9  out whether it was accurate.

10      And I would ask every one of you, after you file your

11  taxes, do you ever go back and look at them again?  Do you

12  ever go back and think I wonder if I got Line 31 correct?

13  No, that doesn't happen.  We don't do that.  You know, you

14  get it done.  You get it out of the way and you move on with

15  your life.  And you move on with your life and she moved on

16  with her life with her mother being terminally ill with

17  having Alzheimer's and being completely oppositional, which

18  is a much nicer word than horsey.  I'm glad Ms. Shelton gave

19  me that word.  It's like trying to drag a toddler across

20  eight lanes of traffic, okay, a toddler whom she loved very

21  much, okay?  But it was so difficult.  She had to take her to

22  dialysis three times a week.  She had to go make sure she

23  took her medicine.  She would call and her mother wouldn't

24  answer the phone, so she would send -- I think she would send

25  Krystal, her tax preparer, "Please go check on Mom and make

1    sure she's alive because I'm afraid that she's dead.  Please

2    go do that."  This is with what is occupying her mind and

3    it's not Line 31 on her tax return.

4          There are organized people and there are disorganized

5    people.  This is an indication of a disorganized person who

6    needs people to help her with her administrative, her

7    business affairs.  Mr. Boteler said, "Well, all these numbers

8    are accurate."  How do we know that?  They don't know that.

9    They've never audited her.  They've never given her an

10   opportunity to be heard by the IRS.  Her first opportunity to

11   be heard is now in a criminal trial.  That's not right.

12   That's not fair.

13         This is an important document and we didn't really

14   hammer on it.  So this is the typed-up financial disclosure

15   form that Ms. Trahan gave to Krystal Ancar to type up.  This

16   is the only one that was typed up.  And what's really

17   interesting about this is that the information here is that

18   she accurately disclosed to Krystal how much money she made

19   from her legal fee income that she received during the year,

20   her first year on the bench, from her prior work.  That's

21   right on spot accurate, $25,000 to $100,000.  Why would you

22   disclose that to your tax preparer and then not include it on

23   your taxes?

24         Again, I'm not throwing any stones at Krystal, but

25   she provided the correct information to the same woman who

1   prepared the tax return then that never got filed until

2   Krystal's computer crashed.  Again, certainly, not her fault

3   and they discovered that the returns had not been filed.

4   Okay?

5        That's not her fault.  You can't blame her for that.

6   The government should not be prosecuting somebody for that.

7   That's crazy.

8        You will hear from the judge that character evidence

9   is absolutely appropriate evidence and that you should

10  consider such character evidence, along with all other

11  evidence in the case, and that evidence of a defendant's

12  character inconsistent with those traits of a character

13  ordinarily involved in the commission of a crime may give

14  rise to reasonable doubt since you may think it's improbable

15  that a person of good character with respect to those traits

16  would commit such a crime.  All these people, Ms. Hibbs, the

17  court reporter; Tamara "Tammy" Major, who was called by the

18  government; Krystal Ancar, the tax preparer; Tammy Jacobson,

19  who had to meet with these folks multiple times; Michael

20  Hall, the gentlemen who came in -- the lawyer that came in

21  yesterday, and then Ms. Dee, they all said that this woman's

22  character was of the highest nature, that she had a

23  reputation in the community for truthfulness, for integrity,

24  and for honesty.

25        What do those little asterisks mean?  Those asterisks

1   mean that these were government witnesses, that the

2   government's own witnesses attested to her character and they

3   talked about this being her reputation in the community, but

4   also their dealings with her.  Listen to what the judge tells

5   you about how evidence of good character can be reasonable

6   doubt.  Any one of these, if you really thought that, you

7   know, Dee Henderson was a compelling, strong, honest witness,

8   any one of these witnesses testimony about her character,

9   could be your reasonable doubt.  You may like Lisa.  You may

10  have liked Tammy.  You may have liked Tammy Jacobson, Tamara

11  Jacobson.  Each one of you could have your own reasonable

12  doubt, and if you do and I suggest that you must, that can be

13  the basis for your not guilty verdict in this case.

14          I've never -- I've done this for a long time and I've

15  never seen -- I don't know if I've never seen a government

16  testimony -- talk about the high character of a defendant, of

17  an accused person in a criminal case.  And I've certainly

18  never heard five or six of them.  And remember too, Dee

19  Henderson, she was going to be a government witness but they

20  opted not to call her.

21          Now, let's talk a little bit about her good faith.

22  You heard from the first IRS lady, Ms. Kotsay.  I had to draw

23  it out of her, but she said, yeah, I guess getting on

24  installment plans with the IRS to pay your taxes, yeah, that

25  would be a sign of good faith.  You can look here at all of

**OFFICIAL TRANSCRIPT**

1    her calls with the IRS and she's just trying to get her

2    affairs straight.  That's all she's doing.  That's what it's

3    all about.  You'll have this, if you'd like to take a look at

4    it.  The account transcripts also talk about her being on

5    these installment plans and paying $500 a month, $450 a

6    month.  Again, that's further evidence of good faith.

7         What's the best evidence of her good faith?  Is that

8    before the IRS ever came knocking on her door, she filed

9    amended returns.  She came up with figures that was -- that

10   were even higher than the government's figures.  And she

11   declared more income than they said she should have.  Is that

12   good faith?  Yes, of course, that's good faith.

13        These are the account transcripts you can look at and

14   you'll see here all the payments she made on her installment

15   plans.  Was she perfect?  No.  But perfection is certainly

16   not the measure here.

17        I don't know that there are too many judges who after

18   they took the bench would make sure that their paralegal got

19   paid for work done before they took the bench.  But here's

20   Teena Trahan paying Dee Henderson $9,500, absolutely

21   legitimate business expense, after she's been on the bench 9

22   months and 20 days.  That's good faith.

23        Could you blow up the top half of that, Aaron,

24   please.

25        I think this is the best example of good faith.  She

**OFFICIAL TRANSCRIPT**

1   is telling the IRS that she made a mistake, and that she is

2   fixing it, she's declaring more income and agreeing to pay

3   more tax.  That's good faith.

4        Krystal Ancar, the accountant, the tax preparer, who

5   probably is the absolute closest person, she knows more about

6   Teena Trahan and her taxes than anybody in the world,

7   certainly anybody in this courtroom.  Okay.  She testified.

8   I think this is key.  You know, she could have been

9   embarrassed about, you know, not getting that tax return

10  filed, you know, for messing that up, for her computer

11  crashing, but she told you that Teena never asked her to

12  fudge, never asked her to pump up her deductions.  Instead,

13  what she did was she asked Teena how many weddings did you do

14  away from the courthouse and she, like, plotted on MapQuest

15  the number of miles, you know, for each of those trips and

16  put that on her return.  That was the relationship that they

17  had was one of mutual trust.  Nobody knows her better in

18  terms of her taxes than Krystal Ancar and that was what her

19  testimony was.

20       This is what I was telling you just a moment ago on

21  her amended returns.  The taxes that she declared or the fees

22  that she declared were higher than the government's.  That's

23  good faith.  That's reasonable doubt.

24       Ladies and gentlemen, you are the protectors of this

25  woman's rights.  First thing I told you was that she

1    acknowledged her mistakes.  She's going to pay her taxes.

