**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                      **CRIMINAL ACTION**

**VERSUS**                                                         **NO. 22-2**

**ERNESTINE ANDERSON-TRAHAN**                **SECTION: "G"**

<u>**ORDER AND REASONS**</u>

Pending before the Court is Defendant Ernestine Anderson-Trahan's ("Anderson-Trahan")

Motion for Judgment of Acquittal.[1] On January 7, 2022, Anderson-Trahan was charged by an

Indictment with four counts of making and subscribing false tax returns in violation of 26 U.S.C.

§ 7206(1).[2] A Superseding Indictment was filed on May 12, 2022, charging Anderson-Trahan with

the same offenses.[3] This matter proceeded to trial before a jury beginning on November 14, 2022.[4]

On November 15, 2022, the government dismissed Count One of the Superseding Indictment with

prejudice.[5] The Court declared a mistrial on November 18, 2022, after the jury informed the Court

that it was hopelessly deadlocked as to the remaining counts.[6] Anderson-Trahan requests that the

Court enter a judgment of acquittal as to Counts Two, Three, and Four of the Superseding

Indictment because she asserts that the government failed to conduct an adequate investigation,

---

[1] Rec. Doc. 137.

[2] Rec. Doc. 1.

[3] Rec. Doc. 27.

[4] Rec. Doc. 109.

[5] Rec. Doc. 113.

[6] Rec. Doc. 117.

failed to prove specific tax loss beyond a reasonable doubt, and failed to prove the heightened standard of "willfulness" that applies to tax cases beyond a reasonable doubt.[7] The government opposes the motion and argues that a rational juror could conclude that the government proved each element of the offenses beyond a reasonable doubt.[8]

For the reasons discussed in detail below, even when viewed in the light most favorable to the government, the government failed to prove beyond a reasonable doubt that Anderson-Trahan acted willfully.[9] The government's entire theory on willfulness was based on an inference; the government argued that a rational juror could infer Anderson-Trahan's conduct was willful because she wanted to lessen her tax liability. However, there were numerous inconsistencies in the government's case as to the amount of Anderson-Trahan's tax liability, which was allegedly Anderson-Trahan's motivation. Moreover, other than reporting incorrect gross receipts on her tax forms, there was no evidence to show that Anderson-Trahan was in fact trying to lower her tax liability (*i.e.*, she did not try to inflate or even accurately account for deductions that could have lessened her tax liability).

Through some stretched inferences, perhaps it is plausible for a juror to conclude that Anderson-Trahan acted willfully under a scintilla or preponderance of the evidence standard. However, such a finding would be irrational under the beyond a reasonable doubt standard, even when viewing the evidence in the light most favorable to the government. A finding of willfulness

---

[7] Rec. Doc. 137.

[8] Rec. Doc. 141.

[9] The word "willfully" means the voluntary, intentional violation of a known legal duty. *Cheek v. United States*, 498 U.S. 192, 201 (1991). "Defendant's conduct is not 'willful' if [s]he acted through negligence, even gross negligence, inadvertence, justifiable excuse or mistake. . . ." *United States v. Masat*, 948 F.2d 923, 931 n.15 (5th Cir. 1991).

in this case would be purely speculative and unsubstantiated by the evidence. When the evidence is viewed in the light most favorable to the government, a reasonable juror could not find that the government proved beyond a reasonable doubt that Anderson-Trahan's conduct was willful. Therefore, the government failed to meet its burden of proof in this case. Accordingly, considering the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motion.

## I. Background

### A.    *The Charged Offenses*

On January 7, 2022, Anderson-Trahan was charged by an Indictment with four counts of making and subscribing false tax returns in violation of 26 U.S.C. § 7206(1).[10] On May 12, 2022, Anderson-Trahan was charged by a Superseding Indictment with the same offenses.[11] The Superseding Indictment alleged that from 2013 to at least 2016, while earning wage income as a judge with the Second City Court in the Parish of Orleans, Anderson-Trahan received gross receipts from officiating marriage ceremonies.[12] The Superseding Indictment further alleged that Anderson-Trahan officiated hundreds of marriage ceremonies each year where she generally charged $80 to $100 in officiant fees, and that she charged more under certain circumstances, namely for marriages she officiated on Valentine's Day, outside of the courthouse where Anderson-Trahan worked, or outside of Anderson-Trahan's normal business hours.[13] The Superseding Indictment also alleged that in 2013, 2014, and 2015, Anderson-Trahan received

---

[10] Rec. Doc. 1.

[11] Rec. Doc. 27.

[12] *Id.* at 1–2.

[13] *Id.* at 2.

gross receipts for legal fees, including referral fees and fee-sharing agreements for legal work unrelated to her judicial income.[14]

The government alleged that Anderson-Trahan underreported this income for four consecutive tax years (2013–2016).[15] The Superseding Indictment alleged in Count 1: "The tax return reported, among other false items, (1) false business income (Line 12) of $24,518; (2) false total income (Line 22) of $160,731; and (3) false gross receipts of $16,000 (Schedule C, Line 1)."[16] The Superseding Indictment alleged in Count 2: "The tax return reported, among other false items, (1) false business income (Line 12) of $7,709; (2) false total income (Line 22) of $145,286; and (3) false gross receipts of $16,000 (Schedule C, Line 1)."[17] The Superseding Indictment alleged in Count 3: "The tax return reported, among other false items, (1) false business income (Line 12) of $11,207; (2) false total income (Line 22) of $136,322; (3) false gross receipts from officiating weddings of $16,000 (Schedule C, Line 1); and (4) false gross receipts from legal fees of $9,471 (Schedule C, Line 1)."[18] The Superseding Indictment alleged in Count 4: "The tax return reported, among other false items, (1) false business income (Line 12) of $4,533; (2) false total income (Line 22) of $156,301; and (3) false gross receipts of $15,200 (Schedule C, Line 1)."[19] The Superseding Indictment alleged that Anderson-Trahan knew there were substantially more gross receipts, including from officiating weddings and from legal fees, than stated for the corresponding tax

---

[14] *Id.*

[15] *Id.* at 2–6.

[16] *Id.* at 3.

[17] *Id.* at 3–4.

[18] *Id.* at 4–5.

[19] *Id.* at 6.

years.[20]

## B.   *The First Day of Trial*

This matter proceeded to a jury trial on November 14, 2022.[21]  A brief summary of the parties' theories of the case and evidence presented at trial follows. This summary is presented for context only, and it does not purport to restate all of the evidence presented over the course of the three days of testimony.

In its opening statement, the government argued that the evidence would show that Anderson-Trahan knew how much money she earned, knew she had to pay taxes on that income, and failed to report "around $100,000" because she wanted to "keep her taxes down."[22]  The government argued that Anderson-Trahan knew she was officiating more weddings each year, but she reported that her wedding income stayed the same in 2013, 2014, and 2015, and decreased in 2016.[23]  The government also argued that the evidence would show that Anderson-Trahan failed to report any attorney's fees that she earned in 2013 or 2014 and underreported the attorney's fees that she earned in 2015.[24]

During Anderson-Trahan's opening statement, the defense admitted that Anderson-Trahan "made mistakes on her taxes" and owes "about $38,000 in taxes."[25]  The defense laid out a fairly straightforward theory of the case—although Anderson-Trahan was "careless in preparing her

---

[20] *Id.* at 3–6. Unreported legal fees are not alleged in Count 4. *Id.* at 6.

[21] Rec. Doc. 109.

[22] Tr. at 133–34.

[23] *Id.* at 137–38.

[24] *Id.* at 139.

[25] *Id.* at 144.

taxes," her conduct was not willful.[26] The defense asserted that Anderson-Trahan's disorganization, health problems, life circumstances, and mental health struggles caused her to be negligent or careless in filing her taxes.[27] The defense argued that Anderson-Trahan should be acquitted because the government could not show that Anderson-Trahan's conduct was willful.[28]

After opening statements, the government began the presentation of its case-in-chief. First, the government called Devin George ("George"), the deputy assistant secretary for the Office of Public Health in Louisiana.[29] The government offered a report prepared by George and his staff showing that Anderson-Trahan officiated 282 weddings in 2013, 372 weddings in 2014, 415 weddings in 2015, and 463 weddings in 2016.[30] The government then offered each of the marriage licenses from the weddings Anderson-Trahan officiated into the record as evidence.[31] George testified that the number of weddings performed in Orleans Parish increased in 2015, following the Supreme Court's decision in *Obergefell v. Hodges*, which legalized same-sex marriage.[32] George stated that Anderson-Trahan never asked him to compile a list of the number of weddings she performed.[33] On cross-examination, George testified that he could not tell from the licenses how much Anderson-Trahan charged to officiate each wedding, and there were no indications on

---

[26] *Id.* at 145.

[27] *Id.* at 147–57.

[28] *Id.* at 158.

[29] *Id.* at 160.

[30] *Id.* at 173.

[31] *Id.* at 174–76.

[32] *Id.* at 176.

[33] *Id.* at 178–79.

the licenses if the fees were waived.[34]

Second, the government called Christine Dugas ("Dugas"), who was married by Anderson-Trahan on February 21, 2013.[35] She testified that she paid $100 in cash for Anderson-Trahan to officiate her wedding, and she paid $25 for the marriage license.[36] On cross-examination, the defense brought out that during a meeting with the prosecutors in January 2021, Dugas told them that she paid either $80 or $100 for Anderson-Trahan to officiate her wedding, but she could not recall the exact amount.[37]

Third, the government called Lisa Hibbs ("Hibbs"), a court reporter who worked for Anderson-Trahan and her predecessor Judge K.K. Norman.[38] Hibbs testified that Anderson-Trahan had two other staff members—a minute clerk and a law clerk.[39] Anderson-Trahan was the only judge at the Second City Court during her tenure.[40] According to Hibbs, Anderson-Trahan held court two or three times a week and assisted with cases from First City Court once a week.[41] Hibbs testified that Anderson-Trahan only missed work sporadically if she was dealing with medical issues for herself or her family.[42] Hibbs stated that Anderson-Trahan was sometimes "preoccupied" by caregiving responsibilities during her mother's illness, but Hibbs stated that she

---

[34] *Id.* at 181.

[35] *Id.* at 188–89.

[36] *Id.* at 190.

[37] *Id.* at 191–92.

[38] *Id.* at 194.

[39] *Id.* at 196.

[40] *Id.* at 197.

[41] *Id.* at 199.

[42] *Id.* at 202.

"didn't find really find much difference" in Anderson-Trahan's demeanor.[43]

Hibbs stated that she assisted with processing marriage licenses, which cost $27.50 and were paid in cash.[44] Hibbs testified that Anderson-Trahan originally charged $80 to officiate a wedding, but the charge increased to $100 after *Obergefell*.[45] Hibbs testified that all payments were made in cash or by money order, which the staff members left in Anderson-Trahan's office.[46] According to Hibbs, sometimes Anderson-Trahan waived the officiating fee for friends or family members.[47] Hibbs also stated that there was an additional charge for weddings on Valentine's Day because the staff decorated the courtroom, and she believed Anderson-Trahan charged more to perform weddings on weekends.[48] Hibbs testified that court staff members would create a reservation slip with the couple's information when a wedding was scheduled, but they did not keep the slips after the wedding was performed.[49] She also stated that court staff members did not keep a record of the officiant fees paid.[50] However, court staff members did keep copies of the marriage licenses in a filing cabinet located in Anderson-Trahan's office.[51]

On cross-examination, Hibbs acknowledged that Anderson-Trahan followed the same

---

[43] *Id.* at 202–03.

