**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

SEALED

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 22-2** |
| **v.** | * | **SECTION: "G"** |
| **ERNESTINE ANDERSON-TRAHAN** | * | |
| * | * | * |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL**

**NOW INTO COURT** comes the United States of America, by undersigned counsel, and responds to Defendant's Motion for a Judgment of Acquittal. A rational juror could conclude that in its case-in-chief, the Government proved beyond a reasonable doubt that Defendant signed or authorized the signing of materially false 2014, 2015, and 2016 tax returns under penalty of perjury. The Government also proved beyond a reasonable doubt that Defendant—a judge—understood the legal requirement to accurately report her income on her tax returns. A rational juror could conclude that the Government proved beyond a reasonable doubt that Defendant knew the gross receipts reported on her 2014, 2015, and 2016 tax returns were false. And finally, a rational juror could conclude that Defendant acted willfully. This Court should not be distracted by Defense Counsel's attempt to cast aspersions on the Government's investigation or the origin of this case.

### I. Law Pertaining to the Present Motion for Judgment of Acquittal

A hung jury is not a conviction, of course, but neither is it the equivalent of an acquittal. *Richardson v. United States*, 468 U.S. 317 (1984); *see also United States v. Corona*, 804 F.2d 1568, (11th Cir. 1986). The test this Court is to employ in determining sufficiency of proof on a motion for judgment of acquittal is the same the Fifth Circuit would employ if it were

1

to review this Court's ruling: whether a jury might reasonably conclude that the evidence, viewed in the light most favorable to the prosecution, is sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *See, e.g.*, *Burks v. United States*, 437 U.S. 1, 16 (1978); *United States v. Black*, 644 F.2d 445, 447 (5th Cir. 1981); *United States v. Wilkinson*, 601 F.2d 791, 795 (5th Cir. 1979); *United States v. Fredericks*, 586 F.2d 470, 474 (5th Cir. 1978); *see also United States v. Hamilton*, 37 F.4th 246, (5th Cir. 2022) ("While there was undoubtedly evidence at trial to support [the defendant's] theory of the case, the jury was entitled to believe the Government's theory instead."); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."). In *Black*, the Fifth Circuit phrased the standard as follows:

> The District Court must determine whether the relevant evidence, viewed in the light most favorable to the Government, could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. The same test applies whether the evidence is direct or circumstantial. All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor.

644 F.2d at 447.

"The standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001) (citing *United States v. Baytank*, 934 F.2d 599, 617 (5th Cir. 1991)). "A jury is free to choose among reasonable constructions of the evidence." *Bell*, 678 F.2d at 549. Indeed, the jury—not the Court— "retains sole authority to

weigh any conflicting evidence and to evaluate the credibility of the witnesses." *Loe*, 262 F.3d at 432 (citing *United States v. Millsaps*, 157 F.3d 989, 994 (5th Cir. 1998)). This narrow standard of review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 442 U.S. 307, 319 (1979).

Based upon this standard, the Government's evidence was sufficient for a reasonable jury to convict, even if the particular jury empaneled for this case could not come to a unanimous decision. Thus, for the reasons explained below, Defendant's motion must be denied.

## II.  Law Pertaining to the Charged Offense

The Court instructed the jury consistent with the Fifth Circuit Pattern Jury Instructions on the elements of the offense:

> First: That the defendant signed or authorized the signing of an income tax return that contained a written declaration that it was made under penalties of perjury;
>
> Second: That in the return the defendant falsely underreported her gross receipts;
>
> Third: That the defendant knew the statement was false;
>
> Fourth That the false statement was material; and
>
> Fifth: That the defendant made the statement willfully, that is, with intent to violate a known legal duty.[1]

And the Court clarified the elements as follows:

> A statement is "material" if it has a natural tendency to influence, or is capable of influencing, the Internal Revenue Service in investigating or auditing a tax return or in verifying or monitoring the reporting of income by a taxpayer.[2]

---

[1] D.E. 116-1 at 17.

[2] Defense Counsel falsely insinuates that the Government was required to prove "a specific tax loss beyond a reasonable doubt." Mem. in Supp. of Mot. for J. of Acquittal at 1. Tax loss is not an element of the charged offense, and the Government was not required to prove any specific tax loss beyond a reasonable doubt. *See United States v. Garcia*, 553 F.2d 432, 432 (5th Cir. 1977) (per curiam) (upholding the trial court's refusal to allow defense evidence of tax

An electronic signature has the same effect as an actual signature for this offense.[3]

### III.   Evidence Presented at Trial

A.   <u>Defendant's 2014–2016 wedding gross receipts were at least $29,760;</u>
<u>$33,200; and $46,300</u>

In its case-in-chief, the Government presented evidence that Defendant officiated 282 weddings in 2013, 372 weddings in 2014, 415 weddings in 2015, and 463 weddings in 2016, documented by copies of the marriage certificates themselves.[4]   The Government also presented sworn testimony from Defendant's employees that Defendant charged $80 a wedding from 2013 into 2015,[5] and $100 from sometime in 2015 into 2016.[6]   The same employees testified that wedding couples had to pay the fees in cash.[7]

Defendant's employee testified that Defendant charged more under certain circumstances, including holidays and weddings conducted outside of the courthouse or outside of traditional court hours.[8]   Indeed, a wedding client testified she paid $100 for her 2013 wedding.[9]

Defendant's employees testified that Defendant increased the standard fee to $100 in response to the increase of weddings she was performing following the 2015 Supreme Court decision, *Obergefell v. Hodges*, that legalized same-sex marriage.[10]   A member of the Louisiana

---

liability or lack thereof in a § 7206(1) case)); *United States v. Holladay*, 566 F.2d 1018, 1020 (5th Cir. 1978) ("Although the government did not prove that the defendant received profits or income . . . it did establish . . . substantial receipts that he failed to report.   This material misrepresentation suffices to establish liability for filing false returns[.]").
[3] D.E. 116-1 at 18.
[4] Government Exhibits 2–6; R. at 173.
[5] R. at 208, 242; *see also* R. at 422.
[6] R. at 208.
[7] R. at 209, 243.
[8] R. at 210.
[9] R. at 189.
[10] R. at 209 ("When they initiated the same sex marriages, we went up.   We just knew it would be so much busier we went up.").