2    She has paid her taxes.  She will continue to pay her taxes.

3    We don't convict people of felony crimes for that.  We just

4    don't.  We don't do that to our fellow citizens.  We

5    particularly don't do it when they're under the utmost stress

6    that they've ever experienced in their lives.  You don't do

7    that when they're raising their children to go on to college

8    and grad school when they're taking care of their husband,

9    when they're taking care of all of their family obligations.

10           THE CASE MANAGER:  One minute.

11           MR. MAGNER:  Thank you.

12           We just don't do that to our fellow citizens

13   certainly not on the scant unreliable evidence that we had in

14   this case.  We just don't do it.  That's not our way.  That's

15   not what our constitution provides.  That would be wrong.

16   That would be unjust and certainly violate the Taxpayer Bill

17   of Rights.  But it offends our conscience.  It shocks us when

18   a revenue agent gets up here and says, "Yeah, I didn't look

19   at all that stuff because the pilot told me not to."  That's

20   wrong.

21           You're the representatives of our community.  You're

22   the bulwark that has been erected to protect this citizen

23   from an arbitrary, unfair, unsubstantiated federal

24   government.  That's why you're here.  That's why the bill of

25   rights provides that a person, a citizen accused of a crime,

**OFFICIAL TRANSCRIPT**

1   is entitled to a trial, a speedy and public trial by a jury

2   of her peers, and that's you.

3        And this is going to be the last time I get to speak

4   with you.  You may be thanking yourselves for that.  We're

5   almost through.  But this is the most important day in this

6   woman's life and her life hangs in the balance and depends on

7   you being fair and following the law that the judge gives

8   you.  You're supposed to use your common sense and not be

9   bowed or cowed by the fact that the government has spent at

10  least tens of thousands or hundreds of thousands of dollars

11  to collect a tax debt of $25,000.  You're the protection

12  against that government because that government you don't

13  know what's going to happen next.  There's no good reason to

14  find this good, kind, Christian woman guilty of anything.

15       I thank you for your time, your courtesy, and I ask

16  you to return the only just verdict in this case and that is

17  not guilty of these counts.  Thank you, ladies and gentlemen.

18       THE COURT:  All right.  Government save time for

19  rebuttal?

20       THE CASE MANAGER:  You have 13 minutes.

21       MR. BOTELER:  Can you give me a five-minute --

22       THE CASE MANAGER:  Uh-huh.

23       MR. BOTELER:  When I started my closing, I mentioned

24  something to you.  What is the heart of this case?  And I

25  said it is willfulness and that is the heart of the case.  We

1   are not trying to hide from the willfulness.  It is.  If it

2   is a mistake and you find that it is a mistake, you find the

3   defendant not guilty.  If you find that it's willful and you

4   find the other elements and you find beyond a reasonable

5   doubt, then you find her guilty.

6        We are not hiding from that.  We understand the

7   burden.  You're right.  You saw that Count 1 was dismissed.

8   You saw the handwritten note that the government received

9   slightly before trial that was in Ancar's handwriting.  We

10  take that responsibility.

11       Now, you've heard evidence.  You heard a lot of

12  statements and we don't -- we're not arguing whether or not

13  Judge Trahan is a good person or she's a good judge.  The

14  question is whether she filed a false tax return, whether she

15  willfully filed a false tax return.  And this is not a case

16  where we're trying to be arbitrary and unfair.  You saw the

17  evidence.  You saw the evidence that each one of those tax

18  returns are false.  The 2016, '15, and '14 are false.  They

19  do underreport the wedding fees.  So it's not a case where

20  there isn't a reason.  It's because they are false.  And not

21  just that they're false, you also see evidence, evidence to

22  show that Judge Trahan knew they were false and willfully

23  gave a wrong number.  That shows intent.  It shows beyond a

24  reasonable doubt that she knew that when she provided those

25  numbers over there, they were wrong.  The numbers kept going

1    up.  More weddings and more fees being charged.  In 2016, it

2    wasn't 15,000 that she reported.  It was a lot more.

3         But to talk about the return briefly, if we go to

4    Exhibit 17 on page 31, you've heard a lot of discussion about

5    expenses.  And if we go to the return, you'll see part one is

6    these gross receipts, this is on the 2016 return.  It says

7    $15,200.  When you get your instruction from the judge, on

8    count -- we have five elements we have to prove.  And the

9    second element is that in the return the defendant falsely

10   underreported her gross receipts.  That number.  Number one.

11   And that was falsely reported.  It wasn't $15,200.  It was

12   well over $40,000.

13        And, yes, you heard a lot about expenses and you'll

14   see some here in part two.  Those expenses were assumed to be

15   correct.  They were assumed that Judge Trahan didn't lie on

16   those numbers.  But we can show you and prove that those

17   gross receipts are wrong.  They went up each year and she

18   collected more money.  And this number is what you're looking

19   at to see whether or not the return is false.  And we're not

20   looking at 2013.  We're looking at '14, '15, and '16.

21        Now, as I mentioned in the first part of my closing,

22   the IRS did work with Judge Trahan.  They did.  You saw that

23   history.  And Mr. Magner pointed it out to you before, again,

24   but during that time where she was -- the IRS was working

25   with her she was not being truthful to the IRS.  These is a

1   time when each of these returns, '14, '15, and '16 were

2   false.  And it maybe started out like a little bit of money

3   but it adds up.  It does add up.  $25,000 is not necessarily

4   a small sum of money.  It can have a big impact.

5        And we've heard a lot about Judge Trahan as I

6   mentioned about seasons of life, and I wanted to stress

7   seasons of life because there are different times.  It isn't

8   one long pattern from 2013 to 2017 that Judge Trahan wasn't

9   capable to focus on her taxes.  Yes, we understand her mother

10  was sick and she took care of her.  We saw Ms. Shelton.  We

11  saw the testimony.  But there were times when that wasn't

12  going on, that wasn't something that was overwhelming here.

13  That's why dates do matter.

14       On the timeline, you see the November 17th -- '17

15  date when the tax return was filed in 2016.  That happened

16  months, months after some of Judge Trahan's difficult times.

17  It happened after she had met with Ms. Shelton, got the tools

18  to deal with anxiety.  And it happened after a lot of the

19  stresses that she had and the time demands had ended.  Judge

20  Trahan was very capable.

21       You heard the evidence about her running her

22  courtroom.  You heard the evidence about her holding court

23  here in evidence.  She was capable at that time.  And when

24  she went and filed that tax return, when she gave that number

25  of 15,000, she knew that number was wrong.  She knew she

1   charged more after same sex and she knew she did more.

2        And as I mentioned earlier in my opening, there is an

3   important date, there is one of July 12, 2018.  That was the

4   date the Judiciary Commission sent an inquiry.  Mr. Magner

5   highlights, well, Judge Trahan filed amended returns.  Well,

6   she did that only after that inquiry, only after the focus

7   was on her and she got caught.  Yes, maybe it wasn't the IRS

8   who focused on it at that stage, but someone was focusing on

9   it.  Somebody was looking at it.  Somebody was looking at it.