[44] *Id.* at 204–07.

[45] *Id.* at 208–09.

[46] *Id.* at 209–10.

[47] *Id.* at 210.

[48] *Id.*

[49] *Id.* at 211.

[50] *Id.* at 212.

[51] *Id.*

procedures for performing weddings as her predecessor, Judge K.K. Norman.[52] Hibbs also clarified that when the officiant fee increased from $80 to $100, the additional $20 fee did not go directly to Anderson-Trahan, it went into a money till and was later split between three people who worked in chambers.[53] Hibbs testified that Anderson-Trahan was a "people person," and she relied on her staff members to complete organizational tasks.[54] Hibbs stated that Anderson-Trahan had a reputation for honesty, integrity, and truthfulness.[55]

## C.   *The Second Day of Trial*

At the start of the second day of trial, November 15, 2022, the government orally moved to dismiss Count 1 of the Superseding Indictment.[56] The prosecutor represented that, shortly before trial began, the parties discovered handwritten notes showing that Anderson-Trahan reported her 2013 legal income to her tax preparer.[57] After reviewing the handwritten notes and speaking to the tax preparer, the government acknowledged it could not meet its burden of proof as to Count 1.[58] The Court granted the motion and dismissed Count 1 with prejudice.[59]

The government then proceeded with the presentation of its case-in-chief. The government called Tamara Griffin-Major ("Griffin-Major"), a friend of Anderson-Trahan, who worked on

---

[52] *Id.* at 216–17.

[53] *Id.* at 223, 227.

[54] *Id.* at 225.

[55] *Id.*

[56] *Id.* at 256.

[57] *Id.*

[58] *Id.*

[59] *Id.*

Anderson-Trahan's judicial campaign and worked at the Second City Court as Anderson-Trahan's minute clerk from January 2013 to the spring of 2014.[60] Griffin-Major testified that couples paid Anderson-Trahan $80 in cash to officiate their weddings because the courthouse did not have the technology to accept electronic payments.[61] Griffin-Major stated that she or another staff member would take the payment for the officiant fee and put it on Anderson-Trahan's desk.[62] According to Griffin-Major, the staff members did not provide receipts for the payments, and no one kept track of the number of weddings Anderson-Trahan officiated.[63] Griffin-Major stated that she prepared a list for Vital Records of the wedding licenses that were processed and submitted the list to Vital Records with the original licenses.[64]

On cross-examination, Griffin-Major testified that Anderson-Trahan was a "people person," and she relied on others to assist her with organization.[65] Griffin-Major characterized the wedding system as informal, as it was not Anderson-Trahan's "main duty" as a judge.[66] Griffin-Major learned the system from the staff members of Judge K.K. Norman—Anderson-Trahan did not create the system.[67] Griffin-Major testified that Anderson-Trahan experienced a lot of stress dealing with the health of her mother.[68] Griffin-Major indicated that Anderson-Trahan's mother,

---

[60] *Id.* at 233–34.

[61] *Id.* at 242.

[62] *Id.*

[63] *Id.* at 244–45.

[64] *Id.* at 247.

[65] *Id.* at 263–64.

[66] *Id.* at 264.

[67] *Id.* at 265–66.

[68] *Id.* at 270.

Faye Anderson, had difficulty dealing with her dialysis treatments, causing a lot of stress for Anderson-Trahan as her primary caregiver.[69] Griffin-Major stated that Anderson-Trahan had a reputation for honesty, integrity, and truthfulness.[70]

Next, the government called Laura Rocha ("Rocha"), general counsel at the Louisiana Supreme Court, who testified regarding the Financial Disclosure Statements that state judges are required to file with the Office of the Judicial Administrator on May 15th of each year.[71] The government admitted into evidence the Financial Disclosure Statements Anderson-Trahan filed for 2013, 2014, 2015, and 2016.[72] For each year, Anderson-Trahan reported that she earned between $5,000 and $24,999 performing weddings.[73] For the year 2014, Anderson-Trahan also reported that she earned between $5,000 and $24,999 in legal fees.[74]

The government also admitted into evidence Amended Financial Disclosure Statements filed by Anderson-Trahan. On September 10, 2018, Anderson-Trahan filed an Amended Financial Disclosure Statement for 2015, reporting that she earned between $5,000 and $24,999 in legal fees, which she did not report on the original 2015 Financial Disclosure Statement.[75] Anderson-Trahan also amended the amount of income for weddings in 2015 to between $25,000 and $100,000.[76]

---

[69] *Id.* at 270–72.

[70] *Id.* at 273–74.

[71] *Id.* at 277–79.

[72] *Id.* at 280–86; Gov't Ex. 7, 8, 9, 10.

[73] Tr. at 283–86; Gov't Ex. 7, 8, 9, 10.

[74] Tr. at 284–85; Gov't Ex. 8.

[75] Tr. at 287; Gov't Ex. 11.

[76] Tr. at 288; Gov't Ex. 11.

The same day, Anderson-Trahan submitted an Amended Financial Disclosure Statement for 2016, which amended the amount of income for weddings in 2016 to between $25,000 and $100,000.[77] On April 15, 2021, Anderson-Trahan submitted an Amended Financial Disclosure Statement for 2014, which amended the amount of income for weddings in 2014 to between $25,000 and $100,000.[78]

Next, the government called Allison Kotsay ("Kotsay"), a court witness coordinator with the Internal Revenue Service, who testified regarding Anderson-Trahan's tax returns.[79] Kotsay testified that Anderson-Trahan's reported income and gross receipts for 2014, 2015, and 2016 were consistent with the amounts alleged in the Superseding Indictment.[80] Anderson-Trahan itemized her deductions for each tax year.[81] She also itemized expenses related to her rental property.[82]

On December 29, 2018, Anderson-Trahan submitted an amended tax return to the IRS for the 2016 tax year, which amended the amount of gross receipts for weddings to $46,730, compared to the original amount of $15,200, and removed expenses previously claimed for contract labor.[83] The amended return increased Anderson-Trahan's total tax liability for 2016 by $10,696.[84]

On March 10, 2019, Anderson-Trahan submitted an amended tax return to the IRS for the

---

[77] Tr. at 288; Gov't Ex. 12.

[78] Tr. at 298–99.

[79] *Id*. at 302–90; Gov't Ex. 15, 16, 17.

[80] Tr. at 304–14.

[81] *Id.* at 313.

[82] *Id.* at 311.

[83] *Id.* at 316–17; Gov't Ex. 19.

[84] Tr. at 317–18; Gov't Ex. 19.

2015 tax year, which amended the amount of gross receipts for weddings to $34,440, compared to the original amount of $16,000, and removed expenses previously claimed for contract labor.[85] The amended return increased Anderson-Trahan's total tax liability for 2016 by $5,617.[86] Anderson-Trahan did not file an amended tax return for the 2014 tax year.[87] Anderson-Trahan was not audited.[88] As of October 4, 2022, Anderson-Trahan owed $5,557.03 for the 2016 tax year.[89]

In June 2016, Anderson-Trahan entered an installment agreement with the IRS for repayment of back taxes at a rate of $335 per month.[90] In June 2017, Anderson-Trahan entered an installment agreement with the IRS for repayment of back taxes at a rate of $450 per month.[91] On February 28, 2018, Anderson-Trahan agreed to another installment agreement for repayment of back taxes at a rate of $500 per month.[92]

Next, the government called Krystal Ancar ("Ancar"), Anderson-Trahan's tax preparer.[93] Ancar does not audit her clients; she relies on the information they give her to prepare their tax returns.[94] Ancar testified that she prepared Anderson-Trahan's tax returns based on the information Anderson-Trahan provided to her, and she stated that she had no way to independently

---

[85] Tr. at 318–20; Gov't Ex. 18.

[86] Tr. at 320–21; Gov't Ex. 18.

[87] Tr. at 338.

[88] *Id.* at 329.

[89] *Id.* at 323; Gov't Ex. 25.

[90] Tr. at 342.

[91] *Id.* at 338, 341.

[92] *Id.* at 341.

[93] *Id.* at 355.

[94] *Id.* at 356.

verify Anderson-Trahan's income.[95] Ancar stated that she generally explains this to all of her clients, and she identified an engagement letter that she provided to Anderson-Trahan explaining this policy.[96] Ancar testified that she explained to Anderson-Trahan the need to report her income from wedding fees and attorney's fees sometime in 2014 when she began preparing Anderson-Trahan's 2013 tax return.[97]

Ancar identified a post-it note Anderson-Trahan provided to Ancar in order to prepare Anderson-Trahan's 2016 tax return, stating the handwriting was Anderson-Trahan's except for "checkmarks," which Ancar wrote when she placed the information on Anderson-Trahan's tax return.[98] The post-it note states "weddings" and then below that states $15,200, but the figure had been crossed out and then re-written.[99] The post-it also states "(700 x 3 for employee)," which Ancar stated was in reference to a $700 bonus paid to three members of Anderson-Trahan's staff.[100]

Ancar also identified a worksheet that Anderson-Trahan provided in order to prepare Anderson-Trahan's 2015 tax return, which identified Anderson-Trahan's expenses for operating her rental property and for her courtroom.[101] The worksheet listed the $9,471 check from Boykin

---

[95] *Id.* at 360, 377, 385.

[96] Tr. at 368–70; Gov't Ex. 55. Ancar did not have a copy of the engagement letter she provided to Anderson-Trahan when preparing her 2014 through 2016 returns, but she stated that her tax preparation software automatically generates the letter each year. Tr. at 369–70. She provides it to clients as a regular course of her business, but does not retain a copy herself. *Id.*

[97] Tr. at 456.

[98] *Id.* at 378–79.

[99] Gov't Ex. 64.

[100] Tr. at 437; Gov't Ex. 64.

[101] Tr. at 386–89; Gov't Ex. 65.

& Utley, but it did not include the $5,000 check from the Law Offices of Clifton M. Davis or gross receipts for wedding fees.[102] Ancar testified that Anderson-Trahan verbally told her the $16,000 gross receipts figure for wedding income.[103]

According to Ancar, she prepared Anderson-Trahan's 2014 tax return based on the information Anderson-Trahan provided, but she did not have a copy of the records Anderson-Trahan provided because Ancar's computer server crashed.[104] Ancar testified that she always obtains her clients' authorization before filing electronic returns on their behalf.[105] She identified the e-file Signature Authorization that Anderson-Trahan signed for her 2015 tax return.[106] She also identified an unsigned copy of the Signature Authorization for Anderson-Trahan's 2016 tax return from her records, and she stated she must have provided the original to Anderson-Trahan.[107]

Ancar also prepared the amended tax returns for Anderson-Trahan.[108] On cross-examination, Ancar stated that Anderson-Trahan's intention was to provide the IRS with the most accurate information.[109] Ancar testified that Anderson-Trahan was cooperative in preparing the amended return, and she believed Anderson-Trahan acted in good faith in preparing the return.[110] According to Ancar, Anderson-Trahan did not try to "fudge the numbers" to lessen her tax

---

[102] Gov't Ex. 65.

[103] Tr. at 386.

[104] *Id.* at 411–12.

[105] *Id.* at 410.

[106] *Id.*; Gov't Ex. 72.

[107] Tr. at 409–10; Gov't Ex. 71.

[108] Tr. at 424.

[109] *Id.* at 425.