Department of Vital Records similarly testified that his office saw a noticeable increase in the number of weddings due to the Supreme Court decision, and his office made changes to the marriage licenses themselves in order to account for the decision.[11]   Defendant's employees also testified that Defendant paid them a portion of the increased fees.  The employees stated that Defendant previously had not paid them a portion of the wedding fees.[12]

Multiplying the number of 2014 and 2015 weddings by $80 a wedding, and multiplying the number of 2016 weddings by $100 a wedding, Defendant received gross receipts of at least $29,760; $33,200; and $46,300 from 2014 to 2016. [13]   These are conservative calculations; Defendant charged more than those fees under certain circumstances, and her fee increased from $80 to $100 sometime in 2015 (i.e., Defendant was not charging a base of $80 for the entire year).[14]

B.  Defendant's 2014 and 2015 attorney's fees gross receipts were $10,650 and $14,471.43

Defendant received and deposited a $4,000 check from the Law Office of Tamara Kluger Jacobson[15] and a $6,650 check from the Law Office of Michael Hall[16] in January 2014.  Those attorneys testified that those checks were payments to Defendant for cases that Defendant referred to them that settled after Defendant had taken the bench.[17]

Defendant also received and deposited a $9,471 check from Boykin & Utley[18] in October 2015 and a $5,000 check from the Law Offices of Clifton M. Davis[19] in December 2015.  Boykin

---

[11] R. at 176–77; Government Exhibit 5 at 392.
[12] R. at 226.
[13] Government Exhibit 73.
[14] A member of Defendant's chambers testified that Defendant did occasionally waive the fee for "friends or family."   R. at 210.
[15] Government Exhibit 44.
[16] Government Exhibit 42.
[17] R at 483, 497–98.
[18] Government Exhibit 46.
[19] Government Exhibit 45 at 2.

& Utley filed a Form 1099-MISC reporting the payment to the IRS.[20]   The other payments were not accompanied by Forms 1099.[21]

      C.   Defendant made and subscribed tax returns under penalty of perjury that falsely stated her 2014–2016 wedding gross receipts were $16,000; $16,000; and $15,200 and her 2015 legal fees were $9,471

Defendant filed 2014, 2015, and 2016 tax returns on July 2, 2015; October 17, 2016; and November 18, 2017, respectively.[22]   On each return, Defendant declared under penalties of perjury that she examined the return and accompanying schedules and statements and to the best of her knowledge and belief, the returns were "true, correct, and complete."[23]

Each return reported on a Schedule C income and expenses from a "Wedding" business. On Line 1 of the Schedules C, the 2014, 2015, and 2016 returns reported "gross receipts" of $16,000;[24] $16,000;[25] and $15,200;[26] respectively.   Defendant also filed a 2013 tax return on March 20, 2017, reporting gross receipts for a "Wedding" business of $16,000.[27]   Defendant also reported income from a law business on a Schedule C for her 2015 return.   On Line 1 of that Schedule C, the return reported "gross receipts" of $9,471 (i.e., the check from Boykin & Davis).[28] Defendant did not report income from an attorney business on her 2013, 2014, or 2016 tax returns.[29]

Defendant's tax preparer testified that she prepared Defendant's tax returns based on the

---

[20]   Government Exhibit 32 at 5; *see also* R. at 324–25.

[21]   *See generally* Government Exhibits 31–32; *see also* R. at 325.

[22]   Government Exhibits 23–25.

[23]   Government Exhibits 15–17.

[24]   Government Exhibit 15 at 29.

[25]   Government Exhibit 16 at 26.

[26]   Government Exhibit 17 at 31.

[27]   Government Exhibit 14 at 9; Government Exhibit 22 at 2.

[28]   Government Exhibit 16 at 29 (Line 1).

[29]   *See generally* Government Exhibits 14, 15, 17.

information Defendant provided to her and that she had no way of independently verifying Defendant's income.[30]   The preparer said she generally explains this to all of her clients and identified examples of the engagement letter that she provides to clients stating as much.[31]   While the preparer did not have a copy of the engagement letter she provided to Defendant when preparing her 2014 through 2016 returns, she stated that her tax preparation software automatically generates the letter each year and she provides it to clients as a regular course of her business, but does not retain a copy herself.[32]   The tax preparer also testified that she explained to Defendant the need to report her income from wedding fees and from attorney fees sometime in 2014 when she began preparing Defendant's 2013 tax return.[33]

The tax preparer identified a post-it note Defendant provided to the preparer in order to prepare Defendant's 2016 tax return, stating the handwriting was Defendant's except for "check-marks," which the preparer wrote when she placed the information on Defendant's tax return.[34] That post-it note states "weddings" and then below that states $15,200, but the figure had been crossed out and then re-written.   The post-it also states "(700 x 3 for employee)."[35]

The tax preparer likewise identified a worksheet that Defendant provided in order to prepare Defendant's 2015 tax return which identified Defendant's expenses for operating her rental property and for her courtroom.[36]   The worksheet listed the $9,471 check from Boykin & Utley, but did not include the $5,000 check from the Law Offices of Clifton M. Davis or gross

---

[30] R. at 360, 377, 385.

[31] *See, e.g.*, Government Exhibit 55 at 1.

[32] R. at 370.

[33] R. at 456; *see also* R. at 360, 414.

[34] R. at 378–79.

[35] Government Exhibit 64 at 1.