10  And you saw the numbers from Devin George.  You knew -- she

11  knew what she put on there was wrong and she knew it before

12  July 12th and she knew it after.

13       And as the judge is about to instruct you, you are

14  the ones who are the finders of fact.  You sat here.  You

15  heard the evidence.  And you heard both parties' argument and

16  it is for you to decide and I -- the government argues that

17  you've seen the evidence and that Judge Trahan on her 2014,

18  '15, and '16 tax return filed false tax return, that

19  underreported her gross receipts on weddings and that was

20  intentional, that was willful.  It was not a mistake and the

21  evidence showed beyond a reasonable doubt it was that.  You

22  look at the weddings go up and she kept -- and then she

23  charged more and there were periods of time, especially in

24  2016, that was beyond the time when that season of life was

25  difficult.

1        THE CASE MANAGER:  Counsel.

2        MR. BOTELER:  Thank you.  So the United States asks

3   that you find the defendant guilty of Counts 2, 3, and 4.

4   Thank you.

5        MR. MAGNER:  Your Honor, may we take a short break?

6        THE COURT:  Okay.  Quick 10-minute break.  Let's make

7   it quick.

8        MR. MAGNER:  Yes, ma'am.

9        THE COURT:  Instructions are kind of long.

10        THE CASE MANAGER:  All rise.

11        (Whereupon, the jury exits the courtroom.)

12                    (Recess taken.)

13                    (In open court.)

14        THE COURT:  All right.  Is everyone here?  We're

15   ready to bring in the jury?

16        Let's bring in the jury.

17        (Whereupon, the jury enters the courtroom.)

18        THE COURT:  You may all have a seat.

19        Ladies and gentlemen of the jury, I will now instruct

20   you on the law.  In any jury trial, there are in effect two

21   judges.  I'm one of the judges.  The other is the jury.  It

22   is my duty to preside over the trial and to decide what

23   evidence is proper for your consideration.  It is also my

24   duty at the end of the trial to explain to you the rules of

25   law that you must follow and apply in arriving at your

1   verdict.

2        First, I will give you some general instructions

3   which apply in every case, for example, instructions about

4   the burden of proof and how to judge the believability of

5   witnesses.  Then I will give you some specific rules of law

6   about this particular case.  And, finally, I will explain to

7   you the procedures you should follow in your deliberations.

8        You, as jurors, are judges of the facts, but in

9   determining what actually happened -- that is, in reaching

10  your decision as to the facts -- it is your sworn duty to

11  follow all of the rules of law as I explain them to you.  You

12  have no right to disregard or give special attention to any

13  one instruction or to question the wisdom or correctness of

14  any rule I may state to you.  You must not substitute or

15  follow your own notion or opinion as to what the law is or

16  ought to be.  It is your duty to apply the law as I explain

17  it to you, regardless of the consequences.

18        It is also your duty to base your verdict solely upon

19  the evidence without prejudice or sympathy.  That was the

20  promise you made and the oath you took before being accepted

21  by the parties as jurors and they have a right to expect

22  nothing less.

23        The superseding indictment or formal charge against a

24  defendant is not evidence of guilt.  Indeed, the defendant is

25  presumed by law to be innocent.  The defendant begins with a

1   clean slate.  The law does not require a defendant to prove

2   her innocence or produce any evidence at all and no inference

3   whatever may be drawn from the election of a defendant not to

4   testify.

5        The government has the burden of proving the

6   defendant guilty beyond a reasonable doubt, and if it fails

7   to do so, you must acquit the defendant.  While the

8   government's burden of proof is a strict and heavy burden, it

9   is not necessary that the defendant's guilt be proven beyond

10   all possible doubt.  It is only required that the

11   government's proof exclude any reasonable doubt concerning

12   the defendant's guilt.

13        A reasonable doubt is a doubt based upon reason and

14   common sense after careful and impartial consideration of all

15   of the evidence in the case.  Proof beyond a reasonable

16   doubt, therefore, is proof of such a convincing character

17   that you would be willing to rely and act upon it without

18   hesitation in making the most important decisions of your own

19   affairs.

20        As I told you earlier, it is your duty to determine

21   the facts.  To do so, you must consider only the evidence

22   presented during the trial.  Evidence is the sworn testimony

23   of the witnesses, including stipulations and the exhibits.

24   The questions, statements, objections, and arguments made by

25   the lawyers are not evidence.

1          The function of the lawyers is to point out those

2     things that are most significant or more helpful to their

3     side of the case, and in so doing to call your attention to

4     certain facts or inferences that might otherwise escape your

5     notice.  In the final analysis, however, it is your own

6     recollection and interpretation of the evidence that controls

7     in the case.  What the lawyers say is not binding upon you.

8          During the trial, I sustained objections to certain

9     questions and exhibits.  You must disregard those questions

10    and any exhibits entirely.  Do not speculate as to what the

11    witness would have said if permitted to answer the question

12    or as to contents of an exhibit.  Also, certain testimony or

13    other evidence has been ordered removed from the record and

14    you have been instructed to disregard this evidence.  Do not

15    consider any testimony or other evidence which has been

16    removed from your consideration in reaching your decision.

17    Your verdict must be based solely on the legally admissible

18    evidence and testimony.

19         Also, do not assume anything I may have done or said

20    during the trial -- that I have any opinion concerning any of

21    the issues in this case.  Except for the instructions to you

22    on the law, you should disregard anything I may have said

23    during the trial in arriving at your own verdict.

24         In considering the evidence, you are permitted to

25    draw such reasonable inferences from the testimony and

1   exhibits as you feel are justified in light of common

2   experience.  In other words, you may make deductions and

3   reach conclusions that reason and common sense lead you to

4   draw from the facts which have been established by the

5   evidence.

6        Do not be concerned about whether evidence is direct

7   evidence or circumstantial evidence.  You should consider and

8   weigh all of the evidence that was presented to you.

9        Direct evidence is the testimony of one who asserts

10   actual knowledge of a fact such as an eyewitness.

11   Circumstantial evidence is proof of a chain of events and

12   circumstances indicating that something is or is not a fact.

13        The law makes no distinction between the weight to be

14   given either direct or circumstantial evidence.  But the law

15   requires that you after weighing all of the evidence whether

16   direct or circumstantial be convinced of the guilt of the

17   defendant beyond a reasonable doubt before you can find her

18   guilty.

19        I remind you that it is your job to decide whether

20   the government has proven the guilt of the defendant beyond a

21   reasonable doubt.  In doing so, you must consider all of the

22   evidence.  This does that mean, however, that you must accept

23   all of the evidence as true or accurate.

24        You are the sole judges of the credibility or

25   believability of each witness and the weight to be given to

**OFFICIAL TRANSCRIPT**

1    the witness's testimony.  An important part of your job will
2    be making judgments about the testimony of the witnesses who
3    testified in this case.  You should decide whether you
4    believe all, some part, or none of what each person has to
5    say and how important that testimony was.  In making that
6    decision, I suggest that you ask yourself a few questions:
7    Did the witness impress you as honest?  Did the witness have
8    any particular reason not to tell the truth?  Did the witness
9    have a personal interest in the outcome of the case?  Did the
10   witness have any relationship with either the government or
11   the defense?  Did the witness seem to have a good memory?
12   Did the witness clearly see or hear the things about which he
13   or she testified?  Did the witness have the opportunity and
14   ability to understand the questions clearly and answer them
15   directly?  Did the witness' testimony differ from the
16   testimony of other witnesses?  These are a few of the
17   considerations that will help you determine the accuracy of
18   what each witness said.
19          Your job is to think about the testimony of each
20   witness you have heard and decide how much you believe of
21   what each witness had to say.  In making up your mind in
22   reaching a verdict, do not make any decisions simply because
23   there were more witnesses on one side than on the other.  Do
24   not reach a conclusion on a particular point just because
25   there were more witnesses testifying for one side on that

1   point.  You will always -- you will always bear in mind that

2   the law never imposes upon a defendant in a criminal case the

3   burden or duty of calling any witnesses or producing any

4   evidence.