[110] *Id.*

liability.[111] According to Ancar, in 2018, Anderson-Trahan made an initial determination of the number of weddings she officiated based on the number of marriage licenses maintained in her courthouse, but she updated the information after she obtained additional records from the State.[112]

Ancar testified that Anderson-Trahan's opponent in the judicial campaign filed a lawsuit against Anderson-Trahan shortly after she took the bench.[113] Ancar testified that the lawsuit caused Anderson-Trahan a lot of stress.[114] According to Ancar, Anderson-Trahan was exceptionally close to her mother.[115] Ancar stated that Anderson-Trahan was not functioning well after her mother became ill.[116] Ancar classified Anderson-Trahan's bookkeeping as "very poor."[117] She agreed that Anderson-Trahan was less organized than a "little old lady coming to her tax preparer with a Schwegmann bag full of receipts."[118] Ancar worked with the limited financial records she was provided to help Anderson-Trahan identify potentially deductible expenses.[119] Ancar did her best to prepare the tax returns in good faith, and she believed that Anderson-Trahan was acting in good faith.[120] Ancar had to ask Anderson-Trahan to provide her

---

[111] *Id.* at 426.

[112] *Id.* at 427–28.

[113] *Id.* at 431.

[114] *Id.*

[115] *Id.* at 431–32.

[116] *Id.* at 432.

[117] *Id.* at 435.

[118] *Id.*

[119] *Id.* at 439.

[120] *Id.* at 440–41.

with documentation for certain deductions.[121]  Ancar would probe Anderson-Trahan to learn about whether certain deductions could be taken for things like tithing and mileage for her travel to weddings.[122]  Ancar would use the internet to calculate the mileage between the location and Anderson-Trahan's home.[123]

Ancar testified that the 2013 tax return was not filed due to an oversight—Ancar thought Anderson-Trahan filed it and Anderson-Trahan thought Ancar filed it.[124]  Ancar testified that Anderson-Trahan "panicked" and filed it immediately, but Anderson-Trahan forgot to include the legal fees on the 2013 return.[125]  When the 2015 and 2016 amended returns were filed, Ancar calculated the income and deductions as conservatively as possible.[126]  Ancar stated that Anderson-Trahan had a reputation for honesty, integrity, and truthfulness.[127]

### D.     The Third Day of Trial

To begin the third day of trial, the government called Tamara Jacobson ("Jacobson"), an attorney to whom Anderson-Trahan referred a case.[128]  Jacobson paid Anderson-Trahan $4,000 on January 16, 2014, after the case settled.[129]  On cross-examination, Jacobson testified that she did

---

[121] *Id.* at 444.

[122] *Id.* at 445–46.

[123] *Id.* at 446.

[124] *Id.* at 448–49.

[125] *Id.* at 450.

[126] *Id.* at 441.

[127] *Id.*

[128] *Id.* at 471–72, 475–76.

[129] *Id.* at 477–78. The defense stipulated that this payment was income. *Id.* at 482.

not have knowledge of any expenses that Anderson-Trahan had that would offset the income.[130] Jacobson stated that Anderson-Trahan had a reputation for honesty, integrity, and truthfulness.[131] Jacobson believed that Anderson-Trahan was one of the finest people she had ever met.[132]

Next, the government called Michael Hall ("Hall"), another attorney to whom Anderson-Trahan referred a case.[133] Hall paid Anderson-Trahan $6,650 on January 22, 2014, after the case settled.[134] On cross-examination, Hall testified that a portion of that payment was for costs.[135] Hall stated that Anderson-Trahan had a reputation for honesty, integrity, and truthfulness.[136]

Finally, the government called David Carrone ("Carrone"), an IRS agent.[137] According to Carrone, Anderson-Trahan failed to report $77,710 in gross receipts.[138] Specifically, Anderson-Trahan underreported her wedding income by $13,760 for 2014, $17,200 for 2015, and $31,100 for 2016,[139] and she underreported her attorney's fees by $10,650 in 2014 and $5,000 in 2015.[140] Carrone testified that if Anderson-Trahan had reported her true gross receipts her tax liability

---

[130] *Id.* at 485–86.

[131] *Id.* at 487.

[132] *Id.* at 489.

[133] *Id.* at 495–97.

[134] *Id.* at 498.

[135] *Id.* at 500.

[136] *Id.* at 501.

[137] *Id.* at 503–04.

[138] *Id.* at 526.

[139] *Id.* at 509–10, 522 (total unreported wedding income $62,060).

[140] *Id.* at 517, 520, 526 (total unreported attorney's fee income $15,650).

would have increased by $24,907 total for the three-year period[141]—$7,831 for 2014, $6,072 for 2015, and $11,004 for 2016.[142]

On cross-examination, Carrone acknowledged that Anderson-Trahan reported $34,000 in wedding income on the amended 2015 tax return and $46,730 in wedding income on the amended 2016 tax return, which was more than the amounts calculated by Carrone.[143] Carrone testified that in a typical IRS civil investigation, a revenue agent will meet with a taxpayer and their tax preparer or accountant and ask for documentation to support a person's income and deductions.[144] Then, the taxpayer will have an opportunity to make a civil case as to why the tax returns are correct or to fix the tax returns.[145] The week before trial Carrone determined that Anderson-Trahan owed $37,874 to the IRS, which included the 2013 tax year.[146] After Count 1 was dismissed, Carrone determined that Anderson-Trahan owed $24,907 to the IRS.[147] Carrone accepted as true the expenses that Anderson-Trahan reported on the original returns she filed.[148]

After calling Carrone, the government rested its case, and Anderson-Trahan moved for acquittal.[149] Anderson-Trahan argued that the government had not presented sufficient evidence

---

[141] *Id.* at 527.

[142] *Id.* at 519–21.

[143] *Id.* at 529.

[144] *Id.* at 533.

[145] *Id.* at 533–34.

[146] *Id.* at 538.

[147] *Id.* at 539.

[148] *Id.* at 545–47, 556, 567.

[149] *Id.* at 571, 574.

to prove that she acted willfully.[150] Additionally, Anderson-Trahan moved for judgment of acquittal on Count 4 because there was no documentary evidence showing that she signed the 2016 return or the e-file form.[151] The Court reserved final decision on the motion until after the jury returned a verdict.[152]

Thereafter, the defense called three witnesses. First, the defense called Scott Sigl, a paralegal who prepared a chronological medical summary of Anderson-Trahan and her mother's medical records.[153] Anderson-Trahan and her mother's physical health issues were summarily described in the Medical Timeline exhibit.[154] ██████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████      ███████  ████████████

██████   ████████   ████████   ███████   ██████   ██████   ███████   ████   █████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████   ████████   Ms. Faye Anderson passed away on June 17, 2017.███████████████[157]

Second, the defense called Deatrice "Dee" Henderson ("Henderson"), who worked for

---

[150] *Id.* at 574.

[151] *Id.*

[152] *Id.* at 584.

[153] *Id.* at 585–87.

[154] Defense Ex. 20.

 ██ ██

 ██ ██

[157] *Id.*

Anderson-Trahan as a paralegal for approximately 10 years before Anderson-Trahan took the bench.[158] Henderson testified that Anderson-Trahan was not organized; Henderson would not allow Anderson-Trahan to take originals of documents because she feared they would get lost.[159] Henderson testified that Anderson-Trahan was not involved with the administrative operation of the law firm; Henderson did all of the bookkeeping and accounting work.[160] According to Henderson, there were years when she made more than both of the attorneys at the firm.[161] Henderson stated that Anderson-Trahan had a reputation for honesty, integrity, and truthfulness.[162]

After Anderson-Trahan took the bench, Henderson received payments from Anderson-Trahan for paralegal work done before Anderson-Trahan took the bench.[163] Henderson testified that Anderson-Trahan always honored her obligations, and she believed Anderson-Trahan was dogmatic in her desire to pay off a prior tax debt.[164]

According to Henderson, Anderson-Trahan was humiliated when her political opponent filed a lawsuit against her.[165] Henderson testified that Anderson-Trahan also experienced a difficult time during her mother's illnesses.[166]

Finally, the defense called Corrine Shelton ("Shelton"), Anderson-Trahan's therapist, who

---

[158] Tr. at 642–44.

[159] *Id.* at 644–45.

[160] *Id.* at 646, 648.

[161] *Id.* at 651.

[162] *Id.* at 652.

[163] *Id.* at 654.

[164] *Id.* at 655–56.

[165] *Id.* at 656.

[166] *Id.* at 657.

testified as an expert licensed therapist.[167] Shelton began treating Anderson-Trahan in October

2016.[168]



---

[167] *Id.* at 664–67.

[168] *Id.* at 667.

▮▮▮▮▮▮ After calling Shelton, the defense rested its case.[179]

## E.     *The Fourth Day of Trial*

Closing arguments were made the morning of November 17, 2022.[180] During closing arguments, both parties focused on whether Anderson-Trahan's conduct was willful. The government argued that Anderson-Trahan knew that she had falsely reported her gross receipts because: (1) she was able to maintain a successful career as a judge during the relevant time-period;[181] (2) she had staff to assist her with organizing a busy docket;[182] (3) she was doing well in therapy and had tools to cope with her anxiety;[183] (4) she was able to keep track of expenses for her taxes when they benefitted her;[184] (5) she knew the weddings she was performing each year increased but she reported the same amount of income each year and then reported less income in 2016;[185] (6) she waited until after the July 12, 2018 Judiciary Commission inquiry to begin preparing any amended tax returns;[186] and (7) she had the information needed to accurately calculate the number of weddings she performed and it was fairly easy to compute the amount of money earned.[187] The government argued that Anderson-Trahan willfully underreported her

---

[179] *Id.* at 705.

[180] Rec. Doc. 116.

[181] Tr. at 724–25.

[182] *Id.* at 725–26.

[183] *Id.* at 729–30.

[184] *Id.* at 730–31.

[185] *Id.* at 726, 732.

[186] *Id.* at 739.

[187] *Id.* at 740.

income to lessen her tax liability.[188]

The defense acknowledged that mistakes were made on the tax returns but asserted that Anderson-Trahan did not act willfully.[189]  The defense asserted that the government had not proven that Anderson-Trahan's actions were not the result of negligence, gross negligence, or carelessness.[190]  The defense also argued that the IRS agent's testimony supported a finding of reasonable doubt because his testimony showed that the IRS kept lowering the total tax amount.[191] The defense pointed out that the IRS never audited Anderson-Trahan to determine her accurate expenses.[192]  The defense asserted that Anderson-Trahan was a disorganized person who relied on others to assist with her business affairs.[193]  The defense pointed out that Ancar accurately reported Anderson-Trahan's legal fees on the 2014 Financial Disclosure, arguing that the failure to include that same number on her 2014 tax return was nothing more than an oversight.[194]

The Court then instructed the jury on the law. The Court instructed the jury that as to each of Counts Two through 4, the government must have proved each of the following beyond a reasonable doubt:

> *First:*        That the defendant signed or authorized the signing of an income tax return that contained a written declaration that it was made under penalties of perjury;
>
> *Second:*    That in the return the defendant falsely underreported her gross

---

[188] *Id.* at 733–34.

[189] *Id.* at 742–43.

[190] *Id.* at 744.

[191] *Id.* at 746–47.

[192] *Id.* at 747–48.

[193] *Id.* at 756.

[194] *Id.*

receipts;

*Third:*        That the defendant knew the statement was false;

*Fourth:*     That the false statement was material; and

*Fifth:*        That the defendant made the statement willfully, that is, with intent
to violate a known legal duty.[195]

The Court also defined the term "willfully" for the jury:

The word "willfully" means the voluntary, intentional violation of a known legal duty. To prove that a defendant acted willfully, the government must prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that she voluntarily and intentionally violated that duty.