[36] Government Exhibit 65 at 2.

receipts from marriage fees.[37]   The tax preparer stated she then placed this information on her own Schedule C worksheet in order to prepare Defendant's tax return.[38]   The tax preparer asked Defendant for her gross receipts for wedding income because Defendant did not provide that information, and Defendant told the tax preparer $16,000.[39]

The tax preparer likewise prepared Defendant's 2014 tax return based on the information Defendant provided but did not have a copy of the records Defendant provided.[40]   The tax preparer testified that she always obtains her clients' authorization before filing electronic returns on their behalf.[41]   She identified the e-file Signature Authorization that Defendant signed for her 2015 tax return.[42]   She identified an unsigned copy of the Signature Authorization for Defendant's 2016 tax return from her records,[43] and she stated she must have provided the original to Defendant.[44]

      D.   Defendant acknowledged to the Judiciary Commission of Louisiana that her tax returns were false

In July 2018, the Judiciary Commission of Louisiana asked Defendant whether she accurately reported her income from weddings to the IRS.[45]   In response to this inquiry, Defendant amended her 2015 and 2016 returns and provided those amended returns to the Judiciary Commission.[46]   Defendant also stated an intent to amend her 2013 and 2014 returns.[47] Defendant indeed directed her tax preparer to prepare an amended 2014 return,[48] but Defendant

---

[37] *Id.*
[38] *Id.* at 1; R. at 386–87.
[39] R. at 386.
[40] R. at 411–12.
[41] R. at 410; *see also* R. at 361, 459.
[42] Government Exhibit 72.
[43] Government Exhibit 71.
[44] R. at 410.
[45] D.E. 109-2 at 1; R. at 158–59.
[46] Government Exhibit 35.
[47] Government Exhibit 39.
[48] Government Exhibits 62 and 67.

never filed it.[49]   On the unfiled, amended 2014 return and the filed, amended 2015 and 2016 returns, Defendant reported in Line 1 of the Schedules C for her "Wedding" business gross receipts of \$29,760;[50] \$34,440;[51] and \$46,730;[52] respectively.   Defendant also removed all expenses on the unfiled, amended 2014 return,[53] and removed the contract labor expenses of \$2,100 on the filed, amended 2015[54] and 2016[55] returns.   As a result of these changes, as reported on the amended returns, Defendant would owe an additional \$6,549;[56] \$5,617;[57] and \$10,696[58] in taxes above what she owed based on the original tax returns she filed.

Defendant's employee testified that sometime in 2018, Defendant directed her employees to organize the copies of marriage licenses that Defendant officiated, and which Defendant retained in her chambers.[59]   She stated they had not previously organized certificates or tracked the number of weddings Defendant officiated except for scheduling purposes.[60]   The employees did, however, track wedding licenses issued at the request of the Louisiana Department of Vital Records.[61]   The director of Vital Records also testified that he identified marriages officiated by a judge sometime in 2018, and that nobody—including Defendant—had previously asked his office how many weddings a particular judge officiated.[62]

---

[49] Government Exhibit 23 (account transcript for Defendant for 2014, showing no history of an amended return being filed with the IRS).
[50] Government Exhibit 62 at 6.
[51] Government Exhibit 18 at 8.
[52] Government Exhibit 19 at 7.
[53] Government Exhibit 62 at 6.
[54] Government Exhibit 18 at 8.
[55] Government Exhibit 19 at 7.
[56] Government Exhibit 62 at 1 (Line 11).
[57] Government Exhibit 18 at 2 (Line 11).
[58] Government Exhibit 19 at 2 (Line 11).
[59] R. at 214.
[60] R. at 212, 215.
[61] R. at 247–48.
[62] R. at 178–79.

E. <u>Defendant continues to owe taxes</u>

In the Government's case-in-chief, the Government submitted the IRS's Automated Collection System Histories Transcript for Defendant, showing that the IRS completed collection actions against Defendant in 2010 and 2011.[63] In Defendant's case-in-chief, Defendant's former employee testified that she observed Defendant negotiate a collection action with the IRS sometime before Defendant took the bench (i.e., sometime before 2013), and that the IRS was at "the forefront of her cranium."[64]

Based on her self-reported income on her original tax returns, Defendant owed the IRS taxes for each of 2014, 2015 and 2016 when she filed those returns.[65] However, if Defendant had reported her gross receipts accurately, she would have owed additional taxes.[66] On each return, Defendant requested to be placed on an installment plan.[67] Pursuant to those installment plans, as of October 12, 2022,[68] Defendant made payments towards her 2014[69] and 2015 tax debt,[70] but had not started to make payments towards her 2016 tax debt.[71] Defendant does not have an outstanding balance on her 2014 tax debt[72]—the year for which she did not file an amended return, which would have resulted in a tax debt—but as of October 12, 2022, she still owed the IRS taxes

---

[63] Government Exhibit 28 at 7.

[64] R. at 656.

[65] Government Exhibit 15 at 4; Government Exhibit 16 at 4; Government Exhibit 17 at 4.

[66] Government Exhibit 75 at 1; Government Exhibit 76 at 1; Government Exhibit 77 at 1.

[67] *See, e.g.*, R. at 406.

[68] At trial, defense counsel asked the IRS court witness coordinator if the IRS had received an additional payment that Defendant submitted after October 12, 2022. Defense counsel did not present to the jury any evidence of such payment other than asking the question. *See generally* R. at 329.

[69] Government Exhibit 23 at 3–4.

[70] Government Exhibit 24 at 3–4.

[71] Government Exhibit 25 at 3.

[72] Government Exhibit 23.

on her 2015[73] and 2016 income.[74]

F.   Defendant operated a courtroom and sought assistance when necessary

Throughout the trial, including during the Government's case-in-chief, Defense Counsel solicited testimony that Defendant was "scatterbrained" and that she relied on her staff for organizational responsibilities. The same witnesses testified that Defendant still managed a law firm, ran a successful campaign for judge, and diligently administered her courtroom.[75]

Likewise, Defense Counsel solicited testimony that Defendant had to care for her mother and grapple with her own health issues. The witnesses testified that Defendant would take occasional leave from work or would require prodding to stay focused. The witnesses did not testify to what impact, if any, the Defendant's health or her mother's health had on Defendant's knowledge that the returns she signed and filed underreported gross receipts.[76]



Defendant filed her 2014 tax return well before April 2016, in July 2015.[79]

---

[73] Government Exhibit 24 at 1.

[74] Government Exhibit 25 at 1.

[75] R. at 228, 237, 659.

[76] *See, e.g.*, R. at 662.

[77] Defense Exhibit 20; R. at 597.

[78] R at 628–29; Defense Exhibit 30 at 2.

[79] Government Exhibit 23.

[80] R. at 667, 675, 689; Government Exhibit 79 at 1–2.