5        Where a defendant has offered evidence of good

6   general reputation for truth and veracity, honest, and

7   integrity or character as a law-abiding citizen, you should

8   consider such evidence along with all the other evidence in

9   the case.

10       Evidence of a defendant's character inconsistent with

11  those traits of character ordinarily involved in the

12  commission of the crime charged may give rise to a reasonable

13  doubt, since you may think it improbable that a person of

14  good character with respect to those traits would commit such

15  a crime.

16       During the trial, you heard the testimony of Corrine

17  Shelton, who expressed opinions concerning the defendant's

18  mental health history and diagnosis.  If scientific,

19  technical, or other specialized knowledge might assist the

20  jury in understanding the evidence or in determining a fact

21  in issue, a witness qualified by knowledge, skill,

22  experience, training, or education may testify and state an

23  opinion concerning such matters.

24       Merely because such a witness has expressed an

25  opinion does not mean, however, that you must accept this

1    opinion.  You should judge such testimony like any other

2    testimony.  You may accept it or reject it and give it as

3    much weight as you think it deserves considering the

4    witness's education and experience, the soundness of the

5    reason given for the opinion, and all the evidence in the

6    case.

7         You will note that the superseding indictment charges

8    the -- that the offenses were committed on or about a

9    specified date.  The government does not have to prove that

10   the crime was committed on that exact date so long as the

11   government proves beyond a reasonable doubt that the

12   defendant committed the crime on a date reasonably near the

13   dates stated in the superseding indictment.

14        You are here to decide whether the government has

15   proved beyond a reasonable doubt that the defendant is guilty

16   of willfully falsely reporting the gross receipts collected

17   for performing marriage ceremonies and income from the

18   practice of law.  The defendant is not on trial for any act,

19   conduct, or offense not alleged in the superseding

20   indictment; neither are you called upon to return a verdict

21   as to the guilt of any other person or persons not on trial

22   as a defendant in this case except as you are otherwise

23   instructed.

24        If the defendant is found guilty, it will be my duty

25   to decide what the punishment will be.  You should not be

1    concerned with punishment in any way.  It should not enter

2    your consideration or discussion.

3         A separate crime is charged in each count of the

4    superseding indictment.  Each count and the evidence

5    pertaining to it should be considered separately.  The fact

6    that you may find the defendant guilty or not guilty as to

7    one of the crimes charged should not control your verdict as

8    to the others.  Remember, on day two of trial, the government

9    dismissed Count 1 of the superseding indictment relating to

10   tax year 2013.

11        Certain charts and summaries of other records have

12   been received into evidence.  They should be considered like

13   any other evidence in the case.  You should give them only

14   such weight as you think they deserve.  The charts and

15   summaries include inferences or conclusions drawn from the

16   records underlying them.  It is up to you to determine if

17   these inferences or conclusions are accurate.  The underlying

18   records are the best evidence of what occurred.

19        Summary testimony by David Carrone and Scott Sigl and

20   charts or summaries prepared or relied upon by the witnesses

21   have been received into evidence for the purpose of

22   explaining facts disclosed by testimony and exhibits, which

23   are also in evidence in this case.  If you find that such

24   summary testimony and charts correctly reflect the other

25   evidence in the case, you may rely upon them.  But if and to

1   the extent that you find they are not in truth summaries of

2   the evidence in the case, you are to disregard them.  The

3   best evidence of what occurred are the underlying records

4   themselves.

5       I will now charge you as to each count of the

6   superseding indictment and elements charged in each count.

7   For your deliberations, you will be given a copy of the

8   superseding indictment along with these instructions.

9   Remember that the government dismissed Count 1 on day two of

10   trial and so it is stricken from the superseding indictment.

11       Counts 2 through 4 of the superseding indictment

12   charge the defendant with filing false tax returns for the

13   calendar years 2014 through 2016, in violation of Title 26,

14   USC Section 7206(1).  Count 2 charges that the defendant

15   filed a false 2014 tax return by failing to disclose gross

16   receipts from legal fees and underreporting her gross

17   receipts from officiating weddings.

18       Count 3 charges that the defendant filed a false 2015

19   tax return by underreporting her gross receipts from legal

20   fees and from officiating weddings.

21       Count 4 charges that the defendant filed a false 2016

22   tax return by underreporting her gross receipts from

23   officiating weddings.

24       Title 26, United States Code, Section 7206(1), makes

25   it a crime for anyone willfully to make a false material

1    statement on an income tax return.

2         As to each count, for you to find the defendant

3    guilty of this crime, you must be convinced that the

4    government has proved each of the following beyond a

5    reasonable doubt:  First, that the defendant signed or

6    authorized the signing of an income tax return that contained

7    a written declaration, that it was made under penalties of

8    perjury.  Second, that in the return, the defendant falsely

9    underreported her gross receipts.  Third, that the defendant

10   knew the statement was false.  Fourth, that the false

11   statement was material.  And, fifth, that the government made

12   the statement willfully -- that is, with intent to violate a

13   known legal duty.

14        A statement is material if it has a natural tendency

15   to influence or is capable of influencing the Internal

16   Revenue Service in investigating or auditing a tax return or

17   in verifying or monitoring the reporting of income by a tax

18   preparer.

19        MR. MAGNER:  Excuse me, Judge.  I'm sorry to

20   interrupt.  The fifth element I believe you said that the

21   government made a statement willfully and it should be --

22        THE COURT:  Oh, I'm sorry.  I'm sorry.  You see it up

23   there.  Thank you for correcting it.

24        That the defendant made the statement willfully --

25   that is, with intent to violate a known legal duty.  That was

1    one of the elements.

2           Would you like me to repeat all of them?

3           MR. MAGNER:  No, ma'am.

4           THE COURT:  And you can see it on there.  I

5    apologize.  I have a lot to read there.

6           A statement is material -- I'm going to pick up from

7    there -- if it is a -- if it has a natural tendency to

8    influence or is capable of influencing the Internal Revenue

9    Service in investigating or auditing a tax return or in

10   verifying or monitoring the reporting of income by a taxpayer

11   and an electronic signature has the same effect as an actual

12   signature for this offense.

13          The word "knowingly" as that term has been used from

14   time to time in these instructions means that the act was

15   done voluntarily and intentionally not because of mistake or

16   accident.

17          The word willfully means the voluntary, intentional

18   violation of a known legal duty.  To prove that a defendant

19   acted willfully, the government must prove that the law

20   imposed a duty on the defendant, that the defendant knew of

21   this duty, and that she voluntarily and intentionally

22   violated that duty.  If the government proves actual

23   knowledge of the pertinent legal duty, then the government

24   has satisfied the natural component of the willfulness

25   component.  A person's conduct is not willful if she acted

**OFFICIAL TRANSCRIPT**

1    through negligence, even gross negligence, inadvertence, or

2    justifiable excuse or mistake or due to her good faith

3    misunderstanding of the requirements of the law.