If the government proves actual knowledge of the pertinent legal duty, then the government has satisfied the knowledge component of the willfulness requirement. A person's conduct is not "willful" if she acted through negligence, even gross negligence, inadvertence, or justifiable excuse or mistake, or due to her good faith misunderstanding of the requirements of the law.

To carry its burden of establishing that a defendant acted willfully, the government must prove the absence of good faith. In other words, the government must prove beyond a reasonable doubt that the defendant was not acting with the good faith belief that she was acting lawfully. A person who believes in good faith that her actions comply with the law does not act willfully, even if her belief that she is complying with the law is irrational or unreasonable.[196]

After being instructed on the law by the Court, the jury began its deliberations at 11:15 AM

continuing until after 9:00 PM.[197]

## F.    *The Fifth Day of Trial*

When the jurors returned on November 18, 2022 at 9:30 AM, the Court gave an *Allen*

---

[195] *Id.* at 777–78.

[196] *Id.* at 778–79.

[197] Rec. Doc. 116.

charge, and the jurors resumed deliberations.[198]  That afternoon, the jurors informed the Court that they were hopelessly deadlocked. At 3:30 PM, a mistrial was declared.[199]

Anderson-Trahan then moved again for a judgment of acquittal under Federal Rule of Criminal Procedure 29.[200]  The Court ordered written briefing on the motion. On December 22, 2022, the Court granted Anderson-Trahan leave to file her brief under seal.[201]  On January 10, 2023, the Court granted the government leave to file an opposition to the motion under seal.[202]  On January 13, 2023, the Court granted Anderson-Trahan leave to file a reply brief under seal.[203]  These briefs were filed under seal to protect the confidentiality of Anderson-Trahan and her mother's medical records.

## II. Parties' Arguments

### A.    *Anderson-Trahan's Arguments in Support of the Motion*

As an initial matter, Anderson-Trahan contends that the government's investigation was inadequate and ignored key facts.[204]  Anderson-Trahan asserts that the government must prove "a full and adequate investigation that establishes a guarantee of essential accuracy in the circumstantial proof at trial as an element of the government's burden of proving guilt beyond a reasonable doubt.'"[205]  Anderson-Trahan points out that she was never audited or given an

---

[198] Rec. Doc. 117.

[199] *Id.*

[200] Tr. at 824.

[201] Rec. Docs. 136, 137.

[202] Rec. Docs. 140, 141.

[203] Rec. Docs. 144, 145.

[204] Rec. Doc. 137-1 at 4.

[205] *Id.* (*quoting United States v. Adams*, 314 F. App'x 633, 645–46 (5th Cir. 2009) (internal quotation

opportunity to present evidence to the IRS to support the validity of her records.[206] Anderson-Trahan asserts that the government's case was "devoid of any evidence of the steps that it took to fully and fairly examine [her] taxes" and reveals that the IRS did not consider that certain expenses would have lessened Anderson-Trahan's overall tax liability.[207] Anderson-Trahan argues that the failure to present evidence of a proper investigation is sufficient to create reasonable doubt.[208] Anderson-Trahan contends that "the government failed to prove the steps it took in its investigation, it failed to prove exactly what it alleged Ms. Trahan's misstatement to be, and it failed to prove her willfulness in making an alleged false statement."[209]

Anderson-Trahan argues that the government failed to adequately address Anderson-Trahan's willfulness, instead "relying on a 'pile' of stretched inferences in making its case."[210] On the other hand, Anderson-Trahan asserts that she presented substantial evidence regarding her "integrity, organizational struggles, and her mental health issues," and upon consideration of this evidence no rational juror could find that the government proved beyond a reasonable doubt that she willfully lied on her taxes.[211] Given the overwhelming evidence as to her lack of willfulness, Anderson-Trahan asserts that no rational jury could have found her guilty beyond a reasonable

---

marks omitted)).

[206] *Id.* at 5.

[207] *Id.* at 6, 8–10.

[208] *Id.* at 6.

[209] *Id.* at 9.

[210] *Id.* at 10.

[211] *Id.*

doubt.[212]

In support of this argument, Anderson-Trahan asserts that the evidence established the following: (1) Anderson-Trahan has a character and reputation for truthfulness; (2) Anderson-Trahan was not an organized person but she prepared her taxes in good faith; (3) Anderson-Trahan inherited a flawed system for tracking weddings and, although she continued the system, she did not do so in an effort to lessen her tax liability; and (4) Anderson-Trahan suffered from persistent and severe anxiety during the relevant period.[213] First, Anderson-Trahan points out that the testimony regarding her character and reputation for truthfulness was overwhelming, as five government witnesses and one defense witness all testified that she was known for these attributes.[214]

Second, Anderson-Trahan submits that the evidence revealed she was not an organized person, which was apparent in her tax preparation, but that her good faith in this preparation was also apparent.[215] Anderson-Trahan relies on the testimony of her tax preparer, Krystal Ancar, to show that Anderson-Trahan acted honestly in attempting to accurately report her taxes, but disorganized records and communication issues caused some mistakes.[216] Anderson-Trahan also points to the testimony of Allison Kotsay, an IRS record witness, who acknowledged that Anderson-Trahan's attempt to come up with a plan to satisfy her tax obligations would be a sign

---

[212] *Id.* at 21.

[213] *Id.* at 10–21.

[214] *Id.* at 10.

[215] *Id.* at 12.

[216] *Id.* at 14–15.

of good faith.[217]

Third, Anderson-Trahan asserts that the evidence showed she inherited a flawed system for tracking weddings, which she continued when she became a judge.[218] Anderson-Trahan notes that her staff was saddled with old technology that did not allow them to accept credit card or check payments and required the use of a typewriter.[219] Anderson-Trahan contends that she continued this system based on the advice of trusted sources, and there is no evidence to find that she continued it in order to lessen her tax liability.[220]

Fourth, Anderson-Trahan submits that the evidence showed that she suffered from persistent and severe anxiety during the relevant period.[221] Anderson-Trahan points to the medical timeline exhibit, which she offered at trial.[222] Anderson-Trahan submits that her role as her mother's primary caregiver exhausted her mental and emotional capacity.[223] Anderson-Trahan cites the testimony of Corrine Shelton, the licensed therapist who testified as an expert at the trial, and began treating Anderson-Trahan in October 2016.[224] Considering Shelton's testimony regarding Anderson-Trahan's persistent and severe anxiety, Anderson-Trahan submits that any rational juror would have a reasonable doubt as to her willfulness.[225]

---

[217] *Id.* at 15.

[218] *Id.* at 15–16.

[219] *Id.* at 16.

[220] *Id.* at 17.

[221] *Id.*

[222] *Id.*

[223] *Id.* at 18.

[224] *Id.* at 19.

[225] *Id.* at 21.

**B.**     *The Government's Arguments in Opposition to the Motion*

The government opposes the motion and argues that a rational juror could conclude that the government proved each element of the offenses beyond a reasonable doubt.[226] Viewing the evidence in the light most favorable to the government, it submits that a rational juror could conclude that Anderson-Trahan "knew she received more gross receipts each year because she knew the volume of weddings increased and she knew her prices increased."[227] The government asserts that the evidence was particularly overwhelming in 2015, "when the true value of [Anderson-Trahan's] gross receipts was at least more than double what she reported."[228] According to the government, a rational juror could "infer willfulness from Defendant's pattern of underreporting gross receipts, especially in light of her outstanding tax debt—which would have only increased had [Anderson-Trahan] reported accurate numbers."[229] The government argues that "the evidence presented at trial refutes Defense Counsel's arguments regarding [Anderson-Trahan's] organizational struggles and mental health issues."[230] Specifically, the government points out that Anderson-Trahan was a successful judge, she identified itemized expenses on her tax returns where those expenses decreased her tax liability, and she developed coping mechanisms after the death of her mother.[231]

The government asserts that Anderson-Trahan's arguments regarding the sufficiency of the

---

[226] Rec. Doc. 141 at 1.

[227] *Id.* at 12–13.

[228] *Id.* at 13.

[229] *Id.*

[230] *Id.* at 13–14.

[231] *Id.* at 14.

government's investigation are misplaced and misstate applicable law.[232] Even if this Court disagreed with the government's exercise of its prosecutorial discretion in this case, the government submits that such a "disagreement would not negate the sufficiency of the [g]overnment's evidence."[233] Although tax loss is relevant to Anderson-Trahan's motive, the government submits that it was not required to prove any specific tax loss beyond a reasonable doubt.[234] The government asserts that Anderson-Trahan did not have the right to a civil audit before the initiation of a criminal case.[235] Although many criminal investigations stem from civil IRS investigations, the government contends that criminal IRS investigations may also originate from outside sources such as the media, informants, or non-tax law enforcement agencies.[236]

The government argues that it proved each element of the offenses. The government asserts that the evidence established that Anderson-Trahan signed, or authorized the signing of, materially false tax returns.[237] The government contends that it also proved that Anderson-Trahan, a judge, understood the legal requirement to accurately report her income.[238] Moreover, the government argues that it proved beyond a reasonable doubt that Anderson-Trahan knew the gross receipts reported on her tax returns were false.[239]

---

[232] *Id.*

[233] *Id.*

[234] *Id.*

[235] *Id.* at 15.

[236] *Id.* at 16.

[237] *Id.* at 18.

[238] *Id.* at 19.

[239] *Id.* at 20–27.

As to the 2016 tax return, the government submits that a rational juror could conclude that Anderson-Trahan knew the $15,200 reported as gross receipts for performing weddings was false since Anderson-Trahan performed more weddings than she had in prior years but reported less income than in prior years.[240] The government asserts that the reason for the increase was noteworthy, as 2016 was the first full year after the legalization of same-sex marriage, and Anderson-Trahan knew the decision would increase the number of weddings she would perform because she decided to charge more fees to account for the increased work.[241] The government contends that "[t]here is simply no good faith reason for [Anderson-Trahan] to report a lower amount of gross receipts" for 2016.[242]

As to the 2014 and 2015 tax returns, the government argues that Anderson-Trahan knew the gross receipts were false.[243] The government asserts that Anderson-Trahan failed to report an additional $13,760 in marriage fees and $10,650 in legal fees on her 2014 tax return and an additional $17,200 in marriage fees and $5,000 in legal fees on her 2015 return.[244] As to the fees for officiating weddings, the government submits that the jury could infer that Anderson-Trahan knew the amounts reported were false because she reported the same amount in 2013, even though the number of weddings she was officiating increased each year.[245] The government argues that the evidence simply does not support Anderson-Trahan's argument that a jury must doubt whether

---

[240] *Id.* at 21.

[241] *Id.*

[242] *Id.* at 22.

[243] *Id.* at 24.

[244] *Id.*

[245] *Id.* at 25.

Anderson-Trahan knew her reported figures were false, but the evidence instead shows that Anderson-Trahan reported those items that she wanted to report.[246]

The government points out that Anderson-Trahan met with Ancar in 2014 to prepare the 2013 return, and Ancar testified that she explained to Anderson-Trahan the need to report her gross receipts for officiating weddings and from attorney's fees.[247]  Despite that advice, the government posits that Anderson-Trahan apparently never:

> (a) documented the receipt of fees (wedding or legal) income when she received it, (b) reviewed her bank records for checks for legal fees, (c) directed her tax preparer to review her bank records for checks for legal fees, (d) reviewed the wedding licenses she officiated, (e) asked the Louisiana Department of Vital Records how many weddings she officiated, or (f) directed her employees to count the licenses she officiated.[248]

The government submits that this all indicates that Anderson-Trahan simply had no intention of reporting her true income to her tax preparer.[249]  In the face of this evidence, the government concludes that "it would certainly be possible for a rational juror to not harbor a reasonable doubt that [Anderson-Trahan] merely 'forgot' her legal income or that her wedding fees increased each year, and at the very least this Court should leave the resolution of this question of fact to the jury."[250]

The government argues that a rational juror could reject Anderson-Trahan's argument that stress and anxiety prevented her from acting willfully, because the evidence also established that

---

[246] *Id.* at 26.