 Defendant filed

her 2016 tax return well after June 2017, in October 2017.[83]

### G. The jury reviewed, engaged with, and deliberated over the evidence

The jury reviewed the evidence and deliberated for over a day.[84]   The jury informed the Court that it could not reach a unanimous verdict after asking several questions,[85] even though the Court provided a modified *Allen* charge.[86]   The Court, with the consent of both parties, then declared a mistrial.[87]

### IV. Argument

Viewing the evidence in the light most favorable to the Government, a rational juror could certainly conclude that Defendant knew she was lying to her tax preparer and on her tax returns when she falsely stated that her gross receipts from weddings stayed the same from 2013 to 2014 and from 2014 to 2015 and *decreased* from 2015 to 2016.   The evidence presented at trial proved that Defendant *knew* she officiated more weddings each year—particularly after the Supreme Court issued the landmark decision *Obergefell v. Hodges* in 2015.   Defendant personally decided to increase prices due to the increased volume of weddings resulting from the legalization of same-

---

[81] Government Exhibit 79 at 10; R. at 697.

[82] R. at 634; Defense Exhibit 9 at 762.

[83] Government Exhibit 25.

[84] *See generally* R. at 790–820.

[85] *See, e.g.*, D.E. 117-1; D.E. 117-3.

[86] R. at 806–09.

[87] R. at 823.

sex marriage.   Accordingly, the evidence presented at trial also proved that Defendant *knew* she charged more for officiating weddings after that 2015 decision.   The result is simple math: Defendant *knew* she received more gross receipts each year because she knew the volume of weddings increased and she knew her prices increased.   This evidence showed that although Defendant earned more in wedding fees in 2016 than she had in prior years and knew she had done so, she lied to the IRS in stating under penalty of perjury that she received a lower amount of fees that year than she had in prior years.   Moreover, a rational juror could conclude that Defendant also knew that the gross receipts that she reported for officiating weddings in 2014 and 2015 were false because she reported *the same* gross receipts in 2013, notwithstanding the fact that weddings officiated increased by a sizeable amount each year.   This is particularly overwhelming regarding the weddings officiated in 2015, when the true value of her gross receipts was at least more than double what she reported.   A rational juror could also infer willfulness from Defendant's pattern of underreporting gross receipts, especially in light of her outstanding tax debt—which would have only increased had Defendant reported accurate numbers.

Defense Counsel nevertheless moves for a judgment of acquittal, arguing that Defendant made a careless mistake due to her "scatterbrain" nature and the stress of caring for her terminally ill mother; that testimony in support of Defendant's good character would prevent any rational juror from finding Defendant guilty; and that the nature of the Government's investigation precludes a finding of guilt beyond a reasonable doubt.   Defendant's motion overreaches and must be denied.

At bottom, the question of what weight to assign evidence is best settled by a jury and should not move the Court in this forum.   Moreover, the evidence presented at trial refutes Defense Counsel's arguments regarding Defendant's organizational struggles and mental health

issues. Defendant—a successful judge—was not scatterbrained but instead identified deductible expenses to the dollar on all three of the charged tax returns when those expenses operated to her benefit, i.e., decreased her tax liability. Defendant's mother had passed away and Defendant had learned, developed, and exercised healthy coping mechanisms for months prior to filing her false 2016 tax return. Ultimately, evidence established that in deciding to report a lower amount of gross receipts in 2016 than in 2015, 2014, and 2013, Defendant demonstrated a deliberate choice to report to the IRS a false number. A rational juror could certainly conclude that Defendant simply lied in order to fraudulently reduce her tax liability. Finally, Defendant's arguments regarding the Government's investigation are misplaced and misstate applicable law.

A. Defense Counsel's arguments regarding the Government's investigation are misplaced

Throughout the trial, Defense Counsel argued that the Government should have pursued a civil rather than criminal resolution of these offenses, noting that the cost of investigation and prosecution outweighed the tax loss at issue.[88] Defense Counsel reiterates this argument in its present motion. This argument, which comes close to an improper appeal to nullification when presented to a jury, has no place in the Court's consideration of the present motion. Even if this Court were to disagree with the Government's exercise of its prosecutorial discretion due to the amount of the tax loss in this case, that disagreement would not negate the sufficiency of the Government's evidence. *See, e.g.*, *United States v. Rice*, 52 F.3d 843, 847 (10th Cir. 1995) ("[W]hether Mr. Everett thought the evidence justified the filing of charges is irrelevant. Guided by proper instructions, the sufficiency of the evidence is for the jury to decide from the facts established at trial. Mr. Everett's notions of prosecutorial filing discretion have no bearing on the

---

[88] *See, e.g.*, R. at 329, 332, 485, 534.

ultimate jury question.").

Tax loss simply is not an element of the offenses.  *See United States v. Garcia*, 553 F.2d

432, 432 (5th Cir. 1977) (per curiam) (upholding the trial court's refusal to allow defense evidence

of tax liability or lack thereof in a § 7206(1) case); *Holladay*, 566 F.2d at 1020 ("Although the

government did not prove that the defendant received profits or income . . . it did establish . . .

substantial receipts that he failed to report.   This material misrepresentation suffices to establish

liability for filing false returns[.]").   The tax loss is relevant because it may explain Defendant's

motive; Defendant did not want to pay the IRS her proper tax liability.   But the Government was

not required to prove any specific tax loss beyond a reasonable doubt, nor was it required to

determine any specific tax loss civilly.   *Cf. United States v. Daniels*, 387 F.3d 636, 641 (7th Cir.

2004) (noting that even in a tax evasion case in which a tax underpayment is an element, the

amount of the underpayment is not an element); *United States v. Davenport*, 824 F.2d 1511, 1516–

17 (7th Cir. 1987) (noting that tax deficiencies as low as $3,000 have sufficed for tax evasion

convictions).

More fundamentally, this case does not call for a jury to render a verdict on either the

history of the Government's investigation nor the origin of the present charges.   "Under our

system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not

guilty.   The jury is not asked to render judgment about nonparties, nor is it normally asked to

render a verdict on the government's investigation."   *United States v. McVeigh,* 153 F.3d 1166,

1192 (10th Cir. 1998).