4         To carry its burden of establishing that a defendant

5    acted willfully, the government must prove the absence of

6    good faith.  In other words, the government must prove beyond

7    a reasonable doubt that the defendant was not acting with the

8    good faith belief that she was acting lawfully.  A person who

9    believes in good faith that her actions comply with the law

10   does not act willfully, even if her belief that she is

11   complying with the law is irrational or unreasonable.

12        To reach a verdict, whether it is guilty or not

13   guilty, all of you must agree.  Your verdict must be

14   unanimous on each count of the superseding indictment.  It is

15   your duty to consult with one another and to deliberate in an

16   effort to reach agreement if you can do so.  Each of you must

17   decide the case for yourself, but only after an impartial

18   consideration of the evidence with your fellow jurors.  Do

19   not let any bias, sympathy, or prejudice that you may feel

20   towards one side or the other influence your decision in any

21   way.  In particular, do not let racial, ethnic, national

22   origin, or other biases influence your decision in any way.

23        During your deliberations, do not hesitate to

24   re-examine your own opinions and change your mind if

25   convinced that you are wrong, but do not give up your honest

1   beliefs as to the weight or effect of the evidence solely

2   because of the opinion of your fellow jurors or for the mere

3   purpose of returning a verdict.

4        Remember at all times you are judges, judges of the

5   facts.  Your duty is to decide whether the government has

6   proved the defendant guilty beyond a reasonable doubt.

7        When you go to the jury room, the first thing you

8   should do is select one of your number as foreperson who will

9   help to guide your deliberations and will speak for you here

10  in the courtroom.

11       A verdict form has been prepared for your

12  convenience.

13       Here it is.

14       All right.  The verdict form says Count 1:  As to

15  charges set forth in Count 2 -- I'm sorry Count 2, not

16  Count 1 -- as to charges set forth in Count 2 of the

17  superseding indictment in this matter, we, the jury

18  unanimously find that the defendant, Ernestine

19  Anderson-Trahan, is either -- you check either not guilty or

20  guilty.

21       Count 3, as to the charges set forth in Count 3 of

22  the superseding indictment in this matter, we, the jury,

23  unanimously find the defendant, Ernestine Anderson-Trahan,

24  either not guilty or guilty.  Count 4, as to the charges set

25  forth in Count 4 of the superseding indictment in this matter

1    we, the jury, unanimously find the defendant, Ernestine

2    Anderson-Trahan, either not guilty or guilty.  New Orleans,

3    Louisiana.  You put a date and the foreperson signs it.

4         The foreperson will check the unanimous answer of the

5    jury in the space provided for each count of the superseding

6    indictment, either not guilty or guilty.  At the conclusion

7    of your deliberations, the foreperson should date and sign

8    the verdict.  If you need to communicate with me during your

9    deliberations, the foreperson should write the message and

10   give it to the court security officer.  I will either reply

11   in writing or bring you back here in the courtroom to answer

12   your message.

13        Bear in mind that you are never to reveal to any

14   person, not even the court, how the jury stands numerically

15   or otherwise on any count of the superseding indictment until

16   after you have reached a unanimous verdict.

17        So that means, you know, if you send a note and you

18   have a question, don't put in the question how people are,

19   you know -- how they are leaning or anything like that.

20   That's what that means.

21        I am now going to let you retire to the jury room to

22   deliberate.  We're sending back with you a copy of the jury

23   instructions, the verdict form that the -- who you select as

24   your foreman should fill out, and a copy of the superseding

25   indictment.  And all -- y'all have agreed all exhibits can go

1   back?

2        MR. MAGNER:  That's fine, Your Honor.

3        MR. FLANAGAN:  Yes, Your Honor.

4        THE COURT:  All exhibits.  And you will have all the

5   exhibits to look at it.  You can break -- you can take a

6   break for lunch.  They'll get your lunch orders and put them

7   in and work and deliberate as long as you need.  Okay?

8        All right.  Thank you.  And with that, you can retire

9   to jury room to deliberate.

10        THE CASE MANAGER:  All rise.

11     (Whereupon, the jury exits the courtroom to begin

12                    deliberations.)

13        MR. MAGNER:  Judge, may we approach?

14        THE COURT:  Uh-huh.

15        WHEREUPON, the following proceedings were held at the

16   bench:

17        MR. MAGNER:  You have to dismiss the alternate.

18             (Discussion off the record.)

19        THE COURT:  I'll put that on the record then.

20        The issue is the court did not dismiss the alternate,

21   but I want to make sure that the alternate is not

22   deliberating, so we're going to bring the alternate back.

23   He's not relieved from jury service in case something happens

24   while they're deliberating.

25        MR. MAGNER:  You may want to tell him not to discuss

**OFFICIAL TRANSCRIPT**

1    the case.

2         THE COURT:  Sure.  We'll bring him back in here.  Him

3    or her.  As many times as you do this you just -- I missed my

4    calling as an actress.

5         (Whereupon, the alternate juror approaches.)

6         Hello, you're our alternate juror.  Okay.  So

7    although you're not to deliberate with the jury, you're

8    still -- your service is still required.  Don't discuss the

9    case with anyone.  So if something should happen, you know,

10   before they finish their deliberations, you would be called

11   into -- they would start deliberating all over with you.

12        So you want to get his phone number?  You have his

13   phone number?

14        THE CASE MANAGER:  I have it.

15        THE COURT:  So we may call you back, but what's most

16   important is please don't discuss anything you know about the

17   case and stay away from people who want to discuss it with

18   you and hopefully we won't need to call you back, but answer

19   your phone if it calls.  We appreciate it.  And we'll start

20   all over again.  Thank you so much for your service.  I think

21   he does get a jury certificate.

22        If you all can make sure that Ms. White has your, you

23   know, numbers, they do often, I don't know if it's just me,

24   but we get questions so we want to be able bring them in here

25   quickly.  I'll remain in chambers, but I'll get it but I

1   won't do anything until I've spoken to both sides and we'll

2   talk about how to address the question and then, you know,

3   we'll write it down and put it in the record.

4                    (Recess taken.)

5

6                    (In open court.)

7                    JURY QUESTION NO. 1

8        THE COURT:  There's a question from the jury.  You

9   can have a seat.  I'm going to read it to you, tell you

10  what I plan to -- our plan and we can work on it.

11       Okay.  So the question is from the jury:  At what

12  time was the defendant made aware, parentheses, by any party,

13  closed parentheses, that there were errors on 1040s from

14  2014, '15, '16, and she was facing the potential of criminal

15  liability?

16       So I think -- don't want to propose a response, but

17  the court cannot comment on the evidence.  As you were

18  instructed, you are to rely on your own recollection of the

19  facts.  That instruction goes further to say that, you know,

20  if you -- can you get the instructions?

21       The instructions says further that, you know, if you

22  took notes, and your recollection differs from your notes,

23  you are to rely on your recollection or if someone else is

24  taking notes, you can't rely on their notes if it differs

25  from your own recollection.  So I would just repeat that

1    instruction, but he's going to get the instructions for me.