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.* at 27.

Anderson-Trahan diligently operated her courtroom and reported her deductible expenses during that time.[251] Finally, the government asserts that a rational juror could reject the argument that evidence of good character requires a finding of not guilty.[252] For these reasons, the government submits that the motion for judgment of acquittal should be denied.[253]

## C.   *Anderson-Trahan's Arguments in Further Support of the Motion*

In reply, Anderson-Trahan asserts that the government "doubles down on its 'simple math' approach to its investigation."[254] Anderson-Trahan contends that trial testimony and evidence demonstrate that this approach was inadequate. [255] According to Anderson-Trahan, the government failed to investigate and account for a number of factors affecting Anderson-Trahan's gross income and her related expenses.[256] Further, Anderson-Trahan asserts that the government mischaracterizes the nature of the revised tax returns, understates Anderson-Trahan's anxiety issues, and ignores the overwhelming nature of supporting character testimony.[257]

First, Anderson-Trahan repeats her prior argument that the government must prove "a full and adequate investigation that establishes a guarantee of essential accuracy in the circumstantial proof at trial as an element of the government's burden of proving guilt beyond a reasonable

---

[251] *Id.*

[252] *Id.* at 28.

[253] *Id.* at 29.

[254] Rec. Doc. 145 at 1.

[255] *Id.*

[256] *Id.*

[257] *Id.*

doubt.'"[258] Anderson-Trahan concedes that the government is not required to perform an audit in a criminal case, but Anderson-Trahan posits "the minimum standard of adequacy for a civil tax investigation must be met, if not exceeded, for a criminal investigation."[259] To the extent a specific civil method may not be followed, Anderson-Trahan argues that "the government must demonstrate its alternative steps to establish a guarantee of essential accuracy."[260]

Second, Anderson-Trahan asserts that an evaluation of tax loss is critical to evaluating her alleged willfulness.[261] Anderson-Trahan contends that "no rational juror could find beyond a reasonable doubt that [she] willfully underreported gross receipts when there would be no effect on her tax loss."[262] Although specific tax loss is not an element of the offense, "where the government's testimony, as here, showed shifting positions on specific tax loss stemming from glaring gaps in its investigation," Anderson-Trahan submits that no rational juror could find that the government proved beyond a reasonable doubt that she acted willfully.[263] Anderson-Trahan argues that the government's own evidence refutes its assertion that she tracked her deductible expenses, and emphasizes that she did not act willfully because she did not fully track her expenses even when doing so would have benefited her.[264] Given the testimony that Anderson-Trahan struggled generally with disorganization, Anderson-Trahan contends that no reasonable juror

---

[258] *Id.* at 1–2 (quoting *Adams*, 314 F. App'x at 645–46 (internal quotation marks omitted)).

[259] *Id.* at 2.

[260] *Id.*

[261] *Id.*

[262] *Id.* at 3.

[263] *Id.* at 4.

[264] *Id.* at 5.

could find her guilty beyond a reasonable doubt.[265]

Third, Anderson-Trahan submits that the government did not prove the amounts of Anderson-Trahan's gross receipts for weddings beyond a reasonable doubt.[266] Anderson-Trahan points out that the figures submitted by the government ($29,760 in 2014, $33,200 in 2015, and $46,300 in 2016) do not account for fees that were waived, and the undisputed evidence at trial was that Anderson-Trahan waived wedding fees.[267] Additionally, Anderson-Trahan points out that the government accounted for $80 per wedding before *Obergefell* and $100 per wedding post-*Obergefell*, but the evidence established that the additional $20 fee went to a separate employee and was never possessed by Anderson-Trahan.[268] Considering that she "never collected, never took possession, and never personally distributed the money that was set aside separately,"[269] Anderson-Trahan submits that no rational juror could find beyond a reasonable doubt that Anderson-Trahan acted willfully in not reporting that amount.[270]

Fourth, Anderson-Trahan asserts that the government mischaracterizes her actions following the Judiciary Commission investigation.[271] Anderson-Trahan submits that she worked to provide the most conservative numbers possible to the Judiciary Commission, and revised her

---

[265] *Id.* at 5–6.

[266] *Id.* at 6.

[267] *Id.*

[268] *Id.*

[269] *Id.* at 7.

[270] *Id.*

[271] *Id.*

taxes based on those same numbers.[272] Anderson-Trahan points to evidence showing that these actions were taken on the advice of counsel, and she asserts that "[s]he took these actions in an attempt to put a potential difficult investigation behind her, not as an admission that she was previously incorrect."[273]  Additionally, Anderson-Trahan asserts that "no rational person would believe beyond a reasonable doubt that [her] earnest response was consistent with willfulness in avoiding taxes."[274]



Sixth, Anderson-Trahan asserts that the government's argument that she could have shifted wedding tracking systems ignores the evidence showing that the courthouse was saddled with old technology.[277]  Seventh, Anderson-Trahan asserts that the government ignores the overwhelming nature of the character testimony.[278]  For all of these reasons, Anderson-Trahan contends that no

---

[272] *Id.*

[273] *Id.*

[274] *Id.* at 8.





[277] *Id.*

[278] *Id.* at 9.

rational juror could find beyond a reasonable doubt that she willfully avoided taxes.[279]

### III. Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant may renew such a motion within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.[280]

The Court may grant a judgment of acquittal if "no rational jury could have found the offenses' essential elements proven beyond a reasonable doubt."[281] The Fifth Circuit has explained that in ruling on a motion for judgment of acquittal:

> The District Court must determine whether the relevant evidence, viewed in the light most favorable to the Government, could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. The same test applies whether the evidence is direct or circumstantial. All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor.[282]

Therefore, to grant a judgment of acquittal, the Court must conclude, after viewing the evidence in the light most favorable to the Government, that a rational juror "must necessarily entertain a

---

[279] *Id.* at 11.

[280] Fed. R. Crim. P. 29(c)(1). Anderson-Trahan first moved for judgment of acquittal at the close of the government's case. The Court reserved decision on the motion and proceeded with the trial. After the Court declared a mistrial, Anderson-Trahan renewed the motion for judgment of acquittal. The Court then granted the parties additional time to file written briefs on the issue.

[281] *United States v. Hankton*, 51 F.4th 578, 592 (5th Cir. 2022) (citing *United States v. McClaren*, 13 F.4th 386, 400 (5th Cir. 2021)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

[282] *United States v. Black*, 644 F.2d 445, 447 (5th Cir. 1981) (quoting *United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979)).

reasonable doubt as to the guilt of the defendant."[283]  "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."[284]

A district court's denial of a motion for judgment of acquittal is reviewed de novo.[285] However, "[a] judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed. . ."[286]  The Supreme Court has recognized this as "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence" because appellate review of a verdict of acquittal would put a defendant "twice in jeopardy."[287]

---

[283] *Burns*, 597 F.2d at 941 (internal citations omitted). The Fifth Circuit previously applied the "equipoise rule" to motions for judgment of acquittal. Under that rule, "[i]f after viewing the evidence in the light most favorable to the prosecution, the evidence still gives equal or nearly equal support to a theory of guilt and a theory of innocence," the Court must grant acquittal "because in that event, a reasonable trier of fact must necessarily entertain reasonable doubt." *United States v. Santillana*, 604 F.3d 192, 195 (5th Cir. 2010) (quoting United *States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992)). However, in 2014, the Fifth Circuit abandoned this rule finding that it was "not helpful in applying the Supreme Court's standard prescribed in *Jackson v. Virginia*, whereby reviewing courts must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301–02 (5th Cir. 2014) (en banc). The Fifth Circuit stated that *Jackson's* "deferential standard" of review prevents courts from usurping the jury's function because it "does not permit the type of fine-grained factual parsing necessary to determine that the evidence presented to the factfinder was in equipoise." *Id.* (citations and quotation marks omitted). The *Jackson* standard is deferential to "the jury's role as factfinder." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). *Jackson* also "unambiguously instructs that a reviewing court, faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (internal citation and quotation marks omitted). Unlike *Jackson* and its progeny, where the jury returned guilty verdicts, here, the jury was unable to reach a verdict after deliberating for two days. Therefore, there is no jury verdict or finding of fact to which this Court could defer. The jury was unable to reach a unanimous agreement in this case, possibly because the evidence gave equal or near equal support to a theory of guilt and a theory of innocence.

[284] *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc).

[285] *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997).

[286] *United States v. Scott*, 437 U.S. 82, 91 (1978).

[287] *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (quoting *United States v. Ball*, 163

"The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense."[288] As the Supreme Court has explained:

> Underlying this constitutional safeguard is the belief that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."[289]

"This guarantee recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek."[290]

## IV. Analysis

Anderson-Trahan requests that the Court enter a judgment of acquittal as to Counts Two, Three, and Four of the Superseding Indictment because she asserts that the government failed to conduct an adequate investigation, failed to prove specific tax loss beyond a reasonable doubt, and failed to prove the heightened standard of "willfulness" that applies to tax cases beyond a reasonable doubt.[291] The government opposes the motion and argues that a rational juror could conclude that the government proved each of the elements of the offenses beyond a reasonable

---

U.S. 662, 671 (1896)). When a court grants a judgment of acquittal after the jury returns a guilty verdict, the government can appeal because "reversal would only require reinstating the jury verdict," and therefore, the Double Jeopardy Clause is not implicated. *United States v. Leal*, 781 F.2d 1108, 1110 (5th Cir. 1986). In this case, of course, the jury did not return a verdict.

[288] *United States v. Dinitz*, 424 U.S. 600, 606 (1976) (internal citations omitted).

[289] *Id.* (quoting *Green v. United States*, 355 U.S. 184, 187–88 (1957)).

[290] *Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018).

[291] Rec. Doc. 137.

doubt.[292]  Before addressing whether the government presented sufficient evidence upon which a juror could find each of the elements of the offenses beyond a reasonable doubt, the Court begins by addressing Anderson-Trahan's preliminary argument that inadequacies in the investigation create a reasonable doubt.

### A.   *Adequacy of the Investigation*

Anderson-Trahan argues that the government's failure to present evidence of a proper investigation is sufficient to create reasonable doubt.[293]  Anderson-Trahan points out that she was never audited or given an opportunity to present evidence to the IRS to support the validity of her records.[294]  Anderson-Trahan asserts that the government's case was "devoid of any evidence of the steps that it took to fully and fairly examine [her] taxes" and reveals that the IRS did not consider that certain expenses would have lessened Anderson-Trahan's overall tax liability.[295]  The government responds that Anderson-Trahan's arguments regarding the sufficiency of the government's investigation are misplaced and misstate applicable law.[296]  Although tax loss is relevant to Anderson-Trahan's motive, the government submits that it was not required to prove any specific tax loss beyond a reasonable doubt.[297]

Anderson-Trahan is charged with three counts of filing false income tax returns, in violation of 26 U.S.C. § 7206(1). "This offense is distinct from tax evasion, which 'requires proof

---

[292] Rec. Doc. 141.