Defense Counsel is simply wrong in arguing that Defendant had a right to a civil audit prior

to initiation of a criminal case because in a "typical" IRS investigation, "the taxpayer will have an

opportunity to make a civil case."   Mem. in Supp. of Mot. for J. of Acquittal at 5.   It is true that

criminal investigations often stem from civil IRS investigations.  *See* IAN M. COMISKY ET AL., TAX FRAUD AND EVASION ¶ 4.02, Westlaw (2022).  This is because IRS employees are trained "when and how to refer a case to [IRS, Criminal Investigation ("IRS-CI")] for criminal investigation," which "usually results in quality criminal fraud referrals" with a "very high" CI acceptance rate.  *Id.*  However, a referral from a civil audit is hardly the only way a criminal investigation initiates.  *Id.*  Criminal investigations may originate "from information gathering and other projects undertaken by elements of CI" or from outside sources "such as the media, a civilian informant, or a federal, state, or local nontax law enforcement or regulatory agency."  *Id.*[89]

The law is clear that the United States is not required to adjudicate tax disputes civilly or administratively before proceeding to criminal prosecution for tax evasion.  *United States v. Ellett*, 527 F.3d 38, 40–41 (2d. Cir. 2008); *see also United States v. Daniel*, 956 F.2d 540, 542 (6th Cir. 1992); *United States v. Hogan*, 861 F.2d 312, 315–16 (1st Cir.1988); *United States v. Dack*, 747 F.2d 1172, 1174–75 (7th Cir. 1984); *United States v. Voorhies*, 658 F.2d 710, 715 (9th Cir. 1981).  Nor is it required to do so where the defendant filed false tax returns.  *See also United States v. Kelley,* 539 F.2d 1199, 1203 (9th Cir. 1976).  It is not an element of the crime.

Furthermore, under IRS guidelines, the IRS "should not attempt to use a civil investigation to develop a criminal tax case" and "under no circumstances . . . develop a criminal tax case under the guise of a civil examination."  *United States v. Powell*, 835 F.2d 1095, 1100 n.12 (5th Cir. 1988).  Criminal matters are meant to be handled criminally, civil matters are meant to be handled civilly, and to mix the two can raise due process concerns.  *See* COMISKY, TAX FRAUD AND

---

[89] *See also How Criminal Investigations Are Initiated*, IRS, https://www.irs.gov/compliance/criminal-investigation/how-criminal-investigations-are-initiated#:~:text=Sources%20of%20Criminal%20Investigations%20for,investigative%20analyst%20detects%20possible%20fraud (June 16, 2022).

EVASION ¶ 4.02.

For the above reasons, the Defendant is wrong to claim that the IRS' "failure" to follow the process "enshrined in IRS Form No. 1, or the Taxpayer Bill of Rights" had any bearing on the adequacy and fairness of its criminal investigation.[90] *See* Mem. in Supp. of Mot. for J. of Acquittal at 5–6. The Taxpayer Bill of Rights relates to the IRS' tax collection efforts, not its deterrence-oriented criminal investigations. Defendant does not have a due process right to have her case adjudicated civilly before proceeding criminally. *Ellett*, 527 F.3d at 40.

The evidence showed that Defendant had tax issues for years, and the IRS permitted Defendant to make incremental payments under an installment plan.[91] However, by underreporting gross receipts, Defendant fraudulently reduced the taxes she owed. While the total tax difference between what Defendant owed and what Defendant should have owed was less than $40,000, that difference apparently was enough to motivate Defendant to seize what she saw as an opportunity—reporting to her tax preparer that the gross receipts she collected in cash remained the same when in fact they increased each year.[92] By then affirming under penalty of perjury that the returns were true and correct when Defendant knew they were not, Defendant committed a crime, regardless of her motivation. *See, e.g.*, *United States v. Pomponio*, 429 U.S. 10, 12–13 (1976) (clarifying that the element of willfulness simply means a voluntary, intentional violation of a known legal duty; there is no requirement to show an evil motive beyond a specific intent to violate the law). A jury could find that the evidence establishes the elements beyond a reasonable doubt, and a rational juror should not be distracted by Defense Counsel's argument that the IRS

---

[90] Neither of these items were introduced into evidence at trial.

[91] R. at 338–41.

[92] In dropping Count 1 related to 2013, the Government has not conceded that Defendant disclosed all gross receipts for the dropped tax year.

should have pursued this case in a civil forum.[93]

               B.   <u>Defendant signed or authorized the signing of materially false tax returns</u>
               <u>(Counts 2–4; Elements 1, 2, and 4)</u>

The Government proved beyond a reasonable doubt that Defendant signed or authorized the signing of materially false 2014, 2015, and 2016 tax returns under penalty of perjury. All three tax returns bear Defendant's digital signature, which has the same effect as a physical signature. *See* 26 U.S.C. § 6061(b)(2) ("[A]ny return, declaration, statement, or other document filed and verified, signed, or subscribed under any method adopted under [26 U.S.C. § 6061(b)(1)(B)] shall be treated for all purposes (both civil and criminal, including penalties for perjury) in the same manner as though signed or subscribed."). All three tax returns contain the appropriate jurats. Defendant's tax preparer testified to the process of preparing these returns with Defendant, and Defendant's tax preparer also testified that she would have obtained Defendant's authorization prior to electronically filing these returns. *See United States v. Ponder*, 444 F.2d 816, 822 (5th Cir. 1971) (rejecting the motion for judgment of acquittal because of testimony from the defendant's secretary that the defendant authorized her to sign and submit his tax return). Further cementing that these are in fact Defendant's tax returns, Defendant has made payments towards the tax debt on the returns and represented to both the Judiciary Commission of

---

[93] Defense Counsel also attempts to impugn the investigation because the Government updated summary charts after dismissing Count 1 relating to 2013. Mem. in Supp. of Mot. for J. of Acquittal at 7. Again, this should have no bearing on the Motion at issue because neither the cumulative tax loss nor the validity of the overarching investigation are elements of remaining charges, Counts 2 through 4 regarding Defendant's original 2014 through 2016 tax returns. Still, the timeline regarding the dismissal of Count 1 does not show that investigation was "inadequate" or that it ignored "key facts." Instead, Defense Counsel had a copy of handwritten notes—presumably provided by Defendant—that were not in the possession of the Government or the Government witness at issue—the tax preparer. Defense Counsel simply did not provide those documents to the Government until the eve of trial. Upon receipt, the Government did not ignore these key facts but promptly verified them with the witness and dismissed the Count. So, the timing of the dismissal should not be attributed to inadequacy on the part of the Government.