2         And if you just give me a minute, I'll write it

3    exactly.  Does anybody have any --

4         MR. BOTELER:  No objection, Your Honor.

5         MR. MAGNER:  May we look at the note?

6         THE COURT:  Sure.  Absolutely.  It will be placed in

7    the record so you can both look.  Let me make sure there's

8    no -- it does have the -- I guess the form, but I'm going to

9    write the answer on it.

10        MR. MAGNER:  What's the last name?

11        THE COURT:  Don't tell it to him.  I don't think you

12   should know at this point.

13        Okay.  Maybe the best thing to do is, it was actually

14   in the preliminary instructions.  I'll read them out loud to

15   you because I don't want to summarize them inaccurately.

16   What I'm thinking is maybe I'll just -- I'll just give them

17   the pages of the preliminary -- so I don't have to sit here

18   and write it.  Okay.  So I'll tell you what the preliminary

19   injunction is.

20        If you'd like to take notes during the trial, you may

21   do so.  On the other hand, you are not required to take notes

22   if you prepare -- if you prefer not to do so.  Each of you

23   should make your own decision about this.  If you do take

24   notes, leave them in the jury room when you leave for lunch

25   and at night and remember that they are for your own personal

1  use.  They are not to be given to or read by anyone else.  If

2  you do decide to take notes, be careful not to get so

3  involved in note-taking that you become distracted from the

4  ongoing proceedings.  Your notes should be used only as

5  memory aids.  You should not give your notes precedence over

6  your independent recollection of the evidence.  If you do not

7  take notes, you should rely upon your own independent

8  recollection of the proceedings and you should not be unduly

9  influenced by the notes of other jurors.  Notes are not

10  entitled to any greater weight than the memory or impression

11  of each juror as to what the testimony may have been.

12  Whether you take notes or not, each of you must form and

13  express your own opinion as to the facts of this case.

14       So I would just start it with the court cannot

15  comment on the evidence.  However, the court reminds the jury

16  of -- of its instructions to you -- of its preliminary

17  instructions to you, which stated, colon, and then I would

18  just attach that part of it.  I mean, they've heard this.

19  But, again, just to be -- and I'll read the whole thing into

20  the record and tell me if you have a problem.

21       MR. MAGNER:  Judge, can I comment first?

22       THE COURT:  Yes.

23       MR. MAGNER:  The question really does not relate at

24  all to notes, you know, that they took at all.  And it seems

25  that maybe it steers them towards the issue of notes when

1   they're really not asking about notes.  So I would ask and

2   what I would prefer is what you said at first, that the court

3   can't comment on the evidence and such and such and so and

4   so.  Then it was like the last sentence or so of the

5   preliminary instructions that said something along the lines

6   of each juror should, you know --

7          THE COURT:  That's what I was trying to -- initially

8   I had summarized reading.  Where it says you should not give

9   your notes precedence over your independent recollection of

10  the evidence.

11         MR. MAGNER:  Right.  But again --

12         THE COURT:  If you did not take notes, you should

13  rely upon your own independent -- well, I guess I had said it

14  in the beginning more clearly, but I'll just summarize it

15  right.  The court cannot comment on the evidence.  However,

16  the court reminds the jury of its preliminary -- I was just

17  going to say I could say the court cannot comment on the

18  evidence.

19         MR. BOTELER:  Your Honor, I would just note as I

20  observed the jury, they did take a lot of notes, so I thought

21  your comment about notes and memory I think was appropriate

22  in this particular context, because it does appear from the

23  question there may be some disagreement as to some facts and

24  this might be a way to kind of help them reframe how they're

25  supposed to look at the issue.

1          THE COURT:  My concern is that, you know, when there

2     is an issue like this, sometimes they can't remember.  They

3     can't remember what it is.  And somebody might have a note,

4     but, you know, that says one thing or another.  But you're

5     right.  It doesn't talk about that.  They just want to know

6     at what time was the defendant made aware by any party that

7     there were errors on 1040s from 2014, '15, and '16 and she --

8     that's all they have and she was facing the potential of

9     criminal liability?  The court cannot comment on the

10    evidence.

11         MR. MAGNER:  That would be our preference.  But we

12    certainly defer to the court's judgment.

13         THE COURT:  He's right.  It doesn't talk about the

14    notes.  I can tell them about the notes.

15         I can say the court cannot comment on the evidence.

16    You must rely on your own independent recollection.  How

17    about that?

18         MR. BOTELER:  Yeah.  I like that, Your Honor.

19         MR. MAGNER:  That's fine.

20         THE COURT:  So then it covers both.

21         All right.  So one more time into the record, the

22    question was:  At what time was the defendant made aware,

23    open parentheses, by any party, closed parentheses, that

24    there were errors on 1040s from 2014, '15, '16, and she was

25    facing the potential of criminal liability?

1              The answer from the court will be:  The court cannot

2     comment on the evidence.  You must rely on your own

3     independent recollection of the facts.

4              MR. MAGNER:  That's acceptable to the defense, Your

5     Honor.

6              MR. BOTELER:  And acceptable to the United States,

7     Your Honor.

8              THE COURT:  All right.  Thank you.

9              Okay.  Take it back.  After they see it, you know you

10    have put it back in the record.

11             Thank you.  And thank you for coming back so soon.

12             THE CASE MANAGER:  All rise.

13                          (Recess taken.)

14                          (In open court.)

15                        <u>JURY QUESTION NO. 2</u>

16             THE COURT:  We have another question from the jury.

17    Let's see.  Okay.  Their question is:  What does it mean to

18    be deadlocked?  What are our options if we are unable to come

19    to an agreement, both tonight and generally?

20             I don't know what that means, both tonight and

21    generally.

22             So they asked what it means to be deadlocked.  Do I

23    want to explain or do I just want to --I was just thinking of

24    bringing them in and giving them an Allen charge.

25             MR. MAGNER:  Judge, I think they've only been

1  deliberating since noon, I'm sure they had lunch about 1:00.

2  It's not very much time in an important case like this case.

3       THE COURT:  We can have them recess for the evening.

4  Come back tomorrow morning.

5       MR. BOTELER:  Your Honor, that may be a good move, so

6  that way they can have their chance to kind of relax and cool

7  their heads and digest what they've heard and come back

8  refreshed in the morning.

9       MR. MAGNER:  Or alternatively ask them if they would

10  like to come back or whatever the court --

11       THE COURT:  You know, if they want to stay or come

12  back?  Is that it?  Because I'm not going to -- I'm not going

13  to -- I'm not just -- they're saying what does it mean to be

14  deadlocked.  I don't have to, you know, answer it now.  You

15  know, I could just tell them let's just -- I've gotten their

16  question and I'm going to let them come home for the evening

17  and come back.

18       MR. BOTELER:  Your Honor, that would be my

19  recommendation.  I think that would allow them an

20  opportunity --

21       THE COURT:  Does she have something to say?

22       MS. BRODNEY:  I do like if they would have a choice

23  too to see if they prefer to have a recess and then

24  reconvening or coming back tomorrow?

25       THE COURT:  Well, I got to make that decision for

1   them.  You know, I really think I do.  I think I can say,

2   look, you know, I'll tell them, I've gotten your message, you

3   know.  What does it mean to be deadlocked?  I could answer

4   and say that your decision has to be unanimous?  Is that a

5   good response?