[293] Rec. Doc. 137-1 at 6.

[294] *Id.* at 5.

[295] *Id.* at 6, 8–10.

[296] Rec. Doc. 141 at 14.

[297] *Id.*

of an intention to evade or defeat a tax, whereas § 7206(1) penalizes the filing of a false return even though the falsity would not produce tax consequences.'"[298] Therefore, the government was not required to prove a specific tax loss.[299] Anderson-Trahan argues that the government should have considered that certain expenses would have lessened Anderson-Trahan's overall tax liability. However, IRS Agent Carrone testified that he accepted as true the expenses that Anderson-Trahan reported on the original returns she filed.[300]

Anderson-Trahan argues that the IRS should have audited her before pursuing a criminal case. The law does not require the government to adjudicate tax disputes civilly or administratively before proceeding to criminal prosecutions.[301] Additionally, IRS guidelines provide that the IRS "should not attempt to use a civil investigation to develop a criminal tax case . . . [and] under no circumstances will these procedures be used to develop a criminal tax case under the guise of a civil examination."[302] Therefore, Anderson-Trahan has not shown that the IRS's decision not to audit her, in itself, creates a reasonable doubt.

Anderson-Trahan relies on the Fifth Circuit's opinion in *United States v. Adams*, which

---

[298] *Adams*, 314 F. App'x 636 (quoting *United States v. Citron*, 783 F.2d 307, 313 (2d Cir. 1986)) (internal quotation marks omitted).

[299] *See United States v. Garcia*, 553 F.2d 432, 432 (5th Cir. 1977) (per curiam) (upholding the trial court's refusal to allow defense to introduce evidence of what tax, if any, would be owing on the unreported income in a § 7206(l) case); *United States v. Holladay*, 566 F.2d 1018, 1020 (1978) ("Although the government did not prove that the defendant received profits or income from the illicit business at his gas station, it did establish, through direct testimony and the gas station notebooks, substantial gross receipts that he failed to report. This material misrepresentation suffices to establish liability for filing false returns, 26 U.S.C. § 7206(1).").

[300] Tr. at 545–47, 556, 567.

[301] *United States v. Ellett*, 527 F.3d 38, 40–41 (2d. Cir. 2008) (tax evasion case); *United States v. Daniel*, 956 F.2d 540, 542 (6th Cir. 1992) (tax evasion case); *United States v. Hogan*, 861 F.2d 312, 315–16 (lst Cir. 1988) (tax evasion case); *United States v. Dack*, 747 F.2d 1172, 1174–75 (7th Cir. l984) (tax evasion case); *United States v. Voorhies*, 658 F.2d 710, 715 (9th Cir. 1981) (tax evasion case); *United States v. Kelley*, 539 F.2d 1199, 1203 (9th Cir. 1976) (false tax return case).

[302] *United States v. Powell*, 835 F.2d 1095, 1100 (5th Cir. 1988)

42

was also a false tax return case.[303]  In *Adams*, the government relied on an indirect method of proof

known as the "bank deposits and cash expenditures method" to prove that the defendant falsely

reported his gross receipts.[304]  Under this method, the government calculates the defendant's

"equal gross income" by: (1) evaluating all deposits made to the defendant's bank accounts; (2)

subtracting amounts deposited that are non-taxable; and (3) adding the amount of expenditures

made in cash.[305]  Then, the government compares the equal gross income figure to the income that

the defendant reported.[306]  The Fifth Circuit observed that there are well-established criteria the

government must establish to prove that "the expenditures and deposits represent taxable income

for the year in question."[307]  The Fifth Circuit explained that the government must prove "a full

and adequate investigation that establishes a guarantee of essential accuracy in the circumstantial

proof at trial as an element of the government's burden of proving guilt beyond a reasonable

doubt."[308]

 Unlike in *Adams*, the government did not rely on a bank deposits and cash expenditures

method to show that Anderson-Trahan underreported her gross receipts. As discussed in more

detail below, the government relied on a combination of documentary and testimonial evidence to

---

[303] *Adams*, 314 F. App'x at 633.

[304] *Id.* at 644.

[305] *Id.* at 644–45.

[306] *Id.* at 645.

[307] *Id.*

[308] *Id.* at 645–46 (quoting *United States v. Boulet*, 577 F.2d 1165, 1168 (5th Cir. 1978)) (internal quotation marks omitted). In *Boulet*, the Fifth Circuit stated, "The government must prove a full and adequate investigation in a bank-deposits case just as it must in a net-worth case. Such investigation must establish a guarantee of essential accuracy in the circumstantial proof at trial as an element of the government's burden of proving guilt beyond a reasonable doubt. . . ." *Boulet*, 577 F.2d at 1168.

prove that Anderson-Trahan underreported her gross receipts. The government did not have to prove the amount of tax loss beyond a reasonable doubt because "§ 7206(1) penalizes the filing of a false return even though the falsity would not produce tax consequences."[309]

Nevertheless, the government concedes that the amount of tax loss was relevant to motive. As the government has repeatedly made clear before, during, and after trial, it alleges that Anderson-Trahan underreported her gross receipts to lower her tax liability. However, the amount of tax loss alleged was a moving target that changed several times during trial. During its opening statement, the government argued that the evidence would show that Anderson-Trahan knew how much money she earned, knew she had to pay taxes on that income, and failed to report "around $100,000" because she wanted to "keep her taxes down."[310] At the start of trial, the government was estimating a tax loss of $37,874.[311]

Then, at the start of the second day of trial, the government orally moved to dismiss Count 1 of the Superseding Indictment.[312] In dismissing Count 1, the government acknowledged that it could not meet its burden of proof on that count because the parties discovered handwritten notes showing that Anderson-Trahan reported her 2013 legal income to her tax preparer.[313] Therefore, the government could not establish that Anderson-Trahan willfully underreported her gross receipts for 2013. After Count 1 was dismissed, the government estimated a tax loss of $24,907.[314]

---

[309] *Adams*, 314 F. App'x 636 (quoting *United States v. Citron*, 783 F.2d 307, 313 (2d Cir. 1986)) (internal quotation marks omitted).

[310] Tr. at 133–34.

[311] Rec. Doc. 137-9.

[312] Tr. at 256.

[313] *Id.*

[314] Rec. Doc. 137-10.

In its post-trial brief, the government acknowledges that the tax loss was not substantial,[315] but it posits that the "difference apparently was enough to motivate [Anderson-Trahan] to seize what she saw as an opportunity—reporting to her tax preparer that the gross receipts she collected in cash remained the same when in fact they increased each year."[316] Although the Court is cognizant that it must view all of the evidence in the light most favorable to the government, the Court questions the reasonableness of this argument, especially in light of the overwhelming defense evidence showing that: (1) Anderson-Trahan has a character and reputation for truthfulness; (2) Anderson-Trahan struggled with disorganization; (3) Anderson-Trahan inherited a flawed system for tracking weddings; and (4) Anderson-Trahan suffered from persistent and severe anxiety during most of the relevant period. Considering the government's shifting theories of tax loss and the wealth of mitigating evidence presented, the government's arguments simply came across as, at best, unrefined and, at worst, contrived. Nevertheless, because the adequacy of the investigation was not itself on trial, the Court proceeds to evaluate whether a reasonable juror could find that the government established each element of the offense beyond a reasonable doubt.

## B.  *Elements of the Offense*

The parties agree on the essential elements of the charged offenses. To prove a violation of 26 U.S.C. § 7206(1), the government must prove each of the following beyond a reasonable doubt:

*First:*        That the defendant signed or authorized the signing of an income tax return that contained a written declaration that it was made under penalties of perjury;

*Second:*   That in the return the defendant falsely underreported her gross

---

[315] The government acknowledges that "the total tax difference between what Defendant owed and what Defendant should have owed was less than $40,000." Rec. Doc. 141 at 17. This estimate includes the alleged tax loss for Count One. *Id.* at 17, n.92.

[316] *Id.*

| | |
|---|---|
| | receipts; |
| *Third:* | That the defendant knew the statement was false; |
| *Fourth:* | That the false statement was material; and |
| *Fifth:* | That the defendant made the statement willfully, that is, with intent to violate a known legal duty.[317] |

The Court may grant a judgment of acquittal if "no rational jury could have found the offenses' essential elements proven beyond a reasonable doubt."[318] Therefore, the Court examines each of the elements in turn.

### 1. Whether Anderson-Trahan Signed or Authorized the Signing of an Income Tax Return that Contained a Written Declaration that It was Made Under Penalties of Perjury

All three tax returns bear Anderson-Trahan's digital signature, which the law gives the same effect as a physical signature.[319] All three tax returns contain jurats stating that they were made under penalties of perjury.[320] Additionally, the government presented evidence showing that Anderson-Trahan authorized her tax preparer, Krystal Ancar, to file the 2014, 2015, and 2016 tax returns on Anderson-Trahan's behalf.[321] According to Ancar, she prepared Anderson-Trahan's

---

[317] Tr. at 777–78; *see also United States v. Boyd*, 773 F.3d 637, 644 (5th Cir. 2014) (The government must prove that the defendant: "(1) made and signed a materially false federal income tax return; (2) submitted a written declaration stating under penalties of perjury that the return was true and correct; (3) did not believe that the return was true and correct when [s]he signed it; and (4) signed it willfully and with the specific intent to violate the law.").

[318] *United States v. Hankton*, 51 F.4th 578, 592 (5th Cir. 2022) (citing *United States v. McClaren*, 13 F.4th 386, 400 (5th Cir. 2021)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

[319] *See* 26 U.S.C. § 6061(b)(2) ("[A]ny return, declaration, statement, or other document filed and verified, signed, or subscribed under any method adopted under [26 U.S.C. § 6061(b)(l)(B)] shall be treated for all purposes (both civil and criminal, including penalties for perjury) in the same manner as though signed or subscribed.").

[320] Gov't Ex. 15, 16, 17.

[321] *See United States v. Ponder*, 444 F.2d 816, 822 (5th Cir. 1971) (affirming conviction in which the defendant did not sign the return but authorized its signing); *see also United States v. Frye*, 770 F. App'x 137 (4th Cir.

2014 tax return based on the information Anderson-Trahan provided, but she did not have a copy of the records Anderson-Trahan provided because her computer server crashed.[322] Ancar testified that she always obtains her clients' authorization before filing electronic returns on their behalf.[323] Ancar identified the e-file Signature Authorization that Anderson-Trahan signed for her 2015 tax return.[324] Ancar also identified an unsigned copy of the Signature Authorization for Anderson-Trahan's 2016 tax return from her records, and she stated she must have provided the original to Anderson-Trahan.[325] Based on this evidence, a reasonable juror could conclude that Anderson-Trahan authorized Ancar to file her tax returns for the 2014, 2015, and 2016 tax years.

### 2.    Whether Anderson-Trahan Falsely Underreported her Gross Receipts

At trial, the defense initially appeared to concede that Anderson-Trahan underreported her gross receipts. During Anderson-Trahan's opening statement, the defense admitted that Anderson-Trahan "made mistakes on her taxes" and owes "about $38,000 in taxes."[326] However, the amount of taxes allegedly owed was later reduced to $24,907, after the government dismissed Count 1 of the Superseding Indictment.[327] Anderson-Trahan now argues that the government failed to prove

---

2019) (per curiam). In *Frye*, the defendant contended that "the mere entry of [the defendant's] personal identification number (PIN) is insufficient to show that she signed her return because Form 8879, the form authorizing e-filing, was unsigned." *Id.* at 139. The court concluded that "a rational juror could conclude that the presence of [the defendant's] PIN, a unique identifier, on her return was sufficient to show that [the defendant] signed her return." *Id.*

[322] Tr. at 411–12.