Louisiana and the IRS that these were her original returns and that she has amended these returns.

All three returns are false in that they underreport Defendant's gross receipts. The simple math of wedding fees multiplied by number of weddings demonstrated that Defendant brought in more than $16,000 each year, irrespective of deductions or expenses. As stated above, Defendant has effectively acknowledged as much by filing amended 2015 and 2016 returns and by representing to the Judiciary Commission of Louisiana that she would amend her 2014 return.

Moreover, the underreporting of gross receipts satisfied the element of materiality. As defined in the instructions by the Court, a falsity on a tax return is material if it has a natural tendency to influence, or is capable of influencing, the Internal Revenue Service in investigating or auditing a tax return or in verifying or monitoring the reporting of income by a taxpayer. That definition is clearly satisfied by the false reporting of gross receipts. *Cf. Holladay*, 566 F.2d at 1020. And although the underpayment of tax is not an element, an IRS revenue agent testified that if Defendant had reported her true gross receipts, her tax liability would have increased by $7,831; $6,072; and $11,004, respectively,[94] further proving that the false reporting of gross receipts was material.

      C. Defendant knew of her legal duty to accurately report her gross receipts on her tax returns (Counts 2–4; Part of Element 5)

The Government also proved beyond a reasonable doubt that Defendant—a judge—understood the legal requirement to accurately report her income on her tax returns. As stated above, the tax returns all contained the appropriate jurats—jurats she understood because of her legal training. Indeed, her employees testified that that she frequently received testimony under oath in her courtroom.[95]

---

[94] Government Exhibit 78.
[95] R. at 200–01, 236.

Moreover, Defendant's tax return preparer explained to Defendant that she needed to report her income on her tax returns, including income from wedding fees and attorney's fees.[96] Defendant understood this legal requirement, as evidenced by the simple fact that she indeed reported gross receipts—albeit false gross receipts—from wedding fees to her tax return preparer and to the IRS each year.    Defense Counsel's argument that Defendant "inherited and continued a flawed system for tracking weddings from a predecessor who was publicly known for performing weddings" misses the mark.    Mem. in Supp. of Mot. for J. of Acquittal at 15.    Defendant's contention that she simply didn't know any better is belied by the fact that her tax preparer explained to her directly, year after year, that she needed to report her income from wedding fees and attorney's fees.    Defendant was on notice that she would be required to report accurate numbers at tax time.    As stated above, Defendant indeed filed false tax returns underreporting gross receipts.    Ultimately, this case turns on whether Defendant *knew* she was reporting false gross receipts when she submitted her original tax returns.

    D. Defendant knew the gross receipts reported on her 2016 tax return were false (Count 4; Elements 3 and 5)

The Government proved beyond a reasonable doubt that Defendant knew the gross receipts reported on her 2016 tax return were false, and at the very least a rational juror could conclude that the Government met its burden as to this element.    As an initial matter, a juror could conclude Defendant knew the amount she reported as her gross receipts—$15,200—on her tax return. Indeed, she was the one who provided the amount to her tax preparer, and she signed under penalty of perjury that she had reviewed the return—which reported gross receipts of $15,200—and that it was true and correct to the best of her knowledge and ability.    *See United States v. Davis*, 603

---

[96] R. at 456; *see also* R. at 360, 414.

F.3d 303, 306 (5th Cir. 2010) ("A taxpayer's signature on a return with a jurat indicates that the taxpayer attests to the accuracy of the reported data.").

Next, a rational juror could conclude that Defendant knew this amount was false. Defendant chose to report gross receipts of $15,200 when the past three years she had reported $16,000. These figures effectively report that 2016 was Defendant's worst year as a wedding officiant, either officiating fewer weddings or making less per wedding than she had previously. In truth, 2016 was Defendant's best year as a wedding officiant up to that point. Conservatively, she earned at least $46,300—over three times what she had reported. *Cf. United States v. Gross*, 286 F.2d 59, 60–61 (2d Cir. 1961) ("The two $2,5000 payments were substantial enough in relation to Gross' total income to negate any possibility of omission through neglect or oversight[.]"). A rational juror could infer that Defendant knew the true amount because she was the one who officiated the weddings and she was the one who collected the fees, and at the very least she knew that the true value of gross receipts was *greater than* in prior years (i.e., $16,000), rather than *less than* in prior years, $15,200 as she reported. *See Black*, 644 F.2d at 447 ("All reasonable inferences which tend to support the Government's case must be accepted.").

Moreover, the reason for the increase in gross receipts was noteworthy: the Supreme Court legalized same-sex marriage in 2015, and 2016 was the first full year of officiating weddings following that decision. While a rational juror could infer that Defendant—an attorney with a small wedding business—would take note of the increase in weddings, there is no need to make that inference here. The evidence demonstrates that Defendant did in fact *know* that the decision increased the number of weddings she would perform, because she decided to charge more fees in order to account for the increased work.[97] So, the evidence demonstrates that Defendant knew

---

[97] R. at 209 ("When they initiated the same sex marriages, we went up. We just knew it would

that in 2016 she was both (a) officiating more weddings and (b) charging more per weddings.

Defense Counsel instead argues that a rational jury must attribute the false reporting to an innocent mistake resulting from carelessness—even gross negligence—rather than an intent to violate a known legal duty. The evidence simply defeats that argument. For three years, Defendant reported $16,000 gross receipts, but for 2016, she reported that her wedding fees went *down*. There is simply no good faith reason for Defendant to report a lower amount of gross receipts for that year. If she had simply "forgotten" or "taken an honest guess" she would have reported that the wedding fees were at least the same. If she had *wanted* to make an accurate accounting, she would have (a) told her employees to track her weddings or the money collected as they occurred, (b) tasked her employees to count the marriage licenses that she kept in her chambers, or (c) asked the Louisiana Department of Vital Records. She did not take any of these steps because she had no intention of reporting her true wedding gross receipts until she was effectively "caught" by the Judiciary Commission.