6         What does it mean to be deadlocked?  Your decision

7   must be unanimous.

8         MR. WICKER:  And then maybe offer the choice I guess.

9         MR. MAGNER:  Or refer them to I think the last page

10   or so of the instructions about deliberations.

11         MR. FLANAGAN:  I mean --

12         THE COURT:  What are you looking at?

13         MR. FLANAGAN:  Your Honor, I'm looking at the first

14   two paragraphs of Jury Charge No. 18, maybe not the whole

15   second paragraph, but...

16         THE COURT:  Let me see -- let's see.  Which ones?

17         MR. FLANAGAN:  Jury Charge No. 18, it doesn't talk

18   about deadlocked but talks about unanimity.

19         MR. MAGNER:  Page 21, 22, perhaps something along the

20   lines of, jury, please consult Jury Charge No. 18 on page 21

21   and 22 of the jury instructions.

22         THE COURT:  You're not still telling me --

23         MR. FLANAGAN:  I'm looking at the -- excuse me, Your

24   Honor, the first sentence of Jury Charge No. 18, to reach a

25   verdict, whether it is guilty or not guilty all of you must

1    agree.  Your verdict must be unanimous in each count under

2    the superseding indictment.  It is your duty to consult with

3    one another and to deliberate in an effort to reach an

4    agreement if you can do so.  And I understand it doesn't say

5    the word deadlocked, but that's sort of their answer.

6          THE COURT:  Well, I mean, what does it mean to be

7    deadlocked, it's more than just you can't agree, right?

8    You're supposed to work through it.  If you all aren't

9    familiar with the modified Allen charge, let me read the

10   Allen charge to you to see what they would be saying.  I'm

11   going to ask that you continue your deliberations in an

12   effort to agree upon a verdict and dispose of this case and I

13   have a few additional comments I would like for you to

14   consider as you do so.

15          This is an important case.  If you should fail to

16   agree on a verdict, the case is left open and may be tried

17   again.  Okay.  They ask about what their options are, right?

18          Any future jury must be selected in the same manner

19   and from the same source as you were chosen and there's no

20   reason to believe that the case could ever be submitted to 12

21   men and women more conscientious, more impartial or more

22   competent to decide it or that more or clear evidence could

23   be produced.  Those of you who believe that the government

24   has proved the defendant guilty beyond a reasonable doubt

25   should stop and ask yourselves if the evidence is really

**OFFICIAL TRANSCRIPT**

1    convincing enough given that other members of the jury are

2    not convinced.  And those of who you believe that

3    the government -- I'm sorry, the government has proved --

4    this says has not proved the defendant guilty beyond a

5    reasonable doubt should stop and ask yourself if the doubt

6    you have is a reasonable one given that other members of the

7    jury don't share your doubt.  Remember at all times that no

8    juror is expected to yield a conscientious opinion he or she

9    may have as to the weight or effect of the evidence.  But

10   remember also that after full deliberation and consideration

11   of the evidence in the case, it is your duty to agree upon a

12   verdict if you can do so without surrendering your

13   conscientious opinion.  You must also remember that if the

14   evidence in the case fails to establish guilt beyond a

15   reasonable doubt, the accused should have your unanimous

16   verdict of not guilty.  You may be as leisurely in your

17   deliberations as the occasion may require and you should take

18   all the time which you may feel is necessary.

19         And this says I'm going to ask you now to retire once

20   again and consider your deliberations with these additional

21   comments in mind and in conjunction with any --

22         I could say at that point, you know, I'm going to let

23   you go home for the evening and reconvene tomorrow, if you

24   wish, or you can continue to deliberate tonight.  How about

25   that one?

```
 1          MR. MAGNER:  I like the idea of an option.

 2          THE COURT:  Okay.

 3          MR. MAGNER:  It empowers them.

 4          THE COURT:  So what I'll do is, in response to the

 5   question, I'll bring them back in and I'll read them the

 6   modified Allen charge in hopes that that addresses --

 7          MR. MAGNER:  Okay.

 8          THE COURT:  Y'all both good with that?

 9          MR. BOTELER:  Yes, Your Honor.

10          THE COURT:  All right.

11          MR. FLANAGAN:  Your Honor, I just want to make sure

12   the defense has no objection to the Allen charge.

13          MR. MAGNER:  I really have to defer to the court.  I

14   think it's a little premature.

15          THE COURT:  Well, you have to defer to your client,

16   who is also a judge.

17          (Discussion between counsel and defendant.)

18          THE COURT:  Or if -- thank you.

19          MR. FLANAGAN:  Yes, Your Honor.  Government has no

20   objection, but we want to hear their answer on the record,

21   Your Honor.

22          THE COURT:  If not, we bring them back in.  I think

23   they believe that they are deadlocked.  So if you don't want

24   the Allen charge, I'll just say, the answer, what does it

25   mean to be deadlocked, the response is that you cannot
```

**OFFICIAL TRANSCRIPT**

1  unanimously agree.  With regard to each count, you cannot

2  unanimously agree.  But they could agree -- this is, you

3  know, if they are -- if they are in agreement as to any

4  count, right, on any count that you cannot unanimously agree,

5  you know.  How should we put that?  What does it mean to be

6  deadlocked?  That means on any charge with respect to any

7  charge, right?  With respect to any of the counts?

8          MR. FLANAGAN:  Any particular charge, any particular

9  count, Your Honor?

10          THE COURT:  With respect to any particular count you

11  cannot unanimously agree, and so as to that count, you would

12  be deadlocked.  All right.  As to the -- as to any count, you

13  cannot unanimously agree, you would be deadlocked, right?

14          Mr. Magner?  That would just answer the question, and

15  then if they come back and say, they're deadlocked, then

16  either I read the Allen charge or I dismiss them.

17          MR. MAGNER:  So I'm okay with that.

18          THE COURT:  With which part?

19          MR. MAGNER:  I'm not sure.  I kind of lost track.

20          THE COURT:  Two.  Let me say, what's on the table now

21  is to the question of what does it mean to be deadlocked.  It

22  would be with respect to any particular count that you cannot

23  unanimously agree as to that particular count, you would be

24  deadlocked, right?

25          MR. BOTELER:  Yes, Your Honor.

1      THE COURT:  That's what deadlocked -- look, if you

2  are deadlocked, you cannot unanimously agree --

3      MR. MAGNER:  Right.

4      THE COURT:  -- on any particular count.

5      MR. MAGNER:  So I'm okay with that and I would just

6  suggest, you know, please refer to my instructions,

7  particularly Jury Charge No. 18, on page 21, 28, because

8  that's something short of a dynamite charge, something short

9  of an Allen charge, but it --

10      THE COURT:  Number 18, are you --

11      MR. BOTELER:  We would be fine with that, the

12  reference back to Jury Charge No. 18 on page 21.

13      THE COURT:  Okay.

14      I only get one shot at writing this correctly, so I'm

15  going to write it out here first.

16      Okay.  With respect to any count in the superseding

17  indictment that you cannot unanimously agree as to guilt or

18  innocence would be considered deadlocked as to that

19  particular count.  Please see Jury Instruction No. 18.