[323] *Id.* at 410.

[324] *Id.*; Gov't Ex. 72.

[325] Tr. at 409–10; Gov't Ex. 71.

[326] Tr. at 144.

[327] *See* Rec. Doc. 137-10.

exactly what it alleged her misstatements to be.[328] The government asserts that the evidence showed that Anderson-Trahan underreported attorney's fees and wedding officiant fees.

        *a.*        *Gross Receipts for Attorney's Fees*

To prove that Anderson-Trahan underreported her gross receipts for attorney's fees in 2014, the government relied on the trial testimony of Tamara Jacobson and Michael Hall and supporting documentary evidence. Jacobson testified that she paid Anderson-Trahan $4,000 on January 16, 2014, after a case Anderson-Trahan referred to her settled,[329] and Hall testified that he paid Anderson-Trahan $6,650 on January 22, 2014, after a case Anderson-Trahan referred to him settled.[330] Neither of these payments were reported on Anderson-Trahan's 2014 tax return.[331]

To prove that Anderson-Trahan underreported her gross receipts for attorney's fees in 2015, the government admitted bank records showing that Anderson-Trahan received and deposited a $9,471 check from Boykin & Utley in October 2015,[332] and she received and deposited a $5,000 check from the Law Offices of Clifton M. Davis in December 2015.[333] Anderson-Trahan only reported the payment from Boykin & Utley on her 2015 tax return.[334] The $5,000 payment from Clifton Davis was not reported.

---

[328] Rec. Doc. 137-1 at 9.

[329] Tr. at 477–78; Gov't Ex. 44. The defense stipulated that this payment was income. Tr. at 482.

[330] Tr. at 498; Gov't Ex. 43.

[331] Gov't Ex. 15. However, the items were reported on Anderson-Trahan's 2014 Financial Disclosure Statement, a publicly available document that Anderson-Trahan filed with the Louisiana Supreme Court. Tr. at 284–85; Gov't Ex. 8. For the year 2014, Anderson-Trahan's Financial Disclosure Statement reported that she earned between $5,000 and $24,999 in legal fees. Gov't Ex. 8.

[332] Gov't Ex. 46.

[333] Gov't Ex. 45.

[334] Gov't Ex. 16.

The defense argues that the government failed to account for expenses that should have been deducted from this income. While expenses would impact Anderson-Trahan's net income, they do not impact the reportable gross receipts. The IRS defines "gross receipts" as "the total amounts [] received from all sources during its annual accounting period, without subtracting any costs or expenses."[335] Viewing this evidence in the light most favorable to the government, a reasonable juror could conclude that Anderson-Trahan underreported her gross receipts for legal fees by $10,650 in 2014 and $5,000 in 2015.

b.    *Gross Receipts for Wedding Officiant Fees*

To prove that Anderson-Trahan underreported her gross receipts for officiating weddings, the government primarily relied on the testimony of Devin George, the deputy assistant secretary for the Office of Public Health in Louisiana, and supporting documentary evidence.[336] The government offered a report prepared by George and his staff showing that Anderson-Trahan officiated 372 weddings in 2014, 415 weddings in 2015, and 463 weddings in 2016.[337] The government then offered each of the marriage licenses from the weddings Anderson-Trahan officiated into the record as evidence.[338] Lisa Hibbs, a court reporter who worked for Anderson-Trahan, testified that Anderson-Trahan originally charged $80 to officiate a wedding, but the charge increased to $100 after the United States Supreme Court legalized gay marriage in 2015.[339]

IRS Agent Carrone used a "simple math" approach to calculate the amount of the gross

---

[335] *See* https://www.irs.gov/charities-non-profits/gross-receipts-defined (last visited Feb. 2, 2023).

[336] Tr. at 160.

[337] *Id.* at 173.

[338] *Id.* at 174–76.

[339] *Id.* at 194, 208–09.

receipts.[340] Carrone multiplied the number of weddings performed by $80 for 2014 and 2015 and by $100 for 2016. Therefore, Carrone determined that Anderson-Trahan earned at least $29,760 officiating weddings in 2014 ($80 x 372 weddings = $29,760), $33,200 officiating weddings in 2015 ($80 x 415 weddings = $33,200), and $46,300 officiating weddings in 2016 ($100 x 463 weddings = $46,300). Anderson-Trahan reported that her wedding income was $16,000 in 2014, $16,000 in 2015, and $15,200 in 2016.[341] Subtracting these calculations from the amount of gross receipts reported, Carrone calculated Anderson-Trahan underreported her wedding income by $13,760 for 2014 ($29,760 - $16,000 = $13,760), $17,200 for 2015 ($33,200 - $16,000 = $17,200), and $31,100 for 2016 ($46,300 - $15,200 = $31,100).[342]

Anderson-Trahan argues that the government did not prove the exact amount of gross receipts for officiating weddings because it did not account for fees that were waived.[343] Anderson-Trahan's court reporter, Hibbs, testified that sometimes Anderson-Trahan waived the officiating fee for friends or family members.[344] However, Hibbs also stated that there was an additional charge for weddings on Valentine's Day because the staff decorated the courtroom, and she believed Anderson-Trahan charged more to perform weddings on weekends.[345] The government's calculation of the fees paid to Anderson-Trahan was a "simple math" approach, but it is also a conservative estimate of the fees received. Although the government did not account

---

[340] *Id.* at 509.

[341] Gov't Ex. 15, 16, 17.

[342] Tr. at 509–10, 522 (total unreported wedding income $62,060).

[343] Rec. Doc. 145 at 6.

[344] Tr. at 210.

[345] *Id.*

for fees that were waived, it also did not add fees for weekends and holidays. Hibbs testified that Anderson-Trahan occasionally waived fees for friends or family. Anderson-Trahan underreported the number of weddings she officiated by 172 weddings in 2014, 215 weddings in 2015, and 311 weddings in 2016. Hibbs's testimony that Anderson-Trahan occasionally waived the fee does not negate a finding that Anderson-Trahan underreported the gross receipts. The government's burden is to prove the element beyond a reasonable doubt, not beyond all doubt.

Anderson-Trahan also points out that the government accounted for $80 per wedding before *Obergefell* and $100 per wedding beginning in 2016 post-*Obergefell*, but the evidence established that the additional $20 fee went to a separate employee and was never possessed by Anderson-Trahan.[346] The Court finds this argument persuasive. Hibbs testified that when the officiant fee increased from $80 to $100, the additional $20 fee did not go directly to Anderson-Trahan, it went into a money till and was later split between three people who worked in chambers.[347] It does not appear that Anderson-Trahan would have to report that amount to the IRS as a gross receipt as it was not an amount "received" by Anderson-Trahan. Nevertheless, even calculating the gross receipts for 2016 at a rate of $80 per wedding, Anderson-Trahan still underreported her wedding income. The uncontroverted evidence established that Anderson-Trahan performed 463 weddings in 2016. At a rate of $80 per wedding, Anderson-Trahan's gross receipts would have been $37,040. On her 2016 tax return, Anderson-Trahan reported gross receipts of only $15,200.

The Superseding Indictment alleged that Anderson-Trahan underreported her gross

---

[346] Rec. Doc. 145 at 6.

[347] Tr. at 223, 227.

receipts. As discussed above, the government did not have to prove the specific tax loss. Viewing this evidence in the light most favorable to the government, a reasonable juror could conclude that Anderson-Trahan underreported her gross receipts for officiating weddings by $13,760 in 2014, $17,200 in 2015, and at least $21,840 in 2016 (using a rate of $80 per wedding for all three years).

### 3.      Whether Anderson-Trahan Knew the Statement was False

The issue of whether Anderson-Trahan knew the statement was false is closely intertwined with whether she acted willfully, as both involve her state of mind. A defendant is "not guilty of violating § 7206(1) unless [she] had signed the tax returns knowing them to be false, and had done so willfully."[348] Anderson-Trahan does not brief the knowledge element. As the Court explained in the instructions to the jury, "[i]f the government proves actual knowledge of the pertinent legal duty, then the government has satisfied the knowledge component of the willfulness requirement."[349] Ancar testified that she explained to Anderson-Trahan the need to report her income from wedding fees and from attorney's fees sometime in 2014 when she began preparing Anderson-Trahan's 2013 tax return.[350] Considering this undisputed evidence, a rational juror could find that Anderson-Trahan had actual knowledge of the pertinent legal duty. However, the issue of whether Anderson-Trahan knew the gross receipts were false is more nuanced. Therefore, the Court discusses it together with the willfulness element.

### 4.      Whether the Statements were Material

Anderson-Trahan does not raise any argument regarding materiality. The evidence

---

[348] *United States v. Pomponio*, 429 U.S. 10, 11 (1976).

[349] Tr. at 778–79.

[350] *Id.* at 456.

discussed above regarding underreporting of gross receipts satisfies the element of materiality. As defined in the Court's instructions to the jury, "[a] statement is material if it has a natural tendency to influence, or is capable of influencing, the Internal Revenue Service in investigating or auditing a tax return or in verifying or monitoring the reporting of income by a taxpayer."[351]  That definition is clearly satisfied by the false reporting of gross receipts.[352]  Viewing the evidence in the light most favorable to the government, a reasonable juror could conclude that the false statements were material.

### 5.   Whether Anderson-Trahan Knew the Statements were False and Made Them Willfully

Anderson-Trahan argues that the government failed to prove beyond a reasonable doubt that she willfully lied on her taxes.[353]  Given the overwhelming evidence as to her lack of willfulness, Anderson-Trahan asserts that no rational jury could have found her guilty beyond a reasonable doubt.[354]  In support of this argument, Anderson-Trahan asserts that the evidence established the following: (1) Anderson-Trahan has a character and reputation for truthfulness; (2) Anderson-Trahan was not an organized person but she prepared her taxes in good faith; (3) Anderson-Trahan inherited a flawed system for tracking weddings and, although she continued the system, she did not do so in an effort to lessen her tax liability; and (4) Anderson-Trahan suffered from persistent and severe anxiety during the relevant period.[355]

---

[351] Tr. at 777.

[352] *See Holladay*, 566 F.2d at 1020.

[353] Rec. Doc. 137-1 at 10.

[354] *Id.* at 21.

[355] *Id.* at 10–21.

The government's brief focuses much of its attention on whether Anderson-Trahan knew the gross receipts she reported were false, devoting surprisingly little time to the issue of her willfulness.[356] According to the government, a rational juror could "infer willfulness from Anderson-Trahan's pattern of underreporting gross receipts, especially in light of her outstanding tax debt—which would have only increased had Anderson-Trahan reported accurate numbers."[357] The government argues that a rational juror could reject defense arguments regarding Anderson-Trahan's organizational struggles, mental health issues, and her character for truthfulness.[358]

"Willfulness . . . requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that [s]he voluntarily and intentionally violated that duty."[359] In *United States v. Masat*, the Fifth Circuit approved a jury instruction on willfulness that read in part: "Defendant's conduct is not 'willful' if [s]he acted through negligence, even gross negligence, inadvertence, justifiable excuse or mistake, or due to [her] good faith misunderstanding of the requirements of the law."[360] A "good-faith misunderstanding of the law or a good-faith belief that one is not violating the law" can negate the statutory willfulness requirement.[361] A jury is "free to consider any admissible evidence from any source showing that" the defendant was not acting willfully,[362] and "the defendant is entitled to wide latitude in the

---

[356] *See* Rec. Doc. 141.