Defense Counsel's emphasis on Defendant's decision to distribute some portion of the increased fee among her staff members also misses the mark. *See* Mem. in Supp. of Mot. for J. of Acquittal at 8–9. First, the Government's case addressed gross receipts, as distinct from income. While Defendant's expenses impact her net income, the expenses do not impact whether Defendant accurately reported her gross receipts; the expenses do not make the false gross receipts any "less false." Second, even though as stated above the Government was not required to prove a tax loss, the revenue agent accepted as true the expenses that Defendant reported on the original returns she filed, even if she later retracted those reported expenses—including expenses reported

---

be so much busier we went up.").

for payments to staff.[98]

Overall, the details of what Defendant reported reveal her true intent. First, Defendant crossed out another number when providing $15,200[99] to her tax preparer—indicating that Defendant (a) took time, (b) thought about a number to write, (c) saw the number, and (d) decided to write down another number. Second, Defendant wrote down "($700 x 3 for employee),"[100] asking her tax preparer to ensure Defendant received credit for paying her employees for their assistance with performing weddings. This was a practice she initiated *only after* she raised her fees after the Supreme Court decision. [101]   This further indicates that Defendant indeed (a) remembered the decision, (b) remembered she was performing more ceremonies because of the decision, and (c) remembered she was charging more for those ceremonies because of the decision. Still, none of that is accounted for on Defendant's tax return; instead, she told her tax preparer that her gross receipts went *down* $800, in addition to telling her tax preparer to deduct contract labor expenses of $2,100. This is consistent with items throughout Defendant's tax return: Defendant could and did identify expenses with specificity when it reduced her tax

---

[98] *Compare* Government Exhibits 73 and 77 (revenue agent calculations showing adjustments only for the unreported gross receipts) *with* Government Exhibit 19 (correcting the original filing to add additional gross receipts and remove reported expenses). The revenue agent also accepted as true *unreported* expenses Defense Counsel *later* identified that would have reduced Defendant's tax liability if Defendant had reported them on her 2013 return. This relates to the dismissed count so it should be irrelevant to this Motion, but Defense Counsel continues to harp on it. Mem. in Supp. of Mot. for J. of Acquittal at 6. The revenue agent's willingness to accept as true those expenses does not show incompetence or a pre-determined outcome on the part of the IRS, but rather a willingness to accept on good faith Defense Counsel's figures for this collateral issue—regardless of how delinquently Defendant or her counsel requested that they be accounted for—in order to focus on the true criminal matter in question: whether Defendant falsely reported gross receipts.

[99] Government Exhibits 64 at 1.

[100] *Id.*

[101] R. at 226.

liability.[102]   A rational juror could conclude that Defendant's reporting of $15,200 gross receipts when the true value was in fact over $46,000 was not the result of oversight or carelessness, but instead was an intentional attempt to fraudulently reduce her tax liability.

So, the evidence admitted at trial would have enabled a rational juror to conclude beyond a reasonable doubt that Defendant knew the reported gross receipts figure on her tax return—$15,200—was false.   If the Court nevertheless is persuaded by Defense Counsel's construction of the evidence, the Court must defer to the jury's "authority to weigh any conflicting evidence." *Loe*, 262 F.3d at 432.   The jury considered the evidence and could not reach a unanimous verdict, indicating that between one and eleven jurors firmly believed that the evidence established guilt beyond a reasonable doubt.   At the very least, that construction of the evidence was reasonable, and the Court should not remove from the jury the duty to act as trier of fact.

E.   Defendant also knew the gross receipts reported on her 2014 and 2015 tax returns were false (Counts 2 and 3; Elements 3 and 5)

Likewise, the evidence proved that Defendant knew the gross receipts reported on her 2014 and 2015 tax returns were false for similar reasons.   As an initial matter, the jury may conclude that Defendant knew the contents of her returns—she was the one who provided the gross receipts figures to her tax return preparer, and she signed under penalty of perjury that she had reviewed the contents of her return and they were accurate.

Next, the jury may conclude that Defendant knew those figures were false; Defendant failed to report an additional $13,760 in marriage fees and $10,650 in legal fees on her 2014 tax return and an additional $17,200 in marriage fees and $5,000 in legal fees on her 2015 return.   The jury may infer Defendant knew those figures were false because she was the one who received

---

[102] *See, e.g.*, Government Exhibit 17 at 11 (Line A), 31 (Line 24b), 34 (Line 7).

those gross receipts:  she collected cash for officiating weddings, and she received and deposited into her bank account checks from Tamara Kluger Jacobson and Michael Hall in 2014 and from Clifton Davis in 2015 for cases she had referred to them.  The jury should particularly infer that Defendant knew that the gross receipts that she reported for officiating weddings—$16,000 in both 2014 and 2015—were false because she reported *the same* gross receipts in 2013.  At the very least, Defendant must have known that she was officiating more weddings each year, and so she knew that reporting a stagnant gross receipts figure was simply a lie.[103]  This is particularly overwhelming regarding the weddings officiated in 2015, when the true value of her gross receipts was at least more than double what she reported.  Also, 2015 was the year that (a) the Supreme Court legalized same-sex marriage, (b) Defendant officiated more weddings as a result of that decision, and (c) Defendant increased her fees in order to account for that decision.  Further, that decision would have been relatively fresh in her mind when she prepared her 2015 tax return, i.e., during the first half of 2016.  Further still, Defendant did report contract labor expenses of $2,100 on her 2015 return, indicating that she remembered paying her employees for their support of her wedding business—a practice she initiated in response to *Obergefell*.

Defense Counsel again argues that twelve rational jurors *must* reasonably doubt whether Defendant knew she underreported her gross receipts because of the evidence that she lacked attention to detail generally and was distracted by her mother's health specifically.  Again, this is simply a matter of conflicting constructions of the evidence that should be left to the jury, but the details of the evidence undercut Defense Counsel's argument that Defendant made a good faith guess at her gross receipts, simply "forgetting" that she had received additional legal fees and marriage fees.  The evidence instead showed Defendant was not overcome by the challenges of

---

[103] *See generally* Government Exhibit 2.

caring for her mother, but rather continued to competently execute her demanding legal job.   Her

thoroughness was not limited to her courtroom, and Defendant's charged tax returns demonstrate

that she indeed tracked and paid close attention to *deductible expenses* that operated to her benefit,

including expenses to her wedding business, expenses from her rental business, and charitable

donations.[104]   So, the evidence simply does not support Defense Counsel's argument that a jury

must doubt whether Defendant knew her reported figures were false; the evidence instead shows

that Defendant reported those items that she wanted to report.   She simply chose to underreport

or omit her gross receipts.