20      MR. MAGNER:  I'm good with that.

21      MR. BOTELER:  United States is good with that, Your

22  Honor.

23      MR. MAGNER:  And, Judge, I'll put my cards on the

24  table why I'm concerned about not sending them home if we

25  don't have.  Some of the news coverage that has popped up

**OFFICIAL TRANSCRIPT**

1    during the trial is wildly inaccurate and it refers to things

2    like a $5 fee for the weddings.  That is just not an issue in

3    the case at all.  You know, we have one juror who is a

4    self-proclaimed news junkie and I don't have any reason to

5    believe he is violating his oath.  But I didn't think this

6    was going to get any real press coverage, but it has.  But I

7    would hate for that to seep into all of this.  That was my

8    concern.

9         THE COURT:  I think that's a legitimate concern and

10   should be on everybody's mind.  I've been working for -- I

11   haven't seen it, but I have been working on this trial.  I

12   appreciate that.  I think it's a valid concern.

13        And, you know, I'm reluctant -- I'm always reluctant

14   to give them Allen charge.  You just -- you don't know.  And,

15   you know, when this is over, I'll tell them about my last

16   criminal trial, what happened, the most bizarre thing

17   happened and I did give them an Allen charge in that case.

18   And so, you know, sometimes you have an experience and you

19   think something really weird could happen and sometimes

20   really weird things do.  So I'm going to give them this

21   answer.

22        Okay.  One more time in the record, what does it mean

23   to be deadlocked?  What are our options if we are unable to

24   come to an agreement, both tonight and generally?

25        Answer from the court:  With respect to any count in

1    the superseding indictment that you cannot unanimously agree

2    as to guilty or innocence would be considered deadlocked as

3    to that particular count.  Please see Jury Instruction No.

4    18.

5         Everybody okay?

6         MR. BOTELER:  No objection.

7         MR. MAGNER:  Yes, Your Honor.

8         THE COURT:  We'll put it back into the record.

9         And the lawyers can approach so I can tell you this.

10   This is off the record.  So they can know my concern.

11             (Discussion held off the record.)

12                  Recess taken.)

13                (In open court.)

14             JURY QUESTION NO. 3

15        THE COURT:  I'm sorry, you can have a seat while I

16   read it.  It just says:  If we have come to a deadlock

17   decision, what is the process?

18             So we discussed that this was sort of the -- the last

19   instruction was intended to be something just a little short

20   of the Allen charge, but it's -- this was kind of Allen

21   charge light, to tell them to go back and read that.  They

22   are -- what I can gather without talking directly to them, I

23   think the sentiment is I think they're tired but, you know, I

24   don't know that it's going to be any better.  I mean, the

25   first was a question about what does it mean to be

1    deadlocked.  This is saying that they're deadlocked.

2         MR. MAGNER:  So I was a proponent of keeping them

3    here.  I'll admit that fully, but it is late and I would

4    suggest that we ask them to come back in the morning at a

5    reasonable hour and then I would be open to the Allen charge

6    at that point.

7         THE COURT:  Tomorrow morning, have them come back and

8    tell them to go home, come back tomorrow.  I'll bring them in

9    right now and just say that.  Don't give them the Allen

10   charge tonight.

11        MR. MAGNER:  No.  No.

12        THE COURT:  I will just tell them I know you're tired

13   and you said that you're deadlocked, but I'm going to ask you

14   to go home, get some rest and come back tomorrow morning at

15   9:00.

16        MR. MAGNER:  And just say I may have some further

17   instructions for you in the morning.

18        THE COURT:  That's a good idea.

19        MR. BOTELER:  Yes, Your Honor, I agree with that.

20        MR. MAGNER:  And, Judge, do you want to suggest maybe

21   a little bit later tomorrow?  9:30-ish or 10:00.  I'm

22   completely deferring to you.

23        MS. BRODNEY:  And, Judge, do you want to, given

24   defense counsel's concerns about news coverage, reiterate

25   again not to watch anything --

1        MR. MAGNER:  Or talk to their spouses or talk to

2    anyone, right?

3        THE COURT:  Talk to anyone, right?

4        So you're saying 10:00, 9:30 or 10:00, I have

5    somewhere to be at noon, from like noon to 2:00.

6        MR. BOTELER:  I would recommend 9:30.

7        MR. MAGNER:  That's reasonable, Judge.

8        THE COURT:  So --

9        THE CASE MANAGER:  Bring them in?

10       THE COURT:  Yeah, bring them in.

11       What if they say no, they're not coming back

12   tomorrow?

13       THE CASE MANAGER:  They needed a minute to get

14   together.

15       CSO:  All rise.

16        (Whereupon, the jury enters the courtroom.)

17       THE COURT:  You can have a seat.

18       So, ladies and gentlemen, I am in receipt of your

19   note.  I know it's late.  We've been here a full 12 hours.

20   So what I'm going to ask you to do is go home and get some

21   rest, come back tomorrow at 9:30.  I may have some further

22   instructions for you then, but I think we need a break.

23   We're all tired.  I'm going to instruct you please do not

24   listen to the news or the radio or any news.  Don't talk to

25   your families, spouse, or friends about this because, you

1    know, things have been said in court and they might be, you

2    know, taken out of context and, you know, it really isn't

3    always even accurate, but more importantly, you really have

4    to make a decision based on what you hear and what you heard

5    right here in the courtroom.  So with that, you know, let's

6    all get some sleep.  Anything else I might have missed?

7              MR. MAGNER:  No, Your Honor.

8              MR. BOTELER:  Nothing, Your Honor.

9              THE COURT:  Okay.  So we appreciate your service and

10   I will -- we will see you tomorrow morning, at 9:30, give you

11   30 minutes more, a longer nap.  I'm sorry if you have a long

12   way to drive, but we appreciate it.

13             JUROR NO. 1:  Could I ask a question from here?

14             THE COURT:  Depends on what it is, yes.

15             JUROR NO. 1:  Can I get a letter for tomorrow?

16             THE COURT:  For your work?

17             JUROR NO. 1:  Oh, absolutely.

18             THE COURT:  Yes, absolutely.  You'll get it from

19   Dena.

20        Can I find out who your tailor because I love that

21   suit.  I want my husband to have one.

22             JUROR NO. 2:  That's his wife that dressed him.

23                       (Laugher.)

24             THE COURT:  You see?  And here I am, that's a nice

25   suit.

**OFFICIAL TRANSCRIPT**

1          JUROR NO. 1:  I go to Men's Warehouse.

2          THE COURT:  So Dena will get that for you tonight.

3          Can you do that on my letterhead or the court's

4    letterhead?

5          THE CASE MANAGER:  I can do that.

6          JUROR:  I would need one as well.

7          THE COURT:  Thank you.  We'll take care of that and

8    thank you so much.

9          THE CASE MANAGER:  All rise.

10          (Whereupon, the jury exits the courtroom.)

11          Y'all good?  See you tomorrow morning.

12                          *  *  *  *

13          (WHEREUPON, the proceedings were adjourned.)

14                          *  *  *  *

15                    REPORTER'S CERTIFICATE

16          I, Nichelle N. Wheeler, RMR, CRR, Official Court
     Reporter, United States District Court, Eastern District of
17   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
18   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

19

20                    /s/ Nichelle N. Wheeler
                       Official Court Reporter
21

22

23

24

25

**OFFICIAL TRANSCRIPT**