[357] *Id.* at 13.

[358] *Id.* at 27–29.

[359] *Cheek*, 498 U.S. at 201.

[360] *Masat*, 948 F.2d at 931 n.15.

[361] *Cheek*, 498 U.S. at 201.

[362] *Id.* at 202.

introduction of evidence tending to show lack of intent."[363]

During trial the Court gave the following willfulness instruction to the jury:

The word "willfully" means the voluntary, intentional violation of a known legal duty. To prove that a defendant acted willfully, the government must prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that she voluntarily and intentionally violated that duty.

If the government proves actual knowledge of the pertinent legal duty, then the government has satisfied the knowledge component of the willfulness requirement. A person's conduct is not "willful" if she acted through negligence, even gross negligence, inadvertence, or justifiable excuse or mistake, or due to her good faith misunderstanding of the requirements of the law.

To carry its burden of establishing that a defendant acted willfully, the government must prove the absence of good faith. In other words, the government must prove beyond a reasonable doubt that the defendant was not acting with the good faith belief that she was acting lawfully. A person who believes in good faith that her actions comply with the law does not act willfully, even if her belief that she is complying with the law is irrational or unreasonable.[364]

With respect to the 2014 gross receipts for attorney's fees, the Court finds that no rational

juror could conclude that Anderson-Trahan willfully underreported the income. The government

dismissed Count 1 on the second day of trial because the parties discovered handwritten notes

showing that Anderson-Trahan reported her 2013 attorney's fees to her tax preparer.[365] The

evidence regarding Anderson-Trahan's 2013 attorney's fees closely mirrored the evidence on her

2014 attorney's fees. Although the 2013 legal income was not reported on Anderson-Trahan's tax

return, it was reported on the publicly available Financial Disclosure Statement Anderson-Trahan

---

[363] *United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir. 1992) (citing *United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1979)).

[364] Tr. at 778–79.

[365] *Id.* at 256.

submitted to the Louisiana Supreme Court for 2013.[366] Similarly, Anderson-Trahan accurately reported her 2014 attorney's fees on the publicly available Financial Disclosure Statement Anderson-Trahan submitted to the Louisiana Supreme Court for 2014.[367]   According to Ancar, she prepared Anderson-Trahan's 2014 tax return based on the information Anderson-Trahan provided, but she did not have a copy of the records Anderson-Trahan provided because her computer server crashed.[368]  Ancar also lost the documentation for 2013 when her computer crashed.[369]  Like the parties discovered with respect to the 2013 attorney's fees, the evidence presented at trial overwhelmingly supports the conclusion that Anderson-Trahan also reported her 2014 attorney's fees to her tax preparer. Therefore, a reasonable juror could not conclude that Anderson-Trahan was willful in failing to report the 2014 attorney's fees.

Whether Anderson-Trahan willfully underreported the 2015 attorney's fees and the wedding fees for all three years presents a closer question. Concededly, this is a close case, as evidenced by the fact that the jury could not reach a unanimous verdict. Courts have observed that "there may well be cases in which the government's proof founders in the realm between preponderance and beyond reasonable doubt."[370] This is exactly such a case. If the Court were simply applying a scintilla or a preponderance of the evidence standard, the inferences upon which the government relies may be sufficient to establish willfulness, but the government bears the burden of establishing each element of the offense beyond a reasonable doubt. Even when the

---

[366] Tr. at 446; Gov't Ex. 7, Gov't Ex. 14.

[367] Tr. at 284–85; Gov't Ex. 8.

[368] Tr. at 411–12.

[369] *Id.* at 455.

[370] *United States v. Olbres*, 61 F.3d 967, 975–76 (1st Cir. 1995) (internal citations omitted).

evidence is viewed in the light most favorable to the government, the Court cannot find that the government met its burden of proving the willfulness element beyond a reasonable doubt.[371]

The government suggests that a rational juror could find Anderson-Trahan's conduct was willful because she had tax problems for years, and she willfully underreported her income in an effort to decrease her tax liability. The Fifth Circuit has held that "evidence of willfulness is ordinarily circumstantial" and may include "failure to report a substantial amount of income, a consistent pattern of underreporting large amounts of income, the spending of large amounts of cash that cannot be reconciled with the amount of reported income, or any conduct, the likely effect of which would be to mislead or to conceal."[372] Here, the government did not prove any such circumstances.

The government did not show that Anderson-Trahan failed to report a substantial amount of income or that she had a pattern of underreporting large amounts of income. As discussed above, in a Section 7206(1) case, the government does not have to prove a specific tax loss. Nevertheless, the government relies on the tax loss to show Anderson-Trahan's alleged motive (lessening her tax liability), which the government says also proves that the conduct was willful. During the trial, the government presented shifting theories on the amount of tax actually owed. By the end of trial, the government was alleging that Anderson-Trahan owed approximately $25,000 in taxes for the three-year period at issue. However, the defense presented evidence suggesting that additional

---

[371] This analysis also applies as an alternative basis for granting judgment of acquittal regarding the 2014 attorney's fees.

[372] *United States v. Kellar*, 394 F. App'x 158, 165 (5th Cir. 2010) (quoting *United States v. Chesson*, 933 F.2d 298, 304 (5th Cir. 1991)) (quotations and alterations omitted) (affirming convictions under 26 U.S.C. §§ 7201 and 7203).

expenses could have been deducted, which would lessen the tax liability even further.[373] The numerous inconsistencies as to the amount of Anderson-Trahan's tax liability created reasonable doubt regarding willfulness. Therefore, even viewed in the light most favorable to the government, a reasonable juror could not find that Anderson-Trahan willfully underreported her gross receipts.

The government repeatedly argued that Anderson-Trahan was able to track and report her expenses when doing so would benefit her and lessen her tax liability, but the defense presented evidence showing the fallacy of this argument. The undisputed evidence demonstrated that Anderson-Trahan did not fully track her expenses. The evidence established that Anderson-Trahan gave disorganized records to Ancar, who used the limited financial records she was provided to help Anderson-Trahan identify potentially deductible expenses.[374] Ancar had to ask Anderson-Trahan to provide her with documentation for certain deductions.[375] Ancar would probe Anderson-Trahan to learn about whether certain deductions could be taken for things like tithing and mileage for her travel to weddings.[376]Ancar would use the internet to calculate the mileage between the location and Anderson-Trahan's home.[377]

---

[373] Tr. at 650 (Dee Henderson testified that Anderson-Trahan would pay her half of any fee, after deducting for expenses).

[374] *Id.* at 439.

[375] *Id.* at 444.

[376] *Id.* at 445–46.

[377] *Id.* at 446.

A plethora of evidence demonstrating Anderson-Trahan's disorganized "bookkeeping" process was presented at trial. Anderson-Trahan prepared handwritten notes for Ancar, which were compiled in a completely inconsistent manner as depicted below:



These documents do not suggest someone who was willfully falsifying her gross receipts in an effort to lessen her tax liability. As the person preparing Anderson-Trahan's tax returns for each year in question, Ancar had the best insight into Anderson-Trahan's state of mind. Ancar testified that she did her best to prepare the tax returns in good faith, and she believed that Anderson-Trahan was acting in good faith.[378] According to Ancar, Anderson-Trahan did not try to "fudge the numbers" to lessen her tax liability.[379]  In short, Ancar's testimony did not establish that Anderson-Trahan willfully underreported her gross receipts.

The evidence also showed that Anderson-Trahan inherited a flawed system for tracking weddings. Anderson-Trahan relied on the process established by Judge K.K. Norman for wedding-related duties. Lisa Hibbs, a court reporter who worked for Anderson-Trahan and her predecessor

---

[378] *Id.* at 440–41.

[379] *Id.* at 426.

Judge Norman, stated that Anderson-Trahan followed the procedures for performing weddings that were established by Judge Norman.[380] Another of Anderson-Trahan's employees, Tamara Griffin-Major characterized the wedding system as informal, as it was not Anderson-Trahan's "main duty" as a judge.[381]

The government points to Ancar's testimony that she explained to Anderson-Trahan the need to report her gross receipts for officiating weddings and from attorney's fees.[382] The government suggests that Anderson-Trahan should have taken steps to better document her income after her meeting with Ancar.[383] Perhaps Anderson-Trahan's failure to keep better records of her gross receipts could be considered negligence or even gross negligence, but the law requires that the government prove that the conduct was willful. The government has not met that burden.

As additional considerations, the testimony regarding Anderson-Trahan's character and reputation for truthfulness was overwhelming, as five government witnesses and one defense witness all testified that she was known for her honesty, integrity, and trustworthiness.[384] ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮

---

[380] *Id.* at 216–17.

[381] *Id.* at 264.

[382] Rec. Doc. 141 at 26.

[383] *Id.*

[384] Tr. at 225 (Hibbs), 273–74 (Griffin-Major), 441 (Ancar), 487 (Jacobson), 501 (Hall), 652 (Henderson).

▮▮  ▮▮▮▮▮



The government argues that a reasonable juror could have rejected this evidence because Anderson-Trahan kept up with the demands of her career ████████████████ ████████████████████████ ████████ The government is correct that a juror could have rejected the testimony regarding Anderson-Trahan's character for truthfulness████ ████████████ However, that argument does not address the government's lack of evidence regarding willfulness and therefore, no rational juror could find that the government proved its case beyond a reasonable doubt. The government bears the burden of proof.

Through some stretched inferences, perhaps it is plausible for a juror to conclude that Anderson-Trahan acted willfully under a scintilla or preponderance of the evidence standard. However, such a finding would be irrational under the beyond a reasonable doubt standard, even when viewing the evidence in the light most favorable to the government. When reviewing a sufficiency of the evidence claim, courts are "empowered to consider . . . whether the inferences

---

drawn by a jury were rational, as opposed to being speculative or insupportable."[391]  A finding of willfulness in this case would be purely speculative and unsubstantiated by the evidence.

## V. Conclusion

For the reasons discussed in detail above, even when viewed in the light most favorable to the government, the government failed to prove beyond a reasonable doubt that Anderson-Trahan acted willfully. The government's entire theory on willfulness was based on an inference; the government argued that a rational juror could infer Anderson-Trahan's conduct was willful because she wanted to lessen her tax liability. However, other than reporting incorrect gross receipts on her tax forms, there was no evidence to show that Anderson-Trahan was in fact trying to lower her tax liability (*i.e.*, she did not try to inflate or even accurately account for deductions that could have lessened her tax liability).

Through some stretched inferences, perhaps it is plausible for a juror to conclude that Anderson-Trahan acted willfully under a scintilla or preponderance of the evidence standard. However, such a finding would be irrational under the beyond a reasonable doubt standard, even when viewing the evidence in the light most favorable to the government. A finding of willfulness in this case would be purely speculative and unsubstantiated by the evidence. When the evidence is viewed in the light most favorable to the government, a reasonable juror could not find that the government proved beyond a reasonable doubt that Anderson-Trahan's conduct was willful. Therefore, the government failed to meet its burden of proof in this case. Accordingly,

---

[391] *United States v. Vargas-Ocampo*, 747 F.3d 299, 302 (5th Cir. 2014) (en banc).

**IT IS HEREBY ORDERED** that Ernestine Anderson-Trahan's Motion for Judgment of Acquittal[392] is **GRANTED**.

**NEW ORLEANS, LOUISIANA,** this <u>14th</u> day of February, 2023.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[392] Rec. Doc. 137.