Moreover, according to Defendant's tax preparer—as elicited from Defense Counsel's

cross examination—Defendant attempted to prepare her 2013 tax return timely, meaning that

Defendant and her tax preparer met sometime in 2014.   During that time, Defendant's tax preparer

explained to Defendant the need to report her gross receipts from officiating weddings and from

attorney's fees.[105]   Despite that advice, during 2014, 2015, and 2016, Defendant apparently never

(a) documented the receipt of fees (wedding or legal) income when she received it, (b) reviewed

her bank records for checks for legal fees, (c) directed her tax preparer to review her bank records

for checks for legal fees, (d) reviewed the wedding licenses she officiated, (e) asked the Louisiana

Department of Vital Records how many weddings she officiated, or (f) directed her employees to

count the licenses she officiated.   This all indicates that Defendant simply had no intention of

reporting her true income to her return preparer, a conclusion corroborated by Defendant's

subsequent false 2016 return on which she took the crime one step further and falsely reported that

her gross receipts did not merely remain stagnant, but actually decreased in 2016.   *See United*

---

[104] *See, e.g.*, Government Exhibit 15 at 14 (Line A), 29 (Line 21), 32 (Line 7); Government
Exhibit 16 at 11 (Line B), at 26–27 (Line 27a and Part V, Other Expenses), at 32 (Line 14).
[105] R. at 456; *see also* R. at 360, 414.

*States v. Bishop*, 264 F.3d 535, 550 (5th Cir. 2001) ("A wide range of conduct can support a finding of willful attempt to evade taxation, for instance: [] a consistent pattern of underreporting large amounts of income[.]").

In the face of this evidence, it would certainly be possible for a rational juror to not harbor a reasonable doubt that Defendant merely "forgot" her legal income or that her wedding fees increased each year, and at the very least this Court should leave the resolution of this question of fact to the jury.

F.   A rational juror could reject Defense Counsel's arguments regarding stress and anxiety

In the face of this evidence, Defense Counsel continues to argue that evidence of the mental stress Defendant faced while caring for her mother would prevent any rational juror from finding that Defendant aced willfully.   This is simply overreaching and discounts a rational juror's ability to weigh the evidence presented.   As stated above, the evidence shows that while caring for her mother, Defendant nevertheless diligently operated her courtroom[106] and reported her deductible expenses on her tax returns.[107]   So, a juror may reject Defense Counsel's argument—which, of course, is not evidence—that mental stress and anxiety caused Defendant to forget her additional income because the mental stress did not likewise impact Defendant's ability to remember other aspects of her life—including aspects related to reporting information on tax returns.

Moreover, even accepting Defense Counsel's premise, medical records presented to the jury at trial established that Defendant reported facing increased anxiety during a specific timeframe encompassing only a portion of the timeline at issue in this case.

---

[106] *See generally* R. at 228, 237.

[107] *See, e.g.*, Government Exhibit 15 at 14 (Line A), 29 (Line 21), 32 (Line 7); Government Exhibit 16 at 11 (Line B), at 26–27 (Line 27a and Part V, Other Expenses), at 32 (Line 14); Government Exhibit 17 at 11 (Line A), 31 (Line 24b), 34 (Line 7).



Because Defendant filed false tax returns before, during,

and after dealing with the anxiety associated with the stress of caring for her mother, a rational

jury could certainly conclude that the stress of that care did not cause Defendant to file false tax

returns.  Instead, a rational juror could rationally conclude that an independent reason must have

caused Defendant to file false tax returns.  In this case, that independent reason is simply that

Defendant wanted to reduce her tax liability.

      G.  A rational juror could reject Defense Counsel's arguments that testimony as to good character requires a finding of not guilty

Defense Counsel argues that no reasonable jury could conclude that a person with a

reputation for integrity could nevertheless engage in misconduct.  Mem. in Supp. of Mot. for J. of

Acquittal at 10–12.  This is patently absurd.  As Defense Counsel notes, several Government

witnesses testified that they knew Defendant to be a person of good character.   Those individuals

worked with Defendant in various capacities, and several testified they considered her a friend.

These individuals were not privy to Defendant's private decision-making process surrounding how

she chose to report numbers regarding weddings officiated or how she thought about her mounting

IRS debt, all of which happened outside the context of their relationships.   It is the jury's role, not

the role of this Court, to judge credibility, and to weigh the testimony of Defendant's friends and

---

[108] R at 628–29; Defense Exhibit 30 at 2.
[109] Government Exhibit 79 at 10; R. at 697.

colleagues.  *See Black*, 644 F.2d at 447 ("Any conflicts in the evidence must be resolved in the Government's favor."); *Loe*, 262 F.3d at 432 (The jury "retains sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.").

## V.   Conclusion

The evidence demonstrates beyond a reasonable doubt that Defendant knew her 2014, 2015, and 2016 tax returns were false, but Defendant nevertheless affirmed under penalty of perjury that the returns were true, correct, and complete—and authorized their submission to the IRS.  Defense Counsel's argument that Defendant merely forgot to report additional income is overcome by the greater weight of the credible evidence.  Rather than attempt to resolve these two conflicting arguments, the Court should defer to the trier of fact—the jury—who thoroughly deliberated before ultimately failing to reach a unanimous verdict.  For the foregoing reasons, the Court should deny the motion for acquittal.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY

BRIAN E. FLANAGAN
Trial Attorney, Tax Division
New York Bar Number: 5191911
150 M. Street NE, Suite 1405
Washington, D.C., 20002
Telephone: 202-616-3362
Email: brian.e.flanagan@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2023, I e-mailed the foregoing pleading to the Clerk of Court's under seal e-filing e-mail address at LAEDdb_Sealed_Docs@laed.uscourts.gov and separately e-mailed a copy to Chambers at efile-brown@laed.uscourts.gov and the Defense at mmagner@joneswalker.com; and twicker@joneswalker.com.

BRIAN E. FLANAGAN
Trial Attorney, Tax Division